# EXHIBIT 4
# Part 2 of 6

approximately between March 2007 and June 2007. That same summer, Pincus independently started the successful venture Zynga.com ("Zynga"). The affirmation by Pincus of the Plaintiff and the Nextdoor/Fatdoor concept right before Zynga was founded was a testament to the power and potential of the Nextdoor/Fatdoor idea and Plaintiff's ability, but for the interference, misappropriation, and theft by Defendants, as explained herein.

53. Wired Magazine also covered the Nextdoor/Fatdoor concept on or about May 31, 2007 in an article entitled "Fatdoor CEO Talks About Balancing Security With Community." The article described the general concepts of Nextdoor/Fatdoor developed by Plaintiff to account for neighborhood security:

> "It wasn't until Abhyanker let me take his neighborhood for a test drive that I started to understand how this actually plays out. Fatdoor is hardly the stalking tool we all feared. In fact, its simple interface made Abhyanker's own community fit together more like a wiki version of a town hall. Users in the neighborhood can broadcast general messages to the entire block, submit an entry about a local business, or even submit entries for friends and other neighbors. Abhyanker's neighborhood is even set up to elect moderators to help police this conduct too. Paired with the amount of control the user has over how much or how little information the neighborhood can access about themselves, it actually seemed....pretty safe." (See Exhibit G).

54. In addition, the Wired Magazine article of May 31, 2007 went on to describe the end product of the secret confidential security algorithms developed by Plaintiff to account for neighborhood security:

> "As far as peeking into other neighborhoods? Abhyanker has that covered too. "We've been playing around with the distance, and after some testing we've found that keeping it at a 5 mile radius [from the user's residence] is the most reasonable," he said. "It keeps the focus on the neighborhood and also keeps the feeling of community. Of course, this is something that we're going to have to change depending on the size and layout of a city, but during testing it seemed like the ideal distance." (See Exhibit G).

Upon information and belief, the secret technical details, software algorithms, knowhow, and then unpublished patent applications that permitted the Nextdoor/Fatdoor concept to be built were stolen by Defendants and opportunistically misappropriated as *'key'* (emphasis added) technology

- 15 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1   for Nextdoor.com, Inc. as described in a San Jose Mercury News article. On or about of October

2   26, 2011, this same San Jose Mercury News article entitled "Epinions co-founder Nirav Tolia

3   back in the saddle with Facebook-like startup" inaccurately credited Defendant Taylor with the

4   invention of the Fatdoor/Nextdoor concept, describing Nextdoor.com, Inc. as, "software

5   developed by an early Google (GOOG) Maps employee" that is used as the "key" technology of

6   Nextdoor "that makes sure only people who live in a specific neighborhood are able to join its

7   network -- giving users a level of privacy that sites like Facebook don't." (See Exhibit H).

8       55.    On or about October 27, 2011, one day after the public launch of Nextdoor.com,

9   Inc., Plaintiff sent an email to Defendant Tolia with the subject line: "Meet? Nextdoor, hello

10  from founder of Fatdoor," after seeing an article about Nextdoor.com, Inc.'s public launch on the

11  website Techcrunch.com ("Techcrunch"). Plaintiff was initially very happy to see that another

12  entrepreneur took it upon himself to independently create a very similar idea to the original

13  Nextdoor/Fatdoor concept of Fatdoor, Inc. and wrote the email immediately on the morning of

14  October 27, 2011.    The entire content of this communication is below and is a present sense

15  impression of the Plaintiff upon reading the initial news of the Nextdoor.com concept:

16

17      "Nirav, I just read about you on Techcrunxh.  Congrats on your
        new venture, Nextdoor.  I am Raj Abhyanker, the founder of the

18      2005 company dealmap (formerly called Fatdoor, now sold to
        Google) which recently sold to google.  I raised over $7.5m in

19      venture funding personally as the CEO of Fatdoor around the get
        to know neighbors concept.  I think I can add significant value to

20      your venture, as Fatdoor was originally a site to get to know your
        neighbors.  I understand the way to make this space very well.  I

21      am wondering if you would be open to me being in your founding
        team, in exchange for me filling a part time general counsel,

22      business development vp, and/or board role, and perhaps a small
        angel investment in cash, resources, and space.  I see you are

23      funded by benchmark.  I had pitched to benchmark the Fatdoor
        concept, but had decoded to take funding from norwest.  Some at

24      Benchmark will remember me, particularly Kevin Harvey and
        Peter Fenton.  I also pitched to bret taylor who was an EIR at

25      benchmark at tue time, and is now the cto of Facebook.  Perhaps
        you can ask them.  After our Norwest funding, I left the company

26      because I wanted to keep the site in a neighborhood direction.  I
        am also listed on more than 50 granted and pending patents in the

27      *neighborhood space*, now owned by google.  If interested, perhaps
        we cannery at my office in mountain view?  Let me know if this is

28      of interest.  I've copied my assistant Desiree.  Raj" [sic]

- 16 -

Raj Abhyanker, P.C.
Mountain View, CA.
rajpatent.com

1   There was no response from Defendant Tolia by that evening, and surprised by the lack of

2   communication from Defendant Tolia, Plaintiff decided to do some research on the background

3   of Defendant Tolia. Upon review of Defendant Tolia's Crunchbase.com profile that evening, and

4   upon reading of the March 2007 and August 2007 Gawker.com articles, it became immediately

5   clear to Plaintiff why Defendant Tolia had chosen not to respond to Plaintiff's gesture of

6   congratulations and support because it was clear that Defendant Tolia worked at Defendant

7   Benchmark and was a former EIR during the time of the disclosure of the Nextdoor/Fatdoor

8   concept to Defendants Benchmark, Harvey, Fenton, Lasky, Gurley, Taylor, Cassidy and Norris.

9       56. Upon information and belief, Defendant Harvey requested a meeting to discuss,

10  explore and finalize the financing of Nextdoor/Fatdoor on or about June 15, 2007 after a referral

11  from Drazan. To celebrate the enormous shareholder value that Plaintiff and his Co-Founder

12  Thota had brought to Fatdoor, Inc., Board member Drazan sent Plaintiff an email on or about

13  June 19, 2007 with the subject line: "A premature, but well deserved congratulations and thank

14  you!!!" The email included the following text:

15

16          "Raj, Chandu.....It sometimes gets lost amid all the frenetic
activity, the significance of this interim accomplishment. After

17          just 3 (?) short months of working together it is more than
impressive how much value you have created on such modest

18          spending. Pause for a moment to reflect on what you have
produced...38 patent applications, an impressively functional

19          website, thousands of initial subscribers, tens if not hundreds of
thousands of page views, strategic interest from the most

20          sophisticated media properties and institutions in the world, world
class employees, candid and supportive feedback from your user

21          community, the list goes on....Thank you for all your endless hours
and unbridled enthusiasm. Jeff" [sic]

22

23       57. A meeting time was set for on or about June 21, 2007. To ensure confidentiality,

24  Fatdoor, Inc. Board member Drazan requested an early morning meeting on or about June 21,

25  2007 and requested that Defendant Benchmark clear conflicts, especially "conflicts else that is

26  [or] resembles what they [Fatdoor] are doing" [sic] before any disclosures were made.

27       58. Defendant Harvey, responded on or about June 21, 2007 to Drazan stating:

28          "We don't have and are not looking at anything that is a direct

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

- 17 -

competitor. Some of our companies Billow [sic] and Yelp are
tangential. We will need to make sure that they are comfortable but
my guess is that they are better partners than competitors."

59. A follow up email sent by Drazan to Plaintiff, Thota, and Harris, Jr. on or about June 21, 2007 stated:

"These relationshoips should give people at Norwest confidence
that a relationship woth [sic] Benchmark could be very helpful".

60. That same day, Thota, the hired CTO of Fatdoor, Inc. commented:

"Yes, Zillow could be a great partner and so is Yelp – In reality,
when we expose our APIs, these two are the applications that third
party developers can build on top of Fatdoor platform."

61. In detrimental reliance of statements by Defendant Harvey, Plaintiff disclosed the Fatdoor/Nextdoor concept to Defendant Harvey that same day (on or about June 21, 2007). Upon information and belief, it appears to be a pattern and practice for Defendant Benchmark to agree to non-disclosures via verbal and email "handshakes." Particularly, the book "eBoys: The First Inside Account of Venture Capitalists at Work" by Randall E. Stross, who worked inside Defendant Benchmark for two years between 1997 and 1999, describes the situation as:

"Ultimately, our agreement was sealed with a handshake-no
written NDA (nondisclosure agreement), no attorneys....I suspect
that the Benchmark partners thought that something ballsy like
this, which was sure to make the graybeards of the guild squirm,
must, ipso facto, be a good thing."

This paragraph above clearly describes the business practice of Defendant Benchmark in choosing non-traditional forms of non-disclosure agreements ("NDA") in preference to those which are signed by both parties. Similarly, a New York Times article on July 11, 1999, quotes Defendant Gurley as to the policy of Defendant Benchmark when dealing with startups: ""We don't do term sheets here," Gurley responded, offering his palm. "We do handshakes."" (See Exhibit J).

62. On or about June 2007, Defendant Harvey sent an email to Plaintiff, requesting that he and Thota meet with Defendant Hoffman that same evening in Mountain View,

- 18 -

1    California. Defendant Harvey informed Plaintiff that Defendant Hoffman did "diligence" for
2    companies that Defendant Benchmark was going to invest in. Defendant Benchmark had a
3    business practice of doing the "Benchmark bear hug" (eBoys, Introduction, page xxii) to show
4    "the power of its team sales effort" (Id.) to companies that Defendant Benchmark intended to
5    invest in by quickly connecting entrepreneurs of companies they wanted to invest in to the top
6    influencers in Silicon Valley.

7          63.  In addition, Defendant Harvey requested a meeting with Plaintiff at Defendant
8    Benchmark's headquarters on Sand Hill Road in Menlo Park, California on or about June 21,
9    2007.  On or about June 21, 2007, Defendant Harvey also requested that Plaintiff send
10   confidential presentations relating to Nextdoor/Fatdoor to his partner, Defendant Lasky, who was
11   to participate in the meeting via teleconference. Defendant Cassidy also personally participated in
12   this meeting along with Defendant Harvey.  On or about June 21, 2007, Plaintiff sent the
13   requested confidential executive summary of the Nextdoor/Fatdoor concept to Defendants Lasky
14   and Harvey. The title of this file was "Executive_Summary-Fatdoor-06-11-07.pdf" ("Executive
15   Summary"). (See Exhibit C).

16         64.  Each page of this Executive Summary included the words "Confidential Material"
17   (see Exhibit C).  Page seven of the Executive Summary showed a maturing networks timeline
18   which made clear that the next phase from Facebook was to be toward the Nextdoor/Fatdoor
19   concept, centered around "[n]eighborhoods." Defendants opportunistically misappropriated
20   knowledge found in this confidential Executive Summary to create the business plan for
21   Nextdoor.com, Inc. Later statements by Defendant Gurley and Defendant Tolia echo descriptions
22   provided in the confidential Executive Summary provided by Plaintiff to the Defendants.

23         65.  The first business created by the founders of Round Two, Inc. was a website called
24   Fanbase.com. However, Fanbase.com, while getting some traction, failed to get the rapid traction
25   that was expected of the business by Defendant Tolia and Defendant Benchmark.

26         66.  An email was sent by Defendant Gurley to Defendant Benchmark's portfolio
27   companies including to Defendant Tolia on or about October 9, 2008 which stated:

28

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

- 19 -

"Like every major shift in the environment, this one will offer opportunities as well as risks.... The real key is to have a keen understanding of the game on the field and to be the one that adjusts swiftly, rather than the one that moves after it's become blatantly obvious to everyone else it's time to move." [sic]
(See Techcrunch: http://techcrunch.com/2008/10/09/benchmark-capital-advises-startups-to-conserve-capital/).  (See Exhibit K).

67.  This quote shows that Defendant Gurley sought to advise companies such as Round Two, Inc. that they should adjust swiftly by adopting new business models if ones in development (e.g., Fanbase.com) did not work.

68.  Defendant Gurley goes on to tell Defendant Tolia and other Benchmark portfolio companies that:

"Many companies that thrived post 2001-2003 were simply "Last Man Standing" in their ndustry....Be calm, but pragmatic...It's simply to convey that the rules of the game have changed.....Better to be "late to the party" than to be early and run out of money" (See Techcrunch: http://techcrunch.com/2008/10/09/benchmark-capital-advises-startups-to-conserve-capital/) [sic].  (See Exhibit K).

69.  This quote shows that Defendant Gurley sought to advise companies to be calm and pragmatic and that it was better to be "late to the party" with a new team such as Round Two, Inc. than to be early with the original Fatdoor/Nextdoor concept created by the Plaintiff.

70.  Defendant Gurley then continues onward to say:

For many, this downturn period could be **opportunistic**: a real chance to differentiate yourselves from the other players in the market.  However, it is imperative to understand that the environment has just shifted to one where differentiation will likely be defined not by aggressiveness, but rather by adaptability." [sic] [emphasis added].  (See Exhibit K).

71.  Through a plain reading of Defendant Gurley's own statements above, Defendant Gurley directly advised Defendant Tolia to adapt actions, decisions, etc. to expediently or effectively act in manners that sacrificed ethical principles. Particularly, this quote shows that

- 20 -

00013.00014,1

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

Defendant Gurley advised or advises Defendant Tolia and other Benchmark portfolio companies to be "opportunistic," which Dictionary.com defines as "adhering to a policy of opportunism; practicing opportunism" in its first definition (see www.websters.com).   Dictionary.com defines "opportunism" in its first definition to mean "the policy or practice, as in politics, business, or one's personal affairs, of adapting actions, decisions, etc., to expediency or effectiveness regardless of the sacrifice of ethical principles" (Id.).

72.  Upon reason and belief, Defendant Tolia, the CEO of Round Two, Inc., and a Stanford B.A. in English graduate, understood the meaning of the word "opportunistic" when pivoting his company from a website for collecting information about sports feats (Fanbase, Inc.), into an entirely new concept of a website about neighborhood social networking around the Nextdoor/Fatdoor concept opportunistically misappropriated and stolen from Plaintiff using Defendant Gurley's ordained policy and practice of adapting actions and decisions of expediency and effectiveness regardless of the sacrifice of ethical principles. (See Exhibit K). Defendant Tolia has a history of following Defendant Gurley's instructions explicitly, having had to settle a lawsuit filed in San Francisco Superior Court against Silicon Valley venture capital firms Benchmark Capital and August Capital, alleging the firms conspired with fellow founder Defendant Tolia to deprive them and other employees of nearly $40 million. (See http://www.siliconbeat.com/entries/2005/12/09/epinions_settlement_a_black_eye_to_vcs.html)

73.  In a separate interview, Defendant Gurley identifies the "local" space (e.g., what the Nextdoor/Fatdoor concept inherently is) as possibly being the most overlooked space on the Internet (see Bloomberg television interview on March 22, 2011 with Defendant Gurley, http://www.bloomberg.com/video/67905008/, around minute 5:40, "Host: What do you think is the most overlooked sector out there?  Gurley: It might be local.").

74.  By September 2010 (based on Defendant Tolia's LinkedIn page), a full pivot had been made from Fanbase.com to the Nextdoor.com concept, based on the original Nextdoor/Fatdoor concept of the Plaintiff and under the advice given by Defendant Gurley to Defendant Tolia and to all Benchmark companies to be "opportunistic".  (See Exhibit K).

75.  Even as recently as October 26, 2011, Defendant Gurley was quoted in an article

- 21 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1    in Techcrunch stating that "Nextdoor" was the "natural evolution of social networking that

2    [would] demonstrate the value of building community to neighborhoods everywhere." In a San

3    Jose Mercury News article that same day, Defendant Gurley was quoted referring to

4    Nextdoor.com, Inc. as "It's Facebook for your neighborhood." (See Exhibit H). Defendant

5    Gurley's statements echo descriptions provided in the confidential Executive Summary provided

6    by Plaintiff to the Defendants.

7        76. In addition to receiving the confidential Executive Summary, Defendants Harvey

8    and Lasky met with Plaintiff and learned about Nextdoor/Fatdoor concept in detail on or about

9    June 21, 2007. Plaintiff spent several hours at Defendant Benchmark's offices disclosing the

10   entire concept in detrimental reliance on Defendant Benchmark's written assurances of

11   confidentiality and no conflicts.

12       77. In follow up email by Plaintiff to Drazan, Thota, and Harris, Jr. on or about June

13   21, 2007, Plaintiff stated:

15           "jeff and bill, great meetings today with benchmark and reid.
             kagle loved product. reid hoffman loved product. reid wants to
16           personally invest too. talked only about biz, referred all financing
             questions to jeff. reid says he knows bill already. reid says he is
16           giving thumbs up to benchmark tonight. reid wants to get
17           introduced to jeff. jeff, should I provide email introduction for
             both of you to each other? Raj" [sic]

19       78. Defendant Hoffman is referenced in this present sense impression by the Plaintiff

20   as someone who expressed interest in both investing and in placing a positive vote in his

21   diligence capacity to Defendant Benchmark. Defendant Hoffman was later seen with Defendants

22   Taylor, Tolia, and Cassidy at a private party, just days before the Nextdoor.com public launch on

23   or about October 20, 2011.

24       79. Mr. Robert (Bob) Kagle is partner at Defendant Benchmark who is referenced in

25   this email above reflecting a present sense impression of thoughts of the Plaintiff of the positive

26   impressions of this Benchmark partner after hearing about the Nextdoor/Fatdoor idea from

27   Plaintiff. There were no further direct email communications between Plaintiff and Mr. Kagle,

28   and therefore Mr. Kagle not been included in this First Amended Complaint as a Defendant.

- 22 -

Nonetheless, he is associated with this action through his partnership at Defendant Benchmark.

80. On or about June 22, 2007, Sergio Monsalve ("Monsalve"), a venture capitalist at Norwest who was to co-invest with Defendant Benchmark replied to an email titled "Conception Documents: Fatdoor (formerly NextDoor)" confirming receipt of the conception documents titled Nextdoor with a message stating: "Great...thanks. Please make sure this also goes to our lawyers at cooley, which I am sure it has. Thx, S"

81. Upon information and belief, Plaintiff and Thota then met with Defendant Hoffman on or about June 21, 2007 at the LinkedIn headquarters in Mountain View, California based on a reference from Defendant Benchmark as a person who did diligence for Defendant Benchmark. Defendant Hoffman expressed genuine interest in the Nextdoor/Fatdoor concept and said that he would not only give a positive recommendation to Defendant Benchmark, but personally invest in the venture. Defendant Hoffman then sent an email to Plaintiff and Drazan on or about June 22, 2007 stating that it was his pleasure to meet with Plaintiff to learn about Nextdoor/Fatdoor. Defendant Hoffman expressed that there was "some very good stuff in [Plaintiff's] planning/doing" to Plaintiff in the same communication.

82. In addition, Defendant Hoffman wrote that he would like to talk with Drazan to discuss investment details. Drazan spoke to Defendant Hoffman via telephone on or about June 22, 2007. On or about June 26, 2007, Hoffman told Plaintiff and Drazan that he would like to invest hundred thousand dollars ($100,000.00) of his personal money in addition to the investment by Defendant Benchmark. In an email on or about June 26, 2007, Drazan wrote to the Plaintiff stating: "Re: how did the call with Reid go?   Went well...he wants to invest $100k...subject to seeing the term sheet, which I told him we would provide post closing (we don't need him to close)."

83. Plaintiff and Thota also met with Motwani in Palo Alto, California, on or about June 26, 2007. Motwani agreed that Defendant Benchmark was a good choice for investment with Norwest and agreed to solidify the agreement with a personal reference call to Defendant Benchmark's advisor, Defendant Hoffman. Motwani also agreed to invest one hundred thousand dollars ($100,000.00) in the new round based on his confidence in Plaintiff.

- 23 -

84.   Plaintiff prepared full diligence files of the Nextdoor/Fatdoor concept and gave them to Defendant Fenton at Defendant Benchmark's office on or about June 22, 2007.  The diligence package included all then unpublished forty six (46) United States patent applications, six (6) foreign PCT patent applications, the Executive Summary, and screenshots created by a Rana on or about the year 2006 clearly showing the name "Nextdoor." On or about June 22, 2007, Plaintiff sent an email to Fatdoor, Inc. employee Paul Zahorsky, to counsel Daniel Hansen, to Daniel Hansen's paralegal, and to California licensed attorney Sheila Maguire attaching conception documents showing the mockups and the Word document for Nextdoor.com as previously described.  The conception documents showing the name "Nextdoor" were also shared electronically with Fatdoor, Inc. employees Emily McIntire and Michael Johnstone.  In addition, Harris, Jr. and Thota received electronic and physical copies of the conception documents showing the name Nextdoor.com from Sheila Maguire shortly after she requested them on their behalf on or about June 22, 2007.

85.   The diligence documents included the statement stating: "Note: we don't have the domain nextdoor.com yet, ive placed a bid on it. We do have modernvilliage.com, but im trying to find a better name. let me know if you find something that is better and available for sale. Should know about nextdoor.com by the end of this week." (Exhibit B). [sic]

86.   Defendants Harvey and Fenton described the Nextdoor/Fatdoor concept to fellow partners and EIRs at a Defendant Benchmark "offsite" approximately between June 23, 2007 and June 25, 2007. The offsite was described in an email from Defendant Harvey to the Plaintiff on June 23, 2007 in which Defendant Harvey writes:

> "Raj, we are going to be offsite from today through Tuesday. We should be able to discuss this and reach a quick decision. I think the biggest question is "What is the killer use case that will drive viral adoption?" Any thoughts on this would be helpful. Overall, people were quite positive. Thanks, Kevin"

87.   The Plaintiff responded to Defendant Harvey that same day and commented :

> "getting to know your neighbors and making friends in the

- 24 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

neighborhood around your house by finding people with similar interests (preseeded data, and in the future user contributed). Raj"

88. Then, on or about June 27, 2007, right after the offsite, Defendant Harvey called Plaintiff and told Plaintiff that Defendant Benchmark will make a positive investment decision as a lead investor or as a co-investor in the Nextdoor/Fatdoor based on their discussions at the offsite and based on Defendant Hoffman's positive recommendation. As a follow up to that call, Defendant Harvey sent an email to Plaintiff on June 27, 2007 stating: "Do you guys have time to meet our Google EIRs?" Defendant Harvey referred Plaintiff to Defendants Taylor and Norris, who were EIRs at Defendant Benchmark. Defendants Taylor and Norris were the co-creators of Google Maps and the Google Maps API, and had left their positions at Google, Inc. to join Defendant Benchmark on or about June 2007. Defendant Taylor is currently the Chief Technology Officer of Facebook, Inc. as of the filing of this First Amended Complaint.

89. Defendant Harvey assured Plaintiff that Defendants Taylor and Norris would like to help the Nextdoor/Fatdoor venture succeed, and would hold information that they obtained in strict confidence and would not start any competing ventures. In reliance of Defendant Harvey's promises, Plaintiff informed the Board of Directors of Fatdoor, Inc., and agreed to meet with Defendants Taylor and Norris on or about June 27, 2007 at Defendant Benchmark's headquarters on Sand Hill Road in Menlo Park, California.

90. Upon information and belief, during the meeting with Defendants Taylor and Norris, Plaintiff and Thota again asked whether Defendant Benchmark had any conflicts of interest before disclosing technical details of the Nextdoor/Fatdoor concept. Defendants Taylor and Norris replied that they were working with something in the consumer space which was totally different, and that Defendant Benchmark intended to invest in Fatdoor, Inc. to build the neighborhood concept. Plaintiff and Thota, spent most of that afternoon with Defendants Taylor and Norris based on those assurances to not compete and maintain confidentiality.

91. On or about June 27, 2007, Drazan sent an email to Plaintiff stating: "[s]poke with kevin today..They will not provide an alternative term sheet...but would like to have 10%". It is not a practice for Defendant Benchmark to give formal term sheets. A New York Times article

- 25 -

1001110014.1

1    on July 11, 1999, stated: ""We don't do term sheets here," Gurley responded, offering his palm.

2    "We do handshakes."" (See Exhibit J).

3         92. To Plaintiff's surprise, on or about June 29, 2007, Defendant Harvey wrote an

4    email to Fatdoor, Inc. director Drazan stating that Defendant Benchmark would pass on the

5    current round even though they were "really intrigued with the space." Defendant Harvey stated:

6

7              "This has been an extraordinarily close call but it looks like we
               will pass for this round. We are all really intrigued with the space
               but can't get comfortable enough with the "killer app." My guess is
8              that it will be obvious soon (and we will feel sheepish) but we need
               to have more conviction before investing. I would like to help
9              these guys as much as possible. Given that we are now up to speed,
               we could be a good quick stop for the next round here." [sic]

10

11   The pullout in funding by Defendant Benchmark came as a complete surprise to Plaintiff and

12   Fatdoor, Inc.'s Board of Directors, as Defendant Benchmark had indicated throughout that they

13   wanted to invest. On or about June 29, 2007, Defendant Harvey wrote to Plaintiff stating: "I bet

14   that you guys will find this [killer app] quickly as we are quite impressed with your thinking on

15   this space." In addition to Defendant Benchmark pulling out, Defendant Hoffman also withdrew

16   his verbal commitment to invest $100,000 in Fatdoor, Inc.

17        93. It appears to be a pattern and practice for Defendant Benchmark to agree to terms

18   and conditions of binding contracts through non-traditional means of contract. In addition to the

19   various examples of "handshakes" cited throughout this Complaint, Defendant Harvey "preferred

20   [method] to seal a deal with an entrepreneur: to secure the agreement before bringing out the term

21   sheet with all of the details" (eBoys, page 243).

22        94. In lieu of an investment by Defendant Benchmark, Fatdoor, Inc. took a smaller

23   investment of five and a half million dollars ($5,500,000.00) from Norwest without participation

24   from Defendant Benchmark. The transaction closed on or about July 17, 2007. Approximately

25   within two weeks of the closing of the second round of funding, Defendant Benchmark began an

26   ill-conceived scheme to unfold and destroy Plaintiff and Fatdoor, Inc.'s focus around

27   neighborhood social networking, so that it could opportunistically start its own company through

28   the confidential information that it had learned with an entirely new set of Founders that it

- 26 -

favored. As a starting point, Defendant Benchmark sought to opportunistically interfere with the operations of Fatdoor, Inc. and influenced Norwest and Fatdoor, Inc. to replace Plaintiff, a person whom they knew to be the lead inventor and thought leader in the neighborhood social networking space, as the CEO. (See Exhibit K).

95.  Defendant Taylor wrote Plaintiff via email on July 19, 2007 stating:

"We are happy to be advisors. The time commitment sounds reasonable to us, and we are interested in helping out as you navigate all the difficult product and privacy issues. The product has a lot of potential, and if you all can find the right product and privacy balance, it has the potential to become the first really successful "geo wiki… Let us know how to proceed from here. Bret" [sic]

96. Norwest partner and new Fatdoor, Inc. director Monsalve expressed concerns about the intentions of Defendants Taylor and Norris in an email sent on July 20, 2007 to the Plaintiff wherein Monsalve wrote:

"Raj: Are you worried about them competing? Why would they want to be advisors if they already have a startup they are working on? Would they want to join full time?...that would be interesting. Seems like you have something they want for their startup, but may be I am missing something. Google people are well known for picking off other's ideas so be careful. Let's talk. Sergio"

97.  That same day, on or about July 20, 2007, Plaintiff wrote an email to Fatdoor, Inc.'s Board of Directors including Monsalve stating:

"Hi Sergio, The right question, and one that I have carefully thought through. As part of our Advisory Agreement with them, we can draft in clauses for them to disclose to us the startup they are building and to warrant that it is not competitive to Fatdoor. They have told me that the startup they are building is not competitive to fatdoor. We can formalize this through this agreement."

98.  On or about July 23, 2007, Defendant Taylor sent an email to Plaintiff responding to a written Strategic Advisory offer letter prepared for Defendants Taylor and Norris stating:

- 27 -

1  "We will take a look at these and get back to you tomorrow with
   the signed copies."

2

3  99. The agreement was not returned signed the very next day. Instead, two days later,

4  on or about July 25, 2007, Defendants Taylor and Norris wrote back to Plaintiff stating:

5

6  "Raj, I wanted our lawyer to review this, and I wasn't
   aware he is on vacation this week – is it possible we get this to you
7  on Monday, or are we running up against a deadline?  Bret" [sic]

8  100. On or about August 2, 2007, Defendant Taylor wrote back to Plaintiff stating:

9

10  "Raj, The only concern we have with the agreement is "Advisor
    agrees not to compete with the business of the Company and its
11  successors and assigns during the term of this Agreement,
    notwithstanding the cause or reason for termination of this
12  Agreement." [sic]

13  Defendant Taylor, who is at the time of writing was still an EIR at Defendant Benchmark, further

14  reaffirmed that he did not have any conflicts with the information he had learned from Plaintiff.

15  In the same email sent on or about August 2, 2007, he stated:

16

17  "Clearly we don't want to get into a directly competing business,
    or we wouldn't be doing this in the first place. However,
18  competition is really in the eye of the beholder sometimes, and we
    are definitely entering the consumer internet space (though
19  definitely not the geo space). How would you feel about removing
    this line to make us more comfortable?  Bret"

20

21  101. Fatdoor, Inc. rejected this last minute update by Defendant Taylor, and Plaintiff

22  was terminated from Fatdoor, Inc. approximately two weeks later. Defendants Taylor and Norris

23  independently created the consumer internet venture FriendFeed.com after leaving Defendant

24  Benchmark as EIRs. FriendFeed was later purchased by Facebook, Inc. on or about August 2009.

25  However Defendant Taylor's representation to Plaintiff on or about August 2, 2007 that he did

26  not have an intention to enter the geo space was not truthful, as Defendants Taylor and Norris did

27  shortly enter the "geo space" with their involvement in the formation and later pivoting of Round

28  Two, Inc., from a website about college and professional sports called Fanbase.com, to an entirely

- 28 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1   unrelated website about neighborhood social networking called Nextdoor.com.

2       102. The Fatdoor, Inc. Board of Directors retained Jon R. Love ("Love") to find a

3   replacement CEO for Fatdoor, Inc. based on a reference from Defendant Benchmark. Defendant

4   Benchmark had gained notoriety for finding CEOs to replace founders in the past. It had found

5   eBay, Inc.'s former CEO Meg Whitman to lead the company in its early years, and had also

6   found a replacement for an Eric Greenberg, who was the CEO of Defendant Benchmark's

7   portfolio company Scient. In a chapter titled "Don't Get Screwed" in the book eBoys, Mr.

8   Greenberg is quoted as saying:

> "Think about this: It's your idea, you write the business plan, you
> don't sleep for months, you talk all these people into joining you.
> There was nobody with me when I got funded, I arranged all the
> funding myself, sold the initial deals, got the initial employees-it
> was my idea, my tenacity – and all of a sudden, you get fired and
> they take your fucking stock away....It was like losing your
> kid." (eBoys, page 64).

        103. The Plaintiff feels somewhat similarly to Mr. Greenberg in the quote above from

the eBoys book. Defendant Benchmark's subsequent efforts to reform Mr. Greenberg are

solidified in the laughter that they collectively shared with Benchmark partner Dunlevie

commenting that "we always do the second one," and the comment of another Benchmark partner

Rachleff commenting: "That's our value add" (eBoys, page 71) when referencing why Defendant

Benchmark chose to invest on a follow up idea Scient (analogous to Round Two, Inc. with an

entirely new team) rather than Mr. Greenberg's initial one (analogous to Fatdoor, Inc. started by

Plaintiff). When contacted, eBoy's author, Mr. Stross, refused to comment on his book and

refused to participate in this litigation. Plaintiff intends to depose and/or subpoena Mr. Stross

during this litigation with respect to his observations described in eBoys.

        104. Defendant Benchmark has a pattern and practice of replacing founders at

companies that they wish to invest in, and has an excellent track record of doing so. As such, the

Board of Directors of Fatdoor, Inc. took the recommendation of Jon R. Love seriously.

Particularly, one Benchmark partner named David Berne was recruited as a partner specifically

- 29 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com