1   **BRUNO W. TARABICHI**, CA State Bar No. 215129
    bruno@legalforcelaw.com
2   **KUSCHA HATAMI**, CA State Bar No. 282954
    kuscha@legalforcelaw.com
3   **LEGALFORCE RAJ ABHYANKER, P.C.**
    1580 W. El Camino Real, Suite 13
4   Mountain View, California 94040
    Telephone: 650.965.8731
5   Facsimile:   650.989.2131

6
    Attorneys for Defendant
7   Raj Abhyanker

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11  NEXTDOOR.COM, INC., a Delaware
    corporation,                              Case No. 3:12-cv-05667-EMC
12
                        Plaintiff,            **DEFENDANT RAJ ABHYANKER'S FIRST**
13                                            **AMENDED ANSWER AND**
                vs.                           **COUNTERCLAIM FOR TRADE SECRET**
14                                            **MISAPPROPRIATION**
    RAJ ABHYANKER, an individual,
15                                            **DEMAND FOR JURY TRIAL**
                        Defendant.
16                                            Case Filed:   November 5, 2012
                                              Judge:        Honorable Edward M. Chen
17  RAJ ABHYANKER, an individual

18                      Counterclaimant,

19              vs.

20  NEXTDOOR.COM, INC., a Delaware
    corporation; PRAKASH
21  JANAKIRAMAN, an individual;
    BENCHMARK CAPITAL  PARTNERS,
22  L.P., a Delaware limited partnership;
    BENCHMARK CAPITAL
23  MANAGEMENT CO. LLC, a Delaware
    limited liability company; SANDEEP
24  SOOD, an individual; MONSOON
    ENTERPRISES, INC., a California
25  corporation, and DOES 1–50, inclusive;

26                      Counterdefendants.

27

28

Defendant Raj Abhyanker ("Abhyanker"), through his attorneys, hereby answers Plaintiff Nextdoor.com, Inc.'s ("Nextdoor.com") Complaint as follows:

### The Nature of the Action

1.      In response to paragraph 1, Abhyanker denies each and every allegation in paragraph 1.

2.      In response to paragraph 2, Abhyanker denies each and every allegation in paragraph 2.

3.      In response to paragraph 3, Abhyanker denies each and every allegation in paragraph 3.

4.      In  response to paragraph 4, Abhyanker denies each and every allegation in paragraph 4.

5.      In response to paragraph 5, Abhyanker denies each and every allegation in paragraph 5.

### Parties

6.      In response to paragraph 6, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 6 and, therefore, denies each and every allegation in paragraph 6.

7.      In response to paragraph 7, Abhyanker admits the allegations in paragraph 7.

### Jurisdiction and Venue

8.      In response to paragraph 8, Abhyanker denies that any conduct or omission giving rise to any claims against him has occurred.  Abhyanker further responds that Nextdoor.com's allegations in paragraph 8 are legal conclusions and jurisdictional allegations that do not require a response.

9.      In response to paragraph 9, Abhyanker denies that any conduct or omission giving rise to any claims against him has occurred.  Abhyanker further responds that Nextdoor.com's allegations in paragraph 9 are legal conclusions and jurisdictional allegations that do not require a response.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

10.     In response to paragraph 10, Abhyanker admits that he resides and conducts business in this judicial district and is subject to personal jurisdiction in this judicial district. Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 10.

**Intradistrict Assignment**

11.     In response to paragraph 11, Abhyanker denies each and every allegation in paragraph 11.

**General Allegations**

12.     In response to paragraph 12, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12 and, therefore, denies each and every allegation in paragraph 12.

13.     In response to paragraph 13, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 and, therefore, denies each and every allegation in paragraph 13.

14.     In response to paragraph 14, Abhyanker denies each and every allegation in paragraph 14.

15.     In response to paragraph 15, Abhyanker denies each and every allegation in paragraph 15.

16.     In response to paragraph 16, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 and, therefore, denies each and every allegation in paragraph 16.

17.     In response to paragraph 17, Abhyanker denies each and every allegation in paragraph 17.

18.     In response to paragraph 18, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 and, therefore, denies each and every allegation in paragraph 18.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

19.     In response to paragraph 19, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 and, therefore, denies each and every allegation in paragraph 19.

20.     In response to paragraph 20, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20 and, therefore, denies each and every allegation in paragraph 20.

21.     In response to paragraph 21, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 and, therefore, denies each and every allegation in paragraph 21.

22.     In response to paragraph 22, Abhyanker admits that on, October 27, 2011, he sent an email to Nirav Tolia and that Nirav Tolia never responded to the email.  Abhyanker further states that the email speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 22.

23.     In response to paragraph 23, Abhyanker admits that, on November 10, 2011, he filed Civil Action No. 1-11-CV-212924 in the Superior Court of California for the County of Santa Clara against Nextdoor.com and other defendants.  Abhyanker further responds that the pleadings on file in Civil Action No. 1-11-CV-212924 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 23.

24.     In response to paragraph 24, Abhyanker responds that the pleadings on file in Civil Action No. 1-11-CV-212924 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 24.

25.     In response to paragraph 25, Abhyanker admits that, on December 28, 2011, he filed U.S. Trademark Application Serial No. 85/504,896 for the NEXTDOOR standard character mark in connection with services in International Class 42 with the U.S. Patent and Trademark Office.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 25.

26.    In response to paragraph 26, Abhyanker admits that he did not file a trademark application for the NEXTDOOR mark prior to December 28, 2011.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 26.

27.    In response to paragraph 27, Abhyanker admits that he filed U.S. Trademark Application Serial Nos. 77/049,286 for FATDOOR and 77/049,854 for GET TO KNOW YOUR NEIGHBORS with the U.S. Patent and Trademark Office and that these two specific applications did not mature into registrations.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 27.

28.    In response to paragraph 28, Abhyanker admits that, on February 28, 2012, he filed U.S. Trademark Application Serial No. 85/537,718 for the FATDOOR GET TO KNOW YOUR NEIGHBORS design mark with the U.S. Patent and Trademark Office.

29.    In response to paragraph 29, Abhyanker denies each and every allegation in paragraph 29.

30.    In response to paragraph 30, Abhyanker admits that he registered the nextdoor.cm domain name.  Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 30 and, therefore, denies each and every remaining allegation in paragraph 30.

31.    In response to paragraph 31, Abhyanker admits that he owns and controls the nextdoor.cm domain name.  Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 31 and, therefore, denies each and every remaining allegation in paragraph 31.

32.    In response to paragraph 32, Abhyanker responds that Exhibit A to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 32.

33.    In response to paragraph 33, Abhyanker responds that Exhibit B to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 33.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

34.     In response to paragraph 34, Abhyanker responds that Exhibits C and D to the Complaint speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 34.

35.     In response to paragraph 35, Abhyanker responds that Exhibit A to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 35.

36.     In response to paragraph 36, Abhyanker responds that Exhibit B to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 36.

37.     In response to paragraph 37, Abhyanker responds that Exhibit B to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 37.

38.     In response to paragraph 38, Abhyanker responds that Exhibit B to the Complaint speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 38.

39.     In response to paragraph 39, Abhyanker denies each and every allegation in paragraph 39.

40.     In response to paragraph 40, Abhyanker admits that, on or around February 9, 2012, he re-registered the nextyard.com and nextlawn.com domain names and that these two domain names pointed to a web server owned by Abhyanker.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 40.

41.     In response to paragraph 41, Abhyanker denies each and every allegation in paragraph 41.

42.     In response to paragraph 42, Abhyanker admits that he registered the edirectree domain name on or around September 2007 and that, at some point, the domain name registration was not renewed.  Abhyanker responds that he lacks knowledge or information sufficient to form

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

a belief about the truth of the remaining allegations in paragraph 42 and, therefore, denies each and every remaining allegation in paragraph 42.

43.     In response to paragraph 43, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 and, therefore, denies each and every allegation in paragraph 43.

44.     In response to paragraph 44, Abhyanker admits that, on or around February 9, 2012, he registered the edirectree.com domain name.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 44.

45.     In response to paragraph 45, Abhyanker admits that, at one time, a web page accessible at the edirectree.com contained a social networking feature that was an extension of its previous "Friends" feature.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 45.

46.     In response to paragraph 46, Abhyanker admits that, at one time, a web page accessible at the edirectree.com contained a "Friends" social networking feature.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 46.

47.     In response to paragraph 47, Abhyanker denies each and every allegation in paragraph 47.

48.     In response to paragraph 48, Abhyanker denies each and every allegation in paragraph 48.

49.     In response to paragraph 49, Abhyanker admits that, on January 20, 2012, he filed a Notice of Opposition with the Trademark Trial and Appeal Board that was instituted as Opposition No. 91203462 and that, on February 9, 2012, he filed a Notice of Opposition with the Trademark Trial and Appeal Board that was instituted as Opposition No. 91203762.  Abhyanker further responds that the pleadings in these oppositions speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 49.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

50.     In response to paragraph 50, Abhyanker responds that the pleadings on file in Opposition Nos. 91203462 and 91203762 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 50.

51.     In response to paragraph 51, Abhyanker responds that, on or around February 7, 2012, he filed a Request for Dismissal Without Prejudice in Civil Action No. 1-11-CV-212924 in the Superior Court of California for the County of Santa Clara.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 51.

52.     In response to paragraph 52, Abhyanker admits that his attorneys sent a letter to Nextdoor.com.  Abhyanker further responds that the letter speaks for itself.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 52.

53.     In response to paragraph 53, Abhyanker responds that the pleadings on file in Opposition Nos. 91203462 and 91203762 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 53.

54.     In response to paragraph 54, Abhyanker denies each and every allegation in paragraph 54.

**Count I – Declaratory Judgment Under 28 U.S.C. § 2201**

55.     In response to paragraph 55, Abhyanker refers to his responses to the allegations in paragraphs 1–54 and incorporates by reference such responses as if set forth in full herein.  In addition, Abhyanker denies that there is any basis for Nextdoor.com to bring a claim against him for declaratory relief.

56.     In response to paragraph 56, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 56 and, therefore, denies each and every allegation in paragraph 56.

57.     In response to paragraph 57, Abhyanker responds that the pleadings on file in Opposition Nos. 91203462 and 91203762 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 57.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

58.     In response to paragraph 58, Abhyanker responds that the allegation in paragraph 58 is a legal conclusion that does not require a response.

59.     In response to paragraph 59, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about what Nextdoor.com does or does not seek by way of declaration from this Court or the truth of the allegations in paragraph 59 and, therefore, denies each and every allegation in paragraph 59.

**Count II – Declaratory Judgment Under 28 U.S.C. § 2201**

60.     In response to paragraph 60, Abhyanker refers to his responses to the allegations in paragraphs 1–59 and incorporates by reference such responses as if set forth in full herein.  In addition, Abhyanker denies that there is any basis for Nextdoor.com to bring a claim against him for declaratory relief.

61.     In response to paragraph 61, Abhyanker responds that the pleadings on file in Opposition Nos. 91203462 and 91203762 speak for themselves.  Except as expressly admitted, Abhyanker denies each and every allegation in paragraph 61.

62.     In response to paragraph 62, Abhyanker responds that the allegation in paragraph 62 that an actual controversy exists is a legal conclusion that does not require a response.  With regard to the remaining allegations in paragraph 62, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about what Nextdoor.com does or does not contend or the truth of the remaining allegations in paragraph 62 and, therefore, denies each and every remaining allegation in paragraph 62.

63.     In response to paragraph 63, Abhyanker responds that he lacks knowledge or information sufficient to form a belief about what Nextdoor.com does or does not seek by way of declaration from this Court or the truth of the allegations in paragraph 63 and, therefore, denies each and every allegation in paragraph 63.

**Count III – Violation of 15 U.S.C. § 1125(D)(1)**

64.     In response to paragraph 64, Abhyanker refers to his responses to the allegations in paragraphs 1–63 and incorporates by reference such responses as if set forth in full herein.  In

addition, Abhyanker denies that there is any basis for Nextdoor.com to bring a claim against him for violation of 15 U.S.C. § 1125(D)(1).

65.     In response to paragraph 65, Abhyanker admits that he registered the nextdoor.cm domain name.

66.     In response to paragraph 66, Abhyanker denies each and every allegation in paragraph 66.

67.     In response to paragraph 67, Abhyanker denies each and every allegation in paragraph 67.

68.     In response to paragraph 68, Abhyanker denies each and every allegation in paragraph 68.

69.     In response to paragraph 69, Abhyanker denies each and every allegation in paragraph 69.

70.     In response to paragraph 70, Abhyanker denies each and every allegation in paragraph 70.

71.     In response to paragraph 71, Abhyanker denies each and every allegation in paragraph 71.

**Count IV – Violation of 15 U.S.C. § 1125(A)**

72.     In response to paragraph 72, Abhyanker refers to his responses to the allegations in paragraphs 1–71 and incorporates by reference such responses as if set forth in full herein.  In addition, Abhyanker denies that there is any basis for Nextdoor.com to bring a claim against him for violation of 15 U.S.C. § 1125(A).

73.     In response to paragraph 73, Abhyanker denies each and every allegation in paragraph 73.

74.     In response to paragraph 74, Abhyanker denies each and every allegation in paragraph 74.

75.     In response to paragraph 75, Abhyanker denies each and every allegation in paragraph 75.

76.     In response to paragraph 76, Abhyanker denies each and every allegation in paragraph 76.

77.     In response to paragraph 77, Abhyanker denies each and every allegation in paragraph 77.

78.     In response to paragraph 78, Abhyanker denies each and every allegation in paragraph 78.

In response to Nextdoor.com's Prayer for Relief paragraphs A–G, Abhyanker denies that there is a basis for judgment against him, damages of any kind for any reason, declaratory relief, an order transferring any domain names, statutory damages, profits, prejudgment interest, punitive damages, attorneys' fees, litigation expenses, costs, liquidated damages, injunctive relief, penalties, restitution, or any other relief.  Abhyanker further prays that Nextdoor.com take nothing by its Complaint, that the Complaint be dismissed with prejudice, that Abhyanker be awarded his attorneys' fees and costs, and that the Court order such further relief as it deems just and proper.

## AFFIRMATIVE DEFENSES

By way of further answer, Abhyanker alleges and asserts the following defenses in response to the allegations contained in the Complaint.  In this regard, Abhyanker undertakes the burden of proof only as to those defenses that are deemed affirmative defenses by law, regardless of how such defenses are denominated in the instant Answer.  Abhyanker reserves the right to assert other affirmative defenses as this action proceeds based on further discovery, legal research, or analysis that may supply additional facts or lend new meaning or clarification to the claims contained in the Complaint.

## FIRST AFFIRMATIVE DEFENSE
## FAILURE TO STATE A CLAIM

79.     Plaintiff's claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief can be granted.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

**SECOND AFFIRMATIVE DEFENSE**
**NO INJURY OR DAMAGE**

80.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has not and will not suffer any injury or damage.

**THIRD AFFIRMATIVE DEFENSE**
**LACK OF STANDING**

81.     Plaintiff's claims are barred, in whole or in part, because Plaintiff lack standing.

**FOURTH AFFIRMATIVE DEFENSE**
**STATUTE OF LIMITATIONS**

82.     Plaintiff's claims are barred, in whole or in part, by one or more of the applicable statute of limitations.

**FIFTH AFFIRMATIVE DEFENSE**
**ADEQUATE REMEDY AT LAW**

83.     Plaintiff has not stated a valid claim for injunctive relief because Plaintiff has an adequate remedy at law.

**SIXTH AFFIRMATIVE DEFENSE**
**ESTOPPEL**

84.      Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

**SEVENTH AFFIRMATIVE DEFENSE**
**LACHES**

85.     Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

**EIGHTH AFFIRMATIVE DEFENSE**
**ACQUIESCENCE**

86.     Plaintiff's claims are barred, in whole or in part, by the doctrine of acquiescence.

**NINTH AFFIRMATIVE DEFENSE**
**WAIVER**

87.     Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

**TENTH AFFIRMATIVE DEFENSE**
**UNCLEAN HANDS**

88.     Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

**ELEVENTH AFFIRMATIVE DEFENSE**
**UNENFORCEABILITY**

89.     Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged trademark(s) are unenforceable.

**TWELFTH AFFIRMATIVE DEFENSE**
**FRAUD**

90.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraud on the USPTO, which is detailed in the Counterclaim below.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**FAILURE TO MITIGATE DAMAGES**

91.     Plaintiff's claims are barred, in whole or in part, because of Plaintiff's failure to mitigate damages, if such damages exist.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**BREACH**

92.     Plaintiff's claims are barred, in whole or in part, because Plaintiff's use of its alleged trademark(s) is a breach of one or more agreements or duties of confidentiality.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**PRIOR TRADEMARK RIGHTS**

93.     Plaintiff's claims are barred, in whole or in part, because Abhyanker has prior and superior rights in the NEXTDOOR mark.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**RIGHT TO ASSERT ADDITIONAL DEFENSES**

94.     Abhyanker expressly reserves the right to amend its Answer to assert additional affirmative defenses upon the revelation of more definitive facts by Plaintiff and upon Abhyanker taking of discovery and investigation of this matter.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

**COUNTERCLAIM**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Counterclaimant Abhyanker counterclaims against Counterdefendants Nextdoor.com, Prakash Janakiraman, Sandeep Sood, Monsoon Enterprises, Inc., Benchmark Capital Partner, L.P., Benchmark Management Co. LLC, and DOES 1 – 50 as follows:

**PARTIES**

95.     Raj Abhyanker is an individual and resident of Cupertino, California.

96.     Nextdoor.com is a Delaware corporation having its principal place of business at 110 Sutter Street, Suite 700, San Francisco, California, 94104.

97.     Prakash Janakiraman ("Janakiraman") is an individual and resident of San Francisco, California.  Janakiraman is the co-founder and Vice President, Engineering of Nextdoor.com.

98.     Sandeep Sood ("Sood") is an individual and resides in the San Francisco Bay Area.  Sood is the President of Monsoon.

99.     Monsoon Enterprises, Inc. ("Monsoon") is a California corporation having its principal place of business at 350 Frank Ogawa Plaza, Suite 100, Oakland, California 94612.

100.     Benchmark Capital Partners, L.P. is a Delaware limited partnership and Benchmark Capital Management Co. LLC is a Delaware limited liability company (hereinafter collectively referred to as "Benchmark Capital"), both having their principal place of business at 2480 Sand Hill Road, Suite 200, Menlo Park, California, 94025.

101.     Abhyanker is ignorant of the true names of the other Counterdefendants sued herein as Does 1 – 50, inclusive, and therefore, sues these Doe Counterdefendants by such fictitious names.  Abhyanker will amend his counterclaim to allege their true names and capacities when ascertained.

**JURISDICTION AND VENUE**

102.     This Court has supplemental jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1367.

103.    Nextdoor.com and Counterdefendants are subject to personal jurisdiction in this district due to their systematic and continuous contacts with this district.  In addition, Nextdoor.com is subject to personal jurisdiction as a result of initiating this lawsuit in this district.

104.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### FACTS RELEVANT TO ALL COUNTERCLAIMS

Nextdoor.com and Benchmark Capital have a history of stealing information and ideas

105.    Nextdoor.com, Benchmark Capital, and the individuals associated with them have a pattern and practice of building companies based on stolen information and engaging in dishonest business practices at the expense of entrepreneurs.  By way of one example, since at least 2006, Nirav Tolia ("Tolia"), one of the founders of Nextdoor.com, admitted that he has been helping Benchmark evaluate confidential ideas of entrepreneurs.  And in 2006, at the behest of Benchmark partner Peter Fenton, Tolia admitted meeting with Jeremy Stoppelman, the founder of Yelp.  At this meeting, Tolia admitted that Stoppelman and Yelp had misappropriated trademarks and the trade identity belonging to his former employer, eBay, Inc.  However, Tolia proceeded with a positive investment recommendation and Yelp was invested in by Benchmark.  Put simply, Benchmark has a pattern and practice of choosing to hire and retain consultants and employees known to be dishonest and with questionable ethical standards, placing such consultants and employees in positions to evaluate confidential ideas from entrepreneurs, and then investing in companies having stolen intellectual property and assets.

106.    Benchmark is in the minority of venture capitalists that employ the practice of Entrepreneurs-in-Residence ("EIRs").  These individuals are people that Benchmark wishes to invest in but have not thought of their ideas yet.  Often, they are successful in previous ventures, and Benchmark deploys them and enables them to listen in on pitches by outside startups pitching ideas to Benchmark.  This highly unethical practice frequently leads to EIRs stealing ideas from the entrepreneurs pitching ideas to Benchmark, forming companies to pursue such stolen ideas, and Benchmark funding EIRs' companies built on such stolen ideas.   At least three of the co-

founders of the Nextdoor.com were EIRs in formal and informal capacities at least since 2006 when the Abhyanker pitched his ideas to Benchmark.

107.    Moreover, Nextdoor.com has a history of failing on its own merits.  According to its own Complaint in this action, Nextdoor.com was founded in December 2007 as SPN, Inc.  In January 2008, SPN, Inc. changed its name to Round Two, Inc. and launched an online almanac of professional and college athletes at www.fanbase.com.  Round Two, Inc. later changed its name to Fanbase Inc.  However, Fanbase Inc. and its Fanbase online almanac was a failure, and by Spring 2010, the Fanbase concept was abandoned.  These failures set the stage for Fanbase Inc. and the persons associated with Fanbase to yet again build a company based on stolen information and misappropriated trade secrets.

108.    As detailed below, Fanbase Inc. proceeded to steal and misappropriate Abhyanker's proprietary and trade secret information for an online neighborhood social network to be called Nextdoor, boldy copying and implementing Abhyanker's proprietary and trade secret execution plan for his Nextdoor concept.  This is how the failed company Fanbase Inc. illicitly renamed itself Nextdoor.com and radically moved its business model from an online almanac for athletes to an online neighborhood social network in early 2011.

Abhyanker develops the LegalForce/Nextdoor online neighborhood social network trade secrets

109.    Around September 2006, Abhyanker had developed the concept of a private online neighborhood social network for inventors to be called LegalForce, and a separate spin off idea using the same code base called Nextdoor.  In connection with his LegalForce and Nextdoor concept, Abhyanker developed and owned trade secret information, including, but not limited to, key product details, algorithms, business plans, security algorithms, database structures, user interface designs, software code, product concepts, prototypes, methods, works of authorship, trademarks, white papers, and instrumentalities, information and plans pertaining to, but not limited to, software that makes sure only people who live in a specific neighborhood are able to join its network—giving users a level of privacy that sites like Facebook don't, email lists of inventive neighbors around Cupertino, California, inventive neighbors in the Lorelei

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

neighborhood of Menlo Park, a private social network activation in a geospatially constrained area when 10 neighbors sign up, geo-spatial database, neighborhood member activation through postal mail, public/private geo-location constrained member groups, neighborhood member address verification, sharing of bulletin and wall communications between neighborhood resident users only, customer lists, architecture, social networking, friend grouping, providing real time updates, neighborhood-level privacy controls, feed aggregation, spheres of influence, application technologies, filtering relevant feeds across multiple networks, filtering conversations, adding contextual relevancy to private messages and connections in a geospatially constrained area, and connections across interactions in neighboring communities, providing in depth conversations through a social graph, community governance, bidding history of the Nextdoor.com domain, the activation of the Lorelei neighborhood as a prime testing neighborhood for communication, neighborhood communication and geo-spatial social networking, and the use of the name Nextdoor.com in conjunction with a private social network for neighborhoods ("Abhyanker's LegalForce/Nextdoor Trade Secrets").

Abhyanker hires Sood to work on his trade secret LegalForce/Nextdoor concept

110.    On or around September 21, 2006, Abhyanker hired Sandeep Sood ("Sood") and his firm Big Circle Media (now called Monsoon) to provide software and website development services for Abhyanker's concept, which was to be an online private social network for neighborhood inventors by geocoding of inventors and owners from public patent and trademark data in a specific neighborhood.  Before disclosing his concept and associated trade secrets to Sood and Big Circle Media, Abhyanker required them to execute and Independent Contractor Agreement and Non-Disclosure Agreement, which were also executed on September 21, 2006. The agreements required Sood and Big Circle Media to keep Abhyanker's LegalForce.com and Nextdoor.com concept and all the accompanying details and work product relating to it confidential.   On Thursday September 6, 2006, Big Circle Media created invoices with a budget of $15,000.  One invoice titled "LegalForce Online Design and Inventor Community" indicated that Big Circle Media will concept, design, and build components including messaging, online

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

identity design, information architecture, and customization of social networking software for LegalForce.

111.    A new corporation called LegalForce, Inc. was formed to own the assets of this original LegalForce.com and Nextdoor.com technology.  Approximately $150,000 in convertible notes were sold in LegalForce, Inc., including a $125,000 note to a Mr. Warren Myer, and equity was sold to investors including Raj Abhyanker and Jeffrey Drazan.  During the development of the source code for the LegalForce.com venture, a decision was made to apply the same source code of LegalForce.com to create a private social network called Nextdoor.com to enable a private, secure collaboration of neighbors in a geospatial area to meet in or about October 2006. Both the LegalForce.com and the Nextdoor.com website were to be private, focused around secure and private collaboration among neighbors who sign up on the site.  A minimum number of 10 inventors/neighbors per neighborhood were required to 'activate' a neighborhood.  The "Lorelei" neighborhood was chosen to prototype the LegalForce/Nextdoor concepts because of its high concentration of technology savvy inventors and neighborhood activism.  The name Nextdoor was chosen as the name of the new website based on Abhyanker's previous use of the name Nextdoor in connection with creating neighborhood walking maps in Cupertino city council campaigns in 2005.  However, the name Nextdoor.com was not for sale, despite numerous bidding attempts by Abhyanker.  As an alternative, Abhyanker purchased the Nextyard.com and Nextlawn.com domains in or about October 2006 to serve as placeholders for his Nextdoor.com website.  However, the public launch of the original Nextdoor.com and LegalForce.com private inventor social network never launched as a social network and remained a trade secret.

The Formation of Fatdoor, Inc.

112.    During the course of developing the LegalForce.com and Nextdoor.com websites, Abhyanker came up with a new concept based on a Wikipedia like public database of neighbor profiles that could be edited and enhanced to provide a "search" and "discover" functionality as opposed to a sign up social network, which Abhyanker named "Fatdoor.com."  Abhyanker first

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

disclosed this idea to Jeffrey Drazan, an equity investor in LegalForce on or around October 2006.

113.    Jeffrey Drazan recommended that Abhyanker carve out IP related to Fatdoor from LegalForce/Nextdoor, and form and raise money for a new corporation to be called Fatdoor, Inc. The concept was also disclosed to Sandeep Sood, who decided it would be best to start a separate venture from LegalForce/Nextdoor related to the Fatdoor concept.  Sandeep Sood charged and billed a separate $4,185 for Fatdoor consulting services separate from his work on LegalForce/Nextdoor on or about November 12, 2006.  This amount was reimbursed by Fatdoor, Inc.  The separate development of the LegalForce and Nextdoor website for invoices totaling $15,000 remained separate, and was paid by Abhyanker and LegalForce, Inc. by February 2007, after the formation of Fatdoor using non-Fatdoor bank accounts and checks.  Based on Drazan's recommendation, on or around October 25, 2006, Abhyanker put his LegalForce/Nextdoor concept on hold to found and pursue Fatdoor.com, around this new and separate idea for Fatdoor. To ensure that the $150,000 in convertible note holders backing the LegalForce, Inc. venture that funded the development of both LegalForce.com and Nextdoor would be protected, Drazan recommended an attorney named Daniel Hansen to form the new Fatdoor, Inc. entity and carve out all trade secrets and intellectual property related to LegalForce and Nextdoor.  While the name 'Nextdoor' was considered for Fatdoor.com, it was decided to not pursue that name because of its mixed ownership with LegalForce and because the name was not available.  As such, the name as applied to a private social network for neighborhoods remained private and a trade secret associated with investors in LegalForce, Inc. as applied to a private social network for neighborhoods.

114.    Abhyanker proceeded to assign trade secrets, inventions, patent rights (including several pending patent applications), and other proprietary information relating to the Fatdoor concept to Fatdoor, Inc. on or around February 1, 2007 through a document drafted by Drazan's attorney Hansen.  Because Drazan and Abhyanker remained equity holders in LegalForce, Inc., purposefully excluded from this transfer were all technologies related to LegalForce and

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

Nextdoor, including the exclusion of the LegalForce/Nextdoor Trade Secrets and the Nextyard, Nextlawn, and LegalForce domains.   Drazan's attorney Daniel Hansen drafted this agreement expressly under the wishes of Drazan and Abhyanker.  To provide equity to Fatdoor, Inc. investors, trade secrets related to Fatdoor were assigned, including more than hundreds of pages of documents that became the basis for more than 46 patent applications assigned by Abhyanker, the lead inventor, to Fatdoor, Inc.  Each and all of these 46 patent application covered the public 'wiki' based Fatdoor commenting tool only, and did not relate to the private social network of LegalForce or Nextdoor developed by Sood for Abhyanker and LegalForce, or the code base for the original Nextdoor concept.

115.    The only mention of the nextdoor.com domain name in at least one of these Fatdoor owned patent applications is in the detailed description section, which is a section of a patent application that can include trademarks and concepts owned by others.  The referenced section in the Fatdoor owned patent application detailed description refers to advertisers placing display ads on the nextdoor.com website.  This reference is only made in passing, as display advertisements can be placed on virtually any website, whether it be a search engine, ecommerce site, or any web page such as Google, Yahoo, Nextdoor.com or eBay.  It makes no mention of what the nextdoor domain is to be used for or what kind of business it would have on it.  Particularly, the referenced section in the Fatdoor owned patent application detailed description does not refer to the use of the Nextdoor mark in conjunction with a private social network for neighbors.  As such, the trade secret of the use of Nextdoor name in conjunction with a private social network for neighbors remained a trade secret owned by Abhyanker (through his acquisition of the LegalForce, Inc. assets in 2008) through the filing of the initial state court complaint in 2011.

116.    After the Fatdoor, Inc. business was formed, in or about February 2007, an entirely new code base was built for the wiki based commenting tool by Chandu Thota, a Chief Technology Officer hired by Abhyanker to develop the Fatdoor concept separate from LegalForce and Nextdoor.   None of the original code base developed for LegalForce, Inc. by Sood around the Nextdoor concept was used in the creation of Fatdoor.  A board of directors was

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

formed consisting of Raj Abhyanker, Jeffrey Drazan, Bill Harris, and Chandu Thota.   The assignment only covered technology related to Abhyanker's Fatdoor concept, and specifically excluded all assets owned by LegalForce, Inc. (of which Abhyanker and Drazan were shareholders) including Abhyanker's LegalForce/Nextdoor Trade Secrets and domains of LegalForce.com, Nextyard.com, and Nextlawn.com based around a private social network for neighborhood.

117.   In or about May 2006, a convertible note holder in LegalForce, Inc., Mr. Warren Myers complained to the Fatdoor Board of Directors that he was concerned that Nextdoor and LegalForce owned technologies and trade secrets were used or planning to be used in Fatdoor, Inc.  This dispute was disclosed to Series Be investors in Fatdoor, Inc. in board minutes and disclosures in conjunction with Series B financing.  A decision was made that if the Nextdoor domain would be desired for Fatdoor again, permission from the LegalForce, Inc. equity investors and convertible note holders, including Warren Myer would first be required.  These disclosures were prepared by Daniel Hansen, and it was stated that Mr. Myers now understood that the original LegalForce trade secrets including the Nextdoor name as useable with a private social network for neighbors remained property of LegalForce, Inc.

118.   LegalForce, Inc. subsequently went through an orderly winddown in 2008 led by the same Fatdoor, Inc. counsel Daniel Hansen that drafted Abhyanker's February 1, 2007 assignment agreement on behalf of Drazan and Abhyanker, and its assets were purchased by Raj Abhyanker, including the source code that made up the original LegalForce/Nextdoor concept and Abhyanker's LegalForce/Nextdoor Trade Secrets.  All convertible debt notes including the $125,000 debt note to Mr. Warren Myer was assumed by Abhyanker in exchange for all assets in LegalForce, Inc. including the LegalForce/Nextdoor Trade Secrets.  Abhyanker continued to work on trying to restart the Nextdoor private neighborhood social network based on his acquired trade secrets.  In August 2011, Abhyanker filed a new private neighborhood social networking ecommerce patent application that recently received a notice of allowance.   In addition, Abhyanker again started trying to acquire the Nextdoor domain.   In early 2010, Abhyanker spoke

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

with Sood and informed him of his desire to restart the Nextdoor business and acquire rights to the Nextdoor domain. Abhyanker also placed numerous bids in an effort to try to secure the Nextdoor.com domain in 2010. However the Defendant was unsuccessful in bidding given that Sood had disclosed the Abhyanker's bidding to Nextdoor.com, upon reason and belief. The original LegalForce, Inc. is not to be confused with the currently active LegalForce, Inc. which incorporated in or about March 2009. This new venture is a separate and distinct entity formed by Abhyanker, with equity investment from Drazan and Hansen. LegalForce, Inc. currently owns the Trademarkia.com domain, and purchased rights to the LegalForce.com domain from Abhyanker.

119.    On or around April 2, 2008, Fatdoor, Inc. was renamed Center'd Corporation. Center'd Corporation is still in existence today. On or around August 2011, Google acquired 46 patent applications and six international PCT applications that Abhyanker had assigned to Fatdoor, which was renamed Center'd. Abhyanker is listed as the lead inventor on each of those applications. These patent applications and the inventions/technology acquired by Google related to Abhyanker's Fatdoor concept. They do not relate or cover Abhyanker's separate and distinct LegalForce/Nextdoor concept. And the trade secrets that form the basis for Abhyanker's trade secret misappropriation claim in the instant pleading were never assigned, purchased, or transferred to Fatdoor/Center'd or Google—they remain owned by Abhyanker personally.

120.    Moreover, because the patent applications acquired by Google, including Patent Application No. 11/603,442, only relate to the Fatdoor Concept and do not cover or relate to Abhyanker's LegalForce/Nextdoor concept, the patent applications do not disclose or reveal the trade secrets that form the basis for Abhyanker's trade secret misappropriation claim in the instant pleading. The trade secrets at issue in the instant pleading have never been publicly disclosed in published patent applications, issued patents, or anywhere else for that matter.

Sood is not chosen to be part of Fatdoor's founding team and becomes disgruntled

121.    Before the formation of Fatdoor, Abhyanker and Sood had discussed the possibility of Sood becoming a co-founder of Nextdoor. However, when Fatdoor was formed,

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

Abhyanker's LegalForce/Nextdoor concept was put on hold to explore the Fatdoor business model.

122.    Unfortunately, Sood was not selected to be part of Fatdoor's founding team.  There were several reasons that Sood was not selected, including Sood's other obligations and his outspoken disagreement with Fatdoor's chosen direction and technology.

123.    As can be expected, Sood was disappointed when he learned that he was not selected to be part of Fatdoor, leaving him disgruntled and with a clear axe to grind.

Abhyanker confidentially discloses his trade secrets to Benchmark Capital

124.    On or around December 15, 2006, Abhyanker showed his Fatdoor prototype to Jeffrey M. Drazan ("Drazan"), an early investor in LegalForce, Inc. that at the time owned the LegalForce.com and Nextdoor.com concept, who was intrigued by the concept of a public Wikipedia like neighborhood commenting tool Fatdoor, Inc.  Drazan agreed to fund a separate entity from LegalForce, Inc., a company that he was a shareholder in, to launch the new public Wikipedia like neighborhood commenting tool Fatdoor.com.

125.    On or about January 5, 2007, Drazan agreed to personally invest $500,000.00 in Fatdoor, Inc.  Drazan also introduced Abhyanker to William H. Harris, Jr. ("Harris, Jr.").

126.    On or about February 1, 2007, Abhyanker closed a $1,000,000.00 Series A round of equity financing with Drazan and Harris, Jr. for Fatdoor, Inc.

127.    Abhyanker then hired the best engineers that he could find to help build working products for Fatdoor, Inc., including Chandu Thota ("Thota") as Chief Technology Officer (CTO) of Fatdoor, Inc.

128.    The prototype of Fatdoor.com was developed into a working beta website. However, based on feedback from users, an internal decision was made to work on an improved version of Fatdoor.com that centered around security and privacy.  To this end, Abhyanker believed this new version of Fatdoor.com could be accomplished by using some of Abhyanker's LegalForce/Nextdoor Trade Secrets.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

129.   Accordingly, on or around June 20, 2007, an initial meeting was set with Benchmark Capital.  This meeting did not involve the disclosure of any non-confidential, trade secret information.  At that meeting, it was discussed that a confidential meeting would take place only after assurances were received from Kevin Harvey ("Harvey"), a general partner of Benchmark capital, that all information shared by Abhyanker would be maintained strictly confidential.  Harvey agreed to maintain confidential any and all information disclosed by Abhyanker during any future meetings in a follow up phone call that afternoon between Harvey and Abhyanker and a separate phone call between Harvey and Drazan.  In this regard, it is the pattern and practice of Benchmark Capital, its general partners, and entrepreneurs in residence (EIRs) to agree to non-disclosure agreements via verbal and email "handshakes."  *See* Randall E. Stross, eBoys: The First Inside Account of Venture Capitalists at Work, xviii (2000).

130.   Based on Benchmark Capital's assurances of confidentiality, a follow up meeting was set for on or about June 21, 2007.  During that meeting, Abhyanker provided a detailed disclosure of Abhyanker's LegalForce/Nextdoor Trade Secrets.  The meeting was attended by a majority of the Benchmark partners and EIRs, including Harvey.

131.   In addition, at Harvey's request, Abhyanker sent confidential and trade secret presentations relating to the Nextdoor concept to Benchmark Capital partner Mitch Lasky ("Lasky") and a diligence file ("Diligence Package") fully disclosing his Nextdoor concept and the trade secrets to Benchmark Capital partner Peter Fenton ("Fenton").

132.   Harvey then informed Abhyanker that he would be discussing the trade secret information with his team at an offsite meeting that would be occurring between June 23 -25, 2007.

133.   At Benchmark Capital's request, Abhyanker had various follow-up meetings with Benchmark Capital discussing the confidential technical details of his trade secrets.

134.   Accordingly, Abhyanker disclosed key details of Abhyanker's Next Door Trade Secrets, including, but not limited to, the Diligence Package, which included, at least key product details, algorithms, business plans, security algorithms, database structures, user interface

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

designs, software code, product concepts, prototypes, methods, works of authorship, trademarks, white papers, and instrumentalities. The Diligence Package also contained a mockup images showing a photograph of sample user, with a personal profile virtual wall feed from neighbors who provided comments on the user's wall. A search area box read "search neighborhood." The word "Nextdoor" was clearly shown in the upper, left-hand side of the screenshot. A map was shown in the screenshot illustrating the location of the user's hypothetical home and images indicating which neighbors had and had not joined the neighborhood surrounding the user's home.

135.    Despite its assurance of confidentiality, Benchmark Capital proceeded to misappropriate  Abhyanker's trade secrets by disclosing and using them in violation of the confidentiality agreement.

136.    The Fatdoor, Inc. series B investors that Abhyanker brought in the summer of 2007 desired to take the company Fatdoor in a drastically different direction that Abhyanker had originally wanted by requesting that a headhunter be hired (recommended by Benchmark Capital) to find a new Chief Executive Officer.  After speaking with Jeffrey Drazan over breakfast at the Stacks restaurant in Menlo Park to discuss this request in the summer of 2007, Abhyanker decided to announce to the Board of Directors of Fatdoor, Inc. in the summer of 2006 that he would be willing to leave the position of Chief Executive Officer if he was permitted to run for another city council campaign and restart a new business around his original Nextdoor trade secrets of a private neighborhood social network for inventors and neighbors in a constrained geospatial area.  Although Abhyanker believed he did not need permission by Fatdoor, he made the request to ensure there would be not dispute over his plans.  Fatdoor agreed that he could pursue his LegalForce/Nextdoor business and trade secrets.  After leaving Fatdoor, Inc. in the Fall of 2007,  Abhyanker again began trying to acquire the Nextdoor.com domain around his ideas for a private neighborhood social network and restarted his LegalForce.com website.

Nextdoor.com founder Janakiraman's secret friendship with Sood

137.    As detailed above, Janakiraman is one of the founders of Nextdoor.com, and Sood was hired by Abhyanker to work on his trade secret Nextdoor concept.

138.    In trying to ascertain exactly how Nextdoor.com misappropriated Abhyanker's trade secrets, Abhyanker recently discovered that Janakiraman and Sood both attended the University of California, Berkeley.  Apparently, unbeknown to Abhyanker, Sood has been friends with both Janakiraman and his wife, Rachna Nivas, since at least 1995.

139.    When Abhyanker discovered that Sood and Janakiraman were friends, he confronted Sood and asked him about his relationship with Janakiraman.  Sood reluctantly admitted to knowing Janakiraman, but tried to downplay their relationship by saying that they have not really kept in touch over the years.  This turned out to be a lie.

140.    Through his own investigation, Abhyanker discovered that Janakiraman and Sood had stayed in touch, exchanging numerous messages as recently as October 28, 2012, a week before Nextdoor.com filed the instant lawsuit.

141.    The fact that Sood did not disclose and then lied about the extent of his relationship with Janakiraman evidences that Sood was trying to conceal his wrongful conduct of disclosing Abhyanker's LegalForce/Nextdoor Trade Secrets to Janakiraman and Nextdoor.com.

Nextdoor.com's founders Janakiraman and Tolia were EIRs at Benchmark Capital

142.    Nextdoor.com's founders are Janakiraman and Nirav Tolia ("Tolia").  And as detailed above, Abhyanker had previously disclosed Abhyanker's LegalForce/Nextdoor Trade Secrets to Benchmark Capital.

143.    In trying to ascertain exactly how Nextdoor.com misappropriated Abhyanker's LegalForce/Nextdoor Trade Secrets, Abhyanker recently discovered that both of Nextdoor.com's founders, Janakiraman and Tolia, were entrepreneurs in residence (EIRs) at Benchmark Capital at the time Abhyanker disclosed his trade secrets to Benchmark Capital.  It is much too coincidental that both the founders of Nextdoor.com would be EIRs at Benchmark Capital when Abhyanker disclosed Abhyanker's LegalForce/Nextdoor Trade Secrets to Benchmark Capital.

144.     On information and belief, Benchmark Capital disclosed Abhyanker's trade secrets to both Janakiraman and Tolia, who then proceeded to misappropriate and use Abhyanker's trade secrets as the foundation of Nextdoor.com.

Sood completes a survey on the Nextdoor concept for Nextdoor.com, and has subsequent email conversations and social meetings with Prakash Janikiraman

145.     On or around the fall of 2010, Janakiraman and Nextdoor.com sent a survey to friends and family seeking feedback on the online neighborhood social networking concept that was misappropriated from Abhyanker.

146.     One of the recipients of the survey was Sood.  Sood completed and returned the survey, informing and/or reminding his long time friend Janakiraman and Nextdoor.com that he had actually worked on Abhyanker's original Nextdoor concept and had been privy to Abhyanker's LegalForce/Nextdoor Trade Secrets.

147.     After completing the survey, Janikiraman spoke with Sood over a number of separate and distinct phone conversations and in person in which he discussed with Sood his knowledge and experience related to Abhyanker's LegalForce/Nextdoor Trade Secrets.  Along the course of these conversations, Sood disclosed Abhyanker's LegalForce/Nextdoor Trade Secrets to Janakiraman and Nextdoor.com.  In addition, Janikiraman met in a number of social settings with Sood, and exchanged private messages over social networks including Facebook and Twitter with Sood with respect to Abhyanker's LegalForce/Nextdoor Trade Secrets.  Because of these conversations, Janikiraman suggested the name 'Nextdoor' to be used with the private neighborhood social network, as admitted by Tolia.  In addition, Tolia admitted that Janikiraman came up with the 'key technologies' including neighborhood level privacy controls that Janikiraman misappropriated from Abhyanker's LegalForce/Nextdoor Trade Secrets through his conversations with Sood.  Specifically, Tolia attributed in a Mercury News article on October 26, 2011 that 'The key,… is software developed by an early Google (GOOG) Maps employee that makes sure only people who live in a specific neighborhood are able to join its network -- giving users a level of privacy that sites like Facebook don't".   Janikiraman was the early Google

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

(GOOG) Maps employee that Tolia referred to. "Tolia said he was referring to Prakash

Janakiraman, his co-founder at Fanbase and Nextdoor who formerly worked at Google on Maps"

in an article by Liz Gannes from the Wall Street Journal's AllThingsd blog on November 11,

2011. This was a material breach of Sood's Independent Contractor Agreement and Non-

Disclosure Agreement.

148.    Despite knowing that Sood had worked on Abhyanker's proprietary and trade

secret LegalForce/Nextdoor concept as disclosed in the survey that Sood filled, Janakiraman and

Nextdoor.com encouraged Sood to improperly disclose Abhyanker's trade secret information and

proceeded to use the information as the foundation of their business.

149.    Furthermore, because Janikiraman and Tolia had access to pitches that were

delivered to Benchmark in their capacity as Entrepreneurs in Residence for the fund, and because

they had access to the Benchmark offices, Janikiraman and Tolia researched the history of

Abhyanker's LegalForce/Nextdoor trade secrets by looking through electronic archives stored at

Benchmark Capital, upon reason and belief.

Nextdoor.com prototypes Abhyanker's LegalForce/Nextdoor concept in Abhyanker's
neighborhood

150.    On or around October 2010, Nextdoor.com set up a website at

loreleineighbors.reallifelabs.com to surreptitiously prototype Abhyanker's online neighborhood

social networking concept under the temporary name "Neighborly" prior to misappropriating

Abhyanker's LegalForce/Nextdoor name and mark. As Nextdoor.com stole the concept from

Abhyanker, it is not surprising that Tolia admits that Janikiraman came up with the idea to

prototype the Nextdoor.com website in the Lorelei neighborhood, the same Lorelei neighborhood

referenced in Abhyanker's LegalForce/Nextdoor Trade Secrets.

151.    When Abhyanker conceived and developed the Nextdoor concept, his offices were

located in Palo Alto, California and Menlo Park, California. The Lorelei neighborhood abutted

Abhyanker's Menlo Park office, which is why Abhyanker selected the Lorelei neighborhood to

test his trade secret Nextdoor concepts and execution plans.

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

152.    In stark contrast, Nextdoor.com had no connection or reason to prototype the misappropriated concept in the Lorelei neighborhood.  Not only is Nextdoor.com based in San Francisco, but all the individuals at Nextdoor.com involved in misappropriating Abhyanker's LegalForce/Nextdoor concept also live in San Francisco — approximately 30 miles from Menlo Park.  Given the fact that there are more than 500 neighborhoods in the San Francisco Bay Area, it is clear that Nextdoor.com did not randomly choose the Lorelei neighborhood, but rather chose the Lorelei neighborhood because it was the neighborhood selected by Abhyanker in his trade secret Nextdoor concepts and execution plans that Nextdoor.com misappropriated.

153.    Nextdoor.com's brazen decision to prototype the concept it stole from Abhyanker in Abhyanker's own Lorelei neighborhood is irrefutable evidence that Nextdoor.com misappropriated Abhyanker's trade secret information.  Moreover, given Nextdoor.com's founder Janakiraman's long-time friendship with Sood and close association with Benchmark Capital, it is clear that Nextdoor.com had the connections and means for accessing and stealing Abhyanker's LegalForce/Nextdoor Trade Secrets.

After Sood's wrongful disclosure, Nextdoor.com adopts the stolen Nextdoor name

154.    On or around January 2011, shortly after Sood completed and returned the survey and Nextdoor.com prototyped the misappropriated concept in Abhyanker's neighborhood, Nextdoor.com (still called Fanbase at the time) coincidentally alleges that it decided to try to register the www.nextdoor.com domain name.  (However, Abhyanker suspects that Nextdoor.com or its principals may have been involved in trying to register the domain name before January 2011 based on their misappropriation of Abhyanker's LegalForce/Nextdoor Trade Secrets.)

155.    In this regard, Sood had been aware that Abhyanker had been bidding and trying to purchase the www.nextdoor.com domain name since late 2006.  In fact, Sood was copied on many emails relating to Abhyanker's attempts to purchase the domain name.

156.    Sood proceeded to disclose confidential information relating to Abhyanker's attempts to purchase the domain name to Janakiraman and Nextdoor.com, which prompted and

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

enabled them to outbid Abhyanker and register the www.nextdoor.com domain name, thereby preventing Abhyanker from rightfully obtaining the domain name.

157.    After wrong fully obtaining the domain name, on or around February 8, 2011, Nextdoor.com (still called Fanbase at the time) proceeded to file a federal trademark application for NEXTDOOR.

158.    On or around March 2011, according to Nextdoor.com's own Complaint, it changed its corporate name from Fanbase Inc. to Nextdoor.com, Inc.

159.    Finally, on or around October 26, 2011, Nextdoor.com publicly launched the www.nextdoor.com online neighborhood social network that uses and was built on the trade secrets misappropriated from Abhyanker.

The Defendants' misappropriation and wrongful acts lead to litigation between the parties

160.    Left with no recourse against Defendants' willful misappropriation, on November 10, 2011, Abhyanker filed a complaint against Defendants in the Superior Court of California for the County of Santa Clara, which was instituted as Case No. 1-11-CV-212924.  In that case, Abhyanker asserted claims for trade secret misappropriation, breach of contract, and additional torts.

161.    Shortly after filing the state court action, Abhyanker also filed two third-party opposition proceedings against Nexdoor.com's trademark application for NEXTDOOR with the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board ("TTAB").  The two third-party oppositions on the basis of priority and fraud were filed on January 20, 2012 and February 9, 2012 and were instituted as Opposition No. 91203462 and Opposition No. 91203762, respectively.

162.    Adhering to the notion that discretion is the better part of valor, Abhyanker decided that, rather than litigate both the state court action and the TTAB oppositions simultaneously, he should choose to maintain either the state court action or the third-party oppositions and focus on that choice.

163.     Accordingly, Abhyanker chose to dismiss his state court action *without prejudice* on February 8, 2012.  By dismissing the state court action, Abhyanker's resources were freed and directed towards litigating the TTAB oppositions, which he did with some success.   In or about September 15, 2012, the Nextdoor.com's motions to dismiss the TTAB oppositions were defeated and formal discovery was to start before TTAB to determine whether the Nextdoor.com should be denied federal trademark rights because of fraud on the United States Trademark Office.

164.     However, on November 5, 2012, Nextdoor.com filed the instant lawsuit seeking declaratory relief regarding trademark infringement and cyberpiracy.  As a result, the TTAB oppositions have been suspended pending the disposition of this lawsuit.  Essentially, Nextdoor.com made the exact opposition decision that Abhyanker had made—it chose to litigate a court action first and put the TTAB oppositions on hold.

165.     Back in court as a result of the instant lawsuit, Abhyanker now reasserts his claim for trademark misappropriation against Nextdoor.com and the other Defendants.

166.     Rather than attempting to defend themselves on the merits (perhaps because they can't), Defendants have opted to desperately mischaracterize and intentionally misconstrue the allegations that Abhyanker made in the state court case and TTAB oppositions.  In this regard, Defendants have attempted to mischaracterize Abhyanker's allegations in prior pleadings as admissions that Abhyanker does not own the trade secrets that are the subject of the Abhyanker's trade secret misappropriation counterclaim in the instant lawsuit.  However, Defendants' argument is meritless.  To be clear, the trade secrets that form the basis for the trade secret misappropriation counterclaim in the instant lawsuit are owned by Abhyanker personally and were never assigned, purchased, or otherwise transferred to Fatdoor, Center'd, or Google.

167.     More specifically, and as discussed in paragraph 119 above, Abhyanker is the lead inventor on 46 patent applications and six international PCT patent applications that Abhyanker assigned to Fatdoor, Inc. and that were eventually purchased by Google.  The subject matter of these patent applications relate generally to geo-spatial database, architecture, and application technologies associated with neighborhood communication and social networking.   But the trade

secrets that form the basis of the instant lawsuit are not disclosed in those patent applications and were not assigned to Fatdoor or purchased by Google; rather, they are owned by Abhyanker personally.  In fact, this is made clear in Paragraph 23 of Abhyanker's First Amended Complaint in the state court action in which he alleges, when discussing the misappropriation, that only "*some* of which are now owned by Google … through its acquisition of the … patent portfolio." To underscore this point, nowhere in any of Abhyanker's prior pleadings in the state court action or TTAB oppositions are there any allegations or statement that "any and all" trade secrets relating to the Abhyanker's private online neighborhood social network were assigned to Fatdoor or purchased by Google.  A simple resort to common sense concludes that Abhyanker would not file a complaint in state court for trade secret misappropriation for trade secrets that he did not own and then make an admission of non-ownership in the complaint—doing so would frustrate and be directly contrary to the very purpose of why he filed the complaint to begin with—i.e., asserting a claim of trade secret misappropriation.

168.    Accordingly, Abhyanker now counterclaims against Defendants for misappropriation of Abhyanker's Trade Secrets, which are owned by him personally and that have never been assigned, purchased, or otherwise transferred to any other person or entity.

**FIRST COUNTERCLAIM**
**TRADE SECRET MISAPPROPRIATION**
**(Against All Defendants)**

169.    Paragraphs 1 – 168, above, are realleged and incorporated by reference as if set forth in full.

170.    As detailed in Paragraph 109 above, Abhyanker developed and owned trade secret information relating to the concept of an online neighborhood social network to be called Nextdoor.  These trade secrets consisted of a wide variety of information, including, but not limited to, key product details, algorithms, business plans, security algorithms, database structures, user interface designs, software code, product concepts, prototypes, methods, works of authorship, trademarks, white papers, and instrumentalities, information and plans pertaining to, but not limited to, software that makes sure only people who live in a specific neighborhood are

able to join its network—giving users a level of privacy that sites like Facebook don't, email lists of inventive neighbors around Cupertino, California, inventive neighbors in the Lorelei neighborhood of Menlo Park, a private social network activation in a geospatially constrained area when 10 neighbors sign up, geo-spatial database, neighborhood member activation through postal mail, public/private geo-location constrained member groups, neighborhood member address verification, sharing of bulletin and wall communications between neighborhood resident users only, customer lists, architecture, social networking, friend grouping, providing real time updates, neighborhood-level privacy controls, feed aggregation, spheres of influence, application technologies, filtering relevant feeds across multiple networks, filtering conversations, adding contextual relevancy to private messages and connections in a geospatially constrained area, and connections across interactions in neighboring communities, providing in depth conversations through a social graph, community governance, bidding history of the Nextdoor.com domain, the activation of the Lorelei neighborhood as a prime testing neighborhood for communication, neighborhood communication and geo-spatial social networking, and the use of the name Nextdoor.com in conjunction with a private social network for neighborhoods ("Abhyanker's LegalForce/Nextdoor Trade Secrets").

171.     Abhyanker's LegalForce/Nextdoor Trade Secrets derived independent economic value from not being known to the public or other persons who could obtain economic value from their disclosure or use.

172.     Abhyanker's LegalForce/Nextdoor Trade Secrets were also the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  As detailed in Paragraphs 110 and 129 above, Abhyanker only disclosed the Nextdoor Trade Secrets to Sood and Monsoon and Benchmark Capital pursuant to strict confidentiality agreements.

173.     Benchmark Capital misappropriated Abhyanker's LegalForce/Nextdoor Trade Secrets by using improper means to acquire and then disclose Abhyanker's LegalForce/Nextdoor Trade Secrets to Nextdoor.com and its founders in violation of its confidentiality agreement with Abhyanker and without Abhyanker's consent.  Among other things, Benchmark fraudulently and

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

intentionally misrepresented that it would maintain the confidentiality of Abhyanker's LegalForce/Nextdoor Trade Secrets when it had no intention of doing so and fraudulently and intentionally misrepresented that Benchmark Capital's use of Abhyanker's LegalForce/Nextdoor Trade Secrets would be limited solely to evaluation for investment purposes.  Benchmark Capital also improperly induced and encouraged Nextdoor.com and its founders to use Abhyanker's LegalForce/Nextdoor Trade Secrets.

174.    Sood and Monsoon misappropriated Abhyanker's LegalForce/Nextdoor Trade Secrets by using improper means to acquire and then disclose Abhyanker's LegalForce/Nextdoor Trade Secrets to Nextdoor.com and its founders in violation of the Independent Contractor Agreement and Non-Disclosure Agreement with Abhyanker and without Abhyanker's consent. Among other things, Sood and Monsoon fraudulently and intentionally misrepresented that they would maintain the confidentiality of Abhyanker's LegalForce/Nextdoor Trade Secrets when they had no intention of doing so.  Sood and Monsoon also improperly induced and encouraged Nextdoor.com and its founders to use Abhyanker's LegalForce/Nextdoor Trade Secrets.

175.    Janakiraman and Nextdoor.com misappropriated Abhyanker's LegalForce/Nextdoor Trade Secrets by using improper means to acquire and then use Abhyanker's LegalForce/Nextdoor Trade Secrets as the foundation of their business. Janakiraman and Nextdoor.com induced both Benchmark Capital and Sood and Monsoon to breach the confidentiality agreements and obligations to Abhyanker by persuading them to disclose Abhyanker's LegalForce/Nextdoor Trade Secrets to them.  Despite being fully aware of Benchmark Capital's, Sood's, and Monsoon's confidentiality obligations and agreements, Janakiraman and Nextdoor.com proceeded to use the Abhyanker's LegalForce/Nextdoor Trade Secrets to build their business.

Counterdefendants' aforesaid misappropriation has caused and continues to cause Abhyanker damages and irreparably injury.  Moreover, Counterdefendants' aforesaid acts constitute willful and malicious misappropriation, thereby entitling Abhyanker to an award of exemplary damages

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

## PRAYER FOR RELIEF

WHEREFORE, Abhyanker prays for judgment against Counterdefendants as follows:

(i)      that Nextdoor.com take nothing by its Complaint;

(ii)     that Nextdoor.com's Complaint be dismissed with prejudice;

(iii)    that Abhyanker be awarded his costs of suit and attorneys' fees;

(iv)     that all Counterdefendants be preliminarily and permanently enjoined from further disclosing or using Abhyanker's LegalForce/Nextdoor trade secrets, as well as Abhyanker's confidential and proprietary non-trade secret information, including, but not limited to, the nextdoor.com website and domain name;

(v)      that Counterdefendant be enjoined from the practice of hiring and/or placing Entrepreneurs in Residence (EIR) that the fund intends to invest in, and which have not yet come up with a public business plan for their venture, to listen in on or participate in any way in meetings involving other entrepreneurs pitching ideas to the fund in an area of technology specialization that the EIRs intend to start a company of their own within and has not thought of or publicly released.

(vi)     that the Court order Nextdoor.com to transfer the nextdoor.com domain name to Abhyanker and order and direct VeriSign, Inc., the domain name registry for the nextdoor.com domain name, to change the registrar of record for the nextdoor.com domain name to a registrar selected by Abhyanker;

(vii)    on his trade secret misappropriation claim, that Abhyanker recover damages for his actual loss caused by the misappropriation;

(viii)   on his trade secret misappropriation claim, that Abhyanker recover for the unjust enrichment caused by Counterdefendants' misappropriation;

(ix)     on his trade secret misappropriation claim, that Abhyanker recover a reasonable royalty to the extent neither damages nor unjust enrichment are provable;

(x)      on his trade secret misappropriation claim, that Abhyanker recover exemplary damages;

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)

(xi)    that the Court order such further relief as it deems just and proper.

**<u>DEMAND FOR A JURY TRIAL</u>**

Abhyanker hereby demands a trial by jury on both Nextdoor.com's claims in the Complaint and his Counterclaim.

Dated: April 8, 2013                                  Respectfully submitted,

LEGALFORCE RAJ ABHYANKER, P.C.

By _____
Bruno W. Tarabichi
Kuscha Hatami
Attorneys for Defendant
Raj Abhyanker

35

AMENDED ANSWER & COUNTERCLAIM
(CASE NO. 3:12-cv-05667-EMC)