1 | **BRUNO W. TARABICHI**, CA State Bar No. 215129
bruno@legalforcelaw.com
2 | **KUSCHA HATAMI**, CA State Bar No. 282954
kuscha@legalforcelaw.com
3 | **ROY MONTGOMERY**, CA State Bar No. 279531
roy@legalforcelaw.com
4 | **LEGALFORCE RAJ ABHYANKER, P.C.**
1580 W. El Camino Real, Suite 13
5 | Mountain View, California 94040
Telephone:  650.965.8731
6 | Facsimile:   650.989.2131

Attorneys for Defendant
Raj Abhyanker

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation, | Case No. 3:12-cv-05667-EMC |
| Plaintiff, | **RAJ ABHYANKER'S RESPONSE TO COUNTERDEFENDANTS' OPPOSITION TO MOTION TO DISQUALIFY COUNSEL** |
| vs. | |
| RAJ ABHYANKER, an individual, | Date:       June 6, 2013 |
| Defendant. | Time:       1:30 PM |
| | Judge:      Honorable Edward M. Chen |
| RAJ ABHYANKER, an individual, | |
| Counterclaimant, | |
| vs. | |
| NEXTDOOR.COM, INC., a Delaware corporation; PRAKASH JANIKIRAMAN, an individual; BENCHMARK CAPITAL PARTNERS VII, L.P., a Delaware limited partnership; BENCHMARK CAPITAL MANAGEMENT CO. VII LLC, a Delaware limited liability company; SANDEEP SOOD, an individual; MONSOON COMPANY, an unknown business entity, and DOES 1–50, inclusive; | |
| Counterdefendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 5

I.   PURPORTED WAIVER BY "ETHICAL SCREEN" ............................................. 5

    A.   *Any Waiver Was Limited to the State Court Action* ................................................. 6

II.  ABHYANKER DID NOT "DELAY" IN BRINGING THE MOTION ................. 7

III. THE ENGAGMENTS ARE SUBSTANTIALLY RELATED ................................ 9

IV.  A CONFLICT DOES EXIST, AND DISQUALIFICATION IS WARRANTED ................ 15

V.   CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Kelly v. Roker*, No. C 11-05822, 2012 U.S. DIST. LEXIS 33604 (N.D. Cal. 2012) ....................... 6

*Stroud Production Enterprises, Inc. v. Castle Rock Entertainment, Inc.*, 09-3796-JSW ................ 6

*Brown v. Stroud*, 08-2348-JSW ................................................................................................... 6


**Rules**

California Rule of Professional Conduct 3-310(e) ......................................................................... 3

# INTRODUCTION

## Rule 3-310(e) of the California Rules of Professional Conduct

In the "Opposition to Abhyanker's Motion to Disqualify" (PACER 79, "Opposition") offered by Counter-defendants Prakash Janakiraman ("Janakiraman") and Nextdoor.com, Inc. ("Nextdoor"), only passing mention is made of the California Rules of Professional Conduct (PACER 79, 13:5-11). At the risk of belaboring the obvious, Rule 3-310(e) provides as follows:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Cal. R. Prof. Conduct 3-310(e).

The Rule prohibits attorneys from 'switching sides' in related matters. Its operation is clear: if legal counsel accepts employment – mistakenly, or otherwise – to represent a new client against an old one (assuming that confidential information material to the second employment was obtained from representing the first client), then legal counsel must resign. Here, the facts are simple:

- Fenwick & West ("Fenwick") represented Counter-claimant Raj Abhyanker ("Abhyanker") personally in 2006, when he retained Fenwick to form one of his companies, 102103, Inc., which later was renamed LegalForce, Inc.; Fenwick prepared agreements to protect trade secrets and other intellectual property invented by Abhyanker and to be developed by the company, and assisted with the sale of corporate securities. Abhyanker Declaration, 1:22-28; 2:1-14.

- Both prior to and after signing an engagement letter with Fenwick, Abhyanker had frequent contact with Fenwick intellectual property partner Rajiv Patel ("Patel"), with whom he continually discussed the company, its concepts, and its intellectual property. In addition, Patel drafted the engagement letter. Abhyanker Declaration, 1:22-28; 2:1-14.

- Confidential information was obtained by Fenwick during this representation, both by Patel and from other Fenwick attorneys who worked with Abhyanker and another individual, Counter-defendant Sandeep Sood ("Sood"), in preparing confidentiality and non-disclosure agreements. Abhyanker Declaration, 1:22-28.

- A legal controversy has arisen, in which Sood stands accused of misappropriating these trade secrets into another entity, Nextdoor.com, Inc., with the assistance of another individual, Prakash Janakiraman ("Janakiraman"). Abhyanker Declaration, 2:15-28; 3:17-28; 4:1-28; 5:1-22.

- Abhyanker is now pursuing legal claims for misappropriation of trade secrets against Sood, Janakiraman and Nextdoor.

- Nextdoor and Janakiraman have chosen to retain Fenwick.

Since Fenwick was forming a new company for Abhyanker, Abhyanker understood that Fenwick would be representing Abhyanker in his personal capacity and as the majority/sole shareholder of the company he was forming. Abhyanker Declaration, 2:5-7. As such, they sent the Engagement Letter to Abhyanker's personal partnership email address, raj@rajpatent.com and wrote that they were enthusiastic about the opportunity to work with Abhyanker (which Abhyanker understood to mean in my personal capacity) and as the sole/majority shareholder of his new company that they were helping to incorporate and form. Abhyanker Declaration, 2:7-12. Abhyanker paid $10,000 to Fenwick in 2006 and 2007 (a personal check #1010 was remitted on October 19, 2006 for $8410.75 and another personal check #1044 was remitted on March 30, 2007 for $ 1589.25). Abhyanker Declaration, 2:11-14. Abhyanker's interests are adverse to those of Nextdoor and Janakiraman. Fenwick's representation of Janakirman and Nextdoor is thus adverse to the interests of its former client, Abhyanker, and is impermissible because Fenwick's prior representation of Abhyanker provided it with confidential information which is material to this present dispute.

The counter-defendants nevertheless argue that Abhyanker has waived any right to object to this conflict of interest, because 1) he agreed to an "Ethical Screen" set up in November 2011 (Pacer 79, 12:9); 2) waiver resulted due to a purported delay in objecting to the conflict (Pacer 79, 15:11); 3) the instant representation is not "substantially related" to Fenwick's 2006 representation of Abhyanker (Pacer 79, 19:23); or 4) even if a conflict exists, Fenwick's disqualification is not warranted in this situation (Pacer 79, 23:18).

I.  **PURPORTED WAIVER BY "ETHICAL SCREEN"**

The counter-defendants, in their "Opposition to Abhyanker's Motion to Disqualify" (Pacer 79), raise the claim that Abhyanker has waived his right to object to Fenwick's representation. Referring to the "Ethical Screen" set up by Fenwick in November 2011, Fenwick claims, "Abhyanker's Motion all but ignores the single most important fact about this purported conflict: *that Abhyanker waived it in writing over a year ago.*" (Pacer 79, 12:14-16).

However, under Rule 3-310(e), for a written waiver to be effective, the "informed written consent of the … former client" is required. Cal. R. Prof. Conduct 3-310(e). During the previous State Court lawsuit in November 2011, Abhyanker agreed to an "Ethical Screen" erected by Fenwick, for that particular litigation only, based on facts that were known to him at the time. At that time, he was unaware of the collaboration by Counter-defendants Sood and Janakiraman in their misappropriation of trade secrets. Abhyanker Declaration, 1:1-14; 3:17-28; 4:1-28; 5:1-22. . Entirely unaware of these critical facts, Abhyanker agreed to an Ethical Screen in November 2011. Absent an understanding of the role played by Janakiraman – Fenwick's client - Abhyanker's agreement was clearly not "informed."

Simply put, without the <u>informed</u> written consent of its former client, Abhyanker, Fenwick has accepted employment adverse to Abhyanker in a matter in which, by reason of its prior representation, has obtained confidential information material to the employment. No amount of misdirection or mischaracterization can hide this fact.

**A. Any Waiver Was Limited to the State Court Action by the Express Terms of the "Ethical Screen"**

The counter-defendants next insist that the November 2011 "Ethical Screen" applies to the State Court action, as well as the subsequent Trademark Trials and Appeals Board ("TTAB") proceeding and the current Federal action.

However, even assuming the "Ethical Screen" was effective, the express terms of the agreement – i.e., as applying to "the above-referenced litigation" – are clear. Abhyanker did not draft this provision; Fenwick did. The language is clear, and the terms are unambiguous. At the time of the agreement, neither party had envisioned further litigation. Fenwick's attempt to now characterize "the above-referenced litigation" as extending to any and all litigation between the parties in the future constitutes a blatant attempt to reinterpret clear and express language. .

Moreover, the counter-defendant's reliance on *Kelly v. Roker*, No. C 11-05822, 2012 U.S. DIST. LEXIS 33604 (N.D. Cal. 2012), heard in this Court, in which an effort to disqualify counsel in a follow-up case was barred by failure to object in prior litigation, is misplaced. In *Kelly*, relatives of the deceased recording artist Nina Simone quarreled over rights to possession of the singer's recordings and personal belongings. The dispute evolved out of two previous judicial proceedings, also heard in this Court, *Brown v. Stroud*, 08-2348-JSW (the "*Stroud* Action") and *Stroud Production Enterprises, Inc. v. Castle Rock Entertainment, Inc.*, 09-3796-JSW. *Kelly's* opinion that "this case is yet another strand in the web of litigation between the parties, which has been pending for years" refers to three judicial actions in the same Court.

Setting aside for the moment Abhyanker's argument that the "Ethical Screen" was ineffective without his informed consent, Abhyanker agreed to the "Ethical Screen" only as applied to "the above-referenced litigation" – i.e., a state court action for trade secret misappropriation (as previously noted, Abhyanker did not choose this language; the "Ethical Screen" was drafted entirely by Fenwick). That matter was then dismissed, and litigation thus ended. Abhyanker subsequently commenced a trademark opposition proceeding in the Trademark Trials and Appeals Board (TTAB). However, TTAB proceedings are administrative

hearings limited to issues of trademark law; the Board cannot adjudicate issues involving trade secrets or other non-trademark issues, nor can parties seek damages. Abhyanker's TTAB proceeding thus did not involve the misappropriation of trade secrets at all, being strictly limited to his assertion of superior rights in the "Nextdoor" mark. Therefore, Abhyanker did not object to Fenwick's limited representation of the counter-defendant in the TTAB opposition. Abhyanker Declaration, 1:15-21.

Abhyanker's objection to Fenwick's representation is based on Fenwick's possession of confidential information related to misappropriated trade secrets; it has nothing to do with Abhyanker's rights to the "Nextdoor" mark. Fenwick's representation, as long as it was strictly limited to the TTAB proceeding, was not objectionable because any confidential information gained by the firm from its previous representation of Abhyanker was not material to their representation in the TTAB proceeding, which merely sought to clarify trademark rights. Abhyanker thus had no reason to object to Fenwick's representation – until Counter-defendants themselves filed suit in the instant action, reopening the issue of trade secret misappropriation.

## II. ABHYANKER DID NOT "DELAY" IN BRINGING THE MOTION

Counter-defendants assert that, even if disqualification of Fenwick is justified, Abhyanker had further waived his right to object by "waiting more than 18 months to file this Motion" (Pacer 79, 15:13-14). This is disingenuous.

As discussed above, Abhyanker had no reason to object to Fenwick's representation after the state court litigation had ended, or during the TTAB proceeding. Particularly, Abhyanker's TTAB proceeding thus did not involve the misappropriation of trade secrets at all, being strictly limited to his assertion of superior rights in the "Nextdoor" mark. Therefore, Abhyanker did not object to Fenwick's limited representation of the counter-defendant in the TTAB opposition. Abhyanker Declaration, 1:15-21.The docket shows that Counter-defendants filed the current lawsuit on November 5, 2012 (Pacer 1, "Complaint"); not until served with this complaint did Abhyanker have a reason to object to Fenwick's presence in the matter.

7

On December 3, 2012, Abhyanker learned for the first time that Sood improperly divulged information to the counter-defendants when Sood admitted filling out a survey for the counter-defendants prior to the launch of the counter-defendant's company, Nextdoor.com, Inc. Abhyanker Declaration, 2:15-17. Upon Abhyanker's discovery, he promptly notified Baker on January 10, 2013, requesting that Fenwick withdraw representation of the counter-defendants because Abhyanker discovered that their current representation of the counter-defendants was substantially related to their prior representation of me and LegalForce, Inc. which included the protection of trade secrets developed by Sood in 2006. Abhyanker Declaration, 3:3-8; Exh. D. In this e-mail Abhyanker informed Baker of the newly-discovered facts concerning Sandeep Sood's misappropriation of trade secrets into the possession of Prakash Janakiraman, a Fenwick client. Abhyanker Declaration, 3:3-10.

Abhyanker informed Baker in no uncertain terms that "there is a substantial relationship between the former representation of LegalForce, Inc. by Fenwick & West, and Fenwick & West's current representation of Nexdoor.com, Inc. in this lawsuit against me. This requires immediate mandatory withdrawal by Fenwick & West from its representation of Nextdoor.com, Inc. per the "substantial relationship" test with respect to California Rules of Professional Conduct". Responding by letter on January 23, 2013, Fenwick acknowledged Abhyanker's January 10 e-mail, but refused to withdraw.

Abhyanker then filed an Amended Answer and Counterclaim on April 12, 2013 (Pacer 59). His Motion to Disqualify (Pacer 70) followed on April 25, 2013, less than two weeks later.

Clearly, Abhyanker did not "delay" in bringing his Motion to Disqualify; indeed, his objections to Fenwick's representation were continuous and consistent. Only after finding it impossible to reach an agreement with Fenwick did Abhyanker resort to Motion. Counter-defendants' own Opposition enumerates only some of Abhyanker's constant objections to Fenwick's representation, which they attempt to characterize as "attempt(s) to renege on his consent" ("Abhyanker's First Attempt to Renege on His Consent", Pacer 79 at 6:3, and "Abhyanker's Second Attempt to Renege on his Consent", Pacer 79 at 9:14).

Counter-defendants' assertion of an "18 month" delay is thus unfounded and disingenuous; Abhyanker's Motion to Disqualify Counsel is timely.

### III. THE ENGAGMENTS ARE SUBSTANTIALLY RELATED

Counter-defendants put forth another argument, that "Fenwick's former role in LegalForce's corporate formation is not substantially related to defense of Nextdoor.com against Abhyanker's trade secret claims." (Pacer 79, 19:26-28). Further claims are made to the effect that "Fenwick's representation of LegalForce was limited to incorporating the entity, providing related corporate advice, and preparing basic form agreements that could be used by LegalForce in its business." (Pacer 79, 20:21-21:1). However, this mischaracterizes the role of Fenwick and its attorneys.

Prior to the engagement letter under which Fenwick began its representation of Abhyanker, and continuing into and beyond the period in which Fenwick corporate attorneys provided their services, Abhyanker engaged in frequent and continuous discussions of his evolving company with Fenwick intellectual property partner Rajiv Patel. Fenwick has attempted to mischaracterize these contacts as a one-time affair, occurring at "a dinner party at Mr. Patel's house" (Pacer 79, 4:15-16). This is untrue. Abhyanker and Patel were personal friends, and frequently spent time in each other's company, bringing their families to each other's houses. Abhyanker Declaration 1:22-28. The evolving intellectual property of Abhyanker's companies was a topic of frequent discussion, and Patel's expert advice was sought and given. It is largely because of his relationship with Patel that Abhyanker sought Fenwick representation, and it is not surprising that Patel then drafted the engagement letter. Abhyanker hired Fenwick in 2006 based on his personal and professional friendship with Patel, whom Abhyanker also knew to be a highly regarded intellectual property attorney at Fenwick and a professor of patent law at U.C. Hastings Law School. Abhyanker Declaration 2:1-3.

Counter-defendants make the further attempt to minimize the work done by Patel and other Fenwick attorneys, stating that "corporate work would be done by Sayre Stevik, a corporate partner. Stevik ultimately billed only 3.7 hours to LegalForce, with the bulk of the work being

done by a corporate associate who left the Firm in 2008." (Pacer 79, 21:7-10). Abhyanker's records disclose two payments to Fenwick for their services, totaling $10,000.00. Abhyanker Declaration 2:11-14. The facts show that Fenwick was deeply involved with Abhyanker and his company, participating in the development of internal agreements as well as the structuring and sale of financial instruments raising capital for the company. Abhyanker Declaration 2:3-12.

As for Patel, Counter-defendants assert that "Patel never billed any time to the LegalForce Matter" (Pacer 79, 21:11). Whether Patel did, or did not bill time to LegalForce this is, of course, irrelevant to the formation of an attorney-client relationship. Moreover, it is instructive that Fenwick's own website, discussing the firm's Start-Up and Venture Capital Practice, states that the firm will "invest in off-the-clock meetings with management and the board." See Fenwick's website URL : http://www.fenwick.com/Services/Practices/Pages/Start-ups-and-Venture-Capital.aspx).

The facts thus show that Fenwick and its attorneys were deeply involved with Abhyanker and his company, and billed accordingly. Counter-defendants' attempts to minimize this involvement is understandable, but not supported by the facts.

On December 3, 2012, Abhyanker learned for the first time that Sood improperly divulged information to the counter-defendants when Sood admitted filling out a survey for the counter-defendants prior to the launch of the counter-defendant's company, Nextdoor.com, Inc. Abhyanker Declaration, 2:15-17. The user interface view in Exhibit A was created by Sood in 2006 while he was a contractor the Abhyanker and the company LegalForce, Inc. that Fenwick formed in 2006. Abhyanker Declaration, 2:20-22. It should be noted that Sood never was hired or worked for a separate company Abhyanker later formed, Fatdoor, Inc. which centers around a different concept related to an open, Wikipedia-like neighborhood commenting software. Abhyanker Declaration, 2:22-24.

Abhyanker prototyped the Nextdoor concept at his Menlo Park office at 4400 Bohannan Court, Menlo Park, California in a neighborhood and street approximately .2 miles away called Lorelei. Abhyanker Declaration, 2:25-28; Exh. B. In 2006, Sood placed his trade secret source

code and designs related to the Nextdoor software technology related to this user interface on at least one staging server identified in the Exhibits to the Declaration by Tyler Baker ("Baker"), who is General Counsel at Fenwick. Abhyanker Declaration, 3:1-3. Upon Abhyanker's discovery, he promptly notified Baker on January 10, 2013, requesting that Fenwick withdraw representation of the counter-defendants because Abhyanker discovered that their current representation of the counter-defendants was substantially related to their prior representation of Abhyanker and LegalForce, Inc. which included the protection of trade secrets developed by Sood in 2006. Abhyanker Declaration, 3:3-8; Exh. D.

Furthermore, Abhyanker also learned the following information during the last quarter of 2012 from conversations with Sood and Nirav Tolia ("Tolia") (the Chief Executive Officer of the counter-defendant), Abhyanker Declaration, 3:12-14.

- Particularly, Sood was a close friend of Nextdoor co-founder Prakash Janikiraman ("Janikiraman"), with whom he has maintained a friendship for over 15 years. Abhyanker Declaration, 3:17-19.

- Sood and Janikiraman have known each other since studying together at the University of California at Berkeley in the mid-1990s. Abhyanker Declaration, 3:20-22.

- Sood was aware that he agreed to and was subject to a legally binding confidentiality agreement and non-disclosure agreement, the duration of which extended for 5 years beginning in September 2006, with Abhyanker and his new entity formed by Fenwick. Abhyanker Declaration, 3:23-25.

- Sood admitted that he "always helps friends from school" including helping Janikiraman, but he later claimed that he did so without violating my trust. Abhyanker Declaration, 3:26-28.

- Contrary to Sood's declaration, Sood acknowledged that he knew he was being recorded in a conversation with Abhyanker when told everything would be recorded. He responded 'Oh Okay,' clearly indicating consent to the recording. Abhyanker Declaration, 4:1-4.

- Sood did not contest the fact that he knew attorneys at Fenwick when they helped Abhyanker protect trade secrets Abhyanker was developing that were related to Nextdoor in 2006. Abhyanker Declaration, 4:5-6.

- Sood admitted that in or around the fall of 2010 he filled out a survey for Janikiraman prior to the counter-defendants' company adopting Abhyanker's Nextdoor namesake. Abhyanker Declaration, 4:8-10.

- Janikiraman recommended that the counter-defendants test their misappropriated technology in Abhyanker's neighborhood (the Lorelei street neighborhood) in or around the fall of 2010.  As shown in Exhibit B, this street is precisely located next to Abhyanker's physical office in Menlo Park in 2006, where Abhyanker first prototyped Nextdoor developed by Sood as shown in Exhibit A.  Abhyanker Declaration, 4:10-15.

- Sood admitted to meeting socially with Janikiraman after filling out the survey. Abhyanker Declaration, 4:16.

- Sood also admitted to corresponding via email between he and Janikiraman, but he refused to share these emails with Abhyanker (Exhibit C).   Abhyanker Declaration, 4:18-20.

- The Lorelei Street neighborhood was chosen to test Janikiraman's concept despite the fact that Janikiraman and other co-founders of Nextdoor resided nearly 30 miles away in San Francisco (Exhibit B). Abhyanker Declaration, 4:21-23.

- Tolia falsely credited Janikiraman as the inventor of a key technology that was originally developed by Abhyanker and Sood and that only allows people who live in a specific neighborhood to join its network (Exhibit E). Abhyanker Declaration, 4:25-28.

- According to Tolia, Janikiraman chose our 'Nextdoor' namesake and picked the Lorelei Street Neighborhood to test the counter-defendants' concept in 2010. Abhyanker Declaration, 5:1-3.

- According to Tolia, Janikiraman negotiated and purchased the Nextdoor domain name in 2011 from an individual with whom Abhyanker had placed a number of competing offers. As early as 2006, Sood was copied on emails Abhyanker sent pertaining to negotiations to purchase the Nextdoor domain. Abhyanker Declaration, 5:4-8.

- According to Tolia, Nextdoor took an "MBA" approach to pivoting their company to the Nextdoor concept after their previous concept, Fanbase, failed to gain traction in 2009. Abhyanker understood the "MBA" approach to mean that the counter-defendants 'borrowed' the ideas of others through a "case study" method in which they studied other individual's concepts and then used them. Abhyanker Declaration, 5:9-14.

- Nextdoor sought to develop a concept that they were confident would lead to something 'on the other side of the rainbow' by using the MBA approach, rather than take the traditional Silicon Valley approach of inventing their own concept by "damning the torpedoes and going for it". Abhyanker Declaration, 5:15-19.

- Sood claims he deleted all of his emails prior to November 1, 2006 that were related to his work for Abhyanker regarding the Nextdoor concept (Exhibit F). Abhyanker Declaration, 5:20-21.

If the Court permits Fenwick to represent the counter-defendants, Abhyanker's interests would be severely and detrimentally harmed due to Fenwick's representation of Abhyanker in 2006 in protecting the very same trade secrets that they now claim Abhyanker does not own. Abhyanker Declaration, 6:3-6. The counter-defendants have launched a website and a company which is strikingly similar in appearance, design, and technology to the LegalForce/Nextdoor trade secrets developed by Sood and Abhyanker in 2006 (compare Exhibit A with Exhibit G). Abhyanker Declaration, 6:6-9. Even the logo and color theme of the counter-defendant's website looks strikingly similar, with the chimney clearly visible and shifted to the other side. Abhyanker Declaration, 6:9-10.

In contrast, the counter-defendants can easily afford to find new counsel at this time. No answer to the counterclaims has been filed. Abhyanker Declaration, 6:12-13. Moreover, the counter-defendants have raised more than $40 million dollars in venture capital funds, including more than $21 million dollars as recently as February 2013 (Exhibit H). Abhyanker Declaration, 6:13-15. As such, the counter-defendants would not be disadvantaged if they were required to find new counsel. Abhyanker Declaration, 6:15-16.

Abhyanker did not bring this request lightly. Abhyanker Declaration, 6:17-18. Abhyanker feels humiliated and embarrassed by the inflammatory language used by his former counsel Fenwick in their pleadings and motions. Abhyanker Declaration, 6:18-19. The counter-defendants were previously involved in a similar civil actions brought forth by other individuals based on fraud and unfair business acts. Abhyanker Declaration, 6:19-21; Exh. I, J & K. Similarly, Fenwick has recently tried to evade disqualification in a matter related to corporate issues, in which they were expressly requested to withdraw by the Securities & Exchanges Commission in 2011. Abhyanker Declaration, 6:21-24; Exh. L.

Abhyanker sought and paid over $4000 for a general ethics counsel related to this matter from Ellen Pansky of Pansky & Markle during the past eighteen months related to bringing a motion to disqualify Fenwick, at her standard billing rate of $550 per hour (including check numbers 3027 in the amount of $2400, check number 3284 in the amount of $1840 and check number 3576 in the amount of $420).  Abhyanker Declaration, 6:25-28, 7:1-2.  Abhyanker is just one individual and has limited resources.  Abhyanker Declaration, 7:2-3.  At least for the reasons described herein and shown in the Exhibits, this request to disqualify Fenwick as counsel for the counter-defendants should be granted.  Abhyanker Declaration, 6:4-5.

### IV.   A CONFLICT DOES EXIST, AND DISQUALIFICATION IS WARRANTED

Counter-defendants advance a final argument, asserting that Fenwick's conflict of interest should be ignored because of the presumable attenuation caused by a) the limited number of hours spent by Fenwick on the Abhyanker representation, and b) the passage of time.  Fenwick's characterization of the representation as having taken "3.7 hours" has already been discussed, above; it is clear that the firm rendered a substantial amount of legal work.

Moreover, Counter-defendants' argument regarding the attenuating effects caused by the passage of time is, like similar assertion that Mr. Patel was not paid for legal advice, irrelevant.  A firm is, or is not, conflicted.  Here the facts show that Fenwick was deeply involved with Abhyanker and his company.

### V.   CONCLUSION

For the foregoing reasons, the defendant respectfully requests that this Court disqualify Fenwick from any further representation of plaintiff Nextdoor in this litigation.

Dated: May 16, 2013                **LEGALFORCE RAJ ABHYANKER, P.C.**

/s/ Roy Montgomery
Roy Montgomery
Attorney for Defendant