1  **BRUNO W. TARABICHI**, CA State Bar No. 215129
   bruno@legalforcelaw.com
2  **KUSCHA HATAMI**, CA State Bar No. 282954
   kuscha@legalforcelaw.com
3  **ROY MONTGOMERY**, CA State Bar No. 279531
   roy@legalforcelaw.com
4  **LEGALFORCE RAJ ABHYANKER, P.C.**
   1580 W. El Camino Real, Suite 13
5  Mountain View, California 94040
   Telephone:  650.965.8731
6  Facsimile:   650.989.2131

7
   Attorneys for Defendant
8  Raj Abhyanker

9                UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12 NEXTDOOR.COM, INC., a Delaware            Case No. 3:12-cv-05667-EMC
   corporation,
13                                           **DECLARATION OF RAJ ABHYANKER
              Plaintiff,                      IN SUPPORT OF DEFENDANT'S
14                                            RESPONSE TO COUNTERDEFENDANTS'
        vs.                                   OPPOSITION TO MOTION TO
15                                            DISQUALIFY COUNSEL**
   RAJ ABHYANKER, an individual,
16                                           Date:        June 6, 2013
              Defendant.                     Time:        1:30 PM
17                                           Judge:       Honorable Edward M. Chen
18
   RAJ ABHYANKER, an individual,
19
              Counterclaimant,
20
        vs.
21
   NEXTDOOR.COM, INC., a Delaware
22 corporation; PRAKASH JANIKIRAMAN,
   an individual; BENCHMARK CAPITAL
23 PARTNERS VII, L.P., a Delaware limited
   partnership; BENCHMARK CAPITAL
24 MANAGEMENT CO. VII LLC, a
   Delaware limited liability company;
25 SANDEEP SOOD, an individual;
   MONSOON COMPANY, an unknown
26 business entity, and DOES 1–50, inclusive;

27            Counterdefendants.

28

1

## DECLARATION OF RAJ ABHYANKER

2

I, Raj Abhyanker, hereby declare and state as follows:

3

My name is Raj Abhyanker and I am the counter-plaintiff in this case.  During the State

4

5

Court lawsuit in November 2011, I agreed to a narrow ethical screen by Fenwick & West

6

("Fenwick") that was expressly limited to the State Court lawsuit because I thought that my trade

7

secrets were misappropriated through Bret Taylor and Jim Norris at Benchmark Capital in 2007,

8

and were unconnected to Fenwick's representation of me in 2006 in protecting my assets through

9

a company they created for me that year called 102103, Inc. (and later renamed to LegalForce,

10

Inc.).   Particularly, I lacked sufficient evidence during the State Court lawsuit to show that the

11

misappropriation was through Sandeep Sood ("Sood"), an independent contractor whom I hired

12

to develop websites for me in the fall of 2006.  For this reason, I dropped that lawsuit without

13

prejudice.

14

I requested that my attorneys file a trademark opposition with the United States

15

Trademark Trials and Appeals Board (TTAB) after dropping the State Court lawsuit which was

16

based on priority and trademark law, and did not involve trade secrets.  Because the TTAB

17

opposition did not involve trade secrets in 2006, there was no conflict with Fenwick's

18

representation of the counter-defendants in the TTAB opposition.   Therefore, I did not object to

19

20

Fenwick's limited representation of the counter-defendant in the TTAB opposition.

21

In the summer of 2006, I hired my friend Rajiv Patel ("Patel"), a partner in the intellectual

22

23

property group at Fenwick to represent my interests and incorporate a new corporation (102103,

24

later renamed LegalForce) to protect the software technologies I was developing, including the

25

technologies related to Nextdoor being developed by Sood.   Patel is a close family friend and we

26

regularly met on weekends in 2006, including babysitting each other's children and attending

27

family functions and outings together.   I hired Fenwick in 2006 based on my personal and

28

RESPONSE TO OPPOSITION TO
MOTION TO DISQUALIFY
(CASE NO. 3:12-CV-05667-EMC

professional friendship with Patel, whom I also knew to be a highly regarded intellectual property attorney at Fenwick and a professor of patent law at U.C. Hastings Law School.

After Fenwick partner Patel helped me with intellectual property strategy, Fenwick sent a new engagement letter for me to sign on July 27, 2006.  Since Fenwick was forming a new company for me, I understood that they would be representing me in my personal capacity and as the majority/sole shareholder of the company I was forming.  As such, they sent the Engagement Letter to my personal partnership email address, raj@rajpatent.com and wrote that they were enthusiastic about the opportunity to work with me (which I understood to mean in my personal capacity) and as the sole/majority shareholder of my new company that they were helping to incorporate and form.  I paid $10,000 to Fenwick in 2006 and 2007 (a personal check #1010 was remitted on October 19, 2006 for $8410.75 and another personal check #1044 was remitted on March 30, 2007 for $ 1589.25).

On December 3, 2012, I learned for the first time that Sood improperly divulged information to the counter-defendants when Sood admitted filling out a survey for the counter-defendants prior to the launch of the counter-defendant's company, Nextdoor.com, Inc.  I have attached a user interface view of software technology developed by Sood for me in 2006 that visualizes the LegalForce/Nextdoor trade secrets in Exhibit A.   The user interface view in Exhibit A was created by Sood in 2006 while he was a contractor for me and the company LegalForce, Inc. that Fenwick formed for me in 2006.  It should be noted that Sood never was hired or worked for a separate company I later formed, Fatdoor, Inc. which centers around a different concept related to an open, Wikipedia-like neighborhood commenting software.   We prototyped the Nextdoor concept at my Menlo Park office at 4400 Bohannan Court, Menlo Park, California in a neighborhood and street approximately .2 miles away called Lorelei (Exhibit B).   In 2006, Sood placed his trade secret source code and designs related to the Nextdoor

RESPONSE TO OPPOSITION TO
MOTION TO DISQUALIFY
(CASE NO. 3:12-CV-05667-EMC

software technology related to this user interface on at least one staging server identified in the Exhibits to the Declaration by Tyler Baker ("Baker"), who is General Counsel at Fenwick.

Upon my discovery, I promptly notified Baker on January 10, 2013, requesting that Fenwick withdraw representation of the counter-defendants because I discovered that their current representation of the counter-defendants was substantially related to their prior representation of me and LegalForce, Inc. which included the protection of trade secrets developed by Sood in 2006 (Exhibit D).   Since it was close to the beginning of 2013, I inadvertently wrote January 10, 2012 rather than January 10, 2013 in the cover letter of this email.  However, the time stamp of the email is clear and I have attached it here as Exhibit D.

I also learned the following information during the last quarter of 2012 from conversations with Sood and Nirav Tolia ("Tolia") (the Chief Executive Officer of the counter-defendant), conversations they consented to having recorded.  If the court requests them, I can provide the original audio recordings to the court.   During these consented meetings, emails and conversations, I discovered the following:

- Sood was a close friend of Nextdoor co-founder Prakash Janikiraman ("Janikiraman"), with whom he has maintained a friendship for over 15 years.

- Sood and Janikiraman have known each other since studying together at the University of California at Berkeley in the mid-1990s.

- Sood was aware that he agreed to and was subject to a legally binding confidentiality agreement and non-disclosure agreement, the duration of which extended for 5 years beginning in September 2006, with me and my new entity formed by Fenwick.

- Sood admitted that he "always helps friends from school" including helping Janikiraman, but he later claimed that he did so without violating my trust.

- Contrary to Sood's declaration, Sood acknowledged that he knew he was being recorded in a conversation with me when I told him I would be recording everything. He responded 'Oh Okay,' clearly indicating consent to the recording.

- Sood did not contest the fact that he knew attorneys at Fenwick when they helped me protect trade secrets he was developing that were related to Nextdoor in 2006.

- Sood admitted that in or around the fall of 2010 he filled out a survey for Janikiraman prior to the counter-defendants' company adopting our Nextdoor namesake.

- Janikiraman recommended that the counter-defendants test their misappropriated technology in my neighborhood (the Lorelei street neighborhood) in or around the fall of 2010.  As shown in Exhibit B, and as described earlier, this street is precisely located next to my physical office in Menlo Park in 2006, where we first prototyped Nextdoor developed by Sood as shown in Exhibit A.

- Sood admitted to meeting socially with Janikiraman after filling out the survey.

- Sood also admitted to corresponding via email between he and Janikiraman, but he refused to share these emails with me (Exhibit C).

- The Lorelei Street neighborhood was chosen to test Janikiraman's concept despite the fact that Janikiraman and other co-founders of Nextdoor resided nearly 30 miles away in San Francisco (Exhibit B).

- Tolia falsely credited Janikiraman as the inventor of a key technology that was originally developed by myself and Sood and that only allows people who live in a specific neighborhood to join its network (Exhibit E).

- According to Tolia, Janikiraman chose our 'Nextdoor' namesake and picked the Lorelei Street Neighborhood to test the counter-defendants' concept in 2010.

- According to Tolia, Janikiraman negotiated and purchased the Nextdoor domain name in 2011 from an individual with whom I had placed a number of competing offers.  As early as 2006, Sood was copied on emails I sent pertaining to negotiations to purchase the Nextdoor domain.

- According to Tolia, Nextdoor took an "MBA" approach to pivoting their company to the Nextdoor concept after their previous concept, Fanbase, failed to gain traction in 2009.  Having an MBA degree myself, I understood the "MBA" approach to mean that the counter-defendants 'borrowed' the ideas of others through a "case study" method in which they studied other individual's concepts and then used them.

- Nextdoor sought to develop a concept that they were confident would lead to something 'on the other side of the rainbow' by using the MBA approach, rather than take the traditional Silicon Valley approach of inventing their own concept by "damning the torpedoes and going for it".

- Sood claims he deleted all of his emails prior to November 1, 2006 that were related to his work for me regarding the Nextdoor concept (Exhibit F).

On January 23, 2013, Baker responded to me, stating that Fenwick would not withdraw from representing the counter-defendants.   I requested that my attorneys prepare a motion to disqualify Fenwick, given that they represented me in 2006 in protecting my trade secrets, including those developed by Sood.  My counsel filed a First Amended Complaint on April 12, 2013, and a Motion to Disqualify Fenwick as counsel for the co-defendants on April 25, 2013.

To date, Fenwick has not prepared or filed a responsive pleading to the counter-claims presented in the original complaint or the First Amended Complaint.

If the Court permits Fenwick to represent the counter-defendants, my interests would be severely and detrimentally harmed due to Fenwick's representation of me in 2006 in protecting the very same trade secrets that they now claim I do not own.   The counter-defendants have launched a website and a company which is strikingly similar in appearance, design, and technology to the LegalForce/Nextdoor trade secrets developed by Sood and myself in 2006 (compare Exhibit A with Exhibit G).  Even the logo and color theme of the counter-defendant's website looks strikingly similar, with the chimney clearly visible and shifted to the other side.

In contrast, the counter-defendants can easily afford to find new counsel at this time.  No responsive pleading has been filed.  Moreover, the counter-defendants have raised more than $40 million dollars in venture capital funds, including more than $21 million dollars as recently as February 2013 (Exhibit H).  I do not believe the co-defendants would be disadvantaged if they were required to find new counsel.

I do not bring this request lightly.  I am humiliated and embarrassed by the inflammatory language used by my former counsel Fenwick in their pleadings and motions.  The counter-defendants were previously involved in a similar civil action brought forth by other individuals based on fraud and unfair business acts (see Exhibits I, J, & K).  Similarly, Fenwick has recently tried to evade disqualification in a matter related to corporate issues, in which they were expressly requested to withdraw by the Securities & Exchanges Commission in 2011 (LexisNexis Law360 article, Exhibit L).

I sought and paid over $4000 for a general ethics counsel related to this matter from Ellen Pansky of Pansky & Markle during the past eighteen months related to bringing a motion to disqualify Fenwick, at her standard billing rate of $550 per hour (including check numbers 3027

RESPONSE TO OPPOSITION TO
MOTION TO DISQUALIFY
(CASE NO. 3:12-CV-05667-EMC

1    in the amount of $2400, check number 3284 in the amount of $1840 and check number 3576 in

2    the amount of $420).   I am just one individual and I have limited resources.  At least for the

3    reasons described herein and shown in the Exhibits, I believe my request to disqualify Fenwick as

4    counsel for the counter-defendants should be granted.

5            I declare under penalty of perjury under the laws of the State of California that the

6    foregoing is true and correct, and that this declaration was executed on May 16, 2013, at Palo

7    Alto, California.

8

9

10                                          /S/ Raj Abhyanker

11                                  **RAJ ABHYANKER**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO OPPOSITION TO
MOTION TO DISQUALIFY
(CASE NO. 3:12-CV-05667-EMC

# EXHIBIT A

User interface from Nextdoor website created by Sandeep Sood in 2006



# EXHIBIT B

Lorelei neighborhood next to Abhyanker's office in 2006







# EXHIBIT C

Sandeep Sood's admission that he 'barely' remembered survey he filled.

---------- Forwarded message ----------
From: **sandeep sood** <sandeep@monsoonco.com>
Date: Mon, Dec 3, 2012 at 2:05 PM
Subject: Re: Nextdoor survey you filled, preserve, witness request
To: Raj Abhyanker <raj@legalforcelaw.com>
Cc: Monika Hortnagl <monika@monsoonco.com>

Raj,
I'd be happy to chat with you.

This week is pretty cramped, but we can talk sometime next week.

I don't have the survey I filled out (barely even remember filling it out).  Also, I don't feel comfortable or obliged sharing email correspondence between myself and an old friend from college.

If you want to continue to involve me, I'm happy to chat.  I'm cc'ing Monika, who can schedule a time for us to chat.

s


**Sandeep Sood**
Principal
**Monsoon Company**
350 Frank Ogawa Plaza
Oakland 94612
o: 510.991.6401 | m: 510.593.7031 |


monsoonco.com @soodsandeep



On Dec 3, 2012, at 8:40 AM, Raj Abhyanker wrote:


Sandeep,

Thanks for your response.   I am in a dispute with Nextdoor.com, Inc.  They started a company with the exact same name and concept as ours in 2011.    Prakash Janikiraman is a cofounder, and this company is a pivot from Fanbase.   I have learned that you received a survey sent to friends and family members by Fanbase/Prakash Janikiraman in 2010 (around October 2010) prior to Nextdoor's launch asking something like :

*If there was a neighborhood social network, would you use it.*

I know that you filled out the survey, sent him emails, and spoke on the phone with him letting him know that you worked with me on the concept early on but that you did not continue with it.    I want to get this information now directly from you so that formal process can be avoided to get the same communications (now saved for discovery).  Can you send to me the survey you received and filled, and any email correspondences between you, Prakash, and/or Nextdoor.com, Inc.?

  You were a paid work for hire contractor to me personally in 2006 on this concept, and it is important for me to find out what happened.    I have been trying to acquire the Nextdoor domain to continue building the concept as late as 2010, but Prakash bought the domain for approximately $58,000.

I plan on continuing the case against Nextdoor.com, Inc., and need to better understand your perspective on things.    Please keep safe and archived any evidence you have as it will be required.

I value your acquaintance and friendship, and trust you will help me understand what happened.  I want to keep you out of this dispute, but I need your help as a cooperating witness.

Please email me what you have this week.  Feel free to call me if you have any questions on my cell at 4083983126.

Kind regards,


Raj


Sent from my iPhone

Sent from my iPad

On Nov 16, 2012, at 3:04 PM, sandeep sood <sandeep@monsoonco.com> wrote:

Great to hear from you, man - will let you know if I come across any interesting web designers.

Prakash went to UC Berkeley with me, although we haven't kept in touch too well over the years.

**Sandeep Sood**
Principal

**Monsoon Company**
1250 Addison Street, #204
o: 510.991.6401 | m: 510.593.7031 |


monsoonco.com @soodsandeep


On Nov 16, 2012, at 8:33 AM, Raj Abhyanker wrote:


Sandeep,

How are things?  All is well, I am going to India next month.   We are opening a retail store in downtown Palo Alto, see :


I am looking for a talented web designer who can help us layout and write content creatively and in a clear manner.   Do you know of a good branding agency that you could recommend me to?

Also, do you by any chance know someone named Paraksh Janikiraman?

Raj

# EXHIBIT D

Raj's email on January 10 2013 to Fenwick & West

---------- Forwarded message ----------

From: Raj Abhyanker <raj@legalforcelaw.com>

Date: Thu, Jan 10, 2013 at 5:49 PM

Subject: Demand for voluntary withdrawal from representation of Nextdoor.com, Inc. & Fenwick representation of LegalForce, "substantial relationship" between the former of LegalForce, Inc. and the current representation of Nextdoor.com, Inc.

To: SStevick@fenwick.com, TBaker@fenwick.com

Cc: epansky@panskymarkle.com, Bruno Tarabichi <bruno@legalforcelaw.com>

ATTORNEY CLIENT PRIVILEGED

Re:  Demand for voluntary withdrawal from representation of Nextdoor.com, Inc. & Fenwick representation of LegalForce, "substantial relationship" between the former of LegalForce, Inc. and the current representation of Nextdoor.com, Inc.

January 10, 2012

Mr. Tyler Baker and Mr. Sayre Stevick,

My former company of 2006, LegalForce, Inc. is a former client of Fenwick & West.     I paid more than $10,000 to the Fenwick & West law firm in handling the corporate formation, equity distribution, convertible note distribution, and organization of LegalForce, Inc. in 2006 and 2007.     I, personally, reacquired all assets and liabilities from LegalForce, Inc. in 2008 in an orderly wind down of the company.

Fenwick & West now represents Nextdoor.com, Inc. as a Plaintiff in a lawsuit filed against me in federal court.    Our Answer and Counter-Claims in this dispute were filed today.

Please note that there is a substantial relationship between the former representation of LegalForce, Inc. by Fenwick & West, and Fenwick & West's current representation of Nextdoor.com, Inc. in this lawsuit against me.   This requires immediate mandatory withdrawal by Fenwick & West from it's representation of Nextdoor.com, Inc. per the  "substantial relationship" test with respect to California Rules of Professional Conduct at least because of the reasons outlined below.

Particularly, a co-founding contractor to LegalForce, Inc., Mr. Sandeep Sood provided key trade secrets to Prakash Janikiraman at Nextdoor.com, Inc. in violation of his independent contractor and non disclosure agreement with me related to LegalForce, Inc. and Nextdoor.com.   Sandeep Sood was a hired contractor subject to a binding non-disclosure and confidentiality agreement in 2006, and developed, prototyped, and was hired to build an online social network called 'Nextdoor' under this agreement. This online version of the social network 'Nextdoor' was an extension of the geo-spatial neighborhood inventor network of LegalForce (e.g., geo-coding of inventor addresses so that inventors in a local area can network with each other, as the attached invoices and email chains will demonstrate).   Sandeep Sood was present in meetings with me at Fenwick & West offices for LegalForce, Inc. related meetings in 2006.   Sandeep Sood was a paid contractor to me with respect to LegalForce and Nextdoor until I decided to put the ventures on hold to explore the Fatdoor business model.   Attached are invoices that prove this fact.   Also, please separately review the Answer and Counterclaims that attorney prepared and filed today.

Sandeep Sood has admitted to divulging key trade secrets of LegalForce, Inc. and the Nextdoor.com concept to a Mr. Prakash Janikiraman, a co-founder of Nextdoor.com, Inc. in 2010, and now represented by Fenwick & West.

This admission was confirmed in a consented audio recording between Sandeep Sood and myself in December 2012.   If you wish, this consented auto recording can be delivered to Fenwick & West offices for your review to confirm the existing conflict.  Given the substantial relationship between Fenwick & West's prior representation of LegalForce, Inc. and the matters in my present dispute, I hereby demand that Fenwick & West voluntarily withdraw from it's representation from Nextdoor.com, Inc.

 Please note that I have a great deal of respect for the Fenwick & West law firm, and wish to have this matter remain private.   Should Fenwick & West choose to continue representing Nextdoor.com, Inc., the conflict will be subject to motion practice (which Fenwick will lose), and public media and California State Bar scrutiny.      Instead, I respectfully request that Fenwick voluntarily withdraw at this time from its representation of Nextdoor.com, Inc. with immediate effect.

I have copied my counsel on this matter Ellen Pansky, an attorney certified by the State Bar of California Board of Legal Specialization in the area of Legal Malpractice Law (see: http://panskymarkle.com/ellen-pansky.html)i.   I have also pasted below a case that she provided to me which discusses "side-switching" and the "substantial relationship" test with respect to California Rules of Professional Conduct.   I have also copied my counsel with respect to the current litigation, Mr. Bruno Tarabichi.

Please let me know your commitment to immediately and voluntarily withdrawing from representation of Nextdoor.com, Inc. no later than January 31, 2013.

Thank you,

Raj Abhyanker

-------------

 Excerpt from Henriksen v. Great American Savings (1992) 11 Cal. App. 4th 109, the "substantial relationship test" is discussed, as is the limited acceptance of screening:

We start with the rules which would prohibit Brock from representing appellants. [4] Under rule 3-310(D) of the California Rules of Professional Conduct, an attorney may not represent a new client whose interests are adverse to those of a former client on a matter in which the attorney has obtained confidential information. fn. 4 The purpose of the rule is to protect the confidential relationship which exists between attorney and client, a relationship which continues after the formal relationship ends. (David Welch Co. v. Erskine & Tulley (1988) 203 Cal. App. 3d 884, 891 [250 Cal.Rptr. 339].) The fiduciary nature of that relationship requires the application of strict standards. (Civil Service Com. v. Superior Court (1984) 163 Cal. App. 3d 70, 79 [209 Cal.Rptr. 159].) For that reason, a former client may seek to disqualify a former attorney from representing an adverse party by showing that the former attorney possesses confidential information adverse to the former client. (H. F. Ahmanson & Co. v. Salomon Brothers, Inc. (1991) 229 Cal. App. 3d 1445, 1452 [280 Cal.Rptr. 614].) [11 Cal. App. 4th 114]

In order to seek disqualification, the former client need not establish that the attorney actually possesses confidential information. It is enough to show that there was a "substantial relationship" between the former and the current representation. If the former client establishes the existence of a substantial relationship between the two representations the court will conclusively presume that the attorney possesses confidential information adverse to the former client and order disqualification. (River West, Inc. v. Nickel (1987) 188 Cal. App. 3d 1297, 1303 [234 Cal.Rptr. 33]; accord, Rosenfeld Construction Co. v. Superior Court (1991) 235 Cal. App. 3d 566, 573-576 [286 Cal.Rptr. 609]; H. F. Ahmanson & Co. v. Salomon Brothers, Inc., supra, 229 Cal. App. 3d at p. 1452; Global Van Lines, Inc. v. Superior Court (1983) 144 Cal. App. 3d 483, 487-488 [192 Cal.Rptr. 609]; see generally Note, Developments in the Law: Conflicts of Interests in the Legal Profession (1981) 94 Harv.L.Rev. 1244, 1315-1354.)

[2b] We need not dwell on the elements of the "substantial relationship" test for in this case there is no dispute that Brock in fact acquired confidential information during his former representation of respondents. Because Brock possesses such confidential information, rule 3- 310(D) of the California Rules of Professional Conduct would prohibit him from switching sides and representing appellants in the same litigation. (Accord, Dill v. Superior Court, supra, 158 Cal. App. 3d at pp. 301, 304; to the same effect see Cal. Compendium on Professional Responsibility, State Bar Formal Opinion No. SD 1975-1, pp. II C-144-146.)

The question is whether Brock's disqualification taints the entire Bartko firm. It does.

The California Rules of Professional Conduct do not specifically address the question of vicarious disqualification, and for that reason the vicarious disqualification rules have essentially been shaped by judicial decisions. As a general rule in California, where an attorney is disqualified from representation, the entire law firm is vicariously disqualified as well. fn. 5 (Klein v. Superior Court (1988) 198 Cal. App. 3d 894, 909, 912-913 [244 Cal.Rptr. 226]; William H. Raley Co. v. Superior Court (1983) 149 Cal. App. 3d 1042, 1048-1049 [197 Cal.Rptr. 232]; Dill v. Superior Court, supra, 158 [11 Cal. App. 4th 115] Cal. App. 3d 301; Global Van Lines, Inc. v. Superior Court, supra, 144 Cal. App. 3d 483.) This is especially true where the attorney's disqualification is due to his prior representation of the opposing side during the same lawsuit. …

We recognize that the ethical wall concept has had some limited acceptance in California as a method to avoid what might be the unduly harsh result of vicarious disqualification of an entire firm. But that acceptance has been in a very different arena-that of former government attorneys now in private practice-and has involved a situation in which the former government attorney has not had access to confidential information concerning the subject matter of the litigation. (See, e.g., Chambers v. Superior Court (1981) 121 Cal. App. 3d 893, 903 [175 Cal.Rptr. 575].)

But, the ethical wall concept has not found judicial acceptance in California on our facts: a nongovernmental attorney armed with confidential information who switches sides during the pendency of litigation. Certainly the [11 Cal. App. 4th 116] Dill court did not endorse the concept. Instead it concluded: "the law firm representing real parties must also be disqualified." (158 Cal. App. 3d at p. 306 (italics added).) In the Dill court's view there simply was no gray area; nor do we see any: the entire firm must be vicariously disqualified even if Brock has been ethically screened fn. 6 from day one.

Not satisfied that Dill should be the last word on the subject, appellants seek refuge in the following line from a more recent case, Klein v. Superior Court, supra, 198 Cal. App. 3d 894. The line is this: "California law clearly prohibits continued representation in a situation such as this, where a partner in a law firm has been disqualified from representation because of his prior receipt of confidential information, and where there has been no attempt to screen him from the litigation at hand." (Id. at pp. 913-914.) Because the Bartko firm attempted to screen Brock from participation in this litigation, appellants argue Klein supports their view that the firm may continue to represent them in this litigation. We wonder whether appellants are reading the same case we are.

Klein is factually inapposite in that the former representation reviewed there was not in the identical lawsuit. Thus, to the extent the court in Klein was attempting to create a rule of law, that rule would not govern the factual situation at hand. Nor did the court in Klein intend that it should.

The Klein court exhaustively reviewed the California cases which addressed vicarious exclusion and the ethical wall doctrine. (See 198 Cal. App. 3d at pp. 908-913.) Included within that review was Dill. With respect to Dill the Klein court specifically noted that Dill had rejected the [11 Cal. App. 4th 117] screening concept as "not applicable when the attorney in question performed work for the opposing party in the same lawsuit." (Klein v. Superior Court, supra, 198 Cal. App. 3d at p. 912.) The Klein court then added its own commentary about the Dill factual situation: "Those facts mandate vicarious disqualification." (Klein v. Superior Court, supra, 198 Cal. App. 3d at p. 912 (italics added).) Thus not only does Klein not support appellants' position, it does not purport to alter the controlling rule of Dill.

In sum, we believe the rule to be quite clear cut in California: where an attorney is disqualified because he formerly represented and therefore possesses confidential information regarding the adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a matter of law. (Dill v. Superior Court, supra, 158 Cal. App. 3d at pp. 305-306; see also Klein v. Superior Court, supra, 198 Cal. App. 3d at p. 912.) The trial court did not abuse its discretion in disqualifying the Bartko firm from continuing in its representation of appellants in the instant proceeding.

b./

# EXHIBIT E

Wall Street Journal's AllthingsD article in which Nirav Tolia falsely credits Janikiraman as the inventor of a key technology.



# News

# Fatdoor Founder Sues Benchmark Capital, Saying It Stole His Idea for Nextdoor

Published on November 11, 2011
by **Liz Gannes**

Fatdoor founder Raj Abhyanker on Thursday filed a complaint with against Benchmark Capital for interference, fraud and misappropriation of trade secrets after seeing the Benchmark-funded Nextdoor launch its local social network last month.

Abhyanker alleges that he pitched a neighborhood site to Benchmark in 2007 and said at the time he would call it Nextdoor if he could buy the domain. Benchmark conducted due diligence on the deal and indicated it wanted to invest.



But the prominent Silicon Valley firm then pulled out, according to Abhyanker, who filed with the Superior Court of California in San Jose.

At fault, according to Abhyanker, are Benchmark and Nextdoor, as well as Facebook CTO Bret Taylor, who was at Benchmark at the time and had agreed at least informally to advice Fatdoor.

After the Benchmark funding fell through, Abhyanker was fired as CEO and Fatdoor changed focus to eventually become a local deal aggregator called The Dealmap. Earlier this year, The Dealmap was bought by Google, along with its one granted patent and more than 40 patent applications that name Abhyanker as the lead inventor.

Raj Abhyanker

Abhyanker — who is now a practicing patent attorney — is faulting Benchmark for getting him kicked out of the company he co-founded, because the VC firm's failure to invest made Fatdoor's investors lose confidence in the start-up's original concept, and because the Fatdoor board used a CEO headhunter to find his replacement that was recommended by Benchmark.



This all came to a head because Nirav Tolia — who was a Benchmark enterpreneur-in-residence later in 2007 — in October launched a local social network called Nextdoor that is funded by Benchmark.

Reached for comment, Nextdoor CEO Nirav Tolia said Abhyanker's charges are without merit.

"I have never met this person, and the idea and naming of Nextdoor was originated solely by the employees and founders of our company," he said.

Nirav Tolia

Indeed, Abhyanker's complaint makes the assumption that Tolia has been working on Nextdoor since 2007. Abhyanker omits any mention of Fanbase, the Benchmark-funded sports directory Tolia started out of his stint as a Benchmark

EIR that launched in 2009.

Nextdoor is a pivot of Fanbase, using the company's remaining funding and the same team, Tolia had told **AllThingsD** when the neighborhood site launched last month.

Tolia on Thursday said he had received an email from Abhyanker last month after Nextdoor launched, asking to be named to Nextdoor's founding team.

The email, which Tolia forwarded to **AllThingsD**, says:

"I am wondering if you would be open to me being in your founding team, in exchange for me filling a part time general counsel, business development vp, and/or board role, and perhaps a small angel investment in cash, resources, and space."

In addition to Benchmark, Nextdoor and Tolia, Benchmark partners Kevin Harvey, Peter Fenton, Mitch Lasky and Bill Gurley are named in the complaint.



Also named are Bret Taylor and Jim Norris, the FriendFeed founders who helped launch Google Maps and were Benchmark EIRs at the time and had allegedly committed via email before the Benchmark deal fell through that they would be Fatdoor advisors.

Abhyanker claims that Taylor and Norris specifically appropriated his idea for neighborhood-level privacy controls, a feature of Nextdoor that Tolia himself attributed to "an early Google Maps employee" in a recent interview with the San Jose Mercury News. **Update**: *Tolia said he was referring to Prakash Janakiraman, his co-founder at Fanbase and Nextdoor who formerly worked at Google on Maps. Tolia also noted he joined Benchmark four months after Abhyanker made his pitch.*

The evidence for that accusation seems a bit vague, but is particularly notable because Taylor is now Facebook's CTO.

A spokeswoman for Benchmark said the firm does not comment on pending legal matters. Taylor said he was not aware of the lawsuit and he has no comment.

Asked to clarify why the complaint doesn't mention Fanbase, Abhyanker said through a spokesman: "Upon reason and belief, Fanbase was just a holding company to bid themselves time until everyone forgot about our Fatdoor/Nextdoor."

Stamped-COMPLAINT – Abhyanker v. Benchmark Capital Et. Al. – FILED-PUBLIC

# EXHIBIT F

Sandeep sends Raj an email saying he deleted everything
prior to November 1, 2006 for "space reasons"

On Tue, Nov 15, 2011 at 4:53 PM, Sandeep Sood <sandeep@monsoonco.com> wrote:
Hey Raj,

I figured out how to log back into my bigcirclemedia.com account and found that the first email I have stored from you is on November 1, 2006.  All of the emails you reference are from the few weeks before this.  I may have deleted these emails due to space issues or some other reason, I'm not sure.  This was on a Google Apps account, so I imagine it can be recovered somehow, but I unfortunately only have records of emails where we began referring to the company as FatDoor...

- sandeep
o: 510.991.6401
m: 510.593.7031
@soodsandeep

On Nov 15, 2011, at 4:34 PM, Raj V. Abhyanker wrote:

Sandeep, can you send t o me these emails and others?  Nice speaking with you today!  Raj

# EXHIBIT G

Counter-defendant's Nextdoor.com website UI



# EXHIBIT H

Article from February 2013 in which counter-defendant
raises $21M in new funding.



# Nextdoor Closes $21.6 Million In New Series B Funding To Take Its Neighborhood-Focused Social Network Global

**Tuesday, February 12th, 2013**

**11 Comments**



**Nextdoor**, the company that lets people create private social networks with others who live in their local neighborhoods, has raised $21.6 million in a new funding round led by **Greylock Partners** with the participation of existing investors **Benchmark**, **DAG Ventures**, **Shasta Ventures**, **Allen & Company**, **Pinnacle Ventures**, along with new investors **Bezos Expeditions** and **Google Ventures**.

This round, which serves as Nextdoor's **Series B**, brings the total venture capital investment in the company **to $40.2 million**. Greylock's **David Sze** is joining Nextdoor's board of directors as part of the new funding; with Greylock pitching in a total of some $15 million into this new round, Nextdoor now marks the biggest check Sze has written to date as a Greylock partner.

In a wide-ranging interview at Nextdoor's San Francisco headquarters, CEO and founder **Nirav Tolia**told me that the new funding will be used to expand Nextdoor's footprint in terms of both product offerings and geographies. International launches of Nextdoor are on track to occur before the end of 2013, he said, and products such as native mobile apps are actively in the works. The company currently has a staff of 43 that also is on track to grow in the weeks and months ahead.

## BIG GROWTH, BUT ALSO BIG RISKS



Nextdoor CEO Nirav Tolia

Nextdoor, which first launched **back in October 2011** and verifies the home addresses of all of its members to ensure privacy and security, now purports to have private social networking groups created for more than 8,075 neighborhoods from all 50 U.S. states, with daily message counts of more than 500,000. That shows a solid growth trajectory from the last time we checked in with Nextdoor **just a little over three months ago**, when the site had 5,500 neighborhoods and 300,000 daily messages.

Even so, Nextdoor's newest batch of big funding may also come across to some people as a big gamble, given the recent closures and stumbles of other locally-focused sites such as**EveryBlock**, **Yardsellr**, and **AOL's Patch**.

Tolia acknowledges that the local space has been a tough nut to crack, but is confident that Nextdoor has what it takes to succeed in the long haul. "In the social networking space, it tends to be winner takes all," Tolia said, while taking care to point out that Nextdoor has significant differences from its recently-shuttered competitors. "When you scratch the surface, there were a thousand difference decisions that we made about Nextdoor [in comparison to other sites], making it really neighbor-to-neighbor driven."

That neighborly feel has taken some work to build up, Tolia says, but he is convinced that it is the only way to really make a successful local social network happen — and that it will pay off. He put it like this:

*"Now we have more cash in bank and patient investors, so we are really looking at the long game. We can think about changing the world and not doing a quick flip. We knew when we were doing postcard invitations that this strategy will be valuable in the long term, but in the short term it can be really painful — it's slow, and it's hand-to-hand combat.*

*You know, all startups wish that they could [grow as quickly as] Instagram, but this local space isn't Instagram. But we hope that after some amount of time, we will have one billion users too."*

## A NEW LOOK AND FEEL WITH NEXTDOOR 2.0

Nextdoor did not put off all its product iteration plans until after this latest fundraise. Also today, the company is unveiling to all of its users Nextdoor 2.0, a revamped version of its flagship app that brings some nice updates to its design and functionality.

Perhaps most notably, Nextdoor 2.0 has a new ability for users to view and post certain messages with closely bordering neighborhoods, a feature addition that could further boost engagement on the site. After all, many of us live on what is actually a border between two or three neighborhoods — and if there is a lost cat in, say, San Francisco's Dogpatch, it could very well be found in Potrero Hill. Allowing people in nearby neighborhoods to see limited updates from each other really makes sense.

Nextdoor 2.0 also has a stronger focus on the site's crime and safety monitoring functions, with a new dedicated section for such posts. Tolia says that today, crime- and safety-related posts account for 20 percent of all Nextdoor's messages, making the site a modern-day version of the classic neighborhood watch. The company has started to partner up with local police and fire departments who can use special Nextdoor accounts to issue dispatches and special "urgent alerts" to residents in Nextdoor 2.0, and it plans to step up those types of initiatives in the months ahead.

Of course, crime-fighting initiatives and neighborhood watch groups are necessary and noble — but they're not exactly known for being lucrative. In terms of future revenue generation, Tolia says that Nextdoor will likely look to establish a foothold in other avenues, such as the $100 billion per year local advertising market (a space that's ripe for disruption after years of being dominated by the likes of the *Yellow Pages* and local TV, radio, and newspaper media.) But, Tolia says, Nextdoor is not planning on starting up any money-making activities in the near term.

## THE PRODUCT CHALLENGES AHEAD

Looking ahead, Tolia says the biggest challenge for Nextdoor is establishing the right pitch in terms of product. "Successfully replicating everything that goes on at the local level is a real balancing act. You have these really serious questions about privacy, you have to verify people's addresses, you have users who don't want to show their real names but want to see other people's real names," he said. "And as we grow and see more messages and interactions, we are focusing more on balancing signal and noise. It's a good problem to have, but it's still a problem. These are real-world interactions, so it's really about diving deep and getting it right."

That is a tall order. But if any company is positioned now with the funds and apparent traction to finally get it right, it indeed might just be Nextdoor.

Here are some images of the newly redesigned Nextdoor 2.0 (click on each to enlarge):



Nextdoor news feed



Nextdoor group page



Nextdoor urgent alert

- <u>**NEXTDOOR**</u>

  Company: **Nextdoor**
  Website: **nextdoor.com**

  Launch Date: **2012**

  Funding: **$40.2M**

  Nextdoor is a free private social network for your neighborhood. The network only allows you and your neighbors to communicate online bringing back a sense of community to the neighborhood.

  

  **→ LEARN MORE**

# EXHIBIT I

Previous lawsuit by individuals against counter-defendants

1  MARC M. SELTZER (54534)
   STEPHEN E. MORRISSEY (187865)
2  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
3  Los Angeles, CA 90067-6029
   Telephone: (310) 789-3100
4  Fax: (310) 789-3150

5  LAW OFFICES OF MANUEL S. KLAUSNER, P.C
   MANUEL S. KLAUSNER (34121)
6  601 West Fifth Street, Eighth Floor
   Los Angeles, CA 90071-2094
7  Telephone: (213) 617-0414
   Fax: (213) 617-1314
8
   LAW OFFICES OF THOMAS K. BOURKE
9  THOMAS K. BOURKE (56333)
   601 West Fifth Street, Eighth Floor
10 Los Angeles, CA 90071-2094
   Telephone: (213) 623-1092
11 Fax: (213) 623-5325

12 Attorneys for Plaintiffs

**FILED**
San Francisco County Superior Court

JAN 1 9 2005

**GORDON PARK-LI, Clerk**
BY: _____
          **Deputy Clerk**

CASE MANAGEMENT CONFERENCE SET
JUN 2 4 2005  9:00 AM
DEPARTMENT 212

SUMMONS ISSUED

13        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14            **FOR THE COUNTY OF SAN FRANCISCO**

15 | NAVAL RAVIKANT; RAMANATHAN "R.V."       No. **CGC  05-437906**
16 | GUHA; MICHAEL SPEISER; LOUIS JAMES
   | MONTULLI II; ALEXANDER TOTIC; JAMES      COMPLAINT FOR DAMAGES AND
17 | IANNONE; GARRETT ARCH BLYTHE;            EQUITABLE RELIEF FOR:
18 | NOAH PARSONS; KEVIN LAWS; SABRINA
   | BERRY PARSONS; KRISTEN KOH; MARK         (1) BREACHES OF FIDUCIARY
19 | TAN; DAN LIBBY; JONATHAN D. KIBERA;          DUTY AND AIDING AND
   | TOM FALLOWS; BARRY H. CHU; ROBERT            ABETTING BREACHES OF
20 | MARKEL; MARK GOLDSTEIN; SEAN                 FIDUCIARY DUTY;
21 | WAGSTAFF; GOODBY, SILVERSTEIN &
   | PARTNERS, INC., a corporation; SIMON W.  (2) FRAUD AND CONSPIRACY TO
22 | HUI; STEVEN GREENBERG; DAVID                 DEFRAUD;
23 | NEWMAN; CINNAMON CHU; TYRENE E.
   | PARTLOW; LAUREN MELLER; VENU             (3) CONSTRUCTIVE FRAUD AND
24 | JAVARAPPA; HELEN KENTISH KILBER;             AIDING AND ABETTING
   | CATHERINE JAMES; DANIEL SPEIRS; SEAN         CONSTRUCTIVE FRAUD;
25 | MACNEW; STEFAN TODD WILKENS;
26 | DAVID BOTKIN; CHRISTOPHER NICHOLS;      (4) VIOLATIONS OF THE
   | JAMES W. BERRY; DANIEL EPSTEIN; SEAN         CALIFORNIA CORPORATE
27 | FITZPATRICK; ANDIS A. BLUKIS;               SECURITIES LAWS;
28 | CHRISTINE ADESSA WILKENS; EUGENIA
                                            (5) UNFAIR BUSINESS ACTS AND
                                                PRACTICES IN VIOLATION OF
                                                BUSINESS AND PROFESSIONS
                                                CODE § 17200 *ET SEQ.*; AND,

                                            (6) UNJUST ENRICHMENT

1

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

1  MAKHLIN; DEANNE A. MYERS; PAIGE
2  MADER; AND JOYCE PARK,

3          Plaintiffs,

4      VS.

5  NIRAV N. TOLIA; J. WILLIAM GURLEY;
6  BENCHMARK CAPITAL HOLDINGS CO.,
   LLC, a Delaware limited liability
7  company; BENCHMARK CAPITAL
8  MANAGEMENT CO., LLC, a Delaware
   limited liability company; BENCHMARK
9  CAPITAL MANAGEMENT CO. III, LLC, a
   Delaware limited liability company;
10 BENCHMARK CAPITAL PARTNERS III, L.P.,
11 a Delaware limited partnership;
   BENCHMARK CAPITAL MANAGEMENT CO.
12 IV, LLC, a Delaware limited liability
13 company; BENCHMARK CAPITAL
14 PARTNERS IV, L.P., a Delaware limited
   partnership; JOHN R. JOHNSTON; AUGUST
15 CAPITAL MANAGEMENT, LLC, a
16 Delaware limited liability company;
   AUGUST CAPITAL MANAGEMENT II, a
17 Delaware limited liability company;
18 AUGUST CAPITAL II, LP a Delaware
   limited partnership; THOMAS
19 GIESELMANN; BV CAPITAL
20 MANAGEMENT, LLC, a Delaware limited
   liability company; BERTELSMANN
21 VENTURES II, L.P., a Delaware limited
22 partnership; BV CAPITAL II, L.P., a
   limited partnership; SHOPPING.COM,
23 LTD., an Israeli company; and DOES 1-
24 100,

25          Defendants.

26

27

28

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

Plaintiffs, by their attorneys, allege as follows on information and belief, except as to those allegations pertaining to their own knowledge and conduct, which are made on personal knowledge:

## NATURE OF THE ACTION

1.    Plaintiffs are former owners of the common stock and vested options to purchase common stock of Epinions, Inc. ("Epinions"). Plaintiffs include founders and other early employees and advisers to Epinions who obtained their stock and options as compensation for their tremendous efforts in helping to establish and build that company. Through false and misleading representations and omissions of material facts concerning Epinions' financial affairs, business operations and prospects and how other shareholders would be treated in the merger of Epinions with DealTime, Ltd. ("DealTime") which took place in April 2003 (the "Epinions merger"), defendants fraudulently caused plaintiffs to give up their ownership interests in Epinions for *nothing*.

2.    After causing plaintiffs' Epinions equity interests to be extinguished without compensation, defendants proceeded with their pre-conceived scheme to steer Shopping.com, Ltd. ("Shopping.com") — the combined enterprise that resulted from the Epinions merger — towards its October 25, 2004 initial public offering (the "IPO"). As a result, the Epinions corporate insiders and other favored shareholders unjustly gained more than $250 million.

3.    Absent defendants' fraudulent scheme to deny plaintiffs the benefits of their equity interests in Epinions, plaintiffs would not have allowed their equity interests in Epinions to be extinguished without compensation. If plaintiffs had been permitted to participate in the Epinions merger on the same terms as those insider shareholders who received preferential treatment in the merger, their equity interests in Epinions would have been worth in excess of $39.4 million in Shopping.com stock immediately following the IPO.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

4.     In communications leading up to the Epinions merger, it was represented to plaintiffs that their shares of common stock and options in Epinions were worthless because all of Epinions was worth only $23 to $38 million and the Epinions' preferred shareholders' liquidation preference of $45 million would therefore leave nothing left to be distributed to any of the common shareholders.

5.     It was further represented to plaintiffs that the equity interests held by other common shareholders, including shareholders who were current employees of Epinions, would be treated equally with those interests held by former employees.

6.     In truth, defendants were well aware at the time of the Epinions merger that Epinions was worth far more than $45 million, and they knew that certain common shareholders — including defendant Nirav Tolia ("Tolia"), Epinions' CEO at the time of the Epinions merger, and other employees who remained with the company after the merger — who were then employed by the company were granted vested options in Shopping.com that enabled those common shareholders to share in the fruits of the IPO based on the ownership interests in Epinions they had obtained through their prior work for Epinions. Indeed, in the IPO, the Epinions common shareholders who were granted options in the new company as part of the merger consideration realized in excess of $37.5 million for their ownership interests in and prior work for Epinions. The other shareholders who received preferential treatment in the merger realized in excess of $213.5 million. Plaintiffs and other non-employee common shareholders received nothing.

7.     To induce plaintiffs' acquiescence to the Epinions merger, and to ensure that required shareholder and regulatory approval would be obtained, the Epinions directors provided plaintiffs with materially false and misleading information concerning the Epinions merger. Specifically, in their communications to plaintiffs regarding the proposed Epinions merger, Epinions' directors:

- Represented that a financial services firm retained by the Epinions board to offer "an independent appraisal" of the value of Epinions' stockholders'

4

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

G00594

equity interest in the combined enterprise after the merger had concluded that interest was worth only $23 million to $38 million — and less than the $45 million liquidation preference of the Epinions' preferred stockholders — even though defendants knew that the financial services firm's purported opinions were based on arbitrary and unreasonable assumptions and methods and that a valuation based on reasonable assumptions and generally accepted valuation methodologies would have concluded that the 35% equity interest the Epinions insiders and preferred shareholders received in the combined enterprise was, in fact, worth far more than the $45 million liquidation preference;

- Withheld crucial information about the signing of a significant revenue deal with Google, Inc. ("Google") that included $6 million in guaranteed revenues per year for the next two years and was characterized in January 2003 by Tolia in an email to the Epinions board of directors as "one of the biggest wins in our history." Because the Google deal was expected to add $3.4 million in annual profits for 2003, a 1400% increase from 2002, defendants knew that Epinions was worth far more than the liquidation preference after the Google deal was executed, but withheld the material facts concerning that deal from plaintiffs;

- Falsely represented that Epinions was in danger of going out of business and that its employees were in danger of losing their jobs if the Epinions merger was not approved. In fact, Epinions' undisclosed results of current operations and projections of revenues and earnings showed that the company was profitable and growing and had ample cash reserves to continue as a stand-alone business or to pursue a merger or acquisition that would provide fair compensation to all of its common shareholders;

- Failed to disclose DealTime's projected financial results, which Epinions' board members reviewed before approving the transaction, and which had

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

served as the basis for discussions about an IPO with a leading investment bank that had advised DealTime that DealTime already was likely worth $300 million to $400 million on a stand-alone basis prior to the merger;

• Did not identify expected cost savings and revenue synergies associated with the merger, including cost savings associated with the consolidation of corporate operations and the extension of Epinions' revenue deal with Google to the combined entity, which was expected to increase DealTime's principal source of revenue, "click-throughs," by 60% from 25 cents per click to 40 cents per click;

• Failed to disclose that certain common shareholders in fact were receiving preferential treatment in the form of substantial retroactive compensation for their shares and options, because defendants had agreed that certain current employee stockholders would be granted vested options to purchase common stock in the combined entity that were on substantially the same retroactive schedule and on substantially the same terms as their pre-existing options in Epinions, based on their tenure with Epinions; and

• Failed to disclose that the Epinions officers and directors who negotiated the Epinions merger had taken no reasonable steps to ensure that the Epinions merger was the product of a fair process that provided fair terms to all of the common shareholders of Epinions.

8.    Shortly after completing the Epinions merger, defendants began executing their pre-existing, but previously undisclosed, plans for the Shopping.com IPO. Defendants believed that an IPO would enable the shareholders who retained equity interests in the combined enterprise to reap many millions of dollars for their equity interests, demonstrating that plaintiffs' equity interests in Epinions were extremely valuable and not worth nothing, as was represented to them. Rechristened as Shopping.com, the company that resulted from the Epinions merger publicly announced its IPO plans in March 2004, less than a year after the Epinions merger was completed,

with the filing of a Registration Statement on Form S-1 with the Securities and Exchange Commission ("SEC").

9.    Less than eighteen months after the Epinions merger was completed, the Shopping.com IPO took place on October 25, 2004, at an offering price of $18 per share. On the first day of the offering, the combined company's stock price gained 52.8% to $28.80 per share, giving Shopping.com a market capitalization of $851 million. At $28.80 per share, the 35% equity interest in Shopping.com obtained by Epinions' former shareholders who were continuing owners of equity interests in the company was worth in excess of $250 million. Since the IPO, Shopping.com's stock has traded as high as $35.62 per share, and that equity interest has been worth as much as $309 million. The post-IPO range of values for the 35% equity interest in Shopping.com obtained by Epinions' former shareholders is very close to the true value of Epinions at the time of the merger just one year before, and is in stark contrast to the $23 to $38 million value that Epinions was represented as having at the time of the merger.

10.    Thus, when trading closed on Shopping.com's first day of trading, defendants and other shareholders who received preferential treatment in the Epinions merger collectively had reaped more than $250 million through defendants' wrongful course of conduct.

11.    In contrast to plaintiffs, who were zeroed-out, the Epinions insiders who negotiated and approved the merger were richly rewarded for their equity interests in Epinions:

- Defendant Tolia and other Epinions current employees who received favorable treatment in the Epinions merger received options to purchase 1,302,674 common shares of Shopping.com that were worth in excess of $37.5 million on the day of the IPO;

- Defendant J. William Gurley ("Gurley") and the investment funds managed by his firm received 2,182,183 shares of Shopping.com common stock that were worth in excess of $62.8 million on the day of the IPO;

7

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

- Defendant John R. Johnston ("Johnston") and the investment funds managed by his firm received 2,152,153 shares of Shopping.com common stock that were worth in excess of $61.9 million on the day of the IPO;

- Defendant Thomas Gieselmann ("Gieselmann") and the investment funds managed by his firm received approximately 954,000 shares of Shopping.com common stock that were worth in excess of $27.4 million on the day of the IPO;

- As a result of defendants' wrongful course of conduct, other preferred shareholders of Epinions received in excess of 2.1 million shares of Shopping.com common stock that were worth in excess of $60.4 million on the day of the IPO. These other preferred shareholders include entities affiliated with Goldman Sachs & Co., the investment bank that later served as the co-lead managing underwriter for the Shopping.com IPO. Goldman Sachs & Co. and its affiliates hold in excess of 1.4 million shares of Shopping.com common stock that were worth in excess of $40.3 million on the day of the IPO.

For their equity interests in Epinions, plaintiffs and other non-employee common shareholders received *nothing*.

12.    The success of the Shopping.com IPO was no surprise to defendants. Epinions was a high-profile Internet company that was founded at the height of the dot.com boom, survived the depths of the dot.com bust, and is now an integral part of Shopping.com. Epinions' founders and early financial backers included veterans of some of the most successful Silicon Valley start-ups, including such companies as Yahoo! and Netscape. Before its web site even launched, Epinions was profiled in the *New York Times Magazine*, MSNBC, CBS Market Watch, Salon.com, PCWorld, and many other media outlets. Since its 1999 launch, the Epinions.com web site has been used by tens of millions of consumers as, in the words of the company web site, a "consumer review

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

platform" that "provides consumer insight, unbiased advice and in-depth product evaluations and personalized recommendations."

13.    At the time of the Epinions merger, defendants knew that the true value of Epinions far exceeded the valuation figures that were shared with plaintiffs in connection with the Epinions merger. Indeed, in a joint presentation dated January 5, 2003 — three months *before* the Epinions merger — that was provided to shareholders who received preferential treatment in the Epinions merger, DealTime and Epinions boasted that the merged entity would have the "best financials" with $15 to $20 million in profits for 2003, and that the merger would enable it to "achieve liquidity" through "a successful public offering which will set the stage for even more growth."

14.    By this action, plaintiffs seek to recover the value of the equity interests in Shopping.com that are rightfully theirs and that were misappropriated from them by defendants, the imposition of a constructive trust, disgorgement of defendants' ill-gotten gains, and all other relief to which they are entitled as a result of defendants' wrongful course of conduct.

## JURISDICTION AND VENUE

15.    Jurisdiction is proper in this Court because the Superior Court is a court of general jurisdiction and because plaintiffs seek both damages and equitable relief.

16.    Venue is proper in this Court because defendants Tolia, Johnston and Gieselmann reside in San Francisco County, because defendant BV Capital maintains its principal place of business in San Francisco County, and because a number of plaintiffs reside in San Francisco County and suffered losses as a result of defendants' conduct in San Francisco County.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

# THE PARTIES

## PLAINTIFFS

17.   Plaintiff Naval Ravikant ("Ravikant") is a resident of Palo Alto, California. Ravikant was a co-founder of Epinions, which was initially called Round1, Inc. He served as the Chief Executive Officer ("CEO") of Epinions from March 1999 through March 2000, and remained on the Epinions board of directors until February 2001. At the time of the Epinions merger, Ravikant owned 4,571,429 shares of Epinions common stock.

18.   Plaintiff Ramanathan "R.V." Guha ("Guha") is a resident of Los Altos, California. Guha was a co-founder of Epinions and was the founding Chief Technology Officer ("CTO") of the company until his departure. Before joining Epinions, Guha was one of the highest ranking engineers at Netscape. At the time of the Epinions merger, Guha owned 1,179,762 shares of Epinions common stock.

19.   Plaintiff Michael Speiser ("Speiser") is a resident of Menlo Park, California. Speiser was a co-founder of Epinions. Before joining Epinions, Speiser was a consultant with McKinsey & Co. At the time of the Epinions merger, Speiser owned 457,143 shares of Epinions common stock. Speiser remained in contact with defendant Tolia through the time of the Epinions merger, and Tolia provided Speiser with certain information concerning Epinions and its financial condition that was not shared with other plaintiffs. However, Speiser did not learn that Tolia and other common shareholders who remained with the company received vested Shopping.com replacement options as part of the Epinions merger consideration until Shopping.com announced its planned IPO in March 2004. Based on defendants' misrepresentations and omissions concerning the merger, Speiser believed that all the common shareholders were being treated the same in the Epinions merger and, based on that belief, did not take additional actions to challenge the merger. Speiser did not consent to the Epinions merger, and was forced to forfeit his shares as a result of the consent to the Epinions merger provided by other plaintiffs.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

20.   Plaintiffs James W. Berry, Andis A. Blukis, Garrett Arch Blythe, David Botkin, Barry H. Chu, Cinnamon Chu, Daniel Epstein, Tom Fallows, Sean Fitzpatrick, Mark Goldstein, Steven Greenberg, Simon W. Hui, James Iannone, Catherine James, Venu Javarappa, Jonathan D. Kibera, Helen Kentish Kilber, Kristen Koh, Kevin Laws, Dan Libby, Sean Macnew, Paige Mader, Eugenia Makhlin, Robert Markel, Lauren Meller, Deanne A. Myers, David Newman, Christopher Nichols, Joyce Park, Tyrene Partlow, Mark Tan, Alexander Totic, Sean Wagstaff, Christine Adessa Wilkens and Stefan Todd Wilkens are former employees or agents of Epinions who owned shares of Epinions common stock or vested options to purchase Epinions common stock, or both, at the time of the Epinions merger.  Plaintiff Goodby, Silverstein & Partners, Inc. is a corporation with its principal place of business in San Francisco, California that performed advertising services for Epinions and was compensated for those services with Epinions common stock.

21.   With the following exceptions, all plaintiffs reside in California: plaintiff Montulli resides in Nevada; plaintiff Blukis resides in Latvia; plaintiff Libby resides in Florida; plaintiffs James, Mader, Makhlin, Myers and Meller reside in New York; plaintiff Greenberg resides in Maryland; plaintiffs Stefan Todd Wilkens and Christine Adessa Wilkens reside in North Carolina; plaintiff Epstein resides in Washington, D.C.; plaintiff Fitzpatrick resides in New Jersey; and plaintiffs Noah Parsons, Sabrina Berry Parsons and Kilber reside in Oregon.

22.   Plaintiffs are collectively referred to herein as the Plaintiff Group.  At the time of the Epinions merger, the Plaintiff Group collectively owned in excess of 7,800,845 shares of Epinions common stock and vested options to purchase Epinions common stock, which represented approximately 52.9% of the outstanding common stock and approximately 13.3% of the outstanding equity interests in Epinions at that time.

---

11

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

## DEFENDANTS

23.    Defendant Tolia is a resident of San Francisco, California. Tolia was a co-founder of Epinions, served as the Chief Executive Officer ("CEO") and a director of Epinions at the time of the Epinions merger, was employed as the Chief Operating Officer ("COO") of Shopping.com and was a member of the Shopping.com board of directors following the merger. Along with defendant Gurley, Tolia negotiated the terms of the Epinions merger on behalf of Epinions and its shareholders. Pursuant to the merger, Tolia received 2,794,540 fully vested options (now 698,635 shares after a 1:4 reverse split) to purchase Shopping.com common stock and a lucrative new employment agreement. Tolia was forced to resign his position as the COO and a director of Shopping.com in June 2004. Among the stated reasons for Tolia's forced resignation was the fact that he had made misrepresentations concerning his educational and professional background. Tolia falsely claimed that he had graduated from Stanford University and that he had been employed as a consultant with McKinsey & Co. As set forth in the prospectus for the Shopping.com IPO, Tolia owns 25,000 of his total 736,682 Shopping.com shares of common stock through his alter ego, Tolia, Inc., of which Tolia is the President and sole stockholder and, as such, has the sole voting and dispositive power over those shares.

24.    Defendant Gurley is a resident of California. Gurley is a principal and managing member of defendants Benchmark Capital Holdings Co., LLC and Benchmark Capital Management Co., LLC (collectively "Benchmark Capital") and is a managing member and general partner of defendants Benchmark Capital Management Co. III, LLC ("BCMIII") and Benchmark Capital Management Co. IV, LLC ("BCMIV"), which in turn are the general partners in defendants Benchmark Capital Partners III, LP ("BCPIII") and Benchmark Capital Partners IV, LP ("BCPIV"), investment funds Benchmark Capital used to invest in Epinions. Benchmark Capital, BCMIII, and BCMIV are Delaware limited liability companies, and BCPIII and BCPIV are Delaware limited partnerships. Benchmark Capital, BCMIII, BCMIV, BCPIII and BCPIV are collectively

1    referred to herein as "Benchmark" or "Benchmark Capital." At all relevant times, Gurley

2    acted on behalf of Benchmark Capital, a venture capital firm that maintains its principal

3    place of business in Menlo Park, California and that, according to its web site, manages

4    more than $2 billion in committed venture capital. Gurley was an Epinions director at the

5    time of Epinions merger and, following the Epinions merger, became a director of

6    defendant Shopping.com, where he remains a director. Along with defendant Tolia,

7    Gurley was a principal negotiator of the terms of the Epinions merger, on behalf of

8    Epinions and its shareholders.

9        25.    Defendant John R. Johnston ("Johnston") is a resident of San Francisco,

10   California. Johnston is a principal and managing member of defendants August Capital

11   Management LLC ("ACM") and August Capital Management II, LLC ("ACMII"), both

12   Delaware limited liability companies, and is the general partner of August Capital II, L.P.

13   ("August II LP"), a Delaware limited partnership and the ACM-managed fund that

14   invested in Epinions. ACM, ACMII and August II LP are collectively referred to herein

15   as "August" or "August Capital." According to its web site, August Capital manages

16   more than $750 million in venture capital. At all relevant times, Johnston acted on behalf

17   of August Capital, a venture capital firm that maintains its principal place of business in

18   Menlo Park, California. Johnston was an Epinions director at the time of the Epinions

19   merger, became a Shopping.com director following the Epinions merger, and currently

20   serves as a director of Shopping.com.

21       26.    Defendant Thomas Gieselmann ("Gieselmann") is a resident of San

22   Francisco, California. Gieselmann is a principal and managing member of defendants

23   BV Capital Management, LLC ("BV Capital"), a Delaware limited liability company,

24   and is the general partner of defendants BV Capital Partners II, L.P. ("BVCPII") and

25   Bertelsmann Ventures II, L.P. ("BVII"), both Delaware limited partnerships, the BV

26   Capital-managed funds that invested in Epinions. BV Capital, BVCPII, and BVII are

27   collectively referred to herein as BV Capital. At all relevant times, Gieselmann acted on

28   behalf of BV Capital. Gieselmann was an Epinions director at the time of the Epinions

merger. BV Capital, which is the successor to Bertelsmann Ventures, is a venture fund based in San Francisco, California and Hamburg, Germany. BV Capital manages capital investments for various institutions, including Bertelsmann AG and AOL Time Warner. Defendant Gieselmann is a general partner of BV Capital and, on behalf of BV Capital, managed BV Capital's investments in Epinions.

27. Defendants Tolia, Gurley, Benchmark, Johnston, August Capital, Gieselmann and BV Capital are collectively referred to herein as the "Epinions defendants."

28. Defendant Shopping.com, Ltd. is an Israeli company with its principal place of business in Brisbane, California. Its wholly owned subsidiary, Shopping.com, Inc., is the surviving corporation of the merger between Epinions and DealTime. Shopping.com, Ltd. and Shopping.com, Inc. are referred to collectively herein as "Shopping.com." Epinions was a Delaware corporation that maintained its principal place of business in Brisbane, California. Prior to the Epinions merger, DealTime was an Israeli company that maintained its principal place of business in New York, New York. Shopping.com moved its principal place of business to Brisbane, California, following the merger. Shopping.com owns and operates the Epinions.com and Shopping.com web sites. Shopping.com's common stock is publicly traded on NASDAQ under the ticker symbol "SHOP."

29. The true names and capacities of defendants named as Does 1- 100, inclusive, whether individual, corporate, associate, or otherwise, are presently unknown to plaintiffs. Plaintiffs therefore sue these defendants by these fictitious names. Plaintiffs will amend their Complaint to substitute true names and capacities when they have been ascertained. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged.

30. By reason of their positions and relationships with Epinions and plaintiffs, including their membership or representation on Epinions board of directors, access to

14

600594

material non-public information concerning Epinions and their control of Epinions and the timing, structure and terms of the transaction at issue in this action, the Epinions defendants were and are fiduciaries to plaintiffs. The Epinions defendants owed to plaintiffs the utmost obligations of good faith, fair dealing, fidelity, trust, loyalty and due care and were required to use their powers (1) to control and manage Epinions so as to benefit all shareholders proportionately and not in furtherance of their personal interests or to benefit themselves or the venture funds they represented; (2) to act in furtherance of the best interests of plaintiffs; and (3) to provide plaintiffs with complete and accurate information concerning the true value of Epinions and its assets. Further, in causing the Epinions merger to take place, the Epinions defendants owed to plaintiffs the duty to ensure that plaintiffs were paid an amount that fairly and reasonably reflected the true value of the underlying assets owned by Epinions and plaintiffs' equity interests in the company. Shopping.com is liable as the successor-in-interest of Epinions and as an aider and abettor of the breaches of fiduciary duty and other violations committed by the Epinions defendants.

31.     In engaging in the wrongful conduct alleged herein, defendants pursued a common course of conduct, acted in concert with each other, and conspired with one another, in furtherance of their common plan, scheme or design. In addition, each of the defendants aided and abetted each other in breach of their respective fiduciary duties, as alleged herein. In aiding and abetting the other defendants' breaches of fiduciary and professional duties, the defendants rendered substantial assistance to the other defendants with knowledge or in reckless disregard of the breaches of duty committed by such defendants.

## DEFENDANTS' WRONGFUL COURSE OF CONDUCT

32.     Epinions was conceived by Ravikant as an Internet site that would enable consumers to make better buying decisions. The company was incorporated as a Delaware corporation in March 1999. Ravikant, who was formerly a strategic planning

manager with @Home, was Epinions' founding CEO. Ravikant recruited several co-founders who were veterans of some of the most successful Silicon Valley start-ups. In addition to Ravikant, Epinions' five co-founders included: Guha, a former senior engineer with Netscape Communications and Apple Computer, hired as the company's Chief Technology Officer and head of Engineering, Speiser, a former McKinsey & Co. consultant, hired as the company's Director of Marketing; Dion Lim, a former executive with Quote.com, hired as the company's Director of Business Development; and Tolia, a former Marketing Manager and corporate spokesman for Yahoo!, Inc. (Yahoo!).

33.     The Epinions business plan was to become a comprehensive customer referral service and online buying guide — a "Zagat for everything" that would maintain a searchable database of consumer reviews for a broad range of goods and services. Using its proprietary software, Epinions allowed consumers to write reviews, to rate products and services, and to evaluate reviews, reviewers and ratings based on their quality and trustworthiness. Epinions planned to derive revenues from advertisers who placed advertisements on the Epinions.com web site and from sellers of goods and services who paid a per-click fee for the sales leads that were generated by the web site.

34.     Epinions quickly obtained financial backing from some of the leading venture capital firms in Silicon Valley. Its initial $8 million round of Series A seed financing came from Benchmark and August. In exchange for their initial investment, Benchmark and August obtained preferred stock in the company and the right to nominate two Epinions directors, namely, Gurley and Johnston, to serve on Epinions' board of directors.

35.     Epinions held two subsequent private financing rounds, a $25 million Series B offering in September 1999 that included Benchmark, August, Bowman Capital, Goldman Sachs & Co., and Dell Computer Co., and a $10 million Series C offering held in February 2001 that included Bertelsmann Ventures (the predecessor to BV Capital), Benchmark, August and Goldman Sachs & Co. In conjunction with its investment, BV

16

600594

Capital obtained the right to nominate a director, namely Gieselmann, to serve on Epinions' board of directors.

36.  Following the Series C financing round, the board of directors of Epinions consisted of defendants Tolia, Gurley, Johnston and Gieselmann, as well as Bill Campbell, who left the board prior to the completion of the Epinions merger.

37.  In the Spring of 2000, Tolia replaced Ravikant as the CEO of Epinions. Ravikant became Epinions' Chief Strategy Officer, a position he held until October 2000, when he left the company to work at August Capital. Ravikant remained on the Epinions' board of directors until February 2001, when he was asked to resign his director position in conjunction with Epinions' Series C financing. Since resigning his position as an Epinions director, Ravikant has not had access to non-public financial information concerning Epinions other than limited information that was provided by defendants.

38.  Between 2000 and 2002, Epinions was forced to lay off numerous employees, including many of the plaintiffs because it had not yet obtained profitability. Epinions succeeded in gaining millions of repeat visitors, and the company's revenues continued to grow, but the company did not begin to make substantial money until late 2001, when it added a price comparison feature to the web site that allowed the company to substantially increase the revenues it derived from lead referrals, *i.e.,* merchants that obtained sales leads from the site.

39.  All plaintiffs worked with Epinions between its founding in 1999 and 2003, and during that period received compensation in the form of grants of Epinions common stock or vested options to purchase Epinions common stock, or both. Plaintiffs collectively owned approximately 7,800,845 shares of Epinions common stock and vested options to purchase Epinions common stock at the time of the Epinions merger.

40.  By mid-2002, Epinions' business had become profitable and had begun to generate positive cash flows, and the company had again begun to hire new employees.

---

17

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

At or about that time, Tolia informed Ravikant that he and the Epinions board of directors were considering selling the company, perhaps to Google.

41.    In or around September 2002, Epinions held discussions with Google regarding a potential acquisition of Epinions by Google.  Under the terms of that proposed transaction, Google would have acquired Epinions with Google common stock. The proposed transaction did not proceed, however, in part because Google learned that Tolia had misrepresented his professional background by claiming, falsely, that he had worked as a consultant with McKinsey & Co.

42.    In September and October 2002, Tolia also held discussions with Yahoo! regarding a potential acquisition of Epinions by Yahoo!.  During those discussions, Yahoo! made an initial offer to acquire Epinions for $22 million in cash, which Epinions rejected as too low.  Later, Yahoo! significantly increased its offer.  The discussions were abandoned because the parties could not agree on a price, and because Epinions was able to negotiate the merger with DealTime on terms that were far more favorable to defendants.

43.    Although Google was unwilling to proceed with an acquisition because of Tolia's misrepresentations concerning his professional experience, Epinions was able to negotiate a new syndication contract with Google that was completed in early 2003.  The Google distribution contract guaranteed that Epinions' revenues would grow by nearly 100% and that its profits would increase by nearly 1400%.  The existence of the Google syndication deal was known to Tolia, Gurley, Johnston, Gieselmann, August, Benchmark and BV Capital by no later than January 21, 2003.  The Google deal represented an undisclosed Bonanza for Epinions that could not have been anticipated by its non-employee common shareholders — as Tolia informed the Epinions board, "Until a few short weeks ago, it would have been difficult to even imagine a two-year contract with a guaranteed $12 million in revenue."  Plaintiffs are informed and believe that defendants disclosed the terms of the Google deal to DealTime in advance of the Epinions merger. Indeed, the Google syndication deal was structured to ensure that the combined entity

would benefit from the contract following the Epinions merger, and ensured that the DealTime businesses' revenues and profits would increase as well.

44.    In conjunction with Epinions' discussions of a potential acquisition by another company, Tolia prepared three-year financial projections for Epinions. The three-year projections, which Tolia described as realistic, showed that Epinions expected that it would be profitable in 2003 through 2005, and that it expected its total profits and profit margins would increase substantially each year. Tolia shared these projections with Gurley, Johnston, Gieselmann, August, Benchmark and BV Capital by no later than January 2003, and shared them with DealTime in advance of the Epinions merger.

45.    Representatives of Epinions and DealTime began to discuss the possibility of a merger with DealTime in late 2002. Tolia and Gurley were Epinions' principal representatives in those discussions. During the course of those discussions, Tolia and Gurley learned that a leading financial institution had advised DealTime executives that DealTime could go public, on a stand-alone basis, within approximately twelve to eighteen months and with a valuation of approximately $300 to $400 million. Tolia shared that information with Speiser in December 2002, but Tolia never provided Speiser with information concerning the equity interests that shareholders would receive in the combined entity as a result of the merger. Nor did Tolia ever inform Speiser that Tolia and other common shareholders who remained with the company would receive preferential treatment in the merger. To the contrary, Tolia represented to Speiser that Tolia and other continuing employees were receiving nothing in consideration for their prior work and ownership interests in Epinions.

46.    Because the DealTime business was credited with 65% percent of the combined enterprise following the Epinions merger, defendants knew that DealTime valued the 35% of the combined entity that DealTime was effectively paying to Epinions stockholders to complete the transaction to be worth at least $162 million to $215 million, and that the combined entity likely would be worth at least $462 million to $615 million, even if the transaction produced no synergies, and they expected significant

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

G00594

synergies to be realized.  Defendants knew that, because of Epinions' revenue and profit
growth, the new Google syndication deal, and the cost and revenue synergies between the
two companies, the combined entity would be worth much more than that, but never
disclosed that fact to the common stockholders of Epinions.

47.    In February 2003, Johnston told Ravikant that Epinions was in bad financial
shape, and represented that the company would need to be sold to remain viable.  Tolia
had previously told Ravikant that the company was not doing well and was in danger of
going out of existence.  In fact, at that time, Tolia and Johnston knew that Epinions was
doing very well financially and that it expected to do even better in the future.  In
particular, Tolia and Johnston knew that Epinions had become profitable by mid-2002,
that the Google distribution deal Epinions entered into in early 2003 guaranteed that
Epinions revenues and profits would substantially increase in the coming years, and that
the three-year financial projections Tolia shared with Johnston and the other members of
Epinions' board of directors showed that Epinions would remain profitable and that its
revenues and profits were expected to grow substantially each year.

48.    On February 9, 2003, DealTime and Epinions reached an agreement on the
Epinions merger, which was approved unanimously by Epinions' board of directors, with
defendants Gurley, Johnston and Gieselmann also acting as board representatives on
behalf of Benchmark, August and BV Capital, respectively.  Epinions and its board of
directors described the terms of the Epinions merger, and their purported reasons for the
Epinions merger, in an Information Statement (the "Information Statement"), dated
March 18, 2003, that was provided to most of Epinions' common stockholders.

49.    Pursuant to the merger agreement, Epinions and DealTime agreed that
DealTime would acquire Epinions and that Epinions would be merged into a subsidiary
of DealTime.  The merger agreement prohibited Epinions' directors from making any
further effort to pursue an alternative transaction that might have provided more value to
Epinions' shareholders.

600594

50.    At the time of the Epinions merger, the outstanding capitalization of Epinions was as follows:

- 16,252,000 shares of Series A preferred stock held by Benchmark and August;
- 9,140,774 shares of Series B preferred stock held by Benchmark, August, Bowman Capital, Goldman Sachs & Co. and Dell Computer Co.;
- 20,322,450 shares of Series C preferred stock held by BV Capital and other preferred shareholders; and
- 14,752,481 shares of common stock principally held by employees and former employees of Epinions, and more than 50% of which were held by members of the Plaintiff Group.

Additionally, Epinions had issued 2,417,621 vested options and warrants to purchase common stock, which were held principally by employees and former employees of Epinions.

51.    Under the Epinions certificate of incorporation, the Epinions merger was subject to approval by a 60% majority of each class of preferred stock, a majority of the outstanding shares of common stock, and a majority of the shares of all four classes of Epinions stock.  Because majority approval of the common stock could be obtained through approval by the shares held by Tolia and other Epinions employees receiving preferential treatment in the merger and a small number of additional non-employee common shareholders, defendants aggressively sought early approval of the transaction from plaintiffs Ravikant and Guha, the former employees who held the largest number of common shares.

52.    The Epinions directors who negotiated and approved the Epinions merger had direct and substantial conflicts of interest with plaintiffs.  These conflicts of interest are reflected in the unfair terms of the Epinions merger, which provided interests in Shopping.com that were tremendously valuable to the Epinions directors and the defendants with which Gurley, Johnston and Gieselmann are affiliated and on whose behalf they acted in negotiating and approving the Epinions merger.  The conflicts of

21
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

interest also are reflected in the employment agreement Tolia contemporaneously entered

into with DealTime, under which Tolia became that company's COO, received a base

salary of $220,000 per year and a right to be terminated only for cause, and received fully

vested equity interests in the combined company that were worth in excess of $20.9

million following the IPO. Defendants did not disclose that they were acting based on

their self-interests, rather than the interests of Epinions and its shareholders, in

negotiating and approving the Epinions merger.

53.  The Epinions board of directors consisted of corporate insiders and

sophisticated financial professionals who were well aware of the true value of the merger

consideration they received for their own benefit and the benefit of the funds they

represented. However, in order to conceal from plaintiffs the unfair nature of the merger

and the fact that they diverted all of the benefits of the merger to themselves, the

Epinions board of directors retained a "financial services firm" to prepare a written report

and offer an appraisal of the merger consideration DealTime proposed for the Epinions

merger. According to the Information Statement, the written report concluded that the

merger consideration was worth between $23 million and $38 million.

54.  The written report prepared by the financial services firm was purposefully

withheld from the common shareholders of Epinions before the completion of the

Epinions merger, although defendants repeatedly claimed that it demonstrated that the

transaction was fair to all of the common shareholders of Epinions, including plaintiffs.

Furthermore, the Epinions directors represented in the Information Statement that they

"believe[d] the terms of the Merger are fair to, and in the best interests of, Epinions and

its stockholders," and that they believed the merger was justified because of "the limited

prospects for Epinions to increase its profitability should it continue to operate on a

stand-alone basis." Those statements were materially false and misleading because

defendants had no reasonable basis for stating that it was in the best interests of Epinions'

common shareholders for their shares to be cancelled without compensation, and had no

reasonable basis for stating that Epinions had limited prospects for increasing its

600594

profitability in light of the Google deal and the three-year projections prepared by Tolia that showed that Epinions was profitable and growing as a stand-alone company.

55. The conclusions of the financial services firm's written report, as described in the Information Statement, were fundamentally flawed and did not reflect a fair and accurate valuation of Epinions or the merger consideration, as defendants knew. Rather, the written report was designed to assist the Epinions directors in convincing plaintiffs that the company was worth much less than it really was worth at the time of the Epinions merger. Defendants knew, but did not disclose to any of the plaintiffs, the following material facts and fundamental flaws concerning the written report:

- The written report's valuation range as set forth in the Information Statement was far lower than the valuation that would have resulted from a standard discounted cash flow analysis using the three-year projections prepared by Tolia and known to defendants, which would have shown that the true value of Epinions and the merger consideration far exceeded the $45 million liquidation preference;

- The written report's valuation range as set forth in the Information Statement does not appear to reflect any consideration of the revenues and cash flow that would be derived from the syndication deal between Epinions and Google, even though the Google deal was signed before the completion of the merger and demonstrated that Epinions' actual revenue and profit growth rate would lead to a valuation far higher than the $23 million to $38 million valuation range;

- The written report's valuation range as set forth in the Information Statement is inconsistent with any assessment of the IPO proposal that DealTime had received and of which Epinions was aware in assessing the value of a 35% equity interest in the combined entity;

- The written report's valuation range as set forth in the Information Statement did not comport with the valuation range that would have resulted from widely

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

accepted valuation techniques for new and rapidly growing companies like Epinions that Gurley himself had advocated while working as a Wall Street financial analyst, and consequently reflected an artificially low valuation and an improper effort by defendants to "low ball" the valuation; and

- As disclosed in the Information Statement, the written report was not issued in the form of a formal fairness opinion that could be relied upon by the board of directors or third parties or disclosed to Epinions' shareholders so that they could assess the reasonableness of its methodologies and conclusions.

56. Defendants were aware of the many flaws in the written report's valuation range that was disclosed in the Information Statement. Among other things, Gurley had served as an all-star ranked research analyst for CSFB and Deutsche Bank before joining Benchmark, and had helped develop the valuation models that are used for companies like Epinions and transactions like the Epinions merger. Based on his prior experience, Gurley knew that long-term revenue and cash flow forecasts — such as the three-year projections Tolia prepared for Epinions — are critical to the accurate valuation of relatively new and rapidly growing companies like Epinions.

57. Defendants did not disclose any of the flaws in the written report to plaintiffs. Indeed, they withheld the written report from plaintiffs because they knew plaintiffs would thereby become aware of the distorted and inaccurate nature of the report.

58. The Epinions board of directors chose not to retain a financial advisor to conduct an independent evaluation of the fairness of the Epinions merger, and consequently did not obtain any fairness opinion from any independent financial advisor. The Epinions board of directors did not conduct an auction, establish an independent valuation committee consisting of persons who were not financially interested in the transaction, or otherwise take any steps to ascertain the true value of the company. Rather, the Epinions merger was a self-interested transaction that had none of the protections and bore none of the earmarks of an arm's-length negotiation undertaken in

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

good faith. The members of the Epinions board deliberately chose not to take any of these customary actions because they knew that those steps would have established that the merger was totally unfair to plaintiffs and other non-employee shareholders.

59.    Shortly after DealTime and Epinions agreed to the Epinions merger, Johnston, on behalf of defendants, sought Ravikant's consent to the transaction. To obtain Ravikant's consent, Johnston falsely represented that the consideration DealTime was to pay for Epinions was worth less than the liquidation preference held by Epinions' preferred stockholders, and the common stockholders would receive nothing in any acquisition in which the consideration paid for Epinions was worth less than $45 million. Johnston also represented, falsely, that Ravikant's consent was not necessary for the transaction to proceed. In fact, Ravikant's consent to the transaction was an important step in defendants' effort to gain the required common shareholder approval the transaction, because defendants sought to use Ravikant's consent to the transaction to influence other shareholders to consent to the transaction and because Ravikant's consent ensured that the remaining non-employee shareholders would be forced to forfeit their shares.

60.    In January 2003, DealTime and Epinions also prepared a presentation that was shared with shareholders who received preferential treatment in the merger, as well as with plaintiff Laws, a former Epinions employee who was being recruited to potentially re-join the company. The presentation noted that the "benefits of a merger" would include the combined entity's ability to "achieve liquidity" through "a successful public offering which will set the stage for even more growth." The presentation also noted that, as a result of the merger, the combined company would be able to offer a "complete product" and would be "one of the top five shopping destinations" on the Internet, that its partnerships would provide it "the leverage to lock up the rest of the market," and that it would have "the best financials" with $15 to $20 million in earnings for 2003 and "significant cash flow every month." The presentation stated that, even without any adjustment for potential synergies, DealTime and Epinions projected that the

combined company would have $62 million in revenues and $18.2 million in earnings for 2003.

61. None of the information in the January 5, 2003 presentation was included in the Information Statement. The presentation was not shared with any member of the Plaintiff Group other than plaintiff Laws. When plaintiff Laws consented to the merger, he did not know that defendants would withhold material information concerning the transaction from the Plaintiff Group and he did not know that Tolia and other common shareholders who would remain with the company would receive preferential treatment in the merger.

62. In January and February 2003, Tolia told Speiser and Guha that all common shares, including his, were being zeroed out and that his new options in DealTime would vest over four years. Tolia also urged Guha to sign the consent form for the merger, and told him that all the common shareholders were being wiped out in the merger. Guha specifically asked Tolia if he too was to have his shares cancelled without compensation, and Tolia assured him that was the case. Guha asked Tolia why he would approve the merger on these terms, and Tolia said that Epinions would be forced to shut down within several months if the merger did not proceed. Tolia also said, falsely, that Guha's consent was not necessary for the transaction to proceed. When Guha raised concerns about how the common shareholders were being treated in the merger, Tolia dismissed those concerns, falsely stating that "I'm in the same boat."

63. Later, in April 2003, Tolia falsely represented to plaintiffs David Newman and Noah Parsons that he was not receiving retroactively vested options in the combined entity as part of the merger consideration. In fact, 90% of Tolia's new options in DealTime vested upon their issuance.

64. The Information Statement was materially false and misleading in numerous respects, including its failure to disclose:

---

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

1    • The existence of either Epinions' three-year financial projections or the one-
2      year projections for the combined entity that were discussed in the January 5,
3      2003 presentation;
4    • The fundamental flaws in and distorted "low ball" nature of the financial
5      services firm's written report alleged above;
6    • The existence or proposed terms of Google's offer to acquire Epinions;
7    • The terms and magnitude of Epinions' highly profitable, multi-year
8      syndication contract with Google;
9    • The fact that DealTime had discussions with a leading investment bank about
10     a possible IPO with a likely valuation in the $300 million to $400 million
11     range on a stand-alone basis;
12   • That Tolia and other current employee common stockholders were not losing
13     any of their equity interests in Epinions because they were receiving, as part of
14     the merger consideration, vested options in the combined entity that vested on
15     the same terms and the same schedule as their prior options to purchase
16     Epinions common stock;
17   • That, contrary to the representation in the Information Statement, as part of the
18     Epinions merger consideration, Tolia received equity interests in the combined
19     entity that exceeded the interests held by the CEO and founders of DealTime,
20     and that those interests were provided to him in consideration for his
21     significant holdings of Epinions common stock;
22   • That the 35% equity interest DealTime was paying for the combined entity
23     was worth far more than the $45 million liquidation preference allocated to
24     Epinions' preferred shareholders;
25   • Epinions' favorable January and February 2003 financial results, which were
26     immediately available to defendants and demonstrated that the company was
27     profitable and growing.
28

600594

65.   All plaintiffs either relied on the material accuracy of the Information Statement and the other communications by defendants alleged above in conferring their written consent to the Epinions merger or were forced to forfeit all of their Epinions shares or options as a result of the written consent provided by other common stockholders who were misled by the materially false and misleading Information Statement.

66.   On April 14, 2003, Epinions completed its merger into a DealTime subsidiary. The holders of preferred stock in Epinions converted their shares for preferred stock in the new company, and common shareholders who remained with the company received stock options in the combined entity to replace their options to purchase Epinions common stock. In contrast, the Epinions non-employee common shareholders, including all members of the Plaintiff Group, were frozen out *and received no compensation whatsoever.*

67.   In October 2003, the surviving company changed its name to Shopping.com, Ltd. At this point, a mere six months after the merger closed, at least one Epinions board member began discussing plans to take the company public.

68.   Shopping.com maintains its corporate headquarters in the Brisbane, California office space that previously served as the Epinions headquarters, and continues to employ many of the former Epinions employees who received Shopping.com options as part of the Epinions merger. Shopping.com has integrated Epinions.com technology into the Shopping.com web site, continues to maintain and operate the Epinions.com web site, and derives a substantial portion of its revenues from the Epinions business.

69.   On March 23, 2004, Shopping.com filed its first preliminary Registration Statement on Form S-1 with the SEC announcing its intent to go public. It was not until they received the information first mentioned in the S-1 that plaintiffs were placed on any notice that defendants had made the material misstatements and non-disclosures about the Epinions merger alleged above.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

70.    In June 2004, Tolia resigned from Shopping.com, after Shopping.com learned that plaintiffs were considering initiating litigation. Although Shopping.com stated that Tolia's resignation resulted from its recent discovery of his falsified educational background and work history, the members of the Epinions board of directors had been aware of some of Tolia's false representations about being a McKinsey & Co. consultant since at least September 2002.

71.    On October 25, 2004, Shopping.com completed its IPO, which was co-managed by the underwriters Goldman Sachs & Co., Credit Suisse First Boston, Deutsche Bank Securities and Piper Jaffray. After Shopping.com filed an amended S-1 Registration Statement that assumed an offering range of between $16 and $18 per share, the IPO priced at $18 per share. On its first trading day, Shopping.com closed at $28.80 per share, and the company's common stock has since traded as high as $35.62 per share.

72.    All defendants have received tremendous benefits as a result of the frauds and breaches of fiduciary duty that allowed them to complete the Epinions merger. Shopping.com collected $123.7 million in proceeds from the IPO, and was able to obtain a market capitalization in excess of $851 million as a result of the IPO. The equity ownership interests Tolia, Gurley, Johnston, Benchmark, August, BV Capital and other preferred shareholders and continuing employees received in the Epinions merger were worth more than $250 million following the IPO. But for defendants' breaches of fiduciary duty and the other wrongful conduct they used to deprive plaintiffs of their shares and options, plaintiffs would have fully retained their equity interests and collectively would have been paid tens of millions of dollars for those equity interests.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (By all Plaintiffs against all Defendants for Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty)

73.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 72, as set forth above.

74.    As directors of Epinions, defendants Tolia, Gurley, Johnston and Gieselmann owed fiduciary duties to all shareholders of Epinions, including its common shareholders. As Epinions' CEO, Tolia also owed fiduciary duties to all Epinions shareholders, including its common shareholders. Because defendants Gurley, Johnston and Gieselmann acted in concert to control Epinions on behalf of Benchmark, August and BV Capital, these defendants also owed fiduciary duties to all Epinions common shareholders, including its common shareholders.

75.    In connection with the Epinions merger, defendants Tolia, Gurley, Johnston, Gieselmann, Benchmark, August and BV Capital breached their fiduciary duties of care, loyalty, honesty and complete candor by failing to disclose material facts concerning the transaction, by misrepresenting the terms of the transaction as being fair and in the best interests of Epinions and its shareholders, by failing to seek any independent evaluation of the fairness of the transaction, by approving a transaction in which they had financial interests without disclosing the true nature and extent of those interests, and by approving transaction terms that were unfair and inequitable to the common shareholders of Epinions, as alleged above.

76.    Because defendants Tolia, Gurley, Johnston, Gieselmann, Benchmark, August and BV Capital were financially interested in the Epinions merger, their fiduciary duties included a duty to treat the common shareholders of Epinions with entire fairness by ensuring that any sale of Epinions was the result of a fair process and was made at a fair price. The Epinions defendants breached that duty by failing to adopt procedural

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

1   safeguards to ensure that the acquisition process was fair, and by failing to negotiate

2   terms that were fair to the common shareholders of Epinions. The Epinions defendants

3   and controlling shareholders did not exhaust financial options that would have preserved

4   shareholder value and they did not appoint an independent committee to represent and

5   negotiate for the interests of the nonemployee shareholders.

6       77.  Through its predecessors DealTime and Epinions, Shopping.com knew

7   about the fiduciary duties the other defendants owed to the shareholders of Epinions, and

8   actively supported, encouraged, aided and abetted the other defendants in breaching their

9   fiduciary duties and concealing material information concerning the financial prospects

10   of Epinions and the combined entity that would have revealed that the Epinions merger

11   was unfair to the common shareholders of Epinions.

12

13       78.  Defendants Benchmark Capital, August Capital and BV Capital, through

14   their representatives on the Epinions board and through their respective funds' support of

15   the Epinions merger, actively supported, encouraged, aided and abetted the other

16   defendants in breaching their fiduciary duties and concealing material information

17   concerning the financial prospects of Epinions and the combined entity that would have

18   revealed that the Epinions merger was unfair to the common shareholders of Epinions.

19       79.  Prior to the Epinions merger, plaintiffs each owned common shares and/or

20   vested options to purchase common shares of Epinions. As a result of the Epinions

21   merger and defendants' breaches of fiduciary duty and other wrongful conduct, those

22   common shares were cancelled, without compensation. But for defendants' breaches of

23   fiduciary duty, and the assistance of Shopping.com and the other defendants in

24   perpetrating those breaches of fiduciary duty, defendants would have been required to

25   abandon the Epinions merger or to modify its terms to treat the common shareholders of

26   Epinions in a fair and equitable manner.

27       80.  Defendants concealed their fraudulent, unlawful and illegal conduct and

28   self-dealing through the completion of the Epinions merger, and thereby denied plaintiffs

the opportunity to seek appraisal based on the material information relating to Epinions' financial condition and the future prospects for Epinions and the combined entity, the value of Epinions and the merger consideration, and the merger consideration that was to be paid to Tolia and other continuing employees in the form of fully and retroactively vested options, and thereby denied plaintiffs a meaningful opportunity to seek appraisal. Defendants have no basis for claiming that plaintiffs' statutory right to an appraisal of their shares was their exclusive remedy.

81.    As a result of the conduct alleged above, plaintiffs received nothing for their Epinions shares and options and were therefore damaged through the loss of their common shares in Epinions and in the value of the equity interests they would now have in Shopping.com if the consideration paid for Epinions in the Epinions merger had been allocated in a fair and equitable manner. Because the Epinions merger was completed through defendants' breaches of fiduciary duty, plaintiffs are entitled to rescission of the Epinions merger or, in the alternative, rescissory damages in the amount of the current value of their equity interests in Epinions that they held prior to the Epinions merger (together with prejudgment interest), and plaintiffs are also entitled to disgorgement of defendants' ill-gotten gains.

82.    The breaches of fiduciary duty and acts to assist in the completion of breaches of fiduciary duty by defendants alleged above were done intentionally, through malice, fraud and oppression, and with the intention on the part of the defendants to deprive the nonemployee shareholders of their common stock and legal rights. This was calculated and despicable conduct that subjected plaintiffs to cruel and unjust hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

### SECOND CAUSE OF ACTION
(By all Plaintiffs against all Defendants for Fraud
and Conspiracy to Defraud)

83.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 72 and 74 through 80 inclusive, as set forth above.

84.   Defendants violated the common law of fraud and California Civil Code §§ 1709, 1710, and 1572 through the material misrepresentations and non-disclosures alleged above, including the failure to disclose material facts concerning the favorable financial prospects for Epinions and the combined entity in the Information Statement for the Epinions merger, in the direct statements by Tolia, Gurley and Johnston to members of the Plaintiff Group concerning the value and financial prospects for Epinions and the combined entity, and misrepresentations concerning the nature and value of the consideration received by the preferred shareholders and the continuing employees who received compensation in the Epinions merger.  Through its predecessors DealTime and Epinions, Shopping.com aided and abetted the other defendants in their fraudulent conduct.

85.   Defendants made their material misrepresentations and non-disclosures knowing that their statements were false and misleading and with the intent to defraud plaintiffs and other common shareholders of Epinions.  As alleged above, defendants conspired with one another to make the material misrepresentations and non-disclosures, and acted in furtherance of their conspiracy by using those material misrepresentations and non-disclosures to complete the Epinions merger.

86.   All plaintiffs either relied on defendants' material misrepresentations and non-disclosures by conferring their consent for the Epinions merger and/or deciding whether to exercise their legal rights to challenge the Epinions merger, or were forced to forfeit their shares because of other shareholders' reliance on those misrepresentations and non-disclosures.

87.   As a proximate result of relying on defendants' material misrepresentations and non-disclosures, plaintiffs incurred actual damages consisting of the loss of their

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

1  common shares in Epinions and the value of the equity interests they would now have in

2  Shopping.com if the consideration paid for Epinions in the Epinions merger had been

3  allocated in a fair and equitable manner.

4      88.    Because the Epinions merger was completed through defendants' fraudulent

5  conduct, plaintiffs are entitled to actual damages, rescission of the Epinions merger or, in

6  the alternative, rescissory damages in the amount of the current value of their equity

7  interests in Epinions that they held prior to the Epinions merger (together with

8  prejudgment interest), and plaintiffs are also entitled to disgorgement of defendants' ill-

9  gotten gains.

10     89.    Defendants' fraudulent conduct alleged above was done intentionally,

11  through malice, fraud and oppression, and with the intention on the part of the defendants

12  to deprive the nonemployee shareholders of their common stock and legal rights and was

13  despicable conduct that subjected plaintiffs to cruel and unjust hardship in conscious

14  disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive

15  damages.

16  

17                    **THIRD CAUSE OF ACTION**
                 **(By Plaintiffs against all Defendants for**
18            **Constructive Fraud and Aiding and Abetting**
                      **Constructive Fraud)**

19     90.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 72, 74

20  through 80, and 84 through 87 inclusive, as set forth above.

21     91.    The Epinions Defendants are liable to plaintiffs for constructive fraud in that

22  their fiduciary duties gave them duties to protect the interests of the common

23  shareholders and to disclose all material facts as to the business and financial prospects of

24  Epinions and DealTime, but those defendants failed to comply with their duties and

25  instead profited themselves.

26     92.    Defendant Shopping.com is liable for constructive fraud because it aided

27  and abetted the other defendants in their concealment of material facts concerning the

28  

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

G00594

business prospects for Epinions, DealTime and the combined entity that would result from the Epinions merger.

93.     Defendants Benchmark Capital, August Capital and BV Capital, through their representatives on the Epinions board and through their respective funds' support of the Epinions merger, actively supported, encouraged, aided and abetted the other defendants in their constructive frauds and concealing material information concerning the financial prospects of Epinions and the combined entity that would have revealed that the Epinions merger was unfair to the common shareholders of Epinions.

94.     As a proximate result of relying on defendants' constructive fraud, plaintiffs incurred actual damages consisting in the loss of their common equity interests in Epinions and the value of the equity interests they would now have in Shopping.com if the consideration paid for Epinions in the Epinions merger had been allocated in a fair and equitable manner.  As additional remedies for defendants' constructive fraud, plaintiffs are entitled to rescission of the Epinions merger or, in the alternative, rescissory damages in the amount of the current value of their equity interests in Epinions that they held prior to the Epinions merger (together with prejudgment interest), and plaintiffs are also entitled to the disgorgement of defendants' ill-gotten gains.

95.     Defendants' fraudulent conduct alleged above was done intentionally, through malice, fraud and oppression, and with the intention on the part of the defendants to deprive the nonemployee shareholders of their common stock and legal rights and was despicable conduct that subjected plaintiffs to cruel and unjust hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION
**(By all Plaintiffs Against all Defendants for Violations of California Corporations Code §§ 25401-03, 25501, *et seq.*)**

96.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 72, 74 through 80, 84 through 87, and 91 through 93, inclusive, as set forth above.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

600594

97.    California law makes it unlawful to buy or offer to buy any security by means of oral or written communications which include an untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading. Cal. Corp. Code § 25401. California law also makes it unlawful for an issuer or any officer, director or controlling person of an issuer to purchase or sell any security of the issuer when he knows material information about the issuer which would significantly affect the market price of that security and which is not generally available to the public. Cal. Corp. Code § 25402. Under California law, the cancellation of the Epinions common shareholders' common stock as part of the Epinions merger constituted a sale of those securities to DealTime. Cal. Corp. Code § 25017.

98.    All defendants are liable under the California securities laws for the material misrepresentations and omissions alleged above because they either made those misrepresentations and omissions, controlled the persons who made them, or knowingly provided substantial assistance to the defendants who made them. All of the misrepresentations and omissions alleged above were made to induce plaintiffs and other common shareholders of Epinions to consent to the Epinions merger and to not exercise their legal rights to challenge the Epinions merger. All defendants had access to material inside information concerning the favorable financial prospects for Epinions, DealTime and the combined entity that they did not disclose to plaintiffs and other common shareholders of Epinions and that they knew was not disclosed to plaintiffs and other common shareholders of Epinions prior to the completion of the Epinions merger.

99.    All plaintiffs relied on defendants' material misrepresentations and non-disclosures concerning the Epinions merger in conferring their consent to the transaction and/or deciding whether to exercise their legal rights to challenge the Epinions merger, or were forced to sell their shares of other shareholders' reliance on those misrepresentations and non-disclosures. As a result of defendants' violations of the California securities laws, plaintiffs suffered actual damages through the cancellation of

their Epinions common stock and options. Under Cal. Corp. Code §§ 25501, 25502, and 25504, and 25504.1, defendants are liable for rescission or damages plus interest as a result of their violations of the California securities laws.

## FIFTH CAUSE OF ACTION
### (By all Plaintiffs against all Defendants for Unlawful Business Acts and Practices in Violation of Business & Professions Code §§ 17200, *et seq.*)

100. Plaintiffs reallege and incorporate by reference paragraphs 1 through 72, 74 through 80, 84 through 87, 91 through 93, and 97 through 98 inclusive, as set forth above.

101. Defendants' misconduct alleged above constituted unfair, illegal, and fraudulent business acts and practices in violation of Business & Professions Code § 17200.

102. As a result of these violations, plaintiffs are entitled to judgment against defendants under § 17203 restoring them the stock that the wrongful acts cancelled, or to monetary or other equivalent restitutionary relief.

## SIXTH CAUSE OF ACTION
### (By all Plaintiffs against all Defendants for Unjust Enrichment)

103. Plaintiffs reallege and incorporate by reference paragraphs 1 through 72, 74 through 80, 84 through 87, 91 through 93, and 97 through 98 inclusive, as set forth above.

104. As a result of the unfair, unlawful and inequitable conduct alleged above, defendants have been unfairly enriched at plaintiffs' expense through the Epinions merger and the subsequent IPO of Shopping.com.

105. Through their wrongdoing, Defendants unjustly denied the members of the Plaintiff Group and other former common shareholders of Epinions the benefits of the merger. Defendants accordingly should be required to disgorge their unjust enrichment and ill-gotten gains.

G00594

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment, jointly and severally, against defendants, as follows:

1. Compensatory damages in an amount to be proven at trial;

2. Rescission of the Epinions merger or, in the alternative, rescissionary damages in the amount of the current value of the equity interests in Epinions that plaintiffs held prior to the Epinions merger;

3. Disgorgement of defendants' ill-gotten gains from the Epinions merger;

4. Punitive and exemplary damages based on defendants' intentional, malicious, cruel and unjust disregard of plaintiffs' rights and interests;

5. The imposition of a constructive trust over the common stock in Shopping.com, and all proceeds they obtained from any transfers of such stock, held by defendants as a result of the Epinions merger; and

6. Pre-judgment interest, costs, attorneys' fees and such other legal and equitable relief as the Court deems appropriate.

Dated: January 19, 2005.

MARC M. SELTZER
STEPHEN E. MORRISSEY
SUSMAN GODFREY L.L.P.

By _Marc M. Seltzer/s, sen_
Marc M. Seltzer

MANUEL S. KLAUSNER
LAW OFFICES OF MANUEL S. KLAUSNER,
P.C.

By _Manuel S. Klausner/s sen_
Manuel S. Klausner

LAW OFFICES OF THOMAS K. BOURKE
THOMAS K. BOURKE

By _Thomas K. Bourke/s sen_
Thomas K. Bourke

38

## JURY DEMAND

Plaintiffs hereby demand a jury trial for all causes of action alleged in their complaint for which they are entitled to a trial by jury.

Dated: January _14_, 2005.

MARC M. SELTZER
STEPHEN E. MORRISSEY
SUSMAN GODFREY L.L.P.


By _Marc M. Seltzer/cpen_

    Marc M. Seltzer

LAW OFFICES OF MANUEL S. KLAUSNER,
   P.C.
MANUEL S. KLAUSNER


By _Manuel S. Klausner/cpen_

    Manuel S. Klausner

LAW OFFICES OF THOMAS K. BOURKE
THOMAS K. BOURKE


By _Thos. K. Bourke/cpen_

    Thomas K. Bourke

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

# EXHIBIT J

NY Times article tiled
"Epinions founders say they were bilked", January 27, 2005

**The New York Times**



**SAN FRANCISCO —** Partners at two prominent Silicon Valley venture capital firms deceived four of the five founders of a start-up company, withholding critical information and thereby cheating them out of tens of millions of dollars, a lawsuit alleges.

The suit, filed last week in Superior Court in San Francisco, was brought on behalf of three of the five founders of Epinions, a consumer product reviewing Web site founded in 1999 that quickly became one of the dot-com era's more celebrated start-ups. The suit named J. William Gurley of Benchmark Capital and John Johnston of August Capital, both original investors in Epinions and directors of the company, and an Epinions co-founder, Nirav Tolia.

"It's rare for the founders of a company to sue their financial backers," said Paul Friedman, a partner at the law firm of Morrison & Foerster in San Francisco. "Venture is a small world in which relationships are very important. Most people find a way to avoid disputes so they can live another day."

The basis for the suit is the proposal made in February 2003 to merge Epinions and DealTime, a comparison-pricing site. By then four of Epinions' five founders - Naval Ravikant, Ramanathan Guha, Mike Speiser and Dion Lim, who did not join the suit - had left the company but still owned a total of more than six million Epinions common shares.

The four owned enough shares to scuttle the merger but gave their blessing to it anyway, even though it meant valuing their shares at zero. At the time, investors holding preferred shares, including Benchmark and August Capital, had a claim on the $45 million they had invested collectively.

The four founders, according to the suit, were led to believe that the company was worth $23 million to $38 million, rendering worthless the shares of anyone holding common stock.

The suit contends that Gurley, Johnston and Tolia failed to share with them "material facts concerning Epinions' financial affairs," including news of a deal with Google that the company knew would increase its 2003 profit by 1,400 percent.

The suit cites an e-mail message written by Tolia in January 2003 - one month before the former partners approved the merger - in which he writes about the Google deal. Tolia's shares were granted to him in the form of equity in the new company, which was named Shopping.com.

Shopping.com filed to go public in April 2004, a year after the Epinions-DealTime merger was completed.

Its shares went on sale in October. Tolia's stake in Shopping.com was worth $38 million after its first day of trading. The two venture capital firms each owned shares worth more than $60 million.

Johnston declined to comment in response to an e-mail message. Gurley and Tolia did not respond to requests for comment.

On Tuesday, Shopping.com acknowledged the suit in a filing with the Securities and Exchange Commission. The company said the allegations were "without merit."

In addition to the three founders, 39 former Epinions employees joined the suit. Their total stake in Shopping.com, had they retained their equity holding in the combined company, would have been worth $39 million on the day the company went public, the suit contends.

# EXHIBIT K

NY Times article tiled
"IPO succeeded, who was rewarded", November 1, 2004



November 1, 2004

# The I.P.O. Succeeded. Who Was Rewarded?

**By GARY RIVLIN**

**S**AN FRANCISCO, Oct. 31 - In 1999, they were celebrated as the embodiment of dot-com bravado when they quit great jobs at companies like Netscape and Yahoo to create Epinions, a Web site that reviews consumer products.

Their story should have had a happy ending last week when Shopping.com - the company formed in April 2003 by the merger of Epinions and a comparison-pricing site called DealTime - went public. Shopping.com enjoyed the most successful first day of any initial offering in the United States since JetBlue went public in April 2002, according to Richard J. Peterson, the chief market strategist for Thomson Financial. But the founders of Epinions - Nirav Tolia, Naval Ravikant, Ramanathan Guha, Dion Lim and Mike Speiser - have learned that success does not necessarily mean that a company's creators will be rewarded.

August Capital and Benchmark Capital, two venture capital firms that invested $4 million each to help start Epinions in April 1999, profited handsomely in the public offering. They had both made additional investments, and each now owns a stake in Shopping.com worth roughly $60 million. Overall, Shopping.com was worth $750 million at the close of the market on Friday.

By contrast, four of the five founders of Epinions did not see a dime from Shopping.com's public sale - their shares in Epinions were rendered worthless when it merged with DealTime.

"What the Epinions story demonstrates," said Paul Saffo, a research fellow at the Institute for the Future, a Silicon Valley research group, "is that the golden rule applies even in Silicon Valley: the people who have the gold, rule."

Of the Epinions founders, only Mr. Tolia, who took over as Shopping.com's chief operating officer after the merger, fared well in the offering. His shares were worth nearly $20 million at Friday's closing price.

But Mr. Tolia's good fortune is not unmarred. In June, he resigned after the company "became aware of inaccuracies in his representations about his work history and educational background," according to a Shopping.com press release.

A biography distributed by Epinions in its early days stated that Mr. Tolia had a degree from Stanford University. A spokeswoman for Stanford, however, said in an interview that though Mr. Tolia had attended the college between 1990 and 1995, a degree was not conferred until last Sept. 30.

Mr. Tolia also claimed he worked as an analyst at McKinsey & Company. "We have no record of a Nirav Tolia ever working for us," a McKinsey spokesman said.

Lou Montulli, a founding engineer at Netscape who joined Epinions three weeks after its inception, said, "It's

really hard for me to discern the real truth on all that happened. Not everything is clear, even to us."

Mr. Tolia's credibility is an issue for Shopping.com, the company said in filings, as it braces for litigation tied to its merger with Epinions. Lawyers for at least 30 former Epinions employees, including Mr. Speiser and Mr. Ravikant, have told Shopping.com that they intend to sue over the valuation of stock options that they were awarded.

Before the offering, Epinions had two classes of shares: common stock, which was granted to the founders and employees, and preferred shares, which were given to investors. Their preferred shares in Epinions entitled the financiers to be reimbursed the $45 million they had invested before anyone else was compensated.

Today, the Epinions portion of Shopping.com is worth hundreds of millions, but at the time of the DealTime merger, Epinions was valued at roughly $30 million, which rendered all common shares worthless.

"The question we're asking," said one former Epinions employee who asked not to be identified and who plans to be part of the lawsuit, "is how this company supposedly worth only $30 million was suddenly worth $300 million only 18 months later."

The 70 or so former Epinions employees who were not hired by Shopping.com, the lawyers assert, are owed as much as 2.4 million shares of Shopping.com, a stake worth $65 million at Friday's closing price of $26.97 a share (the shares were initially priced at $18 each).

Mr. Montulli, who said he had not decided if he would join the suit as a plaintiff, said, "It's my understanding that it could be quite a large group joining that suit." At its peak, 120 people worked for Epinions; all were granted stock options.

J. William Gurley, of Benchmark Capital, declined to comment on Epinions, citing the S.E.C.-mandated quiet period that extends for 25 days after a company's public offering. In April 2003, the California Department of Corporations found that the merger was "fair, just and equitable to parties on both sides of the transaction."

Mr. Tolia also declined to comment. But during a hearing in 2003 he said that it was "always a bit of a tough feeling when one realizes it's the end of the road in terms of holding a piece of stock, and now that piece of stock will be worthless."

Many former employees are critical of Mr. Tolia, including Joyce Park, who worked at Epinions from early 2000 until she was laid off in the spring of 2002. "I think the surprise among most of us is that Nirav was the one to scoop up the whole pot," she said. "Let's just say that to us he was the out-front guy, the charming guy who looked good on TV." Mr. Tolia was not the company's original chief executive, but he served in that position at the time of the merger.

But Eric Goldman, Epinions' general counsel and now a law professor, said that Mr. Tolia was just doing his job in fashioning a merger with DealTime.

"Without Nirav's leadership, the company would not have survived," he said. "So not only would those holding common stock have been annihilated, all the other investors would have been annihilated, too."

That view was echoed by Dion Lim, one of the founders of Epinions. "I believe that everything Nirav has done - including layoffs, the merger, his resignation - has been in the best interest of the company," Mr. Lim wrote in an

e-mail message.

The choice Mr. Tolia faced, Mr. Goldman said, was to accept an offer that would salvage some jobs at Epinions and reward the firm's investors, or see the company shut down. "That doesn't mean people didn't get hurt," he said, "and I'm speaking as one of them."

[Copyright 2004](#) [The New York Times Company](#) | [Home](#) | [Privacy Policy](#) | [Search](#) | [Corrections](#) | [RSS](#) | [Help](#) | [Back to Top](#)

# EXHIBIT L

LexisNexis Law 360
"SEC Wants Fenwick & West Booted From Insider Trader Suit",
October 24, 2011

LAW360
A LexisNexis® Company

FREE TRIAL

News, cases, companies, firms    Search    Advanced Search

News Sections    Jobs    Cases    Tracking    Platform Tools    Subscribe | Sign In

# SEC Wants Fenwick & West Booted From Insider Trader Suit

By **Martin Bricketto**                                   Share us on:

Law360, New York (October 24, 2011, 3:52 PM ET) — The U.S. Securities and Exchange Commission told a California court on Friday that a conflict should disqualify Fenwick & West LLP from representing an alleged participant in an $8 million insider trading scheme involving Tempur-Pedic International Inc. and Acxiom Corp. securities.

## Never miss the news you need.

Stay on top of your practice area, industry or jurisdiction with our daily newsletter. When you sign up, you will receive a concise summary of major litigation, court opinions and legislative developments every business day. Just provide us your email address and choose from any of 30+ newsletters to get started.

**Email** (professional email required)

**Primary area of interest**

☐ California          ☐ Securities

More [+]

Sign up now

The SEC argued that Fenwick was ethically obligated to step down as Ming Siu's counsel because of a "direct, actual and profound" conflict arising from its former representation of another defendant in the lawsuit, Zisen Yu, who confessed to a criminal charge of conspiring to commit insider trading and contradicted Siu's testimony and positions.

"In short, Fenwick is in the ethically compromised position of having to call its former client a liar, which absent an effective waiver the canons of professional responsibility prohibit," the SEC's motion said.

The suit, filed in November 2009 in the Northern District of California, alleges that Chen Tang, the CFO of an unnamed private equity firm, and several relatives and friends including Yu and Siu profited by trading on inside information. Tang later confessed to conspiracy and insider trading allegations.

Fenwick had represented both Yu and Siu, but the court granted Fenwick's request to withdraw as Yu's counsel in March.

The SEC said that Yu pled guilty Sept. 8 to conspiracy to commit insider trading in a parallel criminal case. According to the commission, Yu admitted to insider trading in Tempur securities and directly implicated Siu in the conspiracy.

That same month in the present case, Yu consented to a permanent injunction barring him

## Related

**Sections**

✉ California

✉ Securities

## Case Information

**Case Title**

TRACK   Securities and Exchange Commission v. Tang et al

**Court**

California Northern

**Nature of Suit**

Securities/Commodities

**Case Number**

3:09-cv-05146

**Judge**

Joseph C. Spero

**Date Filed**

October 30, 2009

**Law Firms**

TRACK   Fenwick & West

**Companies**

TRACK   Acxiom Corporation

TRACK   Tempur-Pedic International, Inc.

**Government Agencies**

TRACK   Securities and Exchange Commission

from violating securities laws or aiding such violations, but fell short of a court
order, according to the commission.

"Fenwick owes a duty to Siu to use its best efforts to undermine Yu's credibility, but Fenwick
cannot attempt to do so without violating the continuing duties owed to its former client,
duties which Yu never waived," the SEC said.

The SEC argued that the alleged conflict was on display during a Sept. 29 deposition
involving Yu, and that the firm violated standards that bar lawyers from choosing between
conflicted loyalties when a former client becomes adverse to an existing client in litigation.

Fenwick not only used Yu's own work product and client confidences against him, but also
pulled punches and refrained from rigorously cross examining Yu on statements in his plea
agreement, disadvantaging Siu.

The SEC said it wanted to disqualify Fenwick to preserve the integrity of the case and that
wasn't making its request as part of some kind of strategic delay.

"Rather, Fenwick's ethical violations are so profound as to leave the commission no choice
but to seek the relief requested," the motion said.

The agency claims that in 2008, Tang learned through his job that Tempur-Pedic would not
meet its earnings forecast, and tipped off Seto and others who took short positions on
company securities. They again scored a windfall when Tang later became aware of plans
by his firm to make a large, market-moving purchase of Tempur-Pedic securities, according
to the SEC.

The financial shenanigans did not end there, the suit alleges. Tang also received illegal
trading tips in 2007 from his brother-in-law Ronald Yee, a former CFO of a venture capital
fund, it contends.

Yee was privy to his firm's intention to place a bid for Acxiom and later tipped his friends and
trading partners to take short positions when he learned that the proposed merger was in
jeopardy, the SEC asserts.

A Fenwick attorney did not immediately return a request for comment Monday.

Siu is represented by Christopher J. Steskal, Ilana Rubel, Theis Finlev and Alexis Caloza of
Fenwick & West LLP.

The case is U.S. Securities and Exchange Commission v. King Chuen Tang et al., case
number 3:09-cv-05146, in the U.S. District Court for the Northern District of California.

–Additional reporting by Samuel Howard. Editing by Eydie Cubarrubia.

---

**Related Articles**

SEC Can't Oust Fenwick From Insider Trading Suit
SEC Accuses 7 Of $8M Insider Trading Scheme
Alleged Inside Trader Strikes Deal In $8M SEC Suit