# EXHIBIT 2 TO COUNTERDEFENDANTS' REQUEST FOR JUDICIAL NOTICE

# (Part 2 of 4)

on July 11, 1999, stated: ""We don't do term sheets here," Gurley responded, offering his palm. "We do handshakes."" (See Exhibit J).

92. To Plaintiff's surprise, on or about June 29, 2007, Defendant Harvey wrote an email to Fatdoor, Inc. director Drazan stating that Defendant Benchmark would pass on the current round even though they were "really intrigued with the space." Defendant Harvey stated:

> "This has been an extraordinarily close call but it looks like we will pass for this round. We are all really intrigued with the space but can't get comfortable enough with the "killer app." My guess is that it will be obvious soon (and we will feel sheepish) but we need to have more conviction before investing. I would like to help these guys as much as possible. Given that we are now up to speed, we could be a good quick stop for the next round here." [sic]

The pullout in funding by Defendant Benchmark came as a complete surprise to Plaintiff and Fatdoor, Inc.'s Board of Directors, as Defendant Benchmark had indicated throughout that they wanted to invest. On or about June 29, 2007, Defendant Harvey wrote to Plaintiff stating: "I bet that you guys will find this [killer app] quickly as we are quite impressed with your thinking on this space." In addition to Defendant Benchmark pulling out, Defendant Hoffman also withdrew his verbal commitment to invest $100,000 in Fatdoor, Inc.

93. It appears to be a pattern and practice for Defendant Benchmark to agree to terms and conditions of binding contracts through non-traditional means of contract. In addition to the various examples of "handshakes" cited throughout this Complaint, Defendant Harvey "preferred [method] to seal a deal with an entrepreneur: to secure the agreement before bringing out the term sheet with all of the details" (eBoys, page 243).

94. In lieu of an investment by Defendant Benchmark, Fatdoor, Inc. took a smaller investment of five and a half million dollars ($5,500,000.00) from Norwest without participation from Defendant Benchmark. The transaction closed on or about July 17, 2007. Approximately within two weeks of the closing of the second round of funding, Defendant Benchmark began an ill-conceived scheme to unfold and destroy Plaintiff and Fatdoor, Inc.'s focus around neighborhood social networking, so that it could opportunistically start its own company through the confidential information that it had learned with an entirely new set of Founders that it

- 26 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

favored. As a starting point, Defendant Benchmark sought to opportunistically interfere with the operations of Fatdoor, Inc. and influenced Norwest and Fatdoor, Inc. to replace Plaintiff, a person whom they knew to be the lead inventor and thought leader in the neighborhood social networking space, as the CEO. (See Exhibit K).

95. Defendant Taylor wrote Plaintiff via email on July 19, 2007 stating:

> "We are happy to be advisors. The time commitment sounds reasonable to us, and we are interested in helping out as you navigate all the difficult product and privacy issues. The product has a lot of potential, and if you all can find the right product and privacy balance, it has the potential to become the first really successful "geo wiki… Let us know how to proceed from here. Bret" [sic]

96. Norwest partner and new Fatdoor, Inc. director Monsalve expressed concerns about the intentions of Defendants Taylor and Norris in an email sent on July 20, 2007 to the Plaintiff wherein Monsalve wrote:

> "Raj: Are you worried about them competing? Why would they want to be advisors if they already have a startup they are working on? Would they want to join full time?...that would be interesting. Seems like you have something they want for their startup, but may be I am missing something. Google people are well known for picking off other's ideas so be careful. Let's talk. Sergio"

97. That same day, on or about July 20, 2007, Plaintiff wrote an email to Fatdoor, Inc.'s Board of Directors including Monsalve stating:

> "Hi Sergio, The right question, and one that I have carefully thought through. As part of our Advisory Agreement with them, we can draft in clauses for them to disclose to us the startup they are building and to warrant that it is not competitive to Fatdoor. They have told me that the startup they are building is not competitive to fatdoor. We can formalize this through this agreement."

98. On or about July 23, 2007, Defendant Taylor sent an email to Plaintiff responding to a written Strategic Advisory offer letter prepared for Defendants Taylor and Norris stating:

- 27 -

"We will take a look at these and get back to you tomorrow with the signed copies."

99. The agreement was not returned signed the very next day. Instead, two days later, on or about July 25, 2007, Defendants Taylor and Norris wrote back to Plaintiff stating:

"Raj, I wanted our lawyer to review this, and I wasn't aware he is on vacation this week – is it possible we get this to you on Monday, or are we running up against a deadline? Bret" [sic]

100. On or about August 2, 2007, Defendant Taylor wrote back to Plaintiff stating:

"Raj, The only concern we have with the agreement is "Advisor agrees not to compete with the business of the Company and its successors and assigns during the term of this Agreement, notwithstanding the cause or reason for termination of this Agreement." [sic]

Defendant Taylor, who is at the time of writing was still an EIR at Defendant Benchmark, further reaffirmed that he did not have any conflicts with the information he had learned from Plaintiff. In the same email sent on or about August 2, 2007, he stated:

"Clearly we don't want to get into a directly competing business, or we wouldn't be doing this in the first place. However, competition is really in the eye of the beholder sometimes, and we are definitely entering the consumer internet space (though definitely not the geo space). How would you feel about removing this line to make us more comfortable? Bret"

101. Fatdoor, Inc. rejected this last minute update by Defendant Taylor, and Plaintiff was terminated from Fatdoor, Inc. approximately two weeks later. Defendants Taylor and Norris independently created the consumer internet venture FriendFeed.com after leaving Defendant Benchmark as EIRs. FriendFeed was later purchased by Facebook, Inc. on or about August 2009. However Defendant Taylor's representation to Plaintiff on or about August 2, 2007 that he did not have an intention to enter the geo space was not truthful, as Defendants Taylor and Norris did shortly enter the "geo space" with their involvement in the formation and later pivoting of Round Two, Inc., from a website about college and professional sports called Fanbase.com, to an entirely

- 28 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1    unrelated website about neighborhood social networking called Nextdoor.com.

2        102. The Fatdoor, Inc. Board of Directors retained Jon R. Love ("Love") to find a

3    replacement CEO for Fatdoor, Inc. based on a reference from Defendant Benchmark. Defendant

4    Benchmark had gained notoriety for finding CEOs to replace founders in the past. It had found

5    eBay, Inc.'s former CEO Meg Whitman to lead the company in its early years, and had also

6    found a replacement for an Eric Greenberg, who was the CEO of Defendant Benchmark's

7    portfolio company Scient. In a chapter titled "Don't Get Screwed" in the book eBoys, Mr.

8    Greenberg is quoted as saying:

> "Think about this: It's your idea, you write the business plan, you
> don't sleep for months, you talk all these people into joining you.
> There was nobody with me when I got funded, I arranged all the
> funding myself, sold the initial deals, got the initial employees-it
> was my idea, my tenacity – and all of a sudden, you get fired and
> they   take your fucking stock away....It was like losing your
> kid." (eBoys, page 64).

        103. The Plaintiff feels somewhat similarly to Mr. Greenberg in the quote above from

the eBoys book. Defendant Benchmark's subsequent efforts to reform Mr. Greenberg are

solidified in the laughter that they collectively shared with Benchmark partner Dunlevie

commenting that "we always do the second one," and the comment of another Benchmark partner

Rachleff commenting: "That's our value add" (eBoys, page 71) when referencing why Defendant

Benchmark chose to invest on a follow up idea Scient (analogous to Round Two, Inc. with an

entirely new team) rather than Mr. Greenberg's initial one (analogous to Fatdoor, Inc. started by

Plaintiff). When contacted, eBoy's author, Mr. Stross, refused to comment on his book and

refused to participate in this litigation. Plaintiff intends to depose and/or subpoena Mr. Stross

during this litigation with respect to his observations described in eBoys.

        104. Defendant Benchmark has a pattern and practice of replacing founders at

companies that they wish to invest in, and has an excellent track record of doing so. As such, the

Board of Directors of Fatdoor, Inc. took the recommendation of Jon R. Love seriously.

Particularly, one Benchmark partner named David Berne was recruited as a partner specifically

- 29 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1  for his skills in recruiting new CEOs and senior executives for startups Defendant Benchmark

2  invested in.

3  105. Love had helped Defendant Benchmark to replace senior management for a

4  number of Benchmark portfolio companies including Gaia, Lindon Labs, Pure Play, and

5  When.com. In addition, Love had been retained to replace Defendant Benchmark's advisor,

6  Defendant Hoffman, as the CEO of LinkedIn.

7  106. Because of Defendant Benchmark's interference, Fatdoor, Inc. Board members

8  Harris, Jr. and Monsalve replaced Plaintiff as CEO. Particularly, on or about July 27, 2007,

9  Fatdoor, Inc. Chairman Harris, Jr. let Plaintiff know that his services would no longer be required

10 at Fatdoor, Inc. because the company would be going in a different direction than the

11 neighborhood space based on feedback they received from Defendant Harvey and Defendant

12 Benchmark. Harris, Jr. would be the interim CEO until a replacement was found by Defendant

13 Benchmark headhunter Love to take Fatdoor, Inc.'s business in a different direction than one

14 centered around neighborhoods and to make Fatdoor, Inc. more attractive to investors in future

15 rounds.

16 107. This development came as a shock to Plaintiff because approximately one month

17 earlier, Plaintiff had received a thank you email from Fatdoor, Inc. board member Drazan

18 commenting "impressive how much value you have created on such modest spending. Pause for

19 a moment to reflect on what you have produced...38 patent applications, an impressively

20 functional website, thousands of initial subscribers, tens if not hundreds of thousands of page

21 views, strategic interest from the most sophisticated media properties and institutions in the

22 world, world class employees, candid and supportive feedback from your user community, the list

23 goes on....Thank you for all your endless hours and unbridled enthusiasm.." The development

24 was also particularly injurious for Plaintiff since he had worked countless hours on the

25 Nextdoor/Fatdoor concept, and had left his only source of income behind to build the venture.

26 108. In addition, what made the forced sabbatical/termination even more troubling was

27 the fact that on or about August 7, 2007, Plaintiff received an email from Heather Harde and

28 Michael Arrington from Techcrunch stating that "Fatdoor has been selected as a TechCrunch20

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1   finalist" for the top 20 startups of the year of the year 2007. When Plaintiff asked Fatdoor, Inc.

2   Chairman Harris, Jr. and new Norwest investor Monsalve whether the opportunity should be

3   pursued, Plaintiff was asked to decline the invitation by Techcrunch because Fatdoor, Inc. was

4   rethinking the neighborhood space based on comments made to them by Defendant Harvey at

5   Defendant Benchmark. On or about August 7, 2007, Plaintiff canceled his meeting with Heather

6   Harde and Michael Arrington scheduled for that same afternoon per the request of Fatdoor, Inc.'s

7   Chairman, Harris, Jr.

8         109. Nonetheless, Plaintiff sent a kind and diplomatic email to all Fatdoor, Inc.

9   stakeholders thanking them for the opportunity to develop the Nextdoor/Fatdoor concept and

10   wishing them the best of luck. Plaintiff had an exit interview with Love on or about August 8,

11   2007. Then, during the week of August 15, 2007, approximately one and half months after the

12   pull out of funding by Defendant Benchmark, Plaintiff was immediately asked to no longer come

13   to the offices of Fatdoor, Inc., the company he had started, and was no longer invited to

14   participate in strategic decisions regarding the company.

15         110. Upon information and belief, on or about October 2007, Fatdoor, Inc. hired a new

16   CEO, Jennifer Dulski ("Dulski"), based on a recommendation from the headhunter referred by

17   Defendant Benchmark – Love. Incidentally, Dulski is only one currently identified former

18   Fatdoor, Inc. executive connected via Facebook.com to Defendant Tolia, the former EIR of

19   Defendant Benchmark who is now the CEO of Defendant Nextdoor.com, Inc. Dulski abandoned

20   the pursuit of the Nextdoor.com domain immediately after joining. On or about April 2, 2008,

21   Dulski changed the name of Fatdoor, Inc. to Center'd Corporation, Inc.

22         111. Upon information and belief, Dulski then made a strategic change away from the

23   original Nextdoor/Fatdoor concept of getting to know your neighbors and moved the direction of

24   Fatdoor, Inc. into a local site for mothers to plan events. The website created to host this concept,

25   www.centerd.com, failed to gain traction and a decision was made to create a new effort called

26   the DealMap focused on the mapping of local deals. On or about August 1, 2011, Google, Inc.

27   purchased the Nextdoor/Fatdoor patent assets from Center'd.

28         112. The CEO of Nextdoor was announced to be Defendant Tolia, the former EIR at

Defendant Benchmark, on or about October 26, 2011. It was reported in the San Jose Mercury News on or about October 26, 2011 that "software developed by an early Google (GOOG) Maps employee" was used as the "key" technology of Nextdoor "that makes sure only people who live in a specific neighborhood are able to join its network -- giving users a level of privacy that sites like Facebook don't." (See Exhibit H). Upon reason and belief, this key technology "that makes sure only people who live in a specific neighborhood are able to join its network -- giving users a level of privacy that sites like Facebook don't" was stolen and opportunistically misappropriated from Plaintiff by Defendants Taylor and Norris while they were employed at Defendant Benchmark. (See Exhibit H, Exhibit I, and Exhibit K).

113. A press release was issued on or about October 26, 2011, after the Original Complaint in this case had been filed stating that a new startup called "Nextdoor" was launched. Surprisingly, a photograph on Facebook.com revealed that Defendants Tolia, Hoffman, Taylor and Cassidy had met only six days previously at a dinner party at the home of a Trevor Traina on or about October 20, 2011. (See Exhibits L1-L4). In addition, Defendants Taylor and Tolia are seen visible dining together shortly after the launch of Nextdoor.com on or around November 17, 2011. (See Exhibits L1-L4). Furthermore, the same Defendants were found in a number of photographs throughout the months prior to the launch of Nextdoor.com, Inc., in the months preceding its public launch in April 2011, and in September 2011. (See Exhibits L1-L4). Exhibits L1-L4 demonstrate that Defendant Tolia was, and continues to be, an invited attendee to a monthly CEO dinner series organized by Defendant Taylor in which the Defendants privately meet on a regular basis to opportunistically share ideas in the "whisper circuit" as described in the 1999 New York Times article including tips and ideas about confidential communications privy only to certain Defendants (See Exhibit J).

114. Interestingly, Defendant Janakiraman, who Defendant Tolia later attributed to developing the "key" technology (rather than Defendant Taylor) (retracting and clarifying previous statements to the San Jose Mercury News made weeks earlier in an interview with the All Things Digital blog of the Wall Street Journal) for Nextdoor.com, Inc., is not found in any of these publicly visible photographs. (See Exhibits H, and L1-L4).

- 32 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

00013.09114LT

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

115. Upon information and belief, Defendant Leary was also a former EIR at Defendant Benchmark and is currently the Co-Founder and Vice President of Marketing at Nexdoor.com, Inc. Based on articles posted on the Internet, Defendants Tolia and Leary have been EIRs at Defendant Benchmark since at least March 2007. Their positions as EIRs have been inconspicuous, according to an article in ValleyWag/Gawker on or about March 21, 2007. Defendant Tolia and Leary confirmed their Benchmark EIR status on or about August 29, 2007 in an article in VentureBeat, a few months before the formation of Round Two, Inc. on or about December 4, 2007 which listed Defendant Tolia as CEO and Defendant Leary as the Vice President of Marketing.

116.    Upon information and belief, Defendants Tolia, Taylor and Norris all worked at Defendant Benchmark as EIRs on and about the same day that Defendants learned of the confidential and unpublished technical details, security algorithms, methods and trade secrets associated with Nextdoor/Fatdoor from Plaintiff.  (See Exhibit I). Based on the quoted facts above, and upon reason and belief, Defendants opportunistically conspired together to misappropriate the confidential trade secrets, materials, knowhow, and algorithms from Plaintiff to form the Round Two, Inc. venture on or about December 4, 2007. (See Exhibit K).

117. Upon information and belief, funding was not difficult for Defendant Tolia, as Defendant Benchmark had funded Defendant Tolia in the past with little more than a PowerPoint presentation according to the same article in VentureBeat on or about August 29, 2007 which quoted a previous article in the New York Times stating that Defendant Tolia's last company "launched in 12 weeks, and raised $8 million from Benchmark and August with little more than a PowerPoint presentation." (See Exhibit J).

118. Plaintiff went on unemployment for the remainder of 2007 as he had no law practice to fall back on.  Plaintiff had to rebuild every client from scratch as the sole income earner for his family of four, and was unable to complete graduate studies in engineering at Stanford due to a lack of financial resources.

///

///

## DEFENDANTS' WRONGFUL COURSE OF CONDUCT

119. The Nextdoor/Fatdoor concept was originally created by Plaintiff on or about August 2005 while running for Cupertino City Council. At that time, Plaintiff was surprised by the lack of web based tools available to create walking maps of neighborhoods, and annotate information regarding neighbors around a particular residence. Plaintiff initially developed the Nextdoor/Fatdoor concept as a mash up of maps created using MapQuest and a Wikipedia style entry page for each neighbor met. A conception document was first prepared on or about August 21, 2005 and clearly included the name "Nextdoor."

120. The conception document contained the following paragraph: "What we are trying to create is a way to create a way for neighbors to get to know each other and their surrounding businesses more easily through the Internet. The UI of the site will have a map of your home with a social networking page pop up on the right when one clicks a particular home/location. There will be no information about prices of a home, no information about the number of bedrooms of a home, etc. People will be the focus, not the real estate." [sic]The document was improved and modified on or about November 2006, and submitted as an attachment in the Nextdoor/Fatdoor diligence folder to the Defendants on or about June 22, 2007 (See Exhibit B). The document included the following statement: "Note: we don't have the domain nextdoor.com yet, ive placed a bid on it. We do have modernvilliage.com, but im trying to find a better name. let me know if you find something that is better and available for sale. Should know about nextdoor.com by the end of this week." (See Exhibit B).

121. Plaintiff and Fatdoor, Inc. intended to purchase the Nextdoor.com domain name shortly after Series B funding. Plaintiff worked diligently between August 21, 2005 and June 15, 2006 to get the Nextdoor/Fatdoor website launched along with his business partner and assistant Rana. During this period, Rana created screenshots and wireframes of the Nextdoor/Fatdoor concept using PowerPoint showing the name 'Nextdoor'. There were two mockup images of the Nextdoor/Fatdoor concept shared with the Defendants by Plaintiff on or about June 22, 2007. The first mockup image shows a photo of Rana, with a personal profile wall feed from neighbors who provide comments on Rana's wall. A search area box read "search neighborhood." The

- 34 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

word "Nextdoor" was clearly shown in the upper, left-hand side of the screenshot. A map was shown in the screenshot illustrating the location of Rana's home and images indicating which neighbors have and have not joined the neighborhood surrounding Rana's representative home.

122. The Nextdoor/Fatdoor site was first publicly mentioned in VentureBeat on or about April 3, 2007 in a story titled "The dirt on Amazon, Steve Jobs, Topix, Fatdoor, MySpace, VC tax and more" in which VentureBeat described Nextdoor/Fatdoor as :

> "'FatDoor, secretive social network, to launch soon — The Palo Alto-based start-up, backed by Bill Harris, former CEO of Paypal and Intuit, and Bertram Capital, launches April 15, and describes itself as "a wikipedia of people," with over 130 million people and business profiles at launch. It wants to let you get to know your neighbors....Stay tuned" (See Exhibit E).

123. The Nextdoor/Fatdoor idea by Plaintiff was very well received by major thought leaders, including Pincus, who wrote to Plaintiff and Fatdoor, Inc. director Drazan on or about March 5, 2007 stating:

> "raj, your idea and background were both compelling. sorry if i barragted you with feedback before you could get the whole idea across. i'd def be interesting following up as i like the general macro space and think there are many directions you coudl go with it. best, mark" [sic]

124. Pincus agreed to participate in the first Nextdoor/Fatdoor private beta launch between March 2007 and June 2007. Four months later, Pincus independently started the successful venture Zynga and his affirmation of Plaintiff and the Nextdoor/Fatdoor concept right before Zynga was founded was a testament to the power and potential of the Nextdoor/Fatdoor idea and Plaintiff's ability, but for the interference and theft by Defendants as described in this First Amended Complaint.

125. VentureBeat later covered the Nextdoor/Fatdoor concept again on May 28, 2007 in an article titled "Fatdoor turns neighborhoods into online social networks," dating the initial tests around Plaintiff's city of Cupertino, California between August 21, 2005 and November 15, 2006. The article also included a picture of Plaintiff's home and family in the user interface views:

1

2    "Ever wanted to get to know your neighbors before interacting
     with them in real life? If so, fatdoor, which launches its public beta
3    tomorrow, might be for you.... Fatdoor will start out covering
     Silicon Valley and spread outward.... The interface is clean and
4    simple. The alpha version that we saw in a demo covered only a
     small part of Cupertino, CA. It had a neighborhood feel, with a
5    page that highlights groups like the "Parent's Babysitting
     Exchange," and the "Kiwanis Club of Cupertino." (See Exhibit E).

6
     The secret technical details, software algorithms, knowhow, and then unpublished patent
7
     applications that permitted the Nextdoor/Fatdoor concept to be built as described in the
8
     VentureBeat article of May 28, 2007 were opportunistically misappropriated and stolen by
9
     Defendants through Defendants Taylor and Gurley as described in this First Amended Complaint.
10
     (See Exhibit K).
11
         126.    Mashable.com also covered the Nextdoor/Fatdoor concept on or about May 28,
12
     2007 in an article titled "FatDoor Launches Social Network for Your Neighborhood" showing a
13
     number of actual screenshots of the Nextdoor/Fatdoor concept and describing Nextdoor/Fatdoor
14
     as:
15

16    "FatDoor is a way to get to know your neighbors on a very
      local level, and displays information over a Microsoft Virtual
17    Earth map that can toggle between 2D and 3D views. ....If a
      neighbor hasn't been to FatDoor to "claim" their location, their
18    icon will be shown on the street as opposed to their house, and
      you can leave messages for them that they will see once
19    they've signed up to use the site. You can invite users to
      FatDoor with their email address or their street address." (See
20    Exhibit F).

21
     The secret technical details, software algorithms, knowhow, and then unpublished patent
22
     applications that permitted the Nextdoor/Fatdoor concept to be built as described in the
23
     Mashable.com article of May 28, 2007 were opportunistically misappropriated and stolen by
24
     Defendants through Defendants Taylor and Gurley as described in this First Amended Complaint.
25
     (See Exhibit K).
26
         127.    Wired Magazine also covered the Nextdoor/Fatdoor concept on or about May 31,
27
     2007 in an article titled "Fatdoor CEO Talks About Balancing Security With Community" that
28
                                        - 36 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1    described the difficult problem that Nextdoor/Fatdoor attempted to solve as:

2
3                    "With all the commotion about everything that's visible on
                     Google's StreetView, there seems to be a lot of justifiable paranoia
                     associated with the swiftly evolving map tools on the market.
4                    Likewise, there's been a lot of speculation as to how security and
                     privacy are going to be dealt with on the social networking sites
5                    that draw information from these web apps.... saw this at work
                     earlier this week with the announcement of the alpha launch of
6                    social networking site Fatdoor at Where 2.0. As if the standard
                     security issues aren't tricky enough when it comes to the average
7                    site, Fatdoor's mashup of Live Earth aerial images with wiki
                     versions of users' neighborhoods has a lot of hand wringing going
8                    on." (See Exhibit G).

9
     It should be noted that Defendants Taylor and Norris were part of the Google Maps team
10
     suffering from the privacy and security concerns centered around Google StreetViews described
11
     in the article above, as they joined Defendant Benchmark on or about June 2007 after leaving
12
     Google, Inc.
13
            128.    The Wired Magazine article of May 31, 2007 went on to describe the general
14
     concepts of Nextdoor/Fatdoor developed by Plaintiff to account for neighborhood security as:
15

16                   "It wasn't until Abhyanker let me take his neighborhood for a test
                     drive that I started to understand how this actually plays out.
17                   Fatdoor is hardly the stalking tool we all feared. In fact, its simple
                     interface made Abhyanker's own community fit together more like
18                   a wiki version of a town hall. Users in the neighborhood can
                     broadcast general messages to the entire block, submit an entry
19                   about a local business, or even submit entries for friends and other
                     neighbors. Abhyanker's neighborhood is even set up to elect
20                   moderators to help police this conduct too. Paired with the amount
                     of control the user has over how much or how little information the
21                   neighborhood can access about themselves, it actually
                     seemed....pretty safe." (See Exhibit G).
22

23          129.    In addition, the Wired Magazine article of May 31, 2007 went on to describe the

24   end product of the secret confidential security algorithms developed by Plaintiff to account for

25   neighborhood security: "As far as peeking into other neighborhoods? Abhyanker has that covered

26   too. "We've been playing around with the distance, and after some testing we've found that

27   keeping it at a 5 mile radius [from the user's residence] is the most reasonable," he said. "It keeps

28   the focus on the neighborhood and also keeps the feeling of community. Of course, this is

- 37 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

something that we're going to have to change depending on the size and layout of a city, but during testing it seemed like the ideal distance." The secret technical details, software algorithms, knowhow, and then unpublished patent applications that permitted Nextdoor/Fatdoor concept to be built as described in the Wired Magazine article of May 31, 2007 were opportunistically misappropriated and stolen by Defendants through Defendants Taylor and Gurley as described in this Complaint. (See Exhibit G and Exhibit K).

130. A press release was issued on or about Wednesday, October 26, 2011 reporting that a new website was launched called "Nextdoor.com." The CEO of Nextdoor.com, Inc. was announced to be Defendant Tolia, a former EIR at Defendant Benchmark. Based on articles posted on the Internet, Defendant Tolia has inconspicuously been an EIR at Defendant Benchmark since at least March 2007. Defendant Tolia confirmed his EIR status at Defendant Benchmark on or about August 30, 2007.

131. The Economic Times reported on or about October 29, 2011 that Nextdoor.com, Inc. had raised between ten (10) million and fifteen (15) million dollars in venture capital financing from Defendant Benchmark and Shasta Ventures. Defendant Gurley, a partner at Defendant Benchmark, is an investor and on the Board of Nextdoor.com, Inc. Upon reason and belief, Defendant Benchmark opportunistically misappropriated from Plaintiff, the key technology of limiting views of neighbors to only a constrained geo-spatial set from Nextdoor/Fatdoor through Defendants Taylor and Gurley. (See Exhibit G and Exhibit K).

132. On or about October 26, 2011, a San Jose Mercury News article titled "Epinions co-founder Nirav Tolia back in the saddle with Facebook-like startup" made it clear that Defendant Benchmark had funded Nextdoor.com, Inc., and that Defendants Taylor and/or Norris contributed to the venture:

> "Tolia said the site goes beyond neighborhood email listservs by giving users a simple and visually appealing interface and search tools. The key, he added, is software developed by an early Google (GOOG) Maps employee that makes sure only people who live in a specific neighborhood are able to join its network -- giving users a level of privacy that sites like Facebook don't." (See Exhibit H).

- 38 -

133. Upon reason and belief, the early Google Maps employee referenced in the article above is Defendant Taylor, who stole the key technology from Plaintiff. Defendant Tolia was inconspicuously an EIR at Defendant Benchmark in a failed attempt to keep confidential both his identity and Defendants' desire to start a competing venture to Fatdoor, Inc. An article in Gawker and Valleywag entitled "The rehabilitation of Nirav Tolia" published three months before the theft of the Nextdoor/Fatdoor concept by Defendants on March 21, 2007, stated: "Nirav Tolia is officially an EIR at Benchmark. Though he's not yet listed on the partnership's website along with the other EIRs."

134. In a follow up article published a few weeks after Fatdoor, Inc. terminated Plaintiff and retained the headhunter referred by the Defendant Benchmark, VentureBeat wrote on or about August 29, 2007 stating: "Nirav Tolia, who led one of the darling and prescient Web sites of the last boom, Epinions, but then who fell into controversy, and then disgrace, is back in the game. He has joined Silicon Valley venture capital firm Benchmark Capital as an 'Entrepreneur in Residence,' a position that lets him work at Benchmark's offices, sit in on company pitches and search for his next idea."

135. The next idea in the VentureBeat article is Round Two, Inc., later renamed to Nextdoor.com, Inc. The nature and business of the pivot to the neighborhood social networking space from an entirely different website called Fanbase.com related to college and professional sports was made public on or about October 16, 2011. The entire basis for Nextdoor.com, Inc.'s business rests on stolen and opportunistically misappropriated materials. Upon reason and belief, Defendant Benchmark funded Nextdoor.com, Inc. with between ten (10) million and fifteen (15) million dollars in equity capital between approximately December 4, 2007 and October 16, 2011.

136. Defendant Tolia was inconspicuously an EIR at Defendant Benchmark in a failed attempt to keep his identity and the Defendants' desire to start a competing venture to that of Plaintiff confidential. An article in Gawker and Valleywag titled "The rehabilitation of Nirav Tolia" on March 21, 2007 characterizes the current CEO of Nextdoor.com, Inc. as:

"Nirav Tolia — the Epinions exec who lied on his resume and provoked a bitter legal dispute with his fellow founders — is

- 39 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

> back.... Epinions, a database of user reviews on everything from gadgets to holiday resorts, was one of the hottest internet startups of 1999. Tolia made about $20m when the venture merged with Dealtime and then went public. But his fellow founders, whose shareholdings were wiped out in the deal, claimed Tolia had won their consent only by withholding vital information about Epinions' prospects. Already tarnished by the controversy, Tolia left the company, and the Valley, in something close to disgrace, when it emerged he'd lied about working for McKinsey, the elite management consultants."

137. On or about August 29, 2007, a follow-up article appeared in Gawker and ValleyWag titled "Nirav Tolia goes to Benchmark," less than two week after Plaintiff was fired from Fatdoor, Inc., and approximately four months before Round Two, Inc. was officially incorporated stating:

> "The rehabilitation of Nirav Tolia is not just complete — it is, at long last, confirmed. The cofounder of Epinions, though tarred by old controversies, will announce tomorrow morning that he has, indeed, landed a long-rumored spot at Benchmark Capital as an entrepreneur-in-residence. (Back in March, Valleywag emeritus Nick Denton was told by several people Tolia was heading to Benchmark.) He'll be joined there by Sarah Leary, a former Epinions executive, and both hope to look at startup ideas having to do with online community and user-generated content."

138. Because the first article was published on or about March 2007 and the second on or about August 2007, the facts reveal a clear pattern of deceit by Defendants. Defendants lied to keep the identity of Defendant Tolia secret in an effort to mislead, misguide, and opportunistically steal the confidential knowhow, trade secrets, algorithm and business methods around the time of their learning all the details of the Nextdoor/Fatdoor venture from Plaintiff on or about June 2007.

139. The relationship between Defendant Taylor and Defendant Tolia is clear in a number of Twitter posts including a post by Defendant Tolia. For example, on or about June 2, 2010, Defendant Tolia wrote in his Twitter feed: "Wow, Bret promoted to CTO at Facebook - smart, great guy. Congrats!"

140. In an earlier article in the New York Times published on or about July 19, 1999, the culture at Defendant Tolia's first company, Epinions, was described as: "[k]ept up constant

- 40 -

reconnaissance on the competitors it will be jockeying with this fall, despite those competitors' best efforts to keep their strategies secret. The Valley has what it calls the "whisper circuit," which is not so much wild gossip as the ability to call in old favors and threaten to pull people's teeth." (See Exhibit J).

141.     The same article further states: "[s]ilicon Valley is sustained by the myth that you can come here from anywhere with sheer smarts and a firm handshake and make good. Second-generation Internet companies seem to seriously tip the favor to those already here. Four weeks ago on the whisper circuit, Tolia learned that an entrepreneur from Arizona was in town to shop a business plan for a company, called Publicopinion.com, with some of the same basic concepts, like rating reviews. Tolia took the challenge seriously." (See Exhibit J).

142.     Plaintiff is also from Arizona, lived there at the time in 1999, but is otherwise unrelated to Publicopinion.com.   Defendant Tolia is originally from Odessa, Texas according to his Crunchbase.com profile, a state connection he shares in common with three of six Defendant Benchmark's partners in and around the year 2007, including Defendant Harvey, Defendant Gurley, and Benchmark partner Bruce Dunlevie. All three are from the state of Texas and publicly represent their pride in the state in public statements.

143.     Defendant Harvey had a positive bias toward those who are from Texas.  This is evident in eBoys where Defendant Harvey is described as someone who liked Defendant Gurley almost a year before personally meeting him because he was from Texas: ""He's a good guy," Kagle said, "a good human being," Harvey said that must be the case-Gurley was from Texas, too." (See eBoys, p. 233 - book which characterizes itself as a "National Best Seller" right on the cover page and is written by a self-proclaimed "writer in residence at Benchmark for two years, from the fall of 1997 to the fall of 1999"). Like Defendant Gurley, Defendant Tolia is also from Texas.

144.     Defendant Harvey is not mentioned in any public materials associated with Nextdoor.com, Inc. Defendants Harvey and Gurley are both partners of Defendant Benchmark's investment fund. In addition, Defendant Gurley was recruited into Defendant Benchmark in 1999, after a positive recommendation from Defendant Harvey.   According to eBoys, Defendants

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

Harvey and Gurley are both hunters, hunt together, and communicate on a variety of business related topics during hunts.

145.   Sharing of ideas between Defendant Benchmark's partners is something that Defendant Harvey takes pride in.   Defendant Harvey comments in eBoys: "We share in the governance and in the economics.....It's like communist capitalist system". (Id. at 243). eBoys goes on to say, "...with his tongue working against his cheek, Harvey flipped the formula around-communists among capitalists." (Id. at 243). Upon reason and belief, this culture of communism at Defendant Benchmark is a sign that the fund openly shares its communal way of misappropriating ideas among its partnership, including the concept of Nextdoor/Fatdoor misappropriated from Plaintiff.

146.   Defendant Gurley is mentioned as being associated with Nextdoor.com, Inc. in numerous press articles and is a Corporate Director of Nextdoor.com, Inc. in his capacity as the lead investing Benchmark partner in Nextdoor.com, Inc.

147.   The same New York Times published on July 19, 1999 goes on to quote Defendant Gurley's characterization of Epinions as ""This is, unequivocally, the fastest I have ever seen a start-up move." The article goes on to say: "[e]verything is faster. Zero drag is optimal. For a while, new applicants would jokingly be asked about their "drag coefficient." Since the office is a full hour's commute from San Francisco, an apartment in the city was a full unit of drag. A spouse? Drag coefficient of one. Kids? A half point per. Then they recognized that such talk, even in jest, could be taken as discriminatory in a hiring situation." (See Exhibit J).

148.   If the same test described by the Defendants were to be applied to Plaintiff in 2007, he would have scored a drag coefficient of two (2) (Plaintiff was married with two kids in 2007), perhaps explaining why Defendants sought to build their company Nextdoor.com, Inc. with an independent team that they favored and thus created the harm giving rise to the causes of action described herein.  Tolia was unmarried at the time of the funding and did not have kids, and therefore had a "drag coefficient" of zero (0).

149.   The article in VentureBeat on August 29, 2007 continues to describe the character of Defendant Tolia with respect to veracity and with respect to his previous dealings with Google

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

Inc., the current owner of the Nextdoor/Fatdoor patent portfolio on which Plaintiff is the lead inventor:

> "Google had considered buying Epinions, but some reports suggested it canceled the deal after discovering Tolia had falsely claimed he'd been employed as a consultant with McKinsey & Co. He also wrongly stated he'd graduated from Stanford University. Tolia was forced to resign from Shopping.com. The mistake was another reason eBay settled a lawsuit filed by early founders at Epinions claiming firms conspired with fellow founder Nirav Tolia to deprive them and other employees of nearly $40 million after the acquisition…. Smarting from the controversy, Tolia moved to New York where he had friends and lay low. He and firms Benchmark and August have steadfastly declined to comment on the case."

150.    In addition, the article in VentureBeat on or about August 29, 2007 describes the relationships between Defendants Tolia, Taylor, Norris, and Benchmark very clearly:

> "There, Tolia will join an impressive roster of other Benchmark EIRs, including former Google employees, Bret Taylor and Jim Norris (see our coverage), Mike Cassidy (our coverage) and Dave Goldberg (our coverage). Tolia brings with him Sarah Leary (below), an early employee at Epinions. She will also be an EIR."

151. Additionally, Defendants Taylor, Gurley, Tolia, and Norris are all connected friends on Facebook.com as of November 3, 2011. Upon reason and belief, these former EIRs at Defendant Benchmark conspired in an illegal scheme to defraud and opportunistically steal confidential trade secrets and knowhow from Plaintiff on or about June 2007 for the above mentioned reasons.

152. An update provided to an article in the Wall Street Journal's All Things Digital article on or about November 11, 2011 correcting previous statements made weeks before to a San Jose Mercury reporter and which remained uncorrected until the Original Complaint was filed, retracts and clarifies previous statements to say:: "Tolia said he was referring to Prakash Janakiraman, his co-founder at Fanbase and Nextdoor who formerly worked at Google on Maps" instead of Defendant Taylor. Upon information and belief, it appears that Defendant Janakiraman worked at Google, Inc. under Defendant Taylor, and was not an "early" employee of Google

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

- 43 -

Maps, as he joined on Google, Inc. in August 2005, which is approximately six months after the public release of Google Maps product on the Google Blog on or about February 8, 2005. In contrast, Defendant Taylor joined Google, Inc. in March 2003, and describes himself as a person who "Co-created and launched Google Maps" on his LinkedIn profile.

153. Defendant Tolia is also quoted in the Wall Street Journal's All Things Digital article on or around November 11, 2011 that he "joined Benchmark four months after Abhyanker made his pitch." Through this statement, Defendant Tolia admits of knowing about Plaintiff's pitch to Defendant Benchmark. Furthermore, Defendant Tolia's statement of "four months" is inconsistent with the announcement of Defendant Tolia's joining of Defendant Benchmark on or about August 30, 2007, which was approximately two (2) months from the first confidential disclosure to Defendant Benchmark, and inconsistent with the Gawker article which places him at Defendant Benchmark as an EIR months before the Plaintiff's first meeting with Defendant Benchmark on or about June 2007.

154. The matter is further supported by the fact that Defendants Benchmark and Tolia incorporated Round Two, Inc. on December 4, 2007, less than six months after misappropriating confidential information from Plaintiff. The article in VentureBeat on August 29, 2007 explains the role Defendant Benchmark had for Defendant Tolia:

> "Tolia and his partner Leary do not have any set mandate as EIRs, but are expected to start their own company at some point (they are not a couple, by the way, something you might ask because they tag around so much together; they've just been through a lot with the Epinions saga, and consider themselves a team)."

155. Upon reason and belief, the responsibility that Defendant Tolia had at Defendant Benchmark as an EIR was to opportunistically steal the Nextdoor/Fatdoor concept from Plaintiff. Certainly, funding was not an issue for Defendant Tolia, as Defendant Benchmark had funded Defendant Tolia in the past with little more than a PowerPoint presentation. Upon reason and belief, it was easy for Defendant Tolia to raise money from Defendant Benchmark because they jointly conspired to misappropriate and opportunistically steal confidential materials from Plaintiff.

- 44 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

156.    The Plaintiff has suffered actual harm in so far as Plaintiff has been blacklisted by the venture capital community as a direct result of the behavior by Defendants as described herein. A 2007 working paper titled "The Impact of Litigation on Venture Capitalist Reputation" by Dr.Vladimir Atanasov, Kate Litvak and Vladimir Ivanov states: "…the tightness of the VC community may play against a complaining founder, instead of against the misbehaving VC, if the merits of complaints are hard to estimate and if VCs tend to support their own and distrust "trouble-makers." The "no lunch in this town" gossip that can often hear in founder circles indicates that the fear (warranted or not) of VCs' implicit collusion not to fund complaining founders may restrict the flow of information about VC misbehavior and thus induce more misbehavior." ("The Impact of Litigation on Venture Capitalist Reputation," see page 11).

157.    This issue is particularly relevant to the present dispute in that Plaintiff's new company Trademarkia (see www.trademarkia.com) was recently approached by Norwest, the same venture fund that had funded Plaintiff's previous company, Fatdoor, Inc. without participation from Defendant Benchmark. The venture Trademarkia.com was created by the Plaintiff between 2008 and 2011, after being fired from Fatdoor, Inc. Norwest Vice President David Su wrote to Plaintiff on November 1, 2011 stating:

> "Raj, I hope this message finds you well. By way of brief background, I am a Vice President with Norwest Venture Partners, a $3.7 billion venture capital and growth equity fund investing in technology and services companies. I have heard a lot of great things about Trademarkia and was hoping to set up a time to speak with you in order to give you more of an introduction to Norwest, but also to see if I could learn a bit more about your company and see if there might be an opportunity for us to work together. As a fund, we spend a lot of time in the online legal and services space and it would be great to have a call where we can share notes and establish a relationship. At Norwest, we make investments in businesses to take them to the next level whether through organic growth or growth through acquisitions. In addition, we are also open to providing liquidity to previous shareholders and founders who may want to diversify their holdings and take some risk off the table. We often find that by taking some chips off the table, founders and management team members are able to feel more comfortable in aggressively growing the business. It would be great to set up a call with you whenever you are available. In the meantime, I have attached some information about Norwest. Additional information can be found on our website: www.nvp.com. I look forward to hearing from you, Regards, David  David P. Su"

- 45 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

158.   However, the possibility of a meeting was promptly dismissed and put aside indefinitely when Plaintiff responded:

> "Sergio Monsalve at Norwest invested in my last company. Can you check if he is interested in working with me again first? Copying Sergio. If he is open to that possibility, I would be happy to speak with Norwest again. Thanks, Raj"

159.   The meeting was dismissed after this email. This fact pattern shows the actual harm that has been suffered by Plaintiff in that Plaintiff has now been harmed as a result of bringing forth the allegations described herein.

160.   On October 30, 2011, Drazan, a former board member of Fatdoor, Inc. and the first investor in the Nextdoor/Fatdoor concept wrote an email to Plaintiff, Monsalve, Chandu Thota, Harris Jr., and Dulski with the title "fatdoor or next door", and having a link to an article in the LA Times featuring the new Nextdoor.com, Inc. venture by Defendant Tolia.

161.   In a follow up email, the Plaintiff wrote on October 31, 2011:

> "Jeff, Thanks for the forward. Nextdoor by Benchmark is quite a surprise! We had disclosed the name 'Nextdoor' to Benchmark during the diligence process during the summer of 2007. Babar and I were not able to buy this domain 'Nextdoor' in 2005/2006 when we first came up with the concept, so later opted for 'Fatdoor'.
>
> I will forward you the relevant email in which we had disclosed this to Dan Hansen before Series B financing. We had even given Benchmark screenshots of the conception of the concept having the name Nextdoor.
>
> Wonder why would they want to even copy the name verbatim? Benchmark had represented to us in email that they had no conflicts of interest, and were not working on anything similar. Interestingly, the CEO of Nextdoor, Nirav Tolia, is an EIR at Benchmark who apparently has been there since 2007. See: http://gawker.com/245891/the-rehabilitation-of-nirav-tolia http://m.gawker.com/294944/nirav-tolia-goes-to-benchmark Looks like they were planning on side stepping Fatdoor from the start, and creating their own using the knowledge they learned from us, and their own EIRs? We had a number of meetings with Benchmark, and they even had detailed meetings with us and EIRs there at the time.
>
> Good thing that some of the Fatdoor patents are now issuing into

- 46 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

granted patents. I see that two Fatdoor just issued in the past couple of months. I wonder if Google, or any of us, should take any recourse. Let me know if any of you are interested in exploring that. I am inclined to pursue it, as it just seems grossly unethical. Raj"

162. In a follow up email on October 31, 2011, Drazan wrote:

"Not me...I look at it simply as testimony to the legitimacy of your idea. We either didn't get it right or were before our time. You need a syzygy in this business. Best Regards, Jeff"

163. As of the writing of this First Amended Complaint, other potential plaintiffs have not yet responded as to whether they would like to join as co-plaintiffs. Google, Inc.'s General Counsel, Mr. Kent Walker, was notified of the Original Complaint. No follow up decisions have been received as to whether Google, Inc. wishes to join as a co-plaintiff in this action.

164. In addition, Fenwick & West, LLP ("Fenwick"), a law firm, has been retained by Defendants Tolia, Leary, and Nextdoor.com, Inc. to represent them in this litigation. Plaintiff had written an email to Fenwick partner Rajiv P. Patel ("Patel") on or about February 6, 2007, just four days after the one million dollar ($1,000,000.00) Series A funding of Fatdoor, Inc. around the Nextdoor/Fatdoor concept stating:

"I am now 100% dedicated to Fatdoor, no longer available for billable time. My venture Fatdoor is now funded.. we're planning on launching in April. Lets catch up soon! Raj".

165. Patel had responded to Plaintiff on or about February 6, 2007 stating: "CONGRATS on the FatDoor!!!...Regards, Rajiv" using a Fenwick email address. Shortly afterwards, Plaintiff had asked Patel if he would be interested in taking over representation of all or at least some of Plaintiff's clients because the terms of the Plaintiff's new funding had required his full time attention in building the Nextdoor/Fatdoor concept into a working business for Fatdoor, Inc. Plaintiff told all his clients of his new role as the full time CEO of Fatdoor, Inc. and that he would need to transfer responsibilities on all legal matters to other law firms. To ensure a smooth transition, different firms including Fenwick were given as recommendations.

- 47 -

166. A detailed list of the Plaintiff's clients was shared with Fenwick through partner Patel on or about April 16, 2007 by Raj Abhyanker LLP (Plaintiff's private solo practice law firm) assistant Rana (who is now a Senior Product Manager at Google, Inc.) in which Rana wrote to Patel at his Fenwick & West email address:

> "Hello Rajiv, how are things? Hope you're keeping well. Following on your recent talks with Raj, I'm sending you a profile summary of our clients (see attached), including brief notes on client type, technology space and matter status for each. Let me know if you have any questions on this, it would be great to hear back from you by the end of this week so we can plan accordingly. Best, Babar Rana."

167. Patel responded that same evening stating: "I'll try to take a look this evening." Fenwick was given an option to hire all employees of Plaintiff's private firm, a single partner LLP, treated as a proprietorship in California. An email with attachments sent by Rana to Patel on or about April 20, 2007 provided Fenwick with the entire operations chart along with a proposal to take over all employees of Plaintiff's private solo practice law firm, which is treated as a sole proprietorship under California law. Patel may be called as a witness to the present litigation for the above mentioned reasons.

168. These facts are material because they demonstrate that Plaintiff transferred his only source of income required to support a family of four to work on the Nextdoor/Fatdoor concept as a full-time CEO. In addition, these facts are relevant because Defendants Nextdoor.com, Inc., Tolia and Leary have chosen Fenwick to represent them in this litigation, despite informal written objections by Plaintiff.

169. Furthermore, Fenwick is also patent counsel to potential co-plaintiff Google, Inc., a company which now owns the rights to the Nextdoor/Fatdoor patent portfolio on which Plaintiff is the lead inventor listed on the cover page of each Google, Inc. owned patent application related to the Nextdoor/Fatdoor concept. In addition, Google, Inc. now owns the rights to the original technology of the Nextdoor/Fatdoor concept, and has been notified of this lawsuit by Plaintiff as described above. As such, the actions of Fenwick to represent the Defendants are prejudicial to

- 48 -

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

the interests Plaintiff and to their current client Google, Inc. which owns the rights to the Nextdoor/Fatdoor patent portfolio. It is not clear that Fenwick has received a waiver from Google, Inc. permitting them to represent these Defendants. Plaintiff continues to believe that it would be grossly unfair and prejudicial if Fenwick continues to represent Defendants in the present litigation.

170. It should also be noted that the standing of the Plaintiff as a former owner of the intellectual property including trade secrets described herein is explicitly clear for the jurisdiction in which this First Amended Complaint is brought. In addition, Plaintiff has suffered considerable and substantial harm and damage as a result of Defendants' wrongful conduct and actions as will be described in the causes of action that follow.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Misappropriation of Trade Secrets, Cal. Civ. Code § 3426
### (Against Defendants Benchmark, Nextdoor.com, Inc., Harvey, Fenton, Lasky, Gurley, Taylor, Cassidy, Hoffman, Tolia, Leary, Norris, and DOES 1-100)

171. Plaintiff incorporates by reference paragraphs 1 through 170, inclusive, set forth above.

172. As a result of investment discussions with Fatdoor, Inc., Defendants became intimately familiar with Fatdoor Inc.'s operations and were granted access to Nextdoor/Fatdoor trade secrets.

173. Defendants knew or had reason to know that the Nextdoor/Fatdoor trade secrets that were acquired as alleged herein constituted or contained protectable trade secrets in that the information had independent economic value, was not generally known to the public or to others who could have obtained economic value from the disclosure or use of the information, and was the subject of reasonable efforts by Fatdoor, Inc. to ensure the secrecy of such information.

174. Plaintiff is informed and believes, and based thereon alleges, that Defendants opportunistically misappropriated and will continue to misappropriate Nextdoor/Fatdoor trade secrets to their own economic benefit by the wrongful disclosure and use of such information,

Raj Abhyanker, P.C.
Mountain View, CA
rajpatent.com

1 without the consent of Fatdoor, Inc. while knowing or having reason to know that they had
2 acquired the Nextdoor/Fatdoor trade secrets under circumstances giving rise to a duty on their
3 part to maintain their secrecy.

4     175. Plaintiff believes, and based thereon alleges that Defendant Benchmark's
5 employees and agents disclosed such Nextdoor/Fatdoor trade secrets to Nextdoor, Inc.'s
6 employees and agents.

7     176. As a proximate result of Defendants' acts of misappropriation and use of
8 Nextdoor/Fatdoor trade secrets, Plaintiff has suffered damages to date based on, among other
9 things, loss of employment, loss of his common shares in Fatdoor Inc., loss of contributory equity
10 interests to the original Fatdoor, Inc. concept, and expenses incurred in his efforts to remedy the
11 effects of Defendants' unlawful conduct, in an amount not now known, but Plaintiff is informed
12 and believes, and thereon alleges, exceeds the jurisdictional threshold for classification as an
13 unlimited civil case. Unless Defendants are enjoined, such damages will increase. Plaintiff will
14 seek leave of Court to amend this Complaint to set forth the exact amount of damages when they
15 have been ascertained.

16     177. Plaintiff is informed and believes, and based thereon alleges, that Defendants have
17 acted with oppression, fraud, and/or malice, and have deliberately caused and have intended to
18 cause great economic harm to Plaintiff with full knowledge of the wrongfulness of their conduct.
19 Plaintiff is further informed and believes, and based thereon alleges, that Defendants' conduct as
20 alleged above was despicable, was carried on by Defendants with a willful and conscious
21 disregard of Plaintiff's rights, and subjected Plaintiff to unjust hardship. Therefore, Plaintiff
22 should be awarded punitive and exemplary damages sufficient to punish Defendants for engaging
23 in this conduct and to deter similar conduct on their part in the future.

24
25                        **SECOND CAUSE OF ACTION**
                       **Fraud and Conspiracy to Defraud**
26 **(Against Defendants Benchmark, Nextdoor.com, Inc., Harvey, Fenton, Lasky, Gurley,
Cassidy, Tolia, Leary, Norris, and DOES 1 – 100)**

27
28     178. Plaintiff realleges and incorporates by reference paragraphs 1 through 177 as if

00013.00014LT

*Raj Abhyanker, P.C.*
*Mountain View, CA*
*rajpatent.com*