1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3         BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

4    ------------------------------)
                                   )
5    NEXTDOOR.COM, INC.,           )
                                   )
6                    Plaintiff,    )
7         v.                       )     No. C 12-5667 EMC
                                   )
7                                  )
     RAJ ABHYANKER,                )
8                                  )
                     Defendant.    )     San Francisco, California
9                                  )     Thursday, June 6, 2013
     ------------------------------)       (36 pages)

10

11

12                   TRANSCRIPT OF PROCEEDINGS

13   APPEARANCES:

14   For Plaintiff:         Fenwick & West, LLP
     (Nextdoor)            555 California Street
15                         Suite 1200
                           San Francisco, California 94104
16                    BY:  LAURENCE F. PULGRAM
                           JENNIFER LLOYD KELLY
17

18   For Defendant:         BRUNO W. TARABIHI
     (Abhyanker)           Attorney at Law
19                         4750G Almaden Expy - #259
                           San Jose, California 95118

20   For Defendant:         LegalForce RAPC
                           323 University Avenue
21                         Palo Alto, California 94301
                      BY:  ROY PATRICK MONTGOMERY
22

23   For Counter-
     Defendants:            Royse Law Firm, PC
     (Benchmark)           1717 Embarcadero Road
24                         Palo Alto, California 94303
                      BY:  HARPREET SINGH WALIA

25

1    Thursday, June 6, 2013

2                                              (2:05 p.m.)

3         (In open court)

4         DEPUTY CLERK:  Calling C 12-5667, Nextdoor.com vs.

5    Abhyanker.

6         Counsel, please come to the podium and state your name

7    for the record.

8         MR. PULGRAM:  Laurence Pulgram of Fenwick & West,

9    appearing for the plaintiff and counter-defendant,

10   Nextdoor.com; and for counter-defendant Prakesh Janakiraman.

11        THE COURT:  Great.  Thank you, Mr. Pulgram.

12        MR. WALIA:  Harpreet Walia, Royse Law Firm, for

13   counter-defendants Monsoon Company and Sandeep Sood.

14        THE COURT:  Thank you.

15        MR. TARABICHI:  Bruno Tarabichi appearing on behalf of

16   defendant and counterclaimant Raj Abhyanker.

17        THE COURT:  Thank you.

18        MR. MONTGOMERY:  Good afternoon, your Honor, Roy

19   Montgomery from LegalForce RAPC appearing for the defendant

20   and counter claimant, Raj Abhyanker.

21        THE COURT:  Good afternoon.

22        I think the first question that logically should be

23   addressed is the adequacy of the allegations of -- in terms

24   of identification of trade secrets.  And obviously it's

25   always sort of a paradox in these cases to have enough of a

1    specification to fulfill the requirements of pleading and

2    notice and everything else and yet not of course suffer under

3    too much weight at the same time.  My view is that, at least

4    for purposes of pleading, I think there's been sufficient

5    degree of specificity here in terms of at least identifying

6    framework, ballpark, subject matter, the gist of the trade

7    secret allegation.

8         I will say, however, that with respect to allegations

9    about wrongful acquisition, disclosure and use, there seem to

10   be specific allegations -- and I will say, by the way, that

11   information and belief is acceptable where the information is

12   not presumptively in the knowledge of the pleading party, and

13   I think that is somewhat the case here.  The problem is,

14   there's -- other than reference to certain subsets such as

15   the use of the Nextdoor.com name in connection with

16   neighborhood-based social networking, neighborhood-level

17   privacy controls, and bidding history of the domain, and

18   perhaps using the specification prototype -- test prototype.

19        The other allegations are -- seem rather conclusory

20   and light, and my inclination in that regard is to the extent

21   that they're not sufficiently specific, I think dismissal

22   with leave to amend is appropriate.  I think there ought to

23   be greater specificity in terms of the actual allegations of

24   wrongful acquisition, because there's a whole list of stuff

25   that are alleged to be trade secrets but it's not so clear

1    which one of those, specifically, are really at issue here.

2          MR. PULGRAM:  Your Honor, we agree that what's lacking

3    in the grittiest part is the wrongful acquisition and use.

4    There is an allegation here that the name was wrongfully

5    acquired, and that's the only thing that was really alleged

6    here to be wrongfully acquired and to have been used.

7          We believe that it's appropriate, at this junction, to

8    dismiss that allegation with prejudice based on the patent,

9    and if it's permissible, I'd like to walk through just a

10   couple of slides of this patent to show how the name was

11   disclosed and shouldn't be in this case at all, because it

12   was very clearly -- this is from a Request for Judicial

13   Notice, Exhibit No. 1.

14         Actually, I have the wrong folder.

15         MR. TARABICHI:  May I say something quickly about

16   that?

17         THE COURT:  Yes.

18         MR. TARABICHI:  My understanding is we're dealing with

19   a motion to dismiss the counterclaim for trade secret

20   misappropriation rather than to strike a portion of it, and I

21   think if we have alleged misappropriation of trade secrets

22   and, you know, they're trying to knock out basically the name

23   "Nextdoor" for the trade secret, we still have other trade

24   secrets that we've identified in Paragraph 109, and in the

25   counterclaim, that suffice to support the claim such that you

1   can't say that we failed to state a claim for trade secret

2   misappropriation.

3          So, I don't know that, you know, it doesn't dispose of

4   the entire cause of action, if that's appropriate.

5          MR. PULGRAM:  Well, I think it will dispose of the

6   entire cause of action, but that regardless, it's clear under

7   the case law that we're -- a substantial component of the

8   cause is dispositively precluded as a matter of law and

9   judicial notice that should be dismissed, and that allegation

10  with respect to the name Nextdoor.com should be....

11         This is -- you actually have the correct document,

12  Counsel.

13         THE COURT:  So we were talking about the use of the

14  name at this point.

15         MR. PULGRAM:  Yes, your Honor.  This is the patent,

16  and Figure 1 of the patent shows in blue the overall global

17  neighborhood environment.  Within the global neighborhood

18  environment, there is a yellow commerce module.  And into

19  that commerce module, advertisers pour ads.  That's what

20  Figure 1 shows.

21         If we turn to Figure 5, the next slide, this is the

22  commerce module blown up.  And it shows the business display

23  advertisement module Number 502 within the commerce module.

24  So what we have is, within the overall environment, a

25  commerce module and ad display module within it.

1        On the next slide -- all the highlighting in here is

2    mine, your Honor -- Paragraph 73, it describes, a commerce

3    module may provide an advertisement system to a business that

4    may enable the users to purchase locations in the

5    neighborhood.  This is describing how an advertiser buys a

6    spot in the commerce module.

7        When we turn to the next page, Page 21, Paragraph 236,

8    it directly describes Nextdoor.com as the name of the

9    network.  It says advertisers can own their listings by

10   placing a display ad on Nextdoor.com.  This reflects that

11   Nextdoor.com was disclosed for a name in a global

12   neighborhood environment in social networking.  And, as a

13   matter of law, that cannot be a secret.  There's no objection

14   to the request for judicial notice.  It wouldn't be well

15   taken.  And there's no case that has ever held that

16   information disclosed in a patent application, as this was on

17   November -- September 20th, 2007, could still be a secret

18   when the information was allegedly shared three years later

19   by Mr. Sood.

20       So from -- this is a key element of the case.  This

21   ultimately is the nuts and bolts of the case.  Because there

22   is nothing else that is alleged to have been used here or

23   turned over with any specificity.

24       Your Honor referred to three other possibilities, and

25   I would address them.  The first is the idea of neighborhood

1    level privacy controls.  But this is at such a high level

2    that we can't really understand what that would be.

3    Certainly there are neighborhood level privacy controls

4    disclosed in this patent.

5         And I will show you, just as one example -- actually,

6    the document that I was handing around before, this is

7    another two pages from the patent, your Honor, and it shows

8    on Figure 9 of the patent, it's the second slide, a profile

9    with private information available to neighbors only.  If we

10   are going to have a description and a claim here that there

11   are neighborhood level privacy controls that are secret, we

12   need an explanation of what those really are and how they

13   were used.

14        THE COURT:  That was going to be my point.  With

15   respect to determining, for instance, whether there's been

16   disclosure that would negate a trade secret claim, I need to

17   know more exactly about what the trade secret is, and here we

18   are in the beginning stages, it seems like where that is

19   required, I can't make that assessment until we get to the

20   next stage where we actually have the compelled disclosure of

21   exactly what it is, because this is just a description of a

22   concept or a function.  I have no idea:  What is it?  Is

23   there a certain algorithm or a certain -- what's the secret?

24        MR. PULGRAM:  That's exactly it, your Honor.  Is there

25   an algorithm?  Tell us what the algorithm is.  Because I can

1   tell you that my client did not use it.  They completely

2   independently developed this website.  You cannot simply say

3   we have trade secrets and an algorithm, we have trade secrets

4   and a business model.  Now, I can understand well the idea

5   that they can have an opportunity to amend.  But I think that

6   what they need to amend here is to identify the specific

7   trade secret, when and how they claim it was disclosed, and

8   when and how they claim it was used.  Because understand that

9   when they give the laundry list of trade secrets, your

10  Honor -- and they say, basically, in Mr. Abhyanker's business

11  back in 2006, we worked on all of these areas, we worked on

12  social networking, realtime updates, neighborhood-level

13  privacy controls, e-mail lists of neighbors, details,

14  algorithms, business plans -- we worked on all these things.

15  But never do they identify one of those things specifically

16  that was used other than the names and those few things that

17  you mentioned before.

18          THE COURT:  All right.  Well, let me ask:

19          When is that -- you feel this is not the appropriate

20  stage to --

21          MR. TARABICHI:  Might be at the cleaning stage.

22          THE COURT:  When's the appropriate process?

23          MR. TARABICHI:  Well, obviously if we were in state

24  court, we'd have to do the -- we'd have to serve the

25  identification of trade secrets.  And I assume they're going

1    to serve discovery asking us to divulge the details of the

2    trade secrets.  And I think really what's happening here is

3    he's asking the Court to look beyond the pleadings and make

4    factual determinations, almost:  What would be appropriate on

5    a summary judgment motion.  So I think, you know, they need

6    to serve discovery, and we will identify, you know, our

7    identification of trade secrets, subject to an appropriate

8    protective order.  Attorney's eyes only.  Get a chance to see

9    when we provide them.  And if they're unhappy with it or if

10   they think they have a basis for a summary judgment motion

11   because they think it's been publicly disclosed and is not a

12   trade secret, they'll have that opportunity.  That's not

13   where we are right now in the pleading stage.

14         And, you know, with regard to the misappropriation,

15   it's not just the name Nextdoor that we've alleged has been

16   taken.  So, for example, you know, in Mr. Abhyanker's

17   business plans and execution plans, he had offices in

18   neighborhoods in Menlo Park to do the initial testing.

19   That's exactly where they went ahead and did their initial

20   testing for their social network.  So that's a pretty

21   powerful fact.  It's not just the name.  There are other

22   things.  And we need additional discovery to find out and to

23   get our hands around exactly what was and what wasn't taken

24   overall.  You know, that's all within their possession,

25   exclusive possession.  And there's enough there right now

1    that we should be able to move forward and have an

2    opportunity to prove our case, obtain evidence, not just from

3    counter-defendants but from third parties.  And we'll see

4    what the evidence turns up.  But there's more than enough

5    there right now to state a claim for misappropriation.

6           Now, this isn't a situation -- we're still dealing

7    with, under Rule 8, Fraud Rule 9, say the date, time and

8    place when different disclosures took place.  But we do have

9    allegations in our amended counterclaim regarding the

10   disclosures, the use of the testing in the same neighborhood,

11   an admission that happened during a meeting between Abhyanker

12   and the CEO of Nextdoor, so, you know, we think we've done

13   more than a sufficient job of alleging a claim for purposes

14   of a motion to dismiss.

15          MR. PULGRAM:  So the problem is, we're missing the

16   three key elements here.  And the *Diodes* case, and all of the

17   Ninth Circuit cases that follow it, hold that the trade

18   secret must be disclosed with sufficiency to separate it from

19   matters of general knowledge in the trade, where -- special

20   knowledge of those persons who are skilled in the trade.  We

21   have things like algorithms, business plans, software being

22   described.

23          So, insofar as all of those items goes, we have

24   nothing that can identify a trade secret.

25          THE COURT:  So is there some reason why we don't adopt

1    the state court disclosure procedure?

2            MR. PULGRAM:  That should be adopted, your Honor, and

3    we'll argue it applies, but *Diodes* says there must be, first

4    pleaded, that differentiation.  They have a laundry list here

5    of everything that was created for their website, and only

6    one thing -- two things.  One is the name and the other is

7    the Lorelei location, which I'll address separately.

8            But as to everything else there needs to be an

9    allegation of what algorithm, of what business plan, of what

10   it is that is allegedly at issue, and when and how was it

11   disclosed.  The allegation that they have in terms of

12   plausibility, we need to put it in context.

13           Mr. Sood, who's alleged to have potentially turned

14   over information, was a contractor in 2006 for Mr. Abhyanker.

15   He is alleged to have filled out a friends and family survey

16   in 2010 about whether or not he was interested in this

17   subject area, and on that basis they want to open the door to

18   discovery to everything they ever did to try to create a

19   website.

20           The allegation, the other allegation is that in 2007,

21   Mr. Abhyanker revealed to Benchmark Capital some secrets

22   which were then never used and never deployed in any way

23   until 2010, supposedly, with no explanation for how those

24   supposedly got into the hands of the plaintiff here, of the

25   counter-defendants.  Before you can start a lawsuit saying, I

1    had an idea in 2006 and I want to sue you about it, you have

2    to identify the pieces of that work that were actually secret

3    and that were disclosed and used.  And to say, I had an

4    algorithm and you must have an algorithm in there, that's a

5    not an information and belief pleading.  You can plead facts

6    on information and belief.

7            THE COURT:  Take algorithms, for instance.  If you

8    want them to disclose the precise, actual --

9            MR. PULGRAM:  They need to at least describe what the

10   purported algorithm is and what it does.  If you don't

11   necessarily give all the math and flow chart, you have to say

12   it was an algorithm for this algorithm, an algorithm for

13   that.  You can't just say it was -- we had a business plan.

14   Well, you have to explain exactly what it is.  We had product

15   details.  What are they?

16           And by the way, this is a website that they had

17   operating, the Fatdoor website operated -- it wasn't a

18   secret.  So they have to identify what secrets were used.

19           THE COURT:  Well, they say algorithms, business plans,

20   etc.  I assume this is what it means, that -- makes sure only

21   people in the neighborhood network, gives users a level of

22   privacy that sites like Facebook don't.  E-mail lists of

23   neighbors around Cupertino....

24           It goes on to have some derivative as to what these

25   algorithms are.

1          MR. PULGRAM:  There's some level of additional detail,

2     but all of it is thrown into this kitchen sink.  I believe

3     they need to identify, if they want to say an algorithm did

4     this, break it out, say what that algorithm purportedly is.

5     Actually differentiate it from all the other algorithms out

6     there to separate by neighborhoods.  But then describe how it

7     was you have some basis to believe that Nextdoor.com got it.

8     Because it didn't.

9          THE COURT:  Why isn't that appropriate for

10    interrogatory statements?  You can ask those precise

11    questions.  It's almost like a claims patent case.

12         MR. PULGRAM:  Because, your Honor, in the context of

13    common sense and judicial experience, looking at this case,

14    needs to conclude whether or not what they have said, at this

15    point, rises to the level of plausibility.  Have there been

16    facts alleged here that support an inference of taking of

17    this particular laundry list?

18         THE COURT:  Well, there's facts of alleged

19    opportunity.  And --

20         MR. PULGRAM:  They were friends, your Honor.

21         THE COURT:  Well, but still, access to certain

22    information, whether it was through Mr. Sood or Benchmark --

23         MR. PULGRAM:  They were friends, your Honor.  And I

24    don't think that an allegation that someone is a friend is

25    enough to put us there.  There needs to be some basis to

1    claim that a friend, for one thing, had the code that they're

2    talking about.

3         Let me talk about Lorelei for just one second, because

4    I think that's a fair point.

5         THE COURT:  Yep.

6         MR. PULGRAM:  This is a specific fact they've alleged,

7    and they said, My office is next to Lorelei, and that's where

8    I planned to test my environment.  To which my question is:

9    What is the trade secret here?  Lorelei is a neighborhood.

10   It has people who are connected.  It has -- it's a tight knit

11   neighborhood.  This is a publicly known fact.  Mr. Abhyanker

12   does not have a monopoly on testing in Lorelei.  There is no

13   formula, method, technique or process involved in testing in

14   Lorelei.  There is no trade secret here.  This is a matter

15   that is available to the public, and by the way, as your

16   Honor knows, one of the elements of a trade secret claim is

17   damages.  What possible damages occurred from testing in

18   Lorelei that Mr. Abhyanker has alleged?

19        THE COURT:  That did strike me.  I don't understand

20   what the trade secret is.

21        MR. TARABICHI:  Well, your Honor, that's like saying a

22   customer list is not a trade secret because the people's

23   names are known.  Mr. Abhyanker specifically identified that

24   neighborhood as particularly appropriate to test his

25   networking concept.  And just because the neighborhood is

1    known doesn't mean that it's -- that that identification was

2    not a trade secret.

3           THE COURT:  So it's like a customer list, is what

4    you're saying.

5           MR. TARABICHI:  Exactly.

6           MR. PULGRAM:  But a customer list has individual

7    customer's names.  This is nothing other than what

8    neighborhood qualities there are.

9           THE COURT:  My point is that there were some work

10   product and analysis that went into determining what belongs

11   on that list.  In this case, it's a list of one neighborhood,

12   and I assume you found certain attributes or something that

13   were of value in testing this product, and therefore -- and

14   the fact that this was a neighborhood that was particularly

15   amenable or valuable.

16          MR. PULGRAM:  But there's no description of any work

17   that went into this.  It's the fact that it's the

18   neighborhood that went across the street from Mr. Abhyanker's

19   business.

20          THE COURT:  The point you made earlier:  Right now we

21   are at the pleading stage, and I think the more productive

22   route is to flesh this out and require that early on to say,

23   what is exactly the test, and how you show that you meet that

24   definition.  And I think there'd have to be also some

25   specificity:  What is the route by which you allege that

1   particular trade secret, on a trade secret by trade secret

2   basis, was misappropriated?

3        MR. PULGRAM:  That's exactly what we think leave to

4   amend would allow.  If they have trade secrets that they

5   actually can identify specifically, they need to do it and

6   they need to say -- if they want to allege that Mr. Sood

7   transmitted that information to us, let them do this and

8   we'll come on Rule 911.  But your Honor, there's no basis for

9   it.  And they can't -- here's the thing:  When you look at

10  the definitions of the trade secrets that they make, they

11  said, This is work we did.  And then, after that, all their

12  allegations are Nextdoor.com was founded on these secrets,

13  with no specification of which ones or how they got them.  No

14  specification of what was used.

15       If we come back and we have an allegation that says,

16  This secret was communicated and obtained in this way, and

17  used, then we'll have a subject for a lawsuit and we'll have

18  a subject for discovery and we'll have a subject for Rule 11.

19  If it's alleged in a way that is patently false --

20       MR. TARABICHI:  Your Honor --

21       THE COURT:  I'm determined to get there.  The question

22  is:  What vehicle?

23       MR. TARABICHI:  I want to say something.  I have not

24  seen a case that says you have to identify the disclosure

25  element or misappropriation element, trade secret by trade

1   secret, within the identification.  We have enough there

2   where we have seen that they've taken some of the trade

3   secrets.  We're not going to have the information to allege,

4   trade secret by trade secret, how it was disclosed.  That's

5   within their knowledge and possession.  Anyone can get away

6   with trade secret misappropriation if you require someone to

7   say, At this date, at this time, you know, this guy disclosed

8   this part of the trade secret to this guy.  I mean, how are

9   you going to do that, if people are, you know, sneaking

10  about, disclosing trade secrets?  You can't do it.

11          And I think we're past the --

12          THE COURT:  You know what was used.

13          MR. TARABICHI:  We know some of what was used.

14          THE COURT:  And there is a --

15          MR. TARABICHI:  There was a discussion between

16  Mr. Abhyanker and the CEO of Nextdoor that confirmed the

17  misappropriation.  And, you know, this is more than just, you

18  know, a couple of people being friends.  You know, the CEO

19  used to be an EIR at Benchmark.  There was definitely an

20  access along the way.  Definite opportunity.  And just the

21  fact that they used the same neighborhood, something that was

22  completely confidential within Mr. Abhyanker's trade secret

23  business plans, that shows that they took his trade secrets.

24  It's, you know, now we're talking about what -- the extent of

25  what was taken.  And I have not seen a case that makes us go,

1    you know, piece by piece through in the pleading stage and

2    identify in the disclosure --

3        MR. PULGRAM:  But -- two things.  First of all, the

4    conversation with Mr. Abhyanker and the CEO.  There was

5    absolutely no admission of taking anything.  But the point

6    is:  That's not in their complaint either.

7        MR. TARABICHI:  It is.  It's in the amended

8    counterclaim.

9        MR. PULGRAM:  It's not in the amended counterclaim.

10   There is no description of any such description in the

11   amended counterclaim.

12       MR. TARABICHI:  It's 147.

13       MR. PULGRAM:  That's why if we're going to have some

14   allegation that he acknowledged taking something, you better

15   put it in the complaint.

16       MR. TARABICHI:  147, 26 to 21 --

17       THE COURT:  You're demanding a level of specificity.

18   This is the pleading stage.

19       MR. PULGRAM:  It is, your Honor, but --

20       THE COURT:  It is the pleading stage, and rather than

21   going back and forth, as we often see in intellectual

22   property cases where we've got six rounds of pleadings, it

23   seems to me we ought to cut to the chase and require a

24   disclosure, whether we adopt the CCP procedure or whatever it

25   is that we do, and require that, early on -- and I think it's

1   fair to allow you -- once you've identified trade secrets --

2   which ones did you allege at this point, based on your

3   knowledge, have been misappropriated, used, rather than a

4   large laundry list kitchen sink approach, saying, among this,

5   some of this was found, used this way.

6        I think it's fair to use the discovery process,

7   whether it's contentioned interrogatories or otherwise, to

8   make that disclosure early on.  Because that may delimit the

9   scope of discovery, because I'm not also going to allow free

10  range discovery sort of just to find stuff on speculation.

11       MR. PULGRAM:  Play this out, your Honor, if we may:

12  If you leave this complaint, all they do is flow out the name

13  because that's got to go.  Okay?  And you leave the

14  complaint, and we have 17 to 25 items on a laundry list, and

15  we say to them:  Tell us which of these are used.

16       THE COURT:  And what are they?

17       MR. PULGRAM:  Exactly.  Why don't we hear that right

18  now?  Your Honor --

19       THE COURT:  Because it's a normal procedure.  Why

20  don't we adopt the procedure normally followed in state

21  court?

22       MR. PULGRAM:  It is the procedure normally followed in

23  state court.  In state court, you must identify the secret

24  with sufficient specificity to differentiate it.  You don't

25  put out a business plan and get away with that.

1    MR. TARABICHI:  Actually, you do.  If you look at the

2  cases I cited, they're all about the knowledge, business

3  plans have been held sufficiently particular -- pricing

4  information sufficiently particularly --

5    THE COURT:  Sufficiently particular for pleading

6  purposes.

7    MR. TARABICHI:  Exactly.  Which is what we're dealing

8  with.  That's what we're talking about today.  Not talking

9  about the identification later on.

10    THE COURT:  I've already ruled.  It's enough for

11  pleading purposes today.  And it's more useful at this point

12  to talk about the next stage.  And you can try to agree on a

13  procedure, because you know what I want, because we're not

14  going to let this go.  I'm not going to give you open

15  discovery at this point.

16    Before we do anything, I want an identification of the

17  specifics of the alleged trade secrets.  We can make an

18  assessment whether or not, Number 1, they really are trade

19  secrets.  And, 2, your base of information to assert that

20  they are misappropriated or used, so at least we know what

21  the foundational basis is.  Rather than using discovery to

22  make your allegation, I want to know what your allegations

23  are now.  So you can do that by way of some kind of

24  disclosure or following the CCP, or interrogatories, but I'd

25  like for you to meet and confer, and, now, I'll order some

1    process, and that that be done early rather than going

2    through rounds and rounds of pleading.  I think the pleading

3    requirements, at least under Rule 8, are sufficient at this

4    point.

5        MR. PULGRAM:  Your Honor, two things on this.  One is:

6    Can we also have a ruling that the allegation that the

7    Nextdoor name for use in a neighborhood social network is not

8    a secret as it was disclosed in the patent?

9        THE COURT:  All right.  That one, I don't see how --

10   unless you have another argument, I don't see how you can

11   avoid that one.

12       MR. TARABICHI:  Well, I think when you're granting the

13   motion to dismiss, you grant it with regard to the entire

14   claim.  I don't know that you just strike out --

15       THE COURT:  Well I have the power to strike --

16   whatever you call it.  Strike.  Motion to dismiss, grant,

17   partial or not, on the merits.  When you make your chart, I

18   don't expect that one to be in there.

19       MR. TARABICHI:  I guess you know the way -- my

20   response to it is:  The Nextdoor name was disclosed in the

21   patent application with regard to, you know, the idea of

22   the -- you know, not with regard to the idea of using that

23   name for a private neighborhood social network, which is not

24   really what this application is geared to.  It's geared to

25   more of a, you know, Wiki-type commenting platform.  That

1    would be the distinction I would draw.

2           MR. PULGRAM:  The patent speaks for itself.  It says

3    right there, "global neighborhood environment".  It goes on

4    to talk about all of these components of the associated

5    network, but it also in the second handout specifically

6    discussed privacy.  And specifically discuss how persons can

7    mark their information proprietary, they can have separate

8    private and public sections.

9           THE COURT:  It's close enough that there's been

10   substantial disclosure, so --

11          MR. PULGRAM:  Absolutely.

12          THE COURT:  So I, you know, however you want to treat

13   this, as a sua sponte motion to strike or a motion to grant

14   the dismissal in part, whatever it is, that's out.

15          MR. PULGRAM:  Thank you, your Honor.

16          THE COURT:  Okay.

17          MR. WALIA:  Your Honor, I'm sorry.  I stood by here

18   just for the -- representing counter-defendants Monsoon and

19   Sood.  I don't want to belabor the point -- I know we've gone

20   back and forth on this -- but I think the idea of pleading

21   with specificity applies to my clients specifically because

22   the only allegation in this myriad of trade secrets claims

23   that they've presented, the only concrete one that they've

24   presented was a disclosure -- alleged disclosure of the name

25   "Nextdoor".  As your Honor has determined, that was publicly

```
1   disclosed prior in the patent application.  So for my client,
2   specifically, it's a matter of what they disclosed.  And they
3   have not alleged anything other than this name.
4       So to say that it can be done at a later stage
5   prejudices my clients.  Because the only allegation that we
6   can understand is, we -- they allegedly disclosed this
7   Nextdoor name.  So without requiring them to plead with
8   greater specificity, my client is stuck now.
9       THE COURT:  Now, which one is first.  You've got to
10  know what it is that's being disclosed, what is the subject
11  of disclosure.
12      MR. WALIA:  But they haven't alleged what my client's
13  disclosed, your Honor.  So I would think, as a person who's
14  required to defend an action, we would at the very least be
15  notified of what we are alleged to have done wrong.  And the
16  only thing I think that's been alleged here is a disclosure
17  of the Nextdoor name.  And we've now made that, you know, a
18  non trade secret issue.
19      So I think it requires a level of pleading that they
20  have not met, at least adds to Monsoon and Sood.
21      MR. TARABICHI:  I'd like to respond to that, your
22  Honor.  First of all, that's not true.  I can point you to
23  paragraphs in the amended counterclaim where we're saying
24  they disclosed the trade secrets.  We never limited it to the
25  name.  So he's mischaracterizing that.  No such limitation.
```

1        MR. WALIA:  Again, that's what I'm saying.  They're

2    saying "disclosed trade secrets".  Again:  What trade

3    secrets?  This is not a use.  This is a disclosure.  So what

4    did we have access to and what did we disclose?  There's

5    nothing in the pleadings that allege that.

6        THE COURT:  I thought I addressed that.  That we're

7    going to require -- you're going to meet and confer, talk

8    about a process by which the trade secrets will be identified

9    with specificity.  And then, through interrogatories or some

10   other process, you'd also do it -- like some kind of chart.

11   I want to know what it is that was disclosed and what the

12   allegations are that support that assertion of use,

13   disclosure, misappropriation, so forth.

14       MR. PULGRAM:  Could we request that that be filed with

15   the Court so we'll have Rule 11 implications?

16       THE COURT:  Yes.

17       MR. TARABICHI:  That's not the procedure that's

18   followed in state court.

19       THE COURT:  Well --

20       MR. TARABICHI:  It would have to be filed under seal.

21       THE COURT:  Yeah, you can file it under seal.

22       MR. PULGRAM:  Sure.  Absolutely.

23       THE COURT:  Yes.  So I'd like to you meet and confer

24   and let me know in -- let's say in two weeks if you can come

25   up with a framework for this.  Otherwise, I'll specify

1      something.

2              MR. PULGRAM:  So the one other point on this, your

3      Honor, is the overarching point about the fact that this

4      plaintiff previously alleged that he didn't own these works.

5      And we're heading down the path here based on an allegation

6      that there's 180 degrees different from the prior allegation

7      that Fatdoor unleashed works.  Now, this is not an

8      inconsequential matter at all, and there is an allegation,

9      and I think if we try to track the explanation on their side,

10     they say, Well, not all of what was involved -- not all of

11     what I did was part of Fat Door.  Some of it was in

12     LegalForce; some of it was in this other entity.

13             And there's a specific paragraph of the complaint that

14     addressed that.  It's Paragraph 111.  And they state that

15     during the development of the source code for LegalForce

16     venture -- which was the law area, the patent exchange, the

17     inventor network, that during the development of the source

18     code there, there was the decision made to apply the same

19     source code of LegalForce to create a private social network

20     called Nextdoor.  They decided to parallel the source code.

21             Other than that, there's no explanation of how what

22     was always alleged to be Fatdoor's work somehow is

23     LegalForce's work.  There's allegation that they paralleled

24     the source code.  And yet we have allegations that we're now

25     about to get into -- and factual discovery about -- involving

1    everything but source code.

2         There's no allegation that LegalForce's source code,

3    which is what Mr. Abhyanker claims he now owns, was ever used

4    by Nextdoor.  And yet that's the only thing that's been

5    identified here as not being part of the Fatdoor business

6    that was pitched to Benchmark and that was disclosed, where

7    the trade secrets were purportedly disclosed to Benchmark.

8    But if -- the law is clear that if one is going to turn a 180

9    and claim that one now owns what briefly a different

10   corporation, Google -- the allegation, remember, was in a

11   state court complaint that the entire basis for

12   Nextdoor.com's business rests on stolen misappropriated

13   materials owned by Google which bought Fatdoor.  If we're

14   going to do a 180 from that now to start a new lawsuit, there

15   needs to be some explanation of what it was that was carved

16   out from LegalForce.  Not simply an assertion.  That --

17   everything that we ever worked on is now moved from the

18   Fatdoor/Nextdoor description to a new label, the

19   LegalForce/Nextdoor description.

20        So, there is no allegation here that the source code

21   was ever swapped.  There's no allegation that anything that

22   has been explicably linked to LegalForce was ever disclosed.

23        And to allow a claim to go forward on that sort of

24   basis, your Honor, I think really frustrates justice.

25        MR. TARABICHI:  Your Honor, if I may respond?

```
1          THE COURT:  What about that?  Yeah.

2          MR. TARABICHI:  First, I want to start from the

3    premise that we've specifically pled, that we've owned these

4    trade secrets.  And it's not just a bare allegation.  We've

5    gone through and we've provided the Court with an explanation

6    of the LegalForce and Nextdoor technology.  And the Fatdoor

7    technology which went to Fatdoor and went to Google.  We

8    have -- we've identified well-respected and well-known

9    individuals who are investors in LegalForce, Mr. Warren Meyer

10   and Jeffrey Trayson, who can also support the claim to

11   ownership of that separate technology.

12         And, you know, he's picking and choosing the language

13   from the state court complaint, because in the state court

14   complaint we have language like, "some of which was owned by

15   Google".  Which implies some of it was not owned by Google,

16   and, you know, we cited a case on point, the Farhang case,

17   where you had basically the same exact situation with same

18   allegations.  The Court said, We think there might be some

19   inconsistent allegations here, it might be troublesome, but

20   it's not sufficient to grant the motion to dismiss, based on

21   lack of ownership at the pleading stage.

22         Same thing here.  So we've -- I know they may not like

23   our allegations regarding ownership, but we're alleging that

24   we own the trade secrets; we've explained why we own them and

25   what they are.  And -- it's the items in Paragraph 109.
```

 1    That's what we're saying he owns:  The trade secrets that

 2    form the basis for the claim.  It's pretty simple and

 3    straightforward.

 4           MR. PULGRAM:  But that's exactly what was alleged in

 5    the prior complaint to be owned by Fatdoor.  The Farhang

 6    case, which was Judge Ron Whyte's case, held that it was

 7    concerned that there were allegations that certain rights

 8    were first owned by another company, but then owned by a

 9    second company.  And Judge Whyte said, But you know what?

10    The first allegation would state a claim.  So this

11    contradiction doesn't need to be explained because the first

12    allegation was sufficient.  Therefore, I'm going to move on

13    to the other issues in the case.

14           That's the opposite of what's true here.  Because the

15    first allegation here, which is that Fatdoor owned this and

16    Fatdoor was bought by Google, pleads them out of court.  And

17    that is exactly what they said in the first amended

18    complaints, Paragraph 169:  Google now owns the rights to the

19    original technology of the Nextdoor/Fatdoor concept.

20           And when one reads the complaint in that action and

21    the complaint here, the technology being talked about is

22    exactly the same.  The only exception that I've found is

23    this idea that LegalForce had source code that was also

24    going to be used for this Nextdoor website.  There's no

25    allegation here that that source code was transferred, was

```
 1    used.  So there has to be some explanation before we go

 2    forward.  And I think if they're going to do that in -- and

 3    amend a complaint, if they have some way to try to explain

 4    why it is that the same things alleged to be owned by Google

 5    now in the prior case are owned by them in this case, let's

 6    hear it.  But it's not appropriate --

 7            MR. TARABICHI:  Your Honor --

 8            MR. PULGRAM:  -- to simply say --

 9            THE COURT:  I find that's going to be a matter for

10    summary judgment or another proceeding.  There are

11    contradictions that may have to be explained at some point.

12    But as far as pleadings go, I am not going to, at this point,

13    rule on the basis of a motion to dismiss and make that

14    finding preclude the assertion.

15            Last thing I want to address.  I'll tell you, I'm

16    going to deny the motion to disqualify plaintiff's counsel.

17    I don't find that there was a substantial enough overlap here

18    or an indication or any proof that any confidential

19    information was obtained by virtue of the prior

20    representation.

21            So, I'm going to proceed and talk about where we go

22    from here.

23            MR. MONTGOMERY:  Your Honor, if I could just make one

24    brief comment?

25            THE COURT:  Yep.
```

1          MR. MONTGOMERY:   Necessarily, our understanding of the

2     facts is evolving as we move forward with discovery.  And we

3     now know that Mr. Abhyanker had not retained his copy of the

4     engagement letter that was signed by Fenwick.  We've now

5     gotten it.  It's Document 81 in Pacer.  We note that this was

6     signed in -- July 27th, 2006.

7          But from looking at -- and from looking at it, we see

8     that they talk about forming the -- the 102, 103 corporation

9     which was later renamed LegalForce, Incorporated.  Looking at

10    the Secretary of State website from Delaware shows that that

11    corporation was actually incorporated in May 2006.

12         Also, we have the declaration of Mr. Abhyanker that

13    there'd been a substantial amount of conversation, advice and

14    counsel back and forth with a Fenwick partner named Rajiv

15    Patel, where clearly this was in early 2006.  And I think

16    that makes the case that there was an attorney/client

17    relationship established between Mr. Abhyanker personally and

18    Fenwick long pre-dating the -- this engagement letter, which

19    I suspect is really an attempt to paper the file.

20         But that being the case, I just would like to say

21    that, given the fact that so much confidential material would

22    have gone back and forth between Mr. Abhyanker, a patent

23    attorney, and Mr. Patel, a patent attorney, I think it's very

24    apparent on the face that Fenwick would have obtained

25    confidential information relating to the intellectual

1   property that later became Nextdoor.  And, given that, I just

2   would like to ask for reconsideration.  If Fenwick genuinely

3   did obtain that confidential information from representing

4   Mr. Abhyanker personally, it does seem to be unfair to now

5   have, where Mr. Abhyanker is being Sood by Nextdoor, to have

6   Fenwick represent the other side in a case that will involve

7   the same intellectual property and many of the -- many other

8   related items as well.

9          THE COURT:  What indication is there that -- and the

10   conduit you're concerned with is Mr. Patel, right?

11          MR. MONTGOMERY:  In the motion to disqualify counsel,

12   yes, Sir.

13          THE COURT:  What -- what information -- what evidence

14   is there of confidential information relevant to this matter

15   having been exchanged?

16          MR. MONTGOMERY:  I think that's a good point, your

17   Honor.  What we have is a declaration from Mr. Abhyanker

18   stating that there was a very close personal relationship,

19   close family relationship.  Tellingly, though, what we don't

20   have, and I think would be the obvious thing, would be for

21   Mr. Patel simply to produce a declaration stating that he had

22   never received any confidential information or that he had

23   never provided any advice and counsel on any of the

24   information that is involved in the current case.

25          Tellingly, I don't think we have that.  I think that

```
 1    probably speaks well for Fenwick.  But the truth is if
 2    Mr. Patel would simply have come forward and said, I never
 3    talked about that sort of thing, I think that would -- at
 4    least there'd be balancing declarations on either side.
 5    Right now, we only have Mr. Abhyanker's declaration.
 6              MR. PULGRAM:  The declaration by Mr. Abhyanker, the
 7    sum total of what he says about suggestions of IP strategy,
 8    at Page 1, says, "After Fenwick partner Patel helped me with
 9    intellectual property strategy, Fenwick sent me a new
10    engagement letter to sign on July 27, 2006."
11              That's the sum total of the description.  There's
12    nothing suggesting anything to do with Nextdoor.com, anything
13    to do with in any way with the matters in this case.
14    Mr. Patel has been walled off from this case for 18 months,
15    as agreed by the parties at that time.  He's not submitted a
16    declaration because we don't talk to him about this.  And
17    that's appropriate, because we don't want to know anything
18    that he knew from his friendship with Mr. Abhyanker.  But the
19    very fact that an engagement letter was executed demonstrates
20    that conversations among friends is different.
21              And there is nothing here to suggest an
22    attorney/client relationship was formed that could be a basis
23    for disqualifying an entire law firm because Mr. Abhyanker
24    and Mr. Patel were friends.
25              THE COURT:  And there's nothing really I've seen that
```

```
 1   specifically suggests that information that was so sensitive
 2   or prejudicial was conveyed.  And -- maybe it was; maybe it
 3   wasn't.  But I don't see anything here.  I note that there's
 4   no billing records that would demonstrate that,
 5   circumstantially.
 6           MR. MONTGOMERY:  If I could point to -- the Fenwick
 7   website specifically says that for startups and
 8   venture-backed companies, they provide assistance and counsel
 9   without charging.  And I think Mr. Patel's relationship with
10   Mr. Abhyanker probably fell into that category.
11           MR. PULGRAM:  We're getting pretty far outside the
12   record, and that's a lot different situation than a
13   friendship.
14           THE COURT:  I understand what you're saying.  But my
15   ruling stands.  I think -- the fact that there's been a wall
16   that's been erected as a matter of additional caution I think
17   is appropriate, and it should be maintained throughout this
18   case, and I assume it will be.
19           MR. PULGRAM:  It will be, your Honor.
20           THE COURT:  And so, given the record and given that
21   assurance, I find there's not a basis for disqualifying
22   counsel at this point.
23           MR. MONTGOMERY:  I understand, your Honor.
24           THE COURT:  All right.
25           So, do we have a discovery conference?
```

```
 1              DEPUTY CLERK:  It's today.

 2              THE COURT:  I think the thing most useful to address

 3     is, I'd like a meet and confer and talk about a process,

 4     so -- for disclosure, and as a predicate to any other

 5     discovery.  And I'd like to come back in and meet soon after

 6     we've had that, see whether we can talk about whether the

 7     next step is a motion, next step is some limited discovery,

 8     or what we're going to do in that regard.

 9              So, I'd like for you to meet and confer and figure out

10     something that's going to happen to us in the next 30 to 60

11     days and then come back here.

12              MR. PULGRAM:  Certainly.  There's a defendant that

13     hasn't been served the last two months since the amended

14     counterclaim or counter defendant.  Benchmark's not here.

15              MR. TARABICHI:  Right.  So with regard to Benchmark,

16     after we filed the amended counterclaim, we had to wait for

17     the new summons to be issued.  And at that point, we were

18     coming up on this hearing.

19              I've had conversations with their counsel.  And now

20     that motion to dismiss has been denied, counsel for the other

21     Benchmark entities -- used to be, you know, served, now

22     there's no number attached to the Benchmark entities, he's

23     going to accept service on behalf of Benchmark this week.

24              THE COURT:  All right.  So they should be brought into

25     this process.
```

1          MR. TARABICHI:  They will be.

2          THE COURT:  Is 60 days enough time figure out what,

3     exactly, the plan is, and then come back?

4          MR. PULGRAM:  Sure.  I think we will bring them in the

5     process -- I expect they'll file their motion to dismiss this

6     claim too.  The -- so I think we should -- I mean, it could

7     be useful to get on your calendar for a CMC in all events.

8     I'm thinking of my own summer.  You guys probably have

9     different plans over the summer.  I'm out for a two-week

10    block end of July, beginning of August, but back the second

11    week of August.  We could set something then as a CMC.

12    And --

13         THE COURT:  Let's set an August date then, Betty.

14         DEPUTY CLERK:  August 22nd, at 10:30.

15         THE COURT:  I would like a report, let's say within

16    the next three weeks about a plan, a plan of disclosure.

17         MR. PULGRAM:  We'll submit a joint report, your Honor.

18         THE COURT:  Okay.  And I forget, has there been any

19    ADR discussion?

20         MR. PULGRAM:  There has been a very concerted

21    reckoning on our side that any mediation at this time would

22    be completely unproductive.

23         MR. TARABICHI:  We did have a phone conference with

24    the ADR unit, and I think they scheduled a follow-up phone

25    call, sometime I think mid to late June.  The date --

```
 1          MR. WALIA:  We wanted to allow Benchmark to come in as

 2   a party to be privy to those discussions.

 3          THE COURT:  So maybe we'll talk about that on the 22nd

 4   as well.

 5          MR. PULGRAM:  Yes.

 6          THE COURT:  Okay.  Thank you.

 7          MR. PULGRAM:  Thank you for your time, your Honor.

 8          THE COURT:  Certainly.

 9          MR. TARABICHI:  Thank you.

10          (Adjourned)

11                               oOo

12

13

14

15

16

17                     CERTIFICATE OF REPORTER

18

19          I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a
20   certified shorthand reporter, and were thereafter transcribed
     under my direction into written form.

21

22   _____

23                 Connie Kuhl, RMR, CRR
                   Thursday, June 13, 2013
24

25
```

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC   (415) 431-2020