1   LATHAM & WATKINS LLP
        Steven M. Bauer (Bar No. 135067)
2           steven.bauer@lw.com
    505 Montgomery Street, Suite 2000
3   San Francisco, California 94111-6538
    Telephone: +1.415.391.0600
4   Facsimile: +1.415.395.8095

5   LATHAM & WATKINS LLP
        Matthew Rawlinson (Bar No. 231890)
6           matt.rawlinson@lw.com
        Adam M. Regoli (Bar No. 262903)
7           adam.regoli@lw.com
    140 Scott Drive
8   Menlo Park, California 94025
    Telephone: +1.650.328.4600
9   Facsimile: +1.650.463.2600

10  Attorneys for Counterdefendants
    Benchmark Capital Partners, L.P., and Benchmark
11  Capital Management Co. LLC

12                      UNITED STATES DISTRICT COURT

13                      NORTHERN DISTRICT OF CALIFORNIA

14                         SAN FRANCISCO DIVISION

15  NEXTDOOR.COM, INC., a Delaware          CASE NO. 3:12-cv-05667-EMC
    corporation,
16                                          **BENCHMARK CAPITAL PARTNERS, L.P.'S
                                            AND BENCHMARK CAPITAL**
                   Plaintiff,               **MANAGEMENT CO. LLC'S NOTICE OF
17                                          MOTION AND MOTION TO DISMISS
                   vs.                      SECOND AMENDED COUNTERCLAIM;
18                                          MEMORANDUM OF POINTS AND**
    RAJ ABHYANKER, an individual,           **AUTHORITIES IN SUPPORT THEREOF**
19
                   Defendant.
20

21

22

23  RAJ ABHYANKER, an individual,

24                 Counterclaimant,         Date:       February 13, 2014
                                            Time:       1:30 P.M.
25                 vs.                      Judge:      Honorable Edward M. Chen

26  NEXTDOOR.COM, INC., a Delaware
    corporation; PRAKASH
27  JANAKIRAMAN, an individual;
    BENCHMARK CAPITAL PARTNERS,
28  L.P.,
    a Delaware limited partnership;

1

2

3

4

5

BENCHMARK CAPITAL
MANAGEMENT CO. LLC,
a Delaware limited liability company;
SANDEEP SOOD, an individual;
MONSOON COMPANY, an unknown
business entity, and DOES 1-50, inclusive,

                    Counterdefendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................ 1

STATEMENT OF THE ISSUES ......................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

I.     INTRODUCTION ..................................................................................................... 2

II.    FACTUAL & PROCEDURAL BACKGROUND ..................................................... 4

    A.     Abhyanker's Prior State Court Action ........................................................... 4

    B.     Nextdoor.com's Lawsuit And Abhyanker's Counterclaims ............................ 6

    C.     Abhyanker's Identification Of His Alleged Trade Secrets ............................. 7

    D.     Allegations Against Benchmark In The SAAC ............................................... 7

ARGUMENT ..................................................................................................................... 9

III.   STANDARD OF REVIEW ...................................................................................... 9

IV.    ABHYANKER FAILS TO STATE A CLAIM AGAINST BENCHMARK
      FOR TRADE SECRET MISAPPROPRIATION ................................................... 10

    A.     The Lack Of An Enforceable Contract Is Fatal To Abhyanker's
         Trade Secret Misappropriation Counterclaim Against Benchmark ................. 10

    B.     Abhyanker Fails To Plead That He Communicated Any Actionable
         Trade Secrets To Benchmark .......................................................................... 13

    C.     Abhyanker's Trade Secret Allegations Do Not Meet The Standard
         Under *Twombly* and *Iqbal* ........................................................................ 17

V.     CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ajaxo Inc. v. E\*Trade Group Inc.*,
135 Cal. App. 4th 21 (2005) ............................................................................. 10, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ passim

*Be In, Inc. v. Google Inc.*,
No. 12-cv-03373, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ......................... 10, 13

*Bell. Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ passim

*Dealertrack, Inc. v. Huber*,
460 F. Supp. 2d 1177 (C.D. Cal. 2006) ............................................................. 14

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ........................................................................... 9

*Kwikset Corp. v. Super. Ct.*,
51 Cal. 4th 310 (2011) ....................................................................................... 13

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ............................................................................. 9

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ............................................................................. 11, 13

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ........................................................................... 9

*Nexsales Corp. v. Salebuild, Inc.*,
No. C-11-3915, 2012 WL 216260
(N.D. Cal. Jan. 24, 2012) ................................................................................... 3, 10, 18, 19

*Pellerin v. Honeywell Int'l, Inc.*,
877 F. Supp. 2d 983 (S.D. Cal. 2012) ............................................................... 3, 18

*PMC, Inc. v. Kadisha*,
93 Cal. Rptr. 2d 663 (2000) ............................................................................... 17

*Reddy v. Litton Indus., Inc.*,
912 F.2d 291 (9th Cir. 1990) ............................................................................. 9, 19

*Religious Tech. Ctr. v. Netcom On-Line Comc'n Servs., Inc.*,
923 F. Supp. 1231 (N.D. Cal. 1995) .................................................................. 11, 15

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................................................................... 15

*Siam Numhong Prods. Co., Ltd. v. Eastimpex*,
   866 F. Supp. 445 (N.D. Cal. 1994) ........................................................................ 11

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) .............................................................................. 13

*Sterling v. Taylor*,
   40 Cal. 4th 757 (2007) ................................................................................. 11, 12

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. C 13-cv-02965, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2012) .........................16

*Tostevin v. Douglas*,
   160 Cal. App. 2d 321 (1958) .............................................................................. 11

*Wehlage v. Empres Healthcare, Inc.*,
   791 F. Supp. 2d 774 (N.D. Cal. 2011) .................................................................. 9

*Whyte v. Schlage Lock Co.*,
   125 Cal. Rptr. 2d 277 (2002) ......................................................................... 11, 14

*Wistron Corp. v. Phillip M. Adams & Associates, LLC*,
   No. C-10-4458, 2011 WL 1654466 (N.D. Cal. Apr. 28, 2011 .................................. 9

*Yield Dynamics, Inc. v. TEA Sys. Corp*,
   66 Cal. Rptr. 3d 1 (2007) ............................................................................. 15, 17

**STATUTES**

Cal. Civ. Code § 1624(a)(1) ...................................................................................... 11

Cal. Civ. Code §§ 3426–3426.11 ...................................................................... passim

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 9

1

## NOTICE OF MOTION AND MOTION

2      **PLEASE TAKE NOTICE** that on February 13, 2014 at 1:30 P.M., or as soon thereafter

3 as the matter may be heard, in the courtroom of the Honorable Edward M. Chen, 450 Golden

4 Gate Avenue, San Francisco, California, Counterdefendants Benchmark Capital Partners, L.P.

5 and Benchmark Capital Management Co. LLC (collectively, "Benchmark") will and hereby do

6 move for an Order dismissing Defendant and Counterclaimant Raj Abhyanker's ("Abhyanker")

7 counterclaim for misappropriation of trade secrets against Benchmark.

8      This Motion is made pursuant to the Federal Rule of Civil Procedure 12(b)(6) on the

9 ground that Abhyanker has failed to state a claim against Benchmark upon which relief can be

10 granted.  This Motion is based upon this Notice of Motion and Motion, the accompanying

11 Memorandum of Points and Authorities, Benchmark's Request for Judicial Notice, the

12 Declaration of Matthew Rawlinson and the exhibits attached thereto, the pleadings and other

13 papers on file in this action, and any other oral or written submissions the Court may entertain.

14

## STATEMENT OF THE ISSUES

15      1.      Has Counterclaimant Raj Abhyanker failed to state that Benchmark has disclosed

16            or otherwise misappropriated his alleged trade secrets, such that the Counterclaim

17            against Benchmark should be dismissed?

18      2.      Has Counterclaimant Raj Abhyanker failed to state that he communicated any

19            actionable trade secrets to Benchmark, such that the Counterclaim against

20            Benchmark should be dismissed?

21      3.      Has Counterclaimant Raj Abhyanker failed to state a plausible claim for trade

22            secret misappropriation under *Twombly* and *Iqbal*, such that the Counterclaim

23            against Benchmark should be dismissed?

24

25

26

27

28

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.     INTRODUCTION**

3          Nexdoor.com, a social networking site, sued Raj Abhyanker ("Abhyanker") to quiet title

4    on a trademark.  In response to that trademark claim, Defendant Abhyanker, who is now on the

5    third version of his proposed Second Amended Answer and Counterclaim (SAAC),[1] countersued

6    Benchmark Capital Partners, L.P. and Benchmark Capital Management Co. LLC (collectively,

7    "Benchmark") — a leading venture capital firm headquartered in Menlo Park, California,

8    accusing Benchmark of misappropriating trade secrets related to certain neighborhood-based

9    social networking concepts.  This counterclaim against Benchmark should be dismissed with

10   prejudice for multiple reasons.

11          *First*, the misappropriation claim fails because, even if taken as true, the allegations in the

12   SAAC do not establish that Benchmark violated any cognizable nondisclosure duty.  Abhyanker

13   originally counterclaimed against Benchmark for breach of an alleged oral contract.  However,

14   as Benchmark pointed out at the time the original complaint was filed, Abhyanker's claim was

15   barred by the statute of frauds.  Abhyanker subsequently abandoned his contract claim and now

16   attempts to recast that claim as one for misappropriation of trade secrets.  The alleged factual

17   basis, however, has not changed:  the claim relies entirely on a vague, alleged oral promise to

18   keep secret "any and all" material from Abhyanker, SAAC ¶ 120, even though most of what

19   Abhyanker allegedly provided was indisputably public information.  As a result, Abhyanker's

20   trade secret claim fails for the same reason his contract claim did.  This alleged oral contract does

21   not provide a cognizable basis to impose a duty on Benchmark, nor does it demonstrate that

22   Abhyanker took reasonable steps to protect the specific trade secrets at issue here.

23          *Second*, Abhyanker has failed to plead that he disclosed any actionable trade secrets to

24   Benchmark.  After repeated efforts to force Abhyanker to identify with specificity the trade

25   secrets he claims were misappropriated, he has narrowed the alleged trade secrets to only two

26   ───────────────

27          [1] As the Court noted, Abhyanker submitted three different versions of his proposed second
amended answer and counterclaims, (Dkt. Nos. 115, 121, 132), in conjunction with his motion
for leave to amend.  (12/12/13 Order [Dkt. No. 136], at 2.)  The Court deemed filed the most

28   recent version, dated December 5, 2013, (Dkt. No. 132, Exh. A), which is the operative SAAC.

MOTION TO DISMISS COUNTERCLAIM
Case Number: 3:12-cv-05667-EMC

1  items:  (i) the "bidding history" (whatever that means) of the nextdoor.com domain name and (ii)

2  the "identification of the Lorelei neighborhood in Menlo Park, California as the ideal first

3  neighborhood to use to test and launch a neighborhood social network."  (Third Am. Designation

4  of Trade Secrets [Dkt. No. 135], at 2.)  Not only does Abhyanker fail to allege facts that would

5  establish (even if true) that either of these is a trade secret with independent economic value,

6  both are publicly available information.

7       *Third*, even putting aside these deficiencies, Abhyanker fails to allege a plausible claim

8  under the standard articulated by the Supreme Court in *Twombly* and *Iqbal*.  Abhyanker admits

9  that the basis for his claim is nothing more than the coincidence that a company funded by

10  Benchmark is allegedly similar in some respects to "his idea" of a neighborhood-based social

11  networking site.  As the Court has already held, however, the "concept" of a neighborhood-based

12  social network was already publicly available at the relevant time and is not a trade secret.

13  (7/19/13 Order [Dkt. No. 100], at 12.)  The coincidence that someone else used this publicly

14  available idea to start a company is thus not a plausible basis to allege disclosure by Benchmark

15  of the specific trade secrets at issue here.  Indeed, as to Benchmark, the only factual allegation in

16  support of the specific trade secrets now asserted (the "bidding history" and the Lorelei

17  neighborhood) is that the founders of Nextdoor.com "had access" to the information while at

18  Benchmark, and even that is pled on "information and belief."  SAAC ¶ 144.  However, it is

19  well-settled that access alone is not a plausible basis for a trade secret misappropriation claim.

20  *See Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012); *Nexsales Corp.*

21  *v. Salebuild, Inc.*, No. C-11-3915, 2012 WL 216260, at *1–*2 (N.D. Cal. Jan. 24, 2012) (Chen,

22  J.)

23       Moreover, Abhyanker's claim is implausible in a variety other respects.  Abhyanker

24  never alleges any colorable motive for Benchmark to steal his trade secrets, and to sit on them

25  for several years, rather than simply investing in his company (Abhyanker's initial explanation in

26  his state court lawsuit was that Benchmark was biased against Arizonans, towards "hunters" and

27  against fathers with children, or just had a "culture of communism").  Abhyanker's current

28  allegations also contradict his original claims in key respects.  For instance, in his state court

1   lawsuit, he admitted that he was pitching Benchmark to invest in Fatdoor, and that Fatdoor (not

2   Abhyanker) owned the intellectual property at issue — a fact that was fatal to his personal claim.

3   He now asserts that he communicated trade secrets that he personally owned (the

4   LegalForce/Nextdoor trade secrets).  SAAC ¶¶ 99–100.  He claims these secrets are entirely

5   "separate and distinct," *id.* ¶ 127, from Fatdoor — the company he was pitching to Benchmark,

6   and that these secrets were relevant to enhancing the "security and privacy" of the "new version

7   of Fatdoor.com," *id.* ¶ 119.  Yet, neither of the two alleged trade secrets contained in

8   Abhyanker's subsequent trade secret disclosure (the bidding history and the Lorelei

9   neighborhood) has any alleged or apparent connection with security or privacy.

10         In short, taken together, Abhyanker's trade secret claim — based entirely on the

11   allegation that Nexdoor.com's founders must have had "access" to this information while at

12   Benchmark — simply fails to cohere or make "common sense" to state a plausible theory of

13   liability or damages.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

14   **II.     FACTUAL & PROCEDURAL BACKGROUND**

15         **A.     Abhyanker's Prior State Court Action**

16         On November 10, 2011, Abhyanker sued Benchmark and several individuals associated

17   with Benchmark (among others) in Santa Clara Superior Court, Case No. 11-cv-212924.  Shortly

18   thereafter — and prior to any defendant responding to the complaint — on December 6, 2011,

19   Abhyanker filed a First Amended Complaint ("State Compl.").  (Declaration of Matt Rawlinson

20   in Support of Benchmark's Motion to Dismiss ["Rawlinson Decl."], Exh. 1.)  According to that

21   complaint, Abhyanker was "a founder and former CEO of Fatdoor, Inc."  State Compl. ¶ 20.

22   The complaint made clear that "Fatdoor" was a "neighborhood social networking" website:

23         • "Plaintiff is the lead inventor on forty six (46) United States patent applications
24            and six (6) international PCT patent applications filed by Fatdoor, Inc. relating to
              the Nextdoor/Fatdoor concept and covering a wide variety of geo-spatial
25            database, architecture, and application technologies *associated with
              neighborhood communication and geo-spatial social networking.*"  *Id.* ¶ 20
26            (emphasis added).

27         • "Defendants actively interfered with the operations of Fatdoor, Inc. with respect
28            to the Nextdoor/Fatdoor concept causing the company to abandon its plans to

pursue the domain Nextdoor.com, the ***Nextdoor/Fatdoor business model for neighborhood social working*** . . . ." *Id.* ¶ 21 (emphasis added).

- "Absent Defendants' fraudulent scheme to interfere with the business operations of Fatdoor, Inc. . . . [the company] would not have abandoned the pursuit of its original and novel ***Nextdoor/Fatdoor neighborhood social networking concept*** that Plaintiff invented and developed." *Id.* ¶ 24 (emphasis added).

- "Defendant Benchmark began an ill-conceived scheme to unfold and destroy Plaintiff and ***Fatdoor, Inc.'s focus around neighborhood social networking***[.]" *Id.* ¶ 94 (emphasis added).

These and other allegations also made clear that Fatdoor and "Nextdoor" were one and the same. *See supra* (repeatedly referencing the singular "Nextdoor/Fatdoor" concept); *see also id.* ¶ 35 ("Since the name 'Nextdoor.com' was expensive to buy, Fatdoor, Inc. used the name 'Fatdoor.com' as a second preference until additional funding could be raised after the summer of 2007 to purchase the Nextdoor.com domain. . . . It was Plaintiff and Fatdoor, Inc.'s intention to purchase the name Nextdoor.com, and change the name of its business accordingly from Fatdoor, Inc. to Nextdoor, Inc.").

In June 2007, Fatdoor sought venture capital financing. *Id.* ¶¶ 56–57. As part of this effort, Abhyanker alleged that he and other Fatdoor representatives met with Benchmark to seek funding for Fatdoor. *Id.* ¶¶ 56, 77, 80–81. In doing so, Abhyanker alleges that Fatdoor provided Benchmark a "diligence package" that allegedly included various "patent applications" and "secret technical details, software algorithms, [and] knowhow." *Id.* ¶¶ 50, 84. Benchmark decided not to invest in Fatdoor. Fatdoor, however, received significant funding from other investors. *Id.* ¶ 94. Nevertheless, a few weeks later, following the completion of the fundraising process, Fatdoor fired Abhyanker. *Id.* ¶ 101. Fatdoor was later sold, and according to Abhyanker, "Google, Inc. now owns the rights to the original technology of the Nextdoor/Fatdoor concept." *Id.* ¶ 169.

More than four years after Abhyanker met with Benchmark, "[a] press release was issued" announcing "a new website called 'Nextdoor.com.'" *Id.* ¶ 130. Nextdoor.com was founded by a group including Counterdefendant Prakash Janakiraman ("Janakiraman") and received financing from Benchmark. *Id.* ¶¶ 13–15, 130–31. Abhyanker alleged in conclusory

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

1   terms that Nextdoor.com was the end result of Benchmark's "scheme" to destroy Fatdoor.  *Id.* ¶

2   24.

3         In January 2012, Benchmark (along with the other defendants) demurred to the State

4   Complaint.  (Rawlinson Decl., Exh. 2 [Demurrer].)  Benchmark pointed out that, among other

5   deficiencies, the State Complaint made clear that Abhyanker was merely Fatdoor's agent when

6   he pitched Benchmark, and that Google (not Abhyanker) now owns Fatdoor's former intellectual

7   property.  *Id.*  Abhyanker never opposed Benchmark's Demurrer.  Instead, shortly thereafter, in

8   February 2012, Abhyanker voluntarily dismissed the complaint.  (Rawlinson Decl., Exh. 3

9   [Dismissal].)

10        **B.      Nextdoor.com's Lawsuit And Abhyanker's Counterclaims**

11        Though he dismissed his state court action, Abhyanker soon renewed his efforts to harass

12   Nextdoor.com.  *See generally* Dkt. No. 1.  Among other things, Abhyanker opposed

13   Nextdoor.com's efforts to register the "NEXTDOOR" trademark and launched a website called

14   www.nextdoor.cm.  *Id.* ¶¶ 29–40, 49–53.  In response, Nextdoor.com eventually initiated the

15   instant action against Abhyanker in November 2012.  Most basically, Nextdoor.com "seeks a

16   declaration that it is the senior user and owner of the NEXTDOOR Mark in its field . . . [and]

17   also seeks to end Abhyanker's recent acts of infringement and cyberpiracy. . . ."  *Id.* ¶ 5.

18   Benchmark is not mentioned in this Complaint.

19        In January 2013, Abhyanker answered Nextdoor.com's Complaint and asserted various

20   counterclaims against both Nextdoor.com and several nonparties to the original action.  In

21   response to motions to dismiss by Benchmark and the other Counterdefendants, Abhyanker filed

22   yet another amendment to his claims.  (*See* First Amended Answer and Counterclaims

23   ["FAAC"], Dkt. No. 59.)  In the FAAC, Abhyanker asserted a single counterclaim for

24   misappropriation of trade secrets against Benchmark and the other Counterdefendants.

25        Although Benchmark was not served until September 24, 2013, Counterdefendants

26   Nextdoor.com and Sandeep Sood moved to dismiss the claims, partly on the ground that

27

28

1   Abhyanker had not identified any specific trade secrets that had been stolen.[2]  On July 19, 2013,

2   the Court ruled that there could be no trade secret misappropriation as to the "use of the name

3   nextdoor.com" because this "concept" was already disclosed in a patent application before the

4   alleged acts of misappropriation took place.  (Dkt. No. 100, at 12.)  The Court otherwise allowed

5   the claims to proceed, with the caveat that Abhyanker was to disclose with specificity the trade

6   secrets that had been allegedly misappropriated by August 2, 2013.  (*Id*. at 9–10, 25–26.)

7   **C.**     **Abhyanker's Identification Of His Alleged Trade Secrets**

8   On September 26, 2013, more than 8 months after the original counterclaim was filed and

9   more than a month after the Court's deadline, Abhyanker filed an "amended" disclosure that, for

10   the first time, identified the purported trade secrets that Benchmark allegedly misappropriated.

11   (Dkt. No. 116.)  In less than one page of text, Abhyanker purports to identify three alleged trade

12   secrets:  (1) "the bidding history of the Nextdoor.com domain," (2) "identification of the Lorelei

13   neighborhood as the first neighborhood to launch Nextdoor in," and (3) "the source code for the

14   user interface of his online private social network."  (*Id*. at 2.)  Subsequently, Abhyanker

15   dropped the source code claim, limiting his identification of trade secrets to only "the bidding

16   history of the Nextdoor.com domain and the identification of the Lorelei neighborhood in Menlo

17   Park, California as the ideal first neighborhood to use to test and launch a neighborhood social

18   network."  (Dkt. No. 135, at 2.)

19   **D.**     **Allegations Against Benchmark In The SAAC**

20   Abhyanker's current counterclaim against Benchmark contradicts his original state

21   complaint in many respects.  Abhyanker now recasts Fatdoor as a "public Wikipedia-like

22   neighborhood commenting tool."  *Id*. ¶ 117.  He claims that this Fatdoor concept was entirely

23   "separate and distinct" from his "Legalforce/Nextdoor concept," SAAC ¶ 127, which now

24   embodies the neighborhood-based social networking idea he previously called Fatdoor in this

25

26      [2]  Two days after service, Abhyanker filed a motion for leave to further amend his
counterclaims.  (Dkt. No. 115).  In light of that motion, counsel for Benchmark and Abhyanker

27   agreed via email to extend Benchmark's answer deadline until 21 days after the Court ruled on
his motion for leave.  At the Case Management Conference on December 12, 2013, the parties

28   and the Court agreed that Benchmark's motion to dismiss would be filed by January 9, 2014.
(Dkt. No. 137.)

state court complaint.[3]  Abhyanker claims that despite pitching Fatdoor — an entirely "separate and distinct" idea from LegalForce/Nextdoor, he nevertheless made "a detailed disclosure" of his own "LegalForce and Nextdoor Trade Secrets" to Benchmark, *id.* ¶ 121.  He gives no explanation for why he would be doing so, other than that these alleged trade secrets were relevant to enhancing the "security and privacy" of a "new version of Fatdoor.com, which was to incorporate LegalForce and Nextdoor Trade Secrets."  *Id.* ¶¶ 119, 120.

Abhyanker alleges that in 2010 — three years after he purportedly disclosed unspecified trade secrets to Benchmark and after he was fired as CEO of Fatdoor — he returned to working on the Nextdoor concept and "placed numerous bids in an effort to try to secure the Nextdoor.com domain," but was "unsuccessful in bidding given that Sood, upon reason and belief, had disclosed [his] bidding to Nextdoor.com."  *Id.* ¶ 132.  In October 2010, he alleges that Nextdoor.com prototyped its website in the Lorelei neighborhood under the temporary name "Neighborly," and then publicly launched the nextdoor.com website a year later.  *Id.* ¶¶ 145–50.

Notably missing from Abhyanker's counterclaim, however, are any facts related to Benchmark's disclosure or use of his alleged trade secrets.  Rather, the basis for Abhyanker's claim against Benchmark appears to be nothing more than that four years after he pitched some sort of concept to Benchmark that involved local social networks (a public concept), two people who were allegedly entrepreneurs in residence at Benchmark at the time started a local social network, and used as their name one of the several names Abhyanker had considered for his long abandoned project.  Like the concept of a neighborhood-based social network, the idea of using this name for such a network was also an idea in the public domain.  Based on nothing more than the coincidence that Nexdoor.com used these two public domain ideas, Abhyanker asserts one cause of action against Benchmark for trade secret misappropriation.  *Id.* ¶¶ 187–94.[4]  The

---

[3] But as described above, Abhyanker was clear that "Fatdoor, Inc.'s focus [was] around neighborhood social networking."  State Compl. ¶ 94.  Indeed, the fact that Fatdoor was a "neighborhood social networking" site was the basis for his state claim.  *See, e.g.*, *id.* ¶ 21.

[4] Indeed, although Abhyanker has now been forced to identify the "trade secrets" he claims were taken, it is clear from his counterclaim that the real issue is that he believes Nextdoor.com stole his "idea" or "concept."  *See, e.g.*, SAAC ¶ 97 (asserting he "pitched his ideas to Benchmark"); ¶ 126 (alleging he tried to acquire the Nextdoor.com domain around his "idea for

1  SAAC fails to state a plausible claim for relief and should be dismissed with prejudice.

2  <strong><u>ARGUMENT</u></strong>

3  **III.    STANDARD OF REVIEW**

4         Dismissal under Rule 12(b)(6) is proper where the complaint either (1) lacks a cognizable

5  legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory. *Mendiondo*

6  *v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "To survive a motion to

7  dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

8  relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*,

9  550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief

10 will . . . be a context-specific task that requires the reviewing court to draw on its judicial

11 experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Wistron Corp. v. Phillip M.*

12 *Adams & Assocs., LLC*, No. C-10-4458, 2011 WL 1654466, at *10 (N.D. Cal. Apr. 28, 2011)

13 (Chen, J.). "Where a complaint pleads facts that are merely consistent with a defendant's

14 liability, it stops short of the line between possibility and plausibility of entitlement to relief."

15 *Iqbal*, 556 U.S. at 678 (citation and quotes omitted); *accord Lacey v. Maricopa Cnty.*, 693 F.3d

16 896, 911 (9th Cir. 2012) (en banc); *Wistron Corp.*, 2011 WL 1654466, at *11. Nor is it enough

17 that the complaint is "factually neutral"; rather, it must be "factually suggestive." *Twombly*, 550

18 U.S. at 557 n.5.

19        The district court need not grant leave to amend if amendment of the complaint would be

20 futile. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051–52 (9th Cir. 2008). Dismissal

21 without leave to amend is proper where the curative allegations would be inconsistent or contrary

22 to the prior pleading. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990); *accord*

23 *Wehlage v. EmpRes Healthcare, Inc.*, 791 F. Supp. 2d 774, 781 (N.D. Cal. 2011).

24 ///

25 ///

26

27 a private neighborhood social network"); ¶¶ 99–113 (repeatedly referencing his "LegalForce and Nextdoor concepts," the "LegalForce/Nextdoor concepts," the "Nextdoor concept," or "original

28 Nextdoor concept"). But as the Court held, this is nonsense. The "concept" upon which he is fixated was clearly in the public domain and was not "his." (Dkt. No. 100, at 12.)

IV.     **ABHYANKER FAILS TO STATE A CLAIM AGAINST BENCHMARK FOR TRADE SECRET MISAPPROPRIATION**

A.      **The Lack Of An Enforceable Contract Is Fatal To Abhyanker's Trade Secret Misappropriation Counterclaim Against Benchmark**

To state a claim against Benchmark for trade secret misappropriation under the California Uniform Trade Secret Act ("CUTSA"), Cal. Civ. Code §§ 3426–3426.11, Abhyanker must allege that: (1) he owned a trade secret; (2) Benchmark "acquired, disclosed, or used the trade secret through improper means;" and (3) Benchmark's actions damaged him.  *Nexsales*, 2012 WL 216260, at *2.  The CUTSA defines "misappropriation" as either (1) improper acquisition of a trade secret or (2) improper disclosure or use of a trade secret.  Cal. Civ. Code § 3426.1(b).  "A trade secret is misappropriated if a person . . . discloses or uses a trade secret the person has acquired by 'improper means' or in violation of a nondisclosure obligation . . . ."  *Ajaxo Inc. v. E*Trade Group Inc.*, 37 Cal. Rptr. 3d 221, 255 (2005).  "[W]here an UTSA plaintiff seeks to show misappropriation by 'breach or inducement of a breach of duty to maintain secrecy,' that party must demonstrate that the defendant (1) had a duty to maintain secrecy, and (2) breached that duty."  *Be In, Inc. v. Google Inc.*, No. 12-cv-03373, 2013 WL 5568706, at *3 (N.D. Cal. Oct. 9, 2013) (quoting Cal. Civ. Code § 3426.1(a)).

Here, Abhyanker does not allege any facts that Benchmark wrongfully *acquired* or *used* his trade secrets.  Rather, the gravamen of Abhyanker's misappropriation claim is that Benchmark *disclosed* his trade secrets in violation of an oral confidentiality agreement.  *See* Cal. Civ. Code § 3426.1(b)(2)(B)(ii).  Abhyanker alleges he received oral assurances that Benchmark would keep confidential "any and all information disclosed by Abhyanker during any future meetings."  *See* SAAC ¶ 120.  Abhyanker claims that in violation of this "oral confidentiality agreement," *id*. ¶ 107, Benchmark "disclosed Abhyanker's Trade Secrets to both Janakiraman and Toila, who then proceeded to misappropriate and use [his] Trade Secrets as a foundation of Nextdoor.com."  *Id*. ¶ 135.[5]

This alleged oral contract is the entire basis of Benchmark's purported duty.  However, as

---

[5] As described below, Abhyanker does not allege any nonconclusory facts regarding such disclosure of the trade secrets to Janakiraman and Toila — *i.e.*, when Benchmark made such disclosures, by whom, and in what context.

1    Benchmark pointed out at the time the original counterclaim was filed, this alleged nondisclosure

2    obligation between Abhyanker and Benchmark is clearly invalid under the statute of frauds.

3    (Mem. in Supp. Motion to Dismiss [Dkt. No. 40], at 9–13.)  "An agreement that by its terms is

4    not to be performed within a year from the making thereof" is "invalid, unless [it], or some note

5    or memorandum thereof, [is] in writing."  Cal. Civ. Code § 1624(a)(1); *see also Sterling v.*

6    *Taylor*, 40 Cal. 4th 757, 766 (2007) ("A memorandum satisfies the statute of frauds if it

7    identifies the subject of the parties' agreement, shows that they made a contract, and states the

8    essential contract terms with reasonable certainty.").  Abhyanker does not allege that there is any

9    such document in writing.  And there is no possibility in either law or fact that the

10   "confidentiality agreement" alleged by Abhyanker was intended to last for only one year; it was

11   to extend for perpetuity.  Indeed, Abhyanker does not even allege it was breached within a year.

12   Accordingly, under California law, this is not a valid oral contract.  *See Tostevin v. Douglas*, 160

13   Cal. App. 2d 321, 327–28 (1958) ("[A] contract is invalid under the statute of frauds when it is

14   evident from the subject matter of the contract that the parties had in contemplation a longer

15   period than one year as the time for its performance." (citation and quotes omitted)).

16          The absence of a cognizable contract under these circumstances also bars Abhyanker's

17   trade secret claims.  The primary purpose of the statute of frauds "is to bar fraud-induced

18   enforcement of contracts never actually made by requiring reliable evidence of the existence and

19   terms of the contract.  The statute of frauds is meant to prevent courts from enforcing an alleged

20   oral contract that never actually was entered into. . . ."  *Siam Numhong Prods. Co., Ltd. v.*

21   *Eastimpex*, 866 F. Supp. 445, 450 (N.D. Cal. 1994).  Indeed, trade secret cases have applied the

22   same principle, holding that a party must take reasonable steps to protect the secrecy of his

23   information, and this includes securing written confidentiality agreements, and clearly

24   distinguishing between confidential and non-confidential material.  *See MAI Sys. Corp. v. Peak*

25   *Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d

26   277, 286–87 (2002); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp.

27   1231, 1253–54 (N.D. Cal. 1995); *see also* Cal. Civ. Code § 3426.1(d)(2) (defining a trade secret

28   as information that "[i]s the subject of efforts that are reasonable under the circumstances to

1    maintain its secrecy").

2        Abhyanker's "oral contract" is precisely the type of vague, unsubstantiated claim of an

3    unspecific agreement that the statute of frauds was designed to prohibit, *see, e.g.*, *Sterling*, 40

4    Cal. 4th at 766, and that demonstrates he did not take "reasonable steps" to keep the secrets at

5    issue here confidential, *see MAI Sys. Corp.*, 991 F.2d at 521.  Although Abhyanker is an attorney

6    by training, and notwithstanding that he was apparently providing to Benchmark confidential

7    information for two entirely "separate and distinct" entities, SAAC ¶ 127, he made no effort to

8    document the exchange.  He also fails to allege any of the specific facts about the contract (what

9    was agreed to, by whom, and the conditions of the oral contract between himself and

10   Benchmark); rather, he just vaguely claims that Benchmark agreed to keep "any and all

11   information" secret.  SAAC ¶ 120.  Moreover, although much of the material communicated was

12   indisputably public information, Abhyanker does not allege that any distinction was made

13   between the mass of public information and the information he now claims was a trade secret.

14   Nor does he allege that he informed anyone at Benchmark that he considered the two pieces of

15   information — which he now alleges were trade secrets — to be "confidential" or covered by the

16   alleged promise, even though neither is obviously confidential or a trade secret, and neither was

17   designated as such.  This simply does not reflect sufficient efforts by Abhyanker to maintain the

18   confidentiality of the information he now claims was a trade secret.

19       Not only is the alleged "promise" implausible on its face, Abhyanker's allegations

20   regarding the circumstances surrounding the alleged June 2007 oral confidentiality agreement

21   have repeatedly shifted.  In his initial counterclaims ("CC"), for example, he alleged that in two

22   different phone calls, Benchmark's general partner Kevin Harvey separately gave oral assurances

23   of confidentiality to Abhyanker and Fatdoor investor Jeffrey Drazan.  CC ¶ 119.  As Benchmark

24   pointed out, however, the purported oral contract between Drazan and Fatdoor undercut

25   Abhyanker's assertion that he entered into an oral contract in his individual capacity.  (Mem. in

26   Supp. Motion to Dismiss [Dkt. No. 40], at 11 n.2.)  Abhyanker subsequently changed his story

27   once again — now alleging that there was only one phone call between himself and Harvey.  *See*

28

1   SAAC ¶ 120.[6]

2          In sum, Abhyanker  cannot show that Benchmark violated a cognizable nondisclosure

3   agreement, *Ajaxo Inc.*, 37 Cal. Rptr. 3d at 255; that he had a duty to maintain secrecy, *Be In*,

4   2013 WL 5568706, at *3; or that he took reasonable steps to protect the trade secrets at issue,

5   *MAI Sys. Corp*, 991 F.2d at 521.

6          **B.      Abhyanker Fails To Plead That He Communicated Any Actionable Trade**
           **Secrets To Benchmark**
7

8          As noted above, although the Court denied Counterdefendants' motion to dismiss in its

9   July 2013 Order, it simultaneously directed Abhyanker to identify the allegedly misappropriated

10  trade secrets with specificity.  *See* Dkt. No. 100, at 9–10 (Abhyanker is "to provide additional

11  detail regarding the trade secrets he alleges Counter-Defendants misappropriated, and how each

12  secret was allegedly misappropriated by Counter-Defendants.").  The Court expressly held that

13  the Counterdefendants' motion to dismiss the alleged trade secret misappropriation was denied

14  "***without prejudice*** to [their] ability to bring a motion to dismiss *if the disclosure process*

15  *identified by the parties reveals deficiencies in Plaintiff's claim*."  (*Id.* at 10 (emphasis added));

16  *see also Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010) ("It is critical to any

17  CUTSA cause of action . . . that the information claimed to have been misappropriated be clearly

18  identified."), *overruled on other grounds by Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (2011).

19         Some two months later, in September 2013, Abhyanker finally purported to disclose the

20  alleged trade secrets he claims were misappropriated with respect to Benchmark.  (Dkt. No.

21  116.)[7]  Although deficient, even based on this disclosure, it is clear that Abhyanker's trade secret

22  claims against Benchmark are not viable.  Indeed, despite references in the SAAC to

23  "algorithms," "business plans," "user interface designs," "software code," and the "name

24

---

25       [6] In similar fashion, Abhyanker's original counterclaim alleged that he had transferred
     tangible trade secrets — computer code and a hard copy diligence file — items that could be
26   verified and tested against the public domain.  Now, the only two trade secrets at issue are
     alleged oral communications.  But as discussed below, despite the Court's order to identify the
27   alleged trade secrets with great specificity, even the contours of these oral statements remain
     vague and unspecific.

28       [7] Abhyanker later amended this disclosure yet again on December 12, 2013.  (Dkt. No. 135.)

1    Nextdoor," among others, SAAC ¶ 100, none of these matters are now at issue.  Rather, the only

2    two alleged trade secrets identified by Abhyanker are the "bidding history" for the nextdoor.com

3    domain name and the identification of the Lorelei neighborhood as a test neighborhood to

4    prototype a social networking website.  (Dkt. No. 135, at 2.)  Neither of these alleged items

5    constitute an actionable trade secret.

6         A trade secret is "information, including a formula, pattern, compilation, program,

7    device, method, technique, or process, that:  (1) [d]erives independent economic value, actual or

8    potential, from not being generally known to the public or to other persons who can obtain

9    economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable

10   under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  "The test for the

11   existence of trade secrets is 'whether the matter sought to be protected is information (1) which

12   is valuable because it is unknown to others and (2) which the owner has attempted to keep

13   secret.'"  *Dealertrack, Inc. v. Huber*, 460 F. Supp. 2d 1177, 1183–84 (C.D. Cal. 2006) (quoting

14   *Whyte*, 125 Cal. Rptr. 2d at 286).

15        First, despite the Court's order to disclose the alleged trade secrets in more detail,

16   Abhyanker fails to even describe what the "bidding history" is that he claims is a trade secret.[8]

17   But on its face, the bidding process (along with background information on the status and

18   registration of the domain name) is publicly accessible.  The methods for submitting bids are

19   transparent and readily accessible on numerous registration sites online.[9]  If the domain name is

20   already in use, the search result will state that the domain is taken.  *See* Rawlinson Decl. ¶ 5 &

21   Exh. 4 [Search Result for Nextdoor.com].  Searches on the "WHOIS" record will also enable a

22   browser to obtain information on every single domain currently registered in the world, including

23   the registrant's contact information, domain creation, expiration dates, and other data.  *See*

24
_____

25        [8] For example, he does not define what the "bidding history" means (the number of bidding
     attempts, the fact that he personally placed the bid, or something else?); he does not describe the
26   manner or method of the bid; and he otherwise provides no information that would permit a
     determination of whether it was secret and economically valuable.

27        [9] Examples of such sites include networksolutions.com, godaddy.com, and tierra.net, among
     many others.  The Internet Corporation for Assigned Names and Numbers ("ICANN")
28   coordinates domain names world-wide and maintains a list of accredited domain-name registrars.
     *See* http://www.icann.org/registrar-reports/accredited-list.html.

1  Rawlinson Decl. ¶ 6 & Exh. 5 [WHOIS Search Result for Nextdoor.com].  A prospective buyer

2  may place bids using various methods — *e.g.*, placing a direct bid, using an agent, or a certified

3  offer service.  *See* Rawlinson Decl. ¶ 7 & Exh. 6 [Bidding Sites].  Thus, the bidding process,

4  along with background information on the status and registration of the domain name, is publicly

5  accessible and therefore not a trade secret.  *See* Cal. Civ. Code § 3426.1(d)(1); *Ruckelshaus v.*

6  *Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is

7  generally known in an industry cannot be a trade secret."); *Religious Tech. Ctr.*, 923 F. Supp. at

8  1254 ([I]nformation that is generally known or readily ascertainable through proper means by

9  others . . . is not protectable as a trade secret." (citations and quotes omitted)).  Further, making a

10  bid does not bind the receiving party from any confidentiality agreement:  the online user simply

11  places a monetary offer or requests a price from the owner.  The moment one makes such an

12  offer, it is known to another person and thus no longer a secret.  *See* Cal. Civ. Code §

13  3426.1(d)(1); *Ruckelshaus*, 467 U.S. at 1002 ("If an individual discloses his trade secret to others

14  who are under no obligation to protect the confidentiality of the information . . . his property

15  right is extinguished.").

16      Furthermore, Abhyanker has not pled any facts sufficient to demonstrate (even if true)

17  that the "bidding history" (whatever it is) has any independent economic value.  *See Yield*

18  *Dynamics, Inc. v. TEA Sys. Corp*, 66 Cal. Rptr. 3d 1, 17–18 (2007) (explaining that to qualify as

19  a trade secret the information must be "sufficiently valuable and secret to afford an actual or

20  potential economic advantage over others," not merely "helpful or useful to another person in

21  carrying out a specific activity") (citation and quotes omitted)).  The Court has already ruled that

22  the nextdoor.com domain name was publicly disclosed in this context, and therefore not a trade

23  secret.  *See* Dkt. No. 100, at 12 ("To the degree that Abhyanker's counterclaim is based on the

24  use of the nextdoor.com name in connection with a neighborhood-based social network . . . there

25  is no trade secret subject to misappropriation, since this concept was disclosed in the '442 patent

26  application prior to any of the alleged acts of misappropriation.").  Given that, absent any

27  allegations in either the SAAC or Abhyanker's trade secret disclosures supporting some

28  economic value specific to the bidding here, there can be no serious argument that some

1  unspecific reference to the "bidding history" has any economic value beyond the value of the

2  idea of using the name itself.

3       Second, as with the bidding of domain names, the identification of the Lorelei

4  neighborhood in Menlo Park, California, as the place to prototype a neighborhood-based social

5  networking website cannot be a trade secret.  As true of his identification of the "bidding

6  history," Abhyanker fails to even identify what this alleged trade secret consists of, but instead,

7  merely references the fact that Nextdoor.com tested in that location in 2010.  *See* SAAC ¶ 145.

8  Even putting aside Abhyanker's failure once again to identify with any precision his alleged

9  trade secret, the characteristics of a single neighborhood — such as demographic makeup,

10  proximity to IT centers or resources, and other factors that might lead to use of any particular

11  location — are public information and not proprietary to Abhyanker.  *See* Cal. Civ. Code §

12  3426.1(d)(1) ); *Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-cv-02965, 2013 WL 5770542 (N.D.

13  Cal. Oct. 24, 2013), *7 (observing that "material [that] is publicly accessible" is not covered by

14  trade secret protection).

15       Moreover, Abhyanker's own allegations demonstrate that he had publicly disclosed the

16  location of the Lorelei neighborhood as a launch site for a neighborhood-based social network

17  before Nextdoor.com's launch in 2010.  Abhyanker specifically alleges that he "had already

18  ***prototyped*** his own Nextdoor and Fatdoor concepts in Lorelei," before Nextdoor.com prototyped

19  its website in the Lorelei neighborhood in October 2010.  SAAC ¶ 147; *see also id.*¶ 119 ("The

20  prototype of Fatdoor.com was developed into a ***working beta website***.").  The fact that Fatdoor

21  was already prototyped into a working (and thus public) website in the Lorelei neighborhood

22  destroys any claim that this concept was somehow a "trade secret" when Nextdoor.com

23  launched.[10]

24       Finally, Abhyanker's claim that the Lorelei neighborhood was a trade secret

25  independently fails because he does not allege how knowledge of the Lorelei neighborhood as a

26

27

28

---

[10] The fact that the Fatdoor site was launched in the Lorelei neighborhood is also flatly
contradictory with the suggestion that this alleged "trade secret" was owned by Abhyanker
personally, rather than in his capacity as the CEO of Fatdoor and for Fatdoor's benefit.

1    testing site provided "an actual or potential economic advantage over others." *Yield Dynamics,*

2    *Inc.*, 66 Cal. Rptr. 3d at 17 (quotes omitted).

3          C.     **Abhyanker's Trade Secret Allegations Do Not Meet The Standard Under**
     **_Twombly_ and _Iqbal_**

4

5          In addition to the foregoing deficiencies, Abhyanker's allegations fail to meet the basic

6    plausibility standard required by federal law.  Abhyanker's theory of Benchmark's

7    misappropriation is based on the coincidental fact that Janakiraman and Toila were entrepreneurs

8    in residence at Benchmark in June 2007 and later launched a website similar to a public domain

9    idea that had been pitched to Benchmark during that time.  But as the Supreme Court made clear,

10   simple coincidence or parallelisms, without more, are insufficient to show misconduct.

11   *Twombly*, 550 U.S. at 556–57.  This is particularly true here, given that the "coincidence"

12   involves purely public domain material (neighborhood social network; nextdoor.com domain

13   name for a neighborhood social network); hence, nothing about the alleged coincidence even

14   suggests wrongful conduct.  Moreover, in the SAAC, Abhyanker does not allege who at

15   Benchmark disclosed the purported trade secrets to Janakiraman and Toila; he does not allege

16   when the purported disclosure to Janakiraman and Toila occurred; and he does not allege which

17   of the various purported trade secrets Benchmark allegedly disclosed.  Abhyanker thus does not

18   allege any tortious misconduct by Benchmark that is required for a misappropriation claim.  *See*

19   *PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663, 673 (2000) ("Misappropriation of trade secrets is an

20   intentional tort.") (citing Cal. Civ. Code § 3426.1)).[11]

21

22       [11] In fact, this coincidence may be of no consequence at all since Abhyanker admits that there
     are other sources who had nothing to do with Benchmark from whom Janakiraman and Toila
23   could have received the purported trade secrets.  For example, Benchmark now accuses Sandeep
     Sood — who is not alleged to have any relationship with Benchmark at all — of the same
24   misconduct.  *See* SAAC ¶ 143 ("Janakiraman and Nextdoor.com encouraged Sood to improperly
     disclose Abhyanker's trade secret information and proceeded to use the information as the
25   foundation of their business."); *see also id.* ¶¶ 139–44 (allegations regarding Sood's
     communications of his trade secrets); Second Am. Designation, at 2–3 (same).  Thus,
26   Abhyanker's allegation that Benchmark provided the purported trade secrets to Nextdoor.com is
     admittedly one guess among others.  This is precisely the sort of speculative claim that should
27   not survive a motion to dismiss.  *See Twombly*, 550 U.S. at 555.

28

1    In addition, Abhyanker's allegations with respect to the two specific trade secrets at issue

2    fail to do anything more than allege "access," and even that is alleged only on information and

3    belief.  *See* SAAC ¶ 144 ("On information and belief, as Entrepreneurs in Residence at

4    Benchmark, Janakiraman and Toila had access to confidential pitches that were delivered to

5    Benchmark."); *id*. ¶ 182 ("Toila had access to Abhyanker's confidential material . . . ."); *see also*

6    First Am. Designation, at 5 (making similar allegations of how Janakiraman Toila had "full

7    access" to Benchmark's materials); Second Am. Designation, at 4–5 (same).

8    It is well settled, however, that mere allegations of "access" (much less allegations of

9    access based merely on "information and belief") are not sufficient to state a claim for trade

10   secret misappropriation. *See Nexsales*, 2012 WL 216260, at *2 (dismissing trade secret claim

11   where "[p]laintiff fails to identify the information that was taken" and "provides only conclusory

12   allegations, claiming that Defendant was given access to confidential and proprietary information

13   which was then disclosed to third-parties."); *Pellerin*, 877 F. Supp. 2d at 989 ("[A]llegations that

14   [plaintiff] had access to and acquired [defendant's] trade secret information is insufficient to

15   establish misappropriation." (quotes omitted)).

16   Finally, Abhyanker's trade secret allegations fail the "common sense" litmus test under

17   *Twombly* and *Iqbal*.  The crux of Abhyanker's allegations against Benchmark relate to the June

18   2007 meetings and subsequent disclosures of trade secrets in connection with his

19   LegalForce/Nextdoor concepts.  SAAC ¶¶ 117–26.  But it makes no sense that Abhyanker would

20   be pitching Fatdoor — a "public Wikipedia-like neighborhood commenting tool," *id*. ¶ 117, to

21   Benchmark, and at the same time, disclose purported trade secrets about a "separate and

22   distinct," *id*. ¶ 127, neighborhood social networking business LegalForce/Nextdoor.  It makes no

23   sense that Abhyanker would be pitching one business, but provide an entire "diligence file," *id*. ¶

24   122, about another business.

25   Abhyanker further provides no explanation for why trade secrets related to the

26   LegalForce/Nextdoor concept (or concepts) would be relevant to Fatdoor, an entirely separate

27   idea.  Abhyanker only alleges that "an internal decision was made to work on an improved

28   version of Fatdoor.com **centered on security and privacy**," and "[t]o this end, [he] believed [a]

1   new version of Fatdoor.com could be accomplished by using some of Abhyanker's LegalForce

2   and Nextdoor Trade Secrets." *Id.* ¶ 119 (emphasis added).  But neither of the two trade secrets at

3   issue here — the bidding history of nextdoor.com and location of the Lorelei neighborhood —

4   has any apparent or alleged relationship with enhancing the security and privacy of a new

5   version of Fatdoor.  Fatdoor was already named, prototyped, and "developed into a working beta

6   website," *id.* ¶ 119; thus, the bidding history of nextdoor.com or the initial testing of the website

7   in the Lorelei neighborhood would be irrelevant.

8        Again, the only scenario that makes any sense is that Fatdoor and Nextdoor were one and

9   the same — just as Abhyanker alleged previously in state court.  *See* State Compl. ¶¶ 34–35.[12]

10   As such, Abhyanker's trade secret misappropriation allegations fail to offer "sufficient facts to

11   allow the Court to draw a reasonable inference that [Benchmark] is liable for the alleged

12   misconduct." *Nexsales*, 2012 WL 216260, at *1.

13   **V.    CONCLUSION**

14        Abhyanker has already filed and dismissed a meritless action against Benchmark,

15   alleging the same events that underlie this action.  Even construed in the light most favorable to

16   Abhyanker, the allegations in the SAAC simply fail to add up.  Abhyanker alleged two core trade

17   secrets — the nextdoor.com domain name and source code — which are no longer at issue in this

18   action.  And the remaining trade secrets he has identified (bidding history and Lorelei

19   neighborhood) cannot plausibly form the basis of his misappropriation claim against Benchmark.

20   Nor has Abhyanker alleged any facts that Benchmark specifically misappropriated (*i.e.*,

21   improperly acquired, used, or disclosed) those alleged secrets.  Because Abhyanker has been

22   given ample opportunity to amend his pleading — the SAAC is his *fifth* pleading — and any

23   attempts to cure the defects would only mire him in further inconsistencies and contradictions,

24   Abhyanker's counterclaim should be dismissed with prejudice.  *Reddy*, 912 F.2d at 296–97

25   (upholding dismissal with prejudice where curative allegations would be inconsistent with his

26   _____

27   [12] In fact, Abhyanker at one point appears to use Fatdoor and Nextdoor interchangeably in
     the SAAC.  *See* SAAC ¶ 116 ("Before the formation of **Fatdoor**, Abhyanker and Sood had
28   discussed the possibility of Sood becoming a co-founder of **Nextdoor**.  However, when Fatdoor
     was formed, Sood was not selected to be part of **Fatdoor's** founding team." (emphasis added)).

1    prior pleading).

2

3    Dated:  January 9, 2014                    Respectfully submitted,

4                                                LATHAM & WATKINS LLP

5                                                By /s/ Matthew Rawlinson
                                                    Matthew Rawlinson
6
                                                    Steven M. Bauer
7                                                   Matthew Rawlinson
                                                    Adam M. Regoli
8                                                   Attorneys for Counterdefendants
                                                    Benchmark Capital Partners, L.P., and
9                                                   Benchmark Capital Management Co. LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28