1 | **BRUNO W. TARABICHI**, CA State Bar No. 215129
bruno@legalforcelaw.com
2 | **HEATHER R. NORTON**, CA State Bar No. 257014
heather@legalforcelaw.com
3 | **LEGALFORCE RAJ ABHYANKER, P.C.**
1580 W. El Camino Real, Suite 13
4 | Mountain View, California 94040
Telephone: 650.965.8731
5 | Facsimile:  650.989.2131

6 | Attorneys for Defendant
Raj Abhyanker
7 |

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO DIVISION

11 | NEXTDOOR.COM, INC., a Delaware
corporation,

12 |

13 | Plaintiff,

14 | vs.

15 | RAJ ABHYANKER, an individual,

16 | Defendant.

17 | RAJ ABHYANKER, an individual

18 | Counterclaimant,

19 | vs.

20 | NEXTDOOR.COM, INC., a Delaware
corporation; PRAKASH
21 | JANAKIRAMAN, an individual;
BENCHMARK CAPITAL PARTNERS,
22 | L.P., a Delaware limited partnership;
BENCHMARK CAPITAL
23 | MANAGEMENT CO. LLC, a Delaware
limited liability company; SANDEEP
24 | SOOD, an individual; MONSOON
ENTERPRISES, INC., a California
25 | corporation, and DOES 1–50, inclusive;

26 | Counterdefendants.

27 |

28 |

Case No. 3:12-cv-05667-EMC

**DECLARATION OF RAJ ABHYANKER
IN SUPPORT OF DEFENDANT AND
COUNTERCLAIMANT RAJ
ABHYANKER'S OPPOSITION TO
NEXTDOOR.COM, INC. AND PRAKASH
JANAKIRAMAN'S MOTION FOR
SUMMARY JUDGMENT ON
ABHYANKER'S TRADE SECRET
MISAPPROPRIATION COUNTERCLAIM**

Date:          February 13, 2014
Time:          1:30 p.m.
Courtroom:  5 – 17th Floor
Judge:         Honorable Edward M. Chen

1      I, RAJ ABHYANKER, declare as follows:

2      1.      I am the Defendant and Counterclaimant in this lawsuit.  I make this Declaration in

3      support of Defendant and Counterclaimant Raj Abhyanker's Opposition to Nextdoor.com, Inc.

4      and Prakash Janakiraman's Motion for Summary Judgment on Abhyanker's Trade Secret

5      Misappropriation Counterclaim.  The matters set forth herein are of my own personal knowledge,

6      and if called upon to testify as to such matters, I could and would do so.

7      I.      **My Professional and Entrepreneurial Background**

8      2.      In its Motion for Summary Judgment and throughout this case, Nextdoor.com

9      attempts to disparage me by portraying me as a failed entrepreneur who is simply "looking to get

10     a piece of Nextdoor.com's success through serial litigation."  Nothing could be further from the

11     truth.

12     3.      I am a highly successful entrepreneur and do not need to glom success or money

13     from Nextdoor.com.  After being terminated without cause because of the actions of

14     Counterdefendant Benchmark in 2007, I have gone from supporting my family through federal

15     and state unemployment benefits in late 2007 to building Trademarkia.com, a self-funded $7.3

16     million annual business website now employing more than 30 individuals in the San Francisco

17     bay area alone.   I have built this business with no external venture funding other than my own

18     hard work, credit card loans, and self-motivation.  The Trademarkia website now attracts nearly 2

19     million unique visitors per month and my business that created it was recognized as the 9th fastest

20     growing company in the San Jose Metro Area  (and in the top 1,000 fastest growing companies in

21     America) in the  Inc. Magazine 2013 survey.  (See **Exhibit A**).   In addition, my business was

22     recognized as a top 100 Bay Area business in 2013 by the San Francisco Business Journal (See

23     **Exhibit A**).

24     4.      Furthermore, in the last seven months, I have been recognized by the American

25     Bar Association with the 2013 Fastcase 50 Legal Innovation award and the 2013 Legal Rebel

26     designation awarded exclusively to "innovators who are remaking the legal profession" and who

27     are leading the way to make the  "legal system a little better, a little faster, a little more accessible

28     to those in need of justice." (www.abajournal.com).   In fact, my success to date is the only reason

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1   I can afford to adjudicate this dispute against such well-heeled counterdefendants.  Attached as

2   **Exhibit A** are true and correct copies of articles regarding the success of Trademarkia and my

3   recent awards from the American Bar Association.

4         5.     I founded Fatdoor, Inc. in October 2006.  I personally worked hard to build

5   Fatdoor, Inc. into a successful business and recruited a world-class advisory board consisting of

6   leading computer science professors at Stanford University, privacy experts, and world class team

7   members including a former Chief Executive Officer of PayPal, Inc.  I was the sole founder of

8   this business. Employee #1, and I recruited all co-founders.  Within one year, by July 2007, I

9   raised $7 million dollars in funding for this business, at a post money valuation of over $20

10   million dollars.  At the time I left the company, Fatdoor, Inc. was a great success with a bright

11   future.  We had just been selected as a top 20 company in Silicon Valley by the prestigious

12   TechCrunch publication and had made it to the final competition to present on stage as a

13   contender for the best new startup of Silicon Valley for the year 2007.  After I left the company, I

14   was forced to support my family on unemployment, and Fatdoor, Inc. fell apart because of the

15   actions of the Counterdefendants.

16         6.     On November 13, 2013, I became counsel to GeoTag, Inc., which acquired some

17   of the original Fatdoor, Inc. patent applications and assets prior to the sale to Google, Inc.,

18   including a case whose priority claim dates to a U.S. utility patent application filed in October

19   2006 serial number 11/603,442 on which I am the sole inventor, which is titled 'MAP BASED

20   NEIGHBORHOOD SEARCH AND COMMUNITY CONTRIBUTION' and which expressly

21   names 'Nextdoor.com' as the name of my social network.  I am now owner and lead inventor on

22   more than 15 United States utility patent applications related to neighborhood social networking

23   that I now personally own, including more than 8 claiming priority utility patent application

24   11/603,442 which expressly names 'Nextdoor.com' as the name of my social network and has a

25   priority claim of March 2006.  GeoTag, Inc. is currently in a federal patent dispute with Google,

26   Inc.

27         7.     In addition, as later described in this Declaration, I am also the CEO of the new

28   Fatdoor, Inc.  The Fatdoor.com website and mobile platform will relaunch in May 2014, and will

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1   continue to be placeholder name for Nextdoor until I am able to adjudicate my rights in the

2   Nextdoor name through this lawsuit.

3         8.    As such, my purpose in bringing my counterclaims is to obtain recognition for my

4   ideas and contributions that were unlawfully misappropriated.  I am merely seeking an

5   opportunity to participate in the Nextdoor startup to which I dedicated years of my life and to

6   have a chance to be a part of something I created.  I appeal to this court to let me have a chance to

7   seek justice in this matter on behalf of myself and other Silicon Valley engineers and

8   entrepreneurs facing similar situations in their dealings with unscrupulous venture capitalists.

9   **II.**    **Development of Trade Secrets**

10         9.    On or around September 2006, I developed the concepts for two private online

11   neighborhood social networks. The first concept, LegalForce.com, was to be an online private

12   social network for neighborhood inventors, created by geocoding inventors from public patent

13   data. The second concept, Nextdoor.com, was to use the same source code as LegalForce.com to

14   create a private social network for secure collaboration of neighbors in a geospatial area.  Both

15   the LegalForce.com and the Nextdoor.com websites were to be used by neighbors who registered

16   with the site.  During the development of the LegalForce.com and Nextdoor.com concepts, I also

17   originated a new concept based on a Wikipedia-like public database of neighbor profiles that

18   could be edited and enhanced to provide a "search" and "discover" functionality in addition to a

19   sign-up social network.  I named this new functionality "Fatdoor.com."

20       **A.**    **Lorelei Trade Secret**

21           **1.**    **The Lorelei Trade Secret Was Derived Through Substantial Effort**

22                 **and Not Generally Known to the Public or Others**

23         10.    I identified and selected the Lorelei neighborhood in Menlo Park to prototype the

24   LegalForce/Nextdoor concepts because of its high concentration of technology savvy inventors

25   and neighborhood activism.

26         11.    The Lorelei neighborhood was not randomly chosen. The selection of the Lorelei

27   neighborhood was based a mathematical geocoding of all public addresses of inventors listed on

28   U.S. patent applications during the years 2005 and 2006 in terms of calculated latitude and

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1    longitude coordinates, and simultaneously plotting this resultant data set on a map of the United

2    States. Then, a pushpin density map, a shaded area map, a symbol map, and a density map

3    sequentially generated, analyzed, and narrowed based upon the resultant data set.

4    12.    The pushpin density map and the shaded area map were further divided based on

5    inventor classification based on the classification index on United States patent applications in the

6    software, privacy, database, and internet arts. All data records were then again simultaneously

7    geocoded to create the shaded area map. The shaded area map was analyzed to determine regions

8    in statistical probability reveal that there are the highest concentrations of technology savvy,

9    forward thinking individuals intimately familiar with modern web technologies as of September

10   2006. Menlo Park was identified to be a city having the right inventor dynamics of a city in which

11   there is a strong likelihood of user adoption.

12   13.    From there, the Lorelei neighborhood of Menlo Park (on Lorelei Street) was

13   further narrowed careful analysis of the data, as it contained the right attributes for potential

14   LegalForce & Nextdoor users based on an analysis of neighborhood sophistication, and its

15   proximity to my Menlo Park office. At less than .1 miles away from my office in Menlo Park at

16   4400 Bohannon Drive, Menlo Park, the Lorelei Street (heart of the Lorelei neighborhood of our

17   office) had the right characteristics as being a neighborhood in which there existed a strong

18   likelihood of user acceptance and adoption of new web concepts challenging traditional forms of

19   neighborhood communication, and it was walking distance away.

20   14.    I engaged in significant manual efforts to transform the Lorelei neighborhood into

21   an ideal neighborhood to test a neighborhood social network, including manual efforts to

22   establish connections between residents and overcome a lack of interest. I went door to door to

23   establish these connections between residents and engaged in extensive handholding to overcome

24   any initial lack of interest among residents. It was these efforts, coupled with the original

25   identification, that allowed me to eventually achieve a 90% penetration rate in the Lorelei

26   neighborhood.

27   15.    I did not tell Lorelei residents, and they did not know, why the Lorelei

28   neighborhood was ideal from a selection and transformation point of view.

4

1          **2.      The Lorelei Trade Secret Possessed Independent Economic Value**

2          16.      As discussed in Paragraphs 52-70 of this Declaration, Mr. Tolia admitted to me

3    that using the Lorelei neighborhood to prototype the Nextdoor.com concept allowed Fanbase to

4    survive and exponentially expedited the time necessary to prove the viability of my business

5    model to its investor Benchmark.  He told me that, by May 2010, Fanbase had let 5 of 12

6    employees go, had about $9 million in cash left, and would continue experimenting new ideas

7    only until the end of that summer (e.g., 4 months) or the Fanbase would be shut down.  As such,

8    Tolia made it clear to me that Fanbase's choice of its pilot neighborhood was critical to the pivot

9    and survival of Fanbase to Nextdoor.com.  Nirav Tolia admitted that adoption in the Lorelei

10   neighborhood was super fast, and Nextdoor.com "knew within two weeks" that the response was

11   great.  In contrast, for other neighborhoods, Tolia stated that adoption in most neighborhoods is

12   "super slow" for Nextdoor.com.  In short, Tolia confirmed that there was incredible independent

13   economic value to the Lorelei Trade Secret.

14          **3.      I Undertook Reasonable Efforts to Maintain Its Secrecy**

15          17.      Lorelei was carefully and confidentially maintained as a secret through focus

16   groups, surveys, usability studies and meet up groups held throughout the Bay Area for the best

17   neighborhood to start the Nextdoor/Fatdoor social network.   The Lorelei Trade Secret was not

18   generally known.

19          18.      In 2007, a professional consultant Anand Hattiangadi was hired to conduct focus

20   groups throughout the Bay Area.

21          19.       I took measures to maintain the secrecy of the Lorelei trade secret.  Particularly,

22   Anand prepared a set of confidential rules for focus group selection in 2007.  Mentioned in these

23   rules is a requirement for NDAs to be taken from each neighborhood participant.   I required

24   Lorelei residents to sign confidentiality agreements in focus groups and upon signing up with the

25   Fatdoor social network.   Attached as **Exhibit B** is a true and correct copy of the outline for the

26   focus group selection and process dated March 28, 2007, showing a "Checklist" that includes

27   "Legal docs" including a "NDA" was required for all neighborhood focus group and usability

28   participants.

ABHYANKER DECLARATION
                                                                      CASE NO. 3:12-cv-05667-EMC

1      20.    I made disclosures of the Lorelei trade secret and the bidding history to Sandeep

2  Sood and Benchmark Capital pursuant to confidentiality agreements.

3      21.    Every participant including those neighbors who attended focus groups in the

4  Lorelei neighborhood signed NDAs, and were provided consideration (food, drink or $25 to $50

5  checks) for participating in focus groups.   An additional graphic facilitator was hired to

6  confidentially capture feedback from neighborhood participants.

7      22.    When Lorelei residents first signed up for the Fatdoor social network they had to

8  agree to an online terms of use agreement that included a confidentiality provision.

9      23.    I did not actually tell Lorelei residents the particulars of my Lorelei Trade Secret—

10  in other words, they were not told of the process by which the neighborhood was selected or of

11  the special attributes that resulted in it being selected, including my follow-up manual efforts in

12  the neighborhood.

13      24.    Much of this information was provided to Benchmark Capital on the confidential

14  Fatdoor Due Diligence CD on June 22, 2007.

15      25.    The CD was labeled 'confidential' in its casing, and has been produced to the

16  counter-defendants.

17      26.    And my disclosure of the Lorelei Trade Secret to Sandeep Sood was made

18  pursuant to an agreement containing a confidentiality provision.

19      **B.    Bidding History Trade Secret**

20          **1.    The Bidding History Trade Secret Was Not Generally Known to the**

21              **Public or Others**

22      27.    Bids as high as $50,000 were placed on domain names on behalf of myself and the

23  original Fatdoor, Inc. between 2007 and 2010.   Some bids were placed on Centered.com and

24  others were placed on Nextdoor.com.   Bids for Nextdoor.com and Centered.com domains were

25  handled through Fatdoor, Inc. counsel Mich Rosenbaugh, LegalForce and Fatdoor counsel Daniel

26  Hansen, myself, LegalForce Chief Operations Officer and interim Chief Executive Officer Babar

27  Rana, LegalForce VP of Marketing Alexander Gault, Abhishek Sharma, Fatdoor employee Dan

28  Visnik, Fatdoor CTO Chandu Thota, or my assistant Paul Zahorsky.   Agents of the domain

6                    ABHYANKER DECLARATION
                     CASE NO. 3:12-cv-05667-EMC

1   broker Sedo.com were used by Fatdoor employees and my agents listed above, and watch alerts

2   were created on Sedo and GoDaddy for domains.    Particularly, it is my understanding that one

3   offer for $40,000 was made through Gregg Bois at Sedo.com.   Further, it is my understanding

4   that another offer was made through Matt Rosebrook at Sedo.com. Another set of offers for

5   $50,000+ were negotiated through counsel Mich Rodenbaugh.

6        28.    I did not make the Bidding History public in any manner—it could not be found in

7   any public materials or from any public source.  It certainly was not generally known to the

8   public or to others who could derive economic value from it.

9

10              **2.      The Bidding History Trade Secret Possessed Independent Economic**

11                        **Value**

12        29.    By knowing how much I and Fatdoor had been willing to pay for the nextdoor.com

13  domain name ($50,000), Benchmark Capital and Nextdoor.com were able to value the domain

14  name and then outbid me and purchase the nextdoor.com domain name for reportedly $58,000.

15  Using knowledge it obtained from me through Benchmark in December 14, 2010, Nextdoor.com

16  obtained the domain name itself in the very next month on January 14, 2011, which allowed it to

17  more efficiently compete against my version of the Nextdoor neighborhood social network built

18  around neighborhood restaurants restricted to people living or working in a particular zip code

19  (first named as 'Nextdoor' when showing to Drazan and Harvey over breakfast on December 14,

20  2011, then renamed 'Eatbid' and later restored to 'Nextdoor' in 2012).

21              **3.      I Undertook Reasonable Efforts to Maintain Its Secrecy**

22        30.    I disclosed the Bidding History to only two persons: Sandeep Sood and Kevin

23  Harvey of Benchmark Capital.  With regard to Mr. Sood, I had entered into a written agreement

24  requiring Mr. Sood to keep such information confidential.  With regard to Benchmark Capital, a

25  written no-conflicts agreement was entered with Benchmark through Kevin Harvey (**Exhibit C**).

26  Benchmark also entered an oral agreement with me when Kevin gave assurances of

27  confidentiality before disclosing the information at breakfast at Bucks in Woodside on December

28  14, 2010 (**Exhibit D**).

7

1                          **a. Confidential Disclosure to Benchmark**

2          31.     I was the founder, and first employee of the original Fatdoor, Inc. formed in

3    October 2006, and hired my co-founder Chandu Thota.

4          32.     Jeffrey Drazan was a first Series A preferred investor in Fatdoor, Inc. in February

5    2007 with a $500,000 personal investment.    Jeff is a prominent a Silicon Valley venture

6    capitalist.

7          33.     Jeffrey Drazan introduced me to Kevin Harvey, a partner of Benchmark Capital

8    in June 2007.

9          34.     Kevin Harvey provided written, verbal, and implied assurances of no conflicts and

10   confidentiality on June 21, 2007.  Attached as **Exhibit C** is a true and correct copy of an email

11   string with Kevin Harvey on June 21, 2007.

12         35.     Solely based on these assurances, one day later, I provided the Fatdoor Diligence

13   CD to Peter Fenton at Benchmark Capital the morning of June 22, 2007.

14         36.     On the morning of December 14, 2010, I met Kevin Harvey at Bucks restaurant in

15   Woodside California for a few minutes shortly after meeting with Jeffrey Drazan.   I showed both

16   of them my Nextdoor prototype website (later temporarily named 'EatBid'), my Trademarkia

17   website, and to discuss restarting a Nextdoor private neighborhood social network website

18   bringing neighbors together around food available in their neighborhoods.

19         37.     I demonstrated to  Kevin and Jeff this Nextdoor neighborhood social network and

20   neighborhood commerce engine at this meeting on December 14, 2010 at Bucks on my local

21   machine, and described the bidding attempts on the domain Nextdoor.com by Center'd, Inc. and

22   myself for as high as $50,000.  Before disclosing my bidding history to Kevin Harvey of

23   Benchmark Capital, I reaffirmed and reentered into an oral agreement and received oral

24   assurances of confidentiality from Benchmark.

25         38.     I spoke and demonstrated Nextdoor to Kevin on December 14, 2010 confidentially

26   under the belief that the confidentiality and no conflicts agreement that he made in June 2007

27   with Jeff Drazan and myself continued to hold effect.

28         39.     Kevin failed to inform me that Benchmark had recently pivoted an internally built

                                    8                    ABHYANKER DECLARATION
                                                         CASE NO. 3:12-cv-05667-EMC

1  company Fanbase to a neighborhood social network in our Lorelei neighborhood, and therefore

2  now had a conflict of interest.   He remained silent and kept letting me show him and tell him my

3  ideas about Nextdoor.

4      40.   After hearing my ideas and seeing my prototype of Nextdoor at Bucks on

5  December 14, 2010, Kevin expressed more interest in my other startup Trademarkia.com.

6  Attached as **Exhibit D** is a true and correct copy of my December 14, 2010 email to Kevin

7  Harvey.   Per his request, I sent Kevin a follow up email that same morning of December 14,

8  2010 on Trademarkia.   Surprisingly, Kevin never responded to that email.

9      41.   Then, exactly one month later, on January 14, 2011, Nextdoor.com purchased the

10  'Nextdoor' domain according to Whois records (**Exhibit D**).   Surprised that I was outbid for

11  Nextdoor.com by a person Mr. Prakash Janikiraman listed as an 'entrepreneur' on the Benchmark

12  website at the time (**Exhibit D**), I settled temporarily on another name EatBid.com, which I

13  purchased two weeks later on February 3, 2011 (**Exhibit D**).   Nine months later, Nextdoor.com

14  went live on October 26, 2011 and was announced on Techcrunch.com, the next morning I

15  promptly emailed its CEO that very same morning asking to be part of the company that I helped

16  to start (**Exhibit D**).   I heard no response.   Therefore, I filed the state court lawsuit that has

17  materialized in this instant dispute and on December 28, 2011, I purchased the domain

18  Nextdoor.cm (**Exhibit D**) and changed my website name back to 'Nextdoor' from the temporary

19  name 'EatBid' after discovering that the very same investors had misappropriated my Nextdoor

20  trade secrets and bidding history, and that Nirav Tolia was not only the Chief Executive Officer

21  of Nextdoor.com, he was also an "entrepreneur" of Benchmark, had a prior history of deceit, and

22  was employed there at the time I first disclosed my trade secrets to Benchmark in 2007 (**Exhibit**

23  **D**).   Jeff Drazan sent me an email on October 22, 2013 indicating that Benchmark had

24  misappropriated my trade secrets when I disclosed it to them (presumably on December 14,

25  2010).   Attached as **Exhibit E** is a true and correct copy of the email from Jeff Drazan.

26  **III.**   **Assignment of Fatdoor Trade Secrets to Me**

27

28

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1    42.    To the extent that either Nextdoor.com, Benchmark Capital, or Sandeep Sood

2    attempt to argue that any of my trade secrets were owned by Fatdoor rather than me personally,

3    the argument is moot because Center'd has assigned all its trade secrets to me.

4    43.    I am the Founder and Chief Executive Officer of the original Fatdoor, Inc., formed

5    on October 25, 2006 as a Delaware C Corporation.  The original Fatdoor, Inc. changed its name

6    to Center'd, Inc. on April 2, 2008.  Attached as **Exhibit F** is a true and correct copy of a printout

7    from the Delaware Secretary of State for Center'd Corporation.

8    44.    On November 11, 2012, I contacted the remaining representatives of Center'd Inc.

9    and requested that I be appointed interim CEO of Center'd, Inc.  Attached as **Exhibit G** is a true

10   and correct copy of my correspondence representatives of Center'd Inc.

11   45.    On behalf of Center'd, Jeff Drazan, a Series A preferred shareholder and a

12   decision maker for Center'd approved my appointment as the interim CEO of Center'd.  *See*

13   Exhibit G.

14   46.    I had a follow-up telephone conversation with former counsel for Fatdoor and

15   Center'd, Dan Hansen.  He informed me that Mr. Drazan had the ability to appoint me interim

16   CEO by himself and no further action was required.

17   47.    Likewise, Alessandro Biral, a Series B investor in Center'd, Inc. stated to me in a

18   phone call I only needed permission from one preferred shareholder such as Jeffrey Drazan to

19   serve as interim CEO of Center'd, Inc.

20   48.    On November 12, 2012, Center'd and I executed an Assignment Agreement.  The

21   Assignment Agreement assigned all of Fatdoor's trade secrets to me, along with the right to sue

22   for any past trade secret misappropriation.  Attached as **Exhibit H** is a true and correct copy of

23   the Assignment Agreement.

24   49.    On March 1, 2013 Center'd, Inc. was voided as a Delaware C corporation.  *See*

25   **Exhibit B**.

26   50.    A new Fatdoor, Inc. was formed on May 30, 2013, and has licensed rights in

27   Fatdoor from me in restructuring and restarting.  Attached as **Exhibit I** is a true and correct copy

28   of a printout from the Delaware Secretary of State for the new Fatdoor, Inc. entity.

10

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1    51.    I became the Chief Executive Officer of the new Fatdoor, Inc. on October 25,

2    2013.

3    **III.    September 28, 2012 Meeting With Nextdoor.com's Co-Founder Nirav Tolia**

4    52.    Nirav Tolia requested to meet with me on September 28, 2012 in a public setting,

5    at a Panera Bread in downtown San Francisco near 4th Street and King street.

6    53.    I requested and received permission from Nirav Tolia, CEO of Nextdoor.com, Inc.

7    to audio record the meeting, which I did.  I have a copy of the audio recording and I can make a

8    copy available to the Court if desired.  It has already been provided to Nextdoor.com.  In addition,

9    I transcribed the recording in its entirety to the best of my ability (it may need further

10    proofreading).  Attached as **Exhibit J** is a true and correct copy of the transcript I prepared from

11    the audio recording.

12    54.    The audio recording was made with an Olympus VN-702PC note taking device

13    which has on it a red light when on.   This device was placed openly on a table at Panera Bread

14    restaurant in downtown San Francisco, where Nirav Tolia was directly sitting in front of me.

15    55.    Nirav Tolia acknowledges on the audio recording that his attorneys would

16    "probably say don't tell him any anything" but he is giving me a "full disclosure" so that I can

17    take the recording and "do with it what you will". (**Exhibit J**)

18    56.    The recording lasts over 1 hour and 58 minutes.  Nirav Tolia decided to start by

19    fully explaining his side of the story at the beginning of the recording.  Nirav chose to speak for

20    27 minutes directly into the recorder to lay out his whole story without stopping for pause for me

21    to speak. (**Exhibit J**)

22    57.    This audio recording contains a number of key admissions that are material to our

23    in our trade secret counterclaims for Lorelei and the Nextdoor.com bidding history. (**Exhibit J**)

24    58.    Among admissions made by Tolia include that they gained significant economic

25    value by prototyping Nextdoor in the Lorelei neighborhood because their previous efforts for

26    Fanbase was a "failed company" by April 2010, and they were planning on giving remaining

27    money raised from Benchmark back to them, had to lay off their employees from 12 people to 7

28    people, and needed a pivot that will save the company from collapse. (**Exhibit J**)

11                                          ABHYANKER DECLARATION
                                            CASE NO. 3:12-cv-05667-EMC

59. Further, Nirav volunteered that they only had until the "end of the summer and if we can't come up with anything through the end of the summer we're going to shut the company down and at that point you're not going to get any severance." (**Exhibit J**)

60. Nirav further volunteers that the value of the Lorelei trade secret to them by acknowledging that within two weeks the site was successful in the Lorelei neighborhood, thereby saving his company from collapse. (**Exhibit J**)

61. Nirav admits his theft by saying that they took a "little bit more of a MBA" approach, rather than "in Silicon Valley it's like I've got this awesome idea". Nirav continues to volunteer that their goal was "make sure that before we pull the ripcord that we really think there's something on the other side of this rainbow." (**Exhibit J**)

62. Nirav admitted that his cofounder Prakash Janikiraman as the person who came up with the Nextdoor name and who knew a "HOA president" in the Lorelei neighborhood and that is a reason that Nextdoor.com selected the Lorelei neighborhood. (**Exhibit J**)

63. Nirav Tolia changed his story a number of times with respect to when he first heard of "Fatdoor" during the meeting. First, he said he heard of the concept when I first emailed him the morning after their launch on October 26, 2011. Later, Nirav confessed that he heard of Fatdoor when researching press contacts prior to the launch of Nextdoor.com. (**Exhibit J**)

64. Nirav admitted that he found press coverage of Fatdoor "before we were launching when we started to look for what has the press covered around this space." I believe this was done to capture the goodwill of Fatdoor and confuse the press and users into thinking that their company was the same as mine. (**Exhibit J**)

65. Nirav Tolia admitted that someone I knew that worked with me early on was a friend of his cofounder Janikiraman and filled out a survey prior to the launch of Nextdoor.

66. Nirav Tolia admitted to advising Benchmark Capital since 2006 when he met with Yelp chief executive Jeremy Stoppelman at the behest of Benchmark Capital partner Peter Fenton when as Nirav boasts "in 2006 Peter Fenton sent me an email and said I'm looking at this thing Yelp. Can you go and meet the CEO and this and that? I go sure." (**Exhibit J**)

67. Nirav callously volunteers that neither he nor Benchmark cared that Yelp stole a

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1   trademark developed for his former employer because Benchmark invested anyways.

2   Particularly, Nirav boldly states "He [Stoppelman] said well, your tagline was real people, real

3   reviews.  We stole that."  Nirav also says "Yelp is interesting because --- funded by Benchmark."

4   (**Exhibit J**)

5          68.    Nirav brashly admits that an entrepreneur should go in and just expect a venture

6   capitalist to take intellectual property from others "because in Silicon Valley this sort of stuff

7   happens all the time." (**Exhibit J**)

8          69.    Tolia admitted that he knew the replacement CEO to me, Jennifer Dulski since

9   she worked at Yahoo, Inc., and exchanged communications with her through Facebook, including

10  an email discussing my inquiry to him the day after the Nextdoor.com website launched on

11  October 26, 2011.  (**Exhibit J**)

12         70.    Tolia admits that the pro-generators of his neighborhood social networking idea

13  were his "co-founders" Madison Bell and Adam Varro.  But Adam Varro's LinkedIn page

14  indicates that he did not even work at Nextdoor until February 2012, over a year later than

15  Nextdoor.com first prototyping in the Lorelei neighborhood.  Attached as **Exhibit K** is a true and

16  correct printout from LinkedIn of Adam Varro's LinkedIn profile page.

17  **New, Recent Access to Old Fatdoor Emails Revealed Even More Wrongdoing**

18         71.    Google, Inc. provided the new Fatdoor, Inc. access to the Fatdoor.com email and

19  App access rights to emails stored on their servers in November 2013.

20         72.    Through access provided by Google, Inc. in November 2013, the new Fatdoor, Inc.

21  discovered that Nirav Tolia (then a paid employee of Benchmark Capital as an Entrepreneur in a

22  Residence) and a number of other Benchmark Capital "entrepreneur in residence" employees

23  including Bret Taylor, Mike Cassidy and David Goldberg were my replacement Chief Executive

24  Officer candidates for Fatdoor, Inc. in September 2007 and were prescreened by Jon R. Love, a

25  headhunter frequently employed by Benchmark portfolio companies.  Attached as **Exhibit L** is a

26  true and correct copy of a report by Jon Love regarding potential replacements of me as CEO of

27  Fatdoor, including Nirav Tolia.

28         73.    A spreadsheet prepared by Jon R. Love indicates that Nirav Tolia was eliminated

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1 | as a Chief Executive Officer candidate for the original Fatdoor, Inc. in September 2007 because

2 | of "ethical issues at Shopping.com (well publicized)". (**Exhibit D and Exhibit L**)

3 |     74.    Through the access provided by Google, Inc. in November 2013, the new Fatdoor,

4 | Inc. discovered that Sergio Monsalve and other original Fatdoor board members erased 1,000,000

5 | of my vested shares in an already externally published cap table between September 2007 and

6 | November 2007 to prevent 3% dilution to my replacement CEO Jennifer Dulski, to hire Jon R.

7 | Love, and to prevent dilution in a follow-on round of financing by Keynote ventures without

8 | consent of Raj Abhyanker. Attached as **Exhibit M** is a true and correct copy of an email string

9 | regarding Fatdoor's conspiracy to erase my vested shares.

10 |     75.    For example, on October 29, 2007, before the erasing of my 1,000,000 vested

11 | shares without my approval, the original Fatdoor, Inc. board externally published a Cap Table to

12 | Keynote Partners showing that I held 2,421,875 vested shares from my original 4,000,000 share

13 | issuance of shares on November 16, 2006, meaning that the original Fatdoor, Inc. had

14 | repurchased only 1,578,125 of those original 4,000,000 shares. Attached as **Exhibit N** is a true

15 | and correct copy of an October 29, 2007 email and CS-1 of the Cap Table.

16 |     76.    Then, on November 26, 2007, less than one month later, the original Fatdoor, Inc.

17 | board published a revised Cap Table to Keynote Partners showing that I held only 1,421,875

18 | vested shares from my original 4,000,000 share issuance of shares on November 16, 2006, and

19 | now showing that Fatdoor, Inc. had repurchased an additional 1,000,000, or a total of 2,578,125

20 | of those original shares. Basically, the original Fatdoor board surreptitiously substituted my

21 | vested shares for options, thereby reducing my equity percentage in comparison to that of the new

22 | Chief Executive Officer Jennifer Dulski and preventing dilution of other optionees of

23 | approximately 3%. Attached as **Exhibit O** is a true and correct copy of an November 26, 2007

24 | email and CS-1 of the Cap Table.

25 |     77.    The original Fatdoor, Inc. counsel even memorializes this fraud by saying that

26 | "Raj's separation agreement did not specify where the repurchased shares came from so a choice

27 | was to be made and Sergio preferred to leave the 1M option shares outstanding" while falsely

28 | stating that "which is how we had it" in light of the externally published Cap Table. *See* **Exhibit**

14

ABHYANKER DECLARATION
CASE NO. 3:12-cv-05667-EMC

1    **M**.

2        78.    This decision to unilaterally reacquire vested stock was made without informing

3    Raj Abhyanker and without consent of Raj Abhyanker in November 2007 by Sergio Monsalve,

4    Alessandro Biral, and Chandu Thota of the original Fatdoor, Inc. board, with a purposeful intent

5    to conceal this move from Raj Abhyanker and other board members including Jeff Drazan. For

6    example, Alessandro Biral of Keynote Partners writes "Of course. Do not worry about this stuff

7    with me. I see a long term trust I build with entrepreneur like you as my key "competitive

8    advantage"… I am a good person, feel safe" to Fatdoor board member Chandu Thota, in response

9    to his email asking to keep the post financing cap table secret "after adjusting Raj's options" *See*

10   **Exhibit M**.

11       79.    For the above mentioned reasons, I believe that I continued to hold 1,000,000

12   shares of vested stock in Center'd, Inc. through the time of voiding of Center'd, Inc. on March 1,

13   2013.

14       80.    Benchmark Capital expressed interest in funding the Fatdoor concept after I

15   disclosed confidential information to it.

16       81.    While I and others from Fatdoor were in discussions with Benchmark Capital,

17   Norwest Venture Partners ("Norwest") also expressed interest in providing funding to Fatdoor.

18   Norwest provided a higher valuation of Fatdoor than did Benchmark Capital.

19       82.    Benchmark Capital did not want to meet Norwest's terms, but also declined to be a

20   secondary investor. It remained interested in funding Fatdoor as the primary investor. Fatdoor

21   declined to accept Benchmark Capital's lower valuation, and instead accepted funds from

22   Norwest.

23       I declare under penalty of perjury under the laws of the State of California that the

24   foregoing is true and correct. Executed January 23, 2014 at Mountain View, California.

25

26   _____

27   Raj Abhyanker

28

15

| Exhibit | Description |
|---|---|
| A | Articles regarding the success of Trademarkia and my recent awards from the American Bar Association |
| B | Outline for the focus group selection and process in the Lorelei neighborhood |
| C | Email string with Kevin Harvey on June 21, 2007 |
| D | My December 14, 2010 email to Kevin Harvey |
| E | Email from Jeff Drazan stating Counterdefendants stole my trade secrets |
| F | Printout from the Delaware Secretary of Sate for Center'd Corporation |
| G | My correspondence with the remaining representatives of Center'd Inc. |
| H | Assignment Agreement between Center'd and me |
| I | Printout from the Delaware Secretary of State for the new Fatdoor, Inc. entity |
| J | Transcript of audio recording of meeting between me and Nirav Tolia |
| K | Adam Varro's LinkedIn profile page |
| L | Report by Jon Love regarding potential replacements of me as CEO of Fatdoor, including Nirav Tolia |
| M | Email string regarding Fatdoor's conspiracy to erase my vested shares |
| N | October 29, 2007 email and CS-1 of the Cap Table |
| O | November 26, 2007 email and CS-1 of the Cap Table |

16

# EXHIBIT A



**STARTUP     GROW     LEAD     INNOVATE     PEOPLE     MONEY**

**COMPANY PROFILE**

SEARCH COMPANIES | Search for a Company by Name 🔍

# Raj Abhyanker

LegalForce RAPC worldwide is a full-service law firm that offers trademark services and other legal services to entertainment and business clients all over the world.



4 SHARES | SHARE THIS PROFILE

### 2013 STATISTICS

| | | | |
|---|---|---|---|
| RANK | 982 | EMPLOYEES | 20 |
| 3-YEAR GROWTH | 438% | JOBS ADDED | 10 |
| 2012 REVENUE | $7.3 MILLION | FOUNDED | 2005 |
| 2009 REVENUE | $1.4 MILLION | LOCATION | MOUNTAIN VIEW, CA |
| WEB SITE | LEGALFORCELAW.COM | INDUSTRY | BUSINESS PRODUCTS & SERVICES |

### 2013 HONORS





Top 100
Business
Products &
Services
Companies



San Jose
Metro Area



# How patent lawyer Raj Abhyanker developed a $8.5M book of business with Trademarkia

By Stephanie Francis Ward
Sep 24, 2013, 08:30 am CST



*Photo of Raj Abhyanker by Tony Avelar.*

As a law student Raj Abhyanker had many questions, mostly about why the profession seemed so inefficient.

"I wouldn't be surprised if some people didn't quite get Raj," says Douglas Sylvester, dean of Arizona State University's Sandra Day O'Connor College of

Law. "His questions weren't about interpretations; they were challenges to the whole idea.

"He was never very interested in learning the doctrine of rules," Sylvester adds. "It was always about 'I don't think this is right.'"

Abhyanker, 38, is responsible for the trademark search engine Trademarkia, which this year was rebranded into his law firm Legal Force. The firm has offices in Mountain View, Calif., and Phoenix, as well as London, Beijing and Bangalore, India. There's also a Palo Alto, Calif., storefront open seven days a week that sells books, legal advice and forms. Spend $45 at the store and you get a 15-minute attorney consultation on a variety of legal areas.

"Our store is more of a lounge/bookstore than anything else," Abhyanker says. "Our legal concierges are trained to treat everyone kindly, compassionately and help any way they can."

A patent attorney, Abhyanker says his firm will prepare about 14,000 trademarks this year. He estimates that 2013 firm revenues will be $8.5 million. Revenues for 2012 were $7.3 million.

Two things helped make his Trademarkia site soar from filing 10 trademarks a year to approximately 9,000 in 2012. First, Abhyanker says, the site's search engine mines the U.S. Patent and Trademark Office's trademark database more efficiently than the government's own search tool. And second, fees range from $159 up, depending on the matter's complexity, plus the $325 PTO trademark registration fee. Other trademark applicants might pay $150 to $500 an hour in attorney fees alone for the process.

Still, Abhyanker sees himself as more of an engineer than a lawyer.

"I wanted to create a firm that allows me to support myself and fund my engineering projects," he says.

The path to an $8.5 million book of business has not been a smooth one. Abhyanker's parents, Indian immigrants who owned a computer store, went bankrupt and lost the business when he was an ASU engineering student.

He started law school there in 1999. "I left after one year. That was partly because I didn't like it, and partly because I did not have enough money to stay in school," Abhyanker says.

Next came an engineering job with Silicon Valley's Juniper Networks. Then the Internet market crashed and Abhyanker was out of work. He felt bad that his wife, a pharmacist, was supporting him and went back to law school in January 2003.

"I needed to find a way to make a living," he says. "So I didn't hate it so much."

After graduating, Abhyanker tried doing patent work at law firms, but found that wasn't the right fit. He went on to start the neighborhood social networking site Fatdoor, raising more than $5.5 million in venture capital. In 2007 he was let go as the site's CEO. And four years after Abhyanker was pushed out, Google purchased the site, then known as Dealmap, for $30 million.

In 2009 Abhyanker launched Trademarkia with software engineer Dongxia Liu. Rather than deal with venture capital funding again, Abhyanker financed the site with a home equity loan. He also kept his patent practice running as a sole practitioner.

And the firm's success has taught him something:

"I don't feel bad about failure anymore," he says. "I feel bad if I don't try."



Oct 15, 2013, 6:00pm PDT   |   **UPDATED:** Dec 9, 2013, 1:30pm PST

# Fast 100: Meet the Bay Area's fastest-growing private companies 2013

‹   49 of 100   ›

« Back to article



No. 52: LegalForce RAPC Worldwide
Raj Abhyanker, founder and CEO
The Palo Alto-based trademark law firm boosted revenue 146.4 percent from 2010 to 2012.

Paolo Vescia



# *Making* His **MARK**

## RAJ ABHYANKER, 38
### PALO ALTO, CALIF.

No one could say Raj Abhyanker's path to success was an easy one. As an undergraduate engineering student, Abhyanker's parents, Indian immigrants who owned a computer store, went bankrupt and lost the business. His first foray into law school ended after one year: "That was partly because I didn't like it, and partly because I did not have enough money to stay in school." His first engineering gig ended with the dot-bomb. He returned to law school at Arizona State, but after graduation, patent work at law firms was not a good fit. He even started a social network that was purchased by Google—only he had been pushed out of the CEO post four years earlier.

How things have changed. Abhyanker now leads his law firm Legal Force, with offices from Silicon Valley to London, Beijing and Bangalore, India. And his trademark search engine Trademarkia brought in $7.3 million in 2012, filing about 9,000 trademarks at prices as low as $464 for the simplest applications.

A patent lawyer who sees himself as an engineer, Abhyanker is also a bricks-and-mortar retailer. His Palo Alto, Calif., storefront is open seven days a week and sells books, legal advice and forms. Spend $45 at the store and you get a 15-minute attorney consultation on a variety of legal areas.

And yes, all the ups and downs have taught Abhyanker a supreme lesson in entrepreneurship: "I don't feel bad about failure anymore," he says. "I feel bad if I don't try."



Home ▸ News ◂ Fastcase announces 50 legal innovators to watch

BUSINESS OF LAW

# Fastcase announces 50 legal innovators to watch

Posted Jul 15, 2013 11:12 AM CST
By **Rachel M. Zahorsky**



☑ Email    🖨 Print    🗐 Reprints    ☑    ➕ Share / Save 🔵 🔵 ➦

With a record number of nominations, online legal research company **Fastcase** chose its latest class of 50 legal innovators and visionaries to honor in 2013. They include legal technologists and law professors, from start-ups to the establishment, who are inventing, adopting and advocating for new models of delivering legal services.

Honoree Raj Abhyanker, co-founder of Trademarkia, which served as the world's largest trademark firm, recently opened a retail storefront reminiscent of Apple computer stores for legal services in Palo Alto, Calif. The gist is to change the way consumers shop for lawyers and to promote accessible and affordable legal services.

That mission is shared by Charley Moore, the founder and executive chairman of Rocket Lawyer, and **Richard Granat**, founder and CEO of the Granat Group. Granat's prolific works include one of the nation's first virtual law offices, a self-help website for Maryland family law and a legal forms company.

Granat's efforts to deregulate the legal profession as a means to bridge the access to justice gap for middle-class and lower-income consumers are supported by fellow honoree, Renee Newman Knake, an associate professor of law at Michigan State University. Knake and her colleague Daniel Martin Katz, who co-founded & co-directs ReInvent Law with her, are among a half-dozen legal academics selected.

Tom Barnett, executive director of the State Bar of South Dakota, was honored for his work with the state legislature to create an incentive program to bring lawyers to underserved, rural communities. Barnett is joined by bar leaders in Arizona, Virginia, North Carolina and Florida, and also Paulette Brown, a partner at Edwards Wildman, whose uncontested nomination for president of the ABA in 2015 would make her the first African-American women to lead the American Bar Association.

# The New York Times

**APRIL 11, 2012, 7:00 AM  4 Comments**

## A Start-Up Rethinks the Process of Getting a Trademark



Trademarkia is an online search engine that helps small-business owners sift through the more than six million names, slogans and logos that have been trademarked in America since 1870. The Web site, which went live in September 2009, grafts a user-friendly interface onto a colossal database, built with free information provided by the United States Patent and Trademark Office. It also serves as a lure, steering visitors who want to apply for their own trademarks to the law firm of Trademarkia's co-founder, Raj Abhyanker, and offering other fee-based services such as domain registration, logo design and automated alerts that notify trademark holders when

marks similar to their own are filed.

**Employees:** Eight full-time. In addition, in the last three years, Trademarkia has generated enough business to help Mr. Abhyanker's law firm grow from a solo practice to an international operation with more than 190 employees, including more than 60 lawyers.

**Founders:** Mr. Abhyanker, 36, Trademarkia's chief executive, is a lawyer and serial entrepreneur who previously founded FatDoor, a social networking site for neighbors. (In 2007, Mr. Abhyanker was ousted as chief executive of FatDoor, which later transformed into The Dealmap and was purchased by Google in 2011.) He founded Trademarkia with Dongxia Liu, 39, a software developer and the former vice president of engineering at Imagekind. Ms. Liu now serves as chief technology officer.

**Location:** Trademarkia is headquartered in Mountain View, Calif., in the same building as Mr. Abhyanker's law firm, which also has satellite offices in India, China and France.

**Pitch:** "We want to make applying for a trademark as easy as getting a domain name," Mr. Abhyanker said.

**Traction:** Based on the strength of Trademarkia, which gets nearly three million page views each month, Mr. Abhyanker expects his legal practice to file for more than 13,000 trademarks this year (about 10,000 American and 3,000 overseas). "We're basically the law firm that represents the most small businesses in terms of intellectual property," he said.

**Revenue**: In 2011, according to Mr. Abhyanker, Trademarkia brought in $1.3 million in revenue and the law firm brought in $5.5 million, excluding government filing fees that passed through both companies. He said he expected both figures to grow by 50 percent this year.

**Financing:** No outside money. "I had a bad taste about venture capital," Mr. Abhyanker explained, after losing control of FatDoor. He bootstrapped Trademarkia with about $25,000 in seed money. As for the law firm, he added, that began in 2005 with $1,000 from his savings, a small office over a Palo Alto rug store, a used desk from Craigslist and a Web site he built himself. While he doesn't plan to pursue venture capital, "I'd like to have investors that are other lawyers," he said, adding that, he's considering using crowdfunding from California-licensed attorneys.

**Marketing**: Trademarkia spends roughly $1 million each year on paid search advertising, mostly Google AdWords. Even so, Mr. Abhyanker said, most of Trademarkia's traffic relies on word of mouth and in-bound links from other sites, such as Wikipedia.

**Competition:** Online rivals include LegalZoom, the legal documents company that offers a smorgasbord of services, and The Trademark Company, which offers registration packages starting at $149, undercutting Trademarkia's basic offering

by $10. Competitors also include big international law firms, such as Greenberg Traurig and K&L Gates, which have dominated the trademark space.

**Challenge**: Mr. Abhyanker isn't shy about his ambitions. "Our goal, in the end, is to build the biggest law firm in the world," he said. He wants to do that in two ways: first, by making other types of public data – including patents, copyrights and incorporations – "more interesting and accessible" to consumers. He also plans to rebrand Trademarkia with a new name, LegalForce, and wants to pivot the company into a hybrid with both a strong online presence and brick-and-mortar storefronts serving mostly business owners, available for franchise by independent attorneys. He envisions the latter as "the Apple store meets H&R Block" and hopes to have between five and 10 of them open within 18 months.

Have you filed trademark applications on your own, or have you used a traditional attorney or an online legal service? What do you think of Mr. Abhyanker's plans?



Photo of Raj Abhyanker by Tony Avelar.

MAKING HIS MARK

Raj Abhyanker, 38

Palo Alto, Calif.

No one could say Raj Abhyanker's path to success was an easy one. As an underreduate engineering student, Abhyanker's parents, Indian immigrants who owned a computer store, went bankrupt and lost the business. His first foray into law school ended after one year: "That was partly because I didn't like it, and partly because I did not have enough money to stay in school." His first engineering gig ended with the dot-bomb. He returned to law school at Arizona State, but after graduation, patent work at law firms was not a good fit. He even started a social network that was purchased by Google—only he had been pushed out of the CEO post four years earlier.

How things have changed. Abhyanker now leads his law firm Legal Force, with offices from Silicon Valley to London, Beijing and Bangalore, India. And his trademark search engine Trademarkia brought in $7.3 million in 2012, filing about 9,000 trademarks at prices as low as $484 for the simplest applications.

A patent lawyer who sees himself as an engineer, Abhyanker is also a bricks-and-mortar retailer. His Palo Alto, Calif., storefront is open seven days a week and sells books, legal advice and forms. Spend $45 at the store and you get a 15-minute attorney consultation on a variety of legal areas.

And yes, all the ups and downs have taught Abhyanker a supreme lesson in entrepreneurship: "I don't feel bad about failure anymore," he says. "I feel bad if I don't try."

**TECH FORECAST**

# LEGALFORCE REVS UP $10M FUND TO HELP STARTUPS BUILD PATENT PORTFOLIOS

BECAUSE EVEN IF THE STARTUP ENDS UP FAILING, AT LEAST THE PATENTS ARE WORTH SOMETHING.

BY ALICE TRUONG

**Back in February, when LegalForce's combination brick-and-mortar bookstore** and legal advice center BookFlip opened its doors on Palo Alto's University Avenue, there were concerns about how to make this business work. Foot traffic was--and remains today--slow, while monthly operational costs for this coveted 8,000-square-foot, three-story retail space exceeded $50,000 a month.

But the idea was fresh, if perhaps a bit convoluted. Parent company Trademarkia, which built its success registering trademarks for more than 24,000 clients, wanted to make law accessible to everyday people--no appointment necessary. In CEO Raj Abhyanker's mind, that meant a business with a design aesthetic of the Apple Store across the street: bright, airy, welcoming. Yet how this space--part law firm, part bookstore--would operate perplexed lawyers. Almost half a year after opening, LegalForce is embarking on the next segment of this business: a $10 million venture fund to help early-stage startups establish themselves and develop patent portfolios based on their innovations.





With its bright orange palette and open floor plan, LegalForce looks nothing like a traditional law firm. It also doesn't maintain typical law firm hours, staying open on weekends and in the evenings, when passersby are most likely to drop in. A 15-minute consultation begins at $45, while more complicated issues can run $120 to $600 hourly.

"It's the only place in the Bay Area at 7 at night where you can walk in to see a patent attorney ," Abhyanker told *Fast Company*. "Our main mission is make it less stressful and reduce time in seeing a lawyer."

Though LegalForce specializes in intellectual property, it offers a wide range of legal services and handles about six to 10 consultations each day. "We're not experts in everything," Abhyanker remarked. "We don't profess to be. Most people's questions aren't that difficult." With more complicated matters, a LegalForce <u>lawyer will</u> ⬀ follow up after doing more research or by referring clients to a specialist.

John Steele, a sole practitioner whose Palo Alto office is three miles from LegalForce, noticed the "friendly and cozy" storefront one weekend while walking down University Avenue with his wife.

"I applaud anything that promotes accessibility to quality legal services," said Steele, an expert on legal ethics. "The knock on the legal profession is that we handle the high end very well, and we represent organizational clients very well and expensively ... making it inaccessible to Joe and Jane consumers."

## <u>A NEW REVENUE MODEL FOR A BOOKSTORE</u>



Though LegalForce has a unique business model, accessible legal services were an afterthought.

Abhyanker had originally envisioned this historic 1920s Birge Clark building as a bookstore. Problem was, the city of Palo Alto didn't think it was feasible. After all, a Borders around the corner had shuttered in 2011. Meanwhile, the beloved Kepler's Books in nearby Menlo Park had restructured into a hybrid for-profit, nonprofit organization last year after being on the verge of bankruptcy ⤴ for the second time. On the other hand, LegalForce's location has had a history with entrepreneurship. It was once home to the Medallion Rug Gallery that birthed the VC career of Pejman Nozad, who sold rugs to Silicon Valley heavyweights.

Without a good revenue model to emulate, Abhyanker decided to create a new one. His space, which was zoned for retail, would offer legal services while selling books. The bookstore isn't yet a bustling business, selling 40 to 50 books on a given

weekend.

"It's a very expensive real-world setting," Abhyanker admitted. To build LegalForce, he took out a $100,000 home equity loan three years ago, and in December he sold his Cupertino creperie. "Like any business, we take calculated risks. The mission is longer term than next month or next year. Foot traffic doesn't have to be really high. Look at Tiffany's or Neiman Marcus. The traffic there isn't as high as Walmart."

Of course, it also doesn't hurt to have a successful online business subsidizing this bookstore endeavor. In 2010, its first full year, Trademarkia had filed 4,000 trademarks in the U.S., outpacing even the largest law firms. After filing 12,000 in 2012, Abhyanker expects that figure to reach 15,000 this year.

**A VENTURE FUND WITH AN IP TWIST**



Already broad in scope, LegalForce is gearing up for a new segment in its business by building community. The store has been throwing parties to get to know the startup scene. "Right here on University Avenue, we have access to the latest and hottest startups," Abhyanker said. "We're letting them know we're available for law."

But he's interested not only in bringing in startups who could use the firm's legal services. He's also looking to attract venture capitalists to fund LegalForce's next project: launching LF Ventures in the fall. The $10 million fund intends to dole out $500,000 apiece to 20 startups in return for a piece of equity. Given the company's expertise in intellectual property, LF Ventures will put its "A-team of patent <u>attorneys</u> ↗" at work to help build up the patent portfolios for these early-stage startups.

"We can build these massive portfolios that have value even if [the startups] fail," Abhyanker said, calling it a form of <u>insurance</u> ↗. "Their patents could be valuable to Google, Facebook, or even Intel for that matter. At the same time, if the company succeeds, they have this massive IP portfolio."

Using Trademarkia's lawyers, LF Ventures plans to write 1,000 patent applications over the course of two to three years. "When they raise a series A or series B at Accel across the street, Accel can't give them what we give them." To prepare for the launch of LF Ventures, LegalForce has purchased a building in Mountain View, about half a mile from the tony downtown area, for the startups to work out of.

Abhyanker saw the value of a patent portfolio with his last venture-funded startup <u>Dealmap</u>, a social networking site for neighbors Google acquired in 2011 for a reported <u>$30 million</u> "mostly to buy patents." According to Abhyanker, after closing a series B round he was ousted as CEO because investors didn't see the value of the company's patents.

Because of the focus on intellectual property, 17 Funds has a few criteria it's looking for in startups. "They should be in industries with relatively few patents and have huge number of verticals to address the core product in," Abhyanker said. Possible themes include new high-tech batteries for solar cars and innovations in the use of RFID.

"We're not investing in a startup that's focused on execution. We're focused on a new platform for entire industries. For them, we can write really meaningful patents."

[*Images: Alice Truong for Fast Company*]



## ALICE TRUONG

Based in San Francisco, Alice Truong is Fast Company's West Coast correspondent. As a special contributor for USA TODAY, she wrote a tech column and hosted an online gadgets show. She previously reported in Chicago, Washington D.C., New York, and most recently Hong Kong, where she (left her heart and) worked as a staff reporter for the Wall Street Journal.

CONTINUE

July 24, 2013 | 5:34 PM

## YOU MIGHT ALSO LIKE

# EXHIBIT B

# Focus Group and Usability Testing Proposal

FatDoor.com
Proposed by Anand Hattiangadi, 3/28/07

## Introduction to FatDoor.com and Current Challenges

FatDoor.com has a vision of a social networking site tied to geographic location. The tag line: "Get to know your neighbors". There are also several features that have been proposed for realizing the vision, ranging from more interactive maps to features more common to social networking sites. These features are in various stages of proposal, design and implementation. One challenge facing FatDoor.com is to prioritize these features and understand the effect that they might have on a user base. In doing so it is useful to divide features into two general sets – features that get an immediate reaction and can be expected to draw people to the site (grabbers) vs. features that over the longer term provide the value that keeps people loyal (holders).

A key capability of FatDoor.com is to provide access to a significant amount of publicly accessible data and to tie it to geographic location and an identity. This capability and the technology that underpins it is a key strategic asset. The challenge for FatDoor.com is to understand how best to leverage it to drive viral growth and a richer user experience, while allaying fears that might be tied to public availability of this data.

Another key capability of FatDoor.com is the implementation of the "wiki" in a social networking context. While *wikis* have been around for a while, FatDoor.com provides unique features in tying the *wiki* format to personal data and identity. This has the potential to be a key strategic asset in terms of developing a dynamic and rich dataset. However it also faces the challenges that *wikis* in general face of being prone to misuse. Finally, in addition to the strategic questions of how to best exploit strategic assets and prioritize features in a way that gain trust and loyalty, FatDoor.com has also to make sure that the actual implementation of the features maximizes usage. For example, sign-on bottlenecks need to be minimized, and viral design needs to be smooth to enable the required growth.

## Proposal

We propose that FatDoor.com conduct two independent studies, a focus group and a usability study.

The purpose of the focus group is to provide insight into customer thinking about what is really valuable about the features and strategic assets that FatDoor.com provides. This should be rich enough to generate interesting alternatives for feature design to exploit the assets. The focus group should provide a prioritization of capabilities and features, along with insights into the reasoning behind the prioritization. Finally, the focus group should provide some feedback on the current feature set and implementation.

The usability test is a forum for more detailed feedback on the current feature set and designs. It will be designed to address specific questions around key operational concerns.

## *Focus Group Design:*

There will be two sessions.
Participating in each focus group session will be:
8-12 potential users. 1 facilitator
1 note-taker/co-facilitator
1-2 observers (Raj, Chandu)


## Participant selection

Selection of these users will require a balance of diversity vs. technical savvy. The key is to have people bring different perspectives, while being able to envision new possibilities.
Diversity over
a. Age
b. Gender
c. Neighborhood (?) rental vs. house vs. other


## Agenda

Time limit: 1.5 hours.
1. Introduction, recording device statement, ground rules, and warm up (10 min)
    a. Your first name, two sentences about your neighborhood.
2. Problem Definition (20 min)
    a. Brainstorm: What would you do if you knew your neighbors better? (10 min) (use a fishbone style diagram to get a variety of ideas)
        i. Concerns and refinements (5 min)
    b. If there are features that FatDoor.com has considered but which haven't been brought up, bring them up here.
3. Refinement and Prioritization (20-30 min)
    a. Refinement
        i. Can we take some of these ideas and put them together?
        ii. What are the key ideas here?
    b. Prioritization
        i. Vote on the most valuable features.
        ii. Discussion on why the most valuable ones are valuable
        iii. If someone votes differently from the rest, get some insights into what they are thinking.
        iv. Which of these features are most likely to draw the person to the site, and which are most useful?
    c. Discussion on some of the implementation details
        i. Note how some of these features require rich data, how some of them require giving up some control of what people say about you in order for it to work.
4. Features and Privacy Concerns (30 – 40 min)
    a. Brief Demo 10 min

     b. Notice that it's pre-populated with a lot of data. How do you feel about that? (Work out tradeoffs, i.e. what features would you give up for how much privacy?) (10 min)

     c. Notice that anyone can edit anything. Which people would you feel comfortable editing something about you? Which people would you not want to edit something about you? How would it make you feel if …

     d. Overall impressions of the product

Pizza party, candid camera interviews, in person demos (30 min/1hour)

After users leave, immediately conduct debrief w/ facilitator, co-facilitator and observers (30 min)

## Checklist

Whiteboards, note-cards (for prioritization), Pens
Recording equipment (tape, video for after group interviews)
Coffee/juice/water for during meeting
Name tags + Place tags
Legal docs (NDA, likeness waiver, etc. as required for advertising)
Cameras. Etc. to record results of brainstorms

## Key Milestones

Before Apr. 2 Participants pre-screened
Apr 2-4: Sign-ups for 2 time slots (Apr 4 @ 5:30pm, Apr 5 @ 8pm)
Legal docs ready
Apr 3: Expectation set, dry run w/ management team
(We basically do the same exercise with FatDoor.com founders and employees. The purpose here is two-fold. First, to make sure the questions make sense, the formats are clear, note-taking and recording facilities are exercised. Second, to determine what the assumptions of the team are, so that surprises that occur during the actual focus group can be given the importance they deserve).
Apr 4: Logistics check: catering, refreshments, etc.
     Carry out event
     Debrief, make notes of what did work, what didn't work (Key question – is the information we are gathering useful to FatDoor.com decisions?)
Apr 5: Make appropriate changes to methodology, questions, etc.
     Logistics check: catering, refreshments, etc.
     Carry out event
     Debrief
Apr 6: Initial report out: Prioritizations, how to use the key strategic assets of FatDoor.com, surprises, grabber features, holder features. Key insights
Apr 9: Final report due.

## Budget

Participants

| | |
|---|---|
| $100 per person x 20 participants | $2000 |
| Pizza for 30 | $400 |
| Drinks, refreshments | $100 |
| White boards/other stationary (as needed) | $40 |
| Legal (?) | |
| Transcriptions (-na-) | |
| Fees          (-na-) | |
| | $2540 |

## *Usability Test Design*

### Purpose:

The usability test is designed to specifically

    a.  Understand and fix any bottlenecks that might reduce initial adoption

    b.  Find any misunderstandings that occur due to messaging and/or feature design

    c.  Elicit feedback as to whether the features meet the needs and strategic objectives of FatDoor.com (especially those prioritized highly in the focus groups)

### Format:

4-8 sessions, each with

1:1 conversation behind a 1-way mirror with observers.

Participants:

1 facilitator

1 user

The user is given 3-4 tasks to perform, possibly including

    a.  initial sign on

    b.  invite someone else to participate

    c.  edit someone else's *wiki*

    d.  find directions

    e.  make changes to privacy functionality

During the actions, the facilitator encourages the participant to discuss the choices they make from a. an operational standpoint (What are you thinking of clicking on? Why did you make that choice?) as well as b. an emotional standpoint (How do you feel about this? Does this functionality make you excited? Are you worried?)

### Schedule:

My expectation is that the usability tests will occur the week following the Focus Groups. The feedback will primarily be in the form of bugs that will need to be fixed and minor feature redesign. (We can discuss this)

**Milestones:**

1. Questions defined
2. Study design complete
3. Feature tested
4. Dry run through with team members
5. Run tests w/ users
6. Initial Report
7. Final Report

# EXHIBIT C

**From:** Jeff Drazan [mailto:jeff@bertramcapital.com]
**Sent:** Thursday, June 21, 2007 10:32 AM
**To:** chandu@fatdoor.com; bill@harris.vu; raj@fatdoor.com
**Subject:** Re: Conflicts

These relationshoips should give people at Norwest confidence that a relationship woth Benchmark could be very helpful

Jeff Drazan
Managing Director
Bertram Capital
650.543.9300
www.bertramcapital.com

----- Original Message -----
From: Chandu Thota <chandu@fatdoor.com>
To: Jeff Drazan; 'Bill Harris' <bill@harris.vu>; 'Raj Abhyanker' <raj@fatdoor.com>
Sent: Thu Jun 21 10:23:59 2007
Subject: RE: Conflicts

Yes, Zillow could be a great partner and so is Yelp – In reality, when we expose our APIs, these two are the applications that third party developers can build on top of Fatdoor platform.

Chandu Thota

Co-Founder & CTO
chandu@fatdoor.com
(425) 765 1526
http://www.fatdoor.com <http://www.fatdoor.com/>

From: Jeff Drazan [mailto:jeff@bertramcapital.com]
Sent: Thursday, June 21, 2007 9:36 AM
To: Bill Harris; Raj Abhyanker; Chandu Thota
Subject: FW: Conflicts

------ Forwarded Message
From: Kevin Harvey <kevin@BENCHMARK.com>
Date: Thu, 21 Jun 2007 09:06:33 -0700
To: Jeff Drazan <jeff@bertramcapital.com>
Conversation: Conflicts
Subject: RE: Conflicts

We don't have and are not looking at anything that is a directs competitor.
Some of our companies (Zillow and Yelp) are tangential. We will need to make sure that they are comfortable but my guess is that they are better partners than competitors.

-----Original Message-----
From: Jeff Drazan [mailto:jeff@bertramcapital.com]
Sent: Thursday, June 21, 2007 8:53 AM
To: Kevin Harvey; Bill Harris; Raj Abhyanker; Chandu Thota

Subject: Conflicts

Kevin -

I forgot to mention...
The subject of conflicts came up...does BM have anything that presents a
conflict in their portfolio to Fatdoor???
Are you looking at anything else that is resembles what they are doing?

Thanks,
Jeff


------ End of Forwarded Message


**From:** Jeff Drazan [mailto:jeff@bertramcapital.com]
**Sent:** Friday, June 15, 2007 11:09 AM
**To:** Kevin Harvey
**Cc:** Bill Harris; Raj Abhyanker; Chandu Thota
**Subject:** Kevin Harvey at Benchmark

Raj,
Pls contact Kevin Harvey at Benchmark and set up a meeting with them.
Jeff
**Jeffrey M. Drazan**
Managing Director | Bertram Capital | jeff@bertramcapital.com

1117 California Palo Alto, CA 94034

650.543.9300 | 650.543.9329 fax | www.bertramcapital.com

**From:** Kevin Harvey [mailto:kevin@BENCHMARK.com]
**Sent:** Friday, June 15, 2007 11:03 AM
**To:** Jeff Drazan
**Subject:** RE: Any interest in playing Cordevale Friday at 11:45?

Sure. let me know the best way to connect.


**From:** Jeff Drazan [mailto:jeff@bertramcapital.com]
**Sent:** Friday, June 15, 2007 11:02 AM
**To:** Kevin Harvey
**Subject:** RE: Any interest in playing Cordevale Friday at 11:45?

Separately,
Do you want to look at a "geospatial social networking" company (that's a mouthful) that Bill Harris and I seeded?

It is focused on a variety of "local", "in the neighborhood" apps.

3 other funds are getting ready to do term sheets - so a bit late in the process.

Founded by the the lead developer from msft who did virtual earth (Chandu Thota) and a patent lawyer who has filed 38 applications around the concept (Raj Abhayanker).

www.fatdoor.com

They will "launch" in about 3 months...they have done a "controlled release" to about 750 people to get feedback on usability and to prioritize the feature releases.

Let me know.

**Jeffrey M. Drazan**

Managing Director | Bertram Capital | jeff@bertramcapital.com

1117 California Palo Alto, CA 94034

650.543.9300 | 650.543.9329 fax | www.bertramcapital.com

# EXHIBIT D

---------- Forwarded message ----------
From: **Raj V. Abhyanker** <raj@trademarkia.com>
Date: Tue, Dec 14, 2010 at 12:57 PM
Subject: Trademarkia.com, nice seeing you at Bucks in Woodside this morning
To: kharvey@benchmark.com


Kevin,

Nice meeting you for a few minutes this morning at Bucks in Woodside.  I was meeting
with Jeff Drazan from Bertram Capital on a variety of topics.  It has been about 3 years
since we first met while I was raising money for Fatdoor.  I have now co-founded a new
business called Trademarkia.com.  Trademarkia is a legal search engine, and is one of
the fastest growing legal service sites on the Internet.  Our traffic is almost that of
Legalzoom now.   We are profitable and growing fast, with aggregate first year revenues
of over $7 million dollars.   See this recent Deal Radar article on
us.  http://www.sramanamitra.com/2010/06/14/deal-radar-2010-trademarkia/

We have many new features planned in 2010, including a legal quora, and many
others.  Is this a company that might be of interest to Benchmark?

Let me know if this is of interest and if you would be interested in meeting and hearing
more.

Raj

--
Raj Abhyanker

CEO

Trademarkia.com
1580 W. El Camino Real Suite 8
Mountain View, CA 94040
650-965-8731 (office)

## Whois Record for 2011-02-13

 

« Previous (2011-02-09)                                          Next (2011-09-19) »

**Domain:**

nextdoor.com

| | |
|---|---|
| **Record Date:** | 2011-02-13 |
| **Registrar:** | GODADDY.COM, INC. |
| **Server:** | whois.godaddy.com |
| **Created:** | 2004-02-11 |
| **Updated:** | 2011-01-14 |
| **Expires:** | 2020-02-11 |

**Reverse Whois:**

dns-admin@nextdoor.com   Q

```
Registrant:
   Prakash Janakiraman
   110 Sutter St.
   Suite 700
   San Francisco, California 94104
   United States

   Registered through: GoDaddy.com, Inc. (http://www.godaddy.com)
   Domain Name: NEXTDOOR.COM
      Created on: 11-Feb-04
      Expires on: 11-Feb-20
      Last Updated on: 14-Jan-11

   Administrative Contact:
      Janakiraman, Prakash  dns-admin@nextdoor.com
      110 Sutter St.
      Suite 700
      San Francisco, California 94104
      United States
      +1.3440333      Fax -- +1.3440303

   Technical Contact:
      Janakiraman, Prakash  dns-admin@nextdoor.com
      110 Sutter St.
      Suite 700
      San Francisco, California 94104
      United States
      +1.3440333      Fax -- +1.3440303

   Domain servers in listed order:
      NS07.DOMAINCONTROL.COM
      NS08.DOMAINCONTROL.COM
```

## Whois Record for 2011-06-19



*Previous*                                                              Next (2011-11-16) »

**Domain:**

eatbid.com

**Record Date:**   2011-06-19
**Registrar:**     ENOM, INC.
**Server:**        whois.enom.com
**Created:**       2011-02-03
**Updated:**       2011-02-03
**Expires:**       2012-02-03

**Reverse Whois:**

support@namecheap.com 🔍    raj@rajpatent.com 🔍

```
Registration Service Provided By: Namecheap.com
Contact: support@namecheap.com
Visit: http://namecheap.com

Domain name: eatbid.com

Registrant Contact:
   self
   Raj Abhyanker ()

   Fax:
   1580 W. El Camino Real Suite 8
   same
   Mountain View, CA 94040
   US

Administrative Contact:
   self
   Raj Abhyanker (raj@rajpatent.com)
   +1.6509658731
   Fax: +1.6509892131
   1580 W. El Camino Real Suite 8
   same
   Mountain View, CA 94040
   US

Technical Contact:
   self
   Raj Abhyanker (raj@rajpatent.com)
   +1.6509658731
   Fax: +1.6509892131
   1580 W. El Camino Real Suite 8
   same
   Mountain View, CA 94040
   US

Status: Locked

Name Servers:
   dns1.registrar-servers.com
   dns2.registrar-servers.com
   dns3.registrar-servers.com
   dns4.registrar-servers.com
   dns5.registrar-servers.com

Creation date: 03 Feb 2011 18:14:00
Expiration date: 03 Feb 2012 13:14:00
```



**From:** Raj Abhyanker <raj@rajpatent.com>
**Date:** October 27, 2011 7:45:30 AM PDT
**To:** "nirav@nextdoor.com" <nirav@nextdoor.com>
**Cc:** Desiree Zamora <desiree@rajpatent.com>
**Subject: Meet?  Nextdoor, hello from founder of Fatdoor**

Nirav,
I just read about you on Techcrunxh.  Congrats on your new venture, Nextdoor.  I am Raj Abhyanker, the
founder of the 2005 company dealmap (formerly called Fatdoor, now sold to Google) which recently sold to
google.  I raised over $7.5m in venture funding personally as the CEO of Fatdoor around the get to know
neighbors concept.
  I think I can add significant value to your venture, as Fatdoor was originally a site to get to know your
neighbors.  I understand the way to make this space very well.

 I am wondering if you would be open to me being in your founding team, in exchange for me filling a part time
general counsel, business development vp, and/or boardrole, and perhaps a small angel investment in cash,
resources, and space.

I see you are funded by benchmark.  I had pitched to benchmark the Fatdoor concept, but had decoded to take
funding from norwest.  Some at Benchmark will remember me, particularly Kevin Harvey and Peter Fenton.  I
also pitched to bret taylor who was an EIR at benchmark at tue time, and is now the cto of Facebook.  Perhaps
you can ask them.  After our Norwest funding, I left the company because I wanted to keep the site in a
neighborhood direction.  I am also listed on more than 50 granted and pending patents in the neighborhood
space, now owned by google.

If interested, perhaps we cannery at my office in mountain view?

Let me know if this is of interest.  I've copied my assistant Desiree.

Raj

Sent from my iPhone



http://gawker.com/245691/the-rehabilitation-of-nirav-tolia   Go

OCT **NOV** DEC
◄ **28** ►
2010 2011 2013

15 captures
28 Oct 11 - 4 Jul 13

# GAWKER

TOP STORIES

LATEST STORIES ▾   MONDAY, NOV 28, 2011

VALLEYWAG

## The rehabilitation of Nirav Tolia

Silicon Valley is such a touchingly forgiving place. Nirav Tolia — the Epinions exec who lied in his resume and provoked a bitter legal dispute with his fellow founders — is back. The entrepreneur, known for his Bollywood idol looks as much as his bumpy career path, has returned, from exile in New York, to work on a new project in San Francisco. How on earth did this happen? Here's the background. Epinions, a database of user reviews on everything from gadgets to holiday resorts, was one of the hottest internet startups of 1999. Tolia made about $20m when the venture merged with Dealtime and then went public.

But his fellow founders, whose shareholdings were wiped out in the deal, claimed Tolia had won their consent only by withholding vital information about Epinions' prospects. Already tarnished by the controversy, Tolia left the company, and the Valley, in something close to disgrace, when it emerged he'd lied about working for McKinsey, the elite management consultants.

So what are Tolia's chances of a comeback? Pretty good, actually. The Valley has a short memory. Entrepreneurs, especially battle-hardened ones, are in short supply. And, most importantly, word is that Tolia has a heavyweight backer: none other than Bill Gurley, the Benchmark partner who, the Epinions team claimed in their suit, was in on the scheme to squeeze them out of the company. Anyone know what they're working on?

Update: I've been told by a couple of people that Nirav Tolia is officially an entrepreur-in-residence at Benchmark. Though he's not yet listed on the partnership's website along with the other EIRs.

BY NICK DENTON ⚙   MAR 21, 2007 11:28 AM

Share   6,909 ♥ 5 💬

GAWKER

f FACEBOOK    t TWITTER    ✉ NEWSLETTER


Nirav Tolia

### TOMORROW'S NEWS

KARDASHIANS   78 ▲
Watch Kim Kardashian's Marriage Fall Apart Before Your Very Eyes

BLACK FRIDAY   62 ▲
Black Friday Shoppers Step Over Man Who Lay Dying on the Floor

SYRACUSE   57 ▲
The Next College Sports Child Rape Scandal is Officially Underway

UK   50 ▲
Man With 15 Kids by 13 Different Women Isn't Done Making Babies Yet

GOSSIP ROUNDUP   46 ▲
Miley Cyrus: I 'Smoke Way Too Much F—ing Weed'

WAR ON DRUGS   46 ▲
All This Botched SWAT Team Raid Achieved Was a Man's Death

60 MINUTES   23 ▲
Angelina Jolie: 'For Many Reasons, I Shouldn't Be Here'

PARENTING   26 ▲
Don't Let Your Kids Get Too Fat, Unless You Want Them Taken Away

MUSIC   26 ▲
Every Pop Diva Hates Every Other Pop Diva

## Whois Record for 2012-08-03

 

« Previous (2012-03-07)                                          Next (2012-10-15) »

**Domain:**

**nextdoor.cm**

**Record Date:**  2012-08-03
**Registrar:**
**Server:**        whois.netcom.cm
**Created:**
**Updated:**
**Expires:**

**Reverse Whois:**

**raj@rajpatent.com** 🔍

```
Domain Information
Query: nextdoor.cm
Status: Active
Created: 28 Dec 2011
Modified: 28 Dec 2011
Expires: 28 Dec 2012
Name Servers:
    dns1.registrar-servers.com
    dns5.registrar-servers.com
    dns4.registrar-servers.com
    dns3.registrar-servers.com
    dns2.registrar-servers.com

Registrar Information
Registrar Name: enom

Registrant:
Name: Raj  Abhyanker
Organisation: self
Address:
        1580 W. El Camino Real Suite 8
        Mountain View, CA 94040
        US
Email Address: raj@rajpatent.com

Admin Contact:
Name: Raj  Abhyanker
Organisation: self
Address:
        1580 W. El Camino Real Suite 8
        Mountain View, CA 94040
        US
Email Address: raj@rajpatent.com

Technical Contact:
Name: Raj  Abhyanker
Organisation: self
Address:
        1580 W. El Camino Real Suite 8
        Mountain View, CA 94040
        US
Email Address: raj@rajpatent.com
```

# EXHIBIT E

---------- Forwarded message ----------
From: **Jeff Drazan** <jeff@bcap.com>
Date: Tue, Oct 22, 2013 at 8:30 AM
Subject: Re: Fatdoor, Nextdoor, Benchmark litigation, update
To: Raj Abhyanker <raj@legalforcelaw.com>


This was your idea Raj - clearly they copied it when you disclosed it to them.

**Jeff Drazan**
Managing Partner | Bertram Capital
800 Concar Dr, Ste 100, San Mateo, CA 94402
650.358.5010
jeff@bcap.com
www.bertramcapital.com
EA: Stephanie Perecko sperecko@bertramcapital.com | 650.358.5015

# EXHIBIT F

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | **4241271** | Incorporation Date / Formation Date: | **10/25/2006** (mm/dd/yyyy) |
| Entity Name: | **CENTER'D CORPORATION** | | |
| Entity Kind: | **CORPORATION** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |
| Status: | **VOID** | Status Date: | **03/01/2013** |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | **2010** | Tax Due: | **$ 407,252.56** |
| Annual Tax Assessment: | **$ 0.00** | Total Authorized Shares: | **271,783,952** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **NATIONAL REGISTERED AGENTS, INC.** | | |
| Address: | **160 GREENTREE DR STE 101** | | |
| City: | **DOVER** | County: | **KENT** |
| State: | **DE** | Postal Code: | **19904** |
| Phone: | **(302)674-4089** | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0240 | Amendment; Domestic | 3 | 07/28/2011 | 08:58 | 07/28/2011 |

| 2 | 0245S | Restated; Stock | 18 | 12/14/2009 | 08:46 | 12/14/2009 |
|---|-------|-----------------|----|-----------|--------|-----------|
| 3 | 0240 | Amendment; Domestic | 1 | 04/02/2008 | 17:56 | 04/02/2008 |
| | **Former Name:** | FATDOOR, INC. | | | | |
| 4 | 0240S | Amendment; Stock | 1 | 11/15/2007 | 15:49 | 11/15/2007 |
| 5 | 0245S | Restated; Stock | 16 | 07/17/2007 | 14:05 | 07/17/2007 |

# EXHIBIT G

---------- Forwarded message ----------
From: **Jeff Drazan** <jeff@bertramcapital.com>
Date: Sun, Nov 11, 2012 at 9:27 PM
Subject: Re: Center'd Inc. , CEO?
To: Raj Abhyanker <raj@legalforcelaw.com>
Cc: Daniel Hansen <dhansen@mh-llp.com>, "bill@harris.vu" <bill@harris.vu>
You have my vote
Jeff Drazan
Bertram Capital
650.358.5010
On Nov 11, 2012, at 6:52 PM, "Raj Abhyanker" <raj@legalforcelaw.com> wrote:
Dan, Jeff, and Bill,
…….. Would the current directors/equity owners be ok with me serving as the interim
CEO again for the purpose of recovering $ for the company to restart? …..
Thoughts?
Raj

# EXHIBIT H

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is entered into and effective as of November 12, 2012 (the "Effective Date") by and between Center'd, Inc., a Delaware C Corporation formed on October 25, 2006 (the "Assignor") and Raj Abhyanker, an individual (the "Assignee"). This Agreement shall take effect immediately upon the execution of this agreement.

NOW, THEREFORE, for the payment of $1 to the Assignor and such other good and valuable consideration, receipt of which is acknowledged, the parties agree as follows:

1.  **Assignment**: The Assignor agrees to assign and hereby does assign to the Assignee any and all right, title and interest (choate or inchoate) in all residual assets in the Assignor, including but not limited to all goodwill, contracts, agreements, trademarks, domain names, trade secrets, business plans, source code, user interface designs, and copyright interests in conjunction with the past, present, and future usage of the names, assets, and technologies of the concepts of the neighborhood social networking concepts of 'Nextdoor', 'Fatdoor', and 'Centerd'.

2.  It is understood that this assignment includes a transfer to the Assignee of all rights to acquire, enforce, litigate, and reassign based on superior rights of the Assignor the domain Centerd.com, the domain Nextdoor.com (once secured), the domain Fatdoor.com, future rights of interest to enforce naming rights, trade secrets, user interface designs, source code, prospective business negotiations, contracts, agreements, confidentiality agreements, goodwill, non-disclosure agreements, non-compete agreements, business plans, improvements, inventions, formulae, processes, techniques, discoveries, developments, improvements, trade secrets, business methods, ideas, know-how and data, whether or not patentable, and all designs, trademarks and copyrightable works that Assignor solely or jointly made, conceived or reduced to practice or learned that are not otherwise assigned to Google, Inc. and/or a different party (collectively, the "Technology").

3.  The foregoing assignment includes, without limitation, the following: (i) all precursors, portions and works in progress with respect to the Technology and all inventions (whether patentable or not), improvements, works of authorship, mask works, technology, information, know-how, materials and tools relating thereto or to the development, support or maintenance thereof, not otherwised assigned; (ii) all patent rights, copyrights, trade secret rights, trademark rights, mask work rights, domain names, and all other intellectual property rights and all business, contract rights, and goodwill in, incorporated or embodied in, used to develop, or related to any of the foregoing; (iv) all derivative works, applications for registration, provisional applications, divisions, substitutions, continuations, continuations-in- part, reexaminations, renewals, reissues, extensions and foreign counterparts of all of the foregoing, (v) all claims known and unknown, past and future, against any third party relating to the foregoing, (vi) any right similar to those set forth in this subsection and any other proprietary rights relating to intangible property, and (vii) all software programs, other computer programs and copyrightable material, technical drawings, product ideas and concepts, data, business plans, marketing plans and customer lists relating to the foregoing.

4.    **Moral Rights**.  Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Assignor hereby waives and agrees not to assert such Moral Rights and consents to any action of the Assignee that would violate such Moral Rights in the absence of such consent.  Assignor shall confirm any such waivers and consents from time to time as requested by the Assignee.

5.    **Further Assurances.**  The Assignor agrees to assist the Assignee in every proper way to evidence and perfect the Assignment and from time to time, as may be necessary, to enforce, maintain and defend the assigned Technology in any and all countries as the Assignee may designate from time to time.  Assignor will execute all documents the Assignee may request for such purposes, including, without limitation, specific patent application assignments. In the event that the Assignee is unable for any reason whatsoever to secure Assignor's signature on any document Assignor is requested by the Assignee to execute pursuant to the foregoing, Assignor hereby irrevocably designates and appoints the Assignee and its duly authorized officers and agents as its agents and attorneys-in-fact to act for and in Assignor's behalf and in place of Assignor, to execute and file any such document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by Assignor.

6.    **Representations and Warranties:** The Assignor represents and warrants to the Assignee that:

(a)    Assignor has not previously assigned, transferred, licensed, pledged or otherwise encumbered any interest in the Technology, or agreed to do so, except to the Assignee;

(b)    Assignor has full power and authority to enter into this Agreement and to make the assignment;

(c)    Assignor is not aware of any actual or potential violation, infringement or misappropriation of any third party's rights (or any claim or potential claim thereof) by the Technology, or the production, use sale or other exploitation thereof, and

(d)    Assignor is not aware of any persons or entities that contributed to or that were involved in the creation or development of the Technology other than former employees of Assignor, Assignee, LegalForce, Inc., and Raj Abhyanker LLP.

6.    **Miscellaneous**:  This Assignment Agreement is not assignable or transferable by Assignor without the prior written consent of the Assignee; any attempt to do so shall be void. Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally or three days after mailing if mailed by first-class, registered or certified U.S. mail, postage prepaid to the respective addresses of the parties as set below (or such other address as a party may designate by ten (10) days

mailed by first-class, registered or certified U.S. mail, postage prepaid to the respective addresses of the parties as set below (or such other address as a party may designate by ten (10) days notice). No failure to exercise, and no delay in exercising, on the part of either party, any privilege, any power or any rights hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right or power hereunder preclude further exercise of any other rights hereunder. This Assignment Agreement shall in all respects be construed in accordance with and governed by the laws of the State of California, as applied to contracts entered into and to be performed solely within the state, solely between residents of the state. The prevailing party in any action to enforce this Assignment Agreement shall be entitled to recover costs and expenses including, without limitation, attorneys' fees. Assignor shall hold this Agreement in confidence and not disclose it to third parties without the Assignee's express authorization. Any waiver or amendments hereto shall be effective only if made in writing and signed by a representative of the respective parties authorized to bind the parties. The parties agree that this Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements and communications relating to its subject matter.

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the date first set forth above.

**ASSIGNOR:**

By _____  11/12/12

Raj Abhyanker,
Chief Executive Officer, Center'd, Inc.

**ASSIGNEE:**

By _____  11/12/12

Raj Abhyanker, an individual

# EXHIBIT I

| | Entity Details | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| File Number: | **5343046** | Incorporation Date / Formation Date: | **05/30/2013** (mm/dd/yyyy) |
| Entity Name: | **FATDOOR INC.** | | |
| Entity Kind: | **CORPORATION** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |
| Status: | **GOOD STANDING** | Status Date: | **05/30/2013** |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | **NO REPORTS ON FILE** | Tax Due: | **$ 0.00** |
| Annual Tax Assessment: | **$ 75.00** | Total Authorized Shares: | **100** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **LEGALINC CORPORATE SERVICES INC.** | | |
| Address: | **1679 S DUPONT HWY STE 100** | | |
| City: | **DOVER** | County: | **KENT** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0102S | Incorp Delaware Stock Co. | | | | |

# EXHIBIT J

# CONSENTED DISCLOSURE TRANSCRIPT

<u>**START OF TRANSCRIPT**</u>

**Nirav Tolia:**     Okay. So - I mean, it's actually fairly simplistic from our standpoint. I've read the lawsuit so I understand sort of what you think may have happened. I'm here to say that without any doubt whatsoever I didn't know that you were meeting with Benchmark. I wasn't told you were meeting with Benchmark. There was zero communication ever until we heard from you the first time that there was even this guy Raj and there was this thing called Fatdoor. The only relationship I had to it was Jennifer Dulski, who became the CEO of the company - it was someone I worked with at Yahoo many, many years ago. But I didn't even talk with her.

So there was literally the first time I heard about anything related to this - this goes for Sarah, my co-founder and Prakash my third co-founder - was when you sent the email the first time. That was launch week. I got 500 emails from different people. I was trying to put out my own fires at that point. So at some point maybe I would have written back to you and said this is great et cetera, et cetera. But yours was not the only email that I received that said I thought of this. Can we figure out a way to work together et cetera, et cetera.

So I think that in terms of understanding the part of the process that you may believe was a co-opting of your idea or something like that, I can tell you that beyond - it's not even sort o of one

per cent. There was zero conversation. I mean, we started Nextdoor out of the failure of

another company. We were at Benchmark working on something called Fanbase. It was a

legitimate idea - a legitimate company - that didn't have great execution. Maybe the idea itself

was lacking in some way. Maybe it was the way I built the company - whatever. These things

fail for thousands of reasons, some of which are extrinsic, some of which are intrinsic - some

under our control and some not under our control.

About two and a half years ago - so when I had met my now wife - that sort of salved the

wounds a little bit of working on a company that wasn't working - which was Fanbase - and we

raised [$11.75 million] on Fanbase. There was no other concept at - it's not the way - you know

this because you've started companies. You don't start a company and think well, I have these

other few ideas just in case that doesn't work. Once you have some kind of escape velocity,

whether it's in terms of a round of financing or a public acknowledgement of launching - even

hiring people - that's the boat that you're on until further notice.

So about two and a half years ago - I would say probably April, May of 2010 - we not only

realised that Fanbase was not working - we'd realised that maybe six months before. But we

had done the let's develop a Facebook app, let's develop a mobile app - what else can we do to

turn this thing around. At that point it was a very, very tough time because we had about $9

million in the bank. See still had a loyal team in place of about a dozen people. But this was a

failed company. So I went back to Benchmark and I said, hey, do you want the money back? I'm

somewhat fortunate in that I've had some success in the past.

So I wasn't reliant on that job to put food on the table and, given that I had met the woman who is now my wife, I thought you know what? Maybe now is the time when I focus after so many years of just focusing on work, maybe now's the time when I focus on my personal life - [this is more important] to get married - anyway, who knows what I am going to do? Am I going to be a CEO? Am I going to be something else, right? So I went back to Benchmark and [she asked the] [unclear] was the [series lead] on Fanbase. I said look, we're going to give you the money back because this didn't work. It's sort of humbling to say that it failed.

But we're in a place where we're intellectually honest enough to say that it did fail. We were okay with the stigma attached to that. The investor said okay, that's fine. We don't want the money back though. Do you want to try to sell this thing or - it's sort of an [Aqua Hire] type scenario at that point because there wasn't a real asset to sell - or do you want to work on different ideas? I went back to the company and I said look, we're not going to work on the sports thing anymore. Anyone who wants to leave the company now because they were hired under the premise of working on a sports company you can leave. We'll give you a lot of severance. We'll do whatever the right thing to do is. If you want to stay and understand what it's like to pivot you can do that. But no promises.

We're going to do it through the end of the summer and if we can't come up with anything through the end of the summer we're going to shut the company down and at that point you're not going to get any severance. So a tough time - 12 people at that point down to seven. Five people left. It wasn't like rats fleeing the ship. It was more like mostly engineers saying look, my expected earnings at this point is - if I go anywhere it's greater than it is here - and the premise

under which I joined this company has changed - I can't take the risk at this point in my career. We're a little bit different in that I'm 40. It's not like I'm 25.

The people that we hired for Fanbase initially were all folks we had worked with in the past. So they were a little older too. So at 35 and 36 an engineer says look, I can't just - I can't take the risk of in three months this may not be anything, right? So we went down to seven people, which I think is probably still too many people to come up with a new company idea. The biggest lesson that we learned from that experience is that we can't come up with this grand vision and we can't pursue an idea unless we have empirical proof that there is something there - empirical proof on the most crude sort of atomic piece of value.

So Fanbase was sort of this - can we build a user-generated version of ESPN? That was sort of the big broad vision. Let's start by creating a structure of taxonomy that looks a little bit like Wikipedia and a little bit like IMDB, if you're familiar with those sites. If we'd ever gotten to scale - I don't know if you're a sports fan but if we'd ever gotten to scale and we have this incredible site where you don't have to rely on an editorial news source because fellow fans are actually creating content by the minute, by the second - whatever. Maybe it works but at a very atomic level it was too broad at the beginning. It was too murky as to why do you visit this site.

It was just an [SEO play] - we were getting a lot of SEO traffic. So we said this time we're going to actually build a bunch of prototypes and we're going to test those prototypes and, based on that testing, we're going to follow the users. We're not going to be - it was a little bit more of an [NBA/MBA approach] than it was sort of - in Silicon Valley it's like I've got this awesome idea. I'm just going to [down] the torpedoes and go for it. This was much more of a let's take a

step back, let's learn from the mistakes that we've made around Fanbase and let's make sure that before we pull the ripcord that we really think there's something on the other side of this rainbow.

So we had four or five different ideas. We actually started a - we had a new Google Apps version called Hedgehog [labs]. That was sort of our little incubator, if you will. The reason we picked the hedgehog is famous because the hedgehog can only do one thing but it does that one thing extremely well. So we said okay, this time instead of having this broad vision we're going to pick one thing and we're going to do it extremely well. So we were Hedgehog Labs. We printed t-shirts and the whole thing, right? We then had a variety of different ideas that we pursued.

We - this was the summer of 2010 so we looked at [daily deals ] - ironically Dealmap and [unclear] - but we looked at daily deals as a segment of the market that was gaining a lot of traction. We said can we do something there that's different? We looked at social gaming because Zynga was actually up into the right. We looked at ecommerce because that's where he had a past ourselves. We didn't look at sports because we were basically [burnt to a crisp on] sports. We looked at social networking because we said look, this is another thing clearly that is way up into the right. Ironically, it was not me, Sarah or Prakash who were even the progenitors of this idea.

There were a couple of - [now they're] cofounders but they were quite junior people - a guy named Adam and a woman named Madison. They live in a neighborhood in San Francisco and they said you know, it's a little weird that we have this pothole on our street. There's no way

we can fix it and there's no way we can mass together to figure out when is it going to be fixed, how can it be fixed, what can we do et cetera, et cetera? So that was really the kernel of the idea for Nextdoor. It wasn't - again, it didn't come from anyone even connected to Benchmark. Madison and Adam, they have no exposure to Bill Gurley or the - I forget - was it Kevin Harvey who was actually the guy who was the sponsor of your project or whatever.

But there was zero - zero exposure. We were not meeting with Bill weekly. We were not saying here are ideas. It was very organic at that point. We were literally looking at five or six different ideas. This is why when it comes to litigation and all that stuff, we were sort of like well, we have this Hedgehog Labs thing. It's got the notes every single week of us working on these different projects and stuff. Anyone who would have insight into these - my take on this is always let me just show him the evidence and then he'll sort of realize that things can be perceived without data one of 10 different ways.

But once you have the data, the sort of scope of allowable outcomes goes down. So - anyway, our lawyers are like no, you can't do that. You've got to wait for [unclear] - so anyway the case - we went down this path where we eventually narrowed the ideas that we were going to pursue to two ideas. One idea was a platform for helping people get together around local issues. The other was a persistent feed that we called NeedFeed. We [actually had] another idea that now one of my friends is working on because we gave him the idea. We weren't working on it so we said go work on this thing.

But it was basically this persistent wish list that is a feed that you say I need a carpenter, you put it on there and it virally goes out to your friend networks and they can answer it and this

and that. Ironically - based on this conversation - I was actually the one saying let's do NeedFeed - because it was something I understood a little bit more. Local, as you know firsthand, it's very unscalable. Local is just like - I mean, it is trench warfare at its least scalable. We had said privacy is really important so no SEO and no [open graph integration]. So we knew that if we were going to pursue this neighborhood thing it's going to be like a 10 year mission. Fanbase had 15 million users.

So I'm talking about that as a failure but it had 15 million users. It had scale because we had an SEO strategy and this and that. So anyway, to make a long story short, we continued to do empirical research. I think along the way - again, I'm giving you sort of full disclosure so you can take this and do with it what you will - but there's a guy who worked with you early on that Prakash knows. I haven't met him. It's an Indian guy. I don't actually remember his name. You probably know who he is. But we had sent a survey out to our friends and family saying if there were a website that would help you connect with your neighbors, would you use it?

What would you use it for - et cetera, et cetera. He was one of the recipients of the survey. He answered it and he said oh by the way, I worked on this thing. I left because - I forget exactly what he said - the founders didn't get along or the CEO got fired. But he said some - there was some reason why he didn't work with the thing. That was basically the only - at that point Prakash had no reason to come back and say there's this guy Raj and there was - he just said I heard from my friend - I think he was a fellow Goggle guy who had worked on something like this. This was pre the acquisition of Fatdoor, Dealmap or whatever it's called by Google.

So that was really the only connection at that point. But that wasn't taken back to Gurley - again, there was on - we had no way to connect the dots because we weren't looking to connect any of those dots. So we eventually said let's build a prototype for this thing and see where it goes. So we - Prakash has a friend who's the HOA president of a neighborhood in Menlo Park - so a neighborhood called Lorelei. So we built a prototype - we still didn't have the name Nextdoor. We didn't have a name - actually we were calling it Neighborly - that was the name of it.

We built this thing on a URL real life labs - another one of our learnings from Fanbase was we wanted to solve a real world problem. So it's got to be like real world labs, not - we were sort of really focused on real world communities versus virtual ones. Community is something [with the opinions/ Epinions] and other things. We've worked on community for a long time, even before you were looking at Fatdoor and that sort of thing. So this is something that runs in our blood anyway. But we started this thing called loreleineighbors.reallifelabs.com. That was the prototype for Nextdoor. That was October of 2010.

We knew within two weeks that the response to that was way better than the response to NeedFeed, which we'd also built a prototype for. So we then decided to pursue it. So we had to come up with a name and - another assertion, we took the name or whatever - Prakash came up with the name, again, independent of Gurley. Gurley actually has had very little role except for basically supporting the company [through a pivot]. But he never said here's the strategy that I heard from someone else and here is what you should do and that sort of thing. I think

around that time - actually, we still had not reached out to anyone related to Fatdoor or anything like that - we just - there wasn't anything like this at that time.

I think there were some good reasons why Fatdoor [had to pivot]. I'm a big believer in timing being a pretty important piece for why certain things are successful. I think it took Facebook - I've said this publicly and I believe this - it took Facebook helping people to believe that it was mainstream - to have identity on the internet. To start to think about oh, there's also going to be a social network for my neighborhood and there's also going to be a social network for my business career and this and that. I think Facebook has had - played a very important role in making it feel natural - whereas the notion that we have, which is your real name and address, that really wouldn't have flown five, six or seven years ago.

There just wasn't a - that wasn't commonplace. I mean, if you think way back to Epinions, no one would even use their real name. It was always a handle. It was crazy to expect your user profile to have your real name. Anyway, Prakash came up with the name. We had a number of different names. Again, this is like one of those where we have a huge chain of emails where people are brainstorming different names. Prakash came up with it. Prakash had no relationship to Benchmark as you know. Then we - I used a guy named Josh Becker who bought the Fanbase URL and who has bought other URLs for me to negotiate with the guy in Tennessee - who I never talked to.

No one at Benchmark again had ever talked to this guy. Benchmark doesn't - I don't know what other venture capitalists do but Benchmark doesn't get in those kinds of weeds. It might be helpful at times if they did but this was on us, right? So we negotiated with the guy and bought

the URL. Then we started to build Nextdoor. I think the first time that we really came up on Fatdoor was almost nine months later before we were launching when we started to look for what has the press covered around this space. That's when we found the Fatdoor stuff. Now, this was still before we knew you or you had sent me the email et cetera.

At that point I was like oh yes, this is the thing Jennifer Dulski ran - because I didn't know you then - I didn't know the history and all that stuff. So I said but they pivoted because it didn't work. We were pretty - we understood, we thought, some of the reasons it didn't work, beyond the fact that it was really hard. We thought it's too early. Some of the execution was different than what we believed were the right kinds of things. We're very neighborhood-centric and it's like trying to build a bunch of silos that are literally just silos - et cetera, et cetera. But a lot of this stuff has been informed - I mean, Facebook's privacy mishandling has in many ways opened up the opportunity - I'm sure you understand this because you [unclear] long time - has in many ways opened up the opportunity.

If they had never really bungled privacy, this opportunity may never have existed. If you remember when you first joined Facebook there was this notion of you live in San Francisco, you live in Sunnyvale or you live wherever. That has sort of degraded over time. It's just a strategic decision they've made. So if some of those things hadn't have happened, the opening wouldn't even have existed. It's a little bit like Google never would have existed if Yahoo had not stopped investing in algorithmic search. So anyway, we launched the thing. Obviously you reached out - a lot of other people reached out.

I think at that point I went to Jen Dulski on Facebook - she's a Facebook friend of mine. I said hey, you may have noticed - you may have read about this thing that we started and, by the way, I got an email from a guy who says he was the founder [unclear] whatever. The only message I got back from her was don't mess with - I wouldn't deal with Raj if I was you. That was it. She never wrote back to me - nothing. It's sort of weird because I wouldn't say that I am friends with her but - I'm Facebook friends with her - it was a little weird.

But at the same time I was like look, she's got kids. She's busy. She's at Google now. Maybe Google is working on something related to this. There could be a thousand reasons why she doesn't want to engage with me on this conversation. But that's basically it. Even today, we don't have copies of the patents that you filed and we were sort of combing through them to say are there things we can take away from this and apply it into our product and that sort of thing. I mean, this is really - it's an original implementation of - it would be stupid for me to call it an original idea because lots of people have had an idea of creating a local community.

Yet, I think our implementation is original. I think that there are certain things, particularly around privacy and around the launch process of the new neighborhood - getting nine people and - a lot of these little things around the edges that are quite unique in terms of implementation. But the thing - the reason that I don't get as bent out of shape as Sarah and Prakash when I read what the lawsuit says and this and that - because I'm like look, at the end of the day the atomic value proposition here is connecting neighbors.

That's not something we came up with. It's not even something you came up with. It's something that's happened in the real world and has happened for - ever since there was this

notion that we are humans and we live in places. It's just a question of how is that communication going to occur? Is it going to occur because there's a welcome wagon. Is it going to occur because there's an email list - like a Yahoo - people always say, who are your competitors? We've always said our main competitors are Yahoo. In areas we they don't have a Yahoo group there is no competitor.

We're trying to create some community [unclear] community. So anyway, I don't know if that's helpful or if that even - if you believe it or whatever the case is. But for what it's worth, that is - the reason this has been such a surprise to us - I think to some extent the reason why we've been so steadfast in saying we're going to fight this thing to the death is because there's always grey area in everything. But I honestly believe that in this case, if the assertion is we took someone's idea, there's no grey area.

There was no communication of this anywhere, either from someone who used to work at Fatdoor, from an investor that you pitched, from an existing investor or anything like that. There just wasn't any of it. The closest that we ever came to that was when you were sending us emails saying here's some product feedback. That's when our lawyers are like you've got to take him off the system because at some point he's going to say he gave you some advice and you implemented it - blah, blah, blah type stuff, right?

So anyway, that's the perspective from our side. Our attorneys would probably say don't tell him anything. He should have to go through discovery or whatever - the due process - to get all this stuff. But if that - if what you're telling me is the fact that you've spent so much of your life force on this makes this personal - not necessarily personal against me but just personal

because you made a lot of sacrifices and you really believed in this. You want to know that the stuff you did wasn't co-opted or wasn't - you weren't taken advantage of or something like that. I can tell you with 100 per cent confidence that that wasn't the case from us.

Did someone else do something? I don't know. I don't know why you weren't able to run the company. I don't know why it was renamed. I don't know why it was pivoted. I don't know any of those details because I wasn't around and I don't know any of those people. But what I can tell you is that there was no - there's no conspiracy. Conspiracy is like a really strong word. There's not even a coincidence. It's not even that Bill said oh, let me dig up some notes that I Took in a meeting - here you go. It wasn't even that. It was serendipity. I think that it's - it's not surprising to me, having been around Silicon Valley for a decade and a half that people work on the same idea.

I personally think it's about execution anyway. This is why NeedFeed - the name - the domain name, the name, the product itself - we gave that to a friend of ours because we were like you can have it - I don't know what it's worth. I don't think an idea in and of itself is worth anything. He's proving that because he doesn't have a lot of traction. Maybe we got lucky not pursuing that path. But anyway, if this ever came to the legal black and white, I think what you would find is there were no conversations about you, Fatdoor or anything related to a pitch that happened at Benchmark that inspired the idea, that refined the idea, that drove the idea - that's number one.

Number two, the name itself - Nextdoor - there was no connection between the exploration you had of the name and the mockups or in the trade mark file, whatever the case is. It was

wholly independent and that was from Prakash. There is a big vapor trail around that. Number three, we never had any sort of predetermined - if we'd met in 2007 when I was [in EIR] and you said you know, I really think [we/you] should really pursue social networks on a local scale I would have said are you crazy? There's no - there's no way you could ever get scale then. I would say I'm looking at doing something where I can use SEO or I can - even Open Graph wasn't really available back then.

The [Opinions] was a huge recipient of SEO and so it was very natural for me to create a business that would be a recipient of SEO. That's what Fanbase was. So this was just a - I think as hard as it may seem to believe this, this is more of a serendipitous outcome. Ultimately you don't have to believe my words - I mean, I don't - believe whatever you want, right? But I can understand how you could stay up at night and sort of draw a chain of events that were laid out in the lawsuit and that sort of thing. But unfortunately - because [I can't understand the chain of events right] - but unfortunately that isn't actually what happened. It's just a coincidence that you pitched Benchmark and that Benchmark is now backing this thing.

It's really nothing more than that. You know Brett Taylor - I barely talked to him when I was in … I've become friends with him post … He would shut the door and work on his little FriendFeed thing. There was no - I guess he was in the meeting when you pitched Benchmark or whatever. But he just - he didn't even know about Nextdoor. None of these guys even knew about it. For the first year of Nextdoor, we were operating under Fanbase because we were sort of like look, Fanbase we launched with a New York Times article and we put ourselves out

there, we're not going to launch anything again until we are pretty sure that there's something here, because otherwise it just makes us look like people who don't know what we're doing.

So we were pretty embarrassed - 2010 to 2011 - and saying we're damn sure going to make a product that people want to use because we haven't done that with Fanbase. So anyway, I can understand why you would believe the things that you would believe. I can understand it sort of logically. But it's unfortunately not what happened - or maybe fortunately it's not what happened. Whether we want to prove that in court, okay, that's a very expensive way for us to do it but we'll do it if we have to. If there's another way for you to come to that understanding and - at the end of the day,

I think it's really sort of - there are three outcomes. One outcome is you're antagonizing the company - meaning you're in opposition to it. The second piece is you're completely neutral - you couldn't care less - sort of like how I feel about your businesses. It's not that I don't like them or that I like them. They're just not in my sphere of caring. My sphere of caring is my son, my wife and Nextdoor - a pretty small sphere actually. Then the third thing is there some way that we can link up together so that you're an advocate versus someone who wants to antagonize.

I think that the original feeling when you first sent me the email - I was just bogged down doing whatever - but when we got hit by the lawsuit, that from an emotional standpoint made it very difficult for us to say there's this guy out there who actually has some really good ideas, as proven by the fact that he came up with this idea and he wrote some patents. He's passionate about this. He could be really helpful - in a very sort of high integrity way helpful - not we're

going to steal your ideas or whatever but much more he can help guide the evolution of this thing.

Now, does he have full context on the way we think about it and our strategy? No, he doesn't because that's - those are like independent things but we can bring him up to speed. He can be an advisor. He can play a role. I think that was a bit more difficult to do that at that time, given that there was an accusation and the way it sort of went down. Where are we today? I don't really know. I think part of it was - this meeting was for me to say okay [unclear] - all I know…

**Raj Abhyanker:**      I'm not that scary.

**Nirav Tolia:**      Exactly. It's not a scary thing. It's more of a what is your motivation - like there are some people out there who their only motivation is to cause trouble. I'm not saying you're one of those people right but there are some people out there who - you know this - they're just that way. So there's that whole - that saying if you wrestle with pigs you're going to get dirty no matter what. So there's a class of people out there that even if we do the best of possible things, it's just not going to end in a good place. Then there's a class of people out there who - they bring their own biases to the situation. If they better understand the picture and if they can get some peace on whatever's bothering them, then maybe there's an opportunity to work together or maybe there's just an opportunity to say look, we agree to disagree and that's just the way it is.

Maybe there's an opportunity to say look, life's too short. Is there some kind of resolution [that can say] this is done. You can move on with your life and we can move on with ours. But I am increasingly now as a father and frankly, the company, it's not perfect by a longshot but we

think we do have a great opportunity. So it's my job as the CEO to try to find solutions to the

things that malign the company. It doesn't mean I always can but if I can, great.

If I can't then we'll just keep - I'm always thinking about adoption. It's super slow for us. It's just

the - it's just the way it is, right? So it's not something that I go to bed at night and think oh,

we're in a good place. We're not. It's - we need to have 50 million users - 100 million users.

We're not even - we don't even have a million. So anyway - this is - again, I'm sort of being just

to sort of help you understand who I am. I could show up here and tell you nothing. We could

just sit across the table in uncomfortable silence and the whole thing. But…

**Raj Abhyanker:**        What would you like to know from me? You tell me that/

**Nirav Tolia:**     I think it's more what to you represents a good outcome here. Fast forward a

couple of years from now, what - do you want to have a role with the company? Do you want

to - know that you've heard the story from mouth you can either say I believe it or I need to vet

it. I mean, after that happens - let's assume what I said was true. Would that make you feel

better and you would say okay, I want to shut the door on this - because the little research I've

done, you actually have some pretty good stuff going on that's completely unrelated to this. It

looks like you've got the tiger by the tail in terms of the business that you're running - the

multiple businesses that you're running. So it's not like you need this…

**Raj Abhyanker:**        I don't.

**Nirav Tolia:**     …in your life. So I think it's just more - you understand where I'm coming from…

**Raj Abhyanker:**        [unclear]. Okay. So the bottom line is - first of all, [I just got off] by thanking you [unclear] Secondly I should say that I have no ill feelings against you or anyone else, okay? I am an entrepreneur, like you are. So what I like to do is build things - create things - and make them constructively better. Being an attorney and a patent attorney, what I do is I write patents to create things. I still program, I still code - I still develop things - because I like creating things. I don't like destroying things. Even my patent practice has never been - and my trade mark practice - has always been creating intellectual property, not destroying it. So even getting into this whole thing is kind of new for me. [unclear] or trade mark.

So, you know - the second thing I should say is I'm very impressed with how you've executed the content. Leaving everything else aside, I'm very impressed with how you guys … This is the way I wanted it executed. I tried to execute it and I've been trying to execute it. I'm very focused on one neighborhood at a time, very focused on privacy and not trying to expand out to lots of different places. Trying to get high user engagement, even if that means you have less users. Trying to get city governments involved, trying to get crime, trying to get [unclear] and stuff like that … I think you're doing a good job. Maybe you're doing a better job than … I think anyone possibly could do, right?

**Nirav Tolia:**     [inaudible]

**Raj Abhyanker:**        [unclear]…

**Nirav Tolia:**     We can still be crushed. Any - while we're at this conversation someone could crush us. That's the job.

**Raj Abhyanker:**      So first of all, even though you … if you see the world from my

perspective, I see the world from your perspective and I - my mother is a psychiatrist. I grew up

in a family of psychiatrists. So I can see both sides of the coin. What do I want? I want Nextdoor

to be successful. I don't want it to fail. I mean, I've put too much time and effort into working

very hard giving up on lots of opportunities to - even [look to the] point [unclear] decide to find

a [unclear] or change it to a … site. The reason I wasn't around is because I didn't want to [go

that way]. I wanted to stick to what I thought was the right way to do things, which I see

happening. So for that, the world is a better place with Nextdoor than without Nextdoor. So it's

not my intention to crush or destroy the company.

**Nirav Tolia:**      I appreciate that - I mean, there are plenty of people out there who want to

crush and destroy the company. If we are successful there will be anymore so - many more. So

it's - I appreciate that. Look, I think as entrepreneurs - a funny story - I don't know if you know

much about Epinions but one of the first mainstream user-generated content websites - not my

idea. One of my cofounders had the idea. I've never actually been one of these people who's

like it's my idea type thing - because I just - maybe it's because I'm not as creative. I don't come

up with as many ideas. But I just believe execution - maybe this is your psychology [prior]

rationalization on some level because what I think I'm good at is the execution.

**Raj Abhyanker:**      It's very important.

**Nirav Tolia:**      So anyway, what's important about Epinions is I actually thought the concept for

Epinions and a platform for user-generated content that could create this self-organizing

community with reputation built in and incentives built in - [brilliant]. I thought the execution

wasn't great. Then we caught turbulence in terms of being in the middle of a downturn, [the need to monetize] - blah, blah, blah - all these things happened. Now ultimately we were able to find one tiny little seam which was ecommerce. We were able to get it to a point where it was rescued enough to create a positive outcome. But even today I think of things like YouTube … the original vision for Epinions.

What's the difference between writing an electronic opinion and uploading a video? It's user-generated content, right? Wikipedia, it's an authoritative source of user-generated content, whereas a review is not authoritative. There are many different viewpoints. The closest to what we're doing - Yelp - it's not like we said Epinions is just about products. It can be about services as well. So Yelp is interesting because - funded by Benchmark. The way that it became funded by Benchmark is in 2006 Peter Fenton sent me an email and said I'm looking at this thing Yelp.

Can you go and meet the CEO and this and that? I go sure. So I go and meet with Jeremy Stoppelman, the CEO, and I said look, you're doing so many things well that we didn't do - not completely dissimilar to what you basically said, which is a lot of the execution we're doing with Nextdoor is what you wanted to do but for one reason or another it didn't happen. I told Jeremy the same thing. I was like man, if I were running Epinions today I would be doing all of these things. He started laughing. I said, what's so funny? He said you know, we stole your tagline. I said, what do you mean?

He said well, your tagline was real people, real reviews. We stole that. That was something that I did come up with because I'm maybe more marketing-centric in some ways but product-centric mostly. But I came up with that. I just  - it didn't - again, just so you understand my

perspective, he wasn't a friend of mine. Benchmark had not invested. Do I feel like Epinions as a

good outcome? Yes. Do I feel like it could have been much better? Absolutely. Did I pour five

years of my life into it? Without a doubt - five years. Those were dog years - those were

definitely dog years. So I just felt like you - I'm happy that someone is taking this concept of real

people, real reviews and making it mainstream, because - I remember - do you know Walt

Mossberg?

He's like the biggest, most famous tech critic. He writes for the Wall Street Journal. Before

Epinions came along, for you to buy this, this or this you would read Walt Mossberg. There's

just no notion of I go read what other people say. I was on a press tour for the launch of

Epinions and I went to pitch Walt Mossberg. Within five minutes he said get out of my office. I

said - I was being very polite. It wasn't like I was being [unclear] in some way. He said look, the

notion that anyone would care what someone thinks if they don't know that person - this is the

most rotten website I could ever imagine in my life.

I remember chuckling to myself and thinking you know, I understand why he's saying that. He's

obviously got a lot to lose if this marketplace now becomes full of other people. But it became a

mission - and it was a mission. So anyway, the point of that is I appreciate you saying that the

world can be a better place if something like Nextdoor succeeds, whether it's Nextdoor or

something else. I share that enthusiasm. I would share that even if Nextdoor failed today and if

you picked up the pieces or someone else picked up the pieces. So I think we're very aligned as

entrepreneurs in that way. That's a part of what makes us entrepreneurs.

**Raj Abhyanker:** So let me tell you, after - this [was/wasn't] in the complaint. [But] I gave all the facts to my attorney. After I left Fatdoor I had lost my entire law firm. I had to [set it] down … So I was … I had to sell my clothes to pay my mortgage. I sold my car. I sold everything to try to get my … So I had to kind of - I couldn't afford … graduate school. I tried for a semester and thought gosh, I can't be doing this. I've still got to earn a living. So I was in a really tough place. So when people are in a really tough place they either sink to the bottom or they do something else and they make it work. So I [created trade mark, yeah] which I did on my own, not a single outside funder. It's grown now. It's very successful … $8 million … we have 3.5 million pages a month…

**Nirav Tolia:** It's incredible.

**Raj Abhyanker:** It's the fifth largest legal website on the internet. It's completely - I own like 80 per cent. I basically - it generates $2 million of free cash flow every [year].

**Nirav Tolia:** You make a lot more money than I'm making. I'm paying myself.

**Raj Abhyanker:** So basically at this point I don't - it's a machine that keeps [working]. [We've got everything] in India … India and in Bangalore and [brought it here]. So I'm in a different place than I was then. But this whole thing has put me back in that place. This is tough, right?

**Nirav Tolia:** Yes. By the way, congrats on - I mean, I've had some very low lows as well - always of my own making. So I don't blame anything else that happened. I know what it's like to hit rock bottom - not that I'm saying - I'm not saying that you were at rock bottom but…

**Raj Abhyanker:** At that time I had a one year old daughter, a three year old daughter and my wife's not working. My parents are broke. My parents are [unclear] bankrupt twice. My wife's parents are not helping at all. So it's like, what do you do? You're really passionate about something that you tried to build. You thought you were making … From 2005 to 2007 I really put my life into it … It's also then really troubling that I've lost a lot of friends over it. One of my best friends, after we brought this litigation … Rajiv Patel who's a partner at Fenwick and West - he's a guy that I've been - when my second daughter was born, I put my first daughter in his house.

I've babysat his kids. We've seen his family very week for the past few years before I filed this lawsuit. [When I see him] - all of a sudden Nextdoor is represented by Fenwick and West, which is my best personal friend - my wife's friend … That also made me really upset because Rajiv is the first guy to know about Nextdoor - the original Nextdoor - about Fatdoor and all of this stuff. So I told Rajiv look, listen - you've got to withdraw. You can't represent Nextdoor when you know how all this starts. [The courts say] powerless. So I've been in - this has cost me personal friendships. If you put me back in that place which was a really difficult time - beyond that, I also have now pretty much blacklisted.

As far as I can tell, I can never raise venture capital again for any idea I've ever had, because no VC or investor wants to invest in an entrepreneur who sues - it's just not going to happen. Even still [unclear]. Even after all that, I want the content to succeed. I want to be part of that success. What would be fair to me is to be an equal partner in that success - an equal partner in working really hard - because I can add a lot of value, I believe, to what you're doing to make it

successful. That's what I'm really passionate about. Trademarkia, as I said, is a self-sustaining entity - my law firm is a self-sustaining entity.

We file 15,000 trademarks a year, just in the US. In Europe we file 2000, 3000. So we have this [engine] of filing trademarks. So the attorneys at my firm want me to go through this like [all hell] - because we are a trade mark and patent firm. This is what we do. If we can't take the founder of this and defend his rights, what the hell - so I've got all my team there working hard to even - more than me - to try and make sure that we win this. To me I don't care because what I really want to see happen is that Nextdoor the concept doesn't get lost in the … I think it's been executed really well. So [as I watch and] look what's happening. I see it's been executed well. I see it's being executed by people who, in other ways, who'd be friends [of mine]. In a different parallel universe these people…

**Nirav Tolia:**      Sure, sure.

**Raj Abhyanker:**        …could be friends [of ours]. They grew up in a similar way. They basically have similar - you grew up in Texas, I grew up in Arizona - not too far away. We grew up similarly…

**Nirav Tolia:**      A lot in common.

**Raj Abhyanker:**        Yes.

**Nirav Tolia:**      A lot of common routes.

**Raj Abhyanker:**        I have [unclear]. Dad is telling me, why are you suing another Indian guy? So even my own family now … So you know, I want Nextdoor to succeed.

**Nirav Tolia:**     No, I appreciate that. Look, I think it's…

**Raj Abhyanker:**     So if we get nothing from this meeting … just know I'm not out to just get blood. I just want the truth - to understand what happened to me in this time. Secondly, I'd like to figure out - I don't want to do it at the expense of Nextdoor the company, the concept and the execution that you've done being for naught, because I think you're doing the things that I think are the right things to do in terms of execution.

**Nirav Tolia:**     No, I appreciate that. Look, I think it's - there are a thousand things that it will take to succeed. We will have to do a hundred thousand things to find the thousand things that will work. So on the outside, you see some of the things that are working. On the inside I see the 10x things that we've tried that need to be discarded. That's part of the process, right? So I - it's helpful to hear that.

**Raj Abhyanker:**     [unclear] neighborhood there's two kinds of neighbors, especially in suburban neighborhoods. My Phoenix neighborhood, I compare that to my Cupertino neighborhood. Both are suburban neighborhoods but vastly different. In my Arizona neighborhood where - especially where I grew up - we had a neighborhood association. We were pretty much the only Indian people on the block. Everyone was white or Mexican. I was [really active in the ] newsletter - I used to make my newsletter for our neighborhood association and go door to door and … My next door neighbor did this. My father had an Apple computer store. I grew up doing these types of things. So I see that neighborhood. In that neighborhood - as well as my Cupertino neighborhood - there are some similarities. My

Cupertino neighborhood is primarily immigrants - first generation Indian or Chinese immigrants. But there are still some similarities.

**Nirav Tolia:**      Sure.

**Raj Abhyanker:**      The similarities are there is a small group of people who are highly engaged, highly active and highly [care] and a whole bunch of people that are passive recipients of that … So how do you get the passive people to take more interest and how do you get the active ones to really adopt…

**Nirav Tolia:**      Engage.

**Raj Abhyanker:**      Engage, right. So at a high level I see those challenges, right? Then beyond that, scaling from one neighborhood to another. You may be highly engaged in this neighborhood but the one next door to it is not. So how do you move from one to other and getting the specific governments involved, the specific clubs involved - the Rotaries, the Lions Club - people like that. [There's a] right track. Can you think …

**Nirav Tolia:**      Yes, I think it's like most really good ideas. The idea and the solutions that the idea requires, it doesn't take a long time to understand that there is what we call a founding member or a set of leads in each neighborhood - like no one needed to tell us that. One day at work and we would realize that just from interviewing people if we didn't know it ourselves. In our case we knew it ourselves because two of the founders were those people, right? Getting the civic institutions involved, there are pros and cons frankly.

Some people don't like to hear from the city government. The police departments don't really understand how to communicate in a high signal to noise way. But all of these things are sort of [challenges]. Groups that have their own distinct memberships that are sometimes within a neighborhood, sometimes across neighborhoods - that's a key way of growing this thing as well. Being able to communicate with people maybe outside your neighborhood. There's something there that we're testing right now…

**Raj Abhyanker:** Every city has - like Cupertino - the city government maintains a list of [unclear]…

**Nirav Tolia:** Yes, yes - the CERT guys, the NERT guys, the Neighborhood Watch guys. We're - it's all sort of - anyone that we've interviewed or talked to that has spent much time on this, they all basically say why don't you focus on schools? Why don't you focus on local organizations? Why don't you focus on government? These aren't - the hard part is not knowing directionally where to go. The hard part is understanding okay, if the end point is here and we're here, we know we need to get there but is it this way or is it this way or is it this way? This - the function of actually getting there - the difficulty is not getting there because eventually you will. It's how fast and how much money does it take because ultimately…

**Raj Abhyanker:** [unclear] activation, adoption and … I think you've done a great job at activation - [where to tell people to join/ready to tell people to join] and then having those 10 people that really champion it [unclear] approach, right? It's a slow growth approach at the beginning but it's the right one to take.

**Nirav Tolia:**     It works in some places. In other places it doesn't work as well. But you know, this is - I think that - you know this because you've worked on the concept - the number of insights that you gain on a weekly basis when you're working on something fulltime, it's sort of non-linear. It's not like if you say I'm going to spend a day a week - we've all had the people who are like I'm going to spend a day a week on this type stuff. It's not that you get one seventh the insights if you spend one out of every seven days. It's non-linear because these things - it's a complex system. You suddenly have 11 pieces of context and it's that twelfth piece that helps you align all the stars and say oh, I see what we need to do. If you only have six pieces of context you're just never going to get - you're just - so the example of Facebook…

**Raj Abhyanker:**      The other really important thing I'll share with you is that when I ran for city council, the city government in the counties - the Santa Clara County Registrar's office will give a politician access to the voter list - everyone that lives in the city - who has voted in the city. In that voter list there's a column for email - because if you run for political office, you are not subject to the [unclear] because it's not a commercial purpose. So essentially…

**Nirav Tolia:**     I know - because when you started your neighborhood and you sent out 3000 emails, we got hundreds of angry users. How did you get my email? I don't know this guy. So we definitely - we felt some of the ramifications of that.

**Raj Abhyanker:**      So the [unclear] doesn't apply to politicians. So essentially politicians that run for local office have a clear objective to get to know as many people as possible. Some people will be happy, some people won't be happy - just as they are. You have people that if

you - then you have people that ... I have lots of people ... have a lot of people that ... We polarize people. But that's part of being a public person, right?

**Nirav Tolia:**     I'll give you - yes, yes.

**Raj Abhyanker:**      Essentially anyone that becomes a public person you can have [unclear]. On a micro scale local politics is just as nasty and difficult as national politics ... So there's a paradigm that exists of how that's ... whether it's going door to door and leaving hangers on people's doors ... 3000 doors. Also having a way to cross-promote that inside those physical experiences.

**Nirav Tolia:**     It's a great point. I think in terms of the fertile ground for driving adoption it makes a lot of sense. One thing I'll share with you - this is neither right or wrong, it's just sort of one of our [true norths] - we decided from the very beginning that the sorts of things we wanted to try to get people to talk about, we wanted to try and gear them towards things that would be community building, versus pole - you used the word polarizing. We use the word fragmenting. So we actively said - we get probably a dozen biz dev enquiries from religious institutions every week that say we want to use this platform for this.

We had a guy come in and say I'm responsible for some large amount of funding around the upcoming campaign and social media advertising. Will you let us advertise on the platform? We have no revenue and we have no plans for revenue in the near-term so we wouldn't do it anyway. But if we were generating revenue, we would have made the decision, as difficult as it is - we're not going to actually do anything to encourage politics, political speak, local elections - not because we don't think ultimately that will be a big piece of the puzzle. That's a big piece -

if one of the things that one of these services does is engage people locally it's a good thing. But in this nascent stage it doesn't - it's tough.

**Raj Abhyanker:**      The other thing is they're activity based groupings in neighborhoods.

**Nirav Tolia:**    For sure.

**Raj Abhyanker:**      So there's too much traffic down by the school or [unclear] road block … All the people that are immediately around that area are immediately engaged - highly engaged. Then you go away and then the next thing comes up. It could be in two different … you've got a bunch of people here that don't care and you've got … around this particular street or this particular gate … a walkway that all of a sudden are really engaged. No one else cares because people that do care have a mission to make sure as many people they can convince care as possible.

Sometimes you create these factions where - in Cupertino we had [unclear] - we had this one trail access going to Blackberry Farm. One side of the trail people did not want it at all. The other side, people really wanted it. There was this bitter battle. Their main goal was to try and get as many petitions as possible. So giving the neighborhood residents themselves the power to organize around [their activities]…

**Nirav Tolia:**    Sure - groups of some sort…

**Raj Abhyanker:**      …is a [crucial power] because then they go out and get the signatures …

**Nirav Tolia:**    One of the things we've done - I mean, this is really - the thing that you're describing was half of the genesis of the idea, which is a platform for issues. That's actually

what we call them internally. The other 50 per cent of the genesis of the idea - I think you'd find this interesting because maybe this was less a focus for Fatdoor - maybe it was a big focus, I'm not sure. But engineers have this longstanding we hate craigslist - we love craigslist but we hate craigslist. We love it because it's really useful. We hate it because the UI looks like it's stuck in 1900 and this and that. So one of the - the two things that came together to create Nextdoor were partly a lot of these community issues that you're talking about. But in large part it was how do I sell an old pair of skis? How do I actually find a roofer - et cetera. So I think - again, something…

**Raj Abhyanker:**      [It's like garages], right? So my garage is full of … Most people's garages have all kinds of stuff. So there's city-wide garage sales that the city's organized.

**Nirav Tolia:**      Sure.

**Raj Abhyanker:**      That's a big community event. In fact, they'll publish a map of where the garages are and stuff like that. But on a day to day basis there's just a bunch of stuff in my garage that I would just rather give away, you know…

**Nirav Tolia:**      Or maybe lent [unclear]

**Raj Abhyanker:**      Yes. So people put it on the side of their street … carrying it out is … exercise … So I just want somebody to come pick it up. I'm too lazy to go use Google and I'm too lazy to use…

**Nirav Tolia:**      Then the great thing is one man's trash is another man's treasure.

**Raj Abhyanker:**        Exactly. That's so true. My father, he makes more money taking

computers that businesses have - so for instance Coca Cola. He went into Coca Cola and said

okay, we're going to upgrade all your old Macintosh Pluses to Macintosh SEs. We're going to

take all your Macintosh Pluses back and we're going to give you [unclear]. They're …

**Nirav Tolia:**     Yes, they love…

**Raj Abhyanker:**        …because it goes to excess. The money that you make on the parts -

sometimes the parts of the whole of that computer is a lot more profit than the three per cent

or five per cent…

**Nirav Tolia:**     Than the sum of the parts, yes.

**Raj Abhyanker:**        Right. Some of the parts are worth more than the whole. [unclear]

reverse logistics thing assuming the disassembly …

**Nirav Tolia:**     This is actually why when you send in an iPhone and you get a refurbished one

back, you think you're thing is broken because it's got a scratch right here. But in actuality it's

the GPS thing inside here that cost them $80. This thing on the front cost them $0.80.

**Raj Abhyanker:**        The first time I had - when I moved to Silicon Valley I had the same idea

round reverse logistics - because I grew up [in the computers]. But some of the parts are worth

more than the whole. So I got this job at HP in strategic planning and modeling … to come up

with a new internet site. It raised a lot of money too. There was a major … It was called …

**Nirav Tolia:**     [I remember].

**Raj Abhyanker:**        It's basically there's a patent I have that's issued for reverse logistics

optimization, where you basically list something as … computer on their website and it

automatically looks at the [build/bill] of materials of it and explodes the [bill of] materials.

**Nirav Tolia:**    There's a display. There's RAM. There's this, there's that.

**Raj Abhyanker:**        Right. So you are simultaneously listing the whole and their parts so

people can then see which one is worth more. There's a disassembly factor [unclear] aggregate

… But that here in the neighborhood context is really - I just want someone - it's [freecycle],

right? So people have this recycle in the neighborhood and it kind of works. But there has to be

a more efficient way of getting those things out, right? So one thing we thought about with

Fatdoor is … garage creator.

So you'd create a garage. It's a fun thing to do for users. It's not boring. So you have this

template of items of things that are in your garage and you can move them into garage, right?

It's kind of a semiprivate garage but this is the stuff that I have in my garage and you organize

your garage so you know what bag is there. You would know yourself that my garage has

$20,000 of stuff in it, of which $8000 I don't really need. I might as well [unclear] give it to

salvage … and donate it. You can do that a lot easier nowadays …

**Nirav Tolia:**    Sure, sure.

**Raj Abhyanker:**        [unclear]. You basically have this garage creator and that garage creator

has a different visual experience to listing items for neighborhoods.

**Nirav Tolia:**      So look, you have a lot of great ideas. I don't want you to tell me anymore of them, given that we've thought about a garage as well but now for me to say that you can say you gave me the idea et cetera - not that you would. But just from an appropriateness standpoint I don't want you to share stuff with me that you feel is yours that I may or may not have, because that's sort of why we're in this situation, right?

**Raj Abhyanker:**      Well - I mean, those things, like I say, have nothing to do with you, okay - personally would have nothing to do with you. You have nothing to do with this content - which I want to succeed.

**Nirav Tolia:**      So here…

**Raj Abhyanker:**      So the thing is even this garage [stuff] is in my patent application of 2006, which I think is the issue - one of which is the issue. So - but none of this stuff really saw the light of day. The mailing of postcards is in a patent application of [unclear] it's called … which is this way of sending [mail to mail] postcards. So [if] you are executing really well. I want that - I want this concept to succeed.

**Nirav Tolia:**      So I think I would enjoy working with you, both because I think we do have a lot in common - even throw this aside - I think we have probably similar sensibilities on a lot of things just based on our backgrounds and based on our experiences. Life's too short to not spend it with people that you like, people that you respect, you can learn from and that sort of thing. I feel that way about you. So that's one thing. I think in addition to that you've thought about this a lot. You don't know everything I know for sure because now I've thought about it a lot as well, right?

I'm probably more current on this stuff than you are. [Patch] is now doing a new version of their website that's basically Nextdoor - or Fatdoor or whatever you want to call it. They've taken many of the approaches that you're talking about in terms of creating distinct channels for different groups. So there's - we'll see what ultimately succeeds, right? We have a set of things that we believe are most important and we think everything else is - not noise but they're sort of foundational pieces of the puzzle.

There are things that on the margin add five per cent, 10 per cent - whatever. But if you think about Goggle as a search engine - relevance, speed and scope. Everything else valuable but it's not like - if you didn't have great relevance, if you didn't have an index that was bigger than anywhere else on the web and if it wasn't really fast the thing wouldn't have succeeded. So we have our list of three things or whatever. We'll continue to get super deep on those things. So I think you have a lot of specialized expertise that can help us refine that thinking and expand it.

**Raj Abhyanker:**       Yes. So basically I'm not interested in money. I'm interested in being part of [inaudible]…

**Nirav Tolia:**    No, no - I know [inaudible]…

**Raj Abhyanker:**       [unclear] so that's number one. Number two is I don't want to undo what you've already done. I want to contribute to it. I don't need to be always on my own. I think I can add a lot of value … I can dedicate a lot of time to things that I'm passionate about, like you can. Your son, your wife, your … - I can dedicate that equal energy to the things that I'm passionate about. There's no doubt in my mind that I'm very passionate …

**Nirav Tolia:**      No doubt in mine either. So I think the gist - so let's assume for a second that what we're having a discussion about now is how can we work together. I think that the - one thing you said that proves challenging from a logistical standpoint is when you say I want to be an equal partner, whether that means you want to be a co-CEO or you want to be a member of the management team…

**Raj Abhyanker:**      I don't want [to be a co-CEO].

**Nirav Tolia:**      …or you want to have say an amount of equity or whatever…

**Raj Abhyanker:**      I think you're a fantastic CEO. I think [unclear] CEO. I think I could work for someone like you because I respect you basically. I can respect - I can work with people that I respect. I'm a creator. I'm an innovator. I'm a developer. I … I'm a product person. I am not a CEO. Even with Trademarkia, I have a COO who's really the CEO who executes. I think I definitely do not want to be a co-CEO.

**Nirav Tolia:**      Well, let's talk about the path of getting you involved. So today you're not - you're involved in an antagonistic way. Again, I'm not characterizing you as an antagonizer. I'm just saying that from the company's perspective you're not neutral and you're not friendly. You're unfriendly. Where we might want to go if it's mutually beneficial is you're living and breathing - maybe not at exactly the same level as everyone in the company - but you feel like it's part of you.

**Raj Abhyanker:**      I want to breath - live and breathe [it]. For me it's like all or nothing. I don't ever breath half way. I put my heart and soul into it, right? So it's not - in fact, I would

argue - I would live and breathe it as deeply as I could, given that my first priority is my family, my wife, my kids…

**Nirav Tolia:**      Yes. So logistically - again, sort of - I'm giving you sort of food for thought - both of us are going to have a lot of food for thought after this meeting. So if I think to myself okay, tomorrow you're now a member of the team - whatever that means - whether it's fulltime, part-time or a board member - board adviser - whatever. It can be any of those things. What would it take to get there?

**Raj Abhyanker:**      So it's not money. As I said, I'm not interested in money.

**Nirav Tolia:**      So logistically - no, I get that, I get that.

**Raj Abhyanker:**      So what I want to happen is to be part of something that's successful. It's not just any concept. It's a concept that I've really believed in for a long, long time. I don't know the details. I haven't thought - the reality is that I also seek the truth.

**Nirav Tolia:**      Yes.

**Raj Abhyanker:**      I don't know you and you don't know me. It's like the first time we're sitting down and meeting. I know the facts as I see them and perceive them in my eyes.

**Nirav Tolia:**      Sure.

**Raj Abhyanker:**      You know the facts as you see them and perceive them in your mind. I think there's a value in seeking the truth and the peace that comes from seeking the truth. The

discovery phase of things is where that truth comes out. So I'm inclined to try to figure out what happened. I want to do it in a respectful way but I really need to know, right?

**Nirav Tolia:**     Yes.

**Raj Abhyanker:**      That's been the primary motivation [inaudible] because I would - like I said, that's all I'm trying to do.

**Nirav Tolia:**     The good news there from my perspective - it may not be good news from your perspective depending on what you ultimately want the truth to be - the good news from my perspective is that I think that what you will find, however that process takes shape, is exactly what I told you - which you now need to absorb and you need to think about. But to sum it up again, there was no transmission of your idea to our team.

**Raj Abhyanker:**      It's irrelevant [unclear]. It's irrelevant what happened with Benchmark and their board, [which is the truth I seek], right. There's no question about that, okay? The concept itself and the people executing the concept, I have no animosity towards. In fact, I have a lot of respect for - because that's a concept I don't want to destroy - I'm not in the business of destroying things. [unclear] [want to succeed]. So from that perspective I still seek the truth and that's why we're looking to [inaudible]…

**Nirav Tolia:**     I guess the point I'm trying to make is the good thing is I think when the truth comes out you will find that you weren't wronged the way you thought you may have been wronged. Whether that makes you feel any better about the fact that someone else is executing on the same idea or not, that's a different conversation altogether. But I think…

**Raj Abhyanker:**      I don't care about that.

**Nirav Tolia:**   Well, then you'll be…

**Raj Abhyanker:**      The reality is I don't care about that. It's an execution oriented business in an execution oriented world.

**Nirav Tolia:**   So you'll feel really good…

**Raj Abhyanker:**      In fact I hope that Jennifer will be able to [execute the way that I want it to be executed]. When they changed the name to … I was first in line to say look, I'm going to rebuild Fatdoor. I went to the board. I got their approval to rebuild it. I got a license to rebuild it. Now I basically - the way I see it, I want the concept - I've never not wanted the concept to now succeed. If there's any reason at all that Jennifer doesn't want you to talk to me, it's because I completely [unclear] before she changed concept advocated to the board - [I owned] 27 per cent of the company, even … while she was CEO - to keep the original Nextdoor and Fatdoor concept.

The neighborhood focus was really important. Nonetheless, the past is the past. There is no animosity towards [that] - towards the - where we are today, because I would rather be here today with the Nextdoor website or someone trying to make this really work and change the world than in a place where it still hasn't been done. So - especially if it's being done by people who are intelligent, creative, execution-oriented and who know how to build internet companies and have proven records of success - and are showing a path forward which I believe is the right one.

**Nirav Tolia:**     No, I appreciate that.

**Raj Abhyanker:**        Why am I upset about that? [inaudible]…

**Nirav Tolia:**     No. It…

**Raj Abhyanker:**        I'm not upset about that. What I am upset - I'm not an angry person by nature. I just want to see the truth and I want to be part of something that [I've worked really hard on].

**Nirav Tolia:**     So look, let's talk about both of us then. So in seeking the truth, you need to figure out - because this is sort of your thing - I know what the truth is - relative to the notion of the idea was stolen, I know what the truth is. I'm very - I sleep very well at night…

**Raj Abhyanker:**        Well, that's part of the reason we dropped the lawsuit - I mean, I didn't want to go down that path that soon and that forward because I didn't really have a chance to talk to you [inaudible]. We dropped it without prejudice. We didn't bring it back. I didn't have any intention or desire to bring it back. I made that decision against the wishes of everyone around me, including my own attorneys who were like again, let's go for blood. Where we are right now is a trademark dispute, right?

**Nirav Tolia:**     Sure.

**Raj Abhyanker:**        So there's no cause of action related to ideas of…

**Nirav Tolia:**    So let's talk about the name. If the [true] [unclear] name is did Prakash actually come up with the name independently without reading anything relating to Fatdoor, Nextdoor - et cetera…

**Raj Abhyanker:**    But it's a matter of discovery, okay - so it's a matter of discovery. Will the discovery help get closer to not necessarily just the origins of the name but rather, what happened to my issues with Benchmark in a manner that Google is okay with, in a manner which doesn't require them to get their general counsel's approval, which - the other way - they'd just rather sit on the sides.

**Nirav Tolia:**    Sure, of course. So anyway, that is what it is. You need to think about what is ultimately going to get you the peace of mind that you're seeking.

**Raj Abhyanker:**    I've already made it clear. So what I want is a - first of all, it doesn't work if you don't see any value in it or if you hold animosity or grudges - it doesn't work. No matter [might convince you]…

**Nirav Tolia:**    So the thing about - the thing…

**Raj Abhyanker:**    It has to come from you because it can't come from me - because it's your company - right?

**Nirav Tolia:**    So the thing that I'll tell you - please take this in the spirit that it's given, which is I'm just trying to be transparent - I think that filing a lawsuit and a lot of the things that were written in the lawsuit - I understand that the process of a complaint needs to be as extreme as possible. I get that. I understand that that's the game. I think that that was a very - so if we

think about let's work together, we've got to rebuild - we didn't know you. We really didn't

know you. The first exposure we had to you - even your history with the idea and all that stuff

came through the complaint. The complaint was embarrassing, it was painful, it was - it was

emotionally hurtful - I mean, just to us personally. To Benchmark, they couldn't care less. But to

the founders of the company - again, I'm just sort of telling you just so you have perspective - it

was emotionally painful. So to now…

**Raj Abhyanker:**       The amount of emotional pain for me is also equal.

**Nirav Tolia:**    I get that. But…

**Raj Abhyanker:**       It really starts back in 2007 when I was sitting there selling my clothes on

craigslist.

**Nirav Tolia:**    I get that. But I think to be empathetic, I actually didn't have anything to do - I

didn't know you in 2007. I wasn't working on this. I mean, I would never have wanted that to

happen to you. Honestly, I wouldn't want that to happen to anybody but I certainly wouldn't

want that to happen to somebody who I have a shared background with. I would never want

that to happen to you and I would never do anything that would put you in that situation. The

difference - again, just to be empathetic - the difference is the pain that I felt and my

cofounders felt, that was instigated by something you did. Now, why you did it and whether

that had anything to do with us or other things, I get that part. But I'm just sort of trying to help

you understand because let's assume for a second that…

**Raj Abhyanker:**        The organizational dynamic issue. How do you bring this guy that sued us all of a sudden working [unclear].

**Nirav Tolia:**        Yes. I think it's possible…

**Raj Abhyanker:**        [It's a problem].

**Nirav Tolia:**        I think it's possible but it's not binary. So it's not one day you're suing us - I understand the complaint has been - you've withdrawn the complaint. You can bring it back - I get all of that. But right now your identity in the company is this is the guy that sued us. Regardless of what happened, ultimately…

**Raj Abhyanker:**        [inaudible]

**Nirav Tolia:**        …this is the guy who sued us. So for me as a credible leader - as a credible leader not just of my cofounders and my board but to my employees who I care about deeply - I need to help them come along the journey of establishing trust, establishing affection and establishing a joint, shared vision. That's really sort of - to me in some way that's the path. It's like well, can we trust each other? Do we actually respect each other? So trust and respect are different. Then the third thing is okay, do we want to link hands because we have a shared vision for the future where the incentives are aligned?

They may not be aligned in terms of quantity - I mean, you may not own as much of the company as me, as someone else or whatever the case is. That may be an issue as well. You may own more. But the point is at some point me and the lowest guy on the totem pole, we

trust each other, we respect each other and, if this thing works, we'll both be rewarded. I'll be rewarded a lot more than he will but that's just sort of the way the chips fall.

**Raj Abhyanker:**        [unclear] [worked] for me at this point is I have basically a cash machine. [It's that] -[is] the impact on the world.

**Nirav Tolia:**        Yes.

**Raj Abhyanker:**        It's not - I don't … an exit.

**Nirav Tolia:**        Yes - no, no - look, I appreciate that. I think that it's - this does have a great opportunity. It's far from being real. You think about…

**Raj Abhyanker:**        Right - I know. It's a lot of hard work.

**Nirav Tolia:**        …like when you started Trademarkia, who would have bet on it being where it is today? No one except for you. Even you probably had some doubts. If we were having this conversation three years from now you probably will take that $8 million to $20 million, $50 million or whatever it is. I think you're - I'm a big believer that businesses have different cycles. One hard cycle is simply going from concept to something. Another hard cycle is testing it in the market.

Another hard cycle is okay, you've tested it in the market - can you get adoption? The next hard cycle is can you get mainstream adoption? The next hard cycle is can you capture value for the value that you're creating? Then the last hard cycle, which never ends, is how big can it get? So you're pretty lucky because Trademarkia is in a very different phase than next door. You're in the phase of how big can you get? The idea is now real. You've tested it. The market has

actually appreciated it. You've found a way to capture value. Now it's just a question of okay, you're the fifth largest legal site on the web - can you be number one? After that…

**Raj Abhyanker:**        That is less important to me [unclear] I'll tell you, because we already transformed the legal industry in the trademark world. By this time next year, my little law firm and Trademarkia would have filed more American trademarks than any law firm in the history of the United States…

**Nirav Tolia:**     Wow. [That's crazy]

**Raj Abhyanker:**        ...in the entire history - in its 230 year history. So basically we've protected more small business brands than anyone. That's just in the US. There's probably eight countries where we're in the top five trademark [filers]. In the Europe we're the biggest trademark filer. In China we're in the top five now.

**Nirav Tolia:**     Wow.

**Raj Abhyanker:**        So basically we've got this local - the main problem with it is localizing it. [Kind of boring to localize] - I could do localization…

**Nirav Tolia:**     I tend to be more of an operator so - it's funny because I think you and I in terms of our sensibilities, you're probably a lot more interested super early. I - one of the reasons I started a company after Epinions was - because of the mistakes that I made myself, I was not able to see that. I was going to be the CEO of a public company. Nothing that I had done on my resume was impacting my performance [and opinions] - actually, those are two distinct things. What happened at Epinions, that was just stupid enough to make the resume - which, by the

way, was very stupid, wrong and all that. I take full responsibility for that. But that had nothing to do with running Epinions.

**Raj Abhyanker:**      Sure - of course.

**Nirav Tolia:**    Now, it gave people who were antagonized by Epinions an opportunity [by which] I understand…

**Raj Abhyanker:**      I understand … Look, I've done - people have been upset with the way I have worked. I ran for city council. I was against building homes on the neighborhood hill and cutting down a bunch of old growth trees … But now all of a sudden … in the world. We have … 10,000 trademark … the name of the firm was my name. So how is it that I get the [unclear] the one upset guy out of the 10,000 other ones that are happy, who's suddenly knocking on our door or something. [I don't like to see that].

**Nirav Tolia:**    Yes. The point I'm making is I…

**Raj Abhyanker:**      So the bottom line is I - everybody is creators or targets - innovators or targets. The more successful you are the bigger the target [you become]…

**Nirav Tolia:**    For sure, for sure.

**Raj Abhyanker:**      so I understand that just as equally as you, okay? But I don't - you don't have to explain it to me. I feel that same…

**Nirav Tolia:**    I make - I made some mistakes and I had to pay for them. As a result…

**Raj Abhyanker:**      [You do, you do].

**Nirav Tolia:**    …something that I wanted to do deeply, which was - I'm the kind of person where I actually feel like I'm self-actualizing if I can achieve my potential, whatever it is. One of the things that - just sort of a personal thing unrelated to any of this conversation - it's probably not even interesting to you but I'll say it anyway - I am very committed to figuring out can I be a successful CEO from inception to - through these phases that I talked about? Idea to conception - conception to actual product et cetera. One of those phases is taking it public. Then the next phase is maybe it's a billion dollar in revenue company - a billion dollar in profit et cetera.

So that was something that was - that I was unable to do because of mistakes I had made in the past. Certainly my ambition for next door is not to sell it to the first person who comes knocking. People come knocking all the time. Actually, interestingly enough, there haven't been a lot of knocks. So the value that you perceive and the value that I believe really is there, we're still very early - what that tells me is we're still very early. It's not like Google. If Google felt like Nextdoor was the next big thing, they would probably look at the patents that they own as a result of the Dealmap acquisition and they would be more aggressive [about something]…

**Raj Abhyanker:**    I have [unclear] with you … Google's a part …

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**    It doesn't really matter. The reality is execution is key. I can make Google our best friend very fast, especially Nextdoor's best friend. I have a very good relationship with Google - with the company and - even - a lot of my old attorneys are in their legal department now. I think that doesn't matter at all because it's the concept is what we unite around, right?

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**        There's a past, there's a future and there's a concept - right?

**Nirav Tolia:**    Right.

**Raj Abhyanker:**        The concept is a great one. The execution, I applaud you for it - I mean, I don't think that I could execute [as well as you have].

**Nirav Tolia:**    Well, I appreciate that but there are probably - there are definitely people out there who could execute better than we have, right? So you're always trying to get better.

**Raj Abhyanker:**        The idea is now to try to figure out where you are and where you want to be, right?

**Nirav Tolia:**    Yes. I think the question…

**Raj Abhyanker:**        I can help in that process.

**Nirav Tolia:**    So that's really the thing that I would ask you to think - so what I'm going to do is I'm going to go back - there are sort of two things that we've laid out together. One is a search for the truth, which you have to - you have to help me understand how to get you some closure on that because I don't actually understand the system. If it's just discovery - awesome - we'll do the discovery as it's mandated by the system. But let's put that aside for a second, because I think that's less - I honestly think it's less important.

**Raj Abhyanker:**        The discovery, what happens is there are depositions in that discovery.

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**       People are going to depose, largely [unclear]…

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**       Even our own founder - our own cofounder to our own board, right?

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**       We're searching for the truth, right? Yes. Like I say, I have no interest in destroying [inaudible].

**Nirav Tolia:**    So - look, anyway, that's one thing. The other thing is can we work together on creating a reality for the vision that we share - because I'm very confident that when you do your discovery for truth - I don't know what Benchmark got but they didn't think enough to tell me how to build this company. The never have and, frankly, they never will. That's not the way these guys work. What they tend to do at an early stage I believe because remember, we're not like Pinterest where we got to 20 million users and we can raise money. They're betting on a person. They're betting on a collection of people. They're betting on oh, he figured out something related to X.

Maybe he's going to figure out something related to Y. They funded me on Epinions, they funded me on Fanbase - okay, fine, if he wants to come up with something else let's vet it a little bit but then let's go. We didn't have to raise money from Benchmark for Nextdoor - we didn't. They've never [let around] for Nextdoor. But anyway that notwithstanding I'm confident that once you go through that process you will find that there's no connection between what they did and our - if you want to say we passed the baton - you passed the baton to our team,

there was no Benchmark taking the baton out of your hands and putting it in ours. I'm confident you'll find that. But that - let's throw that aside for a second. Let's assume that that happens in due process and that helps you feel better about the way this has gone down. But now let's talk about the other piece, which is not about what happened in the past. It's about the future, right?

**Raj Abhyanker:**      Yes.

**Nirav Tolia:**      I think what we need to work on together is how do we turn foe into friend. Then from foe to friend to coworker - to partner. It's not a - I think that it's not a switch that can be flipped. I mean, I - my wife, she hated the fact that I was meeting you. She doesn't know you and she's a nice person. But from her perspective…

**Raj Abhyanker:**      My wife too.

**Nirav Tolia:**      So from her perspective it's like who's this guy - blah, blah, blah. So it takes - so now I go back to her and she'll say how did it go? I'll say you know what? He was a nice guy. I mean, he's got his issues, I've got my issues. But he's not a bad person. It's just a question of what's going to enrich our lives versus what's going to bring us down together. Can we find - the hard thing about the legal system and a lot of times the hard thing about life in general is it's a zero-sum game. I win, you lose. You lose, I win.

This is tough stuff. But I think it's worth it for us to think about is there a win-win. Here's the win-win in my broad mind - the company doesn't have to deal with the distraction of any kind of litigation or dispute, whether it's a trademark or whether it's a complaint. The win on your

side is you don't have to take something that was a source of pain for you and continue to feel like you have to lash against it because it's causing you pain so you have to react - because you feel like look, that's settled and I can put it to bed.

**Raj Abhyanker:**        Honestly, the pain is different than the fact that - I have no pain [to see us succeed].

**Nirav Tolia:**    Yes.

**Raj Abhyanker:**        Okay. I have only - admiration actually - to see [it succeed]- whether it's with someone else or - it doesn't really matter. The concept is succeeding - if it's succeeding - maybe it's not. Maybe there is a lot of things when you're in the trenches you've seen problems. But to see that happen is a good thing - to see where it's going is a good thing. I mean, when you [raised your] new round of funding, I was happy - I felt when you first - when I first emailed you … [unclear] my trademark. I emailed … the trademark. I was happy … that was great.

**Nirav Tolia:**    Yes, yes. So anyway - I mean, part of it is the company wins because it doesn't have to deal with that stuff. I think that's a win for you as well because you don't have to deal with that stuff anyway. But the bigger win is - the bigger win that we're trying to create is we've added someone to our team that can significantly increase our likelihood of success. The win on your side is you're now part of something which not only hopefully can be a successful realization of your vision but that you're actually helping get there. So it's not like you're a passive guy - maybe you want to be a passive guy because you're - hey, I'm involved…

**Raj Abhyanker:**       No, I don't want to be passive [guy]...

**Nirav Tolia:**      ...et cetera, right?

**Raj Abhyanker:**       See, a lot of new concepts - I want - I'm meeting [Fringo] right after this. I
want to be passive on it. They want me to be an advisor and help them with their ... - I want to
be very passive on that. This is not something like that. This is what I worked really hard for, you
know?

**Nirav Tolia:**      So I think the - so I appreciate that. I think it just means that the journey from
where we are to that, it's a little longer than if you said you know what, I just want to be
passive. Then maybe - so if we think about the journey as being from here to here, if the end
point is I just want to get this thing done and over with. I never want to see you again and I
never want to hear the word Nextdoor. Maybe we're right here - like this is the distant we have
to traverse. If the outcome that's really good is I actually want to be part of this in a meaningful
way where - maybe it's not dominating my life but I can engage deeply in a way that makes me
feel like I'm part of it, then that distance is a little greater. It's not impossible.

But we need to invest - I mean, things just don't happen because we say so and bang it
happens. It's just like execution - we've got to execute towards that. What are the ways to
execute towards that? Well, this is a step in that execution. I think this has been a good
meeting. This is a step towards that execution. Getting any kind of dispute behind us is a step.
Having you meet the rest of the team, it's a step. Going to a brainstorming session, it's a step.
These are the things tactically that make up the strategic heart of changing your relationship

with the company and the company's relationship to you from a source of pain to a source of pleasure. I'm happy to try to walk down that path.

But I think it's got to be - we both have to in some sense close our eyes and jump. It can't just be me, it can't just be you. It's got to be both. I think my style on this stuff is I try to be pretty transparent and open about here's what I don't think can happen today. So that's why I'm telling you I don't see - if I leave this meeting, I call up Prakash and I'm like hey, I just met with him. He's coming to the management team meeting on Monday. Prakash is going to be like dude, what…

**Raj Abhyanker:**        What's wrong with you.

**Nirav Tolia:**      Actually we have a great relationship. He'll just say, help me understand why - help me understand why it's come from here to there so fast. So it's just a process. We have to think about - I think what I'm really focused on - because it's unfortunate that we can't go back in time to when we first launched and when you first reached out - because basically here was us and here was you. We didn't know you. So then you sent an email [unclear].

We still have to go down a path at that point of who's this guy? Let's meet him. Is there a chemistry? Is there a mutual respect - et cetera. But we're sort of like the distance is not that far because in Silicon Valley this sort of stuff happens all the time. Then the complaint happened. The distance suddenly - it suddenly went … on both sides. The unfortunate thing is we have to make up some distance to get back to the place where cooler heads can say let's not focus on the bad. Let's focus on the upside.

Let's not focus on protecting the downside. Let's focus on the upside. When you say you don't wish harm to the concept I believe you. If I go back to Sarah and I say well, he doesn't wish harm to the concept, she's going to say help me understand this logically. The guy who sued us and basically accused us of stealing his idea and is now fighting so that we don't have a trademark approved - he says he doesn't want to harm the concept - I don't understand that [map/ math]. So look, there is a way to understand the [map], which I now have a better sense of…

**Raj Abhyanker:**       You have to be an entrepreneur, a founder and be really passionate about something to understand that. So if you understand where I'm at - from - that's where I kind of invested my time. I'm not [unclear] friend Rajiv. They've just been lawyers. I went to law school - they went to become lawyers. I became a lawyer after I was an engineer for five years - after being a programmer since I was five years old. I became a lawyer by accident because I wanted to protect inventions and I wanted to do things [inaudible]. I don't like [unclear]. I don't like fighting. I don't like litigation. I don't really need to make a billable hour rate. I really don't - I mean, I like creating something …

**Nirav Tolia:**     Yes. So - I get that. I think that the - again, I'm not the only guy on - the one advantage that you do have over me is that in many ways I can lead this decision on the company's side. But I've always believed this as being a CEO - I am a representative of a group of people.

**Raj Abhyanker:**       Right.

**Nirav Tolia:**     I have the loudest say and I have the biggest vote. But I don't have the only say and I don't have the only vote. Other CEOs - Steve Jobs - who acts like…

[Over speaking]

**Nirav Tolia:**     …totalitarian. That's just not my style. The reason that I like cofounders is because I want them to feel like we're doing it together - because I can't do it by myself.

**Raj Abhyanker:**     Of course, of course. That makes total sense.

**Nirav Tolia:**     So it's - again, all it does is it adds work - execution - to whatever we need to do. Am I saying there's no chance in hell that you're ever going to be involved in the company? Maybe people would have said when they first - the first day they read the complaint. If I would have said by the way, not only did he file a complaint but at some point we may have a conversation in the future about us working together, people would have looked at me like I'm as high as a kite. But time has passed - like water under the bridge - hopefully on both sides.

A search for the truth will be helpful. I think one of the reasons why we may feel so antagonized is because we actually know in our hearts that there was no transmission of idea. So it's one thing to say this guy is suing us and I don't think we did anything wrong - I mean, who cares if we got a couple of ideas from someone? That's sort of one position. But I want you to just imagine that if someone sues you and you say this is weird because Benchmark never said a thing about - right? That's a different position to come from. It's - and you have no way of knowing it, right? This is why the search for truth for you…

**Raj Abhyanker:**     Right.

**Nirav Tolia:**   …is important.

**Raj Abhyanker:**      So - the thing is - yes, exactly. The other thing to realize is that it's not that I didn't make an attempt to understand. It's unfortunate, whatever the reason is. So if I could take away changes in my life that I've made - mistakes - I would take them away. There's a lot of things I would change. But as I say, I understand what you're saying and I appreciate what you're saying. It makes sense and it's very good [that you want to involve] your cofounders and …

**Nirav Tolia:**   But actually, just so you understand - because I want to be…

**Raj Abhyanker:**      In my view I would not even be having the opportunity to be sitting here with you without the course that we've taken. Ideally, if we were sitting together the day after - sorry, the week after - would be a preferred outcome - maybe even in my mind I should have tried harder. Maybe I should have tried to…

**Nirav Tolia:**   Just so you know, I get blasted emails - unsolicited emails like literally a hundred a week. So even today someone may have sent me a really important email and I just don't have time to get to it. So…

**Raj Abhyanker:**      Believe me, I probably have…

**Nirav Tolia:**   The same thing, right?

**Raj Abhyanker:**      …like 600 emails…

**Nirav Tolia:**   Especially since I've had the kid, I'm more than bankrupt from the email inbox standpoint. So that was not a - I always would have - I'll just be honest with you. There was one thing about your email that sort of - when I first read it I thought, I need to be a bit more thoughtful before I respond. There was only one thing, which was - you'll understand this - I think in your email you may have said something like I would want to be a cofounder or something like that. To me - again this is not something you would know - this is a bias I bring to the table - founder to me is not a merit based title. It's a historical title.

So to me we have seven cofounders of Nextdoor. Have they all added an equivalent amount of value? Absolutely not. Are there people in that group of seven that added zero value? Yes, there are. But the good news is those were the guys who stuck around. They were - they at least were passively listening to the conversation. So I think when I saw that I thought, I need to be careful here because I have never met this person. This is before any of this other stuff had come up.

I have never met this person and it's a little odd that someone I've never met - again, from my perspective I'd never heard about Fatdoor, Benchmark and - again, if some of the stuff that you fear happened had actually happened then I can understand you sending me an email like that and I'm like oh gosh, it's the guy who Benchmark told me pitched them. I get that but that's not what happened. This was just like - I was like this is an email from a guy I've never met and I'm getting 500 emails saying congratulations on the launch of Nextdoor.

One of them the guy is saying he wants to be a cofounder. That's the only thing that sort of made me think huh, that's weird. Then I wrote to Jen Dulski saying hey, you may have noticed -

it didn't even have anything to do with you - I was like you may have noticed that we launched Nextdoor. It's a little bit like that thing you worked on - Fatdoor - and, by the way, Raj the founder of it reached out to me. That's all I said. She wrote back and [unclear].

But even if she said don't get back to him, that doesn't - I would have gotten back to you eventually, especially if you'd sent me another email. I would have gotten back to you. But unfortunately this is like a - this is just again like fate and chance. You're sort of spinning more and more and more aggressively in one direction and maybe I could have come in and mitigated and started spinning you in a good direction. But I had no idea. I was dealing with okay, I'm getting all these people coming in and talking to me about various things - who do I spend time with?

By the way, when you launch something nationally everything that's broke, suddenly it's like a burning fire. So anyway, the point of that is we can't go back now. But what we do has an impact. So the thing I was going to tell you is it's not just Sarah and Prakash. Benchmark is the majority owner of the company, again not because they funded Nextdoor. It's because they funded Fanbase and Fanbase became Nextdoor. So I don't have any angst against you going after Benchmark. If they did something wrong you should go after them.

I personally don't think they did anything wrong so if you come and ask me do you think they did anything wrong I'd say no. I think they have high integrity. But I'm not a VC frankly. I'm an entrepreneur. So I understand how these things happen, right? Personally I believe that any entrepreneur should go in and just expecting a VC - it's happened so many times. But anyway, that notwithstanding, the thing you need to understand is Bill is a director of the company.

Bill doesn't have any existing relationship with you. If all of a sudden he perceives you to be antagonistic, not just to Nextdoor but to Benchmark, it just makes my job harder. I'm not telling you this because I care about Benchmark. I care about Nextdoor. I'm telling you this because if I care about Nextdoor and what I care about is getting you involved, I need to arm you with every bit of information I can that will be constructive. So I think ultimately what it boils down to is the pleasure of being involved versus the pain of what you think happened and how do those things get mitigated?

I mean, I think it's a pretty simple - I'll tell you a funny story - when I met my wife, I'd never dated an Indian woman. I was firmly against it. You can probably understand some of this because you grew up in an environment where there weren't an Indians. I'd never grown up around Indians and I didn't want to be that guy who just marries an Indian woman because he's Indian. In fact, I resented the fact that when people would set me up with women they would just assume that I would want an Indian woman. I was like that's [bullshit].

I'm dating blondes. I don't care what people say because I want to choose people based on the chemistry I have with the woman, how much I admire her and how she makes me feel and this and that. It was actually a big downer with my relationship with my wife. I love her - I can't even articulate how much I love her. I knew from our first conversation that she was my soul mate. So this was not a I may be right but I'm not sure This was like every cell in my body was saying you're meant to be with this person. But there was that little piece of me that was like, oh okay, so now I'm going to be in the restaurant, there are going to be a bunch of white people around

and I'm the little Indian couple in the corner. I had it - I had angst about that. I had issues about that.

Ultimately the pleasure of being with her was so magnificent that the pain - I actually - when you talk about mission - I sort of made it my mission - I was like you know what? I'm a big believer in interracial marriage because I want to show people that if this - if we take a 20 year view - is going to be the norm. It's not going to be the exception. I want to have biracial children because I don't want children to feel like there's something wrong. I even sort of convinced myself that from a Darwinism standpoint biracial children from a natural selection are superior because they're taking the best of evolution - crazy shit right?

But basically it was a cause for me - it was like literally a cause for me. Where the - the chance that I would end up with an Indian was not equal. You would think it would be actually higher. It was lower. But ultimately the pleasure was so much bigger and it kept getting bigger, bigger and bigger. I was like, you know what? I'm actually starting to turn now. I'm starting to feel like there are all these benefits because we're both [unclear]. There's unspoken language. The religion issue with our child and what we name our child - all this stuff suddenly just snaps into place. Now, could it have snapped into place if I married Mary Jo Macbeth from somewhere? It could have. So I'm a rationalizer to some extent. I think all people are. But the point I'm trying to make is when you go down this journey - this is sort of...

**Raj Abhyanker:**       Excuse me - my wife grew up in Texas. She's...

**Nirav Tolia:**    Where in Texas did she grow up?

**Raj Abhyanker:**        Houston.

**Nirav Tolia:**      Okay. At least a bigger city than where I grew up.

**Raj Abhyanker:**        [unclear] oil company. So I - when I met my wife I knew that's the person I need to marry. I met her in San Francisco at a [NetApp] conference …

**Nirav Tolia:**      I would like to aggressively avoid [NetApp] and … and all those things.

**Raj Abhyanker:**        I would too. I barely made it. In fact, everyone was dressed up. I was not dressed up. I didn't even want to go. I just showed up because I had a friend there. She was right there. It's the most wonderful thing. The older I get - now I see our kids - more valuable …

**Nirav Tolia:**      So one of the reasons I met with you by the way is because initially the pain of - Fenwick's been saying why don't you just talk to this guy? What they've said from the very beginning is look, this is a personal issue for him. It's not just about the lines. Yes, we've seen the evidence so we believe that when the discovery phase happens and all this other stuff happens it's going to be fine. But for him it's not just about that. It's about being heard, being involved, being understood and understanding. I was like you know what? I can't understand a person who would throw a punch first without trying to put a handshake out there.

Now, you may say I sent an email - that was a handshake. But I would say okay, the handshake was [halting], the punch was pretty hard. It hurt a lot. But as time went on I said to myself you know, the potential upside of us working together is starting to become something. Before it was nothing. Now it's something. Then every day a little more, a little more, a little more - until finally I had the kid and I was like you now what? I don't need bad karma in my life. I don't need

people who feel like they've been wronged because of something I did or - I can't control everyone - or anyone - except for myself - especially my kid which I now realize.

I'm like time out and my wife's like he's eight weeks old. You can't really give him a time out. So what I did make a promise to myself of was I'll be able to sleep at night if I give it my best effort. This is one of my own values. So I don't know if we can get there but I'm going to damn well try. If you tell me it doesn't matter what you do I'll respect that. I'll be frustrated - whatever - I'll be disappointed. But I'll never be able to look in the mirror and say I didn't try. So that's really why we're here.

**Raj Abhyanker:**      That's the same reason why I'm here. That's the same reason why I filed a complaint. That's the same - I wanted to seek the truth. From the best I can see from my vantage is that I had a heavy price to pay. Essentially it's not something - as a patent attorney - as someone who [unclear ] internet company - it's self-funded. It's growing but it needs to grow more. Perhaps one day it can - or it just stays this little private company. It alienates a lot of people. But I felt that it was something that I owed to myself - that I needed to find out the truth.

**Nirav Tolia:**      I don't discount the price you've had to pay. What I'm trying to do is is there a bigger price that you could extract if we can flip this...

**Raj Abhyanker:**      As I say, I have a lot of respect for what you're doing with Nextdoor and I think you're executing...

**Nirav Tolia:**      I appreciate that.

**Raj Abhyanker:**      …well and better than I could have imagined this early on - having 3600 or whatever neighborhoods on there.

**Nirav Tolia:**   Five thousand one hundred and seventy two.

**Raj Abhyanker:**      Okay [inaudible]…

**Nirav Tolia:**   Not that I'm counting.

**Raj Abhyanker:**      Also approaching it with a focus on not numbers or SEOs - trying to keep things what people want in an environment where people don't know their next door neighbor. Also in a very heterogeneous America where you have all these different communities with different needs and different mentalities about what it means to be a neighbor. Some neighborhoods are very homogenous and there are some that are less - and bridging that gap and really transform not just this country but every country.

**Nirav Tolia:**   We believe that. Stronger and safer neighborhoods - I mean, that's the mission. When we hire people we say if you don't believe this in your soul you're going to get sick of working here because we all believe it. We believe that the world - we don't believe that your next door neighbors and your neighbors in general need to be your friends.

**Raj Abhyanker:**      Right.

**Nirav Tolia:**   That's not something that - we're not trying to replace the Facebook modality…

**Raj Abhyanker:**      Exactly.

**Nirav Tolia:**   …but we believe that the people you live around have something in common…

**Raj Abhyanker:** [Common ground], right.

**Nirav Tolia:** ...and that can help you solve problems. That can lead to a safer, stronger and happier existence. Who wouldn't want that? That's real. That's like a - that's not a Pinterest board that makes you - that could make you five cool things or an Instagram thing that makes you feel like this is a beautiful picture. This is, I feel, more secure - where I live. I feel better about my roots. I think that's the opportunity. It's really actually [neat the] technology has the ability to really impact the real world.

**Raj Abhyanker:** Right, exactly.

**Nirav Tolia:** It hasn't been the case for a long time on the internet - I mean, the stuff you're doing now, we call this all the time online to offline. So you're basically using an online platform to affect offline businesses. This is - we're trying to use an online platform - we tell people all the time, look, if people use Nextdoor as a jumping off point to meet in person, awesome. That's great. That means we've won. We don't need them to just have the conversations on Nextdoor. That's not what it's about. People don't know their neighbors, period. So - but there are a lot of good reasons to know your neighbors.

So look, I think we're completely aligned. We could spend 10 more hours on that and we wouldn't be any more aligned because we're already at a local maximum on that. It's really just a question of can we get a line on this other stuff? I think that from my perspective it's an open door but it's a door that's distant. It's not near. We need to step - if we can, we need to step towards it. I don't know that we'll ever close it. Now, if there's a complaint or it gets super litigious - whatever - then the door gets closed. That's actually logical. But I really wish that in

terms of the price you've had to pay - Rajiv, your friends and whatever other perception that you've had to take on because of this - I dearly wish that you didn't have to…

**Raj Abhyanker:**          He hasn't emailed me for nine months - after…

**Nirav Tolia:**     I don't even know the guy by the way. Never met him. Never met.

**Raj Abhyanker:**          Okay. I spoke to him - I said to Rajiv you need to tell your [friend] firm [unclear] program. I said listen, Rajiv is one of my best friends. His wife is my friend. I just saw his last weekend … Rajiv said there's nothing I can do Raj. I'm really sorry. Then I said fine … but I haven't spoken or seen him since.

**Nirav Tolia:**     I - I mean look, first of all I've never met the guy. Fenwick is the firm that took shopping.com public. So I have a long existing relationship with the people that are involved. They frankly fought…

**Raj Abhyanker:**          [unclear] - our kids play together … birthday.

**Nirav Tolia:**     The attorney - my attorney at Fenwick came to my wedding. So it's the same kind of thing. But they fought hard to represent - I was - look, I'm a lay person when it comes to matters of law. If someone comes to me and says you can't have Fenwick represent you because it's a conflict, I'm like okay, help me understand what that means. I'll pick another law firm.

But they fought pretty hard. That being said, let's hope that if we can make progress on this other front one of the nice side effects is you can Rajiv can have a reason to reunite as well - I would hope. Frankly, I know this probably seems really farfetched to you but I would hope that

at some point even you relationship with Benchmark or any of the people that you thought were part of this could also be repaired, because you're going to be successful for a long time and, whether you like it or not, so are they. So it's like…

**Raj Abhyanker:**      I don't care. Other people's success doesn't make me [upset]. I only compare myself to myself.

**Nirav Tolia:**     It's more about the fact that in this shared ecosystem - it's sort of funny. People ask us all the time, do you get a lot of neighbors that are being annoying on Nextdoor. I say well, you know we have the flag thing and we have a way for [leads] to look at flagged messages. There's a mediation … I said, but all that being said, no. We don't actually have a lot of neighbor conflict. In fact, we have hardly any, on the order of 20 basis points of all the messages about that. They say well why … I say well, I think that's a case because it's a real name, your address and you see these people.

**Raj Abhyanker:**      Exactly.

**Nirav Tolia:**     You can't just be nasty. It's like my mum - my wife always says you're a very angry driver. You tend to glare at people all the time if they cut you off or if they're driving slow. Imagine if your name was on your license plate. I wouldn't do it. We've all sort of had that opinion we're we've been glaring at someone and then we realize oh shit, I know that person. All of a sudden it turns into a smile. So in the same way, it's not that I would imply that you would wish ill-will towards anyone. It's more you're in the ecosystem and I'm in the ecosystem. The chance of us never having some kind of connection - our careers are going to span the next 20, 30 or 40 - maybe even more years - it's unlikely that we'll never have some point of contact.

It might be one degree removed but it's much better when that happens that the person in between us is not put in an uncomfortable situation. So I think what you're probably feeling in terms of - you used the word blackballed or whatever - it's more that it's not that the people who you would want to work with had anything to do with anything that happened. It's that they have existing business with Benchmark or future business with Benchmark and they can't jeopardize the optionality. So as a result they cut this thing off. I think what you want to do - I'll give you a personal anecdote - when all this stuff happened about my resume, the most painful thing for people who didn't know me that well was they were like I thought he was trustworthy but now all this stuff is coming out and he's not.

I don't really know what to believe - what really happened? What were the details and this and that. I made a decision that I was not only going to lead with I did this, it was a mistake. I wasn't going to make it taboo - like this is the first time you and I have ever spoken. I brought it up freely - because I said to myself look, I just want to take that off the table. If people ultimately figure out that I'm not a trustworthy guy, okay, [fine] on me - or maybe fine on them. But I'm not going to make this ambiguous thing be like a diaper on the table that no one is willing to touch. So in the same way, I think right now - I don't know this to be a fact but being in an ecosystem, I don't think people have any data about - like the people who you think may not want to work with you - I don't think they have any data on you.

That's not what's driving it. It's this unspoken, unresolved conflict, where they're like well, if I called Benchmark what would they say or if I called Fenwick what would they say? It's probably the same with [Rajiv]. So I would hope that one of the rewards that we can provide or that you

can gain if this thing gets resolved in an amicable way is that that ambiguity gets put to rest and you're like yes, I know you thought that I had - was on bad terms with Benchmark or … or whatever. But it's not the case. You can call … you can call Benchmark or what - that's what I would hope. I don't want someone going out saying this guy stole my idea - that's one of the reasons why I wanted to meet with you. You haven't heard it from me.

Now you've heard it from me now at the very least you can go to someone and say look, I don't know if what he said is true or not true but what he told me is that he didn't do anything. So at least from his perspective he's not the guy who's like he stole the guys idea and I'm not going to - I hope I got away. By the way, just as a point of reference, I do believe - this is my personal opinion - this is sort of gossipy - I do think Zuckerberg stole people's ideas. I think that as the evidence continues to come out it seems like there was something going on there.

So I don't know how he feels about that but whether it was a movie or whether it's not legitimate or whatever, based on what I've seen it looks like he did hear some ideas from people and deliberately mislead those people in terms of his propensity to go after those things. Then once he was successful it didn't matter. That's not what happened here. I'm telling you now, whether you believe me or not - whether it takes a discovery process, deposition process - we can go through all of that - but what I'm telling you is the same thing I'll tell you at the end of the process, which is I'm really sorry that a concept that you pioneered - probably you weren't even the pioneer. There was probably other people who thought about it as well.

But I'm really sorry that a person who worked as hard on this as you that the chips fell in such a way that you didn't get to pursue it. But that didn't have any ties to me. Whether the chips fall

in a positive way for me or not, they don't have anything to do with you. They have to do with my actions and my team's ability to execute, the market externally and what competitors do - all of these other things. I think that's what - I know that's what I will find.

But whether beauty is in the eye of the beholder to some extent - but anyway, the point of all of this is if we can get to that point where some of these prices that you've had to pay and that the company has had to pay can be overshadowed - they're never going to go away. I can't take away the fact that you betting on this concept cost you a shitload of life force, not just it wasn't just difficult, right? I mean, this is like your soul.

**Raj Abhyanker:** [I worked very hard].

**Nirav Tolia:** This is like your soul, right? I know that because I loved Epinions and shopping.com. When they removed me I didn't care that they were writing a New York Times article about the fact that I lied on my resume - yes, I cared about that - but what I cared about is the place that I wanted to go every day more than anything…

**Raj Abhyanker:** Right, exactly.

**Nirav Tolia:** …couldn't…

**Raj Abhyanker:** Exactly.

**Nirav Tolia:** When the story of shopping.com is told today, there is no mention of me. I don't miss that as an ego thing. I miss it as a that's not what happened. So I was at a hotel once in London and a guy came up and he said oh, you work shopping.com - I had a shopping.com shirt on - oh, do you work for shopping.com? He asked me do I work for shopping.com. This was

years later. I said no I don't. He said I do. Do you know about the company? I said well yes, I actually founded the company. He was like really? I never heard that. So that was - but I'm done with that. I'm over it. I'm happy that it's succeeded to some extent. Now I'm just trying to create a new future for myself that's about my wife, my kid and Nextdoor.

I think the great news for you is it cost you a lot but it's kicked serious ass since then. That's - that has nothing to do with Fatdoor, Nextdoor, [unclear], Dealmap - anything. Trademarkia is real. No one can debate that. You probably have a great family dynamic as well with your wife and two kids. You can put more than food on the table. You can put escargot on the table if you like and caviar. So I applaud you for that. I want to try to help you get some closure on this other piece because it's mutually beneficial. So let's figure out if there's a way to do it.

**Raj Abhyanker:**          Sounds good.

**Nirav Tolia:**     I think that's the - so it's sort of where we are.

**Raj Abhyanker:**          Well, thank you for meeting with me. [unclear] the next step, okay?

**Nirav Tolia:**     Okay.

**Raj Abhyanker:**          I'll give you my card if you're…

**Nirav Tolia:**     I don't do - the thing is I'm sort of paperless in general now with a kid. My house is so disorganized.

**Raj Abhyanker:**          You don't need it.

**Nirav Tolia:**     I would lose - [actually it's a cost to you].

**Raj Abhyanker:**          Do you know how to get a hold of me?

**Nirav Tolia:**      I know. I have your email. Okay, all right. So we'll talk.

**Raj Abhyanker:**          All right, sounds great.

**Nirav Tolia:**      Take care.

**Raj Abhyanker:**          Okay.

END OF TRANSCRIPT

# EXHIBIT K



# Adam Varro

Manager, Premium Services at oDesk

San Francisco Bay Area | Internet

Current   oDesk
Previous  Nextdoor.com, Facebook, Google
Education University of Arizona

**Connect**   Send Adam InMail ▾

500+
connections

★ Relationship   📇 Contact Info                          Added 1 month ago

## Background

### 📠 Summary

I've spent the last decade at the intersection of technology, culture and business, and have been fortunate enough to work with some incredibly smart and passionate folks along the way. My career has spanned roles in sales, services, product and marketing and has been propelled forward by my passions for learning, teaching and bringing people together.

A few things I've learned so far:
-Teams built around strengths are unbeatable.
-The one with the best data always wins the argument.
-Toddlers will laugh at pretty much anything.

### 📄 Experience

**Manager, Premium Services & Support**

oDesk

February 2013 – Present (1 year) | Redwood City, CA

▾ 1 recommendation

**Elena Krasnoperova**
Internet and Payments Executive

Adam is a real joy to work with. In the very first interview round he had with us at oDesk, he impressed us so much that we immediately invited him to a team lunch and made him an offer to join us soon afterwards. He's a wonderfully positive person... View ↓

**Sr. Product Marketing Manager**

Nextdoor.com

February 2012 – February 2013 (1 year 1 month) | San Francisco Bay Area

▾ 2 recommendations

**Justine Fenwick**
Senior City Strategist at Nextdoor.com

Adam is the kind of guy you want on your team: sharp, dedicated and collaborative. He is a whiz at analytics, personable and... View ↓

**Lesley Kim Grossblatt**
Strategic Innovation Leader

Adam is a joy to work with. He's full of positive energy, creative ideas and a can-do spirit. He's passionate and gets... View ↓

**Manager, Global Marketing Solutions**

Facebook

November 2010 – March 2012 (1 year 5 months) | menlo park, ca

As a Manager within the Global Marketing Solutions org, I managed a team who help SMBs take

# EXHIBIT L

This report is confidential and proprietary to JL & Co. and the Fatdoor

| FIRST | LAST | COMPANY | TITLE | NOTES | LinkedIn |
|---|---|---|---|---|---|
| Jennifer | Dulski | Yahoo! | Group VP, Commerce and Local | Sergio 9/6. Chandu 9/14. Bill 9/19. Chandu product demo 9/21. Sergio dinner 9/25. Maybe Hector and Rajeev if those go well. Jennifer would like | http://www.linkedin.com/profile?viewProfile=&authType=name&key=407452 |
| Andre | Haddad | eBay (ex iBazaar, P&G, Booz) | SVP Product | Sergio is a fan. Sergio 9/13. Chandu 10/5. | http://www.linkedin.com/profile?viewProfile=&key=37598 |
| John | Lilly | Mozilla | COO | interested, scheduling with Sergio. | http://www.linkedin.com/profile?viewProfile=&key=1269 |
| Rob | Goldman | ex Shopping.com/eBay | VP/GM | interested. Rescheduling with Sergio 9/?? | http://www.linkedin.com/profile?viewProfile=&key=177796 |
| Randy | Ching | ex eBay | VP/GM Classifieds | Sergio 9/?? | http://www.linkedin.com/profile?viewProfile=&key=36031 |
| Bryan | Schreier | Google | Senior Dir Online Sales and Ops | Sergio 9/13. Sergio: maybe better for investor/advisor. Chandu 10/1. | http://www.linkedin.com/profile?viewProfile=&key=5596673 |
| Michael | Buhr | StumbleUpon/eBay | VP/GM (up through Product ranks) | Sergio is a fan. Will take a look at site, think about concept and call JL on 9/24 | http://www.linkedin.com/profile?viewProfile=&key=825759 |
| Jim | Safka | IAC/IAC Investments | ex CEO of Match.com, now running West Coast VC for | Bill has heard good things about him. Setting up meeting with JL | http://www.linkedin.com/profile?viewProfile=&key=8736937 |
| Dan | Cohen | PageFlakes (ex Y!) | CEO | setting up call with JL | http://www.linkedin.com/profile?viewProfile=&key=586754 |
| Anne | Dwane | Monster.com | SVP/GM | Sergio is a fan. LM | http://www.linkedin.com/profile?viewProfile=&key=541540 |
| Allison | Mnookin | Intuit | VP/GM Quickboks | probably not entrepreneurial, enough consumer, but super smart/accomplish, but worth a call. LM | |
| Paul | Gardi | ex-IAC | former CEO, Advertising Solutions | trading messages | http://www.linkedin.com/profile?viewProfile=&key=7898882 |
| Josh | Berman | MySpace (NewsCorp) | COO | LM | http://www.linkedin.com/profile?viewProfile=&key=476288 |
| Jeff | Blackburn | Amazon | SVP Biz Dev, also GM for Search and Browse Teams | LM | http://www.linkedin.com/profile?viewProfile=&key=960627 |
| Jim | Bankoff | AOL | ex EVP Programming and Product | LM | http://www.linkedin.com/profile?viewProfile=&key=406122 |
| Ed | Fish | AOL | SVP, Premium and Subscription Services | need to check him out | http://www.linkedin.com/profile?viewProfile=&key=31005 |
| Erich | Hachenberg | Metacafe (ex EA) | CEO (was VP/GM Online at EA) | relatively new at MetaCafe; worth calling | http://www.linkedin.com/profile?viewProfile=&key=7523917 |
| Roger | Keating | ex TWC, AOL, Zatso | EVP, CEO | better fit for bigger company | |
| Alex | Kazim | Tokoni (ex eBay) | CEO (was Pres of Skype & Special Initiateves at eBay) | just recently founded his new company | http://www.linkedin.com/profile?viewProfile=&key=1860703 |
| Owen | Mahoney | EA, ex Pointcast | SVP Corp Dev | not the right fit | http://www.linkedin.com/profile?viewProfile=&key=29537 |
| Brian | Steel | ex Overture, IdeaLab, OnComm | President/COO | recently accepted CEO position at PodBridge | http://www.linkedin.com/profile?viewProfile=&key=1838136 |
| David | Lawee | Google (ex Xfire) | VP Marketing (co-founder/COO of Xfire) | not interested | http://www.linkedin.com/profile?viewProfile=&key=40176 |
| Simon | Rothman | ex eBay | VP/GM eBay Motors | not right fit | old resume on file |
| Brett | Taylor | Benchmark, Google | EIR, Group PM | starting his own company | |
| Sanjeev | Agrawal | Tellme, Google | VP Product | not the right fit | http://www.linkedin.com/profile?viewProfile=&key=458954 |
| Nirav | Tolia | Benchmark, Shopping.com | EIR, co-founder | ethical issues at Shopping.com (well publicized) | http://www.linkedin.com/profile?viewProfile=&key=8108 |
| Hilary | Schneider | Yahoo! (ex Knight Ridder, Red | EVP, Global Partner Solutions (GPS) | Big company background | http://www.linkedin.com/profile?viewProfile=&key=19030 |
| Michael | Dearing | ex eBay | ex SVP Marketing & Merchandising | Sergio is a fan. Not available until after 1/08 | http://www.linkedin.com/profile?viewProfile=&key=3501661 |
| Mark | Jacobstein | Loopt | EVP | now EIR at CRV and intent on starting a company | http://www.linkedin.com/profile?viewProfile=&key=118838 |
| Christopher | Payne | ex MSFT, Amazon | Corp VP Search and Shopping | good for search, not enough community | http://www.linkedin.com/profile?viewProfile=&key=1866895 |
| Josh | Silverman | eBay/Shopping.com, ex-Evite | division CEO Shopping.com (ex CEO of Evite) | | http://www.linkedin.com/profile?viewProfile=&key=2008 |
| Naval | Ravikant | HitForge/Epinions | CEO/Founder | not interested, referred Mike Speiser | http://www.linkedin.com/profile?viewProfile=&key=7335 |
| Sheryl | Sandberg | Google | VP Sales/Ops | not available until at least mid '08 | http://www.linkedin.com/profile?viewProfile=&key=7598750 |
| Jonathan | Rosenberg | Google | SVP Product Management | not interested in leaving GOOG | http://www.google.com/intl/en/corporate/execs.html#jonathan |
| Steve | Boom | Yahoo! | SVP Broadband & Mobile | committed to Jerry Yang to stay for at least 1 more year | https://www.linkedin.com/profile?viewProfile=&key=56982 |
| Rich | Riley | Yahoo! | SVP, Online Channel & Small Business Services | committed to stay at Y! for at least one more year | http://www.linkedin.com/profile?viewProfile=&key=1323709 |
| Steve | Kessel | Amazon | SVP, Digital Initiatives | not interested in leaving Amazon | |

| First | Last | Company | Title | Notes | LinkedIn |
|---|---|---|---|---|---|
| Mark | Britto | Ingenio (ex Amazon) | CEO | committed to seeing Ingenio through to exit | |
| Dan | Levin | Intuit (ex Replay TV) | VP/GM | too early stage | http://www.linkedin.com/profile?viewProfile=&key=1877228 |
| Brad | Garlinghouse | Yahoo! (ex Dialpad, CMGI) | SVP/GM, Community and Front Doors | not the right fit | http://www.linkedin.com/profile?viewProfile=&key=3807 |
| Richard | Wolpert | Accel, ex RealNetworks | Venture Advisor, Chief Strategy Officer | SoCal only | http://www.linkedin.com/profile?viewProfile=&key=5029340 |
| Steve | Banfield | Sony | Senior Vice President, Media Applications and Platform | not the right fit | http://www.linkedin.com/profile?viewProfile=&key=114745 |
| Amit | Shafrir | AOL | President, Premium Products | probably better for later stage | http://www.linkedin.com/profile?viewProfile=&key=222376 |
| Dave | Madden | Wild Tanget (ex NewsCorp) | EVP, Sales, Marketing and Biz Dev | locked into WT for now (expects exit to happen soon) | http://www.linkedin.com/profile?viewProfile=&key=1653417 |
| Thomas | Ryan | EIR at Bessemer, ex-EMI | EIR; SVP of Digital & Mobile Strategy and Development | deal/strategy background, lacks product chops | http://www.linkedin.com/profile?viewProfile=&key=32198 |
| Gary | Briggs | eBay (ex Pepsi) | CMO | Sergio: incredible marketer, but may not be as strong in Product | http://www.linkedin.com/profile?viewProfile=&key=185942 |
| Steph | Tilenius | eBay/PayPal | GM | Not right entrepreneurial fit | http://www.linkedin.com/profile?viewProfile=&key=40312 |
| Chris | George | PayPal | GM (?) | not right fit | |
| Dana | Stalder | PayPal | SVP | Not right entrepreneurial fit | |
| Scott | Garell | IAC | CEO, Consumer Applications and Portals | too early and strong pref to East Bay or City | http://www.linkedin.com/profile?viewProfile=&key=7869476 |
| Dave | Goldberg | Benchmark, ex Y!/Launch | EIR, ex VP/GM Music at Y! | too unclear to him how to kick start consumer demand/use | http://www.linkedin.com/profile?viewProfile=&key=73551 |
| Mike | Cassidy | Benchmark (ex Xfire, Direct Hit | EIR (former CEO) | pass.  Doesn't see "killer use case" | http://www.linkedin.com/profile?viewProfile=&key=9935 |
| Peter | Karpass | Intuit (ex Activision) | Chief Marketing and Product Officer | Too early for him. | http://www.linkedin.com/profile?viewProfile=&key=60234 |
| Scott | Banister | IronPort, LinkExchange, Overtu | co-founder/VP Product | no response. | http://www.linkedin.com/profile?viewProfile=&key=4275 |
| Steve | Parkis | Walt Disney/Disney Internet Gr | VP, Premium Content | no response. | http://www.linkedin.com/profile?viewProfile=&key=3933992 |
| Andy | Jassey | Amazon | SVP, Web Services | wants to stay in Seattle | http://www.linkedin.com/profile?viewProfile=&key=1523653 |
| Matt | Ackley | eBay | Sr Dir Internet Marketing/Partnerships | Sergio is big fan, smart, resiliant, thinks he could do it if passionate/committed.  JL LM, no response yet. | http://www.linkedin.com/profile?viewProfile=&key=524701 |
| Geoff | Ralston | ex Y! | Chief Product Officer | interested.  met Sergio 9/11, maybe better for Advisor or investor. | http://www.linkedin.com/profile?viewProfile=&key=327895 |
| Scott | Morrow | CitySearch | EVP Product and Marketing | interested.  Met Sergio 9/10.  Prob not the right fit. | http://www.linkedin.com/profile?viewProfile=&key=46476 |
| Mike | Speiser | Y! (VP Community, via Bix acq | CEO/Bix, VP at Y! | definitely pursue, per Sergio.  Sergio will send intro note. | http://www.linkedin.com/profile?viewProfile=&key=976599 |
| Aric | Wood | Xplane (ex Intuit) | CEO | not a good fit | http://www.linkedin.com/profile?viewProfile=&key=647096 |
| Rich | Sorkin | VC/investor, ex Zip2 | CEO/investor | setting up call with JL | |
| Gil | Penchina | Wikia (ex eBay) | CEO | not interested | http://www.linkedin.com/profile?viewProfile=&key=13224 |
| Jeff | Weiner | Yahoo! (ex Warner Bros.) | EVP, Network Division | no response, have heard he's recommitted to Y! | |
| Adam | Boyden | Xfire/Viacom | VP/GM, Xfire | interested. Sergio 9/19. | http://www.linkedin.com/profile?viewProfile=&authType=name&key=30391 |
| Dave | Eun | Google (ex AOL, Arts Alliance) | VP Content Partnerships | going to stay at GOOG for another year or two | http://www.linkedin.com/profile?viewProfile=&key=122152 |
| Jim | Lanzone | IAC/Ask.com | CEO of Ask.com | not interested (too early) | http://www.linkedin.com/profile?viewProfile=&key=436577 |
| Jim | Scheinman | Bebo | employee #3, VP Biz Dev & Sales | interested.  Met Sergio 9/6.  Knows social network but light on product. Most likely not the right fit and more interested in starting his own company. | http://www.linkedin.com/profile?viewProfile=&key=8570 |

# EXHIBIT M

Begin forwarded message:

**From:** Alessandro Biral <alessandro@keynoteventures.com>
**Date:** September 13, 2007, 10:10:28 PM PDT
**To:** <chandu@fatdoor.com>
**Subject: Re: Fatdoor Cap table**

Of course.  Do not worry about this stuff with me.  I see the long term trust I build with entrepreneur like you as my key "competitive advantage"...  I am a good person, feel safe

**Alessandro Biral**

**General Partner | KeyNote Ventures**
3000 Sand Hill Road, #1-185 | Menlo Park, CA 94025 | U.S.A.
+1 650 926-9820 | alessandro@keynoteventures.com

On Sep 13, 2007, at 6:13 PM, Chandu Thota wrote:

Also just got this note from our attorney *After* I sent the document to
you:

" The specific share and option data can be sensitive employee data under CA
law, so you'll want to ask that he keep it confidential.  Or, send summary
info until term sheet."

So, please keep the employee stock details confidential..

Thanks again.

Chandu Thota
Founder & CTO
Phone: (425) 765 1526
Fax: (650) 989-1267
http://www.fatdoor.com

-----Original Message-----
From: Chandu Thota [mailto:chandu@fatdoor.com]
Sent: Thursday, September 13, 2007 6:07 PM
To: 'Alessandro Biral'
Subject: Fatdoor Cap table

Alessandro: attached is the current cap table - please let me know if you
have any questions.

PS: we still need to add a couple of engineers to update employee option
pool, but the net change should be less than 70K options.

Chandu Thota
Founder & CTO
Phone: (425) 765 1526
Fax: (650) 989-1267
http://www.fatdoor.com

**From:** "Daniel Hansen" <dhansen@mh-llp.com>
**Date:** September 13, 2007, 6:06:28 PM PDT
**To:** "Sergio Monsalve" <sergio@nvp.com>, <chandu@fatdoor.com>
**Subject: RE: Cap Table**

The specific share and option data can be sensitive employee data under CA law, so you'll want to ask that he keep it confidential.  Or, send summary info until term sheet.

Dan

---

**From:** Sergio Monsalve [mailto:sergio@nvp.com]
**Sent:** Thursday, September 13, 2007 6:02 PM
**To:** chandu@fatdoor.com; Daniel Hansen
**Subject:** RE: Cap Table

Sure…I am fine with that

---

**From:** Chandu Thota [mailto:chandu@fatdoor.com]
**Sent:** Thursday, September 13, 2007 5:59 PM
**To:** 'Daniel Hansen'; Sergio Monsalve
**Subject:** Cap Table

Dan/Sergio: Alessandro @ Keystone ventures wants to see our post financing cap table – is it ok if I share the most recent one after adjusting Raj's options?

Dan: as a backgrounder – Alessandro is interested in investing in fatdoor.

**Chandu Thota**
Founder & CTO
Phone: (425) 765 1526
Fax: (650) 989-1267
**http://www.fatdoor.com**

-----Original Message-----
From: Sergio Monsalve [mailto:sergio@nvp.com]
Sent: Wednesday, November 14, 2007 1:46 PM
To: Miriam de la Cruz; jeff@bertramcapital.com; chandu@fatdoor.com;
Bill@Harris.vu
Cc: Daniel Hansen
Subject: Re: Fatdoor - Board and Stockholders consents

Dan:
I have a question on the cap table included...they show Raj owns 5M
shares.  I'd also like to better understand the option pool numbers on
both sheets.

Please call me to discuss.

Thanks,
Sergio

---------- Forwarded message ----------
From: **Daniel Hansen** <dhansen@mh-llp.com>
Date: Wed, Nov 14, 2007 at 4:46 PM
Subject: RE: Fatdoor - Board and Stockholders consents
To: Sergio Monsalve <sergio@nvp.com>, jeff@bertramcapital.com, chandu@fatdoor.com, Bill@harris.vu,
Parker Emmott <pemmott@nvp.com>
Cc: Miriam de la Cruz <mdelacruz@mh-llp.com>


Gents,

Per discussions with Sergio today, attached is an updated cap table.
The numbers haven't changed from our last table.

This revision more clearly indicates that the 2.5+M shares repurchased
from Raj were from his original 4M founder issuance.  Raj had two sets
of shares:  4M founder shares and 1M option shares that were issued at
the same price one month apart (why he did this is a mystery -- it was
before my time).  Raj's separation agreement did not specify where the
repurchased shares came from so a choice was to be made and Sergio
preferred to leave the 1M option shares outstanding, which is how we had
it.

The alternative is to treat the 1M option shares as being repurchased,
which would in turn make them available for reissuance in the pool,
consequently increasing the pool and potential dilution by about 3%.
Doing this would also require we recalculate Jen's and Jon Love's
options.

Let me know if you have any questions.

Dan

# EXHIBIT N

**---------- Forwarded message ----------**
**From: Daniel Hansen <dhansen@mh-llp.com>**
**Date: Mon, Oct 29, 2007 at 6:57 PM**
**Subject: Fatdoor Series B Second Closing -- Cap Table**
**To: alessandro@keynoteventures.com, barry@carr-ferrell.com**
**Cc: chandu@fatdoor.com, jeff@bertramcapital.com, sergio@nvp.com, bill@harris.vu, Sheila Maguire <SMaguire@mh-llp.com>**


**Dear Alessandro and Barry,**

**As requested, attached is an updated Fatdoor cap table to reflect a**
**$1.5M Series B second closing, with $1M to KeyNote.  This also reflects**
**the pending option to Jennifer Dulski.**

**Let Sheila or me know if you have any questions.**

**Best regards,**

**Dan**

**Daniel R. Hansen**
**Managing Partner**
**Montgomery & Hansen, LLP**
**525 Middlefield Road, Suite 250**
**Menlo Park, CA  94025**
**(650) 331-7003 (direct)**
**(650) 331-7001 (fax)**
**(650) 867-4179 (cell)**
**dhansen@mh-llp.com**

_____

**This e-mail message is for the sole use of the intended recipient(s) and**
**may contain confidential and privileged information. Any unauthorized**
**review, use, disclosure or distribution is prohibited. If you are not**
**the intended recipient, please contact the sender by reply e-mail, and**
**destroy all copies of the original message.  To ensure compliance with**
**requirements imposed by the IRS, we inform you that any tax advice**
**contained in this communication, unless expressly stated otherwise, was**
**not intended or written to be used, and cannot be used, for the purpose**
**of (i) avoiding tax-related penalties under the Internal Revenue Code or**
**(ii) promoting, marketing or recommending to another party any**
**tax-related matter(s) addressed herein.**

**Fatdoor, Inc.**
**Common Stock Ledger**

| Cert No. | Stockholder Name | Res | Date Of Issuance | Consideration | Price per Share | Shares Issued | Shares Canceled / Repurchased | Shares Outstanding | % of Common Stock Ownership | % of Fully-Diluted Ownership | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CS-1 | Raj Abhyanker | CA | 11/16/2006 | $400.00 | $0.0001 | 4,000,000 | 4,000,000 | 0 | 0.00% | 0.00% | RSPA; 1,578,125 repurchased; balance reissued at CS-16 |
| CS-2 | Taarinya Polepeddi | WA | 11/16/2006 | $400.00 | $0.0001 | 4,000,000 | 4,000,000 | 0 | 0.00% | 0.00% | RSPA; trasferred to C Thota at CS-15 |
| CS-3 | Raj Abhyanker | CA | 12/26/2006 | $100.00 | $0.0001 | 1,000,000 | 1,000,000 | 0 | 0.00% | 0.00% | Option exercise; all repurchased |
| CS-4 | Chandrasekhar Thota | WA | 12/27/2006 | $100.00 | $0.0001 | 1,000,000 | | 1,000,000 | 11.93% | 3.55% | Option exercise |
| CS-5 | Sanjeev Agrawal | CA | 2/23/2007 | Services Rendered | $0.0300 | 25,000 | | 25,000 | 0.30% | 0.09% | RSPA - issue from the plan |
| CS-6 | Babar Rana | CA | 2/27/2007 | Services Rendered | $0.0300 | 50,000 | | 50,000 | 0.60% | 0.18% | RSPA - issue from the plan |
| CS-7 | M&H Advisors, LLC | DE | 3/14/2007 | $750.00 | $0.0300 | 25,000 | | 25,000 | 0.30% | 0.09% | RSPA - issue from the plan |
| CS-8 | Jeffrey M. Drazan | CA | 3/19/2007 | $5,000.01 | $0.0300 | 166,667 | | 166,667 | 1.99% | 0.59% | Option exercise |
| CS-9 | William H. Harris, Jr | CA | 6/25/2007 | $9,999.99 | $0.0300 | 333,333 | | 333,333 | 3.98% | 1.18% | Option exercise |
| CS-10 | Andreas Paepcke | CA | 7/9/2007 | $2,000.00 | $0.0400 | 50,000 | | 50,000 | 0.60% | 0.18% | RSPA - issue from the plan |
| CS-11 | Hector Garcia-Molina | CA | 7/9/2007 | $2,000.00 | $0.0400 | 50,000 | | 50,000 | 0.60% | 0.18% | RSPA - issue from the plan |
| CS-12 | Jan Jannink | CA | 7/11/2007 | $12,000.00 | $0.0600 | 200,000 | | 200,000 | 2.39% | 0.71% | Option exercise |
| CS-13 | Kalyan Ayyagari | CA | 7/11/2007 | $2,700.00 | $0.0600 | 45,000 | | 45,000 | 0.54% | 0.16% | Option exercise |
| CS-14 | Emily McIntire | CA | 7/11/2007 | $900.00 | $0.0600 | 15,000 | | 15,000 | 0.18% | 0.05% | Option exercise |
| CS-15 | Chandrasekhar Thota | CA | 7/13/2007 | gift | --- | 4,000,000 | | 4,000,000 | 47.72% | 14.19% | Transfer from T. Polepeddi |
| CS-16 | Raj Abhyanker | CA | 9/11/2007 | | --- | 2,421,875 | | 2,421,875 | 28.89% | 8.59% | Vested shares after repurchase per separation agreement |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| Totals: | | | | $36,350.00 | | 17,381,875 | 9,000,000 | 8,381,875 | 100.00% | 29.73% | |

| | |
|---|---|
| TOTAL SHARES AUTHORIZED: | 33,000,000 |
| TOTAL SHARES ISSUED: | 17,381,875 |
| TOTAL SHARES CANCELLED/REPURCHASE | 9,000,000 |
| TOTAL COMMON STOCK OUTSTANDING: | 8,381,875 |
| TOTAL SHARES AVAILABLE FOR ISSUANCE | 24,618,125 |

1/19/2014

# EXHIBIT O

---------- Forwarded message ----------
**From:** Daniel Hansen <<u>dhansen@mh-llp.com</u>>
**Date:** Mon, Nov 26, 2007 at 12:10 PM
**Subject:** FW: Fatdoor cap table/stock ledgers
**To:** Sergio Monsalve <<u>sergio@nvp.com</u>>, Jeff Drazan <<u>jeff@bertramcapital.com</u>>, Bill Harris
<Bill@harris.vu>, Parker Emmott <<u>pemmott@nvp.com</u>>
**Cc:** Miriam de la Cruz <<u>mdelacruz@mh-llp.com</u>>, <u>chandu@fatdoor.com</u>


FYI, latest cap table.

Dan

-----Original Message-----
**From:** Miriam de la Cruz
**Sent:** Monday, November 26, 2007 11:22 AM
**To:** <u>alessandro@keynoteventures.com</u>; Barry Carr
**Cc:** Daniel Hansen; <u>chandu@fatdoor.com</u>
**Subject:** Fatdoor cap table/stock ledgers

Hi Alessandro and Barry,

Attached for your records are the current cap table and stock ledgers
for Fatdoor.

Regards,
Miriam


**Miriam M. dela Cruz**
**Senior Law Clerk**
**Montgomery & Hansen, LLP**
**525 Middlefield Road, Suite 250**
**Menlo Park, CA 94025**
p) <u>650-331-7015</u>
f) <u>650-331-7001</u>
<u>mdelacruz@mh-llp.com</u>
<u>www.mh-llp.com</u>

This e-mail message is for the sole use of the intended recipient(s) and
may contain confidential and privileged information. Any unauthorized
review, use, disclosure or distribution is prohibited. If you are not
the intended recipient, please contact the sender by reply e-mail, and
destroy all copies of the original message.

To ensure compliance with requirements imposed by the IRS, we inform you
that any tax advice contained in this communication, unless expressly
stated otherwise, was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding tax-related penalties under the
Internal Revenue Code or (ii) promoting, marketing or recommending to
another party any tax-related matter(s) addressed herein.


----- Original Message -----
**From:** Alessandro Biral <<u>alessandro@keynoteventures.com</u>>

**To: Barry Carr <BCarr@carrferrell.com>; Daniel Hansen**
**Sent: Tue Nov 20 15:30:32 2007**
**Subject: fatdoor cap table**

**I would appreciate it if you could send me the final cap table for**
**fatdoor, reflecting our investment, including fully diluted on**
**as-converted basis**

**Thank you**



**Alessandro Biral**


**General Partner | KeyNote Ventures**
**3000 Sand Hill Road, #1-185 | Menlo Park, CA 94025 | U.S.A.**
**+1 650 926-9820 | alessandro@keynoteventures.com**

**Fatdoor, Inc.**
**Common Stock Ledger**

| Cert No. | Stockholder Name | Res | Date Of Issuance | Consideration | Price per Share | Shares Issued | Shares Canceled / Repurchased | Shares Outstanding | % of Common Stock Ownership | % of Fully-Diluted Ownership | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CS-1 | Raj Abhyanker | CA | 11/16/2006 | $400.00 | $0.0001 | 4,000,000 | 4,000,000 | 0 | 0.00% | 0.00% | RSPA; 2,578,125 repurchased; balance reissued at CS-16 |
| CS-2 | Taarinya Polepeddi | WA | 11/16/2006 | $400.00 | $0.0001 | 4,000,000 | 4,000,000 | 0 | 0.00% | 0.00% | RSPA; trasferred to C Thota at CS-15 |
| CS-3 | Raj Abhyanker | CA | 12/26/2006 | $100.00 | $0.0001 | 1,000,000 | 1,000,000 | 0 | 0.00% | 0.00% | Option exercise; cert canceled and reissued at CS-16 with remaining unpurchased shares from CS-1 |
| CS-4 | Chandrasekhar Thota | WA | 12/27/2006 | $100.00 | $0.0001 | 1,000,000 | | 1,000,000 | 11.75% | 3.55% | Option exercise |
| CS-5 | Sanjeev Agrawal | CA | 2/23/2007 | Services Rendered | $0.0300 | 25,000 | | 25,000 | 0.29% | 0.09% | RSPA - issue from the plan |
| CS-6 | Babar Rana | CA | 2/27/2007 | Services Rendered | $0.0300 | 50,000 | | 50,000 | 0.59% | 0.18% | RSPA - issue from the plan |
| CS-7 | M&H Advisors, LLC | DE | 3/14/2007 | $750.00 | $0.0300 | 25,000 | | 25,000 | 0.29% | 0.09% | RSPA - issue from the plan |
| CS-8 | Jeffrey M. Drazan | CA | 3/19/2007 | $5,000.01 | $0.0300 | 166,667 | | 166,667 | 1.96% | 0.59% | Option exercise |
| CS-9 | William H. Harris, Jr | CA | 6/25/2007 | $9,999.99 | $0.0300 | 333,333 | | 333,333 | 3.92% | 1.18% | Option exercise |
| CS-10 | Andreas Paepcke | CA | 7/9/2007 | $2,000.00 | $0.0400 | 50,000 | | 50,000 | 0.59% | 0.18% | RSPA - issue from the plan |
| CS-11 | Hector Garcia-Molina | CA | 7/9/2007 | $2,000.00 | $0.0400 | 50,000 | | 50,000 | 0.59% | 0.18% | RSPA - issue from the plan |
| CS-12 | Jan Jannink | CA | 7/11/2007 | $12,000.00 | $0.0600 | 200,000 | | 200,000 | 2.35% | 0.71% | Option exercise |
| CS-13 | Kalyan Ayyagari | CA | 7/11/2007 | $2,700.00 | $0.0600 | 45,000 | | 45,000 | 0.53% | 0.16% | Option exercise |
| CS-14 | Emily McIntire | CA | 7/11/2007 | $900.00 | $0.0600 | 15,000 | | 15,000 | 0.18% | 0.05% | Option exercise |
| CS-15 | Chandrasekhar Thota | CA | 7/13/2007 | gift | --- | 4,000,000 | | 4,000,000 | 47.01% | 14.19% | Transfer from T. Polepeddi |
| CS-16 | Raj Abhyanker | CA | 9/11/2007 | | --- | 2,421,875 | | 2,421,875 | 28.46% | 8.59% | Vested shares after repurchase per separation agreement |
| CS-17 | Jon R. Love | CA | 11/1/2007 | $13,969.45 | $0.1100 | 126,995 | | 126,995 | 1.49% | 0.45% | Option Exercise |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| Totals: | | | | $50,319.45 | | 17,508,870 | 9,000,000 | 8,508,870 | 100.00% | 30.18% | |

| | |
|---|---|
| TOTAL SHARES AUTHORIZED: | 33,000,000 |
| TOTAL SHARES ISSUED: | 17,508,870 |
| TOTAL SHARES CANCELLED/REPURCHASE | 9,000,000 |
| TOTAL COMMON STOCK OUTSTANDING: | 8,508,870 |
| TOTAL SHARES AVAILABLE FOR ISSUANCE | 24,491,130 |

1/19/2014