**BRUNO W. TARABICHI**, CA State Bar No. 215129
bruno@legalforcelaw.com
**HEATHER R. NORTON**, CA State Bar No. 257014
heather@legalforcelaw.com
**ROY MONTGOMERY**, CA State Bar No. 279531
roy@legalforcelaw.com
**LEGALFORCE RAJ ABHYANKER, P.C.**
1580 W. El Camino Real, Suite 13
Mountain View, California 94040
Telephone: 650.965.8731
Facsimile: 650.989.2131

Attorneys for Defendant
Raj Abhyanker

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> RAJ ABHYANKER, an individual, <br><br> Defendant. | Case No. 3:12-cv-05667-EMC <br><br> **DEFENDANT AND COUNTERCLAIMANT RAJ ABHYANKER'S OPPOSITION TO BENCHMARK CAPITAL PARTNERS, L.P. AND BENCHMARK CAPITAL MANAGEMENT CO. LLC'S MOTION TO DISMISS RAJ ABHYANKER'S SECOND AMENDED ANSWER AND COUNTERCLAIM** |
| RAJ ABHYANKER, an individual <br><br> Counterclaimant, <br><br> vs. <br><br> NEXTDOOR.COM, INC., a Delaware corporation; PRAKASH JANAKIRAMAN, an individual; BENCHMARK CAPITAL PARTNERS, L.P., a Delaware limited partnership; BENCHMARK CAPITAL MANAGEMENT CO. LLC, a Delaware limited liability company; SANDEEP SOOD, an individual; MONSOON ENTERPRISES, INC., a California corporation, and DOES 1–50, inclusive; <br><br> Counterdefendants. | Date: February 13, 2014 <br> Time: 1:30 p.m. <br> Courtroom: 5 – 17th Floor <br> Judge: Honorable Edward M. Chen |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 1-2

II.  BACKGROUND ............................................................................................. 2-5

III.  LEGAL STANDARD..................................................................................... 5-6

IV.  ARGUMENT ................................................................................................. 6-22

    A.  BENCHMARK WAS OBLIGATED TO GUARD THE SECRECY OF MR. ABHYANKER'S CONFIDENTIAL INFORMATION................................. 6-12

        i.  The oral agreement between Benchmark and Mr. Abhyanker could have been performed within one year........................................................................ 7-8

        i.  Benchmark is estopped from relying on the statute of frauds ................... 8-10

        ii.  Issues of facts regarding Benchmark's obligations should be resolved at trial ............ 10

    B.  MR. ABHYANKER PLED THE COMMUNICATION OF ACTIONABLE TRADE SECRETS TO BENCHMARK ................................................................ 12-20

        i.  Mr. Abhyanker identified his trade secrets with sufficient particularity................. 12-15

        ii.  The trade secrets at issue are valid trade secrets, though Mr. Abhyanker is not required to prove his case on the merits at the pleading stage................................. 15-20

            1.  The identified trade secrets were not publicly known ..................................... 16-18

                a.  Mr. Abhyanker took reasonable steps to preserve the secrecy of the his Lorelei Neighborhood trade secret ........................................................ 16-17

                b.  Mr. Abhyanker took reasonable steps to preserve the secrecy of the his bidding history trade secret........................................................................ 17-18

            2.  The identified trade secrets have independent economic value ..................... 18-20

                a.  The Lorelei neighborhood trade secret has independent economic value 18-19

                b.  The bidding history trade secret has independent economic value .......... 19-20

    C.  MR ABHYANKER SATISFIED THE PLEADING REQUIREMENTS AS SET FORTH IN IQBAL AND TWOMBLY ....................................................... 20-22

V.  CONCLUSION ................................................................................................ 23

**Cases**

*AccuImage Diagnostics Corp v. Terarecon*, Inc., 260 F. Supp. 2d 941 (N.D. Cal. 2003) ............ 12

*Allergan, Inc. v. Merz Pharmaceuticals, LLC*, No. 11-446, 2012 U.S. Dist. LEXIS 31981 (C.D. Cal. Mar. 9, 2012) ............................................................................................... 18-19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 2, 5, 12, 20

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) ............................................................. 5

*Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, No. 10-CV-03428, 2011 U.S. Dist. LEXIS 30227 (N.D. Cal. Mar. 23, 2011)................................................................ 18, 20

*Burroughs Payment Sys. Inc. v. Symco Group, Inc.*, No. C–11–06268, 2012 WL 1670163 (N.D. Cal. May 14, 2012) ..................................................................................... 13-15 18, 20

*California Int'l Chemical Co. v. Sister H. Corp.*, 1999 U.S. App. LEXIS 868 (9th Cir. Jan. 19, 1999) ........................................................................................................... 16 18, 20

*Colon v. Tosetti*, 14 Cal. App. 693 (1910) ...................................................................... 8 18, 20

*DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119 (N.D. Cal. 2010)........................... 12, 15

*Estate of Housley*, 56 Cal. App. 4th 342 (1997) ................................................................ 9

*Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988) .................................................... 7

*Gable-Leigh, Inc. v. North American Miss*, No. 01-01019, 2001 U.S. Dist. LEXIS 25614 (9th Cir. April 16, 2001)..................................................................................................... 16

*GiveMePower Corp. v. Pace Compumetrics, Inc.*, No. 07-cv-157, 2007 U.S. Dist. LEXIS 59371 (S.D. Cal. Aug. 14, 2007) ............................................................................. 13-14

*Glacier Water Co., LLC v. Earl*, 2010 WL 5071258 WD Wash, Dec. 7, 2010........................ 9-10

*Hall v. Hall*, 222 Cal.App.3d 578, 585–86 (1990).......................................................... 9

*Hollywood Motion Picture Equipment Co. v. Furer* 16 Cal.2d 184, 187, 105 P.2d 299 (1940) ..... 7

*In re Eastview Estates II*, 713 F.2d 443 (9th Cir.1983) ................................................... 9

OPP TO MOTION TO DISMISS
CASE NO. 3:12-cv-05667-EMC

*K-2 Ski Co. v. Head Ski Co., Inc.*, 506 F.2d 471 (9th Cir. 1974)............................................16-17

*Keller v. Pacific Turf Club* 192 Cal.App.2d 189 (1961)....................................................................7

*King v. Riveland*, 125 Wash. 2d 500, 506 (1994) ............................................................................9

*KnowledgePlex, Inc. v. PlaceBase, Inc.*, No. C-08-4267, 2008 U.S. Dist. LEXIS 103915 (N.D. Cal. Dec. 17, 2008) .................................................................................................................. 13, 20

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ..........................................6

*Mar Partners 1 LLC v. Amer. Home Mort. Servicing, Inc.*, No. C 10–02906, 2010 WL 3184334 (Aug. 11, 2010). ..............................................................................................................................8

*Maximo v. San Francisco Unified School District*, No. C 10-35533 JL, 2011 U.S. Dist. LEXIS 30225 (N.D. Cal. Mar. 21, 2011) ................................................................................................ 6, 20

*Monarco v. Lo Greco*, 35 Cal. 2d 621 (1950) ..................................................................................9

*Parks Sch. of Bus. v. Symington*, 51 F.3d 1480 (9th Cir. 1995)................................................5, 10

*Premiere Innovations, Inc. v. Iwas Industries*, LLC, No. 07-cv-1083, 2007 U.S. Dist. LEXIS (S.D. Cal. Sept. 28, 2007) ............................................................................................................ 13

*Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp.2d 1079 (E.D. Cal. 2012) ......................... 18

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231 (N.D. Cal. 1995) ................................................................................................................................................7

*Rosenthal v. Fonda*, 862 F.2d 1398 (9th Cir. 1988) ........................................................................7

*Siam Numhong Prods. Co., Ltd. v. Eastimpex*, 866 F. Supp. 445 (N.D. Cal. 1994).......................6

*SOAProjects, Inc. v. SCM Microsystems, Inc.*, 2010 WL 5069832, No. 10–CV–01773 (N.D. Cal Oct. 9, 2013)......................................................................................................................................9

*Solis v. Webb*, C-12-2055 EMC, 2012 U.S. Dist. LEXIS 138516 (N.D. Cal. Sept. 26, 2012)........ 5

*Speech Technology Associates v. Adaptive Communication Systems, Inc.*, 1994 WL 449032, No. C–88–2392 (Aug. 16, 1994, ND Cal) ............................................................................................6

*StonCorGrp., Inc. v. Campton*, No. C05–1225JLR, 2006 WL 314336 (W.D. Wash. Feb. 7, 2006) ...................................................................................................................................................... 12

*Sweet v. Bridge Base, Inc.*, No. CV F 08–1034, 2009 WL 1514443 (E.D. Cal. May 28, 2009) ..... 8

*TMX Funding, Inc. v. Impero Technologies, Inc.*, No. C-10-00202, 2010 U.S. Dist. LEXIS 60260

iii

(N.D. Cal. June 17, 2010) ........................................................................... 13

*Tostevin v. Douglas*, 160 Cal. App. 2d 321 (1958) .......................................... 8

*Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993) ......................... 16

*White Lightening Co. v. Wolfson,* 68 Cal. 2d 336 (1968) ................................ 7

*Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277 (2002) ............................... 6

*Wolf Designs United States District Court*, 322 F.Supp.2d 1065 (C.D. Cal. 2004) ...................... 6

**Statutes**

Cal. Civ.Code § 3426.1(b) ..................................................................6-7, 12

Cal. Civ.Code § 3426.1(d)(2) ................................................................ 20

Rule 12(b)(6) ............................................................................... 5

**Other Authorities**

Dickinson, Boonsri. "So What The Heck Is An Entrepreneur In Residence Anyway?" Business

    Insider 15 Mar. 2012 .................................................................. 2

Martine, Jennifer. "Fanbase Steps Up to the Plate." *Gigaom*. 24 Aug 2009. ................................. 4

Milgrim, Trade Secrets, § 2.07 ............................................................ 16

# I.   INTRODUCTION

Defendant and counterclaimant Raj Abhyanker hereby opposes the motion to dismiss filed by counterdefendants Benchmark Capital Partners, L.P. and Benchmark Capital Management Co. LLC (collectively "Benchmark").  (D.E. 145 ("Benchmark MTD")).  Benchmark spends much of its motion creating distractions and mischaracertizing facts when the only relevant issue is whether Mr. Abhyanker has sufficiently pled his trade secret misappropriation claims, such that the claims should proceed to discovery.  Quite simply, he has.

The Court has already denied motions to dismiss Mr. Abhyanker's trade secret misappropriation claims brough by Nextdoor.com, Inc. ("Nextdoor.com"), Prakash Janakiraman, and Sandeep Sood.  (D.E. 100.)  In addition, the Court allowed Mr. Abhyanker leave to file his Second Amended Complaint and Counterclaim (SAAC).  The SAAC includes the present trade secret misappropriation claims, which are a subset of the claims that survived the prior motions to dismiss.  (*See* D.E. 100.)   Accordingly, the claims are properly pled, and Mr. Abhyanker should be permitted to take discovery on them.

Because Mr. Abhyanker's claims are properly pled, Benchmark attempts to distract the Court with a lengthy recitation of largely irrelevant and mischaracterized facts.  Benchmark's motion then focuses on the argument that it cannot be held to its promise to guard Mr. Abhyanker's trade secrets because its oral non-disclosure agreement, which it is in the practice of granting to entrepreneurs, cannot be enforced.  Benchmark ignores California law, which holds that the statute of frauds is to be used only for the prevention of fraud, and not to perpetrate fraud. A party must be held to its promise, when the promisee has reasonably relied on the representation.

Benchmark next argues that Mr. Abhyanker's trade secrets are not actionable in that they do not have independent economic value and were already known to the public.  That argument is undercut by the fact that Benchmark itself expressed interest in developing Mr. Abhyanker's concept.  If the trade secrets truly had no value, or if they had lost their value through being widely known, Benchmark would not have entered into funding discussions with Mr. Abhyanker. Importantly, however, Mr. Abhyanker is not required to prove the validity of his trade secrets at

this stage of the litigation.

Finally, Benchmark argues that the SAAC fails to meet the pleading standard as articulated by the Supreme Court in *Twombly* and *Iqbal*. Benchmark's argument is largely manufactured from mischaracterized facts, and from a misguided notion of what is required at the pleading stage. The SAAC identifies the trade secrets, explains the value of them, and explains the steps that Mr. Abhyanker took in order to maintain secrecy. Nothing further is required at the pleading stage. In sum, Benchmark's motion is lacking in merit, and Mr. Abhyanker respectfully requests that his claims be allowed to proceed to the discovery stage.

## II.    BACKGROUND

Nextdoor.com, Benchmark, and the individuals associated with them have a pattern and practice of building companies based on stolen information and engaging in dishonest business practices at the expense of entrepreneurs. SAAC ¶ 97. Benchmark is in the minority of venture capitalists that employ the practice of Entrepreneurs-in-Residence ("EIRs"). SAAC ¶ 98. Benchmark's EIRs are people who do not have a formulated business concept while they are in residence, but Benchmark aims to invest in the EIRs if and when they do formulate a business concept. *Id.* (citing Boonsri Dickinson, <u>So What The Heck Is An Entrepreneur In Residence Anyway?</u>, Business Insider, Mar. 15, 2012). In the meantime, Benchmark allows the EIRs to listen in on pitches by outside startups pitching ideas to Benchmark. This highly unethical practice frequently leads to EIRs stealing ideas from the entrepreneurs who are pitching their ideas to Benchmark, and then forming companies to pursue such stolen ideas with funding from Benchmark. *Id.*

In or around September 2006, Abhyanker developed the concepts for two private online neighborhood social networks. The first concept, LegalForce was to be an online private social network for neighborhood inventors, created by geocoding inventors and owners from public patent and trademark data. The second concept, Nextdoor.com, was to use the same source code as LegalForce to create ,a private social network for secure collaboration of neighbors in a geospatial area. Both the LegalForce and the Nextdoor networking sites were to be used by neighbors who registered with the site. *Id.* ¶ 100.

In connection with his LegalForce and Nextdoor concepts, Abhyanker developed trade secrets including the trade secrets at issue in the present motion. *Id.* During Abhyanker's development of the LegalForce and Nextdoor concepts, he also originated a new concept based on a Wikipedia-like public database of neighbor profiles that could be edited and enhanced to provide a "search" and "discover" functionality as contrasted with a sign-up social network. Abhyanker named this new functionality "Fatdoor" *Id.* ¶ 109. However, based on feedback from users, an internal decision was made to work on an improved version of Fatdoor centered on security and privacy. Accordingly, Mr. Abhyanker incorporated some of his LegalForce and Nextdoor trade secrets into Fatdoor, in order to make improvements, and to create a more secure neighborhood social networking concept. *Id.*

As he developed his social networking concepts, Mr. Abhyanker began to approach various sources, including venture capital firms, in order to fund the further development of his ideas. Being ignorant of Benchmark's history of misappropriating intellectual property, Mr. Abhyanker approached Benchmark to discuss funding for his projects. On or around June 20, 2007, an initial meeting was set with Benchmark to discuss funding for Fatdoor. *Id.* ¶ 121. The initial meeting with Benchmark did not involve the disclosure of any nonconfidential, trade secret information. Instead, at that meeting it was discussed that a confidential meeting would take place only after assurances were received that all information shared by Mr. Abhyanker would be maintained strictly confidential. *Id.*

In keeping with its pattern and practice of verbal agreements and handshakes, Benchmark provided oral assurances to Mr. Abhyanker that it would keep his materials confidential. *Id.* Based on those assurances, Mr. Abhyanker shared his confidential information, including the trade secrets at issue here. *Id.* ¶¶ 121-123. At least three of the co-founders of plaintiff and counterdefendant Nextdoor.com were EIRs in formal and informal capacities when Mr. Abhyanker pitched his ideas to Benchmark. *Id.* ¶ 98.

After reviewing Mr. Abhyanker's confidential information, Benchmark clearly recognized the value in Mr. Abhyanker's concepts as it expressed interest in funding the development of Mr. Abhyanker's concepts. *Id.* ¶¶ 124-125. However, another venture capital firm, Norwest Venture

Partners, provided a higher valuation of Fatdoor. *See* Declaration of Raj Abhyanker ISO Opp. to Nextdoor's Mot. for Summary Judgment (filed concurrently herewith), ¶¶ 80-82. Accordingly, the Fatdoor founders decided to accept funding from Norwest. Benchmark was only interested in being a primary investory, not a secondary investor. Accordingly, the talks between Mr. Abhyanker, Fatdoor and Benchmark ended. *Id.* Had Benchmark truly thought that Mr. Abhyanker's trade secrets lacked intrinsic economic value, or lacked value for having been widely disseminated to the public, Benchmark would not have considered investing in the development of those ideas. To the contrary, Benchmark did recognize the value in Mr. Abhyanker's ideas, but failed to meet Norwest's terms.

One company that Benchmark did fund, however, began floundering after Benchmark had received Mr. Abhyanker's valuable trade secrets. That company, Fanbase Inc was founded by Nirav Tolia, an EIR who was in residence at Benchmark when Mr. Abhyanker pitched his concepts. *Id.* ¶¶ 99, 143, 183. Fanbase Inc. evolved from the failed SPN, Inc. and Rount Two, Inc. concepts. *Id.* After receiving $5 million in funding from Benchmark in 2009, Fanbase launched a sports-related website. *See, e.g.,* Jennifer Martine, <u>Fanbase Steps Up to the Plate,</u> Gigaom, Aug. 24, 2009, available at: http://gigaom.com/2009/08/24/with-funding-from-benchmark-fanbase-steps-up-to-the-plate/ ("The company has received $5 million in funding from Benchmark Capital, the original investor in Epinions, a startup co-founded by Fanbase CEO Nirav Tolia that was shrouded in controversy and legal battles and ultimately acquired by eBay."). By 2010 it became clear that the Fanbase concept was also a failure, and Nirav Tolia and others within Fanbase were scrambling for a new concept in order to salvage Benchmark's investment. *See* SAAC ¶ 99. By March 2011, Fanbase had reinvented itself as Nextdoor.com, and finally launched a successful venture, built on concepts that Benchmark already knew to be valuable. *Id.* ¶ 150.

In 2011, following the revalation that Benchmark had disclosed Mr. Abhyanker's trade secrets, Mr. Abhyanker filed suit against Nextdoor.com in state court. Case No. 1-11-CV-212924. That action has no bearing on the present proceeding, given that none of the claims at issue in the state court action were decided on their merits. Instead of pursuing the state court

action, Mr. Abhyanker chose to dismiss his state court action without prejudice on February 8, 2012. By dismissing the state court action, Abhyanker's resources were freed and directed towards litigating the TTAB oppositions, which he did with some success. SAAC ¶ 156. In or about September 15, 2012, Nextdoor.com's motions to dismiss the TTAB oppositions were defeated and formal discovery was to commence before TTAB to determine whether the Nextdoor.com should be denied federal trademark rights because of fraud on the United States Trademark Office. SAAC ¶ 156. However, on November 5, 2012, Nextdoor filed the instant lawsuit seeking declaratory relief regarding trademark infringement and cyberpiracy. As a result, the TTAB oppositions have been suspended pending the disposition of this lawsuit, and Nextdoor.com has avoided facing a determination that it committed fraud. *Id.* Thus, far from being in court beause Mr. Abhyanker is "harassing" Nextdoor.com as Benchmark alleges, Mr. Abhyanker is back in Court as a result of the instant lawsuit, filed as a tactical maneuver by Nextdoor.com. SAAC ¶ 157.

## III. LEGAL STANDARD

A Rule 12(b)(6) motion is "viewed with disfavor." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). In ruling on a motion to dismiss under Rule 12, the Court takes "all allegations of material fact [in the complaint] as true and construe(s) them in the light[] most favorable to the nonmoving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). The Court should deem allegations sufficient to state a cognizable claim if they present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This minimal demand for "plausible grounds to infer" a claim "does not impose a probability requirement . . . . [A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id*. at 556 (footnote omitted).

The issue in a motion to dismiss is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims in the complaint. *Solis v. Webb*, C-12-2055 EMC, 2012 U.S. Dist. LEXIS 138516, at *14 (N.D. Cal. Sept. 26, 2012.) The moving party therefore, has the heavy burden of showing that the non-moving party has not met the minimal pleading requirements of FRCP 8(a). *Maximo v. San Francisco Unified School*

*District*, No. C 10-35533 JL, 2011 U.S. Dist. LEXIS 30225, at *11–12 (N.D. Cal. Mar. 21, 2011).

## IV.    ARGUMENT
### A. Benchmark was obligated to guard the secrecy of Mr. Abhyanker's confidential information.

Benchmark first attempts to avoid liability by arguing that it cannot be bound by its promise to keep Mr. Abhyanker's pitch materials confidential. MTD at 10-13. That argument fails as a matter of law.

Misappropriation is defined as the disclosure or use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Cal Civ Code 3426.1. Allegations of misappropriation are properly based on oral agreements to maintain secrecy. *See, e.g., Speech Tech. Associates v. Adaptive Communication Sys., Inc.*, 1994 WL 449032, No. C–88–2392, *9 (Aug. 16, 1994, ND Cal); *Wolf Designs United States District Court*, 322 F.Supp.2d 1065 (C.D. Cal. 2004). The cases that Benchmark cites do not undermine that fact. Benchmark cites *Siam Numhong Prods. Co., Ltd. v. Eastimpex*, 866 F. Supp. 445, 450 (N.D. Cal. 1994) (MTD at 11), which states, "Thus, the statute of frauds defense may be asserted only against a wrongful allegation that one is a party to a contract, not simply to prevent enforcement of an agreement that happened to be oral." *Siam* therefore supports Mr. Abhyanker's assertion that the oral contract must be enforced.

The remainder of the cases that Benchmark cites simply hold that the owner of trade secrets must take reasonable steps to guard the secrecy of its trade secrets, but they do not hold that oral agreements are insufficient. MTD at 11 (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (holding that a customer database qualifies as a trade secret in part because the plaintiff took reasonable steps to insure the secrecy to the information); *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 286–87 (2002) (reiterating that "the test for trade secrets is whether the matter sought to be protected is information (1) which is valuable because it is unknown to others and (2) which the owner has attempted to keep secret); *Religious Tech. Ctr. v.*

*Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253–54 (N.D. Cal. 1995) (finding that the plaintiff took reasonable steps to protect its trade secrets, and noting that *reasonable efforts can include advising employees of the existence of a trade secret* and limiting access to the information on a "need to know basis") (emphasis added); Cal. Civ. Code § 3426.1(d)(2) ("trade secret" is something that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use). Benchmark has not cited a single case in which a Court has dismissed a trade secret case because an oral confidentiality agreement was deemed to violate the statute of frauds. To the contrary, the *Religious Tech.* case holds that simply "advising" persons of the existence of trade secrets is a reasonable measure to protect trade secrets.

The oral agreement that underlies Mr. Abhyanker's trade secret misappropriation claims here gave rise to Benchmark's duty to maintain secrecy, and it is not subject to the statute of frauds.

### i. The oral agreement between Benchmark and Mr. Abhyanker could have been performed within one year

First, agreements are only subject to the statute of frauds if their terms specify that the agreement cannot be performed within one year. *See, e.g., White Lightening Co. v. Wolfson,* 68 Cal. 2d 336, 343 (1968) (citing *Hollywood Motion Picture Equipment Co. v. Furer* 16 Cal.2d 184, 187 (1940); *Keller v. Pacific Turf Club* 192 Cal. App. 2d 189, 195-196 (1961)). If instead an agreement is capable of being performed within one year, then it is outside of the statute of frauds. *Rosenthal v. Fonda*, 862 F.2d 1398, 1401 (9th Cir. 1988) ("Only those oral contracts which "expressly preclude performance within one year" or that "cannot possibly be performed within one year" are unenforceable.) (internal quotations removed). "Accordingly, if by its terms performance of a contract is possible within one year, the contract does not fall within the statute of frauds even though it is probable that it will extend beyond one year." *Id*. at 548–549; *see also Foley v. Interactive Data Corp.*, 47 Cal.3d 654,673 (1988) ("if a condition terminating a contract may occurs within one year of its making, then the contract is performable within a year and does not fall within the scope of the statute of frauds. *This is true even if the contract may extend for*

OPP TO MOTION TO DISMISS
CASE NO. 3:12-cv-05667-EMC

*longer than one year if the condition does not occur.*") (emphasis added); *see also Sweet v. Bridge Base, Inc.*, No. CV F 08–1034, 2009 WL 1514443, *3 (E.D. Cal. May 28, 2009). The case cited by Benchmark, *Tostevin*, does not hold differently. In *Tostevin v. Douglas*, 160 Cal. App. 2d 321, 327–28 (1958), the court noted that if the terms of a contract specify that it is not to be performed within a year, then the statute of frauds applies.

In *Sweet*, the plaintiff claimed she entered into an oral agreement whereby the defendant corporation agreed to pay a percent of gross revenues to investor in exchange for investor's efforts in setting up the corporation's online business. The alleged express agreement was an arguably an agreement of indefinite duration, but the court found it could not be said to require more than one year for its completion. The court found that the discontinuation of one of the businesses within one year, however remote that possibility may have been, would have terminated the contract, and that therefore the contract did not fall within the statute of frauds. *Id.* at *3-4.

Likewise, the agreement between Benchmark and Mr. Abhyanker could have been performed within a year. If, for example, Mr. Abhyanker had developed his social networking concept and released it to the public within the year, then Benchmark would not have been under an ongoing obligation to maintain the confidentiality of the concept. As a result, the statute of frauds does not apply to Benchmark's promise.

### i. Benchmark is estopped from relying on the statute of frauds

Moreover, Benchmark cannot avoid its liability by relying on the statute of frauds because Mr. Abhyanker upheld his end of the bargain. "Under California law, the statute of frauds is to be used only for the prevention of fraud, and not to perpetrate fraud; i.e. as a shield, not as a sword. Thus, when there has been complete performance of an oral agreement by one party, there is 'an absence of fraud or deceit implied by law." *Mar Partners 1 LLC v. Amer. Home Mort. Servicing, Inc.*, No. C 10–02906, 2010 WL 3184334, *2 (Aug. 11, 2010) (quoting *Colon v. Tosetti*, 14 Cal. App. 693, 695 (1910) (internal quotation marks removed)).

Mr. Abhyanker developed valuable social networking concepts, and approached

Benchmark for funding, such that he could develop his ideas, and eventually unveil his products to the general public. Before providing details of his concepts to Benchmark, Mr. Abhyanker secured a promise that Benchmark would keep his materials confidential, so that they would retain their value, and so that they would remain Mr. Abhyanker's possession and control. Benchmark provided oral assurances of confidentiality, as was its pattern and practice. SAAC ¶ 121. Based on Benchmark's assurances, Mr. Abhyanker then pitched his concepts to Benchmark, and subsequently entered into discussions with Benchmark regarding funding. Given that Mr. Abhyanker performed his part of the agreement by sharing his concepts, Benchmark cannot now say that it does not have to perform its part of the deal. *See SOAProjects, Inc. v. SCM Microsystems, Inc*., 2010 WL 5069832, No. 10–CV–01773 (N.D. Cal Oct. 9, 2013) ("In California, ... the doctrine of equitable estoppel can, in appropriate circumstances, prevent a party from asserting the Statute of Frauds.") (citing *In re Eastview Estates II*, 713 F.2d 443 (9th Cir.1983) (citation omitted)). "[A] substantial change of position in reliance on an oral agreement will estop reliance on the statute of frauds." *Id*. (citing *Estate of Housley*, 56 Cal.App.4th 342, 357 (1997) (quoting *Hall v. Hall*, 222 Cal.App.3d 578, 585–86 (1990)); *see also Monarco v. Lo Greco*, 35 Cal.2d 621, 623, 220 P.2d 737 (1950) (the doctrine of estoppel is meant "to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances.").

When a plaintiff establishes that: (1) a promise was made which (2) defendants should reasonably have expected would cause plaintiffs to change their position and (3) which did in fact cause plaintiffs to change their position (4) in justifiable reliance on the promise and (5) in such a manner that injustice can be avoided only by enforcing the promise. *Glacier Water Co., LLC v. Earl*, 2010 WL 5071258 WD Wash, Dec. 7, 2010 (citing *King v. Riveland*, 125 Wash.2d 500, 506 (1994)). In *Glacier Water*, the defendant promised that it would file certain applications, which were to include the plaintiff's information. The plaintiffs therefore shared confidential business information and trade secrets with the defendants, assisted them in filing the applications, and did not oppose the applications when filed. Given the nature of the relationship between the parties at the time, the court found that plaintiffs' reliance was reasonable, and estopped the defendant from later relying on the statute of frauds.

Just like the *Glacier Water* case, Mr. Abhyanker shared confidential business information and trade secrets with Benchmark in reasonable reliance on Benchmark's assurances of confidentiality. Benchmark cannot excuse its misappropriation through meritless attempts to void its promise to maintain confidentiality.

### ii. Issues of fact regarding Benchmark's obligations should be resolved at trial

Benchmark also attempts to evade liability by implausibly insinuating that it never promised to keep Mr. Abhyanker's information confidential, and by attempting to manufacture nonexistent inconsistencies in Mr. Abhyanker's allegations. Benchmark has absolutely no basis for those assertions, and indeed Benchmark's arguments are not supported by declarations or by any other concrete evidence. Rather, they are based on conjecture and attorney argument. To the extent there are factual issues regarding the boundaries of Benchmark's promise, those issues are more properly resolved at trial, not at the pleading stage. In a motion to dismiss, all facts in complaint must be taken as true, and all inferences drawn in favor of non-moving party. Therefore, Benchmark's unfounded conjectures must be rejected. *See Parks Sch. of Bus*, 51 F.3d at 1484 (In ruling on a motion to dismiss under Rule 12, the Court takes "all allegations of material fact [in the complaint] as true and construe(s) them in the light[] most favorable to the nonmoving party.").

Benchmark argues, without factual or evidentiary support, that "the alleged 'promise' implausible on its face." MTD at 12. There is nothing implausible about a venture capital firm promising to keep pre-launch business information confidential, particularly when it is considering investing in the business. To the contrary, what is implausible is that any venture capital firm with a potential financial interest in a pitched concept would fail to see the importance of safeguarding pre-launch information. Similarly, it is implausible that any entrepreneur would have provided a venture capital firm with confidential information, including trade secrets, without first extracting a promise of confidentiality. The SAAC explains that Mr. Abhyanker did just that. SAAC ¶¶ 121-122. In particular, Mr. Abhyanker did not share any confidential information with Benchmark until Benchmark promised to "maintain confidential

any and all information disclosed by Abhyanker during any future meetings." *Id.* ¶ 121. Given

that it is the pattern and practice of Benchmark, its general partners, and EIRs to agree to non-

disclosure agreements via verbal promises and handshakes, Mr. Abhyanker felt comfortable with

Benchmark's blanket verbal NDA. *Id.*

Benchmark argues that because Mr. Abhyanker is an attorney by training, he should have

forced Benchmark to document its promise in writing. MTD at 12. The SAAC explains that it is

Benchmark's normal pattern to issue only verbal assurances, and Mr. Abhyanker acquiesced to

that practice in the interest of forming a relationship. *See* SAAC ¶¶ 121-122. Regardless, a

motion to dismiss is not the proper place for Benchmark to question Mr. Abhyanker's

sophistication or legal experience. Benchmark does not provide any evidence to contradict the

statements in the SAAC, or provide the Court with any reason to take the extraordinary step of

construing those allegations against Mr. Abhyanker.

Benchmark also alleges that its NDA is invalid because some of the information that Mr.

Abhyanker supplied to Benchmark was public. MTD at 12. Whether or not some of the

information discussed between Mr. Abhyanker and Benchmark was publicly known, is neither

here nor there. The fact remains that Benchmark's blanket NDA obligated it to safeguard Mr.

Abhyanker's trade secrets. Benchmark does not identify with any particularity what information

was supposedly public, and, as discussed below, Mr. Abhyanker took reasonable steps to

maintain the secrecy of his trade secrets. Nevertheless, if some discussions between the parties

involved publicly available information, there is no basis for asserting that such a discussion

would invalidate the NDA.

Finally, Benchmark attempts to manufacture an inconsistency in Mr. Abhyanker's

pleadings by stating that he alleged in one document that in two different phone calls,

Benchmark's general partner Kevin Harvey separately gave oral assurances of confidentiality to

Abhyanker and Fatdoor investor Jeffrey Drazan, and in another document stated that there was

one phone call between himself and Harvey. MTD at 12. Benchmark's argument

mischaracterizes the statements in Mr. Abhyanker's pleadings. In the first pleading, Mr.

Abhyanker stated that Mr. Harvey gave assurances of confidentiality to Mr. Drazan as well as to

Mr. Abhyanker. The SAAC then states, "In a follow-up telephone call Harvey, a general partner of Benchmark capital, agreed to maintain confidential any and all information disclosed by Abhyanker during any future meetings." SAAC ¶ 122. Nowhere does the SAAC state that the call between Mr. Harvey and Mr. Abhyanker consisted of Benchmark's *only* assurance of confidentiality. Accordingly, the supposed inconsistency is entirely manufactured by Benchmark.[1] The fact is that Benchmark made multiple promises of confidentiality, and it should be held liable for breaching those promises.

## B. Mr. Abhyanker pled the communication of actionable trade secrets to Benchmark

Benchmark next argues that Mr. Abhyanker has not pled that he communicated any actionable trade secrets to Benchmark. That argument is misguided, as it attempts to require Mr. Abhyanker to prove the merits of his claim at the pleading stage. To state a cause of action for misappropriation of trade secrets under the Uniform Trade Secrets Act, plaintiff must only plead two primary elements: (1) the existence of a trade secret, and (2) misappropriation of the trade secret. *AccuImage Diagnostics Corp v. Terarecon*, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing Cal. Civ.Code § 3426.1(b)). Mr. Abhyanker has done both, yet Benchmark's motion improperly argues that Mr. Abhyanker prove the merits of his trade secret misappropriation at the pleading stage. Such a showing is not required.[2]

## i. Mr. Abhyanker identified his trade secrets with sufficient particularity

In order to plead the existence of a trade secret, a plaintiff "need not plead with specificity what particular proprietary information was misappropriated[.]" *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1145 (N.D. Cal. 2010) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955; *StonCor Grp., Inc. v. Campton*, No. C05–1225JLR, 2006 WL 314336, at *5 (W.D. Wash.

---

[1] Benchmark acknowledges that there is an oral contract between itself and Fatdoor, but argues that the existence of that contract undercuts Mr. Abhyanker's standing to sue in his personal capacity. MTD at 12. The fact that Fatdoor may also have standing to sue does not undermine Mr. Abhyanker's standing. Moreover, Fatdoor has assigned its intellectual property and trade secrets to Mr. Abhyanker. See Declaration of Raj Abhyanker ISO Opposition to Nextdoor.com's Motion For Summary Judgment (filed concurrently herewith) at ¶¶ 42-51.

[2] As to the misappropriation prong, Benchmark argues only that it cannot be held to its oral promise. As discussed above, that argument fails.

Feb. 7, 2006) (finding alleged misappropriation of "proprietary and confidential information concerning ... sales and marketing strategies, pricing and pricing policies, and customer lists and installers" sufficient to state a claim); *TMX Funding, Inc. v. Impero Technologies, Inc.*, No. C-10-00202, 2010 U.S. Dist. LEXIS 60260, *8-9 (N.D. Cal. June 17, 2010) (Finding that a plaintiff does not need to spell out the details of its trade secret in its complaint to avoid dismissal.) Instead, a plaintiff must simply put the defendant on notice as to its wrongdoing. *Burroughs Payment Sys. Inc. v. Symco Group, Inc*., No. C–11–06268, 2012 WL 1670163 (N.D. Cal. May 14, 2012).

In *Burroughs,* the plaintiff argued on information and belief that the defendant had misappropriated trade secrets that resided on the plaintiff's computers. The defendant argued that the trade secret misappropriation claim was not adequately pled because the plaintiff did not specify which aspects of its computer programs were trade secrets. The Court rejected the defendant's arguments and held that the allegations were sufficient to put the defendant on notice as to the allege wrongdoing.

Similarly, in *TMX*, this Court found the following descriptions of trade secrets to be sufficient for a pleading: software, source code, data formulas, business methods and marketing plans, product information for cost, pricing, and margin data, customer lists, contact names for accounts, customer profiles, login and password information. *Id.* Likewise, in *KnowledgePlex*, this Court found the following description sufficient: "the code required to operate DataPlace and all of the design and development work of the project to create the code are protectable trade secrets." *KnowledgePlex, Inc. v. PlaceBase, Inc*., No. C-08-4267, 2008 U.S. Dist. LEXIS 103915, *24 (N.D. Cal. Dec. 17, 2008). In *Premiere Innovations*, the Court found the following description sufficient: "the Products' design, manufacture, pricing, and market opportunity." *Premiere Innovations, Inc. v. Iwas Industries*, LLC, No. 07-cv-1083, 2007 U.S. Dist. LEXIS, *10 (S.D. Cal. Sept. 28, 2007). And in *GiveMePower*, the Court found the following identification sufficiently particular: "Plaintiff's proprietary database of existing and prospective field technicians and business affiliates, Plaintiff's confidential contractor agreements, as well as confidential business plans and processes developed by Plaintiff for the BAM Project."

13

*GiveMePower Corp. v. Pace Compumetrics, Inc.*, No. 07-cv-157, 2007 U.S. Dist. LEXIS 59371, *27-28 (S.D. Cal. Aug. 14, 2007).

By contrast, a disclosure is insufficient if it alleges only the misappropriation of a "secret process" and provides no additional details from which the court, or the defendant, could determine what "secret process" was alleged to have been misappropriated. *Burroughs*, 2012 WL 1670163 at *14. Thus, a plaintiff has to allege more than the fact that a secret was misappropriated, but high-level categorical identifications of trade secrets are sufficient to put a defendant on notice as to its wrong-doing.

Here, Mr. Abhyanker has done more than provide high level, categorical descriptions of his trade secrets. The allegations in the SAAC are therefore more than enough to put Benchmark on notice as to its wrongdoing. Moreover, Benchmark has the benefit of Mr. Abhyanker's Second Amended Designation of Trade Secrets, to which it refers in its motion to dismiss, for additional details as to Benchmark's wrongdoing.

With respect to the Lorelei neighborhood trade secret, the SAAC states that Mr. Abhyanker's trade secrets include the identification of inventors in the Lorelei neighborhood and the activation of the Lorelei neighborhood as a prime testing neighborhood for Mr. Abhyanker's social networking concept. SAAC ¶100. The SAAC further details the efforts that Mr. Abhyanker undertook in order to identify the Lorelei neighborhood as a neighborhood for prototyping his neighborhood social network, and it explains his efforts to walk through the neighborhood and popularize his concept with the residents. SAAC ¶¶ 101-103. The Second Amended Designation of Trade Secrets ("SADTC") (D.E. 135) explains that the fact that the Lorelei neighborhood is the ideal first neighborhood to use to test and launch a neighborhood social network is a trade secret. SADTC at 2. Based on that information, Benchmark is on notice that it wrongly disclosed the fact that the Lorelei neighborhood is the ideal first neighborhood to use to test and launch a neighborhood social network.

The SAAC also identifies the bidding history of the Nextdoor.com domain as a trade secret. SAAC ¶100. The SAAC further explains that Mr. Abhyanker had placed numerous bids for the Nextdoor.com domain, but was unable to secure the domain, given that his bidding history was

misappropriated and disclosed to Nextdoor.com, who then successfully purchased the domain. SAAC ¶133; *see also* SAAC ¶¶152-153. The SADTC likewise identifies the bidding history for the Nextdoor.com domain as a trade secret. SADTC at 2. Thus, Benchmark is on notice that it wrongly disclosed Mr. Abhyanker's bidding history to Nextdoor.com.

Benchmark claims on one hand that it does not understand what a "bidding history" is (MTD at 3) and on the other hand states that a bidding history cannot be a trade secret since the general public knows what it is and how to bid on domain names (MTD at 14-15). Despite Benchmark's contradictory arguments, it is clear that Mr. Abhyanker's pleading has put Benchmark on notice as to its wrongdoing, and that Mr. Abhyanker's identification is at least as specific as the identifications found sufficient in the cases discussed above.

### ii. The trade secrets at issue are valid trade secrets, though Mr. Abhyanker is not required to prove his case on the merits at the pleading stage

As described above, Mr. Abhyanker satisfied the pleading requirements. At the pleading stage, the party alleging misappropriation of trade secrets is only required to put the defendant on notice as to the allegation of wrongdoing. *Burroughs*, WL 1670163 at *4, *15-16.

Nevertheless, Benchmark's motion argues that Mr. Abhyanker should go beyond that requirement, and prove the merits of his case. In particular, Benchmark argues that Mr. Abyanker is required to prove that his trade secrets were not widely known at the time, and that they had independent economic value. MTD at 14-16.

In *DocMagic*, defendant argued at the pleading stage that the trade secret misappropriation claim should be dismissed because the trade secrets were known to others. *DocMagic,* 745 F. Supp. 2d at 1145. In particular, the defendant argued that it had independent access to the alleged trade secrets, and that the allegations of misappropriation were therefore implausible. The court rejected the defendant's argument, and noted that the plaintiff had invested expense and effort into compiling the information into a specific form. The court therefore held that it was too early in the case to determine whether the defendant compiled the information at issue independently, rather than misappropriating it. *Id.*

The same principle applies here. Mr. Abhyanker explained that he undertook

considerable efforts to identify the Lorelei neighborhood as a prime neighborhood in which to prototype a social networking concept (SAAC ¶¶ 101-102), and that he undertook considerable effort to bid for the Nextdoor.com domain names (SAAC ¶¶ 133, 152). As discussed below, Mr. Abhyanker has satisfied the pleading standard and should not be required to prove the merits of his case.[3]

### 1. The identified trade secrets were not publicly known

Absolute secrecy is not required to maintain a trade secret. *California Int'l Chemical Co. v. Sister H. Corp.*, 1999 U.S. App. LEXIS 868, *13 (9th Cir. Jan. 19, 1999). Only relative secrecy is required, and it is sufficient that the trademark owner engage in reasonable efforts to preserve secrecy and that the trade secret is not generally known within the industry. *Id.; K-2 Ski Co. v. Head Ski Co., Inc.*, 506 F.2d 471, 474 (9th Cir. 1974); *Gable-Leigh, Inc. v. North American Miss*, No. 01-01019, 2001 U.S. Dist. LEXIS 25614, *60 (9th Cir. April 16, 2001); Milgrim, Trade Secrets, § 2.07. It is enough that the trade secret owner "made it difficult" for competitors to acquire the trade secret by proper means. *Gable-Leigh*, 2001 U.S. Dist. LEXIS 25614 at*60 (citing *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993)). Moreover, whether the trade secret owner's efforts to maintain secrecy were reasonable is a question of fact, and "the trier of fact must consider the entirety of circumstances surrounding use of the secret." *K-2 Ski*, 506 F.2d at 474. Therefore, even limited public disclosures may not destroy the trade secret when the disclosure does not result in the secret becoming generally known to those who can derive economic value from it. *See e.g., K-2 Ski*, 506 F.2d at 474 (public tours of the K-2 plant showing ski manufacturing operation did not destroy secrecy); *Gable-Leigh*, 2001 U.S. Dist. LEXIS 25614 at*58 (disclosure to employees did not destroy secrecy).

### a. Mr. Abhyanker took reasonable steps to preserve the secrecy of the his Lorelei Neighborhood trade secret

Mr. Abhyanker secured a verbal NDA from Benchmark before disclosing his trade secrets and other confidential information. Similarly, Mr. Abhyanker required Counterdefendants Sandeep Sood and Big Circle Media to execute an Independent Contractor Agreement and Non-

---

[3] Mr. Abhyanker also refers the Court to his Opposition to Nextdoor.com's Motion for Summary Judgment, being filed concurrently herewith, in which he presents evidence supporting his trade secret misappropriation claims.

OPP TO MOTION TO DISMISS
CASE NO. 3:12-cv-05667-EMC

Disclosure Agreement before disclosing his concepts and Trade Secrets, including details about his selection of the Lorelei neighborhood. SAAC ¶ 100. Those agreements required Sood and Big Circle to keep the LegalForce.com and Nextdoor.com concepts and all accompanying details and work product relating to it confidential. *Id.* Mr. Abhyanker therefore took reasonable steps to preserve the secrecy of his bidding history trade secret.

Benchmark alleges that the fact of Mr. Abhyanker's prototyping destroyed Mr. Abhyanker's trade secret. MTD at 16. Benchmark's argument is misguided. The fact that the Lorelei residents were exposed to Mr. Abhyanker's social networking concept has no bearing on whether or not they were aware of the process by which their neighborhood was selected, or of the special attributes that resulted in it being selected. In fact, the residents were not exposed to those details. Rather, as stated in the SAAC Mr. Abhyanker simply popularized his concepts in the neighborhood. SAAC ¶ 104. Moreover, the disclosure of the Lorelei Trade Secret to Benchmark was made on a CD that was clearly marked confidential and provided subject to oral assurances of confidentiality by Benchmark. Accordingly, Mr. Abhyanker clearly undertook reasonable efforts to maintain the secrecy of his Lorelei Trade Secret, such that his claims should proceed to discovery.

### b. Mr. Abhyanker took reasonable steps to preserve the secrecy of the his bidding history trade secret

As set forth in above, absolute secrecy is not required. *K-2 Ski*, 506 F.2d at 474. A trade secret owner is only required to take reasonable efforts to maintain the secrecy of his trade secret. *Id*. And whether the efforts taken were reasonable has been held to be a question of fact for the trier of fact. *Id*.

Benchmark alleges that the bidding history for the Nextdoor.com website is not a trade secret because the methods for submitting bids are transparent and readily accessible on numerous registration sites online. MTD at 15. Again, Benchmark's argument is misguided. The fact that the public knows how to bid on domain names in general is irrelevant to Mr. Abhyanker's particular bidding history for the Nextdoor.com domain. Mr. Abhyanker's particular bidding history for the Nextdoor.com domain was not made public in any manner—it

could not be found in any public materials or from any public source. The bidding recipients may have known portions of Mr. Abhyanker's bidding history, but that fact does not magically transform that bidding history into something that is generally known by the public or others in the industry. The knowledge of Mr. Abhyanker's bids in particular, allowed Nextdoor.com to gain a competitive advantage, and secure the domain that Mr. Abhyanker had been unsuccessful in securing. SAAC ¶¶133, 152-153. Accordingly, Benchmark fails to provide any reason why the Court should disregard the allegations in Mr. Abhyanker's pleadings and SADTC at this early stage of the litigation.

### 2. The identified trade secrets have independent economic value

The requirement that a trade secret derive independent economic value from not being generally known "has been interpreted to mean that the secrecy of this information provides a business with a substantial business advantage." *Allergan, Inc. v. Merz Pharmaceuticals, LLC*, No. 11-446, 2012 U.S. Dist. LEXIS 31981, *30 (C.D. Cal. Mar. 9, 2012). Therefore, if the disclosure of the trade secret to a competitor would allow the competitor to more selectively and more effectively compete with the trade secret owner, then the trade secret does derive independent economic value from not being generally known. *Id*. ("[D]isclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product."); *Brocade*, 873 F. Supp.2d at 1214 (trade secret derived economic value by allowing a competitor to develop a product that meets the needs of customers).

### a. The Lorelei neighborhood trade secret has independent economic value

In the instant case, there is no question that Mr. Abhyanker's Lorelei Trade Secret had independent economic value because it allowed Nextdoor.com to exponentially expedite the time necessary to prove the viability of its business model to its investor Benchmark. SAAC ¶ 148. It is trade secret owner's expenditure of significant time, resources, and efforts to compile the trade secret, coupled with the unfair advantage it provides a "competitor to solicit both more selectively and more effectively without having to expend the effort." *Pyro Spectaculars North, Inc. v.*

*Souza*, 861 F. Supp.2d 1079, 1088-89 (E.D. Cal. 2012) (noting the "comprehensive, if not encyclopedic, compilation of customer" information).

Mr. Abhyanker undertook considerable efforts to identify the Lorelei neighborhood through geocoding. And after identifying and selecting the Lorelei neighborhood, Mr. Abhyanker and Fatdoor engaged in even further efforts to transform the Lorelei neighborhood into the ideal neighborhood to test neighborhood social network over a period of four to six months. Mr. Abhyanker went door-to-door engaging in manual efforts to establish connections between residents, engaging in extensive handholding to overcome any initial lack of interest among residents. At the time of the misappropriation, Nextdoor.com was a startup in distress. SAAC ¶¶ 99, 143, 183. It had finally come to terms with the failure of its original Fanbase concept. *Id*. Against that backdrop, Nextdoor.com suddenly decided to redirect its business into the neighborhood social networking space in order to retain its investment from Benchmark. *Id*. By using Mr. Abhyanker's Lorelei trade secret, Nextdoor.com was able to prototype its business in a neighborhood where it could achieve fast penetration due to the prior effort of Mr. Abhyanker and Fatdoor. *See id.* ¶ 148. Mr. Abhyanker's trade secret was not simply the fact that the Lorelei neighborhood existed or even that he was testing his network in the neighborhood, but it was the fact that it was specially selected and transformed into the ideal neighborhood. Mr. Abhyanker's trade secret was not simply the fact that the Lorelei neighborhood existed or even that he was testing his network in the neighborhood, but it was the fact that it was specially selected and transformed into the ideal neighborhood.

### b. The bidding history trade secret has independent economic value

As discussed in above, a trade secret possesses independent economic value if it allows a competitor to gain an unfair advantage and more effectively compete with the trade secret owner. *Allergan*, 2012 U.S. Dist. LEXIS 31981, at *30.

In the instant case, Mr. Abhyanker's Bidding History Trade Secret clearly had independent economic value. By knowing how much Mr. Abhyanker and Fatdoor had been willing to pay for the nextdoor.com domain name, Benchmark Capital and Nextdoor.com were

able to value the domain name and then outbid Mr. Abhyanker and purchase the nextdoor.com domain name. Clearly, Nextdoor.com obtained the domain name itself, which allowed it to more efficiently compete against Mr. Abhyanker.

### C. Mr. Abhyanker satisfied the pleading requirements as set forth in Iqbal and Twombly

The Court has already found Mr. Abhyanker's pleading to be sufficient with respect to his trade secret misappropriation claims. In particular, the Court has already denied motions to dismiss Mr. Abhyanker's trade secret misappropriation claims brought by Nextdoor, Prakash Janakiraman, and Sandeep Sood. (D.E. 100.) In addition, the Court allowed Mr. Abhyanker leave to file his SAAC, which includes the present trade secret misappropriation claims, which are a subset of the claims that survived the prior motions to dismiss. (*See* D.E. 100.) Accordingly, there can be no doubt that the trade secret misappropriation claims should be allowed to proceed to discovery.

In *Iqbal* and *Twombly*, the Supreme Court reiterated that in order to survive a motion to dismiss, the allegations do not need to be probable. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal citation omitted). Even after *Iqbal* and *Twombly,* "[m]otions alleging that a plaintiff has failed to state a claim are disfavored and rarely granted." *Maximo*, 2011 U.S. Dist. LEXIS 30225, at *11–12 (internal quotations omitted). Moreover, in misappropriation cases, the facts and knowledge of the wrongdoing are almost always in the exclusive possession of the defendant. *Brocade Communications Systems, Inc. v. A10 Networks, Inc*., No. 10-CV-03428, 2011 U.S. Dist. LEXIS 30227, *19-20 (N.D. Cal. Mar. 23, 2011) (denying motion to dismiss trade secret misappropriation claim due to allegations made on information and belief because "pleading in this manner is acceptable for information that is not presumptively in the knowledge of the pleading party"). A liberal pleading standard should be applied to misappropriation claims, otherwise, defendants would be able to get away with trade secret misappropriation simply by keeping their wrongful conduct to themselves. *See id*; *see also KnowledgePlex, Inc*, 2008 U.S.

Dist. LEXIS 103915 at*25-26 ("Given that Plaintiff has not yet had the benefit of discovery, and in light of the liberal pleading standard of Rule 8(a), the Court concludes that Plaintiff adequately has alleged misappropriation of a trade secret.")

This case is no different — only Benchmark knows with certainty which of Mr. Abhyanker's confidential materials it wrongly disclosed to the founders of Nextdoor.com. As a result, it would be unrealistic for Mr. Abhyanker to prove the merits of his claim, or identify the particulars of the "who, what, when and where" of the claims, without the opportunity to proceed to discovery. Nevertheless, the SAAC sets forth sufficient facts to raise a reasonable expectation that discovery will reveal evidence of misappropriation.

As described above, the SAAC explains the efforts that Mr. Abhyanker undertook to identify the Lorelei neighborhood as a prime neighborhood in which to prototype his social networking concept, describes his efforts to transform Lorelei into the ideal neighborhood to test neighborhood social network by going door to door to establish connections between residents and to overcome any initial lack of interest among residents, and it describes his efforts to secure the nextdoor.com domain name.

Benchmark is incorrect in alleging that Mr. Abhyanker's pleading is based on no more than access. To the contrary, the SAAC explains that when a Benchmark-funded company was struggling, it: (1) suddenly decided to enter the neighborhood social networking space and develop a social networking concept that was nearly identical to Mr. Abhyanker's concept; (2) chose the *exact* name that Mr. Abhyanker had chosen for his social networking concept; (3) chose to prototype the concept in the *exact* neighborhood in which Mr. Abhyanker had prototyped and popularized his concept; and (4) obtained the *exact* domain name that Mr. Abhyanker had targeted for his social netowrking concept. It did so after having received confidential information from Mr. Abhyanker, which effectively provided a roadmap for Nextdoor.com's success. The information contained in that roadmap had been previously disclosed to Benchmark pursuant to a confidentiality agreement. Accordingly, it is more than just a coincidence that when a company Benchmark had funded was struggling, Benchmark was able to salvage its investment by following Mr. Abhyanker's roadmap to success.

Benchmark again attempts to manufacture confusion and inconsistencies by arguing that it makes no sense that Mr. Abhyanker would have revealed confidential information relating to both Fatdoor and the LegalForce and Nextdoor concepts. MTD at 18. Benchmark's argument is entirely unrelated to whether or not the SAAC satisfies the pleading standards for trade secret misappropriation claim. Regardless, Benchmark Mr. Abhyanker did not pitch one business and then proved an entire diligence file about another business as Benchmark alleges. MTD at 18. The SAAC plainly states that while the Fatdoor concept was under development, Mr. Abhyanker incorporated some of his LegalForce and Nextdoor Trade Secrets into Fatdoor, in order to make improvements, and evolve his concept from a wiki type concept to a secure neighborhood social networking concept. The SAAC also states that he pitched the developing Fatdoor concept, which included LegalForce and Nextdoor trade secrets, to Benchmark. During the pitch, he provide Benchmark with confidential information, including information about the desired name for his company and the accompanying domain name he was trying to obtain, and his successful prototypes of his concept.

There is no inconsistency of lack of common sense in those facts. The simple facts are that Mr. Abhyanker revealed confidential information to Benchmark — including the trade secrets at issue —and Benchmark misappropriated those trade secrets when it needed to save a floundering business. Benchmark's misappropriation prevented Mr. Abhyanker from pursuing his concepts after the original Fatdoor was taking his concepts in a different direction, and Benchmark should not be permitted to evade liability for its wrongdoing by attempting to create confusion where there is none.

Finally, Benchmark alleges that Mr. Abhyanker's claims are implausible, or lack common sense, because Benchmark lacked a motive to misappropriate his trade secrets. MTD at 3; *see also* MTD at 18-19. To the contrary, Benchmark and its EIRs had an urgent need to start a new concept out of thin air, and they needed that concept to prosper. They were able to achieve that success only by using information that they had obtained from Mr. Abhyanker, and have previously determined to have value. Thus, far from being implausible, Mr. Abhyanker's trade secret claims are likely to succeed on the merits.

1

## V.    CONCLUSION

2

For all the foregoing reasons, Mr. Abhyanker respectfully requests that the Court deny

3

Benchmark's Motion to Dismiss, and allow Mr. Abhyanker's claims to proceed to discovery.

4

5

Dated: January 23, 2014                                    Respectfully submitted,

6

LEGAL FORCE RAJ ABHYANKER, P.C

7

BY: _____

8

Bruno W. Tarabichi
Heather R. Norton

9

Roy Montgomery
Attorneys for Defendant

10

Raj Abhyanker

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28