LATHAM & WATKINS LLP
   Steven M. Bauer (Bar No. 135067)
    steven.bauer@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

LATHAM & WATKINS LLP
   Matthew Rawlinson (Bar No. 231890)
    matt.rawlinson@lw.com
   Adam M. Regoli (Bar No. 262903)
    adam.regoli@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: +1.650.328.4600
Facsimile: +1.650.463.2600

Attorneys for Counterdefendants
Benchmark Capital Partners, L.P., and Benchmark
Capital Management Co. LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>       vs.<br><br>RAJ ABHYANKER, an individual,<br><br>              Defendant. | CASE NO. 3:12-cv-05667-EMC<br><br>**BENCHMARK CAPITAL PARTNERS, L.P.'S AND BENCHMARK CAPITAL MANAGEMENT CO. LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COUNTERCLAIM** |
| RAJ ABHYANKER, an individual,<br><br>            Counterclaimant,<br><br>       vs.<br><br>NEXTDOOR.COM, INC., a Delaware corporation; PRAKASH JANAKIRAMAN, an individual; BENCHMARK CAPITAL PARTNERS, L.P., a Delaware limited partnership; BENCHMARK CAPITAL MANAGEMENT CO. LLC, | Date:    February 13, 2014<br>Time:   1:30 P.M.<br>Judge:  Honorable Edward M. Chen |

a Delaware limited liability company;
SANDEEP SOOD, an individual;
MONSOON COMPANY, an unknown
business entity, and DOES 1-50, inclusive,

Counterdefendants.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................................. 1

ARGUMENT ......................................................................................................................................... 3

I. ABHYANKER'S OPPOSITION DOES NOT IDENTIFY ANY ACTIONABLE TRADE SECRETS THAT WERE COMMUNICATED TO BENCHMARK ................................................................................................. 3

    A. The Bidding History Cannot Be A Trade Secret ..................................................... 3

    B. The Identification Of The Lorelei Neighborhood Cannot Be A Trade Secret ........................................................................................................... 5

II. ABHYANKER FAILS TO ALLEGE FACTS THAT HE TOOK REASONABLE STEPS TO PROTECT CONFIDENTIAL MATERIALS, OR THAT BENCHMARK HAD A VALID DUTY OF NONDISCLOSURE ................................................................................................. 8

    A. Abhyanker Fails To Allege That He Took Reasonable Steps To Protect Confidential Material ................................................................................ 8

    B. Abhyanker Fails To Allege Any Nondisclosure Duty ........................................ 10

III. ABHYANKER'S TRADE SECRET MISAPPROPRIATION ALLEGATIONS ARE IMPLAUSIBLE UNDER *TWOMBLY* AND *IQBAL* ........................................................................................................................ 12

    A. Abhyanker Fails To Plead Sufficient Allegations Of Disclosure ....................... 12

    B. Abhyanker's Misappropriation Allegations Are Implausible ............................. 13

IV. CONCLUSION ................................................................................................................. 15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
   260 F. Supp. 2d 941 (N.D. Cal. 2003) .................................................................................... 3

*Ajaxo Inc. v. E*Trade Group Inc.*,
   37 Cal. Rptr. 3d 221 (Ct. App. 2005) .................................................................................... 11

*Apple, Inc. v. Psystar Corp.*,
   No. C 08-3251, 2012 WL 10852 (N.D. Cal. Jan. 3, 2012) ...................................................... 4

*Ashcroft v. Iqbal*,
   56 U.S. 662 (2009) ........................................................................................................... 12, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 3, 12, 13, 15

*Cal. Int'l Chem. Co. v. Sister H. Corp.*,
   Nos. 97-15233+, 1999 U.S. App. LEXIS 868 (9th Cir. Jan. 19, 1999) ................................... 6

*Epicor Software Corp. v. Alternative Tech. Solutions, Inc.*,
   SACV 13-00448, 2013 WL 3930545 (C.D. Cal. June 21, 2013) ............................................ 8

*Farhang v. Indian Inst. of Tech., Kharagpur*,
   No. C–08–02658, 2010 WL 2228936 (N.D. Cal. June 1, 2010) ............................................. 9

*Gable-Leigh, Inc. v. N. Am. Miss*,
   No. CV 01-01019, 2001 U.S. Dist. LEXIS 25614 (C.D. Cal. Apr. 13, 2001) ......................... 7

*Gemisys Corp. v. Phoenix Am., Inc.*,
   186 F.R.D. 551 (N.D. Cal. 1999) ............................................................................................ 9

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................................................. 3

*In re Providian Credit Card Cases*,
   116 Cal. Rptr. 2d 833 (Ct. App. 2002) .................................................................................... 6

*K-2 Ski Co. v. Head Ski Co., Inc.*,
   506 F.2d 471 (9th Cir. 1974) ............................................................................................... 6, 7

*Kwikset Corp. v. Super. Ct.*,
   246 P.3d 877 (Cal. 2011) ......................................................................................................... 4

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) ............................................................................................... 3, 8

*Mattel, Inc. v. MGA Enm't, Inc.*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ..................................................................................... 9

*Nexsales Corp. v. Salebuild, Inc.*,
   No. C-11-3915, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ............................................. 3, 5

*Pellerin v. Honeywell Int'l., Inc.*,
   877 F. Supp. 2d 983 (S.D. Cal. 2012) .................................................................................. 3

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008) ............................................................................................. 12

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984) ............................................................................................................ 6

*Silvaco Data Sys. v. Intel Corp.*,
   109 Cal. Rptr. 3d 27 (Ct. App. 2010) ................................................................................. 4

*SkinMedia, Inc. v. Histogen, Inc.*,
   869 F. Supp. 2d. 1176 (S.D. Cal. 2012) ............................................................................. 6

*SOAProjects, Inc. v. SCM Microsystems, Inc.*,
   No. 10-cv-01773, 2010 WL 5069832 (N.D. Cal. Dec. 7, 2010) ....................................... 11

*Speech Technology Associates v. Adaptive Communication Systems, Inc.*,
   No. C-88-2392, 1994 WL 449032 (N.D. Cal. Aug. 16, 1994) .......................................... 10

*Swartz v. Deutsche Bank*,
   No. C03-1252, 2008 U.S. Dist. LEXIS 36139 (W.D. Wash. May 2, 2008) .................... 15

*Synopsys, Inc. v. AtopTech, Inc.*,
   No. C 13-02965, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ........................................ 5

*Vacco Indus., Inc. v. Van Den Berg*,
   6 Cal. Rptr. 2d. 602 (Ct. App. 1992) ................................................................................. 4

*VasoNova, Inc. v. Grunwald*,
   C 12-02422, 2012 WL 6161041 (N.D. Cal. Dec. 11, 2012) ............................................... 3

*Whyte v. Schlage Lock Co.*,
   125 Cal. Rptr. 2d 277 (Ct. App. 2002) ............................................................................... 9

*Wolf Designs, Inc. v. DHR & Co.*,
   322 F. Supp. 2d 1065 (C.D. Cal. 2004) ............................................................................ 10

**STATUTES**

Cal. Civ. Code § 1624(a)(1) ..................................................................................................... 11

Cal. Civ. Code § 3426.1 ............................................................................................................ 3

Cal. Civ. Code § 3426.1(b)(2)(B)(ii) ....................................................................................... 11

Cal. Civ. Code § 3426.1(d) ............................................................................................... 3, 4, 6

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 2

## INTRODUCTION

Raj Abhyanker's Opposition to the Motion to Dismiss filed by Benchmark Capital Partners, L.P. and Benchmark Capital Management Co. LLC (collectively, "Benchmark") does not seriously challenge Benchmark's arguments and entirely ignores the Court's directives in this case.

The theme that runs throughout Abhyanker's counterclaim, trade secret designations, and briefs is that Benchmark has improperly disclosed his "concept" or "idea" of a local social network (sometimes called "Fatdoor," "Legal Force," or "Nextdoor"). He references his "concept" or "idea" some 40 times in the Second Amended Answer and Counterclaim ("SAAC"), and more than 30 times in his Opposition to Benchmark's Motion to Dismiss ("Motion"). But the Court has already ruled that this "concept," along with the domain name nextdoor.com, were publicly disclosed in Abhyanker's '442 patent application before any purported acts of misappropriation took place, and therefore, they are not trade secrets.

Thus, despite Abhyanker's repeated references to his "concept" (and despite originally alleging the theft of highly technical trade secrets such as "source code" and "algorithms"), Abhyanker's claims have now been pared down to only an unspecified "bidding history" of the nextdoor.com domain name and the "identification" of the Lorelei neighborhood in Menlo Park, California, as a launch site for a social networking prototype. (Second Am. Designation of Trade Secrets ["Designation"], Dkt. No. 135, at 2.) With respect to these specific alleged trade secrets, Abhyanker has failed to (1) plead facts that (if true) would establish that they are actionable trade secrets, (2) plead facts that (if true) would establish that he took reasonable steps to protect the secrecy of the alleged trade secrets, or that Benchmark violated any nondisclosure duty that applied to this information, and (3) plead facts that (if true) would establish a plausible claim that Benchmark misappropriated these specific trade secrets.

First, Abhyanker has failed to plead facts that would establish that either of the bidding history or identification of the Lorelei neighborhood is a trade secret. Not only does Abhyanker still fail to adequately describe what these trade secrets are, or how they could create economic value, but both alleged secrets had already been publicly disclosed at the time of the purported

misconduct. Because he cannot deny the basic facts of public disclosure, Abhyanker now claims that he was not required to maintain their "absolute" secrecy. This misconstrues the law — none of the cases cited by Abhyanker suggests that a party can purposefully disclose his trade secrets to a third party who is under no duty of confidentiality (what Abhyanker did here), while maintaining their status as trade secrets. As a backup argument, Abhyanker also attempts (yet again) to revise his characterization of the trade secrets, and add new elements that he claims had not been publicly exposed. But not only is none of this new material included in the SAAC, it fundamentally contradicts the descriptions given in the Designation provided by Abhyanker. Having provided that description in response to this Court's Order, and having repeatedly represented to both the Court and counsel that it was a complete and accurate description of his trade secrets, Abhyanker is not free to change (or add to) the description now merely because the items he described were publicly disclosed.

Second, even putting aside his public disclosure of the alleged trade secrets, Abhyanker has failed to plead that he took reasonable steps to protect the alleged trade secrets when he disclosed them to Benchmark, or that Benchmark breached any cognizable duty of nondisclosure with respect to these items. Not only did Abhyanker fail to seek a written confidentiality agreement, but it is now undisputed that much of the information he allegedly provided to Benchmark was public material. Nevertheless, Abhyanker makes no allegation that he designated either of the items he now claims were trade secrets as confidential or made any effort to differentiate them from the public material he provided. Rather, Abhyanker based his duty of nondisclosure entirely on a vague, oral agreement that was not directed at these items and, as pled, is invalid under the statute of frauds.

Finally, Abhyanker's Opposition only reinforces the implausibility of his misappropriation claim against Benchmark, as he continues to assert new and contradictory allegations — none of which add up to a coherent set of facts that (even if true) would establish a plausible claim that Benchmark misappropriated his trade secrets. His counterclaim for trade secret misappropriation against Benchmark should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6).

**ARGUMENT**

**I.   ABHYANKER'S OPPOSITION DOES NOT IDENTIFY ANY ACTIONABLE TRADE SECRETS THAT WERE COMMUNICATED TO BENCHMARK**

**A.   The Bidding History Cannot Be A Trade Secret**

To assert a claim for trade secret misappropriation, Abhyanker must plead sufficient, nonconclusory facts of (1) the existence of a trade secret and (2) misappropriation of the trade secret. *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003); Cal. Civ. Code § 3426.1. "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). While the proof of these elements is premature at the pleading stage, the plaintiff cannot rely on "a formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" are disregarded by the district court, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Rather, Abhyanker must plead "facts" that, if true, would establish liability under the California Uniform Trade Secret Act ("CUTSA"). *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915, 2012 WL 216260, at *2 (N.D. Cal. Jan. 24, 2012) (Chen, J.); *accord Pellerin v. Honeywell Int'l., Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012); *VasoNova, Inc. v. Grunwald*, C 12-02422, 2012 WL 6161041, at *3 (N.D. Cal. Dec. 11, 2012).

Under the first of these two elements, Abhyanker must plead facts that (if true) would establish that the two purported trade secrets at issue — the bidding history of the nextdoor.com domain name and identification of the Lorelei neighborhood — "(1) [d]erive[] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [are] the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." Cal. Civ. Code § 3426.1(d). Abhyanker cannot avoid the pleading requirement by simply recasting his pleading deficiencies as failure of proof. *See* Opp'n to MTD, at 15.

Here, the Court's July 19, 2013 ruling regarding Abhyanker's purported concept —

which his Opposition conveniently ignores — eviscerates any claim that the bidding history of the nextdoor.com domain name has any independent economic value. *See* Motion, at 15–16; *see also Yield Dynamics, Inc. v. TEA Sys. Corp.*, 66 Cal. Rptr. 3d 1, 17–18 (Ct. App. 2007). The Court held that both the "concept" and the domain name nextdoor.com were publicly disclosed in Abhyanker's 2007 '442 patent application before any purported acts of misappropriation took place, and therefore do not constitute actionable trade secrets. (Dkt. No. 100, at 12–13).[1] The moment that Abhyanker published the concept and name in his patent application, he destroyed their secrecy. *See* Dkt. No. 100, at 10 ("Under California law, an unprotected disclosure of information terminates the existence of a trade secret." (citing *Vacco Indus., Inc. v. Van Den Berg*, 6 Cal. Rptr. 2d. 602, 611 (Ct. App. 1992)); *see also Apple, Inc. v. Psystar Corp.*, No. C 08-03251, 2012 WL 10852, at *1 (N.D. Cal. Jan. 3, 2012) ("Public disclosure (absence of secrecy) is fatal to the existence of a trade secret."). Similarly, the moment he placed a bid with a third-party (without having a nondisclosure agreement, which he does not allege), he destroyed the secrecy of his bid. *See* Motion, at 15. Simply put, non-confidential bidding information is not a trade secret.

Abhyanker fails to address this core defect.[2] Rather, he asserts that notwithstanding his disclosure to third parties before the alleged wrongful act, the bidding history had independent value because it enabled Benchmark, along with Nextdoor.com, to "outbid" him and "purchase the nextdoor.com domain name." (Opp'n to MTD, at 20.) But nothing in this assertion overcomes the fact of disclosure, or suggests that the "bidding history" had any actual or

---

[1] Moreover, it is unclear whether a mere "concept" would even qualify as a trade secret. *See Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 38 (Ct. App. 2010) ("[T]he trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only *the right to control the dissemination of information*."), *overruled on other grounds by Kwikset Corp. v. Super. Ct.*, 246 P.3d 877 (Cal. 2011); *see also* Cal. Civ. Code § 3426.1(d).

[2] Abhyanker claims that Benchmark "clearly recognized the value" in his concepts, and therefore this shows that there was "intrinsic economic value." (Opp'n to MTD, at 3, 4.) But the "concepts" are not what are at issue — the Court has ruled that they are not trade secrets, and nothing in this explanation describes why the "bidding history" — rather than the non-secret "concepts," has value. Moreover, Abhyanker alleges that Benchmark agreed to hear a pitch on the Fatdoor business, and nothing about that decision suggests a conclusion that his LegalForce/Nextdoor "trade secrets," which he has pled are "separate and distinct" from Fatdoor, have value.

potential economic value beyond the value of the nextdoor.com concept and name — the secrecy of which was already destroyed in 2007, before Nextdoor.com purchased the domain name years later in 2011.  See SAAC ¶ 150; see also Synopsys, Inc. v. AtopTech, Inc., No. C 13-02965, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013) ("Plaintiff's complaint is impermissibly conclusory . . . . Materials are not trade secrets just because Plaintiff says they are:  there must be some minimally plausible factual explanation for why trade secret protection applies."); Nexsales, 2012 WL 216260, at *2 ("Plaintiff provides only conclusory allegations . . . and does not provide facts demonstrating that the information constitutes a trade secret." (citation and quotes omitted)).

But even putting that aside, there are simply no facts pled in the SAAC that support the conclusion that several years later, the "bidding history" somehow helped Nextdoor.com obtain the name, much less any facts suggesting that Nextdoor.com obtained the name by "outbidding" Abhyanker (as opposed to simply purchasing it from a third party in a transaction to which Abhyanker had no relation).  The pleading record contains no facts beyond the assertion that a party later purchased a domain name that Abhyanker had previously tried, and failed, to purchase.  These facts, if true, prove nothing — and the leap from there to the claim that somehow, magically, this prior "bidding history" enabled the later purchaser to "outbid" Abhyanker is exactly the sort of conclusory allegation devoid of any specific factual content that the courts have repeatedly found will not support a claim.  Nexsales, 2012 WL 216260, at *2.

### B.   The Identification Of The Lorelei Neighborhood Cannot Be A Trade Secret

Abhyanker further does not meaningfully challenge Benchmark's argument that the identification of the Lorelei neighborhood cannot be a trade secret.  The sum and substance of his alleged trade secret related to the Lorelei neighborhood is "the *identification* of the Lorelei neighborhood in Menlo Park, California as the ideal first neighborhood to use to test and launch a neighborhood social network."  Second Am. Designation, at 2 (emphasis added); see also SAAC ¶ 100 (listing as a trade secret "the activation of the Lorelei neighborhood as a prime testing neighborhood for communication, and neighborhood communication and geo-spatial social networking").  But Abhyanker had already "prototyped" and launched a "working beta

1  website" of the alleged Nextdoor and Fatdoor concepts before Nextdoor.com prototyped its
2  website in the Lorelei neighborhood in October 2010.  *Id.* ¶¶ 119, 147; Motion, at 16.  By testing
3  and launching a social network in the Lorelei neighborhood, Abhyanker necessarily placed in the
4  public domain the idea of testing and launching a social network in the Lorelei neighborhood.
5  He thereby destroyed its secrecy and concomitant economic value.

6  Tacitly admitting his disclosure problem, Abhyanker claims that "[a]bsolute secrecy is
7  not required to maintain a trade secret," but that "[o]nly relative secrecy is required."  (Opp'n to
8  MTD, at 16.)  But none of the cases he cites in support of this proposition suggests that a party
9  may intentionally disclose a trade secret to the public without ending its status as a trade secret.
10  To the contrary, any number of cases stand for the opposite conclusion.  *See, e.g.*, *SkinMedica,*
11  *Inc. v. Histogen, Inc.*, 869 F. Supp. 2d. 1176, 1194 (S.D. Cal. 2012) ("[U]nprotected disclosure
12  of the holder's secret terminates the existence of the trade secret."); *In re Providian Credit Card*
13  *Cases*, 116 Cal. Rptr. 2d 833, 842 (Ct. App. 2002) ("Public disclosure, that is the absence of
14  secrecy, is fatal to the existence of a trade secret.  'If an individual discloses his trade secret to
15  others who are under no obligation to protect the confidentiality of the information, or otherwise
16  publicly discloses the secret, his property right is extinguished.'" (quoting *Ruckelshaus v.*
17  *Monsanto Co.*, 467 U.S. 986, 1002 (1984))).

18  The cases Abhyanker relies on do not contradict these authorities.  Rather, they simply
19  stand for the proposition that the trade secret owner need not take extravagant measures to ensure
20  secrecy from all possible discovery.  As discussed above, there are two elements for determining
21  whether a trade secret exists — the purported trade secret must have (1) "independent economic
22  value" and (2) "reasonable steps" must be taken to maintain its secrecy.  Cal. Civ. Code
23  § 3426.1(d).  The cases cited by Abhyanker are addressing the second prong — that a party need
24  not go to impossible lengths to prevent discovery.  *See Cal. Int'l Chem. Co. v. Sister H. Corp.*,
25  Nos. 97-15233+, 1999 U.S. App. LEXIS 868, at *13 (9th Cir. Jan. 19, 1999) (holding that party
26  took reasonable steps to preserve secrecy of its pool treatment system by requiring its "licensees
27  to sign non-disclosure agreements in order to gain access to" its system and limiting "access to
28  its facilities and certain aspects of its technology on a 'need-to-know' basis"); *K-2 Ski Co. v.*

*Head Ski Co., Inc.*, 506 F.2d 471, 473–74 (9th Cir. 1974) (discussing the doctrine of relative secrecy under Maryland state law in the context of determining whether a party took reasonable steps to maintain the secrecy of its method for manufacturing skis); *Gable-Leigh, Inc. v. N. Am. Miss*, No. CV 01-01019, 2001 U.S. Dist. LEXIS 25614, at *60 (C.D. Cal. Apr. 13, 2001) (finding that a beauty pageant company's "efforts to maintain the secrecy of the customer lists — i.e., keeping the lists on [company president's] home computer, limiting access to the lists, and communicating their confidential nature to the employees — were *reasonable under the circumstances*").

Abhyanker further cites *K-2 Ski Co.*, 506 F.2d at 474, for the tortured proposition that "even limited public disclosures may not destroy the trade secret when the disclosure does not result in the secret becoming generally known to those who can derive economic value from it." (Opp'n to MTD, at 16.) But in that case, the trade secret at issue concerned the *method* of manufacturing skis — the secrecy of which the court determined was properly maintained despite "limited tours of the K-2 plant [that] were conducted," because there were certain reasonable steps taken: "personnel from competitor ski manufacturers were not permitted to view the ski manufacturing operation," and the manufacturing "plant was located in a remote area." *K-2 Ski Co.*, 506 F.2d at 474. Nothing in *K-2 Ski* (or any other cases cited by Abhyanker) suggests that if the party had intentionally disclosed the method (the relevant trade secret) to the public — even a limited portion of the public — it could have remained a trade secret.

Next, Abhyanker once again tries to avoid the defect in his alleged trade secret by changing the description of what his trade secret is. He claims — for the first time in his Opposition — that his public disclosure had no bearing on whether the Lorelei residents "were aware of the ***process*** by which their neighborhood was selected, or of the special attributes that resulted in it being selected," and that Lorelei was "***transformed*** into an ideal neighborhood." (Opp'n to MTD, at 17, 19 (emphasis added).) But Abhyanker has repeatedly stated that this trade secret concerns the "identification" of the Lorelei neighborhood as a testing site for a neighborhood-based social network. *See* Second Am. Designation, at 2 (stating he is "limiting his identification of trade secrets in this designation to two trade secrets," including the

1  "identification of the Lorelei neighborhood in Menlo Park, California as the ideal first
2  neighborhood to use to test and launch a neighborhood social network"); *see also id.* at 2–5
3  (using the specific phrase "identification of the Lorelei neighborhood" eight times); First Am.
4  Designation [Dkt. No. 16], at 2 (limiting his designation to the "identification of the Lorelei
5  neighborhood as the first neighborhood to launch Nextdoor in"); Designation [Dkt. No. 105], at
6  2 (same); SAAC ¶ 100 (stating as his trade secret "the activation of the Lorelei neighborhood as
7  a prime testing neighborhood for communication, and neighborhood communication and geo-
8  spatial social networking").

9  Indeed, the word "process" in relation to the selection of the Lorelei neighborhood or
10 how it was "transformed" by Abhyanker do not even appear in any of the designations, the
11 SAAC, or his prior pleadings. Nothing in the SAAC or the designations identifies any additional
12 information that Abhyanker now seems to suggest is the "real trade secret," or alleges that he
13 disclosed this additional "process" or transformative information to Benchmark. Abhyanker and
14 his attorneys repeatedly represented to this Court and to counsel that his Designation was
15 complete, and there was nothing else needed to describe the trade secrets. Given that, he cannot
16 — as he attempts in the Opposition — opportunistically amend his description each time a defect
17 is identified in the trade secrets he originally described.

18 **II. ABHYANKER FAILS TO ALLEGE FACTS THAT HE TOOK REASONABLE STEPS TO PROTECT CONFIDENTIAL MATERIALS, OR THAT**
19 **BENCHMARK HAD A VALID DUTY OF NONDISCLOSURE**

20 **A. Abhyanker Fails To Allege That He Took Reasonable Steps To Protect Confidential Material**
21

22 Abhyanker also fails to allege "facts" that would establish that he took reasonable steps to
23 protect the confidentiality of this material when he provided it to Benchmark. *See Epicor*
24 *Software Corp. v. Alternative Tech. Solutions, Inc.*, SACV 13-00448, 2013 WL 3930545, at *5
25 (C.D. Cal. June 21, 2013) (dismissing misappropriation claim for failure to allege "facts showing
26 it took reasonable steps"). Abhyanker (an attorney) does not claim he tried to execute with
27 Benchmark a written confidentiality agreement, which is typically sufficient to satisfy the
28 reasonable steps requirement for a trade secret. *See, e.g.*, *MAI Sys. Corp.*, 991 F.2d at 521;

1 *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 286–87 (Ct. App. 2002).[3]

2 Moreover, it is undisputed that much of the material Abhyanker allegedly provided to Benchmark in 2007 was public record material. (*See* Dkt. No. 100, at 12–13.) Indeed, in addition to the material this Court identified in its prior Order, it appears undisputed that he had already launched his website in the Lorelei neighborhood and had already disclosed to third parties his bid for the Nextdoor domain name. *See* discussion *supra* Part I.A–B. Abhyanker's failure in such circumstances to identify as "secret" the material that he now claims was a trade secret is simply incompatible with the reasonable steps a trade secret owner is required to take. Indeed, given the nature of the alleged trade secrets (not obviously "secret" material in the normal sense), and given Abhyanker's failure to allege that he ever specifically called out to Benchmark that he considered the bidding history and identification of the Lorelei neighborhood confidential or proprietary, there is no basis pled to suggest that Benchmark should have considered these specific items to be secret. *See Mattel, Inc. v. MGA Enm't, Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) ("[A]n employer's vague descriptions of exactly what it is that constitutes a trade secret renders the confidentiality agreement largely meaningless. Moreover, an employer's failure to mark documents as confidential or trade secret 'precludes in many cases trade secret protection for those materials.'" (quoting *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 559 (N.D. Cal. 1999))); *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C–08–02658, 2010 WL 2228936, *14 (N.D. Cal. June 1, 2010) (rejecting "vague description" because it did not "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade," nor "permit the defendant to ascertain at least the boundaries within which

---

[3] Oddly, though he does not allege any written agreement in his SAAC, trade secret designations, or brief opposing Benchmark's Motion, in his opposition to Nextdoor's Motion For Summary Judgment, he appears to claim that there was a written agreement promising him confidentiality. But Abhyanker then cites, in support of that claim, an e-mail which clearly does *not* support such a claim. Nor, importantly, does it have anything to do with his "personal trade secrets," but instead, is addressed directly to Fatdoor, the company that he pitched to Benchmark, and whose intellectual property he does not own and has no standing to assert.

the secret lies." (citation and quotes omitted)).[4]

### B. Abhyanker Fails To Allege Any Nondisclosure Duty

This conclusion is further bolstered by the fact that the only basis for Benchmark's duty asserted by Abhyanker is a vague oral contract that is clearly invalid under the statute of frauds. *See* Motion, at 10–11. Abhyanker's simple observation that oral agreements of confidentiality *can* be sufficient to show the existence of a duty in some circumstances, (Opp'n to MTD, at 6–7), does not shield his oral agreement from the statute of frauds. Nor do the cases Abhyanker cites even hold that an oral confidentiality agreement is per se sufficient to give rise to a nondisclosure duty under the CUTSA. For example, Abhyanker relies on *Speech Technology Associates v. Adaptive Communication Systems, Inc.*, No. C-88-2392, 1994 WL 449032, at *1, *7–*9 (N.D. Cal. Aug. 16, 1994), but that case only confirms that when the owner of trade secrets did require a "comprehensive" and "extensive" written confidentiality provision with its business partner (which defendants should have been aware of), the written NDA gave rise to "a clear duty to [plaintiff] to keep the [material] secret." Contrary to Abhyanker's argument, nothing in this decision suggests that dumping an undifferentiated mix of public material and material the plaintiff later claims includes undesignated trade secret material on another party based on a vague, alleged oral agreement are reasonable steps under the CUTSA.[5]

Abhyanker further argues that the oral agreement between him and Benchmark could have been performed within a year and therefore the statute of frauds does not apply. (Opp'n to MTD, at 7–8.) This is nonsense. In the SAAC, Abhyanker alleges that he received oral assurances that Benchmark would keep confidential "***any and all information*** disclosed by

---

[4] This is even more true given that, while he is no longer pursuing claims as to this material, he alleges he provided computer code and "algorithms" etc. While that material may have seemed obviously confidential, there is no reason to believe Benchmark should have considered information that had already been provided to third parties (the bids and the already public launch location) as "secret." And despite his claim to the contrary, neither the SAAC nor Designation alleges that he specifically disclosed "the Lorelei Trade Secret" to Benchmark in a "CD that was clearly marked confidential." (Opp'n to MTD, at 17.) In fact, the items listed in the "Diligence Package," SAAC ¶¶ 122, 124, do not even reference his two alleged trade secrets.

[5] Abhyanker further generally cites *Wolf Designs, Inc. v. DHR & Co.*, 322 F. Supp. 2d 1065 (C.D. Cal. 2004), but that case is entirely inapposite, as it concerns a motion to dismiss a trade dress claim for lack of personal jurisdiction.

Abhyanker during any *future* meetings." SAAC ¶ 120 (emphasis added).  Abhyanker does not provide any further details of what was agreed upon.  Even assuming that Abhyanker could have "developed his social networking concept and released it to the public within a year," (Opp'n to MTD, at 8), it would not expose all of the information he claims to have provided — *e.g.*, the "bidding history," source code, logarithms, mockups, or whatever additional information about the Lorelei neighborhood he now claims exists, and so forth.  Rather, Abhyanker is again ratcheting up or down the level of specificity in his description of his trade secrets as it suits his purpose — now focusing on the high level "concept" (which is not a trade secret), rather than all of the specific information he provided that he claims was confidential.  Under the alleged facts, nothing in the launch would have ended the contract as to all of that material in one year.

Finally, Abhyanker argues that Benchmark should be equitably estopped from relying on the statute of frauds.  (Opp'n to MTD, at 8–9.)  But his only support for invoking the doctrine of equitable estoppel is his claim that "he performed his part of the agreement by sharing his concepts," and thus, "Benchmark cannot now say that it does not have to perform its part of the deal."  (*Id.* at 9.)  But the very case he cites in support of his position holds that "to cause an estoppel there must be unusual circumstances which give the injury an unjust and unconscionable character."  *See SOAProjects, Inc. v. SCM Microsystems, Inc.*, No. 10-cv-01773, 2010 WL 5069832, at *7 (N.D. Cal. Dec. 7, 2010) (citation, quotes, and bracket omitted).  "A simple allegation that a party has not lived up to its end of the bargain is not enough." *Id.*  Even setting aside the fact that Abhyanker did not clearly identify Benchmark's obligation to keep confidential his bidding history or identification of the Lorelei neighborhood, Abhyanker does not point to any allegation suggesting that he suffered an unjust and unconscionable injury resulting from the alleged sharing of concepts that he had already made public.

Because by its term, the oral agreement cannot be completed within a year, and there was no written memorandum, the statute of fraud renders the oral agreement invalid. Cal. Civ. Code § 1624(a)(1).  Abhyanker thus fails to allege any cognizable duty of nondisclosure that Benchmark breached to state a misappropriation claim.  *See* Cal. Civ. Code § 3426.1 (b)(2)(B)(ii); *Ajaxo Inc. v. E*Trade Group Inc.*, 37 Cal. Rptr. 3d 221, 255 (Ct. App. 2005).

## III. ABHYANKER'S TRADE SECRET MISAPPROPRIATION ALLEGATIONS ARE IMPLAUSIBLE UNDER *TWOMBLY* AND *IQBAL*

Abhyanker attempts to bypass the plausibility standard articulated by the Supreme Court by advocating a relaxed pleading standard. (Opp'n to MTD, at 20.) The Court should reject such an invitation because it is contrary to federal law.[6] The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "specifically abrogated the usual notice pleading rule" under Rule 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41 (1957). *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (citation and quotes omitted); *see also Ashcroft v. Iqbal*, 56 U.S. at 662, 684 (2009). Under *Twombly*, district courts are to disregard all "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, and only allow a "plausible claim" to survive a motion to dismiss, *id.* at 679. Plausibility requires pleading facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### A. Abhyanker Fails To Plead Sufficient Allegations Of Disclosure

The Court's July 19, 2013 Order directed Abhyanker not only to provide "additional detail regarding the trade secrets he alleges Counter-Defendants misappropriated," but also "*how* each secret was allegedly misappropriated by Counter-Defendants." (Dkt. No. 100, at 10 (emphasis added).) Abhyanker fails to do so. The only allegation concerning Benchmark's purported disclosure of his alleged trade secrets appears in paragraph 135 of the SAAC where he baldly states that Benchmark "disclosed Abhyanker's Trade Secrets to both Janakiraman and Tolia." SAAC ¶ 135. But there are no allegations of *how* Benchmark disclosed or otherwise wrongfully used the bidding history of the nextdoor.com domain name or the identification of the Lorelei neighborhood as a launch site. Abhyanker responds that the SAAC "sets forth sufficient facts to raise a reasonable expectation that discovery will reveal evidence of

---

[6] Abhyanker's claim that Court has already found his pleading sufficient with respect to his trade secret misappropriation claims, (Opp'n to MTD, at 20), is clearly incorrect. The Court dismissed his misappropriation claim with respect to his core alleged trade secrets (the concept and name nextdoor.com); it did not rule on a motion to dismiss brought by Benchmark; and it denied dismissal of the claim without prejudice to considering the issue again, once Abhyanker complied with the Court's order to fully identify the trade secrets. (Dkt. No. 100, at 10, 12–13.)

1  misappropriation." (Opp'n to MTD, at 21.) But "a district court must retain power to insist upon
2  some specificity in pleading before allowing a potentially massive factual controversy to
3  proceed." *Twombly*, 550 U.S. at 558 (citation and quotes omitted).

4        The only facts that Abhyanker asserts in the SAAC and Designation is that Janakiraman
5  and Tolia had "access" to his alleged trade secrets, who then proceeded to use his alleged trade
6  secrets to found Nextdoor.com. *See* SAAC ¶¶ 144, 182; Dkt. No. 135, at 4. In his Opposition,
7  Abhyanker insists that he has pleaded more than mere "access," stating that an unidentified
8  "Benchmark-funded company" (1) "develop[ed] a social networking *concept* that was nearly
9  identical to [his] *concept*," (2) "chose the *exact name*" that he had chosen, (3) "chose to
10 prototype the *concept* in the *exact* neighborhood" in which he "had prototyped and popularized
11 his *concept*," and (4) "obtained the *exact domain name*" that he "had targeted for his social
12 netoworking [sic] *concept*." (Opp'n to MTD, at 21 (emphasis added).) This litany makes clear
13 that the only "coincidence" involved is that someone else started a company with the same
14 (alleged) concept that this Court has already held was public information, using a name that this
15 Court has also held is public information. But as to the specific trade secrets at issue here — as
16 opposed to the public record concepts that are not trade secrets — there are literally no
17 allegations of fact that relate to Benchmark other than access.[7]

18     **B.**    **Abhyanker's Misappropriation Allegations Are Implausible**

19       Finally, Abyanker's claims should be dismissed because they simply fail to tell a cogent
20 story. *Iqbal*, 556 U.S. at 679. As this Court likely recalls, Abhyanker first filed his claims in
21 state court, claiming that as CEO of Fatdoor, he pitched his neighborhood social network idea to
22 Benchmark. Benchmark demurred on the grounds that Abhyanker was an employee of Fatdoor,
23 not the owner, and therefore lacked standing to pursue claims for Fatdoor's intellectual property.

---

[7] To the extent that Abhyanker relies on the conclusory allegation that Benchmark has a "pattern and practice of building companies based on stolen information," or that it is the "pattern and practice of Benchmark . . . to agree to non-disclosure agreements via verbal and email 'handshakes,'" SAAC ¶¶ 96, 120, he does not come close to alleging facts suggesting any recurring or pervasive "pattern" or "practice," let alone facts suggesting that Benchmark built Nextdoor.com based on trade secrets stolen from him, or any facts plausibly suggesting that Abhyanker executed an enforceable oral agreement with Benchmark.

1    As a result, in the SAAC, Abhyanker has tried to plead around this issue by claiming that, though he was pitching Fatdoor (which he did not own), he provided to Benchmark during this pitch his own personal trade secrets regarding his LegalForce/Nextdoor concept[s]. He repeatedly emphasizes in the SAAC, however, that the LegalForce/Nextdoor concepts are entirely "separate and distinct" from Fatdoor, which he now recasts as a "public Wikipedia-like neighborhood commenting tool," SAAC ¶ 117, rather than — as he claimed in the state court— a neighborhood social network. He also alleges that he did all this without any documentation separating which material belongs to which company, or distinguishing for Benchmark what belonged to him versus what belonged to Fatdoor — the company for whom he was soliciting an investment. Benchmark respectfully suggests that this bizarre story is sufficient to render the claim implausible on its face.

If it were not implausible on its face, it certainly becomes so when Abhyanker tries to explain it. According to Abhyanker, as alleged in the SAAC, he offered his personal LegalForce/Nextdoor trade secrets to Benchmark while he was pitching another business (Fatdoor) because he was pitching a "*new* version of Fatdoor.com centered on *security and privacy*," and to this end, Fatdoor was to incorporate "some" of Abhyanker's personal trade secrets. *Id.* ¶ 119. But as Benchmark pointed out earlier, *see* Motion, at 18–19, and putting aside that there was no suggestion of this in the state court complaint which straightforwardly described everything as belonging to Fatdoor, this is not plausible: the bidding history and Lorelei neighborhood bear no relationship to improving Fatdoor's security and privacy.[8]

Now Abhyanker's story changes again — and he claims in his Opposition without any citation to the SAAC — that he incorporated some of his LegalForce/Nextdoor trade secrets into Fatdoor "to make improvements, and *evolve his concept from a wiki type concept to a secure neighborhood social networking concept*." (Opp'n to MTD, at 22 (emphasis added)). This directly contradicts his allegation in the SAAC that Fatdoor was "separate and distinct" from his

---

[8] Adding to this implausibility is the difficulty in understanding how the decision about *where* to launch Fatdoor (the alleged trade secret relating to the Lorelei neighborhood), could not necessarily belong to Fatdoor, since it was already "prototyped . . . in Lorelei" and "developed into a working beta website" before Abhyanker pitched it to Benchmark. SAAC ¶¶ 119, 147.

1   LegalForce/Nextdoor social networking concepts.  Likewise, in the opening paragraph of his

2   Opposition to Nextdoor.com's Motion for Summary Judgment ("Opp'n to SJ"), Abhyanker

3   contradictorily claims that in 2006, he "conceived of a neighborhood social network to be called

4   Nextdoor.com," and that "[i]n 2007 Mr. Abhyanker *and his company Fatdoor* confidentially

5   pitched the *idea* [of Nextdoor.com]" to Benchmark.  (Opp'n to SJ, at 1).  But Abhyanker clearly

6   maintains in the SAAC that he was pitching Fatdoor, which had nothing to do with a social

7   networking concept.  These contradictions — arising from Abhyanker's desperate attempts to

8   invent a story that allows him to chase claims relating to his "concepts" that were publicly

9   disclosed and proprietary to Fatdoor (and not him) — strike directly at the heart of whether his

10  basic claim is even plausible.  Benchmark respectfully suggests that they are not.

11  **IV.    CONCLUSION**

12          Abhyanker urges the Court to put aside the basic common sense embodied in the federal

13  plausibility standard and permit him to proceed to discovery on the basis of two obviously

14  spurious trade secrets — the bidding history of the nextdoor.com domain name and identification

15  of Lorelei neighborhood.  Neither of these are trade secrets under the alleged facts.  Nor does

16  Abhyanker allege any valid duty of nondisclosure or nonconclusory facts of wrongful disclosure

17  by Benchmark.  Abhyanker should not be allowed to abuse discovery to find more illusory

18  details of his speculative claim, *Twombly*, 550 U.S. at 560 n.6.  Nor should he be permitted to

19  engage in another round of ever-mutating, contradictory allegations in the making of his creative

20  nonfiction.  *See Swartz v. Deutsche Bank*, No. C03-1252, 2008 U.S. Dist. LEXIS 36139, at *78

21  (W.D. Wash. May 2, 2008) (dismissing complaint without leave to amend because, *inter alia*,

22  "the dictates of justice and judicial economy require that [the] merry-go-round of re-wording, re-

23  fashioning and reinventing the nature of this litigation be halted").  The SAAC should be

24  dismissed with prejudice.

25  Dated:  January 30, 2014                                Respectfully submitted,

26                                                          LATHAM & WATKINS LLP

27                                                          By /s/ Matthew Rawlinson
                                                              Matthew Rawlinson
28                                                            [Attorneys for Counterdefendant Benchmark]