1

1        Pages 1 - 100

2            UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF CALIFORNIA

4          BEFORE THE HONORABLE EDWARD M. CHEN

5    NEXTDOOR.COM, INC., a        )
     Delaware corporation,        )
6                                 )
              Plaintiff,          ) Case No. 3:12-cv-05667-EMC
7                                 )
        vs.                       )
8                                 ) San Francisco, California
     RAJ ABHYANKER, an            ) Thursday
9    Individual,                  ) February 20, 2014
                                  ) 1:30 P.M.
10            Defendant.          )
     _____)
11   RAJ ABHYANKER, an            )
     Individual,                  )
12                                )
              Counterclaimant,    )
13                                )
        vs.                       )
14                                )
     NEXTDOOR.COM, INC., a        )
15   Delaware corporation;        )
     PRAKASH JANAKIRAMAN, an      )
16   individual; BENCHMARK        )
     CAPITAL PARTNERS, L.P., a    )
17   Delaware limited liability   )
     company; SANDEEP SOOD, an    )
18   individual; MONSOON          )
     ENTERPRISES, INC., a         )
19   a California corporation,    )
     and DOES 1-50, inclusive;    )
20                                )
              Counterdefendants.  )
21   _____)

22

23            TRANSCRIPT OF PROCEEDINGS

24

25

1    APPEARANCES:

2    For Plaintiff Nextdoor.com, Inc.:

3                    Fenwick & West LLP
                     555 California Street, Suite 1200
4                    San Francisco, CA 94104
                BY: **LAURENCE F. PULGRAM**
5
                     Fenwick & West LLP
6                    801 California St.
                     Mountain View, CA 94041
7               BY: **ERIC J. BALL**

8    For Defendant and Counter-claimant Raj Abhyanker:

9                    Harmon & Seidman LL
                     2627 18th Avenue
10                   San Francisco, CA 94116
                BY: **HEATHER RACHEL NORTON**
11
                     Bruno W. Tarabichi
12                   4750G Almaden Expy #259
                     San Jose, CA 95118
13              BY: **BRUNO W. TARABICHI**

14   For Counter-defendant Benchmark Capital Partners VII,
     L.P. and Counter-defendant Benchmark Capital Management
15   Co. VII LLC:

16                   Latham & Watkins LLP
                     140 Scott Drive
17                   Menlo Park, CA 94025
                BY: **MATTHEW RAWLINSON**
18
     For Counter-defendant Sandeep Sood:
19
                     Royse Law Firm, PC
20                   1717 Embarcadero Road
                     Palo Alto, CA 94303
21              BY: **HARPREET SINGH WALIA**

22

23

24

25   *Reported By:  Kelly Lee Polvi, CSR No. 6389, RMR, FCRR*

3

1          P R O C E E D I N G S

2    FEBRUARY 21, 2014                          1:50 P.M.

3          THE CLERK:  Calling case C-12-5667, Nextdoor

4    vs. Abhyanker.

5          If Counsel can please come to the podium and

6    state your appearances for the record.

7          MR. PULGRAM:  Good afternoon, Your Honor.

8    Laurence Pulgram for Plaintiff Nextdoor.com and

9    Plaintiff -- and Counter-Defendant Janakiraman.

10         THE COURT:  All right.  Thank you.

11         MR. RAWLINSON:  Matt Rawlinson of Latham

12   Watkins on behalf of Counter-Defendant Benchmark.

13         THE COURT:  All right.  Thank you.

14         MR. WALIA:  Harpreet Walia, appearing on behalf

15   of Counter-Defendants Sandeep Sood and Monsoon

16   Enterprises.

17         THE COURT:  All right.  Thank you.

18         MR. TARABICHI:  Your Honor, Bruno Tarabichi

19   appearing on behalf of Defendant and Counter-Defendant

20   Raj Abhyanker.

21         THE COURT:  All right.  Thank you.

22         Go ahead.

23         MS. NORTON:  Heather Norton appearing an behalf

24   of Mr. Abhyanker, Defendant and Counter-Claimant.

25         THE COURT:  All right.

4

1          MR. BALL:  Good morning, Your Honor.  Eric Ball

2     from Fenwick & West on behalf of Plaintiff Nextdoor.com

3     and Counter-Defendant Prakash Janakiraman.

4          THE COURT:  All right.

5          Let me address the motion for summary judgment,

6     Nextdoor's motion for summary judgment, and kind of

7     jump to the core issues about the two trade secrets that

8     have been now identified at this juncture, the first

9     being the identification of the Lorelei neighborhood as

10    an ideal first neighborhood to use to test and launch a

11    neighborhood social network.

12         And I understand Nextdoor's argument that,

13    given the public nature of Mr. Abhyanker's efforts in

14    conducting his surveys and going door to door and

15    transforming the neighborhood, beginning market

16    penetration to sort of build the idea and to popularize

17    it, is done in a public way.

18         While there is, I guess, some suggestion of a

19    confidentiality agreement that may have been used in

20    some context, perhaps a focus group, there's no evidence

21    that this was done on a widespread basis -- for

22    instance, when he went door to door.

23         On the other hand, the fact that people may

24    have known what he was doing and that he's doing a

25    survey, that they were part of this survey or attempted

1   to be the subject of some discussion and marketing of,

2   for instance, a network, did not necessarily indicate

3   that the residents with whom he had contact knew exactly

4   why he was choosing that neighborhood or, in fact, that

5   he was choosing only that neighborhood, unless there's

6   some evidence that says that Mr. Abhyanker went and told

7   everybody, "I am focusing only on this neighborhood as

8   the ideal, you know, test site or prototype for the

9   prototype of this network."

10          So I'm not sure why it's any different than if

11  you use a customer list, which is a trade secret, and

12  you start contacting customers in a public way.  You

13  call people up and you contact them and try to market

14  whatever you're trying to market and you don't obtain a

15  confidentiality agreement for each customer that you

16  talk to.  That doesn't necessarily disclose the customer

17  list.

18          So I guess that's my question to Nextdoor.

19          I'm having trouble understanding why the sort

20  of secret requirement has been lost by virtue of the

21  actual context of his transformative efforts and

22  marketing efforts.

23          MR. PULGRAM:  Thank you, Your Honor.

24          In the case of a customer list, it is that

25  collection of information, that collection of the names

1     of the individuals, that is the secret.  And any one

2     individual knowing that they're on that list does not

3     mean that they have the core secret, which is the

4     contents of that list.

5           But in this case the alleged secret is the

6     identification of this neighborhood as a place to

7     prototype.  It is not the names of each of the people

8     that were prototyped, it is the identification of that

9     neighborhood.

10          And what Mr. Abhyanker says he did was he came

11    up with a methodology to determine that that would be

12    the neighborhood.

13          That's not identified as a trade secret.  That

14    methodology is not something that he has contended that

15    he ever disclosed to Mr. Sood or ever disclosed to

16    Benchmark and has never been identified as a trade

17    secret.

18          That, in theory, potentially, conceivably,

19    might be something, but it is not, in this case.

20          What this case is about is only the identity of

21    a neighborhood as a good place to prototype.

22          So how is that disclosed by him?

23          In the first place, he signed up that

24    neighborhood; he went and actually did the prototype

25    there.

1        THE COURT:  He went to people in the

2   neighborhood.

3        MR. PULGRAM:  He went to those people in the

4   neighborhood and he signed them up.

5        And what he says is he went door to door to

6   encourage people and to overcome their initial

7   resistance.

8        He told people, whether they're joining or not,

9   "Hey, I want you to be part of this prototype."  And he

10  claims that he invested in establishing that.

11       When he said that to each of those people --

12  and he said that there were over 750 people that

13  ultimately did join, that's what exhibit -- I think it's

14  C to his declaration says, over 750 different people,

15  many others -- he didn't get a hundred percent

16  penetration; he claims 90 percent.

17       So there's at least another 75 people that he

18  went and approached and tried to get to sign up.

19       And he wasn't signing people up to be a

20  customer; he was signing them up to a neighborhood

21  website.  He was disclosing that "This neighborhood is

22  the one that I'm prototyping."

23       THE COURT:  Did he disclose Lorelei as "the

24  neighborhood"?

25       MR. PULGRAM:  Well, he did, and he had to.

1    Because it's a neighborhood website.  In other words,

2    what he's setting up -- and, in fact, what he has put in

3    as his evidence in this case -- is that, "I'm setting up

4    a neighborhood website for Lorelei."

5            So when you do that --

6            I'm sorry.

7            THE COURT:  Well, the critical question is so

8    what would any individual know that -- would the

9    individual know that it is, in fact, what is being

10   targeted, is the Lorelei neighborhood as qua

11   neighborhood, not something bigger, or Silicon Valley,

12   or Santa -- you know, whatever -- Menlo Park, generally.

13           But, really, this neighborhood, did that become

14   apparent, either by something he said or when they

15   actually signed up, it was entitled, "Network for the

16   Lorelei neighborhood"?  Was there anything that was

17   identified to the individual participants that it was a

18   Lorelei neighborhood?

19           MR. PULGRAM:  So because it was a neighborhood

20   website it necessarily was talking about "a

21   neighborhood."

22           With respect to whether it was specifically

23   Lorelei, that's the way he described it on the document

24   at the time.

25           If you could find the focus group document,

1    Eric, and see if there's anything on that one in

2    particular.

3          But he is walking door to door in a relatively

4    confined area trying to overcome resistance of those

5    people to share information.

6          THE COURT:  Any one recipient might not know

7    what the radius of his sweep was.  A neighborhood can be

8    defined many ways.  Zip codes.  Precincts.  Towns.

9          As far as they know, how do they know he wasn't

10   doing the entire -- is this in Menlo Park?  Where is

11   this?

12         MR. PULGRAM:  It is in Menlo Park.

13         THE COURT:  So how does he know he wasn't just

14   doing Menlo Park as a neighborhood?

15         MR. PULGRAM:  I can tell you that he's never

16   suggested that that was anything -- the theory that you

17   have come up with is not something that has been

18   suggested in the record as a basis for this to be

19   distinct.

20         The only thing that's been suggested by him is

21   that he did, in fact, go in this neighborhood and that

22   it was the particular location.

23         And he also did say, he said to -- and he put

24   this in the record, that he told the CEO of Nextdoor

25   later that the residents in Lorelei were very

1    enthusiastic about this site.

2         THE COURT: Who did he tell?

3         MR. PULGRAM: He told this to Mr. Tolia, who is

4    the CEO of Nextdoor.

5         THE COURT: Yes?

6         MR. PULGRAM: He said to him -- this is Kelly

7    Declaration Exhibit 2: I don't know if you realize this

8    was -- when we spoke, but the Lorelei neighborhood in

9    Menlo Park was the first beta neighborhood for the

10   Nextdoor/Fatdoor concept.

11        The Fatdoor concept was very popular in the

12   Lorelei and Lorelei Manor neighborhood.

13        He himself identifies it as specific to that

14   neighborhood.

15        And it's interesting that, by the way, he

16   simply gave this information, in Kelly Declaration

17   Exhibit 2, without any pretense of confidentiality when

18   he sent it.

19        THE COURT: Exhibit 2?

20        MR. PULGRAM: Exhibit 2.

21        THE COURT: This is the problem with i-Pads.

22        MR. PULGRAM: I would also -- once I find it, I

23   have one other point.

24        THE COURT: Well, it's going to be hard to find

25   because I have Exhibit A and B. Is there two? Kelly

1   Declaration --

2            MR. PULGRAM:  Kelly Declaration --

3            MR. TARABICHI:  Your Honor, can I just point

4   out the date on that email is well after the fact?

5            THE COURT:  What's the date of that email?

6            MR. TARABICHI:  I think it's 2012.  It's after

7   they already prototyped in the neighborhood.  It's not

8   really relevant.

9            MR. PULGRAM:  Well, it's relevant to two

10  things, I think.  One is that he wasn't treating this as

11  a secret at that time.

12            MR. TARABICHI:  Nextdoor had already destroyed

13  the secret at that point.

14            MR. PULGRAM:  He doesn't say that he believed

15  that Nextdoor had used it in that neighborhood.

16            THE COURT:  Is there any contemporaneous or

17  time where we don't need to dispute timeliness for where

18  the trade secret was allegedly appropriated and

19  destroyed that shows his disclosure of Lorelei as the

20  neighborhood prototype?

21            MR. PULGRAM:  What he states in his own

22  declaration is he describes efforts to transform Lorelei

23  into the ideal neighborhood to test neighborhood social

24  networks by going door to door to establish connections

25  between residents and engage in extensive hand-holding

1    to overcome any initial lack of interest among

2    residents.

3            And this is in his declaration -- I can give

4    you the paragraph number, but it's also opposition,

5    page 1, to the motion.

6            It is building connections between residents in

7    that neighborhood.

8            He's saying to them, "I'm building connections

9    in this neighborhood."

10           The idea that this was somehow broader is not

11   something that the record suggests because, in fact,

12   when you -- if you go on --

13           THE COURT:  Well, it's not that he was or was

14   not, in fact, broader; I mean, I assume that this is all

15   correct, that his actual efforts were confined to this

16   prototypical test neighborhood.

17           The question is whether or not any secret

18   nature of this -- which is essential, obviously, to any

19   trade secret be maintained here -- was vitiated by

20   disclosure.  And I'm still having problems.

21           Unless he told focus group people or disclosed

22   to the people he went door to door with, "Listen, I'm

23   testing the Lorelei neighborhood, you're part of this

24   neighborhood, and" -- you know, such and such.  He just

25   said, "We got this social networking."

1       If he just said neighborhood generally, "I've

2  got neighborhood networking," that's ambiguous whether

3  it's the block, precinct, Lorelei neighborhood,

4  Menlo Park.

5       MR. PULGRAM:  One thing that I know and that

6  you may not is that the way Nextdoor.com works is it

7  defines a neighborhood.  You are a member of one.

8  That's what you're in.

9       THE COURT:  Is there a graphic or something?

10       MR. PULGRAM:  Yes, there is.

11       MR. TARABICHI:  That's his service.  Nextdoor's

12  service.

13       THE COURT:  I'm talking about what he did.

14  What they would have seen.

15       MR. PULGRAM:  So, in the case of Fatdoor, where

16  they also had graphic descriptions -- and they're in the

17  record, as well --

18       THE COURT:  Is there a graphic you can show me?

19       MR. PULGRAM:  I don't know that there would

20  be -- we need to look at the Supplemental Statement, and

21  I do think that that was submitted, where he has some

22  mock-ups.

23       MR. WALIA:  Your Honor, and if I may add that

24  the record does reflect that the concept, the idea

25  behind what Abhyanker was claiming to be promoting, was

14

1    a neighborhood network.  That it would be limited -- in

2    his own words, it would be limited to only --

3            THE COURT:  I get you.

4            MR. WALIA:  So when he goes out and he's

5    promoting this and he's marketing this, he's informing

6    people about the Lorelei neighborhood and these are

7    the --

8            THE COURT:  That's my question.  Did he say

9    "Lorelei neighborhood" or how did they know

10   "neighborhood" was specific to Lorelei, which is the

11   trade secret, as opposed to the local precinct?

12           MR. WALIA:  Well, that's the essence of his

13   business plan, that it is limited only to the

14   neighborhood.

15           And that's what he promoted; right?

16           The record, I think, in many of the documents

17   that he's reflected, where he's appended attachments

18   promoting the success of this idea, it was -- and he

19   stated that this was specific to neighborhoods, that we

20   launched it limiting the interaction between people

21   within those neighborhoods.

22           These are -- these were attached to his initial

23   pleadings in this case.

24           MR. TARABICHI:  Your Honor, can I address the

25   issue?

1           THE COURT:  Yes.

2           MR. WALIA:  Thank you.

3           MR. TARABICHI:  So when we're looking at the

4     three prongs, obviously I think right now we're talking

5     about that first prong, was it generally known by the

6     public or people who could derive economic value.

7           And I think you've latched onto one business

8     direction that's happening here.  It's not that a test

9     was going on in the Lorelei neighborhood, but that

10    Lorelei had been selected and transformed into the ideal

11    neighborhood.  That was not disclosed.

12          And I think, you know, if you look at the cases

13    we cite, not being generally known does not mean

14    absolute secrecy's required or that nobody knows the

15    trade secret.

16          And I think that makes sense when you think

17    about things -- other things that could be trade

18    secrets, like compilations of publicly-available

19    information or customer lists.

20          You know, one thing that's really interesting

21    is that *Pyro* case that I cited in our opposition, which

22    says, you know, if something's truly generally known,

23    then the defendant would acquire it by proper means,

24    and, if the defendant acquired it by improper means,

25    that tends to show that it's not generally known.

1        And even though we raise that issue in our

2   opposition brief, nowhere in the moving or reply papers

3   has Nextdoor ever come out to say exactly how they ended

4   up selecting and using this Lorelei neighborhood, which

5   tends to show that it was not generally known.

6        I also want to address one of the things

7   Mr. Pulgram said, which was, you know, Mr. Abhyanker's

8   efforts in methodology in selecting the Lorelei

9   neighborhood.

10       That isn't the identification of the trade

11  secret, but, you know, when you're trying to figure out

12  if something's generally known or not, one thing that

13  you look to is efforts.

14       If it took great efforts to identify the trade

15  secret or compile it or create it, then that tends to

16  show that it's not generally known.

17       And that's what we were introducing that

18  evidence for.

19       I mean, think about it this way --

20       THE COURT:  Let me ask you.  Is there any

21  evidence that, from your perspective, that the Lorelei

22  neighborhood was identified to the recipients of his

23  efforts as "the neighborhood"?

24       MR. TARABICHI:  No, not at the -- an ideal

25  neighborhood for testing social network.

1          I mean, think about it this way.  There's two

2    things i want to -- think about if you, you know,

3    decided to go start a neighborhood social network.  How

4    would you have known that -- to test your neighborhood

5    social network in Lorelei?

6          If it's generally-known information, you know,

7    where is it?  Is it published somewhere?  How would you

8    figure that out, if not through, you know,

9    misappropriation.

10         And if you really look at the evidence that

11   Nextdoor has submitted, it's no evidence that Lorelei is

12   publicly known; all they're doing is pointing to

13   statements made by Mr. Abhyanker's unsworn testimony in

14   letters and things like that.

15         And what's funny is when we introduced the

16   declaration by Mr. Abhyanker, suddenly his testimony is

17   self-serving or conclusive or doesn't constitute

18   evidence; but when they want to rely on unsworn

19   statements and twist them around, suddenly they're

20   conclusive that something's generally known.

21         And, you know, I think you've hit on the two

22   points; one being that the fact that the neighborhood

23   was ideal was never disclosed, and, two, the fact that

24   even if there was, you know, some disclosure in Lorelei,

25   which we say was subject to a confidentiality agreement,

1    that does not equate or transform it into being

2    generally known by the public, which is the statutory

3    language.

4            And, you know, if they're going to --

5            THE COURT:  But had he disclosed it, had he

6    said -- given a survey instrument of people saying, I am

7    testing this in the Lorelei neighborhood," case over.

8            MR. TARABICHI:  Well, I would say, you know,

9    the trade secrets that the Lorelei neighborhood had

10   ideal characteristics for testing, the network, not just

11   that it was being tested only in Lorelei, I mean, I

12   think there's a important distinction there.

13           MR. RAWLINSON:  Your Honor, I don't want to

14   talk out of turn.  I'm here on a motion to dismiss.  But

15   this issue actually impacts both, and I'd like at least

16   a little bit of a chance to address it.

17           First, let me just deal with the secrecy issue.

18   I'm going off the Complaint, and, based on the Complaint

19   in paragraph 119, they appears that they weren't just

20   doing a survey, they had launched a website.  Right?

21   There was a prototype website that this group could

22   access.  And by accessing that website -- at least as I

23   understand it, if it's defined within a certain area,

24   they would be able to tell that.

25           MR. PULGRAM:  And, Your Honor --

1          THE COURT:  Wait.  Wait.  Say that again.

2          MR. RAWLINSON:  So this is paragraph 119.

3          The prototype of Fatdoor.com was developed into

4     a working website.

5          So, as I understand, the trade secret -- and

6     I'm going to get to the definition of a trade secret in

7     just a minute, the idea is this was -- you can call it

8     ideal, you can call it very good -- and I'm going to get

9     to ideal here in a minute -- neighborhood to launch a

10    website.

11         They had launched the website.  So inherent in

12    that is this is a good place to launch the website.

13         And it is defined as a neighborhood website.

14         Second, if you look at paragraph 147, it is one

15    of three websites that were early websites and early

16    neighborhood and prototype neighborhoods.  It was not

17    the one and only.

18         So, you know, I struggle a little bit.

19         And then, finally, in this vein we've been

20    talking about, which is what's the measure of the

21    neighborhood, was it Lorelei, was it some subset of

22    Lorelei, was it all of Menlo Park, I mean, we have a

23    second amended trade secret disclosure which identifies

24    the trade secret and it is four lines long for both

25    trade secrets.  And it just says, at that level,

1    "Lorelei neighborhood."

2         If there is something specific about some

3    subset of Lorelei which makes it -- or some super set of

4    Lorelei which makes it important and valuable, that is

5    the trade secret and we were entitled to know it before

6    now.

7         There's been some back and forth and some

8    confusion about this issue of all of the work that was

9    done in order to identify it as the ideal trade secret.

10   That's sort of what I got from Mr. Abhyanker's papers in

11   this process.

12        But that work and that detail and those facts

13   were not ever identified to us as trade secrets; they

14   are not found in the identification of the trade secret;

15   there has never been a mention that specific information

16   was provided to benchmark in anything up until now.

17        If you look in the Complaint -- and we can talk

18   about it later, if we get to talk about my motion --

19   there's nothing, other than this is a good place, ideal

20   place, if you prefer, to launch a neighborhood website.

21   But the neighborhood website had been launched.

22        MR. PULGRAM:  And so, Your Honor, if there is a

23   gap in the evidence here, I believe the gap that I'm

24   hearing you identify is does that launch of that website

25   indicate that it is the neighborhood of Lorelei that is

1      the test or could that person believe it was something

2      broader.

3              Because if that person knows that Lorelei is

4      where the test is happening, then it's been disclosed to

5      them.

6              And if there's a gap in that evidence, I have

7      two suggestions:  The first is -- because no one on this

8      side has ever pretended for a second -- no one on the

9      counter-claimant's side has ever pretended for a second

10     that if you're in that neighborhood you don't know what

11     your neighborhood is.  And anyone who's dealt with this

12     type of business knows that what you identify to the

13     user is your neighborhood.  It is all about your

14     neighbors.  "FatDoor - Get to Know Your Neighbors."

15     That's their slogan that they did in this test.

16             But one thing that you can see that does

17     carefully reflect that is Exhibit -- is tab docket 153,

18     Exhibit C.

19             THE COURT:  Tab --

20             MR. PULGRAM:  Exhibit 153.  I'm sorry.  Docket

21     153, Exhibit C.

22             And these are mock-ups that were provided.

23             THE COURT:  What is docket 153?

24             MR. PULGRAM:  Docket 153 is the Errata

25     submitted by Mr. Abhyanker to his Supplemental

22

1    Statement.

2            So it is his augmented pleading of his

3    trademark claim.

4            THE COURT:  Okay.

5            MR. PULGRAM:  So I could provide a copy, but if

6    I may hand the Court, this is the pages showing what a

7    mock-up the website looks like.  It's the neighborhood

8    on a map.

9            MR. TARABICHI:  I don't think that's the

10   mock-up for -- that's the Nextdoor mock-up.

11           MR. PULGRAM:  That is the Nextdoor mock-up

12   because no one has ever suggested that anyone who is in

13   the Fatdoor neighborhood wouldn't know the scope of the

14   neighborhood they were in.

15           THE COURT:  This is not the actual Fatdoor.

16           MR. PULGRAM:  That is the mock-up that they

17   have showed that purports to show what their website

18   looked at.

19           Remember, it changes names whenever it feels

20   like it.

21           THE COURT:  I don't understand.  What is this

22   that I'm looking at?

23           MR. TARABICHI:  That was submitted to show

24   Mr. Abhyanker's mock-ups for using the Nextdoor

25   trademark in connection with his trademark claim.  It's

1    not really relevant to what we're dealing with here.

2              THE COURT:  But whose map is this?

3              MR. PULGRAM:  That's his.

4              THE COURT:  And what is it of?

5              MR. PULGRAM:  It is a map of a neighborhood

6    that appeared on his mock-up of a website that he has

7    submitted as demonstrating his priority of use.

8              So he put this in as purportedly showing what

9    his website prototypes looked like.

10             MR. TARABICHI:  Not for the Lorelei

11   neighborhood.

12             MR. PULGRAM:  Now, what I'm suggesting is that

13   because no one ever suggested that if you're signed up

14   to a neighborhood you don't know what neighborhood

15   you're in, we should be able to put in the documentation

16   that reflects that fact.

17             It is simply an argument that's never been made

18   and therefore never addressed.

19             THE COURT:  So you think you have some

20   documents.  You think there are documents that would

21   demonstrate that the Lorelei neighborhood was

22   specifically identified by Mr. Abhyanker in his

23   transformative processes --

24             MR. PULGRAM:  I believe that's most likely.  I

25   can't say to a moral certainty because no one challenged

1    this point at any time.

2         THE COURT:  Well, isn't that a fair -- because

3    your question -- your statement is that was not -- the

4    point I made, I think your statement was Abhyanker did

5    not tell Lorelei residents and they did not know why the

6    neighborhood was ideal from a selectional,

7    transformational point of view.

8         MR. TARABICHI:  And probably shouldn't have

9    said not know why.  They didn't know it was ideal at

10   all.

11        THE COURT:  Well, this is coming from his

12   declaration.  And so that's not giving fair notice to

13   the other side.  This is something jumped out at me as

14   something that I thought was relatively obvious.

15        MR. PULGRAM:  I think it's because you've never

16   been in one of these neighborhoods, unless you care to

17   join ours.

18        MR. TARABICHI:  I think it's in our trade

19   secret designation, and so I think they were on notice.

20   I also put it in our opposition.

21        I think, you know, this conversation really

22   demonstrates, I think, why discovery should move forward

23   on this claim.

24         Everyone knows what we're talking about, they

25   know what kind of documents they want to see on the

25

1    Lorelei trade secret.  I think it shows that we've

2    identified it with sufficient particularity to let the

3    scope of discovery move forward.

4            MR. PULGRAM:  Well, I think this actually --

5            THE COURT:  What you're asking for is if I

6    denied it, it would be without prejudice, if you find

7    evidence that, in fact, the neighborhood was disclosed

8    as "the neighborhood."

9            MR. PULGRAM:  Well, actually, I think a little

10   beyond that.  If you deny this, we would -- or express

11   the belief or the concern that there's a lack of

12   evidence on this point, that we'd be permitted within 7

13   days to submit a supplement based on whatever

14   information --

15           THE COURT:  Oh, you'd need full discovery.

16           MR. PULGRAM:  I'm not asking for full discovery

17   at this point, Your Honor.  Because this is not

18   something we've ever believed would be an issue and not

19   something we've asked for discovery to prove.

20           If we do need discovery to prove it because we

21   don't have it in our records and can't find it in the

22   public records, the public demain, then that might be a

23   different story.

24           But I'm talking just about we could submit

25   something within 7 days and, if they want to respond to

1     that, that would be okay too.

2           But no one has ever suggested that if you sign

3     up to a neighborhood you don't know what your

4     neighborhood is.

5           No one has ever -- it's not something that --

6           THE COURT:  People have different definition of

7     neighborhoods.  I mean --

8           MR. PULGRAM:  Sure.

9           THE COURT:  -- you know, I might consider it

10    "my street."  Other people might consider it "my little

11    subdivision."  Other people might consider it "this part

12    of town," the north part of town, the west side of town.

13          So that's the problem.

14          MR. PULGRAM:  Right.  And that's why I would

15    like to demonstrate to you, Your Honor, if we can, by

16    the documents that we can find, that this was plain on

17    the face of the operation that the people were engaged

18    in.

19          THE COURT:  Well, normally I would say, you

20    know, people take their best shot, they'd bring the

21    motion.  On the other hand, the opposition did not raise

22    this point squarely.

23          As I said, in the declaration it really

24    discusses sort of the why the neighborhood was ideal,

25    from a selectional transformative point of view, and

1       then gets into the methodology that Mr. Abhyanker used,

2       the pushpins and the mathematical formula, et cetera, et

3       cetera, et cetera, which is not being claimed at this

4       point as trade secret.

5               MR. TARABICHI:  Well, let me -- maybe I can

6       reiterate why we put that in there.  We put that in

7       there to show that he went through great effort, which

8       means --

9               THE COURT:  Yes, I know that.

10              MR. TARABICHI:  Yeah.

11              THE COURT:  But you have never came back with

12      an argument that seemed to me --

13              MR. TARABICHI:  It thought it was in the

14      opposition.  Perhaps his declaration may be worded a

15      little differently.  And I thought it also was in the

16      trade secret designation, which is what they're working

17      off of when they move for summary judgment.

18              Let me see if I can find that.

19              MR. PULGRAM:  I would, given the Court's

20      concern, request leave to submit, within 7 days, a

21      demonstration of this point.

22              THE COURT:  I'm looking at page 15 of the

23      Abhyanker brief.

24              "Third, the Lorelei residents were not actually

25      told Mr. Abhyanker's Lorelei Trade Secrets -- in other

1   words, they were not told of the process by which

2   the neighborhood was selected or of the special

3   attributes that resulted in it being selected,

4   including Mr. Abhyanker's follow-up manual efforts in

5   the neighborhood."

6          That's different than saying they didn't even

7   know there was a neighborhood.

8          MR. TARABICHI:  You know, that's also dealt

9   with in the operative pleadings.  You know, we talk

10  about, you know, those efforts that he engaged in.

11         THE COURT:  The efforts, but not -- in

12  responding to the motion for summary judgment, all I'm

13  saying is you haven't raised this issue, and if I'm

14  going to rely on this issue in your favor, I think it's

15  fair to give Nextdoor a chance to respond.

16         Because this is an argument that was not

17  clearly asserted or briefed.

18         And I think, as a matter of fairness, I'm going

19  to allow Nextdoor 7 days to file something, I'll give

20  you another 7 days to respond, I'll take that under

21  submission.

22         MR. PULGRAM:  Thank you, Your Honor.

23         May I turn to the question, then, of whether or

24  not there has even been proof of any actual obligation

25  to treat this as a secret?

1            In other words, there was an oblique reference

2     to a disclosure to Mr. Sood of the secret, but there's

3     no evidence in the record of any confidentiality

4     obligation of Mr. Sood, other than the statement that,

5     "I had a confidentiality agreement."  There's no --

6            THE COURT:  All right, I'll let you address

7     that briefly.

8            MR. PULGRAM:  Well, there simply isn't a

9     contract.  Where's the contract?

10           With respect to Benchmark -- and Mr. Rawlinson

11    can speak more to this himself -- there's an obligation

12    of an oral agreement to keep this secret.

13           So, again, assuming they ever heard about the

14    Lorelei, either one of them, and assuming what they

15    heard was a secret in some way, there's no proof of any

16    obligation of confidentiality on the part of either of

17    these recipients.  Mr. Sood, no agreement whatsoever,

18    and with respect to Mr. Rawlinson, only the allegation

19    of an oral -- and therefore barred by the statute of

20    frauds -- agreement.

21           Absent proof of an agreement, there has been no

22    preservation and there's been loss of the trade secret

23    status of the disclosure.

24           MR. TARABICHI:  Your Honor, can I address that?

25           THE COURT:  Yes.

1      MR. TARABICHI:  So we're under that second

2   prong.  Did the trade secret owner take reasonable

3   measures to protect the secrecy of the trade secret.

4   That's the language of the statute.

5      And it's clear that, you know, we have

6   introduced evidence of efforts that we're taking.  The

7   disclosure to Benchmark was pursuant to a

8   confidentiality obligation --

9      THE COURT:  Under what?

10      MR. TARABICHI:  There was a oral agreement, but

11   then also, if you look at the due-diligence CD, that was

12   all marked confidential.

13      We have produced the agreement with Mr. Sood

14   that has a confidentiality provision in there.

15      THE COURT:  Why don't you tell me where, in the

16   record, that is.  You said there is a Sood

17   confidentiality provision --

18      MR. TARABICHI:  There's an agreement.  I don't

19   know that it was introduced, but it's been produced to

20   Nextdoor.  In the supplemental -- if we're doing the

21   supplemental brief, we can attach it as an exhibit.

22      THE COURT:  That issue was raised in the

23   motion, was it not?

24      MR. TARABICHI:  It was really -- their argument

25   was more that we didn't take reasonable efforts in terms

1    of requiring secrecy to the Lorelei residents, as

2    opposed to Mr. Sood.

3          So that was really the focus, if you look at

4    their moving papers.

5          They may have raised it in their reply, but we

6    couldn't, you know --

7          THE COURT:  But if their argument is that you

8    didn't take -- your client didn't take reasonable steps,

9    then the natural comeback is, "Oh, yes, we did; here's

10   the confidentiality --

11         MR. TARABICHI:  It's in his -- he's testified

12   to it in his declaration.  And then we've also put in

13   testimony about the confidentiality agreements put in

14   place with Lorelei residents, as well.

15         So, you know, you're talking about were efforts

16   taken?  There were definitely some efforts taken.  Were

17   they reasonable?  That's a question of fact for the

18   trier of fact to decide.

19         THE COURT:  Well, I want to see the Sood --

20         Where did you first make the argument,

21   Mr. Pulgram, that --

22         MR. PULGRAM:  Your Honor, I think generally

23   with respect to the failure to reasonably protect the

24   trade secrets and reasonably ensure their

25   confidentiality.

1      What struck me was their reliance in their

2  declaration on nothing other than a representation of an

3  agreement that was undefined and hadn't been submitted.

4      And that's where we submitted an objection on

5  the best-evidence basis that there was no proof of any

6  obligation with Mr. Sood that covered this.

7      THE COURT:  All right.

8      So it's clear that nothing is before this Court

9  currently with respect to any written confidentiality

10  agreement with Sood, but it's been represented to me now

11  that there was such an agreement; is that right?

12      MR. TARABICHI:  We produced it to them;

13  correct.

14      THE COURT:  Well, rather than dance around the

15  procedure, is there or is there not such an agreement?

16  Has something like that been produced?

17      MR. PULGRAM:  Yes, Your Honor.  They produced

18  something, but it doesn't have Mr. Abhyanker's name on

19  it.

20      THE COURT:  Whose name was on it?

21      MR. PULGRAM:  Another identity.

22      MR. TARABICHI:  It was his law firm.  All the

23  assets and interest from that law firm had been assigned

24  to him personally, so he's the successor to that

25  agreement.

1      MR. PULGRAM:  There's no proof of Mr. Abhyanker

2   being bound to an agreement, that I've seen.  There's

3   certainly none in the record here.

4          If -- look, you know, goose and gander.  If he

5   has something that he wants to present, I'm -- at the

6   risk of burdening you with more filings.

7          THE COURT:  All right.  Well, I'll take

8   additional evidence.  I don't want a whole lot of

9   briefing; I just need the evidence.

10         MR. PULGRAM:  Yes, Your Honor.

11         THE COURT:  Because I'll give you a chance,

12  although this one -- seems to me that this issue was

13  raised, unlike the other issue.

14         But in the interest of more than due process,

15  I'm going to give you a chance to submit to me

16  whatever -- within 7 days -- evidence with respect to

17  confidentiality, you know, anything more that you have

18  to show that reasonable efforts were taken and, in fact,

19  there was an obligation to keep this information

20  confidential.

21         Assuming it was a trade agreement, which may or

22  may not be the case.

23         And I'll give Nextdoor 7 days to respond as

24  well.

25         MR. WALIA:  Your Honor, if we may also respond

34

1     to that because it goes directly to our client.

2          We haven't seen it and my client indicates that

3     he never signed any such agreement.

4          THE COURT:  Okay.  All right.

5          Let's talk about the other sort of trade

6     secret.

7          MR. TARABICHI:  Your Honor, just some clarity

8     on what we're submitting.

9          You're saying we're submitting a brief first

10    and then they're --

11         THE COURT:  You're going to submit not even

12    a -- you're going to call it a brief.  I'm looking at

13    evidence.  You say there was a confidentiality agreement

14    that bound Mr. Sood.

15         MR. TARABICHI:  Right.

16         THE COURT:  And anything to support that your

17    client was a beneficiary and has -- sustaining that

18    agreement.

19         So if there's -- you've heard, now, a preview

20    that his name's on it; you're going to have to show some

21    kind of chain or something to show that there was an

22    obligation.

23         It goes to both reasonable -- reasonable

24    efforts to maintain secrecy, it goes to whether there

25    was a breach at all.

1        MR. TARABICHI:  And the reason I'm asking, is

2   he was also -- Mr. Pulgram was also talking about

3   Nextdoor filing their own brief on the identification of

4   the Lorelei issue.

5        THE COURT:  Yes, I'm giving him 7 days to

6   respond to the point I raised that Lorelei neighborhood,

7   if not specifically identified and known to the

8   recipients, thereby disclosed to the focus group or

9   people he went door to door to, then I have serious

10  questions about whether the neighborhood, itself, has

11  been disclosed.  Which is the trade secret; not the

12  methodology.

13       MR. TARABICHI:  So we're each submitting

14  something in 7 days.

15       THE COURT:  Yes.  Each submitting something in

16  7 days, and you'll both, then, submit cross responses to

17  that.

18       MR. TARABICHI:  Got it.

19       THE COURT:  So there will be four short

20  submissions.

21       MR. PULGRAM:  Yes, Your Honor.

22       THE COURT:  Evidence.  I don't need a whole lot

23  of legal argument, at this point.

24       MR. TARABICHI:  Is there a page limit on that?

25  I know you want it short, just -- so we're --

1          THE COURT:  With that question, I think I

2     should --

3          I mean, I don't need more than 3 pages.  You

4     just tell me what it is.

5          MR. PULGRAM:  Yes, Your Honor.

6          THE COURT:  It's the evidence.  Give me the

7     document, where it came from.  You have to explain where

8     it came from or whatever, that's fine.

9          I don't need re-briefing about the test for

10    trade secrets or what a reasonable effort is, et cetera,

11    et cetera.  Because you've already briefed that.

12          Bidding history.

13          Here there's no dispute, it seems to me, that

14    to the extent bids were, in fact, submitted, that

15    there's no -- there was no confidentiality obligation

16    imposed upon the receiver of the bidder; correct?

17          MR. TARABICHI:  On the domain-name owners;

18    correct.

19          THE COURT:  Yes.

20          So in that case what prevents the domain name

21    owner who's going to sell it from playing on one bid

22    against another?  I mean, people do that all the time.

23          MR. TARABICHI:  Right.  So really what you're

24    talking about is could they have figured it out by going

25    to the domain name owner.  And that's the readily

1   assertible affirmative defense, where people say I went

2   and I got it through proper means by someone who was

3   under no obligation to keep it confidential.

4         That affirmative defense goes to

5   misappropriation, which is not the element that they're

6   moving on, they're moving on was it a trade secret, and,

7   two, it requires actual evidence that the defendant did

8   use proper means to acquire it.

9         So yeah, perhaps they could have gone to a

10  domain name owner, but is that what happened here?

11  There's no declarations, no evidence, that that's what

12  happened.

13        Really, what we're looking at is, you know,

14  generally -- is it generally known by the public or

15  those who could obtain economic value from it.

16        And I don't know how someone who wants to bid

17  on the Nextdoor.com domain name would be able to figure

18  out, you know, Mr. Abhyanker's domain name, bidding

19  history, and valuation, you know.  Because that's not

20  published anywhere.  That's not public information.

21        THE COURT:  Why doesn't that go to whether

22  there were reasonable efforts to maintain secrecy?

23        MR. TARABICHI:  It does also go to that prong.

24        And so, you know, there's the word "reasonable"

25  there.  And, you know, he took other efforts, in terms

1    of maintaining the secrecy of the domain name.

2         So when he's disclosing those to Sood and

3    Benchmark, those are done pursuant to confidentiality

4    agreements and obligations.

5         And, you know, there's no way for him, when

6    making a bid to an anonymous domain-name owner, to

7    impose confidentiality obligations.

8         So our position would be that that would not be

9    reasonable, and what he did do was sufficient in terms

10   of reasonable efforts, and then it's a question of fact

11   whether what he did was sufficient under the

12   circumstances.

13        THE COURT:  What were his efforts to maintain

14   secrecy in this context?

15        MR. TARABICHI:  So he disclosed it to Sood and

16   Benchmark, and both of those entities were under

17   confidentiality obligations.

18        So, you know, other than, you know, the offers

19   made directly to the owners, the disclosures -- all

20   other disclosures were made confidentially.  And our

21   position would be those efforts were sufficient and

22   reasonable under the circumstances that we're talking

23   about.

24        And our other position is it's a question of

25   fact.

1          THE COURT:  All right.

2          Mr. Pulgram, what can one do -- if you're

3   putting in a bid under these circumstances, you know who

4   the recipient is, what more can you do?

5          MR. PULGRAM:  Well, if you want it to be

6   confidential, you have to send that person something

7   saying, "I want to submit to you a confidential bid" and

8   have them say yes.

9          There are some things in this world that don't

10  get confidentiality protection.  Just because the other

11  side hasn't agreed to it, doesn't mean you can somehow

12  claim it for yourself.

13         The ascertainable point here is really a red

14  herring.  The ascertain-ability situation is this:  You

15  have a customer list.  You've developed it.  You've

16  bound people in your employment to keep it confidential

17  and not to take it.  Okay?  You have done enough to try

18  to keep this secret.  You have, you know, followed

19  reasonable precautions.

20         Someone might come in and say, "You know what?

21  That's reasonably ascertainable.  I can put that

22  together from the Yellow Pages or from the list that I

23  can get out there somewhere else."

24         So even though you have taken reasonable

25  precautions, I'm able and capable of ascertaining it.

1          That's not what happened here.  Here someone

2     took the customer list and gave it away to their

3     customers and said, "Here are all the customers that I

4     go to.  Don't bother with an NDA, I just want you to

5     know who all my good customers are.  Here's my bid.  I

6     want you to know how much the bid is."

7          So there's been no effort to maintain any

8     confidentiality, none at all, and the ascertain-ability,

9     therefore, is not the point.

10          THE COURT:  So the obvious response seems to me

11     that the reasonable efforts would have included asking

12     for -- that the bid be kept confidential.

13          MR. PULGRAM:  Exactly.

14          THE COURT:  Which is done sometimes when people

15     bid on real estate or matters.  You don't want your bid

16     to be shopped, you get an agreement, "Don't shop my

17     bid."

18          MR. PULGRAM:  Exactly.  And if you are actually

19     going to make a bid in an auction in a public place, if

20     you're going to make a bid with something that isn't

21     labeled as confidential, the person who receives that

22     bid has the right to use it any way he or she wants to.

23          Once they have received it, what kept -- in

24     fact, nothing kept Mr. Watson, if he had gotten a bid

25     from Nextdoor, to take it and shop that somewhere else.

41

1      That's the way the world works in bidding.  And there's

2      no bases on which someone can claim that that

3      information can't be used because they don't want it to

4      be.

5                  MR. TARABICHI:  But there's no --

6                  MR. PULGRAM:  If you want that to be the case,

7      if you want to have secrecy in your bid, you have to get

8      someone to commit to it.

9                  MR. TARABICHI:  But there's no evidence any of

10     that happened.  There's no evidence they obtained the

11     information through Watson, you know.

12                 THE COURT:  That goes to a different issue.

13     I'm talking about not -- that's a different issue.  The

14     issue is whether or not reasonable efforts were

15     undertaken.

16                 And your position is yeah, they did.  Because

17     they got -- and maybe this is in dispute --

18     confidentiality agreements from Benchmark and Sood, but

19     they didn't get one from the -- from the bid recipient,

20     your argument, in your brief, is that, "Well, that's not

21     reasonable, you can't do that, it's not the custom, when

22     you bid on domain names, and so that was not a

23     reasonable effort."

24                 MR. TARABICHI:  That's true.

25                 THE COURT:  And your response to that is,

42

1      "Well, you take it as you find it."

2              MR. RAWLINSON:  There's one other issue, Your

3      Honor.

4              Putting aside the reasonableness of the

5      efforts, there's also a black letter rule, which I think

6      trumps this, which you cited in your opinion earlier in

7      this case, which is, under California law, an

8      unprotected disclosure of information terminates the

9      existence of a trade secret.

10             The test isn't whether it's generally known and

11     you stop there.  The question is, if you give a third

12     party the right to distribute your trade secret without

13     protection, that ends the trade secret.  That's the end

14     of the story.

15             That's our view, Your Honor.

16             THE COURT:  There's an issue if it's done

17     negligently --

18             MR. RAWLINSON:  Sure.  And I don't think any of

19     the cases cited by Mr. Abhyanker stand for the

20     proposition that you can intentionally disclose your

21     trade secrets to even a single party and maintain its

22     trade secret status.

23             To me that's the core of that dispute.

24             The cases cited by Mr. Abhyanker are generally

25     about what lengths you must go to to preserve secrecy

43

1    and prevent someone from misusing your trade secret.

2    None of them stand for the proposition that you may

3    intentionally disclose the trade secret to even a single

4    person with no protection and still call it a trade

5    secret.

6            MR. PULGRAM:  And that's exactly what the

7    *Ruckelshaus* case out of the Supreme Court says.

8            If an individual discloses his trade secret to

9    others who are under no obligation to protect the

10   confidentiality of the information, his property right

11   is extinguished.  467 U.S. at 1002.

12           MR. TARABICHI:  Your Honor, I would direct the

13   Court to all those cases we cite on page 15 of our

14   opposition where, you know, they stand for the

15   proposition that limited disclosures may not destroy the

16   trade secret.

17           And, you know, we've cited the *K-2 Ski* case,

18   *Gable-Leigh*, *Hirel Connectors* case and *AAA Blueprint*.

19   And I think if you look at those it's not as black and

20   white as they're trying to make it out to be.

21           MR. PULGRAM:  Well, the *K-2 Ski* case is a

22   really good example.  The allegation was that because

23   you allowed visitors to your plant you've lost your

24   trade secret.  But the visitors weren't allowed to see

25   the part of the plant where they made the skis.  So they

44

1    hadn't disclosed the secret to that person.  Had they

2    done that, they couldn't claim that because someone

3    walked in and looked around their plant and didn't sign

4    an NDA they couldn't necessarily --

5         THE COURT:  So there was no actual disclosure

6    of the trade secret.

7         MR. PULGRAM:  There was no actual disclosure of

8    the trade secret.

9         THE COURT:  So the statement in their brief

10   that even limited public disclosures may not destroy

11   trade secrets when the disclosure does not result in a

12   trade secret becoming generally known to the public or

13   those that can't derive economic value from it is not an

14   accurate statement of the law.

15        MR. PULGRAM:  I don't believe that is an

16   accurate statement of the law under the California case

17   law.

18        MR. TARABICHI:  Your Honor.

19        MR. PULGRAM:  And --

20        MR. TARABICHI:  Look at the other cases, as

21   well.  You know, there's a case where the information

22   was published on the Internet and the Court held that it

23   did not necessarily destroy the secrecy.

24        MR. PULGRAM:  It wasn't published by that

25   person; it was published by another.  The person did not

1      voluntarily, themselves, disclose it.

2              If you take Apple's stuff and put it on the

3      Internet, that doesn't mean Apple can't try, if they

4      have engaged in reasonable activity, to continue to

5      claim it as a trade secret.

6              MR. TARABICHI:  There's plenty of case law that

7      talks about absolute secrecy not being required.

8              MR. PULGRAM:  It's true --

9              THE COURT:  Yes, but when you voluntarily

10     disclose to someone -- are you saying unless you

11     broadcast it to the general public you can still

12     maintain a trade secret status?

13             MR. TARABICHI:  Yeah, if it doesn't fall into

14     that first prong, which is generally known to the

15     public --

16             THE COURT:  That's in the first instance

17     whether it is a trade secret, but we're not losing the

18     trade secret.

19             MR. TARABICHI:  That's how you lose it.

20             THE COURT:  Well, all of these cases I'm very

21     skeptical because I think I've held to the contrary in

22     and other cases, but --

23             MR. RAWLINSON:  Yeah, Your Honor.  Our view of

24     that is that those cases stand only for the

25     proposition -- and we can work through the specifics --

1     that you need not go to extraordinary lengths to

2     maintain the trade secret status.  So how many of your

3     employees may you disclose it to?  You know, how

4     strongly must you guard the facility to make sure no one

5     gets in?  Must you have everyone guard it at all times

6     when they walk through the plant?

7               None of those, in our view, stand for the

8     proposition that the trade secret owner can disclose

9     intentionally and voluntarily to a third party with no

10    requirement that they maintain the secrecy and still

11    maintain trade secret status.  To the contrary, we think

12    that's directly contrary to California law.

13              THE COURT:  All right.  Well, I'm very likely

14    to find that there's no actual trade secret on that

15    count.  I'm very inclined to grant summary judgment

16    and, therefore, the motion to dismiss on that count.

17              The Lorelei count, I'm going to wait and see

18    what the evidence is.  If there is no evidence that the

19    neighborhood itself was identified in an express way,

20    then I don't think the secrecy argument of Nextdoor

21    prevails.

22              On the other hand, if there's evidence that

23    this was -- again, same principle -- if this was

24    disclosed deliberately, without a confidentiality or

25    evidence of any confidentiality obligation, for

1    instance, to Mr. Sood, or Benchmark -- but it sounds

2    like there's at least some assertion and an oral

3    understanding with Benchmark, that, you know, that may

4    be the critical issue in this case, and with respect to

5    that particular claim.

6            So 7 days and 7 days.  And then I'll take the

7    matter under submission officially at that point.  I

8    don't think I need any further briefing.

9            MR. PULGRAM:  I just wanted to add one footnote

10   on Lorelei, if I could.  There actually is an

11   explanation in the record, and it's in the conversation

12   that they submitted, Exhibit J, as to exactly how it was

13   that Nextdoor.com came to use that neighborhood.  And

14   that was that the homeowner association head of Lorelei

15   was a friend of Defendant Janakiraman.  That was the

16   explanation.

17           THE COURT:  Say that again.

18           MR. PULGRAM:  The homeowner's association for

19   the Lorelei neighborhood --

20           THE COURT:  Mm-hm.

21           MR. PULGRAM:  -- was a friend of Prakash

22   Janakiraman, the defendant in this case, and that is

23   what is submitted in their Exhibit J as the explanation

24   for why it is that Nextdoor found that neighborhood.

25           MR. TARABICHI:  He's saying that, but that

1     hasn't been submitted in any declaration or under oath.

2              MR. PULGRAM:  You submitted it.

3              MR. TARABICHI:  It's an assertion.  You moved

4     to strike it.

5              THE COURT:  Well, wait.  Exhibit J to what?

6              MR. PULGRAM:  To Mr. Abhyanker's Declaration.

7              THE COURT:  So you want to strike your own

8     exhibit?

9              MR. TARABICHI:  No, I said he moved to strike

10    it; now he's trying to rely on it.

11             THE COURT:  Well, it should be an estoppel,

12    then.  So it depends which part of that motion I should

13    take first.

14             All right.  Well, that's very interesting.

15             So let's leave it as it is, and I look forward

16    to seeing whatever additional stuff you submit.

17             We do have a discovery matter that I'd like to

18    resolve here.  I'm not sure I fully understand it.  But

19    there's a question about whether or not Abhyanker's

20    Verified Responses to the Interrogatories should be --

21    should include statements made by his counsel.

22             Is that the gist of it?  Basically, certain

23    things were said?

24             MR. PULGRAM:  Well, there's certain things that

25    were written in meet and confer correspondence, and they

1    are attached as Exhibit Q to Ms. Kelly's Declaration.

2         I have extra copies if, Your Honor, it would be

3    convenient.

4         THE COURT:  Well, before I get to that level.

5    But the gist is these -- whatever was -- I think I have

6    that, the December 20th, 2013, letter?

7         MR. PULGRAM:  Yes, Your Honor.

8         THE COURT:  So what you want -- what are you

9    asking for, exactly?

10        MR. PULGRAM:  What we ask for and what Your

11   Honor previously stated at the December 12th hearing was

12   that if there are facts that have been provided as

13   explanations in meet and confer that were not in the

14   interrogatories, that they be verified.

15        And what Your Honor previously said on the 12th

16   at page 15 was as long as there's not a relevancy

17   problem, seems to me it's fair to back up whatever those

18   sorts of facts are with the verification.

19        And the problem that we're facing here, Your

20   Honor, is the ever-changing nature of Mr. Abhyanker's

21   claims.

22        Key example:  In the trade secret disclosures

23   and then in interrogatory responses he stated that he

24   had no recollection of any bids, no recollection of when

25   or the amount other than one bid for $1,300 in 2006.

1          They produced that one document, they said he

2     has no recollection of anything else.

3          And specifically what they said in their meet

4     and confer letter was except for an offer in one email,

5     these offers were done over the phone; therefore, other

6     than the documents produced, Mr. Abhyanker does not have

7     any additional responsive documents and he simply is

8     unable to recall the particular details of the

9     negotiations and offers made over the phone.

10         That's what they said in a letter.

11         And we said if that's the case, when we ask you

12    about what efforts you have made to buy the -- to bid,

13    you need to say that.  You said -- you need to say that

14    you're unable to recall the particular details of the

15    negotiations and offers made and you need to verify

16    that.

17         And you need to do that so that we won't have

18    what happened in this motion happen again, which was the

19    creation out of thin air of a set of bids that are

20    discussed in a vague and general way but with numbers,

21    with purported numbers, in his declaration.

22         So our view is in that example they need to say

23    he's unable to recall anything else.

24         Another example.

25         THE COURT:  That's enough.

1          What's the problem with standing behind what

2    the attorney represented and making that a part of a

3    verified response?

4          MR. TARABICHI:  Well, I think if -- our

5    position is, if you look at our actual interrogatory

6    responses, in response to the actual question being

7    asked, we've provided a full and complete response.

8          And, you know, if we went through everything

9    that they're trying to ask us to include, you'll see

10   that some of it isn't even responsive to the question

11   that they've asked, and some of it, you know, that

12   they're asking us to supplement, are, I believe, their

13   own statements.

14         You know, I thought we were doing the CMC, so I

15   don't have that information in front of me on the

16   discovery.

17         THE COURT:  All right.

18         So their statement, I understand why you were

19   not obliged to adopt that.  But if it's counsel's

20   statement on behalf of Mr. Abhyanker in the context of

21   meet and confer, sufficiency of responses of particular

22   interrogatories, and now that's been given, do you have

23   a theoretical problem with saying, "Yeah, I adopt those;

24   attach this to a declaration or a verified response, and

25   adopt these?"

52

1          MR. TARABICHI:  Well, I have two responses to

2    that.  One is they've already served additional requests

3    asking us to admit each of those statements, so this is

4    really a dispute over nothing.

5          Two, you know, on a whole, some of them are

6    more objectionable than others.

7          And, you know, I wish I had all that

8    information in front of me.

9          But I think if you went through and looked at

10   the --

11         MS. NORTON:  Your Honor, if I may jump in for

12   just a minute.

13         Interrogatories 2 through 4 is an example of

14   what Mr. Tarabichi was referring to in that the

15   interrogatories request that Mr. Abhyanker state all of

16   the facts supporting his claim to ownership of the

17   Fatdoor and the Fatdoor - Get to Know Your Neighbors and

18   Get to Know Your Neighbors mark, and he responded to

19   that interrogatory.

20         What Nextdoor is actually requesting now is an

21   explanation of why Fatdoor does not own the marks, which

22   isn't what they were asking in the interrogatories.

23         And so some of the -- as Mr. Tarabichi says,

24   some of the requests are more objectionable than others,

25   but we would like the opportunity to set forth fully our

53

1   positions with respect to each interrogatory and we were

2   not able to do that within the space limit of the

3   letter.

4          But some of the information that they're

5   requesting is just not relevant to the interrogatories.

6   And we would request -- we have requested that they

7   simply serve discovery requests that directly ask for

8   what they were seeking, and they have now done that in

9   the form of RFAs.

10         So as my colleague said --

11         THE COURT:  They've done that in the course of

12   what?

13         MS. NORTON:  They've served request for

14   admissions which point by point ask for an admission as

15   to whether each statement that they want to have

16   incorporated into the interrogatories, they ask whether

17   that statement is true.

18         So this dispute, really, is moot at this point,

19   in that they will get that, the information that they're

20   seeking, and we have requested previously that they

21   simply provide us with discovery requests asking for

22   exactly what they are seeking and they've now done that.

23         THE COURT:  Well, all right.  Let me ask you.

24   If you've got an RFA out on each of the critical points

25   you want, why doesn't that cover this?

54

1          MR. PULGRAM:  These interrogatories were served

2     last spring.  We met and conferred on them in September.

3     There's no admission to the request for admission, and

4     they can easily be denied or qualified or otherwise.

5          We just want a verification of the truth.

6          Take, for example --

7          THE COURT:  If they admitted, that would

8     obviate this.

9          MR. PULGRAM:  But, they haven't admitted it.

10          THE COURT:  What's the status?

11          MS. NORTON:  Our responses aren't due yet;

12     they're due next week.

13          THE COURT:  Well, why don't you give me a

14     preview?

15          MS. NORTON:  We're still working on them.  Our

16     client is currently out of town, so we haven't been able

17     to discuss them, but they will receive substantive

18     responses to their request.

19          MR. PULGRAM:  Your Honor, we should not have to

20     wait for another round of meet and confers to get what

21     they said.

22          THE COURT:  This is my concern.  Then there's

23     going to be a denial or qualified admission and this and

24     that --

25          MR. PULGRAM:  We asked them to state -- it's

1    quotations from them.

2           With respect to the ownership of Fatdoor --

3    it's on the page in front of you -- they say in -- they

4    won't say in an interrogatory response what they say in

5    their letter.  That after he left Fatdoor, et cetera.

6           THE COURT:  All right.

7           This is what we're going to do.  This is what

8    we're going to do.

9           Anything that counsel has represented on behalf

10   of the client, ought to be verified.  Now, whether you

11   do that in an accelerated way, in the request for

12   admissions, or whether you do it by amending and

13   supplementing the interrogatory response, I don't really

14   care.

15          But, as a matter of principle, something that

16   an attorney represents -- they are the authorized agent

17   of the client -- binds the client, unless it is a

18   fundamental decision like waiving, dismissing the case,

19   or something like that that's binding and that ought to

20   be -- that's the principle.

21          So I'm going to direct you to meet and confer,

22   work it out.

23          MR. TARABICHI:  Okay.  Can I ask a question

24   real quick?

25          If they're asking us to supplement with the

1  response that answers a different question, isn't that

2  an issue we should be concerned about?  An interrogatory

3  they haven't served?

4        THE COURT:  Well, then we get into whether or

5  not this is directly responsive or whether this is

6  derivative to a potential follow-up interrogatory.

7  That's why I said I don't care how you do it.  You can

8  do it by stipulation, you can do it by stipulated

9  further interrogatories with stipulated response

10  thereto, you can do that by admitting on the request for

11  admissions.

12        If it's relevant, it's going to come out.  And

13  I don't want to spend time, and your client's time,

14  fussing about, "Well, this interrogatory didn't exactly

15  ask you this question so why don't you propound set

16  No. 16 and then we'll think about answering that."

17  We're not going to do that.  Just stipulate.

18        Next.

19        MR. RAWLINSON:  Your Honor, and I don't want to

20  try your patience; I'm sure I already have.  Can I have

21  just five minutes on the motion to dismiss?

22        MR. PULGRAM:  We've got a couple more on the

23  discovery, Your Honor.

24        THE COURT:  No, I want to get through issues.

25        MR. PULGRAM:  So, issue No. 2.

1          The next big issue in this lawsuit, Your Honor,

2     is going to be priority of trademark use.  And there is

3     one website in which we believe Mr. Abhyanker has begun

4     use after the launch of Nextdoor.com in an effort to

5     pretend to have used earlier.

6          And this website is called eDirectree.com.

7          We've asked interrogatories for them to specify

8     exactly how they used -- how he purports to have used

9     the term "Nextdoor" on eDirectree.com before the launch

10    of Nextdoor.

11         Have you got the copies?

12         And their response has been to say, "Here's a

13    document that reflects how that use happened."

14         I'm going to show you the document, if I may.

15    Because this is the key point.

16         The document is not from before the launch of

17    Nextdoor.com.

18         May I?  Thank you, Ms. Lee.

19         This is a document that they have acknowledged

20    was printed in October 2, 2013.  It purports, according

21    to them, in meet and confer with counsel, to reflect the

22    website as it was taken down in October of 2012 when we

23    filed the lawsuit -- after we filed the lawsuit.

24         And on page 371 you'll see, about dead center

25    on the page, a tiny little reference that says

1      "NextdoorTM neighbors."

2              That NextdoorTM neighbors is what they now

3      purport to be their trademark use that predated the

4      launch of Nextdoor.com, and this is what they're hanging

5      their claim to priority on.

6              MR. TARABICHI:  It's also on the first page at

7      the top.

8              MR. PULGRAM:  It is also on the first page.

9              Now, prior to this, according to the Internet

10     archive, prior to this time, that NextdoorTM neighbors

11     said "Friends."

12             That NextdoorTM neighbor was plugged into this

13     website at some point, and we're trying to determine

14     when that is.

15             This particular print we know was not from 2008

16     or 2009 or before 2011 because if you look at the first

17     entry in the upper right-hand side of 371, you'll see a

18     link to T time and you'll see next to it updated on

19     August 13th, 2012.

20             Obviously, this was after 2011.

21             MR. TARABICHI:  There's no dispute about that;

22     we agree.

23             MR. PULGRAM:  So what we have asked is that

24     they specify in their interrogatory exactly when and

25     exactly how and exactly with what affect Nextdoor was

59

1    ever used on this website before the launch of the

2    Nextdoor.com website.  And their response is, "Look at

3    the document."

4          In fact, to quote their response in the letter,

5    they say Mr. Abhyanker responded that he used the

6    Nextdoor trademark and he directed Nextdoor to a

7    screenshot.

8          THE COURT:  Okay.

9          MR. TARABICHI:  That's how they used it.

10    That's exactly how it --

11          THE COURT:  That doesn't answer the question.

12    You cannot respond to an interrogatory by saying, "Look

13    at the document; it's self-explanatory," when it's not

14    self-explanatory.

15          MR. TARABICHI:  Well, I think we also said we

16    used it, it appeared on the website, and -- "So you can

17    see how it appeared on the website, look at this

18    document we've produced."

19          And that's exactly how it appeared on the

20    website.  There's not much more to say.

21          You look at it, at the top of it --

22          THE COURT:  Does it say -- do you say that it

23    was used prior to October 26, 2011?

24          MS. NORTON:  That was inherent in one of their

25    questions.

1       MR. TARABICHI:  I think we put dates in there.

2   I didn't know we were going to go through these one by

3   one, so I don't have a copy of our responses in front of

4   me.

5       MS. NORTON:  That date was in one of their

6   interrogatory questions, so our response necessarily

7   indicated that it was prior to that date.

8       THE COURT:  Okay.  Number 1 asks identify all

9   public uses by you on the name Nextdoor in connection

10  with any service prior to October 26, 2011, including

11  documents shown in that use.

12      MR. TARABICHI:  But they put the date in there.

13      THE COURT:  Yes, that's their case.  And in

14  your responses you refer to Bates number -- et cetera,

15  et cetera, et cetera.  Doesn't include 370.  I don't

16  know what these other documents are.

17      Number 5 asks, state all facts supporting your

18  claim to ownership.  And that's a little different.

19  Perhaps related.

20      Ten asks, identify all products and services

21  that you have marketed and offered in connection with

22  the eDirectree.com website, and that's a little

23  different.

24      Eleven asks, identify any use of the term

25  Nextdoor or any variation thereof on the eDirectory.com

1   website prior to February 9th, 2012.

2           And then the answer is -- after several

3   objections, Respondent Nextdoor appeared on the

4   eDirectree website.  Doesn't say when.

5           It refers to Nextdoor documentation Bates 129

6   and 130.

7           What are 129 and 130?

8           MR. PULGRAM:  Well --

9           MR. TARABICHI:  It might be -- you know, they

10  might also be --

11          THE COURT:  It might be this.

12          MR. PULGRAM:  I believe it's a typo, but it is

13  actually an article, "eDirectree Brings Group Wiki Twist

14  to Social Networking."

15          MR. TARABICHI:  It should not refer to that, I

16  don't think.

17          MR. PULGRAM:  So I think that what it meant to

18  refer to most likely was this screenshot.

19          Interrogatory No. 10 is a really good example.

20  Identify all products or services that you have marketed

21  or offered in connection with eDirectree.com website

22  including documents identifying them.

23          There is no specification of what products were

24  marketed on this site.  There isn't anything.  If you

25  look at this page, you can't see any products or

1    services offered or marketed.

2              (Indiscernible, simultaneous speaking.)

3              THE COURT:  One at a time.

4              MR. PULGRAM:  There's no products or services

5    that are identified.

6              And all there is down here is an objection and

7    reference to a page number, without under oath, stating

8    what you claim was marketed under this brand name.

9              And with respect to No. 1, there's nothing that

10   says, "We began on such and such a date to use

11   Nextdoor.com, NextdoorTM neighbors, to do anything."

12             What does it do?  What is the use?

13             Because the question will be whether or not

14   this has been used in a source-identifying way that can

15   be commercial use, as well as whether it was used before

16   Nextdoor.com was launched.

17             So we need narrative, accurate answers to the

18   key questions for the case.

19             MR. TARABICHI:  Your Honor, if you go back and

20   look at the interrogatory he was referencing about

21   identify all products or services you used in connection

22   with that mark on the eDirectree, I don't have our

23   answer, but I know we answered it.  And, to me, that,

24   you know, if someone can read that answer --

25             THE COURT:  No, the answers are, "We refer you

1    to document Bates No. 129 through 130."  There's no

2    narrative, and with respect --

3            MR. TARABICHI:  Are you looking at our

4    Supplemental Verified Responses?

5            THE COURT:  No.

6            MR. TARABICHI:  So we -- we already

7    supplemented, so you might be looking -- they might

8    have -- you know, see, they might have introduced a

9    different -- our first version, which we updated.

10           THE COURT:  Let's see.

11           MR. PULGRAM:  This is the supplemental

12   objection and responses.

13           MR. TARABICHI:  So that's --

14           THE COURT:  Is that attached?

15           MR. TARABICHI:  So that should be Abhyanker's

16   Exhibit 1.

17           So those are our operative answers, and maybe

18   that's some of the confusion here.

19           MR. PULGRAM:  That's -- he --

20           THE COURT:  Yes, I'm looking at Exhibit 1,

21   which is Abhyanker's First Supplemental Objections in

22   Response to Plaintiff's Nextdoor First Set of

23   Interrogatories.

24           Is that the one I'm talking about?

25           MR. TARABICHI:  I think so.

1              MR. PULGRAM:  That's correct.

2              MR. TARABICHI:  But I know we identified --

3     more than just referring to Bates number, I know we

4     actually identified the service in response to that

5     question.

6              THE COURT:  Well.  Oh, okay.  So in 1, yes,

7     there's a narrative.

8              MR. PULGRAM:  Yeah, in 1 there is.

9              THE COURT:  Yes, there's a narrative.

10             MR. PULGRAM:  In 10 there's not.  In 5 --

11             MR. TARABICHI:  In addition to referring them

12    to documents, we -- I believe there should be an actual

13    response to each one.

14             MR. PULGRAM:  In 5 they say, "Abhyanker used

15    the trademark in commerce as early as August 2005," and

16    then refers to documents.

17             Rather than --

18             THE COURT:  Well, refers to -- in 1, talks in

19    1, answer 1, it says, used the trademark as early as

20    2005 in connection with neighborhood map services,

21    publically distributed and marketed such maps under

22    Nextdoor trademark, and names a local group, including

23    groups -- City of Cupertino.

24             Abhyanker also used Nextdoor trademark in

25    connection with publication with various website

65

1    services, including eDirectree and eBid.

2         And then references to several documents with

3    Bates numbers.

4         MR. PULGRAM:  Exactly.  So there's a reference

5    that says only that they used it in eDirectree and eBid.

6    That's what they say in 1.

7         THE COURT:  Yes.

8         MR. PULGRAM:  No facts behind that, reference

9    the documents, including the one we just looked at.

10        Then if you go to the specific question --

11        THE COURT:  To be fair, your question is

12   identify all public uses by you in connection with any

13   product or services prior to October 2011.  So it

14   doesn't say explain the nature of each such use.  You

15   could have had a --

16        MR. PULGRAM:  That's in Interrogatory No. 10.

17        THE COURT:  Identify all products and services

18   you have marketed and offered in connection with

19   eDirectree website.

20        MR. PULGRAM:  And 11.

21        THE COURT:  Identify the use, any use of the

22   term Nextdoor or any variation thereof prior to

23   February 20, 2012, including documents showing use.

24        MR. PULGRAM:  So there is -- again, no

25   identification of how that use is made or any variation

1     of it; there's just -- there's just presentation of one

2     document that's not from before that date.

3             THE COURT:  Well.  So, for one thing, this has

4     an effect that one would want from an interrogatory.

5     You've now limited the response; they can't come back

6     and supplement this.  Unless they supplement this

7     interrogatory response, this is it.  This is the

8     universe of documents they're going to be stuck with.

9             And if it comes out this is the only document

10    and, come cross-examination time, this neighborhood, the

11    Nextdoor neighborhood mark, is shown to have been added

12    at a later date, you got nothing.

13            So that's the risk.

14            Now, if you want to follow this up -- this is

15    one that you could follow it up with a further

16    interrogatory, if you wanted a further explanation or

17    ask for some further --

18            MR. PULGRAM:  Well, actually, we have asked for

19    one further thing with respect to this document, and I

20    think maybe we can get that completed here.

21            The printout of this document from the website

22    requires the database, the database behind a website,

23    that shows the particular link and items that are called

24    into the page.

25            We've asked for production of and received a

1    production of part of the website.  But we have been --

2    we have not received the database that includes this

3    call of the NextdoorTM neighbors name.

4            And we've -- since January 7th of this year

5    been asking them to provide us with that database so

6    that we can see whether that appears and when it was

7    added to the database.  And we have not yet received

8    that.

9            We've also --

10           THE COURT:  You've asked for it.

11           MR. PULGRAM:  We've asked for it.  We've asked

12   for it again yesterday.

13           And we can have a motion to compel on it

14   tomorrow, or we can get a stipulation on the record that

15   it will be provided or a specification that it does not

16   exist; that is, that there is no proof that this

17   Nextdoor.com existed.

18           THE COURT:  That's fine.  I mean, you

19   should meet and confer.

20           MR. TARABICHI:  Can I respond?

21           THE COURT:  Yes.

22           MR. TARABICHI:  He did raise it January 7th and

23   he raised it for the first time again yesterday

24   afternoon.

25           I responded by giving him exactly what he

1    wanted.  I said, "I will check to see if we have it.  If

2    we have it, we will produce it.  If we don't, we'll say

3    we don't have it."

4         And that's exactly what he's asking for and

5    I've already agreed to that.

6         THE COURT:  All right.  Well, that's not before

7    me at this point.  I'm disposing of issues that are

8    brought before me.  And with respect to this particular

9    interrogatory, I find that there's been a sufficient

10   response.  But I'm forewarning Mr. Abhyanker that he's

11   bound by those responses and that any attempt to

12   identify further documents, if not done pursuant to the

13   rules, are going to be subject to preclusion orders or

14   anything else.

15        So when you respond to an interrogatory by

16   saying, "Well, here's the documents," I read that to say

17   "Here are all the documents," not, "Here is a sampling

18   of documents."

19        MR. TARABICHI:  They are all the documents in

20   our possession, custody and control.  And, you know,

21   whether third parties have any, you know, we're going to

22   explore that.

23        But yes, that is everything we have.

24        MR. PULGRAM:  Again -- and this begs the

25   question of what does Mr. Abhyanker know and what can he

69

1      say about the use.  Because --

2             THE COURT:  Well -- and what I've said is that

3      your interrogatory wasn't phrased with that degree of

4      specificity.  And if you want to go back and ask for a

5      follow-up interrogatory, that's fine.  But to say that

6      the responses are inadequate, given the phraseology that

7      was asked, that's -- I'm not going to grant that at this

8      point.

9             So the third issue has to do with this

10     agreement between Centered and Google.  And it's a

11     question of whether or not Mr. Abhyanker has possession,

12     custody or control, and he claims he doesn't.

13            Is that right?  Is that what it boils down to?

14            MR. PULGRAM:  Yes, Your Honor.  This is --

15     during this litigation, Mr. Abhyanker claims that he --

16     having been fired from Fatdoor years ago and Fatdoor

17     then having sold its assets to Google -- had himself

18     appointed interim CEO of Fatdoor and then assigned to

19     himself all of any remnant ownership that Fatdoor had

20     not transferred to Google, and that, based on having

21     assigned that to himself, he now owns it and can sue on

22     Fatdoor's rights.

23            This begs the question of what is it that is

24     left from what Fatdoor transferred to Google.

25            THE COURT:  Right.  And I understand that

1    that's important.  Because whether trademark rights or

2    trade secret rights are --

3            MR. PULGRAM:  According to paragraph 71 of

4    Mr. Abhyanker's Declaration, Google Inc. provided the

5    new Fatdoor -- him -- access to the Fatdoor.com email in

6    November of 2013.

7            If Google is providing to him as the CEO of the

8    new Fatdoor its transferee access to documents, he

9    should go to Google and he should get the document by

10   which Google received Fatdoor's assets.

11           And if Google is prepared to provide him with

12   access to email, I cannot imagine that Google will not

13   also say yes, as the owner of whatever residual rights

14   Fatdoor retained, you are entitled to a copy of the

15   document by which it retained those rights.

16           And for him to say, "I do not have possession,

17   custody or control," is not just splitting hairs, it's

18   failing to obtain a document that is going to be, again,

19   potentially outcome-dispositive in the case.  Because we

20   believe that the transfer to Google will have

21   eviscerated any rights that he now claims.

22           THE COURT:  So he does have possession, custody

23   or control by virtue of his relationship with Google.

24           MR. PULGRAM:  By virtue of the fact that Google

25   is giving him access to things that he asked for.

1              MR. TARABICHI:  He's mischaracterizing the

2     relationship with Google.

3              When Mr. Abhyanker obtained ownership of the

4     Fatdoor.com domain name again and went to set up the

5     emails, you know, Google provided him access to a

6     limited set of documents.  If that agreement had been

7     one of the documents, we would have produced it.

8              By the way, they subpoenaed those documents

9     from Fatdoor and they have been produced.

10             So they have everything we have, you know.

11    He's making us try to go and get documents from a third

12    party who's not under our control.  There's no way --

13             THE COURT:  -- the agreement between Centered

14    and Google have been produced?

15             MR. TARABICHI:  No, no, no.  Whatever documents

16    Fatdoor obtained that were still residing on the server

17    were produced to Nextdoor in response to a subpoena that

18    they served on Fatdoor.

19             We don't have the document.  If we had it, we'd

20    produce it.  It's obviously a relevant document.  But

21    Google's not under Mr. Abhyanker's control.  You know,

22    they don't need to do what he says.

23             THE COURT:  Well, let me say this.  The fact

24    that Google has been cooperative and provided access to

25    some documents does not necessarily prove that somebody

1  has possession, custody or control.  You have to have

2  the right to obtain -- or, at the very least, the

3  practical right to obtain those documents.

4       And it's some indication that he has some

5  access or some working relationship, but I don't know

6  that that proves that he has the kind of control or

7  practical access that would open the door to, for

8  instance, this agreement.

9       What I'd like to know is what efforts did

10  Mr. Abhyanker make to obtain.

11       MR. TARABICHI:  He went through all the

12  documents in his possession, custody and control, and

13  our position -- you know, I think he's mischaracterizing

14  the relationship with Google into something more than it

15  is.

16       THE COURT:  No, I'm short-circuiting it.  You

17  didn't answer my question.

18       What efforts did he make with Google?

19       MR. TARABICHI:  He did not make any efforts.

20       THE COURT:  That's what he should do.  We can

21  obviate this whole thing.  He obviously had some success

22  in getting access to Fatdoor.com email.  He may or may

23  not have success getting it.

24       And I would submit that he probably will have

25  pretty good success because if Google doesn't cooperate,

1    the next thing that's going to happen is a subpoena.

2            MR. TARABICHI:  I can talk to --

3            MR. RAWLINSON:  The other question, Your Honor,

4    I don't understand this discussion.  How can he have any

5    understanding of the basis for the rights and the scope

6    of the rights that he's claiming to have if he's never

7    seen the agreement that describes --

8            THE COURT:  He said he never saw it or doesn't

9    have it now?

10           MR. RAWLINSON:  I don't know.

11           MR. TARABICHI:  Well, that's an agreement

12   between Centered and Google.  The agreement.

13           THE COURT:  But he got the residuary.  So he

14   must know the residuary of what --

15           MR. TARABICHI:  I don't know if he's seen it or

16   not.  I don't know.

17           THE COURT:  Well, that's probably pretty

18   astounding, if he's never seen it.

19           He's assigned himself the residuary rights but

20   not even knowing what the primary rights that were

21   assigned away?  That's not a very good business deal.

22           MS. NORTON:  We're not saying he hasn't.  I

23   think the issue before the Court is whether or not he

24   has that document currently, which he does not.  And we

25   understand from Your Honor that you request that he --

1          THE COURT:  But it's does strain plausibility

2     that he wouldn't have retained that.  Since he got a

3     residuary right, you would think, as a businessman, a

4     sophisticated businessman who came up allegedly with

5     this idea, he'd have the sense to keep the document that

6     gave away A so he has B.

7          He has to know what A is in order to know what

8     B is.

9          So I'm going to direct that you direct your

10    client to make the inquiry, use diligent efforts to

11    obtain this agreement.  We shouldn't be wasting your

12    time or my time over something like this.  It's

13    obviously a very relevant document.  He should make

14    every effort to get it.

15         If he doesn't get it, then we'll decide are we

16    going to have to grant the motion to compel or something

17    or you can subpoena or something.  But the very first

18    step is he should use reasonable diligence to obtain

19    this document from Google.

20         MR. TARABICHI:  I will tell him to do so.  And

21    I just want to advise the Court, though, that he's out

22    of town until Wednesday.

23         THE COURT:  All right.  Well, as soon as he

24    gets back, he should do so.

25         All right.  That's the letter, as far as I

1    know.

2            MR. PULGRAM:  The opposition to the motion for

3    summary judgment talked about a new, never-previously

4    disclosed idea of how information might have been

5    disclosed to Benchmark.

6            It talked about the Bucks breakfast.  I don't

7    know if you recall that from your review of the paper,

8    Your Honor.

9            And I don't want to get deep into here, except

10   to say suddenly there's now a new explanation for how

11   Benchmark might have learned about bids that never

12   before was in the case.

13            THE COURT:  That's the function of

14   interrogatories; that's the function of depositions.

15            MR. PULGRAM:  Here's my concern, Your Honor.

16   We asked that interrogatory and we were told expressly

17   that Mr. Abhyanker -- and here's -- here's the quote:

18   Mr. Abhyanker is unable to recall the particular details

19   of the negotiation offer made over the phone many years

20   ago.  While we understand and acknowledge that you would

21   like the details, Mr. Abhyanker does not remember them.

22            That's what his counsel said after he didn't

23   disclose bids in his interrogatories.  And now there

24   were new bids that were identified in his declaration.

25            I think, related to this -- and here's my real

1   point on this particular point, I'm not -- this is not

2   intended as a side show.  Your Honor ordered

3   Mr. Abhyanker, as part of the whole trade secret

4   process, to comply with the protocol that we stipulated

5   to and you ordered that he specify whether the trade

6   secret was acquired by each particular

7   counter-defendant, and the supporting factual basis, and

8   then whether the trade secret was disclosed by each

9   particular counter-defendant.

10          So he came up in his declaration now with a new

11  supposed disclosure that had never been previously

12  included and that is that there was a breakfast at Bucks

13  in Woodside that after he met with someone he happened

14  to bump into a guy from Benchmark.

15          And there's an email that reflects that they

16  talked for, quote, a few minutes, and that they talked

17  about a subject that's not in this litigation, his

18  business called Trademarkia.  But in his declaration he

19  says we also entered into a new confidentiality

20  agreement and I started talking to him about

21  Nextdoor.com and that I told him the bidding history of

22  Nextdoor.com.

23          Now, the reason that I raised this is I don't

24  want this case to expand into new theoretical

25  disclosures or trade secrets that weren't disclosed when

1    Your Honor ordered them to describe the supporting

2    basis.

3             This is a 2010 conversation.  The email doesn't

4    refer to Nextdoor; it doesn't refer to confidentiality;

5    it doesn't refer to bids.  But there's an email that

6    shows he talked with Benchmark in December of 2010.

7    He's known all along we bought the website domain.

8             THE COURT:  What are you asking for?

9             MR. PULGRAM:  I'm asking that we lock down and

10   hold at the designation and disclosure of trade secrets

11   and we do not expand them by virtue of his declaration

12   or by virtue of his opposition or by any other activity

13   in the case, given --

14            THE COURT:  Well, answers to interrogatories,

15   to the extent I'll have to look at exactly what I

16   ordered, but if what I ordered is a disclosure of X, Y

17   and Z, which I'm going to treat as if it were a

18   responsive interrogatory, there's a purpose for

19   discovery and --

20            MR. PULGRAM:  And that's all we needed.  This

21   will be obviated if you end up finding that there's no

22   trade secret anyway.

23            THE COURT:  All I can say is that to the extent

24   that you believe that now evidence is being used, either

25   here or at trial, that exceeds or is different from that

78

1   previously disclosed which they are obligated to

2   disclose, either by virtue of the order of this Court or

3   by the rules regarding the discovery covered by the

4   Federal Rules of Civil Procedure and there was no

5   supplementation, that's the risk.

6           Which is why I brought up when you cite

7   documents -- for instance, saying, "This is the total

8   universe of documents to support an answer to this

9   particular request or interrogatory," that's it.

10  Nobody, on either side, is going to be allowed to expand

11  that, unless there's good cause or something that's

12  going to excuse that.  So that's all I'm saying.  I'm

13  not going to comment on anything specific.

14          MR. PULGRAM:  That's fine, Your Honor.  I did

15  not want us to, sub silencio, change the pleadings or

16  the identification of trade secrets here.

17          THE COURT:  All right.  I need to end this

18  soon.

19          But you had a comment on the motion to dismiss?

20          MR. RAWLINSON:  Yeah, Your Honor.

21          THE COURT:  Oh, we are going to have to take a

22  break because the reporter wants a break at this point.

23  We've been going at it for -- I've been here for two

24  hours almost.  We'll take a short break.

25          (Recess from 3:22 P.M. to 3:28 P.M.)

1          THE COURT:  Okay.  Something you want to say

2     about the motion to dismiss?

3          MR. RAWLINSON:  Yes, Your Honor.  I'll be

4     brief.  I know you've been patient already.

5          So the only use I'd raise beyond what's been

6     raised on the public disclosure issue is on the

7     reasonable basis, and specifically as to Benchmark and

8     specifically on the pleadings.

9          So let me just start to refresh.  It's a

10    hundred-page Complaint.  There's no allegation in the

11    Complaint with respect to Benchmark that we received

12    either of the two trade secrets that are now the focus

13    of the action.

14          To be clear with the Court, there is one

15    sentence in the trade secret specification that came

16    later, but, in the Complaint itself, there is no

17    allegation that we received either the bidding history

18    or the Lorelei neighborhood information.

19          And I can -- you'll look, in vain, for the

20    reference.  And if you actually look at paragraphs 123

21    and 124 of the Complaint, you'll see a discussion of a

22    meeting with Harvey at Benchmark in 123, and then, 124,

23    a long list of trade secrets that were allegedly

24    disclosed to Benchmark later.

25          And you'll see nowhere on that list are either

1       of the two that are now identified.

2              Now, I say that, as just way of background, to

3       talk about the reasonable basis for confidentiality.

4              There's also -- because neither of those is

5       alleged to have been given to Benchmark in the

6       Complaint, there's no allegation that they were

7       identified as confidential, there is no allegation that

8       anyone attempted to segregate them from the other

9       material that was public and this Court has held was

10      public, there's no allegation that when -- and let me

11      just pause there and say and then the only basis, the

12      only basis for any allegation of duty to hold as

13      confidential is this oral agreement that was allegedly

14      reached with Benchmark.

15             And I'd say that under the circumstances -- let

16      me start, before we get to the statute of frauds'

17      issue -- that under the circumstances where the material

18      is not called out as confidential, there's no

19      allegation, when there's no allegation that any steps

20      were made to segregate it from public material, when

21      there's, by description in the Complaint, two different

22      companies are apparently represented; right?  Obviously,

23      originally the story was that Fatdoor was being pitched

24      to Benchmark, but this other entity, the Abhyanker

25      entity, also offered his trade secrets.  No attempt to

1     segregate between those or identify which are which.

2          And then, with all due respect to the

3     discussion we've had about public disclosure, when we're

4     talking about two trade secrets that are not, on

5     their -- alleged trade secrets that are not, on their

6     face, obviously confidential -- in other words, I've

7     already launched in Lorelei and I think it's a good

8     neighborhood to launch, in number one, and, number two,

9     I put a bid in on a name that I didn't get and, by the

10    way, as Your Honor has held, a public domain name.

11         All that is a background.  And we're dealing

12    with an attorney.  No allegation of any steps to

13    identify the material as confidential, market it as

14    confidential, segregate it from the public material.

15         The only basis for any duty to obtain as

16    confidential is this alleged oral agreement.  And the

17    alleged oral agreement is not specific with respect to

18    this material at all.  And the description of this

19    agreement is in paragraph 120 of the Complaint.

20         And the alleged agreement is, "In a follow-up

21    telephone call, Harvey, a general partner of Benchmark

22    Capital, agreed to maintain confidential any and all

23    information disclosed by Abhyanker during any future

24    meetings."

25         So it's everything we give you with no attempt

1      to say only the confidential material or to segregate it

2      with respect to these materials, and for all time, all

3      future meetings.

4           And that gets to the final point, Your Honor,

5      which is this alleged agreement would be clearly invalid

6      under the statute of frauds.  And, in fact, this was

7      originally brought as a contract claim.

8           And as you may recall, Plaintiff filed a

9      motion -- or filed a Complaint.  We filed a motion to

10     dismiss, a new Complaint was submitted before Your Honor

11     was presented with those motions, the contract claim was

12     withdrawn and the trade secret claim was left as the

13     only claim against Benchmark.

14          So, in effect, what happened is you had an

15     invalid contract claim that simply has had the trade

16     secret label draped over it.

17          And what I'd say here, Your Honor, is I don't

18     think the Court has to decide whether an oral agreement

19     could ever be a basis for a trade secret claim.  But I

20     think, based on the allegations in the Complaint,

21     there's simply no basis on which to hold that there were

22     reasonable steps taken with respect to the material

23     that's now alleged to be the trade secret.

24          Again, in 124 there's a whole list of stuff:

25     Algorithms; product details; business plans; security

1    algorithms; data base structures.  But no reference to

2    these particular trade secrets.

3          The only reference in the Complaint to the

4    bidding history has to do with 2010 and Mr. Sood.

5          And I understand that the plaintiff could just

6    replead, and, given our history in this case, I'm sure

7    he would allege some -- some sort of specifics.

8          But we're not at the beginning of the case.

9    This is, if you count the state court Complaint, the

10   fifth time that we've been faced with a Complaint.  And

11   if you count the trade secret designation, which has

12   been updated two or three times where it's seven or

13   eight tries, and in none of those is there any

14   allegation that this material was called out as

15   confidential, that this material was marked as

16   confidential, this particular material, and, in fact,

17   it's not until the trade secret designation that you get

18   any allegation that came to Benchmark, and that

19   allegation is a single sentence, Your Honor.

20         THE COURT:  What is the allegation?  That the

21   trade secret --

22         MR. PULGRAM:  Let me just read it to you, Your

23   Honor.

24         This is in response to Your Honor's order to

25   have a trade secret designation.  And it is the second

84

1    amended trade secret designation.

2          And it says, "Mr. Abhyanker alleges that the

3    bidding history and identification of the Lorelei

4    neighborhood were acquired by the counter-defendant

5    Benchmark entities.  The factual basis for this

6    allegation is that Abhyanker confidentially disclosed

7    the bidding history and identification of the Lorelei

8    neighborhood to Benchmark during a meeting in June of

9    2007."

10          And that's the sum total.

11          And that's the other thing that I would say

12    generally, Your Honor, is although this is a long and

13    detailed Complaint, with respect to my clients and with

14    respect to the allegations of trade secrets that are

15    currently at issue, it is absolutely bare bones.

16          And, in fact, in the Complaint itself there's

17    no allegation that either of these was communicated to

18    us.

19          And that, what I gave you there, is the sum

20    total of the factual allegation that was communicated to

21    us in the trade secret designation.

22          And that entire basis for the duty of

23    confidentiality is the language I read you from 120,

24    which is a general, "We'll keep it all confidential, and

25    we'll keep it, in all future meetings, confidential."

1    Which I would say would clearly violate the statute of

2    frauds, and it does not constitute --

3         THE COURT:  Does the statute of frauds apply to

4    something that cannot possibly be performed within one

5    year?

6         MR.  RAWLINSON:  The statute of frauds

7    generally only applies when something can't be done

8    within a year.

9         And here, when you talk about an opened-ended

10   agreement that counts to all future meetings -- for

11   instance, to go back to the conversation you just had,

12   they now have alleged in a separate summary judgment

13   that there's a 2010 meeting with Benchmark.

14        THE COURT:  Well, I know, as things have

15   transpired, it took some time, but how do you know that

16   this is something that could not possibly be performed

17   within one year?

18        MR. RAWLINSON:  Well, it's a duty to keep it

19   confidential forever; right?  And, again, go to 124,

20   Your Honor, of the Complaint, and look at the list of

21   material that's included there; right?

22        And it is not just any one thing, it is an

23   entire list of algorithms, business plans, blah, blah,

24   blah, blah, blah.

25        I suppose anything is possible, but there's no

1    reason to think that all of that material would be made

2    public in one year, alleviating us of our

3    responsibility.

4             THE COURT:  Well, likely is not the question;

5    whether it's possible.  That's a pretty tough standard.

6             MR. RAWLINSON:  Plausible, I'd respectfully

7    suggest, Your Honor.

8             THE COURT:  Well --

9             MR. RAWLINSON:  And I won't belabor --

10            THE COURT:  But possible is *White Lighting v.*

11   *Woolson*, California Supreme Court in 1968.  In relying

12   on Section 1624a,(1), says, by their terms, cannot

13   possibly -- not likely, possibly -- be performed within

14   one year.

15            Pretty tough standard to meet.

16            MR. RAWLINSON:  Maintain all information

17   disclosed by Abhyanker during any future meetings.

18            MS. NORTON:  Your Honor, if I may.  Counsel has

19   raised quite a few points here that I would like to

20   address.

21            But just to briefly address the point that

22   we're currently discussing, there is some cases in

23   Mr. Abhyanker's opposition brief addressing this point

24   and cases in which the Ninth Circuit said even if it

25   appears very unlikely that the agreement could be

1    performed in one year, theoretically, one of the

2    companies could have gone bust, anything could have

3    happened.

4            And so it's -- you know, as long as it's

5    possible, even if it's unlikely.

6            And here, for example, if -- there's a number

7    of scenarios.  If Mr. Abhyanker had, in fact,

8    successfully bid on the Nextdoor domain name and

9    obtained it and formed a partnership with Benchmark,

10   there are things that could have happened that would

11   have meant that some of the information provided would

12   no longer have the economic value by virtue of being

13   secret.

14           And that's just one way in which the statute of

15   frauds doesn't apply here.  But it also doesn't apply

16   due to estoppel.

17           And I'd like to draw Your Honor's attention to

18   a case that they raised in their reply brief in which

19   they said that estoppel doesn't apply, just because one

20   party doesn't perform their agreement, but it also needs

21   some other circumstance.  And that was the *SOAP* case.

22           In that case, the party who was trying to have

23   the agreement be enforced said that not only did the

24   opposing party not perform their side of the agreement,

25   but they also misappropriated trade secrets.  And the

1       Court said that that allegation, combined with the

2       nonperformance, was enough to survive a motion to

3       dismiss.

4               And that's exactly the case that we have here.

5       That the allegation is that Benchmark made a promise.

6               And we did provide some articles indicating

7       that it is venture capital's normal practice to provide

8       oral assurances and, in keeping with their normal

9       practice, they provided oral assurance, and in reliance

10      on that assurance, Mr. Abhyanker provided his

11      confidential information which the operative pleading

12      states includes his trade secrets, and, in reliance on

13      their promise, he provided this to Benchmark and then

14      Benchmark failed to perform their side of the agreement

15      and misappropriated the trade secret.  That's the

16      allegation.

17              And based on prevailing case law, that's enough

18      to survive a motion to dismiss based on the statute of

19      frauds.

20              And given that counsel raised a number of

21      points, I'd like to just briefly say that counsel is

22      overly complicating things here by saying -- by trying

23      to draw distinctions between public and private

24      information that was provided and trying to draw

25      distinctions between different companies that appeared

1    before Benchmark.

2           And it's really a very simple story.  That

3    there was a neighborhood social network that

4    Mr. Abhyanker and Fatdoor were developing that

5    incorporated some of Mr. Abhyanker's personal

6    intellectual property, as well as Fatdoor's

7    intellectual property, they pitched this idea to

8    Benchmark, Benchmark ultimately couldn't meet the terms

9    of another venture capital firm that provided a higher

10   valuation, and when Benchmark -- when a company that

11   Benchmark had funded needed to quickly turn themselves

12   around and needed a new -- a new idea, new concept, they

13   misappropriated the trade secrets.

14          So there's no need to split hairs between what

15   was public and what was private.  Trade secrets can be a

16   compilation of information.  So whether --

17          THE COURT:  What about the failure to allege

18   with specificity the trade secrets now asserted in

19   paragraph 124?  It's not in here.

20          MS. NORTON:  I think that Benchmark knows very

21   well the trade secret that we are talking about.  We

22   have provided the trade secret designation, which

23   identifies the trade secrets.

24          They -- I don't think they can honestly allege

25   that they don't know what the allegations are.

1          They understand that the allegations are that

2     Mr. Abhyanker provided them with a confidential CD which

3     included his trade secret information, and between that

4     CD and follow-up conversations Mr. Abhyanker provided

5     Benchmark with his trade secrets that are at issue here

6     which were then misappropriated.

7          MR. RAWLINSON:  Let me just address a couple of

8     those, Your Honor.

9          First of all, the CD does not, by any

10     allegation -- well, first, I'm confined to the

11     Complaint.  There's no allegation that -- and the

12     concept, the simple concept that counsel talks about is

13     not what is at issue here.  The trade secrets at issue

14     in this case are two items; not some generalized concept

15     of a neighborhood social network.  That's been disposed

16     of.

17          So with respect to those two issues, let's

18     start with the plain fact; there's no allegation

19     anywhere in the Complaint that either of those was

20     transmitted to us.  Second, my argument here -- and I

21     don't want to get sidetracked on the statute of frauds,

22     I think the policies behind the statute of frauds go

23     with the reasonable basis to keep material confidential.

24          And my argument to Your Honor is when you make

25     no allegation that you segregated this material, that

1    you called it out as confidential -- and I don't think

2    either of these pieces of information are on any disk;

3    all right?  Although it's certainly not alleged in the

4    Complaint they're on a disk, and the disk is sort of a

5    stalking horse for other material that is no longer at

6    issue, because what's in 124 has apparently been

7    abandoned and replaced by these two specific items.

8         So no allegation that they were segregated, no

9    allegation that they were identified, no allegation that

10   they were given to us.  And the only reason I raised the

11   statute of frauds at all, Your Honor, is because it's

12   instructive about whether this sort of general statement

13   about a general obligation to keep everything

14   confidential forever and in any future meetings

15   satisfies the reasonable steps and whether there's been

16   any allegations in the Complaint that would satisfy

17   that.

18        I understand that the plaintiff can, you know,

19   after eight or nine tries try again, but I really,

20   before we're about to launch off -- unless Your Honor

21   changes his perspective on a long fight with a lot of

22   depositions and a lot of money about what one trade

23   secret in this ideal neighborhood, I don't even

24   understand, necessarily, what the economic value of that

25   would be.

1          I'll put all that aside.

2          But right now, with respect to whether there's

3     any allegation from which you could say our folks -- you

4     know, that there was a reasonable basis that these were

5     confidential to us in the Complaint or even in the trade

6     secret specification, I don't think you can say that,

7     Your Honor.

8          THE COURT:  Where in this Complaint is it

9     alleged that the two trade secrets that are now at issue

10    were conferred or conveyed or transferred to Benchmark?

11         MS. NORTON:  The Complaint alleges that

12    Mr. Abhyanker provided his trade secrets, and it

13    includes quite a bit of information, and then the

14    follow-up trade secret designation identifies them with

15    further specificity.

16         THE COURT:  Well.  Okay.  So you're saying the

17    fact that he described them generally and provided a

18    non-exhaustive list of the trade secret in paragraph 124

19    does not preclude a further specification ultimately in

20    the trade secret disclosure filing, which finally

21    identifies these two trade secrets.  They are

22    encompassed in 124, even though not directly

23    articulated.

24         MS. NORTON:  That's right.

25         THE COURT:  I mean, if this were a -- if we

1    were just dealing with a straight kickball *Tuolumne*

2    issue, that might be the case.  On the other hand, what

3    are we going to accomplish?  They get another chance to

4    amend.

5          It's very hard to argue prejudice under Rule

6    15(a), given the fact that they've already disclosed

7    what the trade secret is and narrowed it to two

8    different things and made a specific allegation.

9          So why go through the exercise of granting the

10   motion to dismiss with leave to amend, having them come

11   back and amend, and we throw another 60 days into the

12   process?

13         MR. RAWLINSON:  If that's Your Honor's

14   perspective, I can't tell you a good reason.  I think

15   there has to come a time when this thing is nailed down

16   and we know what we're shooting at.

17         With all due respect, Your Honor, I cannot

18   imagine we're about to launch a federal case off on the

19   ideal neighborhood versus maybe a good neighborhood

20   versus the launch neighborhood.

21         If you look at the allegations, they're going

22   to subpoena twenty people who are the CEO of FaceBook,

23   the founder of LinkedIn.  I can't imagine what the value

24   of this last alleged trade secret is.  And all I'm

25   saying, Your Honor, is -- I haven't even pushed you on

1    my plausibility issue.  Because I think there's a huge

2    plausibility issue; right?

3            When we come back to the very beginning, he was

4    here -- the allegations in the Complaint, "Are I was

5    pitching FaceBook -- or Fatdoor."  Right?  Which in this

6    Complaint he says is not what's at issue.  He says, "I

7    don't own Fatdoor; that's nobody else's.  And I then

8    gave that whole list of trade secrets in 124 to

9    Benchmark, even though that wasn't the company that I

10   was pitching."  But he leaves out the two trade secrets

11   that we're now fighting about.

12           I think there is a fundamental -- you know, the

13   Court is not required to give them ten chances to put

14   together a coherent story, and they still haven't.

15   Right?  We're now a year -- more than a year in and we

16   still haven't got a coherent story.

17           When we said why would you give up these trade

18   secrets for a different product or a different company,

19   they said for security and privacy.  And then, when we

20   got narrowed down to these two, they said, "Hey, they

21   don't have anything to do with security and privacy."

22   And then the story changed again.

23           I'm worried and I know my co-counsel are

24   worried this is just going to keep changing forever.

25           So you're right, Your Honor.  If they just keep

1  getting a bite at the apple, there's no point.  But we

2  think they've had a lot of bites.

3       THE COURT:  All right.  Give you a last

4  comment.

5       MS. NORTON:  I disagree with counsel's

6  characterization that any story is continuing to change.

7  I think that the issues between the Court are very

8  clearcut.  There's two trade secrets at issue.

9       THE COURT:  Yes, but how do we get here?  It

10 certainly is not indicated from your initial filings and

11 it certainly has shifted.

12      MR. TARABICHI:  Your Honor, I don't have a copy

13 our pleading in front me.

14      MR. PULGRAM:  I got it right here.

15      MR. TARABICHI:  Okay.  Could I take a quick

16 look at this?

17      THE COURT:  Yes.  You're looking at 124 of your

18 second amended counterclaim?

19      MS. NORTON:  Your Honor, while he looks, I just

20 wanted to address counsel's point.

21      And, again, I believe that he's just overly

22 complicating things by stating this issue of security

23 and privacy and the story's changing.

24      And I understand that the Complaint has been

25 amended several times, but my point is that there are

1    two trade secrets that are currently in front of the

2    Court and Mr. Abhyanker has provided a coherent story as

3    to motive from Benchmark for misappropriating those

4    trade secrets.  And if counsel disagrees with that,

5    that's a matter of discovery and that's a matter to be

6    determined as the case goes forward.

7        MR. TARABICHI:  Your Honor, I direct you to

8    page 100, where we define trade secrets.  And if you

9    look at line -- between line 18 and 19, you'll see

10   bidding history of the Nextdoor domain name and then the

11   Lorelei neighborhood as the next sentence.  And that's

12   all part of our definition of trade secrets.

13       MR. RAWLINSON:  But if you, Your Honor,

14   actually look at the allegations in the Complaint and

15   look for bidding history, you'll see, at 132, 151 and

16   152, there's a discussion that they were transmitted to

17   Sood.  No discussion that they were transferred to

18   Benchmark.

19       You can see in 123 and 124 the description of

20   what was given to Benchmark.  There's also no specific

21   allegation in the Complaint that the Lorelei

22   neighborhood was ever communicated to Benchmark.

23       THE COURT:  Well, 154, if you're going to mince

24   words, says Abhyanker disclosed key details of the Trade

25   Secrets -- capital T, capital S -- which arguably

1    relates back to what was earlier defined.  I don't know

2    if it's defined formally in here, whether 100 actually

3    uses the term capital T capital S.

4              But it says, including but not limited to.

5              So it is broad enough to encompass, but it's --

6    but if -- again, if we were here and not already at the

7    point we've had trade secret disclosures or second

8    amended trade secret disclosures, I would have serious

9    problems with this.  But I'm not going to -- we are

10   where we are at this point.

11             So I'm going to -- I'll indicate now that I'm

12   going to deny the motion to dismiss, at least on those

13   grounds, but I'm leaving open and going to take under

14   submission the matters that I had already indicated.

15             MR. RAWLINSON:  Thank you for your patience,

16   Your Honor.  I know it was a long afternoon.

17             THE COURT:  Thank you.

18             With respect to any case management issues, let

19   me just see here whether there was anything that we need

20   to cover.

21             Well, I've dealt with the discovery issue

22   that's referred to in here, and I've got the motions

23   that we're dealing with.

24             We do have dates coming up.  Close of

25   non-expert discovery in June; correct?

1      Is that right?

2           MR. TARABICHI:  Your Honor, I don't have the

3    schedule in front of me but I know one issue is

4    discovery on the trade secret claim is stayed, so when

5    we're talking about that cut off, I don't know if we're

6    talking about for all claims or just the non-trade

7    secret claims because --

8           THE COURT:  This is general cut off because --

9           MR. TARABICHI:  That's an issue I wanted to

10   highlight for you.  Because discovery hasn't been

11   allowed to begin on the trade secret claims yet.

12          THE COURT:  Well, and depending on what I do

13   with respect to this motion, there may not be discovery,

14   and so I will address that in my order.

15          If there still is a trade secret claim left,

16   I'm going to open it up to discovery on whatever claim

17   is left; and, if there's not, I'm not.

18          And I will also forewarn the parties that I

19   take seriously the proportionality principles of Rule

20   26(b), and so when I say discovery's opened up, it's

21   going to have to be coherent and precise; I don't want

22   shotgun-type discovery that's -- that does nothing but

23   burden one side or another.

24          And I do expect that you meet and confer and

25   work out matters and not argue over fine points when

1    there is obvious answers to all of this stuff.

2         And this letter, I will say, is an example of

3    that.  This could have been resolved with reasonable

4    people on each side and not have to bring every little

5    thing to me.

6         MR. PULGRAM:  That's our hope, Your Honor.

7         THE COURT:  All right.

8         Let me ask.  I take it -- I know you've had ADR

9    with Magistrate Judge Vadas?  Is that right?

10        THE CLERK:  Vadas.

11        MR. PULGRAM:  Yes.

12        THE COURT:  Is there any point, given if we

13   open up some discovery or do further discovery or reach

14   another stage here, where it would be useful or fruitful

15   to regenerate any ADR process?

16        MR. PULGRAM:  Well, that -- that effort was not

17   productive, and I'm not sure that there's anything at

18   this point that will be.

19        THE COURT:  All right.

20        Do you concur?

21        MR. TARABICHI:  I pretty much concur with that

22   characterization.

23        THE COURT:  All right.  We'll revisit that next

24   time we get together.

25        Let's -- after discovery's closed, let's have a

1    further status conference at the end of June maybe.

2            THE CLERK:  June 26 at 10:30.

3            MR. PULGRAM:  One moment.

4            THE COURT:  All right.  We'll see you on

5    June 26 at 10:30.

6            MR. PULGRAM:  Thank you for your time, Your

7    Honor.

8            MR. TARABICHI:  Thank you.

9            (Proceedings adjourned at 3:53 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Kelly Lee Polvi, CSR No. 6389, RMR, FCRR

Tuesday, March 4, 2014