1  LAURENCE F. PULGRAM (CSB No. 115163)
   lpulgram@fenwick.com
2  JENNIFER L. KELLY (CSB No. 193416)
   jkelly@fenwick.com
3  ERIC J. BALL (CSB No. 241327)
   eball@fenwick.com
4  MATTHEW B. BECKER (CSB No. 291865)
   mbecker@fenwick.com
5  FENWICK & WEST LLP
   555 California Street
6  San Francisco, CA  94104
   Telephone:     415.875.2300
7  Facsimile:     415.281.1350

8  Attorneys for Plaintiff and Counterdefendant
   NEXTDOOR.COM, INC. and Counterdefendant
9  PRAKASH JANAKIRAMAN

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13  NEXTDOOR.COM, INC., a Delaware          CASE NO. 3:12-cv-05667-EMC
    corporation,
14                                          **NEXTDOOR.COM, INC. AND**
15                  Plaintiff,              **PRAKASH JANAKIRAMAN'S**
                                            **RESPONSE TO ABHYANKER'S**
16          v.                              **SUPPLEMENTAL BRIEF ATTACHING**
                                            **SOOD CONFIDENTIALITY**
17  RAJ ABHYANKER, an individual,          **AGREEMENT**

18                  Defendant.

19  RAJ ABHYANKER, an individual,

20                  Counterclaimant,

21          v.

22  NEXTDOOR.COM, INC., a Delaware
    corporation; PRAKASH JANAKIRAMAN, an
23  individual; BENCHMARK CAPITAL
    PARTNERS, L.P., a Delaware limited
24  partnership; BENCHMARK CAPITAL
    MANAGEMENT CO. LLC, a Delaware limited
25  liability company; SANDEEP SOOD, an
    individual; MONSOON ENTERPRISES, INC., a
26  California corporation, and DOES 1-50,
    inclusive,
27
                    Counterdefendants.
28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Nextdoor.com, Inc. and Prakash Janakiraman provide this response to Raj Abhyanker's submission of his purported confidentiality agreement with Sandeep Sood (Dkt. No. 165). Abhyanker's proffered agreement does not support his trade secret claim because it does not cover the purported Lorelei Trade Secret or its alleged disclosure to Sood.

There is no agreement between Sood and the party that developed the Lorelei Trade Secret at issue here:  Fatdoor, Inc.  This is to be expected, since Sood was not involved in Fatdoor or its Lorelei pilot.  Rather, Sood's relationship was with Abhyanker's prior *law firm*, Raj Abhyanker, LLP (defined therein as the "Firm"), and his confidentiality obligations were limited to information he learned through services he provided to the Firm. Dkt. No. 165-1 at p. 5, 6. Those services had nothing to do with whether Lorelei was an ideal place to pilot the Fatdoor service (or with actually conducting the pilot).  Indeed, the alleged Lorelei secret *did not even exist* until well after Sood's work for the Firm ended in October or November 2006.  By Abhyanker's admission, he and Sood parted ways, when Abhyanker shifted his focus away from the projects he had hired Sood to perform, and instead formed Fatdoor—an entirely separate company—and subsequently developed and tested the Fatdoor website in Lorelei in April and May 2007—*all without any involvement by Sood.*  Abhyanker's submission thus provides no support for the assertion that he took reasonable steps to maintain the secrecy of the Lorelei Trade Secret.  He has failed to meet his burden.  The motion for summary judgment should be granted.

## THE UNDISPUTED TIMELINE OF EVENTS REVEALS NO CONNECTION BETWEEN SOOD'S CONSULTANCY AND THE FATDOOR PILOT IN LORELEI

The following timeline of events is based on Abhyanker's own evidence and admissions:

- **Sept. 21, 2006**:  Abhyanker's law firm hires Sood to perform "website development services . . . to the Firm." Dkt. No. 165-1 at ¶ 2 & Ex. A. Abhyanker claims the work related to, and the alleged confidentiality agreements covered, Abhyanker's Legalforce/Nextdoor concepts.  Dkt. No. 16 (Counterclaim) at ¶ 109; Dkt. No. 59 (FACC) at ¶ 110; Dkt. No. 132 (SACC) at ¶ 104.

- **Oct. 25, 2006**:  Abhyanker puts his Legalforce/Nextdoor concepts "on hold" to pursue a "separate and distinct" business called Fatdoor.  Sood was not asked to be and was not a part of Fatdoor.  Counterclaim ¶110-113; FACC ¶ 122; SACC ¶¶ 112, 116.  As a result, Sood was "disgruntled."  SACC ¶ 116.

- **Nov. 13, 2006**:  Sood's services are paid *by the Firm*. Dkt. No. 165-1 p. 9.

- **Feb. 1, 2007**:  Fatdoor is formed; closes a $1M in funding. SACC ¶ 114, 117.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- **Feb. 2007**: Fatdoor hires a CTO to develop an "entirely new code base" for the Fatdoor service; "none" of the code developed by Sood for Legalforce/Nextdoor is used.  FACC ¶ 116; SACC ¶ 114.

- **March 28, 2007**:  Fatdoor receives a proposal from its consultant regarding focus group and usability testing of its social networking concept.  Dkt. No. 150-1 at 38.

- **April/May 2007**:  Fatdoor tests its service in Lorelei.  The project involved efforts to get Lorelei residents to accept the Fatdoor concept, leading to a "90% penetration rate," as well as their use of Fatdoor's beta website under the Fatdoor TOU.  Dkt. No. 150-2 at ¶¶ 16-17; Dkt. No. 166-4 at ¶ 5 & Ex. D; Dkt. No. 150-1 at ¶¶ 14, 22.  These efforts are what allegedly transformed Lorelei into the "ideal neighborhood to test a neighborhood social network."  Dkt. No. 150-1 at ¶14.

- **May 29, 2007**:  Fatdoor engages in media campaign to generate awareness of its hyperlocal service among potential users.  Dkt. No. 166-4 at ¶6 & Ex. E.

- **June 2007**:  Abhyanker pitches Fatdoor to Benchmark, touting the success of its pilot in Lorelei.  Dkt. No. 150-2 at ¶ 19; Dkt. No. 166-4 at ¶ 5 & Ex. D.

- **Dec. 10, 2012**:  Abhyanker secretly records a phone conversation with Sood, in which he urges Sood to acknowledge that he entered into a confidentiality agreement with Legalforce, *not* Fatdoor, Inc., "because this [Legalforce NDA] is before that [Fatdoor]."  Dkt. No. 165-1 at p. 15.

The above shows that the "what," "when," and "who" are all missing from Abhyanker's claim that any disclosure about Lorelei to Sood was governed by confidentiality obligations.

*First*, the "What":  Sood's contractual obligations related solely to projects that *the law firm* hired him to perform.  Indeed, both the "Confidentiality" and "Proprietary Information" provisions of the Independent Contractor Agreement [Dkt. No. 165-1, Ex. A] ("ICA") contemplate that what Sood would keep confidential was information "*of the Firm*" (¶3) or learned "in connection with the Services" he was to perform (¶5), which were defined as "website development services . . . *to the Firm*."  *Id*. at ¶ 1 (emphases added).  Neither the ICA, nor the NDA (included within Exhibit A, and superseded by the ICA) contemplated that Sood would have any obligations regarding projects pursued by Abhyanker personally, much less those pursued, over seven months later, on behalf of a separate company that did not even exist at the time.  Even more, any assertion by Abhyanker that Sood had any confidentiality obligations related to Fatdoor's activities in Lorelei would fly in the face of his premise that Fatdoor was a distinct concept and entity of which Sood was not a part.  In fact, there is nothing in the record to suggest Sood was even in contact with Abhyanker or his law firm at the time of

1  the Lorelei pilot. Thus, even if Abhyanker could somehow claim the Lorelei Trade Secret

2  belonged to his law firm (a dubious proposition at best), there is no basis to conclude his

3  disclosure of it to Sood could have fallen within the scope of the ICA.

4       <u>Second</u>, the "When": The purported secret—that Lorelei was the ideal place to launch a

5  <u>neighborhood social network—did not even exist until April or May 2007, long after Sood's</u>

6  <u>relationship with Abhyanker's firm had ended</u>. Indeed, this secret could not have existed until

7  Abhyanker actually ran the pilot and achieved the claimed 90% penetration rate. Before then, he

8  simply could not know the fact that was his purported secret.[1] Thus, there is no question that the

9  alleged secret did not exist, and could not have been disclosed to Sood, at the time he was

10  performing services for Abhyanker's law firm.[2]

11       <u>Third</u>, the "Who": Abhyanker's efforts in Lorelei in 2007 were for <u>Fatdoor</u>—not the

12  <u>alleged Legalforce/Nextdoor concepts Sood was hired to work on in 2006</u>. That the efforts in

13  Lorelei were done on behalf of Fatdoor is demonstrated by the evidence cited above, and

14  underscored by Abhyanker's purported expert declaration which refers, no fewer than 26 times,

15  to the selection and use of Lorelei as an "Abhyanker/*Fatdoor*" project. Dkt. No. 150-2.

16       Together, there is only one conclusion: Abhyanker's Lorelei pilot was outside the scope

17  of Sood's alleged agreement with the law firm. Sood had no contractual obligations to Fatdoor

18  or any of Abhyanker's personal activities (with respect to Fatdoor or otherwise) that were

19  outside the scope of the website development services he was hired to perform for the law firm.

20  Thus, when Abhyanker purportedly disclosed the Lorelei Trade Secret to Sood, Sood was under

21  no obligation to keep that information secret. And the alleged trade secret was destroyed.

22

23  [1] Whenever Abhyanker engaged in efforts to identify Lorelei as a *potential* place to test his
24  alleged mathematical geocoding and pushpin mapping based on residences of inventors (*see* Dkt.
    No. 150-1 at ¶¶ 10-11) is of no relevance, as that is not his alleged secret at issue in this case. *See*
25  Dkt. No. 168 at 16:6-11, 26:23-27:4 (Abhyanker's admission, and Court's recognition, that the
    methodology is "not being claimed at this point as the trade secret").

26  [2] Abhyanker does not provide the factual basis for his alleged disclosure to Sood. *See* Dkt. No.
    150-1 at ¶ 20 (asserting only that "I made disclosure of the Lorelei trade secret . . . to Sandeep
27  Sood," not when, how or what aspects were disclosed). Abhyanker still flouts the Court's
    July 19, 2013 order that he disclose, "for each trade secret, whether the trade secret was acquired
28  by each particular Counter Defendant, **and the supporting factual basis**." Dkt. No. 100 at 25.

Dated: March 6, 2014

FENWICK & WEST LLP

By: */s/ Laurence F. Pulgram*
    Laurence F. Pulgram

Attorneys for Plaintiff and Counterdefendant
NEXTDOOR.COM, INC. and Counterdefendant
PRAKASH JANAKIRAMAN