UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEXTDOOR.COM, INC.,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>RAJ ABHYANKER,<br><br>　　　　Defendant.<br>_____/<br><br>RAJ ABHYANKER,<br><br>　　　　Counterclaimant,<br><br>　　　v.<br><br>NEXTDOOR.COM, INC., *et al.*,<br><br>　　　　Counterdefendants.<br>_____/ | No. C-12-5667 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF NEXTDOOR.COM'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT BENCHMARK CAPITAL'S MOTION TO DISMISS SECOND AMENDED COUNTERCLAIM**<br><br>**(Docket Nos. 143, 145)** |

## I. INTRODUCTION

Plaintiff, Nextdoor.com, Inc. ("Nextdoor.com"), brought an action against Raj Abhyanker, seeking a declaration that its use of the NEXTDOOR mark does not infringe on any trademark rights of Abhyanker. Plaintiff also alleges causes of action for trademark infringement and cyberpiracy. Abhyanker counterclaimed against Nextdoor.com trade secrets misappropriation, trademark infringement, and violation of California Business and Professions Code § 17200 *et seq*. Abhyanker also counterclaimed trade secrets misappropriation against Benchmark Capital Partners, L.P., Benchmark Capital Management Co. LLC (collectively, "Benchmark Capital" or "Benchmark"),

Prakash Janakiraman, a co-founder and vice-president of engineering at Nextdoor.com, Monsoon Enterprises, Inc. ("Monsoon"), and Sandeep Sood, president of Monsoon. The operative counterclaims are contained in the Second Amended Answer and Counterclaims ("SAAC"). Docket No. 132, Exh. A.

Currently pending before the Court is Nextdoor.com and Prakash Janakiraman's motion for [partial] summary judgment on Abhyanker's trade secret misappropriation claim pursuant to Federal Rule of Civil Procedure 56, and in the alternative, to dismiss under Federal Rule of Civil Procedure 41(b) for failure to comply with the Court's orders. Docket No. 143. Monsoon and Sood have joined in the Nextdoor.com motion. Docket No. 144. Also pending is Benchmark's motion to dismiss the SAAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.　　NEXTDOOR.COM'S MOTION FOR SUMMARY JUDGMENT

A.　　Factual and Procedural Background

Abhyanker's trade secret misappropriation claim at issue in the motions arises from concepts Abhyanker developed for "private online neighborhood social networks":

> On or around September 2006, I developed the concepts for two private online neighborhood social networks. The first concept, LegalForce.com was to be an online private social network for neighborhood inventors, created by geocoding inventors from public patent data. The second concept, Nextdoor.com, was to use the same source code as LegalForce.com to create a private social network for secure collaboration of neighbord in a geospatial area. Both LegalForce.com and Nextdoor.com websites were to be used by neighbors who registered with the site. During the development of the LegalForce.com and Nextdoor.com concepts, I also originated a new concept based on a Wikipedia-like public database of neighbor profiles that could be edited and enhanced to provide a "search" and "discover" functionality in addition to a sign-up social network. I named this new functionality "Fatdoor.com."

*Id.* Abhyanker's Declaration in Support of Opposition to Nextdoor.com Motion (Docket No. 150-1) ("Abhyanker Decl.") ¶ 9.

Following motions to dismiss the First Amended Answer and Counterclaims (Docket Nos. 63, 88), the Court found that Abhyanker had stated a claim for trade secrets misappropriation, but ordered Abhyanker to provide a more definite identification of his trade secrets. Docket No. 100 at 9, 26. In response to the Court's order, Abhyanker filed an initial Designation of Trade Secrets.

Docket No. 105 at 2. Two amendments ensued. The operative designation is the Second Amended Designation of Trade Secrets ("SAD"). Docket No. 135. The SAD limits the trade secrets to two matters: (1) "the bidding history of the Nextdoor.com domain name" ("Bidding History Trade Secret") and (2) "the identification of the Lorelei neighborhood in Menlo Park, California as the ideal first neighborhood to use to test and launch a neighborhood social network" ("Lorelei Trade Secret"). Docket No. 135 at 2. The SAD was filed one week after the SAAC.

The Lorelei neighborhood was purportedly the "ideal first neighborhood to use to test and launch a neighborhood social network" for two reasons. First, there was "a strong likelihood of user acceptance and adoption of new web concepts challenging traditional forms of neighborhood communication" because of the high concentration of "technology savvy, forward thinking individuals intimately familiar with modern web technologies as of September 2006." Abhyanker Decl. ¶¶ 12-13. Second, in 2006-2007, Abhyanker went door to door to "establish connections between residents and overcome a lack of interest" to promote neighborhood social networking, achieving a "90% penetration rate" in the neighborhood. *Id*. ¶ 14.

Abhyanker attests he disclosed the Lorelei Trade Secret to Sood and Benchmark Capital. *Id*. ¶ 20. Abhyanker alleges that Sood and Benchmark in turn disclosed this to Nextdoor.com founders Tolia and Janakiraman. SAAC ¶ 134; SAD 4-5. After the disclosures, Nextdoor.com prototyped an online neighborhood social network in the Lorelei neighborhood by setting up a website, loreleineighbors.reallifelabs.com. SAAC ¶ 145.

In describing the likely path of disclosure leading to Nextdoor.com's development of Nextdoor, Abhyanker alleges that Sood and Benchmark Capital have various connections to Janakiraman and Tolia. Both were "entrepreneurs in residence" with Benchmark Capital in 2007. SAAC ¶ 134; SAD at 4. Later, Benchmark Capital's venture capital was used in starting Nextdoor.com. Abhyanker Decl. Exh. J at 3, 8 of 71. Further, Sood and Janakiraman were friends since 1995, when they were undergraduates at the University of California, Berkeley. SAAC ¶ 136.

The Bidding History Trade Secret consists of Abhyanker's history of alleged attempts to bid for the nextdoor.com domain name, most importantly, the amount ($50,000) Abhyanker was willing to pay. Abhyanker Decl. ¶ 29. The nextdoor.com domain had been owned by a third party, Kevin

Watson. Docket No. 143-10 ("Watson Decl."). Abhyanker attests that, aside from Watson, he disclosed the amount to only two people, Counterdefendant Sood and a partner of Benchmark Capital, Kevin Harvey. Abhyanker Decl. ¶ 30. Abhyanker had hired Sood and his firm, Monsoon, in September 2006 to provide website development services for the LegalForce and Nextdoor concepts. SAAC ¶ 104. As for Kevin Harvey, Abhyanker met with him in December 2010 to discuss starting a private neighborhood social network website and showed him a prototype website. Abhyanker Decl. ¶¶ 30, 36-37. Nextdoor.com outbid Abhyanker, and purchased the nextdoor.com domain name for $58,000 on January 14, 2011, exactly one month after Abhyanker disclosed his $50,000 bid to Kevin Harvey. Abhyanker Decl. ¶ 29. Abhyanker alleges that Sood and Benchmark Capital disclosed the Bidding History Trade Secret to Nextdoor.com. SAAC ¶ 135.

B. <u>Legal Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

> A moving party without the ultimate burden of persuasion at trial –
> usually, but not always, a defendant – has both the initial burden of
> production and the ultimate burden of persuasion on a motion for
> summary judgment. In order to carry its burden of production, the
> moving party must either produce evidence negating an essential
> element of the nonmoving party's claim or defense or show that the
> nonmoving party does not have enough evidence of an essential
> element to carry its ultimate burden of persuasion at trial. In order to
> carry its ultimate burden of persuasion on the motion, the moving
> party must persuade the court that there is no genuine issue of material
> fact.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000) (internal citations omitted). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id*. at 1102 - 03. Furthermore,

> [T]he judge must view the evidence in the light most favorable to the
> nonmoving party: if direct evidence produced by the moving party
> conflicts with direct evidence produced by the nonmoving party, the
> judge must assume the truth of the evidence set forth by the
> nonmoving party with respect to that fact. Put another way, if a

4

> rational trier of fact might resolve the issue in favor of the nonmoving
> party, summary judgment must be denied.

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citations omitted).

C. <u>Discussion</u>

   1. <u>Evidentiary Objections</u>

Nextdoor.com objects to numerous items of evidence. Docket No. 155-33. The main objections are to the transcript of a conversation Abhyanker had with Nirav Tolia (Abhyanker Decl. Exh. J ("Conversation")) and the expert declaration of Vladmir Atanasov (Abhyanker Decl. Exh. N ("Atanasov Decl.").

   a. <u>The Conversation</u>

Nextdoor.com asserts that the Conversation is inadmissible because it is not relevant to any issue in its motion, and is also inadmissible under Federal Rule of Evidence 408 because it was a "settlement negotiation." Docket No. 155-3 at 8 of 9. The import of the Conversation lies in Tolia's statements that he and his group tested a prototype of Nextdoor in the Lorelei neighborhood, and that the good response allowed them to "pivot" their failing sports-related website, Fanbase.com, to Nextdoor.com. Conversation at 2, 8. This tends to show that Nextdoor.com *used* the Lorelei Trade Secret and that the Lorelei Trade Secret had *economic value*, two elements of trade secrets misappropriation. In this motion, however, Nextdoor.com does not put these elements at issue. Thus, the Conversation is irrelevant to this motion and inadmissible for that reason. Fed. R. Evid. 402.

   b. <u>The Atanasov Declaration</u>

Vladmir Atanasov is a professor in the School of Business at the College of William and Mary. Atanasov Decl. ¶ 2. The Atanasov Declaration is offered as an expert opinion to show: the Lorelei Trade Secret had economic value; the probability that Nextdoor.com independently selected Lorelei without knowledge of Abhyanker's pilot project is low; and that knowledge of Abhyanker's $50,000 bid "could have been instrumental" to Nextdoor.com's decision to bid on the domain name and for the high price of $58,000. *Id.* at 4, 10, ¶¶ 29-30.

5

However, Nextdoor.com's motion does not put at issue the Lorelei Trade Secret's economic value or its use by Nextdoor.com, or the Bidding History Trade Secret's economic value. Hence, this evidence is irrelevant. Fed. R. Evid. 402.

### 2. Standing

Nextdoor.com argues that Abhyanker lacks standing to allege misappropriation of the Lorelei Trade Secret because there is lack of evidence that he, rather than Fatdoor, Inc. owned it. Reply at 6. The Court does not consider Nextdoor.com's argument because it was raised for the first time in the reply brief. *See In re Food Catering & Housing, Inc.*, 971 F.2d 396, 397, n. 1 (9th Cir. 1992) ("We decline to consider Chemcarb's argument because 'appellants cannot raise a new issue for the first time in their reply briefs.'" (citations omitted)). Nextdoor.com could have brought this argument in its moving papers, as it had raised the issue on a prior motion to dismiss, and the Court had expressly noted that Nextdoor.com "could bring a motion for partial summary judgement raising the issue of Abhyanker's ownership of the trade secrets." *See* Docket No. 100 at 15. Thus, lack of standing is not grounds to dismiss the claim for misappropriation of the Lorelei Trade Secret.

### 3. Trade Secret Misappropriation

#### a. Legal Standard

California's Uniform Trade Secrets Act, ("CUTSA"), Cal. Civ. Code § 3426 *et seq.* (which adopts the Uniform Trade Secrets Act without significant change), governs trade secrets in California. *See Cadence Design Systems, Inc. v. AvantA Corp.*, 29 Cal.4th 215, 221 (2002). To prevail on a claim for trade secrets misappropriation under the CUTSA, a plaintiff must prove "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Sargent Fletcher, Inc. v. Able Corp.* 110 Cal. App. 4th 1658, 1665 (2003) (citing Civ. Code § 3426.1). The CUSTA defines "trade secret" as follows:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

    (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Civ. Code § 3426.1(d).

  Secrecy is a requisite element of a trade secret. "Whether information is a trade secret is ordinarily a question of fact." *Id*. at 1537 (citing several cases, including, *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 300, (2002)). Information that is generally known to the public or in an industry lacks the requisite secrecy. *See Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); Civ. Code § 3426.1(d)(1). Information that an individual discloses to others who are under no obligation to protect its confidentiality also lacks secrecy. *See id.*; Civ. Code § 3426.1(d)(2). *See also, In re Providian Credit Card Cases*, 96 Cal. App. 4th at 305 (telemarketing scripts were not trade secrets because they were used on customers over the telephone). A disclosure need not be widespread to defeat trade secret protection; it is defeated if no reasonable effort was made to maintain secrecy. *See e.g., Cole Asia Bus. Ctr., Inc. v. Manning*, 2013 WL 3070913 (C.D. Cal. June 18, 2013) (client list disclosed to a competitor without subjecting the competitor to confidentiality could not receive trade secret protection); *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1543 (2007) (holding it was a question of fact whether a particular confidentiality agreement constituted a reasonable effort to maintain the secrecy of information that the employer disclosed to the employee).

    b.  Lorelei Trade Secret

  The "Lorelei Trade Secret" is "the identification of the Lorelei neighborhood in Menlo Park, California as the ideal first neighborhood to use to test and launch a neighborhood social network." SAD at 2. Nextdoor.com asserts that the Lorelei Trade Secret is not a trade secret because Abhyanker disclosed the purported secret, by popularizing and prototyping the Nextdoor concept in the Lorelei neighborhood, without making reasonable efforts to maintain secrecy. Nextdoor Mot. at 12-13. As discussed below, however, there are genuine disputes of material fact as to both disclosure and reasonable efforts to maintain secrecy.

i. Factual background

Abhyanker emphasizes his significant efforts to initially identify the Lorelei neighborhood in 2006. He first plotted on a map of the United States all public addresses of inventors listed on U.S. patent applications for 2005 and 2006. Abhyanker Decl. ¶ 11. He especially accounted for patent applications in the "software, privacy, database and internet arts," based on the classification index of the patents. *Id.* at ¶ 12. His statistical analysis of the data revealed that Menlo Park had a "strong likelihood of user adoption" because of its "high[] concentration[] of technology savvy, forward thinking individuals intimately familiar with modern web technologies as of September 2006." *Id*. The Lorelei neighborhood was then chosen based on "an analysis of neighborhood sophistication" and its proximity (0.1 miles) to Abhyanker's office. *Id*. at ¶ 13.

Abhyanker also emphasizes his subsequent "significant efforts to transform the Lorelei neighborhood into an ideal neighborhood to test a neighborhood social network,"

> including manual efforts to establish connections between residents and overcome a lack of interest. I went door to door to establish these connections between and engaged in extensive handholding to overcome any initial lack of interest among residents.

*Id*. at ¶ 14. Abhyanker states in an email of November 2012 to Nirav Tolia:

> The Fatdoor concept was very popular in the Laurelai and Laurelei Manor neighborhoods back in 2006/2007, and a number of directors, employees of Fatdoor, Inc. And even neighbors in and around Laurelei remember this to this day, and will testify to this.

Mot. Kelly Decl. Exh. 2. Abhyanker also conducted "focus groups" in the Lorelei neighborhood "to provide insight into customer thinking about what is really valuable about the features and strategic assets that Fatdoor.com provides." *Id*. at ¶ 21, Exh. B.

Abhyanker attests that he disclosed the Lorelei Trade Secret to Benchmark Capital on June 22, 2007, in a Fatdoor Diligence CD labeled "confidential." Abhyanker Decl. ¶¶ 20, 24, 25. He also disclosed the Lorelei Trade Secret to Sandeep Sood. *Id*. at ¶ 20. On December 14, 2010, Abhyanker met with Kevin Harvey of Benchmark Capital and demonstrated a prototype of a Nextdoor private neighborhood social network. *Id*. at ¶¶ 36-37.

In 2008, Benchmark Capital had invested in Fanbase, Inc., which provided an "online almanac of professional and college athletes at www.fanbase.com." SAAC ¶ 98. By Spring 2010, Fanbase had failed, but Benchmark invested in Nextdoor.com. SAAC ¶ 98; SAD at 5. Fanbase/Nextdoor.com "was able to use the [Lorelei] neighborhood's familiarity with the concept" of an online social network site to prototype an initial website there, and "shift[] its business model from an online almanac for athletes to an online neighborhood social network." SAAC ¶¶ 98, 145. In March 2011, Fanbase, Inc. changed its corporate name to Nextdoor.com, Inc. SAAC ¶ 149.

Abhyanker's alleges that Benchmark and Sood wrongfully disclosed the Lorelei Trade Secret to Nextdoor.com. SAAC ¶ 148. He points to the small probability that Nextdoor.com would have chosen the Lorelei neighborhood to prototype its website without relying on his trade secret: Lorelei is one of hundreds of neighborhoods in the Bay Area; Nextdoor.com is based in San Francisco; and all of the individuals who worked on the Nextdoor concept live in San Francisco. SAAC ¶ 147. Further, Tolia and Janakiraman were "entrepreneurs in residence" at Benchmark when Abhyanker had pitched his ideas to Benchmark in June 2007. SAAC ¶¶ 120-122, 134. In addition, Janakiraman and Sood have been friends since they were undergraduates at U.C. Berkeley. SAAC ¶ 136.

ii. <u>There is a Genuine Dispute of Material Fact as to Whether Abhyanker Disclosed the Lorelei Trade Secret Through His Testing</u>

There is no dispute that Abhyanker popularized the concept of an online neighborhood social network and prototyped the "Fatdoor social network" in the Lorelei neighborhood. Abhyanker Decl. ¶¶ 14, 22. However, there exists a genuine dispute of material fact as to whether Abhyanker's actions disclosed the Lorelei Trade Secret as Plaintiff contends. Importantly, Abhyanker does not attest that he told Lorelei residents that his testing was limited to one neighborhood or that "the neighborhood" was limited to the geographic boundary of the Lorelei neighborhood. Because the Court raised this issue sua sponte, it gave Nextdoor.com a chance to submit evidence that would show that in popularizing the Lorelei neighborhood as the subject of his neighborhood social network, Abhyanker disclosed it to neighbors.

The evidence Nextdoor.com has submitted does not show Abhyanker disclosed the Lorelei Trade Secret by testing his neighborhood social network in the Lorelei neighborhood. *See* Docket

No. 166-4 Exhs. A-K. Most of the exhibits pertaining to Abhyanker's efforts do not identify, or even mention, the Lorelei neighborhood. For example, one news article introducing Fatdoor, mentions a different neighborhood: "The alpha version that we saw in a demo covered only a small part of Cupertino, CA." *Id*. at Exh. H. Another article indicates testing was done to see how far a neighborhood social network should extend, was not limited to the confines of the Lorelei neighborhood and did not identify it as such. *Id*. at Exh. K (news article quoting Abhyanker) ("after some testing we've found that keeping it at a 5-mile radius [from the user's residence] is the most reasonable"). The exhibits that do mention the Lorelei neighborhood are largely materials from a "diligence CD" Abhyanker provided Benchmark Capital on June 22, 2007, which Nextdoor.com does not dispute was marked "confidential." *See* Opp. to Nextdoor.com Mot. (Docket No. 150) at 15. Abhyanker asserts that these materials were not shown to Lorelei neighborhood residents. *See id.* at Exhs. C, D (filed under seal); Abhyanker's Supp. Br. (Docket No. 172) at 2-3.

Thus, Nextdoor.com has failed to establish there is no genuine dispute of material fact as to whether Abhyanker disclosed the Lorelei Trade Secret by testing a neighborhood social network in the Lorelei neighborhood. If anything, there is no direct evidence that he did.

      iii. <u>There is a Genuine Dispute of Material Fact as to Whether Sood Was Subject to a Confidentiality Agreement</u>

In opposition to Nextdoor.com's motion for summary judgment, Abhyanker attested that he disclosed the Lorelei Trade Secret to Sood subject to a confidentiality agreement, but did not submit further evidence of the agreement. During the hearing, Sood disputed that he had ever signed any such agreement. The Court gave Abhyanker permission to submit evidence of the agreement, and Sood and Nextdoor.com a chance to respond.

Abhyanker submitted an "Independent Contractor Agreement" ("ICA"), a "Non-Disclosure Agreement" ("NDA"), (collectively, "Agreements"), an "Assignment Pursuant To Partnership Dissolution Agreement" ("Assignment"), copies of checks paid to Sood by Raj Abhyanker, LLP, and a transcript of a telephone conversation Abhyanker had with Sood around December 10, 2012. Docket No. 165-1 Exhs. A, B. Abhyanker asserts that in the telephone conversation, Sood confirmed that he was aware that he was subject to a written confidentiality and a written non-

disclosure agreement. Docket No. 165-1 ¶ 12. From the actual exchange, it is not entirely clear this is what Sood was confirming. *Id.* at 15-16 of 16.

The ICA and NDA were between Raj Abhyanker, LLP and Sood. Both are dated September 21, 2006, and both bear the electronic signatures of Sood and Abhyanker. The ICA states that "Contractor [Sood] will provide website development services (billable and non-billable, collectively the 'Services'), to the Firm [Raj Abhyanker, LLP]," and prohibits Sood from disclosing any "Inventions and other business, technical and financial information" obtained or learned "in connection with the Services." ICA ¶¶ 1, 5. The NDA defines a broad category of "Confidential Information," including trade secrets and "business information," and prohibits the contracting parties from disclosing any Confidential Information for 5 years. NDA ¶¶ 2, 9. The Assignment assigns all intellectual property, including trade secrets and business plans, from Raj Abhyanker, LLP to "Raj Abhyanker, an individual."

Sood objects to the evidence on several grounds: that Sood never placed, or authorized anyone to place, his electronic signatures on the Agreements; that the NDA was never incorporated into the ICA; that the ICA pertains to website development for LegalForce, and not Fatdoor; and that the transcript of the conversation recording is inadmissible under Cal. Penal Code § 632(d) because he did not know the conversation was being recorded nor did he consent to any recording. Sood's Opposition to Abhyanker's Supplemental Br. ("Sood Opp.") (Docket No. 169).

First, the transcript of the telephone conversation is inadmissible. California Penal Code Section 632 prohibits recording a "confidential communication," without the consent of the other party. *See* Cal. Penal Code § 632(a). Evidence obtained in violation of Section 632 is inadmissible in any judicial proceeding. *Id.* at § 632(d). "The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." *Id*. at § 632(b). The communication was a private phone conversation between Abhyanker and Sood, which reasonably indicates Sood would desire it to be confined to himself and Abhyanker. Abhyanker attests that he informed Sood that he would record the conversation, but does not attest that Sood consented. Sood affirmatively asserts that he did not consent and did not even know the conversation was being recorded. Thus,

11

absent a satisfactory foundation that § 632 was complied with, the Court declines to admit evidence of the telephone conversation. Even without the transcript, however, Abhyanker may testify as to the conversation he had with Sood.

Second, there is a genuine dispute of material fact as to whether Sood was bound by the Agreements, including its confidentiality clauses in particular. Abhyanker has submitted documents showing Sood's electronic signatures on the Agreements. Although Sood disputes that he ever authorized those signatures, there is evidence of Sood's promise of confidentiality.

Third, there is a genuine dispute as to whether Abhyanker actually disclosed the Lorelei Trade Secret to Sood "in connection with" Sood's website development services for Abhyanker's firm. Sood asserts that "it is not plausible that Abhyanker both guarded the Lorelei 'trade secret' and disclosed it to Sood for no reason in the context of LegalForce, a completely unrelated project" and points out that Abhyanker, in his briefs, "repeatedly attributes the alleged trade secret to FatDoor and not to LegalForce." Sood Opp. at 2, 3 n.1. However, even if Fatdoor owned the property right to the Lorelei Trade Secret, "a rational trier of fact" might find that Abhyanker disclosed the idea to use the Lorelei neighborhood as a testing site to Sood, in connection with Sood's services. *See T.W. Elec. Services., Inc.*, 809 F.3d at 630-31. Abhyanker attests that both LegalForce.com and Nextdoor.com were to be "private online neighborhood social networks" and that the two were "to use the same source code." Abhyanker Decl. (Docket No. 150-1) ¶ 9. Fatdoor.com was also a "sign-up social network," except that it was to have in addition "a Wikipedia-like public database of neighbor profiles that could be edited and enhanced to provide a 'search' and 'discover' functionality." *Id*. In other words, all three "concepts" require websites for private online neighborhood social networks. Further, a notation on one of the checks paid to Sood says "Fatdoor concept," suggesting that Sood's services pertained to Fatdoor as well. In short, there is evidence suggesting that Abhyanker disclosed information to Sood that was subject to confidentiality.

Nextdoor.com counters the evidence on the additional grounds that the Lorelei Trade Secret "could not have existed until Abhyanker ran the pilot and achieved the claimed 90% penetration rate" in April or May 2007, after Sood's contract with Abhyanker's firm ended in October or

1 November 2006. Nextdoor.com and Janakiraman's Response to Abhyanker's Supplemental Br.
2 ("Nextdoor Opp.") at 3. Neither Sood nor Abhyanker make clear when Sood's contract with
3 Abhyanker's firm ended, but the checks made out to Sood are dated November 13, 2006. The
4 April/May 2007 timing of 90% penetration accords with Abhyanker's evidence. *See* Atanasov Decl.
5 ¶ 21; Opp. to Nextdoor.com Mot. at 11. The Court will assume Nextdoor.com's timeline is correct
6 for the present purpose of assessing the evidence.

7     While Abhyanker's "manual efforts" to "transform the neighborhood into the ideal
8 neighborhood to test neighborhood social network" extended beyond the time of Sood's contract, it
9 is consistent with the evidence that Abhyanker earlier disclosed to Sood during his contract "the
10 identification and selection of the Lorelei neighborhood as the ideal first neighborhood to use to test
11 and launch a neighborhood social network." SAD at 2. It is undisputed that by the time Sood was
12 providing services for Abhyanker's firm, Abhyanker had identified the Lorelei neighborhood "as
13 being a neighborhood in which there existed a strong likelihood of user acceptance and adoption of
14 new web concepts challenging traditional forms of neighborhood communication." Abhyanker
15 Decl. ¶ 13. Abhyanker may well have disclosed to Sood during the contract his plans to "transform"
16 the Lorelei neighborhood.

17     Thus, there is a genuine dispute of material fact as to whether Abhyanker disclosed the
18 Lorelei Trade Secret to Sood under confidential terms in connection with Sood's services for
19 Abhyanker's firm. The Court thus denies Nextdoor.com's motion for summary judgment with
20 respect to the claim for misappropriation of the Lorelei Trade Secret.

21         c.    <u>Bidding History Trade Secret</u>

22     The Bidding History Trade Secret is not a trade secret because Abhyanker disclosed
23 whatever bids he made to the bid recipient. See *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002
24 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect
25 the confidentiality of the information, or otherwise publicly discloses the secret, his property right is
26 extinguished.") Abhyanker acknowledges that the bid recipient was under no obligation to protect
27 the confidentiality of his bid:
28

> it would not be reasonable under the circumstances to require the bid recipients to agree to a confidentiality or non-disclosure agreement, as that is not the custom when bidding on domain names. This is especially true given the fact that the original domain name owner and bid recipient was anonymous. Moreover, the bidding process did not allow a party to unilaterally impose confidentiality obligations.

Opp. to Nextdoor.com Mot. Since the bid recipient is under no obligation to keep bids confidential, it stands to reason that the recipient could have disclosed and likely did disclose the bid to competing bidders to maximize his profit. Nothing suggests the recipient proceeded on the basis of sealed bids. Hence, secrecy was not maintained by Abhyanker.

The Bidding History Trade Secret is not a trade secret because Abhyanker disclosed bids he made to the bid recipient without requiring confidentiality or other reasonable efforts to maintain secrecy. Thus, the Court grants summary judgment for Nextdoor.com with respect to the claim for misappropriation of the Bidding History Trade Secret.

    4.  <u>Nextdoor.com's Rule 41 Motion</u>

Nextdoor.com asserts that, in case the Court does not grant summary judgment, it should dismiss the trade secrets misappropriation claim under Rule 41(b) for Abhyanker's "repeated failure to comply with the Court's Order requiring him to sufficiently identify his trade secrets." Mot. at 17.

"Dismissal with prejudice under Rule 41(b) is a harsh remedy, so . . . [t]he district court judge should first consider less drastic alternatives." *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996) (citing *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981)).

In its previous order, the Court found that Abhyanker has stated a claim for trade secrets misappropriation against Nextdoor.com, but held: "Defendants are entitled, however, to a more definite identification of Abhyanker's claims at a preliminary stage before this case progresses to full discovery." Docket No. 100 at 9. The Court ordered Abhyanker to file by August 2, 2013, his "identification of trade secrets and the factual basis for claims of misappropriation" according to the outline in the parties' Joint Report Regarding Plan for Trade Secret Designation of June 27, 2013 (Docket No. 98). Docket No. 100 at 26-27. The Court also ordered the parties to "meet and confer

14

1 regarding any issues relating to the sufficiency of the trade secret designation," so that any
2 disagreements could be addressed in the next CMC on September 5, 2013. *Id*.

3       Abhyanker filed a Designation of Trade Secrets by the ordered deadline, designating three
4 trade secrets: "the bidding history of the Nextdoor.com domain, identification of the Lorelei
5 neighborhood as the first neighborhood to launch Nextdoor in, and the source code for the user
6 interface of [Plaintiff's] online private social network." Docket No. 105 at 2. Nextdoor.com
7 complains that Abhyanker disregarded Nextdoor.com's attempts to meet and confer about the
8 insufficiency of the designations. At the September 5, 2013 CMC, Abhyanker stated he planned to
9 file an amended designation and the Court gave him until September 26, 2013, ordering the parties
10 to meet and confer. Docket No. 110 at 11, 12, 15. Nextdoor.com complains that Abhyanker was
11 again uncooperative in discussing the insufficiency of the designations.

12       Abhyanker filed a First Amended Designation of Trade Secrets ("FAD") by the September
13 26 deadline. Docket No. 116. The FAD designates the same three trade secrets as the initial
14 Designation, but provides a somewhat more detailed factual basis as to how counter-defendants
15 acquired, disclosed, and used the purported trade secrets. Abhyanker filed the SAD on December
16 12, 2013, withdrawing the source code trade secret designation. Nextdoor.com claims this was in
17 response to its motion for sanctions under Rule 11, filed on November 21, 2013, which it withdrew
18 on December 3, 2013.

19       At this juncture, dismissal under Rule 41(b) would be a drastic remedy. While the Court
20 does not condone evasion of its order to comply with its order to meet and confer, Abhyanker did
21 designate his trade secrets. The Court denies Nextdoor.com's motion to dismiss under Rule 41(b).

22       **III.    BENCHMARK CAPITAL'S MOTION TO DISMISS**

23 A.    <u>Factual and Procedural Background</u>

24       Abhyanker alleges only one cause of action against Benchmark Capital – trade secrets
25 misappropriation. The operative counterclaim against Benchmark is contained in the SAAC
26 (Docket No. 132). Benchmark Capital was served later than the other counter-defendants, on
27 September 24, 2013, after the Court had ruled on the counter-defendants' motions to dismiss. The
28 Court had denied the other counter-defendants' motions to dismiss the trade secrets

1 misappropriation claim, but had ordered Abhyanker to identify the trade secrets and factual basis for
2 claims of misappropriation. *See* Docket No. 100 at 26. The Second Amended Designation of Trade
3 Secrets was filed on December 12, 2013, one week after the SAAC. *See* SAD (Docket No. 135).
4 On January 9, 2013, Benchmark filed this motion to dismiss the claim against it, pursuant to Federal
5 Rules of Civil Procedure 12(b)(6).

6 On or around June 20, 2007, Abhyanker met with Benchmark Capital to discuss funding for
7 a new version of Fatdoor.com. SAAC ¶ 120. Abhyanker did not disclose any trade secrets during
8 this meeting. *Id.* In a follow-up telephone call, Harvey, a general partner of Benchmark Capital,
9 "agreed to maintain confidential any and all information disclosed by Abhyanker during any future
10 meetings." *Id.* Abhyanker alleges that Benchmark Capital has the "pattern and practice . . . to agree
11 to non disclosure agreements via verbal and email 'handshakes.'" *Id.*

12 Abhyanker alleges that on or around June 21, 2007, he met with Benchmark Capital to
13 discuss funding for Fatdoor.com, and disclosed the Lorelei Trade Secret and Bidding History Trade
14 Secret. SAD at 3; SAAC ¶ 121. The meeting was attended by the majority of Benchmark partners
15 and "entrepreneurs in residence." SAAC ¶ 121. In addition, at Harvey's request, Abhyanker sent
16 trade secret presentations relating to the Nextdoor concept to Benchmark Capital partner Mitch
17 Laskey and a "Diligence Package" fully disclosing the Nextdoor concept and trade secrets to
18 Benchmark Capital partner Fenton. SAAC ¶ 122. The Diligence Package contained, among other
19 materials, business plans and prototypes. *Id.*

20 Abhyanker alleges on information and belief that Benchmark Capital disclosed the trade
21 secrets to Tolia and Janakiraman. SAAC ¶ 135. At the time Abhyanker made these disclosures to
22 Benchmark Capital, Tolia and Janakiraman were entrepreneurs in residence at Benchmark, who later
23 became cofounders of Nextdoor.com. SAAC ¶ 134. Nextdoor.com prototyped its initial website in
24 the Lorelei Neighborhood. SAAC ¶ 145. In addition, Benchmark Capital is a large investor in
25 Nextdoor.com. SAD at 5.

26 B. <u>Legal Standard</u>

27 Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the
28 failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to

16

dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

C. <u>Discussion</u>

    1. <u>Benchmark's Statute of Fraud Defense Fails</u>

Benchmark argues that the alleged oral confidentiality agreement is unenforceable due to the statute of frauds, because there is no possibility that it was intended to last for only one year. The statute of frauds prohibits oral contracts which "by their terms, cannot possibly be performed within one year." *White Lighting Co. v. Wolfson*, 68 Cal.2d 336, 343 (1968); Civ. Code § 1624(a)(1). Here, however, the confidentiality agreement could have been performed within one year, since it is possible that Benchmark and Abhyanker would not have had "any future meetings" after one year. Therefore, the statute of frauds does not bar the alleged confidentiality agreement.

    2. <u>Abhyanker Has Failed to State a Claim of Misappropriation of the Bidding History Trade Secret</u>

As discussed in relation to Nextdoor.com's motion, the Bidding History Trade Secret cannot be a trade secret because Abhyanker disclosed bids he made to the bid recipient without requiring confidentiality or other reasonable efforts to maintain secrecy. Thus, the Court dismisses with prejudice Abhyanker's claim for trade secrets misappropriation of the Bidding History Trade Secret.

    3. <u>Abhyanker Has Stated a Claim of Misappropriation of the Lorelei Trade Secret</u>

Like Nextdoor.com, Benchmark asserts that Abhyanker fails to state that the Lorelei Trade Secret was a trade secret because he alleges he "publicly disclosed the location of the Lorelei

neighborhood as a launch site for a neighborhood-based social network" by "'prototyp[ing] his own Nextdoor and Fatdoor concepts in Lorelei.'" Benchmark Mot. at 16 (quoting SAAC ¶ 147). Benchmark also asserts that Abhyanker fails to allege how "knowledge of the Lorelei neighborhood as a testing site provided 'an actual or potential economic advantage over others.'" *Id*. at 16-17 (quoting *Yield Dynamics, Inc. v. TEA Systems Corp.*, 154 Cal. App. 4th 547, 564 (2007)).

As related to Nextdoor.com's motion, for purposes of this Rule 12(b)(6) motion, Abhyanker's "prototyping" did not disclose the Lorelei Trade Secret to Lorelei residents. Abhyanker has also plausibly alleged that the Lorelei Trade Secret gave Nextdoor.com a competitive advantage. Nextdoor.com had previously existed as Fanbase, Inc., which was a failure, but "was able to use the neighborhood's familiarity with the concept" to prototype its initial website there, and "shift[] its business model from an online almanac for athletes to an online neighborhood social network." SAAC ¶¶ 98, 145. Choosing the right neighborhood for the prototype had value. Abhyanker has also alleged that he took reasonable efforts to maintain secrecy by agreeing with Benchmark Capital that disclosures of his trade secret were subject to confidentiality.

### 4. Benchmark's Remaining *Twombly*/*Iqbal* Arguments Fail

Benchmark asserts that Abhyanker fails to plausibly allege that it disclosed the asserted trade secrets to Janakiraman and Tolia. Benchmark Mot. at 17. Abhyanker alleges Benchmark Capital disclosed the trade secrets to Tolia and Janakiraman. They were entrepreneurs in residence at Benchmark in 2007, when Abhyanker disclosed the purported trade secrets to Benchmark. SAAC ¶ 134. Abhyanker also asserts that he disclosed the trade secrets to two entrepreneurs in residence at Benchmark, Taylor and Norris, who were advisors to Tolia. SAD at 5. Later, Benchmark funded Nextdoor.com and Nextdoor.com tested and prototyped its social networking website in the Lorelei neighborhood. Contrary to Benchmark's assertion, these facts plausibly allege that Nextdoor.com obtained the Lorelei Trade Secret through Benchmark.

Benchmark also asserts that it defies common sense that Abhyanker would disclose trade secrets about LegalForce/Nextdoor, and provide it with a diligence file disclosing his Nextdoor concept, when he was pitching Fatdoor. The distinctions between Fatdoor, Nextdoor, and LegalForce are rather unclear, but Abhyanker has alleged overlap between the concepts. All of them

concern private online neighborhood social networking. SAAC ¶¶ 99, 109. The allegations and reasonable inferences therefrom are sufficient to satisfy *Twombly*/*Iqbal*.

Thus, the Court denies Benchmark's motion to dismiss Abhyanker's claim for misappropriation of the Lorelei Trade Secret.

## IV. CONCLUSION

The Court grants Nextdoor.com's motion for summary judgment on the claim for misappropriation of the Bidding History Trade Secret. It denies Nextdoor.com's motion on the claim for misappropriation of the Lorelei Trade Secret.

The Court grants Benchmark's motion to dismiss the claim for misappropriation of the Bidding History Trade Secret. It denies Benchmark's motion on the Lorelei Trade Secret.

This order disposes of Docket Nos. 143 and 145.

IT IS SO ORDERED.

Dated: April 23, 2014

_____
EDWARD M. CHEN
United States District Judge