# EXHIBIT A

FALSE STATEMENTS TO THE COURT BY RAJ ABHYANKER

1) That the document attached as Exhibit G to Abhyanker's Declaration in Support of his Opposition to Nextdoor.com's Motion for Summary Judgment was a true and correct copy thereof, when in fact, it was a truncated version of that document. (*Compare* Dkt. No. 150-1 ("MSJ Decl.") ¶ 44, Exhibit G with June 6, 2014 Rough Tx., p. 198 at 7-9; 198-203; and 219, Deposition Exhibit 82).

2) That in November 2012, attorney Daniel Hansen advised Abhyanker that Jeff Drazan had the authority to appoint him interim CEO of Center'd, without any further action required, when, in fact, Hansen wrote and said that he could give no such advice. (*Compare* MSJ ¶ 46 with June 6, 2014 Rough Tx. pp. 203-205, Deposition Exhibit 84).

3) That Abhyanker believed he had authority to act as interim CEO of Center'd in November 2012 (when he purported to execute an agreement on its behalf, assigning all Center'd assets to himself for $1), when in fact, he admitted to its Board members that, without their consent, he knew he did not have such authority. (*Compare* MSJ Decl. ¶¶ 45-50 with June 6, 2014 Rough Tx., p. 209 at 1-6 and pp. 208-212, Deposition Exhibit 85).

4) That, at the time of the presentation of the $1 assignment agreement between himself and Center'd to the Court in his Opposition to Nextdoor's Motion for Summary Judgment (MSJ Decl., Exhibit H) in 2014, Abhyanker believed this agreement was valid, when in fact, he knew the Center'D Board had again in 2013 refused to allow him to act on its behalf (even after being threatened with breach of fiduciary duty claims by Abhyanker if it refused). (*Compare* MSJ Decl. ¶ 44-48 with June 6, 2014 Rough Tx., pp. 199-200, 212-213).

5) That Abhyanker provided a powerpoint presentation to Benchmark entitled Executive_Summary_Fatdoor 6-21-2007, which first surfaced in December, 2013, and added references to the two trade secrets that remained in the action, including his trade secret related to the Lorelei neighborhood (the "*Lorelei PPT*") (RA000396). (*Compare* MSJ Decl. ¶ 24 with June 6, 2014 Rough Tx. pp.233-234).

6) That the *Lorelei PPT* (RA000396) is authentic and genuine and that he did not create it for the purposes of supporting his allegations in the instant suit. (*Compare* MSJ Decl. ¶ 24 with June 6, 2014 Rough Tx., pp. 233-250).

7) That, through his extensive efforts to persuade Lorelei residents of the merits of his neighborhood-based social networking concept, he achieved a 90% penetration rate among Lorelei residents, when, in fact, he did not know of any Lorelei residents that joined his service, and the 90% figure in fact represented no such thing. (*Compare* MSJ Decl. ¶ 14 with June 6, 2014 Rough Tx., pp. 279-282).

8) That he disclosed "much of this information" about his selection of and efforts in the Lorelei neighborhood to Benchmark via the alleged Due Diligence CD he provided to them on June 22, 2007, when, other than the fabricated *Lorelei PPT*, the alleged CD contained no mention of Lorelei, and Abhyanker could not identify a single document in his files, other than the *Lorelei PPT* that mentioned Lorelei.  (*Compare* MSJ Decl. ¶ 23 with June 6, 2014 Rough Tx., pp. 83-84, 86-89).

9) That the June 4, 2007 Legalforce assignment of assets to Abhyanker upon which he rested his claims was authentic, when it apparently was fabricated and is inconsistent with documents contemporaneously executed by him with third parties.  (June 6, 2007 Rough Tx., pp. 56-57, 168).

10) That in October 2007, Legalforce was dissolved at the direction of the Board of Directors (when there was in fact no Board) and that he was assigned all of its assets (Dkt. No. 71 ¶ 3)—when, in fact, Legalforce was wound up only in December 2008, and the only assets Abhyanker received were the domain name Legalforce.com and its patent applications. (*Compare* Dkt. No. 165-1 ¶ 4-5 with June 6, 2014 Rough Tx., pp. 129-130, 143-145, Deposition Exhibit 76).

11) That he had searched for and produced all responsive documents (via a sworn attestation the Court ordered him in December 2013 to make), when in fact, he had not searched or produced email documents off the "found" hard drive.  (*Compare* Dkt. No. 165-1 ¶ 2 with June 6, 2014 Rough Tx., pp. 233-250).

12) That he did not add the Diligence CD to the "found" hard drive in an effort to make it appear like it had been there all along, or know that it had been added after December 5, 2013.  (June 7, 2014 Rough Tx., pp. 6-20).

13) That, when he created a "Diligence CD" for this case and included labels on it when producing it (in order to make it look like it was an actual CD provided to Benchmark), those labels were the originals created and placed on the CD in 2007, when, in fact, those labels appear to have been created for the purpose of this litigation.  (*Compare* MSJ Decl. ¶ 25 with June 7, 2014 Rough Tx., pp. 33-34).

14) That in or about April, 2008, he received express permission from the Center'd Board to continue using the Fatdoor brand (after he had been fired from the company in 2007), when no action or permission by the Board exists. (*Compare* MSJ Decl. ¶ 44 with June 6, 2014 Rough Tx., pp. 170-196, Deposition Exhibits 78-79).

15) That that he began personally using the "FATDOOR" mark in commerce as soon as he got the Center'd Board's approval (which he never got), when in fact, there is no evidence that he made any use of that mark in commerce between 2008 and 2012. *Compare* Dkt. No. 132 ¶ 29 (Second Amended Counterclaim) with June 7, 2014 Rough Tx. P 22).

16) That he used the phrase "Nextdoor Neighbors" on the eDirectree site "years before" Nextdoor's use of the NEXTDOOR mark, and that Exhibit D to his Supplemental Statement of Regarding His Prior Use (Dkt. 153) depicted the eDirectree site as it appeared at that time, when in fact that Exhibit was created during this litigation. (*Compare* Dkt. No. 153 ¶ 7, Exhibit D with Dkt. No. 192 (abandoning claim based on prior use of NEXTDOOR mark).

17) That Counter-Defendant Sood consented to the recording of his telephone conversation with Abhyanker regarding the facts at issue in this litigation. (*Compare* Dkt. No. Supp. MSJ Decl. ¶ 7 with Dkt. No.171 ¶ 4).

18)  That Sood signed the alleged NDA and Confidentiality Agreement that forms the basis of Abhyanker's claim that Sood owed him a duty of confidentiality with respect to the alleged trade secrets asserted in this case.  (*Compare* Dkt. No. 155-1 ¶ 2 with Dkt. No.171 ¶ 3).

19) That attorney Daniel Hansen drafted documents to carve out LegalForce's private social network assets separately from those of Fatdoor, when no such document exists, and Abhyanker's deposition testimony was that Legalforce's patent applications were in fact assigned to Fatdoor.  (*Compare* Dkt. No. 71 (Declaration of Raj Abhyanker in Support of Motion to Disqualify ("DQ Decl.") ¶ 12-13 with June 6, 2014 Rough Tx., pp. 130-136, Deposition Exhibit 74).

20) That LegalForce's ownership of the alleged trade secrets was evidenced by Warren Myers' complaint that Fatdoor had Legalforce's assets, and that this was disclosed to Fatdoor investors, when, in fact, Myers complained that Fatdoor had his real estate company's assets, and this is what was disclosed.  (*Compare* DQ Decl. ¶ 15 with June 6, 2014 Rough Tx., pp. 106-111, Deposition Exhibit 71).