# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


NEXTDOOR.COM, INC., a Delaware
corporation,

               Plaintiff,

               vs.             No. 3:12-cv-05667-EMC

RAJ ABHYANKER, an individual,

               Defendant.
_____ /

AND RELATED COUNTERCLAIM
_____ /



VIDEOTAPED DEPOSITION OF RAJ ABHYANKER

VOLUME I  (Pages 1-300)

JUNE 6, 2014

9:18 A.M.



555 California Street, 12th Floor

San Francisco, California



REPORTED BY:

Mark W. Banta

CSR No. 6034, CRR

1

1                    A P P E A R A N C E S

2     For the Plaintiff:
            FENWICK & WEST, LLP
3           555 California Street, 12th Floor
            San Francisco, California  94105
4           415.875.2300
            BY JENNIFER LLOYD KELLY
5           BY LAURENCE PULGRAM
            BY MATT BECKER
6           jkelly@fenwick.com
            lpulgram@fenwick.com
7           mbecker@fenwick.com

8

9

      For Defendant and Counterclaimant Raj Abhyanker:
10          LEGALFORCE RAJ ABHYANKER, P.C.
            BY HEATHER NORTON
11          BY SCOTT ALLEN
            BY BRUNO W. TARABICHI
12          1580 West El Camino Real, Suite 13
            Mountain View, California  94040
13          650.965.8731
            heather@legalforcelaw.com
14          bruno@leagalforcelaw.com

15

16    For Counterdefendants Benchmark Capital Partners, L.P.
      and Benchmark Capital Management Co. LLC:
17          LATHAM & WATKINS LLP
            BY JULIAN W. PARK (morning session only)
18          140 Scott Drive
            Menlo Park, California  94025
19          650.328.4600
            julian.park@lw.com
20

21          LATHAM & WATKINS
            BY MELANIE M. BLUNSCHI (morning session only)
22          505 Montgomery Street, Suite 2000
            San Francisco, California  94111-6538
23          415.391.0600
            melanie.blunschi@lw.com

24

25    /

                                                          2

1    APPEARANCES (Continued)

2

3    For Counterdefendants Sandeep Sood and Monsoon
     Enterprises, Inc.:
4         ROYSE LAW FIRM, PC
          BY HARPREET S. WALIA (morning session only)
5         135 Main Street, 12th Floor
          San Francisco, California  94105
6         415.421.9700
          hwalia@rroyselaw.com
7

8

9

10        ALSO PRESENT:  DAN DeFRANK, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**Raj Abhyanker - Volume I**
**June 6, 2014**

1    in LegalForce 1, Jeff Drazan.  Jeff Drazan recommended my

2    counsel to be independent of Fenwick & West which was

3    representing LegalForce with Dan Hansen.  So I met Dan

4    Hansen through Jeff Drazan, and so I don't know what your

5    question is.

6            MR. PULGRAM:  I know.  You need to answer my

7    question.  I'm going to move to strike your answer as

8    unresponsive, because what we do here is I ask questions,

9    you answer questions.  You don't give speeches.

10           THE WITNESS:  I'm sorry.

11   BY MR. PULGRAM:

12       Q.   So the question was did you enter into an

13   assignment agreement at the time that you received

14   funding for Fatdoor 1?

15       A.   Yes.

16           MR. PULGRAM:  Would you take a look, please, at

17   the exhibit marked next in order.

18           (Exhibit 74 marked.)

19   BY MR. PULGRAM:

20       Q.   Looking at Exhibit 74 which is entitled

21   Assignment Agreement, is that your signature as assignor?

22       A.   It's my signature as both assignor and

23   assignee.

24       Q.   Assignee on behalf of Fatdoor, Inc., correct?

25       A.   That's right.

                                                              139

Raj Abhyanker - Volume I
June 6, 2014

1    Q.    Schedule A is defined in page 2D of the

2    assignment agreement.

3    A.    Um-hmm.

4    Q.    It says "Schedule A comprises a complete list

5    of all issued patents, patent applications, filed or in

6    process, all unregistered or registered trademarks, and

7    all domain names within the definition of the

8    technology."  Do you see that?

9    A.    Yes.

10   Q.    If you turn to Schedule A, please, is the

11   name --

12   A.    Actually, where were you reading that?  I'm

13   sorry, because --

14   Q.    That was on page 2, part 4D.

15   A.    That's right.

16   Q.    So looking at Schedule A, it defines under

17   Trademarks Fatdoor, including the U.S. federal trademark

18   registration 77049286, as an asset that you assigned to

19   Fatdoor, Inc., correct?

20   A.    That's an intent to use trademark.

21   Q.    Did you assign that trademark?

22   A.    I assigned the intent to use trademark.

23   Q.    Are you claiming that the trademark that

24   subsequently issued was not assigned?

25   A.    It never issued because they failed to submit a

140

**Raj Abhyanker - Volume I**
**June 6, 2014**

1    statement of use.

2        Q.    So are you claiming in this action that you

3    have any basis to rely on that intent to use filed and

4    assigned to Fatdoor, Inc. 1?

5        A.    Yes.

6        Q.    Why is that?

7        A.    I've already described an assignment of

8    residual assets to you.

9        Q.    Due to the assignment of Fatdoor's residual

10   assets to you?  That's your contention.

11       A.    Right.

12       Q.    Okay.  And what about get to know your

13   neighbors, are you claiming that the term Nextdoor

14   infringes a mark "get to know your neighbors"?

15       A.    I claim that a reasonable person who would be

16   confused between Fatdoor get to know your neighbors as it

17   was used and Nextdoor, given Fatdoor's trade -- previous

18   trade secret of Nextdoor.com that you yourself said was

19   extinguished through the publishing of a patent

20   application that's now granting into very broad claims.

21            MR. PULGRAM:  Move to strike as unresponsive.

22       Q.    You're contending that Nextdoor infringes the

23   mark "get to know your neighbors," correct?

24       A.    My contention is Nextdoor infringes the

25   independent claims of my soon-to-issue patent, and it

141

**Raj Abhyanker - Volume I**
**June 6, 2014**

1    also is likely to be confusingly similar to Fatdoor, and

2    also, that it is confusingly similar to "get to know your

3    neighbors" in connection with a neighborhood social

4    network.

5         Q.    Schedule A of the assignment agreement assigns

6    certain patent applications, including the number 678

7    patents about geospatial environment, correct?

8         A.    Um-hmm.

9         Q.    Excuse me?

10        A.    Yes.

11        Q.    Were there any patents or patent applications,

12   I should say, for LegalForce involving geospatial

13   activities that were not assigned to Nextdoor as of

14   February 1, 2007?

15        A.    I think you made a faux pas, Laurence.  You

16   meant Fatdoor, not Nextdoor.

17        Q.    I withdraw the question.  I appreciate your

18   clarification.

19        A.    Clearly, you're confused yourself.

20        Q.    The question is:  Were there any patent

21   applications for LegalForce 1 pending as of February 1,

22   2008 -- strike that.

23            Were there any patent applications of

24   LegalForce 1 pending as of February 1, 2007, that were

25   not assigned to Fatdoor?

                                                          142

**Raj Abhyanker - Volume I**
**June 6, 2014**

1      A.     Laurence, I think one needs to start with for

2    the first page of this agreement.  This agreement is

3    between an assignor, Raj Abhyanker, it's not between

4    LegalForce, Inc.

5           LegalForce, Inc. had previously been assigned

6    certain applications by Sayre Stevick at Fenwick & West,

7    your partner.

8      Q.     Let me try to focus the question.  Were there

9    any patent applications of LegalForce, Inc. in the area

10   of geospatial environments --

11     A.     Yes.

12     Q.     -- or geospatial activities --

13     A.     Yes.

14     Q.     -- as of February 1, 2007?

15     A.     All those applications are listed as 1 through

16   5.

17     Q.     You're saying 1 through 5 were applications --

18     A.     1 through 4.

19     Q.     -- of LegalForce?

20     A.     1 through 4 were.

21     Q.     1 through 4 were applications of LegalForce?

22     A.     Yes.

23     Q.     Okay.  And they were assigned on Schedule A to

24   Fatdoor, Inc., correct?

25     A.     I'm looking at this now with a different pair

143

1   of eyes, and I don't know.  All I can do is I can rely on

2   the fact that Sayre Stevick had -- when he worked for

3   102103, fulfilled his duties to 102103, insofar as these

4   first 4 applications, specifically the March 17th, 2006,

5   and the June 28, 2006, have absolutely nothing to do with

6   social networking.  They have entirely to do with

7   LegalForce.  If you --

8       Q.    Okay.  So I just want to make sure that I

9   understand what you're saying.

10      A.    Um-hmm.

11      Q.    You're saying that patent applications number

12  1, 2, 3 and 4 described in your assignment agreement to

13  Fatdoor had been filed on behalf of LegalForce 1.

14  Correct?

15      A.    Right.

16      Q.    Okay.  Now, did LegalForce 1 have any other

17  patent applications outstanding as of February 1, 2008,

18  in the area of geospatial mapping, environment,

19  et cetera.

20      A.    Perhaps you're tired, but I think you said

21  February 1, 2008, and not February 1, 2006 or 2007.

22      Q.    I appreciate --

23      A.    What do you mean?

24      Q.    -- you clarifying that, too.  Sometimes I

25  misspeak, and I will stipulate to that.  So I'll rephrase

1    the question.

2           As of February 1, 2007, did LegalForce 1 have

3    any outstanding patent applications in the area of

4    geospatial mapping or geospatial environments other than

5    those identified in your assignment agreement as being

6    assigned to Fatdoor?

7       A.    I don't know.  I'd have to ask Sayre Stevick.

8       Q.    Does Sayre Stevick do patent applications for

9    you, sir?

10      A.    He does assignments of corporate assets.

11      Q.    But he didn't have anything to do with who

12   filed or what patents were filed, correct?

13      A.    That's because I'm a patent attorney, so we

14   tried to save money by doing that and he did all the

15   corporate work to protect those assets.

16      Q.    Who chose whether to file a patent in the name

17   of Raj Abhyanker, LegalForce, Inc., or some other entity?

18      A.    The inventors have an option to choose.

19      Q.    You chose, correct?

20      A.    No.  The people listed on those applications as

21   materially contributing to them.  And if you look at some

22   of them, they include a few other names.

23      Q.    Okay.  So I would like to mark next in order

24   your PIAA, as it's called.  Tab 88.  It will be marked as

25   the next exhibit which is 75 in this deposition.

                                                          145

1          (Exhibit 75 marked.)

2     BY MR. PULGRAM:

3          Q.    Mr. Abhyanker, Exhibit 75 is entitled Employee

4     Proprietary Information and Inventions Agreement.  Is

5     that your signature on page 5 dated January 31, 2007, and

6     again on Exhibit B?

7          A.    Yes.  This replaced the previous one that was

8     prepared on a Fenwick form.  I believe there was another

9     one that Babar -- if I remember, my recollection is

10    correct, I believe there was another one that was created

11    prior.

12         Q.    When you say "created on a Fenwick form,"

13    Fenwick never worked for Fatdoor, did it?

14         A.    Yes, it did.

15         Q.    Did Fenwick have an engagement agreement with

16    Fatdoor?

17         A.    No, but the entire engagement between Fenwick

18    and myself was in reliance of my friendship and trust of

19    one of your partners, Rajiv Patel.

20         Q.    Mr. Abhyanker, when you mentioned a Fenwick

21    form, are you suggesting that you took a form that

22    Fenwick & West had given you for another company and you

23    used it yourself to create a form that you used for

24    Fatdoor?

25         A.    Yes.

                                                        146

1      Q.      Okay.

2      A.      And Rajiv knew that.

3      Q.      So let's look at Exhibit 75.

4      A.      And I did that with the consent of Fenwick.

5      Q.      Excuse me, sir.  Exhibit 75, paragraph 3D.  You

6   agreed, third sentence:  The company shall be the sole

7   owner of all patents, copyrights and other intellectual

8   property and other rights in connection therewith.

9   Correct?

10     A.      Where are you reading?

11     Q.      Paragraph 3D on page number 2 of Exhibit 75,

12   your proprietary information and inventions agreement.

13     A.      Yes.  I signed this agreement, but I don't know

14   what Labor Code Section 2870 says.

15     Q.      Well, I'm looking at the sentence after that.

16   The sentence that says the company shall be the sole

17   owner of all patents, copyrights and other intellectual

18   property or other rights in connection therewith.  Do you

19   see that?

20     A.      I see that.

21     Q.      And did you agree that the company would be the

22   owner of all trademarks developed in connection with

23   Fatdoor, Inc.?

24     A.      It says patents, copyrights, and other

25   intellectual property.  It doesn't say trademarks

147

1    specifically.

2         Q.    Do you exclude trademarks from other

3    intellectual property or do you include it?

4         A.    If it was meant to be included, then it

5    wouldn't be separated from patents and copyrights, which

6    are explicitly clarified there.

7         Q.    I think the document and your interpretation

8    speak for themselves.

9              I will move to paragraph F which says "I have

10   attached as Exhibit B a complete list of all inventions

11   or improvements to which I claim ownership and that I

12   desire to remove from the operation of this agreement,

13   and I acknowledge and agree that such list is complete."

14             Do you see that?

15        A.    I do.

16        Q.    And did you in fact include all inventions or

17   improvements to which you claim ownership on Exhibit B?

18        A.    Yes, because I didn't own those applications.

19   LegalForce did.

20        Q.    Okay.  Did LegalForce have any patent

21   applications that it filed after February 1, 2008?

22        A.    I don't know.  You mean February 1, 2007 again.

23        Q.    Thank you.

24        A.    You're welcome.

25        Q.    But let's ask both those questions.  Did it

1     Q.    I understand, but later, Mr. Drazan told you

2   about it?

3     A.    No, I only talked to him about it within the

4   lacks six months or seven months, whenever we got this,

5   whenever it was, that I was provided a copy of this

6   e-mail.  I was so saddened by it, because anything Jeff

7   says I -- he's a mentor to me, and I take very seriously.

8   Because if he felt like that it would have been

9   disheartening to me.

10    Q.    At the time did Mr. Drazan speak with you and

11  tell you that Center'd disapproved of your constructing a

12  somewhat competitive site?

13    A.    No.

14    Q.    Were you at this time in April of 2008 creating

15  a website?

16    A.    Yes.

17    Q.    Which one?

18    A.    I was creating my Fatdoor.us and my eDirectree

19  sites.

20    Q.    The eDirectree.com site.  At this time,

21  Fatdoor.us, did it redirect to Fatdoor.com?

22    A.    I don't remember.

23    Q.    How long did it redirect to Fatdoor.com?

24    A.    I don't remember.

25    Q.    Did it continue to redirect after Fatdoor.com

187

1    moved to Center'd?

2        A.    I believe it may have for a while and then it

3    started directing to eDirectree, and I believe at some

4    point I put my own code on there.

5        Q.    At what?

6        A.    At some point I put my own code on there, my

7    original codes and different code that I was trying to

8    rebuild which you see today and we've launched.

9        Q.    When -- do you have any record of when you put

10   your own code as opposed to eDirectree.com redirect on

11   the Fatdoor.us?

12       A.    I don't have any records of that.

13       Q.    What's your best understanding?

14       A.    Well, my best understanding is when I got

15   permission I put my own code on there.  And at some point

16   I was managing too many different startups and people

17   thought that was difficult, and I thought that was

18   difficult, so I focused on one which was Fatdoor.

19            MR. PULGRAM:  So would you mark this, please,

20   next in order.

21            THE WITNESS:  And Tradmarkia.

22            (Exhibit 79 marked.)

23            THE WITNESS:  I'm not sure why Jeff sent it to

24   this e-mail address.  Maybe he didn't want me to get it,

25   because he had my e-mail address.

                                                    188

1    at the right number together.

2        Q.    Now, you stated before that when you got

3    permission, you put your own code on the Fatdoor.us site.

4    When did that happen?

5        A.    I don't remember, but I believe it was after my

6    stock sale, around that time of my stock sale.  And it

7    was around -- that's also the same time that they stopped

8    using the name, around April/May 2008.

9        Q.    Well, there was a time when Fatdoor.us was

10   directing to eDirectree?  Correct?

11       A.    I was trying to build too many businesses at

12   the same time, and it was difficult to build too many

13   businesses at the same time.

14       Q.    So what I want to know is do you have a... any

15   proof of the time when Fatdoor.us stopped redirecting to

16   eDirectree?

17       A.    I don't know.  Whatever, it's -- you know, I

18   was trying to do too many things at the same time.

19       Q.    At this time, in June of 2009, Mr. Harris was

20   telling you that he didn't want you to have the domain

21   name Fatdoor.com, correct?

22       A.    Yes.

23       Q.    Okay.

24       A.    A year had passed from when they had switched

25   to Center'd and they had realized I think that they made

193

1    be missing one.  Did we skip one?

2              THE WITNESS:  He's got an 80.

3              MR. ALLEN:  I don't know if we got an extra

4    copy.

5              MR. TARABICHI:  I had a copy I was looking at.

6              MR. ALLEN:  We'll sort it out later.

7              (Exhibit 82 marked.)

8    BY MR. PULGRAM:

9        Q.    Mr. Abhyanker, Exhibit 82 appears to be an

10   e-mail first from you to Dan, Jeff and Bill on

11   November 11th, 2012, and then a response from Jeff Drazan

12   on November 11th, 2012.  Correct?

13       A.    That's right.

14       Q.    Is this a true and accurate copy of an e-mail

15   you sent and that Mr. Drazan responded to?

16       A.    Yes, it is.

17       Q.    And you asked "Would the current

18   directors/equity owners be okay with me serving as the

19   interim CEO again for the purpose of recovering dollars

20   for the company to restart?"  Correct?

21       A.    Um-hmm.

22       Q.    You asked that?

23       A.    Yes, I did.

24       Q.    And you heard back from Mr. Drazan who said

25   "You have my vote."  Correct?

                                                         206

1        A.     That's right.

2        Q.     How long had Mr. Drazan been off the board?

3        A.     I have no idea.

4        Q.     Do you know if he was on the board?

5        A.     Well, I asked the question who is on the

6    Center'd board and who are the shareholders that speak on

7    behalf of it?

8        Q.     You knew that Drazan had been a shareholder,

9    correct?

10       A.     I did.

11       Q.     Did you know if Drazan was on the board?

12       A.     Ever?

13       Q.     At this time?

14       A.     I asked that question.  If I knew that I

15   wouldn't have asked that question.

16       Q.     Did Mr. Drazan resign from the board when they

17   changed direction from Fatdoor to Center'd?

18       A.     I have no idea.

19       Q.     You never heard that?

20       A.     No.  And if I did, I don't remember at that

21   point because that's what I said.  So that's why I would

22   have asked.  Why would I have asked Jeff who was on the

23   board if I knew that?

24       Q.     Did anyone else agree with Mr. Drazan and

25   inform you as much?

1    A.    Of this three that responded here?

2    Q.    Yes.

3    A.    In this chain?  Bill Harris did not respond,

4  and then Dan Hansen, I believe I had some subsequent

5  communication with.  I then followed up with Sergio,

6  Bill, and Alessandro.  All three of which came back and

7  unanimously declined to have me represent not as a CEO,

8  but their interests.  And I kept trying to find out who's

9  on the board of directors.

10    Q.    When they all declined, did they do that in

11  writing?

12    A.    Yes, they did.  Two days later, I believe.

13        MR. PULGRAM:  Have those communications been

14  produced, Counsel?

15        MR. TARABICHI:  I believe they have.

16  BY MR. PULGRAM:

17    Q.    Would you look at what we're marking next in

18  order at Exhibit G to your declaration in support of your

19  opposition to the motion for summary judgment.

20        (Exhibit 83 marked.)

21  BY MR. PULGRAM:

22    Q.    Mr. Abhyanker, Exhibit 83 is your declaration

23  signed under oath in opposition to summary judgment in

24  this case, correct?

25    A.    Yes.

208

Raj Abhyanker - Volume 1
June 6, 2014

1      Q.     Would you look at Exhibit G, please.

2      A.     Um-hmm.

3      Q.     Exhibit G is a version of Exhibit 82 but with

4   much of the text omitted, correct?

5      A.     It looks that way, yes.

6      Q.     And there are dot-dot-dots in it, correct?

7      A.     Yes.

8      Q.     Did you, sir, prepare Exhibit G?

9      A.     No.  My counsel did.

10     Q.     Your counsel took Exhibit 82 and removed the

11  rest of that text and put dot-dot-dots instead?

12     A.     I don't know.

13     Q.     Did you do that, sir?

14     A.     No.

15     Q.     In your declaration --

16     A.     I did tell them the portions that were

17  relevant.  And I don't have anything else to say about it

18  because it's attorney-client privilege, and it didn't

19  seem necessary to include everything.  I told them that.

20     Q.     Okay.  You told them that.

21     A.     Um-hmm.

22     Q.     And at page 10 of Exhibit 83, your declaration,

23  page 10 of the beginning of the exhibit.

24     A.     Um-hmm.

25     Q.     Line 9.

209

Raj Abhyanker - Volume 1
June 6, 2014

1    A.    Um-hmm.

2    Q.    You swore to the court that attached as Exhibit

3  G is a true and correct copy of my correspondence

4  represent --

5    A.    Where is that?

6    Q.    Line 9 at page 10 of your declaration.

7    A.    Line 9 of page 10 of --

8    Q.    You need to go back to page 10.

9    A.    Line 9 on page 10.  Where is this at?  I'm on

10  page 10 now I'm looking at line 9.  "I contacted the

11  remaining shareholders.  Attached as Exhibit G is a true

12  and correct copy of my -- of the correspondence with

13  representatives of Center'd."  Yes.

14    Q.    That's what you testified to the court,

15  correct?

16    A.    Yes.

17    Q.    But Exhibit G is not a true and correct copy,

18  it is a truncated copy of what you decided was --

19    A.    It includes --

20    Q.    -- the important part?

21    A.    It includes all words from the actual copy.

22    Q.    It's not a true and correct copy, is it?

23    A.    To me it is.  It just has certain portions

24  omitted.

25           MR. PULGRAM:  So let's go on to the --

210

```
 1              THE WITNESS:  It has certain portions omitted,
 2    but it is a true and correct copy.
 3    BY MR. PULGRAM:
 4        Q.    So it's okay to omit certain portions and
 5    you'll still be true and correct?  Is that right?
 6        A.    Because the rest is attorney-client privileged.
 7    I --
 8        Q.    So --
 9        A.    I thought.
10        Q.    -- you also told the court in Exhibit G,
11    paragraph 46, that you had a follow-up telephone
12    conversation with former counsel for Nextdoor and
13    centered, Dan Hansen.  "He informed me that Mr. Drazan
14    had the ability to appoint me interim CEO by himself and
15    no further action was required."
16        A.    Um-hmm.
17        Q.    Is that what you swore under oath to the court
18    in your declaration?  Paragraph 46 on page 10?
19        A.    That's what I wrote in my declaration and I
20    believe that to be true.
21              When I spoke with Dan Hansen on the phone, he
22    said that -- I asked him who were on the board of
23    directors.  He says he don't -- he doesn't remember whose
24    on the board of directors.  And I asked him a
25    hypothetical.  If there are no people on the board of
```

211

1   directors, then, how would I be appointed?  Would a

2   Drazan vote be enough?  And he goes "Should be but I

3   don't know."  And that was it.

4       Q.   He said "I don't know."

5       A.   He says "You would have to first talk to some

6   other counsel" which I tried to contact.  I don't

7   remember exactly what else.  That's my recollection today

8   because it's been a while since that day.

9       Q.   Mr. -- is it your testimony that Dan Hansen

10  told you that you could be the CEO just by Mr. Drazan

11  saying so?

12      A.   He says he doesn't know who's on the -- I asked

13  him who's on the board of director of Center'd, and he

14  says he doesn't know.

15      Q.   Okay.  Now, would you look please --

16      A.   And --

17      Q.   -- at what's being marked next in order?

18      A.   And I asked him if he's aware that Jeff Drazan

19  gave me a vote.  I asked him, how do I formalize this

20  agreement?  And he says to formalize this agreement, if

21  there's no board, his vote is enough, but you have to get

22  the Center'd counsel and try to found out who's on the

23  board.  That's what I did.

24          So I --

25      Q.   Did Mr. Drazan -- did Mr. -- strike that.

                                                      212

1          So did Mr. Hansen tell you that Mr. Drazan had

2     the ability to appoint you interim CEO by himself and no

3     further action was required?

4          A.    He told me that if there is no board -- and I

5     could not find any board -- then he has the

6     appointment -- ability to appoint me with no further

7     action required.

8                MR. PULGRAM:  Okay.

9                THE WITNESS:  And there was no board.

10    BY MR. PULGRAM:

11         Q.    Would you please look at what's being marked

12    next in order, sir.

13                (Exhibit 84 marked.)

14    BY MR. PULGRAM:

15         Q.    Mr. Abhyanker, Exhibit 84 is an e-mail from Dan

16    Hansen to you and Jeff Drazan, copying Bill Harris.

17         A.    That's right.

18         Q.    Did you receive it?

19         A.    Yes.

20         Q.    Have you produced that document in the

21    litigation?

22                MR. ALLEN:  Do we have a copy?

23                MR. TARABICHI:  It's this one.

24                THE WITNESS:  Okay.  To this is what the phone

25    call I had referred to I had subsequent to this.

Raj Abhyanker - Volume 1
June 6, 2014

1   BY MR. PULGRAM:

2       Q.    So my question is:  Was it produced in the

3   litigation?

4       A.    I would hope so.

5             MR. PULGRAM:  Was this document logged,

6   Counsel?

7             MR. ALLEN:  Are you talking --

8             MR. TARABICHI:  This is 84.  Sorry.

9             MR. ALLEN:  We're having a little bit of

10  trouble with the numbering.

11            MR. TARABICHI:  This is 84.  One more time,

12  Laurence, sorry.

13            MR. PULGRAM:  Was this document produced or

14  logged?

15            MR. TARABICHI:  84?

16            MR. PULGRAM:  Yes.

17            MR. TARABICHI:  I'd have to check with the

18  discovery production team.

19  BY MR. PULGRAM:

20      Q.    So Mr. Abhyanker, you received this e-mail.

21      A.    Um-hmm.

22      Q.    In which Dan Hansen wrote, "Raj, that's hard to

23  say.  You'll need to find someone who knows what's

24  happening."

25      A.    I picked up the phone and called him.

                                                        214

1   Q.    "The last I knew, Goodwin was representing

2   Center'd, but that was nearly two years ago."

3   A.    Um-hmm.

4   Q.    Correct?

5   A.    Yes.  And I picked up the phone and called him

6   to better understand what he's saying.

7           THE VIDEOGRAPHER:  We've got three minutes.

8           THE WITNESS:  Based upon my talk with Dan

9   Hansen --

10          MR. PULGRAM:  There's no question pending, sir.

11  It's not -- your counsel can ask you questions later.  In

12  this process that's the way it works in courts.  I ask

13  questions, you answer.  Your counsel asks you questions

14  later, you can answer then.

15          THE WITNESS:  I apologize, but I just wanted to

16  clarify my previous statement.  If you'd leave me that

17  opportunity, I would just like to not add anything new.

18  Just I want to clarify my previous statement.

19          MR. PULGRAM:  You can say whatever you want.

20          THE WITNESS:  Right.  So after I got this

21  e-mail, I called Dan Hansen in the morning, and that's

22  why this Exhibit 81 was produced.

23          MR. PULGRAM:  Let's change the tape.  Two

24  minutes.

25          THE VIDEOGRAPHER:  This marks the end of disc 3

215

1     of volume I.  Going off the record, the time is 4:08.

2            (Recess taken from 4:08 to 4:12 p.m.)

3            THE VIDEOGRAPHER:  This is the start of disc 4,

4     volume I.  Going on the record, the time is 4:12.

5            (Exhibit 85 marked.)

6     BY MR. PULGRAM:

7        Q.    Mr. Abhyanker, Exhibit 85 is an e-mail from you

8     to Sergio Monsalve, Alessandro@keynote,

9     cmoss@GoodwinProcter, Jeff Drazan, Bill Harris, Dan

10    Hansen.

11       A.    That's right.

12       Q.    It says urgent response needed Nextdoor

13    Center'd representation.  Correct?

14       A.    That's right.

15       Q.    Did you send this e-mail?

16       A.    Yes, I did.

17       Q.    And Sergio, Bill and Alessandro you addressed

18    because you believed they were on the board?  Correct?

19       A.    No.  Because I didn't know.

20       Q.    Okay.  The first paragraph reads:

21          I did not hear from any of you yesterday.  I

22         left you voice messages.  As a result I do not

23         have a clear indication of authority or consent

24         from the current Center'd board to serve as the

25         interim CEO.

                                                        216

1      A.      Um-hmm.

2              MR. TARABICHI:  Do you have a copy for us?  I

3      think Jennifer stepped out.  Thank you.

4      BY MR. PULGRAM:

5      Q.      Did I read that correctly?

6      A.      Yes.

7      Q.      And was that what you understood at the time,

8      that you did not have authority to serve as the interim

9      CEO?

10     A.      No, I had authority.  I didn't have a clear

11     indication of authority because I couldn't find out who

12     was on the board.

13     Q.      Skip down three paragraphs, please.

14     A.      Um-hmm.

15     Q.      You wrote:

16         I cannot represent you and your funds as

17       Center'd shareholders without clear authority.

18         Correct?

19     A.      Right.  That was meaning that I can't

20     representing themselves in their personal capacity or

21     their funds as Keynote Ventures and Norwest Venture

22     Partners in the litigation against Nextdoor.

23     Q.      So you're still maintaining, as you read this,

24     that you had authority to act on behalf of Center'd?  Is

25     that right?

217

Raj Abhyanker - Volume 1
June 6, 2014

1    A.    I believe I had authority, but it was unclear.

2    Q.    Please turn to the next page.  You state:

3        However, without clear authority to act on

4     behalf of Center'd, Inc., I will solely be

5     representing myself.

6        Do you see that?

7    A.    Yes.

8    Q.    And you did not have authority to act on behalf

9    of Center'd, did you?

10    A.    Not in this lawsuit.  So I didn't know if they

11    were on the board and I didn't want to include them as

12    parties to a lawsuit because the shareholders, I didn't

13    know who's on the board and I had to first request

14    authority from the board.

15    Q.    You knew that you did not have clear indication

16    of authority or consent from the current Center'd board

17    to serve as the interim CEO, but nonetheless you entered

18    an assignment to yourself of all the residual Center'd

19    assets for one dollar, correct?

20    A.    I had authority.  I did not know who's on the

21    board of directors.  Later, after I sent this e-mail,

22    they said no, they -- I cannot represent them and their

23    funds unanimously.

24        Then I contacted Alessandro Biral on the phone

25    and I said, "Alessandro" -- because we've talked together

218

1    on the phone a number of times about this issue, I said

2    to Alessandro, you know, "What are your thoughts?"  And

3    he goes "Well, I have to work with Sergio and Bill, but

4    you don't need their votes because Jeff Drazan's vote is

5    enough."  And you can ask Alessandro that.  And I

6    asked --

7        Q.    So I want to make sure that I get what you're

8    saying here.

9              You're saying after you wrote Exhibit 85 saying

10   you didn't have clear authority, you had a conversation

11   with Alessandro?  Correct?

12       A.    Yes.

13       Q.    And Alessandro -- did you know if he was on the

14   board or not?

15       A.    I asked him.  He said he's not.

16       Q.    He's not on the board.

17       A.    He's not on the board.

18       Q.    Okay.

19       A.    And I asked --

20       Q.    And Alessandro told you that although

21   Alessandro wasn't on the board --

22       A.    Although he can't give me authority.

23       Q.    Although Alessandro is not on the board, that

24   Drazan's vote was enough?  Is that what you're saying?

25       A.    He says it's his understanding, because I

219

1  explained to him that I spoke with Dan Hansen, and he

2  said absent a board I have authority from Jeff Drazan.

3  Is that enough?

4          And he goes "That should be enough."

5      Q.   And Alessandro's a lawyer?

6      A.   Alessandro was a former board member.  I asked

7  Alessandro who's on the board?  Alessandro told me

8  everyone's resigned from the board.  There is no board.

9      Q.   But he wasn't on the board himself?

10     A.   Yes, he said everyone resigned from the board,

11 including himself.

12     Q.   So your understanding when you appointed

13 yourself interim CEO was that there was no board at all?

14     A.   Right.  Now it's confirmed.

15     Q.   Now --

16     A.   There was no board that was operating as a

17 board.  They were not any longer operating as a board.

18     Q.   So who authorized you to be interim CEO?

19     A.   Jeff Drazan.

20     Q.   Was he a shareholder?

21     A.   He was our first shareholder.  He's a Series A

22 preferred shareholder.

23     Q.   Was he a majority shareholder?

24     A.   I don't know because no one showed me the cap

25 table.

1    Q.    Well, all the rest of the shareholders said you

2  could not represent them, correct?

3    A.    That was in this lawsuit.  And I did not

4  include them in this lawsuit for that reason.

5    Q.    You knew that the assignment for $1 of all

6  those assets to yourself was invalid, didn't you?

7    A.    No.  Because I assigned everything to them for

8  a dollar and I thought everything was already gone, so

9  there's not much left, and my goal was to restart the

10 company which is what I've done.

11   Q.    You assigned it all to yourself; is that

12 correct?

13   A.    I wanted to reassign it back from myself to the

14 company, Fatdoor, Inc., which is now an operating

15 business?

16   Q.    Well, Fatdoor, Inc. No. 2 does not have any of

17 those other former shareholders in Fatdoor 1 as

18 investors, does it?

19   A.    They've been all invited.

20   Q.    Invited.  And none chose to join?

21   A.    No, they haven't made any clear indication one

22 way or the other.

23   Q.    None are shareholders, are they?

24   A.    Well, Jeff Drazan has -- we've had talks with

25 them, and I don't know if things have been finalized yet.

221

1    Given this litigation there is a lot of fear.

2         I think the product I've built and the team

3    I've built will speak for myself and speak for itself and

4    they will all be shareholders one day.

5         MR. PULGRAM:  Move to strike.  No question was

6    pending.  Would you mark this, please, next in order?

7         (Exhibit 86 marked.)

8    BY MR. PULGRAM:

9    Q.    Exhibit 86 is an e-mail that you sent to Chandu

10   Thota on or about November 9th, 2013?  Correct?

11   A.    Right.

12   Q.    And you told him that, quote:

13      I need you, Bill, Jennifer and Sergio to

14       assign any and all residual rights in what is

15       now the void Center'd, Inc. to the new Fatdoor,

16       Inc.

17   A.    Um-hmm.

18   Q.    Why did you need that?

19   A.    I wanted anything that those -- I thought held

20   in their own funds that were outside the company, because

21   no one would talk to me to assign those things to me,

22   because I discovered that they had fraudulently changed

23   the cap table after I left the company.

24   Q.    So based on your claim that they had

25   fraudulently claimed -- changed the cap table, you were

222

1    asking them to assign all residual rights in the void

2    Center'd to you in the new Fatdoor, Inc.?  Is that right?

3         A.    Anything that they held in their own personal

4    capacities or their own funds.

5         Q.    Well, you asked them to assign any and all

6    residual rights in what is now the void Center'd to the

7    new Fatdoor, correct?

8         A.    Right.  Anything that they retained.

9         Q.    You knew, when you asked them for this, that

10   you didn't have a valid assignment before, didn't you?

11        A.    No.

12        Q.    You asked them to assign all of the residual

13   rights in Center'd even though you thought you already

14   had them all.  Is that what you're saying?

15        A.    No.  Sergio, Bill, and Jennifer may have had

16   rights themselves as shareholders that they had acquired

17   from the company, and I wanted to close that loop.

18        Q.    Did you tell them that had you already assigned

19   yourself the assets of Center'd for a dollar?

20        A.    I have let them all know that.

21        Q.    Had you told them by November 9th, 2013?

22        A.    I don't remember.

23        Q.    When did you first tell them?

24        A.    I don't remember.

25        Q.    So when you signed the one dollar assignment,

223

1    you didn't tell them at that time?

2         A.    I don't remember.

3         Q.    The --

4         A.    I did tell them that my goal was to start the

5    company again.

6              MR. PULGRAM:  Would you mark that, please.

7              (Exhibit 87 marked.)

8              THE WITNESS:  It's my understanding that all --

9              MR. PULGRAM:  There's no question pending,

10   Mr. Abhyanker.  You need to wait for questions.

11             THE WITNESS:  I would --

12   BY MR. PULGRAM:

13        Q.    Would you look at Exhibit 87, please.

14        A.    Yes.

15        Q.    Did you send this e-mail which is dated

16   November 8th, from you to Chandu Thota, Sergio Monsalve,

17   Jennifer Dulski, with copies to your lawyers?

18        A.    Yes.

19        Q.    And --

20        A.    And to Google's chief patent counsel.

21        Q.    And in it, you assert that:  It is my position

22   and the position of Fatdoor, Inc. that these e-mails at

23   Fatdoor.com belong to you, the rightful domain and

24   trademark owner.  Correct?

25        A.    That's right.

                                                          224

1    Q.    And so you were trying to get ahold of the old

2  Fatdoor.com e-mails?

3    A.    No.  They were just handed to me.

4    Q.    They were handed to you by whom?

5    A.    Google.

6    Q.    Who handed them to you at Google?

7    A.    So you change the C name record and they showed

8  up.

9    Q.    They showed up when?

10    A.    Change the C name record, and when you change

11  the C name record, I wanted to create new accounts for my

12  new company, Fatdoor, and Google provided them.  They

13  were there when I got that C name change.

14    Q.    Your e-mail of Saturday, November 9th, says:

15      These e-mails demonstrate widespread breaches

16     of fiduciary duties.

17      Correct?

18    A.    Yes.

19    Q.    Had you obtained the e-mails yet?

20    A.    Yes, our counsel had -- my counsel had the

21  e-mails.

22    Q.    And then your e-mail goes forward and describes

23  allegations of misconduct by Norwest and Benchmark,

24  Benchmark and Jon Love, Chandu Thota and Jennifer Dulski,

25  correct?

225

1      A.    And Sergio Monsalve.

2      Q.    And Sergio.  All of those people you claim had

3  injured you?  Correct?

4      A.    My counsel went through the e-mails and found

5  out a whole bunch of unethical and fraudulent activity

6  done after I was terminated without cause.

7      Q.    So did you produce this document in the

8  litigation?

9      A.    I've given it to my counsel.  And I trust they

10  have.

11         MR. PULGRAM:  Well, they have not.

12         THE WITNESS:  In fact, they were copied on

13  these e-mails.  Heather Norton, Bruno.

14         MR. ALLEN:  It has been produced by Mr. Rana.

15         MR. PULGRAM:  It sure has.  And that's our

16  problem, is that we get things from other people but we

17  don't get them from you, so we don't know that we have

18  anything from you, and I don't think in fact that we

19  have.

20      Q.    Would you look, please -- hold -- strike that.

21      A.    I need a break, Laurence.

22      Q.    Do you want to break now?

23      A.    Yeah, I don't feel good.

24         THE VIDEOGRAPHER:  Microphones, please.  Going

25  off the record, the time is 4:26.

226

1    STATE OF CALIFORNIA

2    COUNTY OF SAN FRANCISCO

3

4         I, MARK W. BANTA, a Certified Shorthand

5    Reporter, do hereby certify:

6         That prior to being examined, the witness in

7    the foregoing proceedings was by me duly affirmed to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10        That said proceedings were taken before me at

11   the time and place therein set forth and were taken down

12   by me in shorthand and thereafter transcribed into

13   typewriting under my direction and supervision;

14         I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings, nor

16   in any way interested in the outcome thereof.

17        In witness whereof, I have hereunto subscribed

18   my name.

19   Dated:  June 16, 2014

20

21

22

23   _____

24   MARK W. BANTA

25   CSR 6034, CRR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


NEXTDOOR.COM, INC., a Delaware

corporation,

                Plaintiff,

        vs.                  No. 3:12-cv-05667-EMC

RAJ ABHYANKER, an individual,

                Defendant.

_____ /


AND RELATED COUNTERCLAIM

      _____ /


VIDEOTAPED DEPOSITION OF RAJ ABHYANKER

VOLUME II

JUNE 7, 2014

9:57 a.m.


555 California, 12th Floor

San Francisco, California


Reported by:  LANA L. LOPER, RMR, CRR, CCP,
              CME, CLR, CSR No. 9667

301

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5   NEXTDOOR.COM, INC., a Delaware

6   corporation,

7                Plaintiff,

8       vs.                   No. 3:12-cv-05667-EMC

9   RAJ ABHYANKER, an individual,

10                Defendant.

11   _____ /

12

13   AND RELATED COUNTERCLAIM
     _____ /

14

15

16

17

18

19

20        Deposition of RAJ ABHYANKER, taken on behalf of

21   Plaintiff, at 555 California, 12th Floor, San Francisco,

22   California, beginning at 9:57 a.m. and ending at

23   4:09 p.m., on Saturday, June 7, 2014, before

24   Lana L. Loper, RMR, CRR, CCP, CME, CLR, CSR No. 9667.

25

                                                    302

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF NEXTDOOR.COM, INC.:

 4         FENWICK & WEST, LLP

 5         BY:  LAURENCE F. PULGRAM, ESQ.

 6              MATTHEW B. BECKER, ESQ.

 7         555 California Street, 12th Floor

 8         San Francisco, California  94105

 9         415.875.2300

10         lpulgram@fenwick.com

11         mbecker@fenwick.com

12

13    FOR DEFENDANT AND COUNTERCLAIMANT RAJ ABHYANKER:

14         LEGALFORCE RAJ ABHYANKER, P.C.

15         BY:  BRUNO W. TARABICHI, ESQ.

16              HEATHER NORTON, ESQ.

17         1580 West El Camino Real, Suite 13

18         Mountain View, California  94040

19         650.965.8731

20         bruno@legalforcelaw.com

21         heather@legalforcelaw.com

22

23

24         ALSO PRESENT:  DAN DE FRANK, VIDEOGRAPHER

25
```

303

```
 1            THE VIDEOGRAPHER:  Back on the record.  The time
 2      is 10:23.
 3            MR. PULGRAM:  Operator error, my mistake.  We
 4      properly marked that Exhibit 96, and it will remain
 5      Exhibit 96, an October 28, 2013, letter from
 6      Jennifer Kelly to Bruno Tarabichi and Heather Norton.
 7        Q    Do you have that letter in front of you, sir?
 8        A    Yes.
 9        Q    Do you see in the item on the second page called
10      "Second":  "If Mr. Abhyanker has any documents that
11      actually evidence that this website" -- fatdoor.us" --
12        A    Where are you reading?  I'm sorry.
13            "Second, in relation to" --
14        Q    I'm on the second page of Exhibit 96, Item
15      "Second."
16        A    Item "Second."  Okay.  "In relation to
17      interrogatories."  It starts with that:  "Second, in
18      relation to interrogatories"?
19        Q    Yes.  And I'm reading the second sentence there.
20        A    Okay.
21        Q    It says, "If Mr. Abhyanker has any documents
22      that actually evidence that this website" -- referring to
23      www.fatdoor.us -- was live prior to Nextdoor.com's
24      launch, he must produce those documents in a format that
25      allows the date of the documents to be readily determined
```

                                                                330

1    or otherwise explain that he has no such documents."

2            Do you see that?

3        A    Uh-huh.  Yes.

4        Q    Have you produced any documents that -- showing

5    that www.fatdoor.us website was live prior to the launch

6    of Nextdoor.com?

7        A    I have no idea.

8        Q    Okay.

9        A    I don't have --

10       Q    Next category, No. 4 --

11       A    Uh-huh.

12       Q    -- second sentence -- actually, I'll start at

13   the beginning:  "Fourth, there are still a number of

14   documents requested by Nextdoor.com of which your client

15   previously has alleged their existence that have not been

16   produced, for instance, the presentation and diligence

17   materials that your client allegedly provided to

18   Benchmark Capital."

19           Did I read that accurately?

20       A    Where is this written?

21       Q    Item "Fourth."

22       A    Fourth, right.

23       Q    Did I read that accurately?

24       A    I think so, yeah.

25       Q    So Nextdoor.com was requesting copies of the CD

                                                          331

1   STATE OF CALIFORNIA          )

2                                )

3   COUNTY OF SAN FRANCISCO       )

4

5           I, Lana L. Loper, a Certified Shorthand

6   Reporter, do hereby certify:

7           That prior to being examined, the witness in

8   the foregoing proceedings was by me duly sworn to

9   testify to the truth, the whole truth, and nothing but

10  the truth;

11          That said proceedings were taken before me at

12  the time and place therein set forth and were taken down

13  by me in shorthand and thereafter transcribed into

14  typewriting under my direction and supervision;

15          I further certify that I am neither counsel

16  for, nor related to, any party to said proceedings, nor

17  in anywise interested in the outcome thereof.

18          In witness whereof, I have hereunto subscribed

19  my name.

20

21  Dated:  June 19, 2014

22

23  _____

24  LANA L. LOPER, RMR, CRR, CCP, CME, CLR, CSR 9667

25

407

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


NEXTDOOR.COM, INC., a Delaware ) No. 3:12-cv-05667-EMC
corporation,                   )
                               )
            Plaintiff,         )
                               )
     vs.                       )
                               )
RAJ ABHYANKER, an individual,  )
                               )
            Defendant.         )
                               )
                               )
AND RELATED COUNTERCLAIM       )
                               )



VIDEOTAPED DEPOSITION OF RAJ ABHYANKER

VOLUME III

June 11, 2014

10:07 a.m.


555 California Street, 12th Floor

San Francisco, California


REPORTED BY:

Carolyn M. Mann

CSR No. 10066

1     APPEARANCES:

2           For Plaintiff:

3                 FENWICK & WEST LLP
                  BY:  LAURENCE F. PULGRAM
4                      JENNIFER LLOYD KELLY
                       MATTHEW BECKER
5                 555 California Street, 12th Floor
                  San Francisco, California  94105
6                 415.875.2300
                  lpulgram@fenwick.com
7                 jkelly@fenwick.com
                  mbecker@fenwick.com

8
            For Defendant and Counterclaimant:
9
                  LEGALFORCE RAJ ABHYANKER, P.C.
10                BY:  BRUNO TARABICHI
                       HEATHER NORTON
11                1580 West El Camino Real, Suite 13
                  Mountain View, California  94040
12                650.965.8731
                  bruno@legalforcelaw.com
13                heather@legalforcelaw.com

14    ALSO PRESENT:

15                BREANA POZZI, Videographer

16

17

18

19

20

21

22

23

24

25

                                                          410

1          A.   When you say "replaced," what do you mean?

2          Q.   I mean as a category.  The, the category we

3     saw in Exhibit 124 --

4          A.   We might have.

5          Q.   -- was Friends.

6          A.   We might have.  I don't know.  I think --

7          Q.   When --

8          A.   -- so.

9          Q.   -- when that -- excuse me?

10         A.   I don't remember, but I think so.  I don't

11    know when we did it.  I know we did at some point

12    implement a feature in which we have all people that

13    live next to each other create auto groups.  And those

14    auto groups had the ability to take a postsigned-in user

15    and identify, unlike Fatdoor, which we didn't have

16    emails of neighbors, we would now have -- enough density

17    in an area.  Here we would have enough density because

18    now we know what their address is and they've provided

19    their emails.

20         Q.   Well, I want to be clear with this.  Let's

21    mark this next in order.  We'll have something to refer

22    to.

23              (Exhibit 125 marked)

24    BY MR. PULGRAM:

25         Q.   Exhibit 125 is your Supplemental Statement in

                                                      493

1      support of your trademark claims, and I'd like you to

2      look at Exhibit D, please.

3          A.   Uh-huh.

4          Q.   And Exhibit D on page numbered RA 000371 shows

5      "Popular Categories."  Do you see that?

6          A.   Uh-huh.

7          Q.   And I'd like you to compare that with

8      Exhibit No. 123, which was the February 2nd, 2008,

9      version.  And do you see how the category Friends has

10     been replaced by Nextdoor TM Neighbors?

11         A.   First of all, I'm looking at two different

12     things.  One thing is a database-driven site, and the

13     other thing, I don't know that it's a database-driven

14     site or just some static HTML content on a page.  But

15     I'm making an assumption, before I answer your question,

16     okay, I'm making an assumption that 123 is a

17     database-driven site, as opposed to a static page.  I'm

18     making -- and if you want me to answer with all those

19     assumptions, I can answer it, but . . .

20         Q.   And the answer is that Nextdoor TM Neighbors

21     replaced the category Friends, right?

22         A.   Yeah, because the category Friends was

23     useless.  It didn't drive enough engagement.

24         Q.   Okay.  So if you look at Exhibit 124, that

25     replacement happened after January 2009, correct?

                                                            494

1   would sign in first.

2      Q.   So I'm going to provide to you next in order

3   Exhibit 129.

4          (Exhibit 129 marked)

5   BY MR. PULGRAM:

6      Q.   This is a color printout of the eDirectree

7   site.  Now, can you tell, sir, by the fact that Nextdoor

8   TM Neighbors is highlighted, that that is what category

9   has been clicked on here?

10      A.   Yes.

11      Q.   Okay.  So this is what's displayed when one

12   clicks on Nextdoor TM Neighbors, correct, from the

13   public view?

14      A.   I don't know when this was taken, but it looks

15   like it's not functioning here because if I clicked

16   that, it would normally show me a different view.  I

17   think it was a map view of the people that were users

18   that were in my neighborhood.

19      Q.   So sir, this page reflected on 129 is

20   dated 2-16, February 16, 2012.  Do you see that?

21      A.   Uh-huh.

22      Q.   Yes?

23      A.   Yes.

24      Q.   Is this the way that page looked at that date,

25   to the best of your knowledge?

508

**Raj Abhyanker - Volume III**
**June 11, 2014**

1      A.   I don't know.  I don't remember.

2      Q.   You have no reason to believe this isn't a

3  true and accurate copy of what's displayed by the

4  eDirectree site when clicking on Nextdoor TM Neighbors

5  on that date?

6      A.    No, but the site wasn't doing very well so it

7  had gone down.  And normally, the view I remember was

8  different than this view.

9      Q.   Did you take functionality out of Nextdoor TM

10  Neighbors at some time that had been in it before?

11      A.    The entire site went down.

12      Q.    Right.

13      A.    And we didn't, we didn't work on it.  We

14  worked on our Trademarkia site.

15      Q.    When you put the site back up, did you put it

16  back up the way it was before?

17      A.    We didn't -- whatever we had at the time we

18  put it.

19      Q.    What do you mean, whatever you had at the

20  time?

21      A.    Whatever code we had at the time.

22      Q.    Did you put up a site, when you put it back

23  up, that was nonfunctioning?

24      A.    When I put it back up, I was upset that -- for

25  the same reasons this lawsuit arised, that I felt that

509

**Raj Abhyanker - Volume III**
**June 11, 2014**

1    something I started I was no longer part of.

2         Q.   When you put it back up was it not

3    functioning?

4         A.   I don't remember if it was functioning or not.

5         Q.   This display on Exhibit 129, does that include

6    a geospatial sorting of results within Nextdoor TM

7    Neighbors?

8         A.   This is a nonlogged-in state because in the

9    upper right hand it says "Log In" still.  So it wouldn't

10   put "Log in" until you would have your face there and it

11   would say "Welcome" Raj or Laurence.  And then I would

12   see something different.

13        Q.   So what was displayed publicly in the only

14   version that we've got of this site is one in which

15   there is no geospatial sorting of results, correct?

16        A.   I don't know what you have and what you don't

17   have.

18        Q.   Well, this is the only one that we've seen.

19        A.   Okay.  I don't know what to say.

20        Q.   But you would agree there's no geospatial

21   organization reflected in this document.

22        A.   There couldn't be, because you haven't logged

23   in in this view.

24        Q.   So if I'm understanding correctly, what you're

25   claiming is that eDirectree.com at some point included a

510

1    eDirectree.  Do you see that?

2         A.    Yeah.

3         Q.    You don't see that?

4         A.    I do see that.

5         Q.    Okay.  And it reflects that website was

6    created September 20th, 2007, by you.  Is that correct?

7         A.    I don't think it says it's created by that.

8    Says the domain is registered on that date with a

9    register contact and an administrative contact and a

10   technical contact.  It has no bearing on when the site

11   was created.

12        Q.    That's when you acquired the site?

13        A.    No.  That's when we registered the domain

14   name.

15        Q.    Did you own the site before that?

16        A.    There is no site.  It's just a domain name.

17        Q.    Did you own the domain name before that?

18        A.    I don't believe so.  Could be wrong; I don't

19   know.

20             MR. PULGRAM:  Maybe it's over here.  No, it's

21   not.

22   BY MR. PULGRAM:

23        Q.    Was there a point at which you -- I believe

24   you already testified to this.  There was a point at

25   which you took down eDirectree.com, correct?

514

1      Q.   My question was whether you told Mr. Tarabichi

2   that what he was taking a picture of, the screen

3   capture, wasn't the real website.

4           MR. TARABICHI:  Can we agree that this is not

5   a waiver of any --

6           MR. PULGRAM:  Beyond this question.

7           MR. TARABICHI:  Beyond this question?

8           You can answer, Raj.

9           THE WITNESS:  I told my attorneys the truth

10   all times.

11   BY MR. PULGRAM:

12      Q.   Did you tell Mr. Tarabichi that what he was

13   taking a picture of, a screen capture of, wasn't the

14   real website, that it was a JPEG?

15      A.   I don't remember, Laurence.  It's two years

16   ago.  Whenever, a year ago.

17      Q.   It was October of 2013, correct?

18      A.   Okay, a year ago.

19      Q.   Did you register a website called Nextdoor.cm?

20      A.   Yes, I did.

21      Q.   And did you do so shortly after, or at some

22   point after the launch of the Nextdoor.com service by my

23   client, Nextdoor.com?

24      A.   Yes.

25      Q.   Would you look at what we're marking next in

529

1    order, 136.

2              THE REPORTER:  134.

3              MR. PULGRAM:  Thirty-four.

4              (Exhibit 134 marked)

5    BY MR. PULGRAM:

6        Q.   Is Exhibit 134 what the Nextdoor.cm website

7    looked at -- looked like, I'm sorry, on or about

8    February 9th, 2012?

9        A.   Yeah.  It's the Eatbid website we branded as

10   Nextdoor.

11       Q.   Did you create this website?

12       A.   I had it created, yes.

13       Q.   Who did you work with to create it?

14       A.   Initially it was me and a mentee I had

15   named -- what's his name . . .  The co-founder.  Andy

16   Mai at Stanford CS.  He was a freshman.  So he and I

17   created it together.  I taught him Web development and

18   architecture and -- before he started his freshman year,

19   to mentor him.

20       Q.   This was Andy M-A-I, is that his last name?

21       A.   Uh-huh.  M-A-I.  It was called Eatbid at the

22   time.

23       Q.   But Exhibit 134 is the way it appeared on the

24   Internet, correct?

25       A.   We changed the name from Eatbid to Nextdoor.

                                                        530

1       Because I was upset.

2           Q.   You did this because you were upset.

3           A.   Well, saddened that I wasn't able to be part

4       of a company I was part of.

5           Q.   And did this service do anything?

6           A.   Eatbid did stuff.  It helped people, and

7       people bought food and items on it, but not when it came

8       to this form because this form was just because I was

9       upset.

10          Q.   Did you have other domain names that also

11      linked to the same IP address?

12          A.   I don't remember.

13          Q.   Looking at the bottom of 134, there's an IP

14      address of 114.143.101.211.

15          A.   Uh-huh.

16          Q.   Correct?

17          A.   Yes.

18          Q.   That was an IP address you hosted?

19          A.   I don't know.  It probably is on a shared

20      Bluehost server.

21          Q.   And did you link the Nextlawn.com website to

22      that IP?

23          A.   Might have, yeah.  Might have pointed to the

24      same IP.

25          Q.   I can go through the exhibits if you're going

                                                              531

1 to say "might" to make you say yes.  Would you -- can

2 you testify whether or not Nextlawn.com pointed to the

3 same location?

4   A.  Given the nature of your questions, I can't be

5 sure, but I would believe yes.  But I don't know.

6   Q.  Mr. Abhyanker, looking at Exhibit 134, the

7 featured restaurants, Bonjour Crepe and "test new"?

8   A.  Yes.

9   Q.  Were either of those actually capable of

10 delivering food through the website Nextdoor.cm?

11   A.  I doubt it, but eat -- Bonjour Crepes

12 certainly was.  That's my restaurant; I owned it.  When

13 it was Eatbid then we actually used Eatbid on our

14 restaurant.

15   Q.  But not by the time you had it set up as

16 Nextdoor.cm, correct?

17   A.  That was done out of, that was done out of

18 anger and sadness.  And it wasn't really a functional

19 site.  It was only for very brief periods.  It was, it

20 wasn't functional.

21   Q.  You refused to take it down despite the demand

22 of Nextdoor.com, didn't you?

23   A.  I believed I owned rights to Nextdoor.

24   Q.  You believed that you owned rights to

25 Nextdoor?

532

1          A.    (Nods head.)  I still do.

2          Q.    And that issue's been decided against you in

3     the case, correct?

4          A.    No, because as I mentioned in our first day, I

5     have a granting patent which they will -- they are

6     infringing that has independent claims with Nextdoor the

7     domain dot-com and the suffix that will be asserted.  I

8     don't believe I have enough evidence to show trademark

9     rights in Nextdoor.com, but I believe I have enough to

10    show patent rights in Nextdoor.com.

11              (Exhibit 135 marked)

12    BY MR. PULGRAM:

13         Q.    Mr. Abhyanker, looking at Exhibit 135, that is

14    a page printed from Internet archive for Nextlawn.com.

15    Do you see that?

16         A.    Uh-huh.

17         Q.    Excuse me?

18         A.    Yes.

19         Q.    From the date February 16th, 2012.  Do you see

20    that?

21         A.    Yes.

22         Q.    And it reflects that Nextlawn.com was

23    referring to the same IP address that we read before as

24    being the location that Nextdoor.cm was referring to,

25    correct?

```
 1          A.   Yes, but was it showing anything?  Or not?

 2          Q.   It was the same IP address, wasn't it?

 3          A.   Yes.  But it's different days?

 4          Q.   Different website.

 5          A.   Right.  But which day was this taken versus

 6     this taken?

 7          Q.   Well, my question to you is, was it referring

 8     to that IP address?  Because we can capture the IP

 9     address easily enough.  I'm just asking you, did

10     Nextlawn.com refer to the same IP address?

11          A.   As I mentioned, probably yes.

12          Q.   What about Nextyard.com?

13          A.   Probably yes.  If it's easier, yes.

14          Q.   Thank you.

15               Now, you owned the Fatdoor.us website for some

16     period of time, correct?

17          A.   Since its first registration in April 2007.

18          Q.   And that website initially pointed to

19     Fatdoor.com while Fatdoor 1 operated, correct?

20          A.   I believe so, but I'm not sure.

21          Q.   Did Fatdoor 1, the corporation, ever execute

22     any document that granted you the rights to Fatdoor.us?

23          A.   I registered that in my personal name.

24          Q.   Do you mean no?

25          A.   I registered the domain in my personal name.
```

534

1       Q.    Did Fatdoor 1, the corporation, ever execute

2   any documents that granted you the right to do that?

3       A.    Right to do what?

4       Q.    To register Fatdoor.us using the Fatdoor name.

5       A.    I don't remember.

6       Q.    What -- you let the registration in Fatdoor.us

7   expire at some point, did you not?

8       A.    Yes.

9       Q.    When was that?

10      A.    I don't remember.  Sometime.  I don't know.  I

11  think it was late 2009, but I'm not sure.

12      Q.    And why did you let it expire in late 2009?

13      A.    Because I was trying to get Nextdoor.com and I

14  was trying to get Eatbid as a temporary hold, because at

15  that point, I think the Fatdoor company had switched to

16  Center'D and they had somewhat changed their mind about

17  whether what they were doing was the right direction or

18  not with Center'D.  It wasn't working, so they were

19  looking to pivot or just had pivoted.

20      Q.    Sir, the question was why did you let

21  Fatdoor.us expire in 2009.

22      A.    I think it was an accident.

23      Q.    An accident?

24      A.    I think so.

25      Q.    Were you offering any services through

535

1    Fatdoor.com when it accidentally expired?

2         A.   I was trying to raise money for it.

3         Q.   Were you offering any services through that

4    website?

5         A.   Goal was always to create a neighborhood

6    social network.

7         Q.   Listen to my question.  I think that you hear

8    it, but you need to respond to it.

9              Were you offering any services through

10   Fatdoor.us when it accidentally expired in 2009?

11        A.   When it expired, I don't know.

12        Q.   Did you -- were you offering any services when

13   it expired?

14        A.   I don't know.  I don't believe so.

15        Q.   Prior to Center'D pivoting from being Fatdoor

16   to being Center'D, did Fatdoor.us link to the Center'D

17   site?  That is, to what was Fatdoor.com.  That's a bad

18   question.  I'm going to rephrase that.

19              Prior to -- strike that.

20              During the time that Center'D was operating a

21   website at Fatdoor.com, did you link Fatdoor.us to point

22   to Fatdoor.com?

23        A.   Probably.

24        Q.   Did you offer any services through Fatdoor.us

25   separate from whatever services Center'D was offering

536

1    through Fatdoor.com?

2         A.   No.  Not until they switched.

3         Q.   Not until what?

4         A.   Not until they decided to get rid of the whole

5    concept and come up with Center'D.

6              MR. PULGRAM:  Would you mark that, please.

7              (Exhibit 136 marked)

8    BY MR. PULGRAM:

9         Q.   Looking at Exhibit 136, do you recognize that

10   document?

11        A.   Yeah.

12        Q.   What is that document?

13        A.   This is the Fatdoor code base.

14        Q.   The Fatdoor what?

15        A.   This is what I was trying to restart that's

16   now Fatdoor.com.

17        Q.   It's now your new Fatdoor 2.

18        A.   Yes.

19        Q.   Okay.  And is this a true and accurate copy of

20   the Fatdoor.us website as it appeared when you

21   reregistered that website in or about February 2012?

22        A.   I don't know if it looked like this or like

23   that.  I don't know.

24        Q.   Well, if you'd look, please, at the

25   document --

537

**Raj Abhyanker - Volume III**
**June 11, 2014**

```
1          A.   Uh-huh.

2          Q.   -- and --

3          A.   This looks --

4          Q.   -- the bottom left reflects a date of

5    February 9th, 2012.

6          A.   Yes.

7          Q.   You see that?

8          A.   Yes, so yes.

9          Q.   Is that -- is this the Fatdoor.us website as

10   it appeared at that time?

11         A.   Appears to be.

12              MR. TARABICHI:  Laurence, do you have an extra

13   copy of that?

14              MR. PULGRAM:  Certainly.

15              MR. TARABICHI:  Thanks.

16              MR. PULGRAM:  Apologies.

17              MR. TARABICHI:  No problem.

18              THE WITNESS:  Yes.

19   BY MR. PULGRAM:

20         Q.   And is this the way that that Fatdoor.us

21   website looked when you allowed it to expire?

22         A.   I don't remember because -- I don't remember.

23         Q.   At the time --

24         A.   The address is -- no, because the address

25   is 125 University Avenue, Palo Alto, California, which
```

538

1    is not an address we had in -- before it expired.

2        Q.   Other than that address, to the best of your

3    knowledge, is this the way the website looked when it

4    was allowed to expire in 2009?

5        A.   I don't know.  This didn't -- when we put it

6    back up, we had to -- we just, we rebuilt everything

7    from scratch.  So I don't know that it was like the one

8    before 2009.  It certainly had the name factor, get to

9    know your neighbors.

10       Q.   Do you have a copy of the Fatdoor.us website

11   as it existed at the time that you allowed it to expire

12   in 2009?

13       A.   Whatever I have I've given to my counsel.

14       Q.   Do you know what it looked like?

15       A.   No.

16       Q.   Do you know what services it provided?

17       A.   It was a neighborhood social network that had

18   this logo.

19       Q.   This Exhibit 136, it didn't actually work, did

20   it, when it was launched or relaunched in February 2012?

21       A.   This site just relaunched this Tuesday.

22       Q.   Right.  In 2012, when Exhibit 136 was made

23   available on the Internet, it didn't allow neighbors to

24   communicate with each other through the website, did it?

25       A.   No.

1    Q.   And do you have any -- was there a working

2    website that provided communications between members at

3    the time that you allowed the website to expire in 2009?

4    A.   I don't remember when the site went down.

5    Q.   Was there a working website that allowed

6    communication between members when it expired?

7    A.   I don't remember when the site went down.

8    Certainly there was in 2007, when the company was

9    Fatdoor.com, and it certainly was before the company

10   launched and afterwards, on eDirectree, but I don't

11   remember.

12   Q.   When you say there was a working website

13   before the company launched, you mean before Fatdoor.com

14   launched?

15   A.   Uh-huh.

16   Q.   You mean Fatdoor 1?

17   A.   Uh-huh.

18   Q.   Yes?

19   A.   Yes.

20   Q.   So before Fatdoor 1 launched, during the

21   operation of Fatdoor 1 by the company that became known

22   as Center'D, and then your most recent launch by

23   Fatdoor 2, during all of those times you contend that

24   there was an operating Fatdoor social network, correct?

25   A.   There were periods where the site wasn't

540

1    working right.

2         Q.   Okay.  My question is, between the time that

3    Center'D stopped operating the Fatdoor.com service, and

4    the time that your Fatdoor.us mark expired, was there

5    any operating service that you provided through

6    Fatdoor.us?

7         A.   I think for a time it linked to eDirectree.

8    And eDirectree has a Fatdoor group that we definitely

9    had.

10        Q.   So there was a redirect from Fatdoor.us to

11   eDirectree?

12        A.   I don't think so, but I don't know.

13        Q.   Any other service that was offered through

14   Fatdoor.us?

15        A.   We tried to build a neighborhood social

16   network again, but we couldn't raise any capital.

17        Q.   And so no service was launched during that

18   period April 2008 through the expiration of the

19   Fatdoor.us site.

20        A.   When you say "service was launched," this

21   business, Fatdoor, that we have, or even Nextdoor,

22   doesn't have a very clear revenue model when it

23   launches.  It's a very capital intensive business.  So

24   unless you have an outside investor or have a lot of

25   capital, you can't do it.  And so I needed to find a

                                                           541

1    business that could generate income.  And Fatdoor.us

2    needed outside capital to generate income or survive

3    long enough where -- to a point where it could generate

4    income.  And so I sought capital rather than focus on

5    building the site.

6        Q.   Understood.  And as a result of not being able

7    to get that capital, there was not a Fatdoor service

8    launched by you separate from Fatdoor 1 prior to the

9    expiration of the Fatdoor.us mark.

10       A.   Can you define the word "launched"?

11       Q.   Yes.  I mean was there an operating service

12   that allowed neighbors to communicate with neighbors and

13   that was offered to the public for that purpose between

14   April 2008 and the time that Fatdoor.us was first

15   allowed to expire?

16       A.   Only on eDirectree.

17       Q.   Only at eDirectree.  So let's go back to

18   eDirectree for a minute.  And eDirectree, we can look

19   at 125.  That's Exhibit D to your, Exhibit D to your

20   Supplemental Statement.  That's the eDirectree website.

21   When you say that all that was offered for Fatdoor was

22   on eDirectree, are you talking about at page 371, for

23   example, where the word "Fatdoor" appears?

24       A.   Yes.

25       Q.   And what does the word "Fatdoor" mean on that

542

1    page?

2         A.   It's a group of people that are fans or in

3    pictures with others that were part of the Fatdoor

4    family, which was largely our founding team and

5    investors and stakeholders.

6         Q.   So there was a group that people could be

7    tagged to?  Am I right with that?

8         A.   Yeah.

9         Q.   I finally caught on?

10        A.   Yeah.

11        Q.   That could be tagged to that would be labeled

12   "Fatdoor" on the eDirectree website.

13        A.   (Nods head.) Yes, yes.

14        Q.   Was there any other service offered under the

15   name "Fatdoor" besides that on the eDirectree website?

16        A.   I believe we tried to do Nextdoor Neighbors

17   and . . .

18        Q.   I'm talking about Fatdoor now.  I don't want

19   to get back off subject.

20             Was there any other service offered under the

21   name "Fatdoor" on the eDirectree website?

22        A.   I don't, I don't think so.

23             MR. PULGRAM:  Would you mark this, please.

24             (Exhibit 137 marked)

25   BY MR. PULGRAM:

                                                      543

1    Q.   Mr. Abhyanker, Exhibit 137 is a list of terms,

2    hyperlinks, I guess, from the eDirectree.com website,

3    looks like February 7, 2008.  Do you see that?

4    A.   Yeah.

5    Q.   And Fatdoor is one of all these different

6    terms that were used to identify groups on eDirectree;

7    is that correct?

8    A.   Groups of micro social networks, yeah.

9    Q.   And it has "Hillary," it has "Clinton," it has

10   "Cricket," it has "lawyers."  Are you claiming a

11   trademark in any of the other terms on this page besides

12   "Fatdoor" as a result of eDirectree?

13   A.   Am I claiming, or are there other names here

14   that are trademarked?

15   Q.   Are you claiming rights in any other name on

16   this page as a result of them being displayed on

17   eDirectree?

18   A.   I am not.  Other than eDirectree itself, I

19   guess.

20   Q.   Understood.  The Fatdoor Web page that we

21   looked at before, 136, with the John Smith image?

22   A.   Where is this?

23   Q.   There you are.  Right under your finger.

24   A.   Yeah.

25   Q.   Do you know when that was first displayed on

1   attorney that wrote this to rewrite it.  I told him not

2   to make it the same, but apparently it is, so.  I'll

3   have it rewritten.

4       Q.   And the same's true for lots of other parts of

5   the Terms of Use -- arbitration -- by the way, you set

6   up your arbitrations in San Francisco because it was a

7   copy of Nextdoor, right?

8       A.   I didn't write this, Laurence.  I had an

9   attorney that works for us write this.  But I'm now

10   upset.  I made it clear it should be different, and we

11   will have this changed tomorrow.

12       Q.   Let's mark next in order --

13       A.   But it was under my direction, so if it's

14   under my direction, I take responsibility of it.  Our

15   sites are very similar functionally, and therefore it's

16   not a surprise that some of the same words are in these

17   terms.  This being said, we will use our own language

18   for these terms.

19       Q.   I'd like you to look at the Privacy Policy,

20   which is being marked next in order.  140.

21       (Exhibit 140 marked)

22   BY MR. PULGRAM:

23       Q.   So the Privacy Policy side by side comparison

24   shows a lot of identical copying, too, but I'd like to

25   draw your attention to page 3 of 9.

550

1    A.    Okay.

2    Q.    The first two paragraphs there?

3    A.    Uh-huh.

4    Q.    Reading the last sentence of the first

5  paragraph on page 3 of 9, it says, "If you aren't a

6  member, you can opt-out of future email invitations, or

7  ask us to delete any non-public information about you

8  that we use to facilitate member invitations by

9  contacting us at (https://nextdoor.com/contact_us)."  Do

10  you see that?

11    A.    I do.

12    Q.    You even included a link to Nextdoor in your

13  policy, sir?

14    A.    My company made a mistake with this.  We've

15  copied your terms and we've copied your privacy, and

16  we'll, you know, we'll change it, in part.  And I

17  apologize.  This will be taken care of tomorrow.

18          It's in many places, too, on the next page.

19    Q.    Yes, we noticed.

20    A.    That's why my counsel had asked your counsel,

21  you, this weekend before our public launch, to tell us

22  what we should change.

23    Q.    There's no question pending, sir.

24    A.    But you didn't tell us.  That's why we have

25  this issue now.  But we will change it, and I'll tell

551

1    STATE OF CALIFORNIA    )

2    COUNTY OF CONTRA COSTA  )

3

4         I, Carolyn M. Mann, a Certified Shorthand

5    Reporter, do hereby certify:

6         That prior to being examined, the witness in

7    the foregoing proceedings was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10         That said proceedings were taken before me at

11    the time and place therein set forth and were taken down

12    by me in shorthand and thereafter transcribed into

13    typewriting under my direction and supervision;

14         I further certify that I am neither counsel

15    for, nor related to, any party to said proceedings, nor

16    in any way interested in the outcome thereof.

17         In witness thereof, I have hereunto subscribed

18    my name.

19

20    Dated:  JUNE 25, 2014

21

22    _____

23    Carolyn M. Mann
       CSR No. 10066, RPR

24

25

621

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


NEXTDOOR.COM, INC., a Delaware ) No. 3:12-cv-05667-EMC
corporation,                   )
                               )
              Plaintiff,       )
                               )
      vs.                      )
                               )
RAJ ABHYANKER, an individual,  )
                               )
              Defendant.       )
                               )
                               )
AND RELATED COUNTERCLAIM       )
                               )



VIDEOTAPED DEPOSITION OF RAJ ABHYANKER

VOLUME IV

August 4, 2014

1:01 p.m.


555 California Street, 12th Floor

San Francisco, California


REPORTED BY:

Carolyn M. Mann

CSR No. 10066

**Raj Abhyanker - Volume IV**
**August 4, 2014**

```
 1     APPEARANCES:

 2             For Plaintiff:

 3                 FENWICK & WEST LLP
                   BY:  JENNIFER LLOYD KELLY
 4                     MATTHEW BECKER
                   555 California Street, 12th Floor
 5                 San Francisco, California  94105
                   415.875.2300
 6                 jkelly@fenwick.com
                   mbecker@fenwick.com
 7
                   For Defendant:
 8
                   LEGALFORCE, INC.
 9                 BY:  DAVID LAVINE
                   451 Shoreline Drive
10                 Mountain View, California  94040
                   650.965.8731
11                 dave@legalforcelaw.com

12

13     ALSO PRESENT:

14                 DAN DeFRANK, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

624

1        Q.   Why did you register .cm?

2        A.   To continue building my business around my

3   name.  Because I couldn't get the Nextdoor.com business

4   because it was taken from me, domain, by, by this other

5   party.  And I was upset about that.

6             MS. KELLY:  Maybe this is it.

7   BY MS. KELLY:

8        Q.   You were upset with Nextdoor?

9        A.   I was upset that my business was taken from

10  me, the business that I pioneered and the business that

11  I continued to build.  So I wanted this domain with my

12  business, around my trademark application.

13            THE REPORTER:  177.

14            (Exhibit 177 marked)

15  BY MS. KELLY:

16       Q.   Mr. Abhyanker, do you recognize this document?

17       A.   Yes.  This is my EatBid website, now with the

18  Nextdoor name.

19       Q.   Okay.  Was this the content that was posted on

20  the Nextdoor.cm site?

21       A.   Probably.  I think.  I don't know.  Looks like

22  it.

23       Q.   Please take a moment.

24       A.   We had, we had moved our -- we had originally

25  wanted Nextdoor.com, so we intended to put this site up

776

1    on Nextdoor.com.

2         Q.   Right.

3         A.   And we couldn't get the domain Nextdoor.com --

4         Q.   Right.

5         A.   -- because it was taken from us.  So we put

6    that domain on Nextdoor.cm, though we had actually

7    wanted that name, we publicized that name, we worked

8    hard for that name.

9         Q.   Okay.  So is this the content that was on

10   the --

11        A.   I don't know.

12        Q.   -- Nextdoor.com --

13        A.   It looks like it.

14        Q.   -- cm?  Did you put the, did you put your

15   EatBid content on the Nextdoor.cm domain?  Isn't that

16   what you testified earlier --

17        A.   Yeah, uh-huh.

18        Q.   -- in your deposition?

19             Is this content, is that it?

20        A.   Kind of looks like it, yeah.

21        Q.   Okay.  Do you see the page where it says

22   "About"?  It's four pages in.

23        A.   Uh-huh.

24        Q.   Was this posted on the Nextdoor.cm domain?

25        A.   I don't know.  It kind of looks like it, yeah.

777

1     Q.   Okay.  See where it says, "That's what

2   Nextdoor is about"?

3     A.   Uh-huh.

4     Q.   Would that have been on there?

5     A.   I don't know.  Possibly.

6     Q.   Who wrote this content?

7     A.   I don't remember.  But see, it says

8   Nextdoor.com because we intended to get that name the

9   whole time.  And it was probably -- this is our name and

10   this was our company that we've been pursuing for the

11   past, at that time, seven years.

12     Q.   So this is content that you originally had

13   created for a Nextdoor.com site.  Right?

14     A.   Well, our intention always was to get the

15   Nextdoor.com site.

16     Q.   Okay.  And --

17     A.   It continues to be.

18     Q.   -- then when you couldn't get it, you posted

19   it on this site?

20     A.   I don't know that I couldn't get it.  I'm

21   still opposing it.  I hope to get it soon, when this

22   case is over.

23     Q.   You hope to get the domain?

24     A.   Well, we will get the trademark back that

25   they've stolen from us because of its confusion with my

778

1    Fatdoor business.

2        Q.   Okay.  Let's return to the question at hand,

3    which is whether this content was on the Nextdoor.com --

4    Nextdoor.cm site.

5        A.   I mean, it might have been.  I wouldn't be

6    surprised if it was.

7        Q.   Okay.  Who created the content for the EatBid

8    site?

9        A.   Me and Andy.

10       Q.   Who's Andy?

11       A.   He's like a mentee I had.  He's a Stanford CS

12   student.  I taught him how to develop websites.

13       Q.   What's the current status of the .cm site?

14       A.   I mean, I think pending this litigation, when

15   this litigation was first filed, we changed the who is

16   to suspend it.  And we've been waiting for the outcome

17   of this litigation before we start reusing our rights.

18   And I think in the meantime, I don't know if there's

19   anything on there at all.  There was for a short amount

20   of time, but I don't know.

21       Q.   What's the current status of the EatBid site?

22   Are you still running that business?

23       A.   Well, we've now rebuilt the code base into our

24   Fatdoor.com.  Since Google gave us back Fatdoor.com,

25   we've taken what was EatBid and Nextdoor and now we're

779

1   STATE OF CALIFORNIA      )

2   COUNTY OF CONTRA COSTA  )

3

4         I, Carolyn M. Mann, a Certified Shorthand

5   Reporter, do hereby certify:

6         That prior to being examined, the witness in

7   the foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth;

10         That said proceedings were taken before me at

11  the time and place therein set forth and were taken down

12  by me in shorthand and thereafter transcribed into

13  typewriting under my direction and supervision;

14         I further certify that I am neither counsel

15  for, nor related to, any party to said proceedings, nor

16  in any way interested in the outcome thereof.

17         In witness thereof, I have hereunto subscribed

18  my name.

19

20  Dated:  AUGUST 13, 2014

21  _____

22

23  Carolyn M. Mann
    CSR No. 10066, RPR

24

25