DAVID S. LAVINE, SBN 166744
dave@legalforcelaw.com
NICHOLAS M. GEROVAC, SBN 289910
nick@legalforcelaw.com
LEGALFORCE RAJ ABHYANKER, P.C.
1580 W. El Camino Real, Suite 13
Mountain View, California 94040
Telephone: 650.965.8731
Facsimile: 650.989.2131

Attorneys for Defendant
Raj Abhyanker

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>RAJ ABHYANKER, an individual,<br><br>        Defendant. | Case No. 3:12-cv-05667-EMC-NMC<br><br>**DEFENDANT RAJ ABHYANKER'S TRIAL BRIEF** |

Defendant Raj Abhyanker ("Abhyanker") hereby submits his trial brief in the above-referenced case. Abhyanker reserves the right to amend this trial brief prior to or during trial.

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL BACKGROUND ..................................................... 2

    A.   Abhyanker's Prior History With The Nextdoor Name
        And Online Social Networking ........................................ 2

    B.   Abhyanker's Registration and Use of the Nextdoor.cm
        Domain ............................................................. 4

III.  PERTINENT LAW ............................................................. 5

    A.   The ACPA Requires a Bad Faith Intent to Profit That is
        Absent in This Case ................................................ 6

    B.   The ACPA Includes a Safe Harbor Defense That is
        Applicable in This Case ............................................ 7

IV.   LEGAL ARGUMENT ......................................................... 8

    A.   Abhyanker Reasonably Believed That He Had Intellectual
        Property Rights In The Term Nextdoor At The Time Of
        Registering and Using The Domain Name ........................... 8

    B.   The Other Statutory Factors Demonstrate That Abhyanker
        Did Not Act With a Bad- Faith Intent to Profit When
        Registering or Using the Domain ................................... 9

        1.   Abhyanker Did Not Use False or Misleading Contact
            Information When Registering the Domain Name ............. 10

        2.   Abhyanker Did Not Register Multiple Domain Names
            Confusingly Similar to Nextdoor.com's Mark ................. 10

        3.   Abhyanker Did Not and Has Not Offered to Transfer,
            Sell, or Otherwise Assign the Domain Name .................. 11

        4.   Abhyanker Did Not Profit From Activities Occurring
            On The Domain Site ......................................... 12

        5.   Abhyanker Did Not Register a Famous Mark as a
            Domain Name .............................................. 13

    C.   Abhyanker Held a Reasonable Belief That He Was Acting In
         Good Faith In Registering and Using the Domain Name, in
         Compliance with the Safe Harbor ................................ 14

V.    CONCLUSION ............................................................. 15

## TABLE OF AUTHORITIES

CASES

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,
    509 F.Supp.2d 1337 (N.D. Ga. 2007) ……………………………………………………7

*Facebook, Inc. v. Banana Ads LLC*,
    2013 U.S. Dist. LEXIS 65834 (N.D. Cal. 2013)……………………………………… 7

*Interstellar Starship Servs. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) …………….......................................... 5, 6, 7, 8

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009) …………………………………….….. *passim*

*Lucas Nursery & Landscaping, Inc. v. Grosse*,
    359 F.3d 806 (6th Cir. 2004) …………………………………..………….... 6, 7

*Mirage Resorts, Inc. v. Stirpe*,
    152 F. Supp. 2d 1208 (D. Nev. 2000) ……….,,,,,,,,,,…...……………….. 8, 14

*Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*,
    684 F.3d 1211 (11th Cir. 2012) ………………………………………… 8

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190  (9th Cir. 2012) ………………………………………… 6

*Southern Grouts & Mortars, Inc. v. 3M Co.*,
    575 F.3d 1235 (6th Cir. 2009) …………………………......…….......6, 9

*Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research*,
    527 F.3d 1045 (10th Cir. 2008) ……….………………………………... 7

*Virtual Works, Inc. v. Volkswagen of America Inc.*,
    238 F.3d 264 (4th Cir. 2001) …………………………………………..…... 5

STATUTES

Anticybersquatting Consumer Protection Act ("ACPA")
    15 U.S.C. § 1125(d)(1) …………………...……………………..………… *passim*

15 U.S.C. § 1125(c)(2)(A) ……………………………...…………………………… 13

15 U.S.C. § 1125(c)(2)(A)(i)-(iv) ……………………………………………………… 13

15 U.S.C. § 1125(d)(A) ……………………………………………………..………… 6

15 U.S.C. § 1125(d)(A)(i) …………………………………………………………... 6

15 U.S.C. § 1125(d)(1)(B)(i)(I) …………………………………………………….. 8

15 U.S.C. § 1125(d)(1)(B)(i)(V) ……………………………...…………………….. …… 12

15 U.S.C. § 1125(d)(1)(B)(i)(VI) ……………...………………………..…….… 12

15 U.S.C. § 1125(d)(1)(B)(i)(VII) ……………………………………………..… 10

15 U.S.C. § 1125(d)(1)(B)(i)(VIII) …………………………………………....... 11

15 U.S.C. § 1125(d)(1)(B)(i)(IX) …………………….………………………… 13

15 U.S.C. § 1125(d)(1)(B)(ii) ………………………………………………….6, 7

**OTHER**

J. Thomas McCarthy, McCarthy on Trademarks
(4th ed. 2004) ………………………………………………… 8, 10, 13

H.R. Rep. No. 106-412, 13 …………………………………….…………… 11

S.R. Rep. No. 106-140, 5-6 ………………………....……………………… 5

## I.   INTRODUCTION

Defendant Raj Abhyanker ("Abhyanker") is an engineer, an inventor, an entrepreneur, and a pioneer in the field of online neighborhood-based social networking.  Abhyanker was the first to conceive of the term Nextdoor as a way of identifying and delivering such services to a community of neighbors.  Nevertheless, in a stretch of the governing statute, Abhyanker has been sued for alleged cybersquatting by plaintiff Nextdoor.com, Inc. ("Nextdoor").  As will be seen below, as one who was deeply invested in the industry in which he is accused of cybersquatting, Abhyanker does not meet the profile of a cybersquatter in any way.  As to the only remaining issue of whether Abhyanker violated provisions of the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d)(1), ("ACPA") by registering and using the domain name of nextdoor.cm with a bad faith intent to profit in 2011, this Court should find in Abhyanker's favor.

Abhyanker's motivation for registering the domain name and taking numerous other steps to support his rights in the Nextdoor name was that he believed he had intellectual property rights in the domain name stemming from his patent rights and prior usage of the term Nextdoor to describe his homespun, created-from-scratch social network for neighbors.  Abhyanker's interest in registering and using the domain grew out of a desire to protect years of hard work on the Nextdoor concept and in neighborhood social networking generally, and was not an attempt to profit on the back of Nextdoor.com, a much later entrant onto the social networking scene.  His motivation arose out of a reasonable, good-faith belief that he had a legal right to the Nextdoor name which was worth protecting, and is completely at odds with the kind of bad-faith intent to profit typically seen in cybersquatters found liable under the ACPA.

Abhyanker's lack of a bad faith intent to profit is further shown by the complete absence of the traditional indicators of such bad faith intent.  Abhyanker's potential liability here stems from registering a single domain, not the dozens or hundreds that the typical cybersquatter registers.  Abhyanker has never attempted to sell the domain name in question, to the plaintiffs or any other third party, which is again atypical for a cybersquatter bent on squeezing established online companies to purchase domains attractive to them.  Abhyanker also used the domain name

in question to offer services to others, not to simply place advertisements or referral links, a fact again uncharacteristic of a cybersquatter. Abhyanker has no prior history of cybersquatting, and registered the domain name in question using his own name and contact information. The typical cybersquatter runs afoul of all of these factors; Abhyanker has not run afoul of any of them. These factors thus strongly militate against Abhyanker's liability, in that he did not act with a bad faith intent profit when he registered the domain name in question.

Abhyanker was the original visionary of the neighborhood social networking schema. The undisputed facts in this case show that Abhyanker was the first to begin associating the words Nextdoor with this same social network. Abhyanker's subsequent registration of the Nextdoor.cm domain name was therefore an act done without any bad faith intent to profit, but instead was simply a way for Abhyanker to reaffirm his role and to re-establish his rights in the neighborhood networking scene—rights Abhyanker reasonably believed at the time gave him the legal ability to register the domain name in question. As such, Abhyanker cannot be found liable under the ACPA.

## II.    FACTUAL BACKGROUND

### A.   Abhyanker's Prior History With The Nextdoor Name And Online Social Networking.

Abhyanker's interest in and use of the term "Nextdoor" as a name for an online social networking website dates back nearly ten years, to 2005. It was at that time that Abhyanker, surprised by the lack of web-based tools to aggregate and organize information about residential neighbors, began developing technology related to an online network for neighbors who scarcely knew one another. Abhyanker called this concept Nextdoor. Abhyanker's Nextdoor was designed to be a neighborhood-based social network geared toward bringing together neighbors with like interests, or who were in need of a product or service offered by other neighbors, for mutual benefit.

As his ideas started to coalesce through 2005 and into 2006, Abhyanker created screenshots and wireframes showing the name "Nextdoor." Exs. 1061, 1062. A tag-line message

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1   appeared on that mock-up stating "[g]et to know your neighbors." Ex. 1061.  Over the ensuing

2   months, Abhyanker developed software code, product concepts, prototypes and other

3   instrumentalities, many of which included use of the name "nextdoor."

4          In September 2006, Abhyanker hired Sandeep Sood and his firm to provide software and

5   website development services. Exs. 1009, 1011, 1018.  He and his firm agreed to conceptualize,

6   design and build components of Abhyanker's social networking website and associated software.

7   Exs. 1009, 1011, 1018.  Abhyanker created a cap table and equity distribution spreadsheet for a

8   company to be called NextDoor, Inc. with Sood in 2006.  Sood was to be the CEO of this venture,

9   NextDoor, Inc. Ex. 1021.  Together with Sood and another engineer, Ankur Verma, Abhyanker

10  created the alpha neighborhood-based social networking site displaying the name Nextdoor. Exs.

11  1061, 1062.

12          Despite his repeated efforts between 2006 and 2010, Abhyanker could not use the domain

13  name Nextdoor.com because he could not purchase the domain from its third-party owner at the

14  time, which was not Nextdoor.com.  Exs. 1020, 1022, 1032, 1054, 1055.  However, Abhyanker

15  continued to remain interested in the name Nextdoor.  Around September 2007, a U.S. Patent was

16  filed with the United States Patent and Trademark Office, which listed Abhyanker as the sole

17  inventor. Ex. 1133. This application describes and illustrates Abhyanker's invention and, as part

18  of the claims of the patent, included the term Nextdoor as a domain on which a neighborhood

19  social network was placed.  In or around September 2007, another patent application, this time

20  one international in scope, also made use of the words Nextdoor as a domain name inside the

21  patent's claims. Ex. 1134.  The patent, on which Abyhanker is also the sole inventor, describes

22  and illustrates his use of the word Nextdoor as a domain with a neighborhood social network.

23          Abhyanker's best efforts at the time, unfortunately, did not result in a commercially-

24  successful neighborhood-based social network.  Abhyanker thus turned his creative spirit and

25  energies towards other projects.  However, he did not let the idea of the Nextdoor social network

26  get far from his mind.  In late 2010, Abhyanker met with Silicon Valley investors to reinvigorate

27  Nextdoor, so as to avoid abandonment of the patents on which he was listed as inventor. Exs.

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1   1049, 1050.

2       **B.**   <u>Abhyanker's Registration and Use of the Nextdoor.cm Domain.</u>

3         It was only in late 2011 when Abhyanker first learned of the existence of plaintiff

4   Nextdoor.com. Abhyanker was surprised at how similar the concept and functions of its site were

5   to his earlier efforts. What is more, the site launched under the exact same name as Abhyanker

6   had previously created and used to identify his same online social networking site years ago.

7   Abhyanker also began to undercover details surrounding the launch of the site that gave him

8   pause. He discovered, for instance, that one of the founders of the Nextdoor.com site was a good

9   friend of Sandeep Sood, who previously had worked with Abhyanker to build out his Nextdoor

10  concept. He also discovered that Sood had discussed the Nextdoor.com website with that

11  founder. Finally, he discovered that the Nextdoor.com site had launched after an initial testing

12  period in the very same neighborhood where Abhyanker had demoed and prepared to launch his

13  own neighborhood social network.

14        Abhyanker was understandably saddened and upset about these revelations, as he later

15  admitted in deposition. As anyone that had spent years of his life developing and building a

16  unique concept would be, Abhyanker was upset to see that his work had been, to all appearances,

17  co-opted. What is more, Abhyanker was saddened that he was not able to be a part of the

18  execution and idea of a concept and business foundation he had originated. Deposition of Raj

19  Abhyanker, 530:23-531:9.

20        In response, Abhyanker renewed his focus and reasserted his rights to the Nextdoor

21  concept. On December 28, 2011, Abhyanker reached out to Google Ventures and others for

22  advice on how best to proceed. Ex. 1070. He came to the conclusion that, in order to protect the

23  rights he had obtained in the name through his earlier use and patent rights, he needed to register

24  a similar domain name Nextdoor.cm, much as he did when he registered nextyard.com and

25  nextlawn.com years before. When he subsequently registered nextdoor.cm, Abhyanker did not

26  try to conceal his identity or in any way to be elusive with respect to the information he included

27

1  as part of the domain registration.  Abhyanker used his full, legal name in registering the domain,

2  listed his standard work email and mailing address, and paid for the registration via his company

3  credit card.  Abhyanker registered this domain name because he believed he had to take such an

4  immediate, affirmative step to assert his rights, and because he believed that he had the right to do

5  so following from the appearance of the Nextdoor social networking name within the claims of

6  his patent applications.

7       After registering the domain name, Abhyanker took further steps in order to reassert his

8  rights, including developing a website on the domain name of nextdoor.cm that featured social

9  networking capabilities.  Abhyanker never offered to sell or otherwise transfer the domain name

10 in question to Nextdoor.com or any other third parties, nor did he ever have any desire to do.

11 Abhyanker's motivation and guiding spirit behind his registration and use of the nextdoor.cm

12 domain was, without fail, a good-faith attempt at bringing back to life the Nextdoor social

13 networking concept he had created and had established intellectual property rights in.

14 **III.    PERTINENT LAW**

15      In creating the ACPA, Congress was concerned that "cybersquatting"-- registering "well-

16 known brand names as Internet domain names in order to force the rightful owners of the marks

17 to pay for the right to engage in electronic commerce under their own name" -- threatened "the

18 continued growth and vitality of the Internet." *Interstellar Starship Servs. v. Epix, Inc.*, 304 F.3d

19 936, 946 (9th Cir. 2002) (citing *Virtual Works, Inc. v. Volkswagen of America Inc.*, 238 F.3d

20 264, 267 (4th Cir. 2001).[1]  The "paradigmatic harm that the ACPA was enacted to eradicate"

21

22

---

23 [1] Congress defined cybersquatters as those who "register well-known brand names as Internet domain names *in order to extract payment* from the rightful owners of the marks; . . . register
24 well-known marks as domain names and *warehouse* those marks with *the hope of selling them to the highest bidder* . . . register well-known marks to *prey on consumer confusion* by misusing the
25 domain name to divert customers from the mark owner's site to the cybersquatter's own site . . . target distinctive marks to *defraud consumers, including to engage in counterfeiting activities*." S.
26 Rep. No. 106-140 at 5-6 (emphaisis added).

27

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1   was "the practice of cybersquatters registering several hundred domain names in an effort to sell

2   them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359

3   F.3d 806, 810 (6th Cir. 2004).

4        A.  <u>The ACPA Requires a Bad Faith Intent to Profit That is Absent in This Case.</u>

5        To be liable under the ACPA, an individual must act with "a bad faith intent to profit" to

6   "register[], traffic[] in, or use[] a domain name" that "is identical or confusingly similar to" a

7   mark that is "distinctive." 15 U.S.C. § 1125(d)(A). Thus, unlike in other trademark enforcement

8   law, liability under the ACPA necessarily requires a finding of a bad faith intent to profit. 15

9   U.S.C. § 1125(d)(A)(i); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009). That

10   some indication of bad faith, by itself, exists is not sufficient to be held liable under the statute;

11   the plaintiff must establish that the defendant had a bad-faith *intent to profit*. *Southern Grouts &*

12   *Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246-48 (6th Cir. 2009) (declining to find a defendant

13   liable under the ACPA because the plaintiff had not established the defendant acted with an intent

14   to profit from the domain name).

15        In determining whether this species of bad faith exists, the Ninth Circuit applies a three-

16   step approach. *Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1220 (9th Cir. 2012).

17   First, the court must "evaluate the unique circumstances of the case. . . ." *Id.* Second, the court

18   must "survey the nine bad-faith factors. . . ." *Id.* Third, the court must "consider the availability

19   of [the] statutory safe-harbor defense, which protects any defendant who 'believed and had

20   reasonable grounds to believe that the use of the domain name was a fair use or otherwise

21   lawful.'" *Id.* (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). If either a bad-faith intent to profit is not

22   found, or the statutory safe harbor is determined to apply, then the defendant cannot be held liable

23   under the ACPA.

24        Courts have consistently recognized that the most important grounds for determining bad

25   faith are "the unique circumstances of the case." *Interstellar Starships*, 304 F.3d at 946-47.

26   Courts commonly employ considerable freedom to consider any and all factual circumstances

27   when such facts are relevant to determining whether the defendant acted with a bad-faith intent to

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1  profit. *See Interstellar Starships*, 304 F.3d at 946 (considering the descriptive nature of the mark

2  in question, as well as time, money and effort spent by the defendant in building the website on

3  the domain name as indictors of a lack of bad faith intent to profit); *Eagle Hosp. Physicians, LLC*

4  *v. SRG Consulting, Inc.*, 509 F. Supp. 2d 1337, 1349 (N.D. Ga. 2007) (considering factual

5  circumstances indicting that defendant did not believe past contractual agreements had been

6  properly terminated).

7       Courts in this and other circuits are also directed to survey the nine nonexclusive factors

8  enumerated by Congress to determine whether bad-faith intent to profit exists.  While there is no

9  set weight to be placed on any single factor, courts traditionally look to a few specific factors as

10  harbingers of the existence of bad-faith intent to profit, as these factors tend to align with the

11  characteristics of the typical cybersquatter Congress had in mind in drafting the ACPA.  *Lucas*

12  *Nursery*, 359 F.3d at 809; *Utah Lighthouse Ministry v. Found. For Apologetic Info. &*

13  *Research*, 527 F.3d 1045, 1058 (10th Cir. 2008).  These factors are whether the defendant in

14  question has a previous history of cybersquatting, whether the defendant has registered multiple

15  offending domain names, whether the defendant has offered the domain name for sale, and

16  whether the defendant has attempted to make some form of profit from operating a website under

17  the domain name in question. *See Lahoti*, 586 F.3d at 1202-03.  Time and again, courts

18  commonly find a bad-faith intent to profit only when these factors significantly align against the

19  defendant. *See, e.g. Facebook, Inc. v. Banana Ads LLC*, 2013 U.S. Dist. LEXIS 65834 (N.D. Cal.

20  2013).

21       **B.  The ACPA Includes a Safe Harbor Defense That is Applicable in This Case.**

22       The ACPA also contains a provision known as the safe harbor provision, which states that

23  "[b]ad faith shall not be found in any case in which the court determines that the person believed

24  and had a reasonable grounds to believe that the use of the domain name was fair use or

25  otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  Under this provision of the statute, an

26  individual who, at the time of registering the domain name in question, held a reasonable belief

27  that his use of the domain name was lawful, is not liable under the ACPA.  This statutory safe

1    harbor is to be applied in a caring and thoughtful fashion, and should be used when the factual

2    circumstances indicate that the defendant acted with an objectively reasonable good faith intent

3    in registering the domain name in question. *Lahoti*, 586 F.3d at 1203; J. Thomas McCarthy,

4    McCarthy on Trademarks § 25.78 (4th ed. 2004). In determining whether a defendant acted with

5    a reasonable good faith belief, courts look to whether the defendant sought legal or business

6    advice before registering the domain name. *Mirage Resorts, Inc. v. Stirpe*, 152 F. Supp. 2d

7    1208, 1216 (D. Nev. 2000); *Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d

8    1211, 1223 n.8 (11th Cir. 2012).

9       While the statutory safe-harbor defense is one way that a defendant can be found not

10    liable under the ACPA, it is not the only way. A defendant cannot be found liable under the

11    ACPA if the plaintiff fails to establish that the domain name was registered with a bad-faith

12    intent to profit, or if the defendant has established that the domain name was registered in good

13    faith. *Interstellar Starships*, 304 F.3d at 947.

## IV.   LEGAL ARGUMENT

15       Abhyanker registered the domain name nextdoor.cm in order to support and protect a

16    cherished social networking concept that he actually and reasonably believed he continued to

17    have legal rights in. This belief negates the finding of any bad-faith intent to profit as is required

18    for liability under the ACPA, and sets Abhyanker miles apart from the typical cybersquatter

19    commonly found liable under this statute. That Abhyanker lacks a bad-faith intent to profit can

20    be seen through an examination of the enumerated statutory factors in play here. All of the

21    pertinent factors favor Abhyanker.

22

23      A. <u>Abhyanker Reasonably Believed That He Had Intellectual Property Rights In The Term Nextdoor At The Time Of Registering and Using The Domain Name.</u>

24       The first factor listed in the ACPA statute looks to whether the defendant holds

25    "trademark or *other intellectual property rights*" in the domain name. 15 U.S.C.

26    §1125(d)(1)(B)(i)(I). The wording of this factor is broad, and on its face encompasses all

27

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1  intellectual property rights, even those apart from trademark rights, including those stemming

2  from patent law.[2]

3        Abhyanker registered the domain name in question precisely because he reasonably

4  believed he had intellectual property rights in the term that primarily constituted the domain name

5  nextdoor.cm. Abhyanker based this belief on reasonable grounds: he was the first individual to

6  associate the term "Nextdoor" with an online social network. He had previously built, designed

7  and marketed a social media website under the name a few years earlier. Significantly, he had

8  placed images showing a mock-up of a social media website called Nextdoor in his patent

9  applications. At the time he registered the domain name in question, Abhyanker reasonably

10 believed that he retained intellectual property rights in the Nextdoor name – and thereby

11 distinguished himself from the typical cybersquatter profile. This belief is sufficient to establish

12 that Abhyanker did not act with a bad faith intent to profit when he registered the domain name in

13 question.

14

15       B.   The Other Statutory Factors Demonstrate That Abhyanker Did Not Act With a Bad-
            Faith Intent to Profit When Registering or Using the Domain.

16       The remaining pertinent statutory factors that the courts look to in determining whether a

17 defendant acted in bad faith with an intent to profit when registering or using a domain name

18 weigh decidedly in favor of Abhyanker.[3]

19 _____

20

21 [2] Even were the Court to decide, in what appears to be a matter of first impression, that this
   statutory wording does not encompass the factual circumstances found here, these facts are still
22 very much pertinent to the analysis of whether Abhyanker acted in bad faith. Even a mistaken
   subjective belief, reasonably and truly held, that the statute encompassed patent rights as part of
23 "intellectual property rights" supports a finding of Abhyanker's good faith.

   [3] Several factors do not appear to be applicable to the factual circumstances of this case, and
24 therefore should not be considered as favoring or disfavoring a finding of a bad faith intent to
   profit. *See Southern Grouts & Mortars*, 575 F.3d at 1249. These factors are factor (II), "the extent
25 to which the domain name consists of the legal name of the person or a name that is otherwise
   commonly used to identify that person", factor (III), "the person's prior use, if any, of the domain
26 name in connection with the bona fide offering of any goods or services" and factor (IV), the

27 (footnote continued on next page)

1.   Abhyanker Did Not Use False or Misleading Contact Information When Registering the Domain Name.

The typical cybersquatter uses false or misleading information when registering the domain name in question, in order to mask his/her identity and to hide from future liability.  Thus, using false or misleading information on domain name registration information leads to an inference that the registration was done with a bad-faith intent to profit.  *See* 4 McCarthy on Trademarks and Unfair Competition § 25:78 ("The provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process.").  The ACPA recognizes this as a warning sign, and includes the use of false or misleading identification information as a statutory factor to evaluate in determining whether a defendant acted with a bad-faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i)(VII).

Abhyanker did not use false or misleading information when he registered the domain name in question here.  The undisputed facts show that when Abhyanker registered the domain name in question, he placed his full name, Raj Abhyanker, and correct email and physical address, in the registration information.  This should not be surprising, as Abhyanker was never attempting to hide or conceal his activities.  Quite the opposite:  Abhyanker was intending to re-build his internet presence and to reassert rights he firmly believed he held in the neighborhood social networking sphere.  Abhyanker therefore had no purpose or reason to conceal or otherwise give false information during the registration process.  As such, this factor weighs in Abhyanker's favor against a finding that Abhyanker acted with a bad faith intent to profit when registering the domain name.

2.   Abhyanker Did Not Register Multiple Domain Names Confusingly Similar to Nextdoor.com's Mark.

The typical cybersquatter also tends to register dozens or even hundreds of offending

_____

(footnote continued from previous page)

person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name."

domain names at the same time.  An individual that registers such a large volume of domain

names certainly raises the question of whether the domain names were registered with a bad faith

intent to profit, as it appears that the individual is "warehousing" domain names for future sales.

Such warehousing is exactly the type of behavior that Congress was seeking to eliminate through

the passage of the ACPA. *See* H.R. Rep. No. 106-412, 13.  As such, the registration of multiple

domain names is included as a statutory factor to evaluate in determining whether a defendant

acted with a bad-faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

Abhyanker's liability at issue here stems from the registration of a single domain name,

nextdoor.cm.[4]  Abhyanker registered this single domain because it was a name he previously used

to identify his online social network.  Abhyanker is far from the typical cybersquatter who

registers dozens or hundreds of domain names in an attempt to warehouse them for future sales.

This factor therefore also weighs in Abhyanker's favor, and indicates that he did not act with a

bad-faith intent to profit when he registered the domain name in question.

### 3. Abhyanker Did Not and Has Not Offered to Transfer, Sell, or Otherwise Assign the Domain Name.

Not surprisingly, the typical cybersquatter offers to sell the domain name in question for

an amount that far exceeds the costs paid to register the domain name and any value developed

through website operations on the domain. *See Lahoti*, 586 F.3d at 1203 (finding a bad-faith

intent to profit where the defendant offered to sell the domain name in question for over $72,000,

despite having made no efforts to develop recognition of the domain).  Such offers to sell the

domain name tend to indicate that the owner of the domain has no real interest in keeping or

---

[4] Years before, Abhyanker also registered other domain names, including nextlawn.com and nextyard.com, to cover as much domain ground as he could around the neighborhood-based social networking concept.  As these domains were registered well before Nextdoor.com existed, let alone before Nextdoor.com established its trademark, they could not be the subject of a cybersquatting claim, and cannot be used to support liability under the current claim.

maintaining the domain, and only registered it in the first place to sell it to a well-heeled business in that industry at the highest price it can. As such, this behavior tends to be indicative of whether a defendant had a bad-faith intent to profit when registering the domain name in question. 15 U.S.C. § 1125(d)(1)(B)(i)(VI). The ACPA also looks to whether the defendant had previously engaged in such "conduct indicating a pattern of" registering and then selling domain names. *Id.*

Abhyanker has not, at any point prior to or during the course of this litigation, offered to sell or otherwise transfer the domain name in question to the plaintiff or any other third party. Abhyanker also has no such prior history of registering and then selling domain names. By contrast, Abhyanker has a history of registering and then using domain names to build his own truly innovative products and services, and not for any other nefarious purpose. This is not the conduct of a serial cybersquatter with a bad-faith intent to profit when registering a domain name. This factor thus also points in Abhyanker's favor.

4. Abhyanker Did Not Profit From Activities Occurring On The Domain Site.

Another common characteristic of a cybersquatter is that he/she profits from the activities that occur on the domain name in question in some way. This is most typically achieved through the placement of referral links or advertising content on the webpages that appear on the domain name in question. *See Lahoti*, 586 F.3d at 1202 (finding a bad faith intent to profit where the defendant "earned income when customers clicked on links when visiting the Domain Name website, some of which directed them to [plaintiff's] competitors."). The typical cybersquatter has no real interest in using the domain name to build a legitimate business, and makes no concerted effort to do anything constructive with the webpage appearing on the domain name; instead, it is far easier for the cybersquatter to simply place referral links or advertising banners on the page, that way ensuring that the domain name does not go unused, and that no potential revenue stream goes untapped. The ACPA recognizes such conduct as a factor that tends to indicate the domain name in question was registered with a bad-faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i)(V).

DEFENDANT'S TRIAL BRIEF
Case No. 3:12-cv-05667-EMC-NMC

1     Abhyanker did nothing of the sort with the webpage he placed on the domain name in

2   question.  In fact, the opposite is true:  Abhyanker used this domain name as a way of further

3   developing and rolling out a new social networking site he had created.  The plaintiff has not put

4   forward any facts tending to show that Abhyanker received any kind of financial benefit through

5   the operation of the website that was placed on the domain name.  Critically, no banner ads or

6   referral links were present for such revenue to come from.  As such, this factor weighs in

7   Abhyanker's favor and indicates that he did not act with a bad-faith intent to profit.

8             5.    Abhyanker Did Not Register a Famous Mark as a Domain Name.

9             The final common characteristic of a cybersquatter is that he registers a domain name that

10  is in some way similar to a then-famous mark.  This is because the typical cybersquatter is

11  seeking to hold hostage a domain that is important and valuable to an individual or a company,

12  and the most valuable and important domain names are thus that relate back to famous marks.

13  The ACPA recognizes this behavior, and directs that the courts should consider in determining

14  whether a bad-faith intent to profit exists the extent to which the mark incorporated in the domain

15  name "is or is not distinctive and famous."  15 U.S.C. § 1125(d)(1)(B)(i)(IX).  In order for this

16  factor to be indicative of a bad faith intent to profit, the domain name must incorporate a mark

17  that is both distinctive *and* famous.  4 McCarthy § 25:78.  Fame, in turn, is defined elsewhere in

18  the text of the statute as requiring wide recognition by the general consuming public of the United

19  States as a designation of source of the goods or services of the marks owner.  15 U.S.C. §

20  1125(c)(2)(A).[5]

21

22  _____

23  [5] The statute goes on to include several factors that may be relevant to determining the fame of a
    mark. They include "the duration, extent, and geographic reach of advertising and publicity of the
24  mark, whether advertised or publicized by the owner or third parties" . . . "[t]he amount, volume,
    and geographic extent of sales of goods or services offered under the mark" . . . "[t]he extent of
25  actual recognition of the mark" . . . and "[w]hether the mark was registered under the Act of
    March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. §
26  1125(c)(2)(A)(i)-(iv).

27

1    Abhyanker registered the nextdoor.cm domain name on December 28, 2011. At that time,

2    Nextdoor.com was in its infancy, and the NEXTDOOR mark was (and remains) far from a

3    famous mark. Nextdoor.com did not (and still to this day, does not) have a federal trademark

4    registration for NEXTDOOR mark. Nextdoor.com has not and cannot show that its mark at the

5    time of the domain name registration was anything but a young, formative mark. This factor thus

6    also weighs in Abhyanker's favor.

7

8        C.    Abhyanker Held a Reasonable Belief That He Was Acting In Good Faith In
              Registering and Using the Domain Name, in Compliance with the Safe Harbor.

9    Finally, Abhyanker's good faith intent in registering the domain name in question should

10   be considered by this Court in connection with the safe harbor provision of the ACPA. By

11   registering the domain name in question, Abhyanker was acting with a belief that he was

12   completely within the legal rights he had developed and established to the term Nextdoor. At the

13   time Abhyanker registered the domain name in question, and indeed, to the present day,

14   Abhyanker believed that his prior usage of the name Nextdoor as a way of identifying his online

15   social network, together with the appearance of the words Nextdoor in his two patents displaying

16   the term Nextdoor as a way of identifying an online social network, gave him the legal ability to

17   register the domain name in question.

18   In order to be protected in the statutory safe harbor, Abhyanker must establish that his was

19   a reasonable belief. The reasonableness of Abhyanker's belief can be seen most clearly through

20   the testimony of patent expert Shelden in this case, who testified at his deposition in connection

21   with determining patent ownership rights, and will testify as trial, that the owner of a patent has

22   rights to the words found within a patent. Abhyanker was also acting in accordance with legal

23   and business advice he received at the time, as he worked to re-establish an online presence for

24   the Nextdoor concept. *See Mirage Resorts*, 152 F. Supp. at 1216. Whether the advice or counsel

25   Abhyanker received from trusted professionals was correct is beside the point for present

26   purposes, so long as he relied on it in good faith. Accordingly, Abhyanker should receive the

27

1   benefit of safe harbor protection for registering and using the nextdoor.cm domain.

2   **V.    CONCLUSION**

3        The undisputed facts in this case make it clear that Abhyanker did not act with the

4   required bad-faith intent to profit that the ACPA requires.  Abhyanker is an entrepreneur and

5   inventor, and was the first to use the term Nextdoor to refer to an online social network.  When he

6   discovered that his Nextdoor concept had resurfaced in a strikingly similar manner, he took action

7   to re-establish an online presence and legal rights that he reasonably believed were his.

8   Abhyanker did not, and has not, shown any of the characteristics typical of a cybersquatter:  he

9   registered the domain name in question in his own name, he has not sought to sell or transfer the

10  domain name, he has not registered multiple offending domain names, and he has not profited

11  from activities occurring on the website operated on the domain name.  All of these factors

12  establish that Abhyanker did not act with a bad-faith intent to profit when he registered the

13  domain name in question.

14       This Court should also find that the statutory safe harbor is applicable to Abhyanker's

15  activities here.  Abhyanker held a good faith belief that he was acting within his legal rights when

16  he registered the domain name in question. This belief was a reasonable one, as it was based on

17  his prior use of the name—the first known instance—to associate the term to an online social

18  network, as well as on the fact that the domain name appeared within the claims of Abhyanker's

19  prior patents.  When a defendant acts with such a reasonable, good-faith intention as Abhyanker

20  did, especially following the guidance of the trusted professionals he consulted, the statutory safe

21  harbor comes into play and negates liability under the statute.

22       For all of the foregoing reasons, Abhyanker asserts that this Court should find that he did

23  not violate the ACPA when he registered and used the domain name in question.

24                                          Respectfully submitted,
    Dated:  November 4, 2014               LEGALFORCE RAJ ABHYANKER, P.C.
25

26                                          */s/ David Lavine*
                                            DAVID LAVINE
27                                          Attorney for Defendant RAJ ABHYANKER

DEFENDANT'S TRIAL BRIEF
                                            Case No. 3:12-cv-05667-EMC-NMC