LAURENCE F. PULGRAM (CSB No. 115163)
lpulgram@fenwick.com
JENNIFER L. KELLY (CSB No. 193416)
jkelly@fenwick.com
ILANA S. RUBEL (CSB No. 221517)
irubel@fenwick.com
GUINEVERE L. JOBSON (CSB No. 251907)
gjobson@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

ERIC J. BALL (CSB No. 241327)
eball@fenwick.com
MATTHEW B. BECKER (CSB No. 291865)
mbecker@fenwick.com
FENWICK AND WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

Attorneys for Plaintiff
NEXTDOOR.COM, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>RAJ ABHYANKER, an individual,<br><br>Defendant. | Case No.: 3:12-cv-05667-EMC-NMC<br><br>**NEXTDOOR.COM, INC.'S TRIAL BRIEF**<br><br>Final Pretrial<br>Conference: November 25, 2014<br>Time:         2:30 p.m.<br>Courtroom: 5, 17th Floor<br>Judge:       Hon. Edward M. Chen<br>Trial Date:  December 1, 2014 |

# TABLE OF CONTENTS

**Page**

I. NEXTDOOR.COM'S THEORY OF THE CASE ............................................................. 1

II. PERTINENT FACTUAL HISTORY ............................................................................... 3

III. NEXTDOOR.COM WILL EASILY PREVAIL ON ITS CYBERPIRACY CLAIM ............................................................................................................................. 6

    A. There Is No Dispute That Abhyanker Registered And Used The .cm Domain Name After Nextdoor.com's Public, Nationwide Launch ......................... 7

    B. The Court Has Already Determined That The .cm Domain Name Is Identical To Nextdoor.com's Distinctive NEXTDOOR Mark ............................... 7

    C. Abhyanker's Bad Faith In Registering And Using The .cm Domain ...................... 7

        1. Abhyanker's Admitted Reason For Registration Of The .cm Domain Name Will Show His Bad Faith .......................................................... 9

        2. Evaluation Of The Statutory Factors Also Strongly Support A Finding That Abhyanker Acted In Bad Faith ............................................ 10

        3. The Unique Circumstances Presented, Including Abhyanker's Willfulness, Fabrications, Spoliation And Perjury, Further Confirm He Acted In Bad Faith ................................................................ 12

    D. The Evidence Precludes Any Defense Under The ACPA's Safe Harbor .............. 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Audi AG v. D'Amato*,
    469 F.3d 534 (6th Cir. 2006) ................................................................................................... 14

*City of Carlsbad v. Shah*,
    850 F. Supp. 2d 1087 (S.D. Cal. 2012) ................................................................................... 14

*DSPT Int'l, Inc. v. Nahum*,
    624 F.3d 1213 (9th Cir. 2010) ........................................................................................ 6, 8, 9, 15

*Flow Control Indus., Inc. v. AMHI, Inc.*,
    278 F. Supp. 2d. 1193 (W.D. Wa. 2003) ................................................................................ 12

*Garden of Life, Inc. v. Letzer*,
    318 F. Supp. 2d 946 (C.D. Cal. 2004) ...................................................................................... 8

*GoPets Ltd. v. Hise*,
    657 F.3d 1024 (9th Cir. 2011) ............................................................................................. 8, 14

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009) ................................................................................... 8, 9, 12, 14

*Louis Vuitton Malletier and Oakley, Inc. v. Veit*,
    211 F. Supp. 2d 567 (E.D. Pa. 2002) .................................................................................. 9, 13

*Omega S.A. v. Omega Engineering, Inc.*,
    228 F. Supp. 2d. 112 (D. Conn. 2002) ...................................................................................... 7

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ............................................................................................ 8, 12

*Southern Grouts & Mortars, Inc. v. 3M Co.*,
    575 F. 3d 1235 (11th Cir. 2009) ............................................................................................. 11

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
    202 F.3d 489 (2nd Cir. 2000) ................................................................................................. 13

*Storey v. Cello Holdings, L.L.C.*,
    347 F.3d 370 (2d Cir. 2003) ..................................................................................................... 8

*Super-Krete Int'l, Inc. v. Sadleir*,
    712 F. Supp. 2d 1023 (C.D. Cal. 2010) .................................................................................... 8

*Verizon California, Inc. v. Navigation Catalyst Systems, Inc.*,
    568 F. Supp. 2d 1088 (C.D. Cal. 2008) .................................................................................. 12

*Verizon California, Inc. v. Onlinenic, Inc.*,
    No. C 08–2832, 2009 WL 2706393 (N.D. Cal. 2009) ............................................................. 9

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*,
 238 F.3d 264 (4th Cir. 2001)..................................................................................................14

**STATUTES**

15 U.S.C. § 1125(d) ......................................................................................................................6, 7

15 U.S.C. § 1125(d)(1)............................................................................................................. *passim*

15 U.S.C. § 1125(d)(1)(A) ...............................................................................................................6

15 U.S.C. § 1125(d)(1)(B)(i)(I-IX) ..................................................................................................9

15 U.S.C §1125(d)(1)(B)(ii) .....................................................................................................6, 14

**RULES**

Fed. R. Civ. P. 11 ........................................................................................................................1, 6

Plaintiff Nextdoor.com, Inc. submits this trial brief on the controlling issues of law for its claim against Defendant Raj Abhyanker for cyberpiracy in violation of 15 U.S.C. § 1125(D)(1) (the Anticybersquatting Consumer Protection Act (the "ACPA")). This is the only claim left for trial, and the parties have agreed that it will be tried to the Court. Dkt. 370, 373.

## I. NEXTDOOR.COM'S THEORY OF THE CASE

This is, and always has been, a case about Abhyanker's bad faith. There is no dispute that he set up and began operating a site using the NEXTDOOR mark at www.nextdoor.cm domain (the ".cm Domain") shortly after Nextdoor.com's public launch in October 2011. This Court has already found that (i) the NEXTDOOR mark is distinctive, and (ii) Abhyanker's use of the NEXTDOOR mark on that site was likely to confuse. That leaves only one element of Nextdoor.com's ACPA claim left for determination by this Court: whether Abhyanker had a "bad faith intent to profit" in connection with his registration and use of the .cm Domain.

The evidence will overwhelmingly support the conclusion he did. It will show that Abhyanker registered and used the .cm Domain not only to divert traffic to a shell website that mimicked Nextdoor.com's site, but to support his knowingly false assertion, both here and before the Trademark Trial and Appeals Board, that he had priority of use in the NEXTDOOR mark. Abhyanker's motive was clear: to gain leverage in his dispute with NEXTDOOR, to his financial advantage. Indeed, any doubt about whether Abhyanker had some legitimate reason to operate the .cm site was put to rest when he admitted, at his deposition; he did so because he was "mad" about Nextdoor.com's successful launch in a field where he intended to compete. Under the case law interpreting the ACPA, there is no question this constitutes bad faith intent to profit.

Abhyanker will find no refuge in the ACPA's safe harbor. That is a very narrow, rarely applied defense available only to defendants who can prove they subjectively *and* reasonably believed their use of the mark was lawful. Abhyanker can prove neither.

The Partial Final Judgment (Dkt. 193) already settled that Abhyanker had no actual rights to the NEXTDOOR mark, and that Nextdoor.com has priority of use. Abhyanker stipulated to this critical fact in the face of a motion for Rule 11 sanctions based on his fabrication of evidence that he used the mark on his "eDirectree" site "years before" Nextdoor.com's launch, to support

his false claim of priority (just one of many fabrications in this case). Subsequently, the Court held that Abhyanker's use of the NEXTDOOR on the .cm site was trademark infringement, calling Abhyanker's claim that such use was not likely to confuse consumers "disingenuous." Dkt. 364 at 36:17. These findings, along with other evidence Nextdoor.com will present, render untenable Abhyanker's claim that it was *objectively* reasonable for him to think he had senior rights.

Equally untenable is Abhyanker's assertion that he subjectively believed he had the right to use the NEXTDOOR mark after Nextdoor.com's launch. Indeed, he admitted he launched the .cm site *because he was upset about Nextdoor.com's launch and wanted to compete with it*—not because he genuinely believed he had the right to use the NEXTDOOR mark. That alone kills this theory. But there is much more, including that Abhyanker owns and operates one of the largest trademark prosecution firms in the world. He knows darn well that trademark rights arise only from commercial use of a mark, not from merely having an idea to use one.

In fact, the evidence will show Abhyanker has always known his claim of senior rights in the NEXTDOOR mark was a sham: *First*, at no time did he actually use the term NEXTDOOR in commerce. Rather, although he liked and thought about using the name "Nextdoor" in connection with a neighborhood-based social network in October 2006, when his effort to buy the nextdoor.com domain failed on October 24, he opted to go with the name "Fatdoor" for this business concept the very next day. From that day until after Nextdoor.com publicly launched, there is no documentation that he ever made use of the NEXTDOOR name, *even privately*. Nor did he ever attempt to register any domain with "nextdoor" in it until www.nextdoor.cm.

*Second*, when Abhyanker formed Fatdoor, Inc. in 2007, he assigned all of his IP rights to that company. Abhyanker pleaded exactly that in his state court lawsuit in 2011, which he dismissed abruptly after this obvious standing problem was raised. Abhyanker thus knew full well he did not possess Fatdoor, Inc.'s rights, which is why he later fabricated an assignment of those rights from Fatdoor, Inc.'s successor (Center'd) to himself, falsely purporting to act as its

"interim CEO" on November 12, 2012, exactly one week after this lawsuit was filed.[1]

Abhyanker has no evidence to support his revisionist assertion that he subjectively and reasonably believed, *at the time he was using the .cm Domain* (December 2011 to November 2012), that he had senior rights in the NEXTDOOR mark. He has no documents (other than fabricated ones) to show he ever used the mark in connection with any social networking concept after October 24, 2006. His proposed witnesses are directed at presenting facts about his hopes in 2006, which Nextdoor.com has never disputed, and which cannot help him in any event.

As a result, Nextdoor.com expects to prevail at trial. After presentation of the evidence, it will request a judgment that Abhyanker is liable for cybersquatting, that he convey the .cm Domain to it as owner of the NEXTDOOR mark, and that Abhyanker and his companies forever be enjoined from using the NEXTDOOR mark, or any confusingly similar mark, as a domain.

## II. PERTINENT FACTUAL HISTORY

It is not disputed that in 2006, Abhyanker had the idea to create a social network he hoped to call "nextdoor." He circulated a "specification" for what a "nextdoor" network would be on October 21, 2006, but failed in his effort to acquire the domain name www.nextdoor.com, which was not for sale, on October 24, 2006. As a result, he opted to use the name "Fatdoor" for the exact same business concept, incorporating Fatdoor, Inc. on October 25, 2006. That Fatdoor was merely a renaming of the same concept is confirmed by Abhyanker's referring to the "Nextdoor/Fatdoor" concept in his pleadings in the state court action filed in November 2011. Likewise, when Abhyanker circulated his 2006 "nextdoor" specifications to potential investors in 2007, he called them "Conception Documents: Fatdoor (formerly Nextdoor)."

Once Abhyanker had settled on Fatdoor as the name for his network, in February 2007, he executed an assignment transferring all rights, including any in his Nextdoor/Fatdoor concept and related intellectual property, to that company. Again, in seeking VC funding for Fatdoor, Inc. in June 2007, he represented to investors that he had transferred all of his rights related to his

---

[1] Abhyanker's alternative claim, that he had rights to the NEXTDOOR name by virtue of an assignment from another entity he controlled, Legalforce, Inc., after its dissolution, also derives from an extremely suspicious, and apparently fabricated, 2007 assignment agreement that directly conflicts with an authenticated 2008 Agreement (which did not convey to him any such rights).

"Fatdoor (formerly Nextdoor)" concept to the company, and had no rights independent of those conveyed. Other than documents fabricated on December 5, 2013 to suggest that Abhyanker intended to change the name *back* to Nextdoor, Abhyanker never used the Nextdoor name again.

Fatdoor, Inc. did not achieve success. In mid-2007, it fired him. In April 2008, it changed its name to Center'd, and transitioned its business model away from neighborhood-based social networking. Eventually, in August 2011, most of Center'd's IP was acquired by Google, and the rest went into a liquidating trust managed by Sherwood Partners. Neither Fatdoor, Inc. nor its successors or assigns ever used the name "nextdoor."

After Abhyanker was fired, he pursued a number of different business ideas, including dabbling in other unsuccessful social networks, including www.eDirectree.com which experimented with categorizing users' relationships. Other than documents created after the launch of Nextdoor.com, there is no evidence of any of Abhyanker's businesses, including eDirectree, eatbid, Trademarkia, or Legalforce, using or incorporating the term "nextdoor."

Nextdoor.com publicly launched its social networking site for neighbors on October 26, 2011. The following day, Abhyanker sent an unsolicited email to Nextdoor.com's CEO, Nirav Tolia, congratulating him on the launch and stating that he had pursued a similar business concept under the name Fatdoor. He said nothing about owning the "nextdoor" name. In that email, he asked Mr. Tolia if he wanted to hire him as general counsel and part of the "founding team." Mr. Tolia, not knowing Abhyanker, did not respond.

Less than two weeks later, Abhyanker sued Nextdoor.com, its founders, and its investor Benchmark Capital for misappropriation and related claims in Santa Clara Superior Court. Then, on December 28, 2011, Abhyanker registered the .cm Domain. That same day, he also applied for registration of the NEXTDOOR mark in his own name. In February 2012, as an amendment to allege his use and priority, he submitted to the USPTO a specimen depicting the content he was featuring on the .cm Domain, which included the NEXTDOOR mark. Thus, he used the .cm Domain to attempt to usurp for himself the name under which Nextdoor.com just launched.

Nextdoor.com and the other defendants demurred in the State Court Action, all challenging Abhyanker's standing to assert claims that his pleadings clearly showed were owned,

if anyone, by Fatdoor, Inc. Abhyanker voluntarily dismissed that case in March 2012.

Meanwhile, in January and February 2012, he commenced opposition proceedings in the TTAB challenging Nextdoor.com's application to register the NEXTDOOR mark. He specifically asserted his use of the .cm Domain as a basis. In addition, Abhyanker resurrected his eDirectree website (which had not been in operation at all in 2010 or 2011) and inserted the term "Nextdoor™ Neighbors" where the term "Friends" had been when he had last operated the site in 2008 and 2009. He manufactured evidence to support his claim that he had been using the NEXTDOOR mark on eDirectree.com since before Nextdoor.com's launch, and cited that false evidence in support of his oppositions in the TTAB, as well as in support of own competing application for the NEXTDOOR mark (and later in this case).

On March 22, 2012, Nextdoor.com sent Abhyanker a letter regarding his infringement and cyberpiracy, demanding that he cease all use of the NEXTDOOR mark, including any use of the .cm Domain. Abhyanker wrote back on March 29 acknowledging that he was operating the .cm Doman, but refused to cease his unlawful actions.

Ultimately, on November 5, 2012, Nextdoor.com filed this suit for declaratory relief, trademark infringement and violation of the ACPA, seeking to put an end to Abhyanker's harassment and clear its title to the NEXTDOOR mark. Nextdoor.com's complaint alleged, among other things, that Abhyanker's use of the NEXTDOOR mark, both on eDirectree and the .cm site, had only commenced after Nextdoor.com's launch.

Within days, Abhyanker removed all content on the .cm Domain. Then, on November 12, 2012, he executed an assignment of Center'd's remaining assets to himself for $1. He signed the document on behalf of Center'd, purportedly on the basis that he had authority to act on its behalf, notwithstanding that he had been fired by its predecessor more than five years earlier. Although Abhyanker represented to the Court in 2014 that he had such authority, he knew perfectly well he did not, as the Board had refused his requests in 2012, and again in 2013, to act on its behalf.

Abhyanker then proceeded to defend this case aggressively and asserted numerous counterclaims premised, *inter alia*, on his purported senior use of the NEXTDOOR mark, which he told this Court was evidenced only by the eDirectree screenshot. But after his fabrication of

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case3:12-cv-05667-EMC Document392 Filed11/04/14 Page10 of 19

the eDirectree evidence came to light (including destruction in 2012 of the eDirectree source code that would have shown what that site looked like prior to Nextdoor.com's launch), and in response to a motion for Rule 11 sanctions, Abhyanker stipulated to dismiss with prejudice his claim for priority, and to an injunction against any further use of the NEXTDOOR mark. Then, during his deposition in June 2014 (by which point many other lies and fabrications had been uncovered,), Abhyanker admitted he had registered the .cm Domain out of spite, because he was "angry," "upset" and "sad" that he was not a part of Nextdoor.com's success. He also admitted that, at the time he was operating a shell website in connection with the .cm Domain, he intended to compete with Nextdoor.com.

On October 16, 2014, the Court granted summary judgment on Nextdoor.com's claim for trademark infringement, finding that Abhyanker's use of the NEXTDOOR mark, including on the .cm Domain, was likely to confuse. Abhyanker has not, before or since, explained any reason for his continued desire to use the .cm Domain other than to infringe.

### III. NEXTDOOR.COM WILL EASILY PREVAIL ON ITS CYBERPIRACY CLAIM

The ACPA protects marks against confusing or dilutive uses of Internet domain names. *See, e.g.* 15 U.S.C. § 1125(d)(1)(A). Under the ACPA, liability for "cyberpiracy" attaches where (1) a party registers, traffics in, or uses a domain name; (2) which, at the time of the domain's registration, is identical or confusingly similar to a distinctive mark or dilutive of a famous mark owned by the claimant; and (3) the party acts with "bad faith intent to profit" from the claimant's marks. 15 U.S.C. § 1125(d); *see also DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010). While the ACPA provides a safe harbor, this defense is reserved only for those defendants who can prove they both *subjectively* and *reasonably* believed they had the right to register and use the domain. *See* 15 U.S.C §1125(d)(1)(B)(ii) ("Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.")

For the reasons explained below, Nextdoor.com will easily establish all three elements of its ACPA claim. And Abhyanker cannot meet his burden of proof under its safe harbor.

Fenwick & West LLP
Attorneys At Law
San Francisco

**A.     There Is No Dispute That Abhyanker Registered And Used The .cm Domain Name After Nextdoor.com's Public, Nationwide Launch**

The first element is that Abhyanker registered, trafficked in, *or* used the domains at issue. Proof of *any one* of the three satisfies this element. *See* 15 U.S.C. § 1125(d)(1 )(a)(ii); *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 2d. 112, 121 (D. Conn. 2002).

Here, there is no dispute that Abhyanker both registered *and* used the .cm Domain. Both documentary evidence and Abhyanker's own admissions in this case prove such use after registration on December 28, 2011 until Nextdoor.com was forced to file this lawsuit on November, 5 2012. Abhyanker used the .cm Domain to redirect traffic to a shell website on which he used Nextdoor.com's name, mark, and URL (www.nextdoor.com), but which did not actually offer any products or services. And he used the .cm Domain as a tool in his effort to appropriate Nextdoor.com's name at the TTAB and through this Court.

**B.     The Court Has Already Determined That The .cm Domain Name Is Identical To Nextdoor.com's Distinctive NEXTDOOR Mark**

The second element of Nextdoor.com's ACPA counterclaim is established by proof that its mark was (a) distinctive at the time of the .cm Domain's registration and (b) the .cm domain is identical or confusingly similar to the NEXTDOOR mark. Nextdoor.com easily meets both.

The Court has already found in Nextdoor.com's favor on distinctiveness. *See* Dkt. 364 at 43:6-12 ("it is clear that . . . that NEXTDOOR mark, in and of itself, is not descriptive. It is distinctive, at least vis-à-vis the – its use in this context as an online social network"). Because inherently distinctive marks are source identifiers from the first moment of use, the NEXTDOOR mark was distinctive at least as early as Nextdoor.com's launch on October 26, 2011, prior to Abhyanker's retaliatory registration of the .cm Domain. *See* McCarthy on Trademarks 11:4.

The Court has also already found confusing similarity. Dkt. 364: 43:21-22 ("I also find as a matter of law that there is a likelihood of confusion."). Alternatively, the .cm Domain incorporates, verbatim, the NEXTDOOR mark. Thus, the .cm Domain is not just confusingly similar to the NEXTDOOR mark, it is identical.

**C.     Abhyanker's Bad Faith In Registering And Using The .cm Domain**

The final element of the ACPA claim is that Abhyanker acted with a bad faith intent to

NEXTDOOR.COM, INC.'S TRIAL BRIEF            7            CASE NO. 3:12-cv-05667-EMC-NMC

profit. The evidence will easily support the conclusion that he did.

As the ACPA case law makes clear, the bad faith element reaches a wide variety of activities, including use of a domain to obtain leverage in a business dispute, to divert traffic by confusing potential customers, or otherwise to gain some competitive advantage over a mark holder—all of which Abhyanker engaged in here. *See e.g., GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011) (bad faith found where evidence showed defendant intended to divert traffic by confusing consumers); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1033 (C.D. Cal. 2010) (bad faith element likely met where defendants used a domain name "confusingly similar" to a competitor's mark solely to route potential customers to defendant's website); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220-21 (9th Cir. 2012) ("Rearden Commerce acted in bad faith by seeking to gain leverage in an ongoing trademark dispute."); *DSPT Int'l, Inc.*, 624 F.3d at 1218-19 (bad faith "intent to profit" found where defendant registered domain to use as leverage to obtain money he false believed plaintiff owed him); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202-03 (9th Cir. 2009) (bad faith found where defendant used domain name not to offer goods or services, but to demand money); *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 962-63 (C.D. Cal. 2004) (defendants likely had bad faith where, *inter alia*, they had no genuine good faith reason for registering the domain).

Further, the inquiry does not simply focus on a defendant's state of mind on the day he registered the domain, but looks at the entire period of use (thus here, from December 2011 through November 2012). *See, e.g., Lahoti*, 586 F.3d at1202 ("Evidence of bad faith may arise well after registration of the domain name."); *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003) (domain name rights are based on ongoing conduct, not just fixed at the time of registration, thus, the ACPA makes domain name registration contingent on ongoing conduct rather than to make them fixed at the time of registration).

The ACPA lays out nine non-exclusive factors that can be considered in making a determination of bad faith: (I) whether the party has trademark or intellectual property rights in the domain name, (II) whether the domain name consists of the legal name of a person, or a name they commonly use, (III) whether the party has made a prior use of the domain in connection with

the bona fide offering of any goods or services, (IV) whether the mark corresponding with the domain is used in a non-commercial or fair use manner on any website accessible under the domain, (V) whether the party intended to divert consumers from the mark owner's website. (VI) whether a party has offered to transfer, sell, or otherwise assign the domain names to the mark owner or any other person for financial gain without having used the domain names, (VII) whether a party provided false or misleading contact information in registering the domain, (VIII) whether the party registered or acquired multiple domain names known to be confusingly similar to marks of others, and (IX) whether the marks at issue are distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i)(I-IX). While these factors may be useful under the facts of specific cases, the fact finder "need not . . . march through [them] seriatim because the ACPA itself notes that use of the listed criteria is permissive." *Lahoti*, 586 F.3d at 1202 (citation omitted).[2] Instead, it is the "unique circumstances" of each case that are most important for determining bad faith. *Id*. This includes inferring willfulness "by the fact that a defendant continued infringing behavior after being given notice" of the allegations of infringement. *Louis Vuitton Malletier and Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002). Additionally, courts consider the egregiousness of the defendant's cybersquatting and other behavior evidencing an attitude of contempt for the judicial process. *Verizon California, Inc. v. Onlinenic, Inc.*, No. C 08–2832, 2009 WL 2706393, at *3-6 (N.D. Cal. 2009). As described below, the ACPA factors, as well as the unique circumstances presented here, overwhelmingly establish Abhyanker's bad faith.

### 1. Abhyanker's Admitted Reason For Registration Of The .cm Domain Name Will Show His Bad Faith

At trial, Nextdoor.com will present Abhyanker's own admission that he registered and operated a site in connection with the .cm Domain, on which he used the NEXTDOOR mark, out of anger. This alone is sufficient for a finding of bad faith under the ACPA.

---

[2] The ACPA does not require that all the factors be analyzed, for example, there is no requirement that a defendant attempt to sell the domain name to find the registrant acted in bad faith. *See DSPT Int'l*, 624 F.3d at 1218-19.

### 2. Evaluation Of The Statutory Factors Also Strongly Support A Finding That Abhyanker Acted In Bad Faith

As the caselaw makes clear, Nextdoor.com need not establish that all or even a majority of the statutory factors are in it favor. Yet seven of the nine overwhelmingly are.

**Factor I**: (trademark or other intellectual property rights of the person, if any, *in the domain name*). Abhyanker had no rights in the NEXTDOOR mark during the period he used the .cm Domain. The Court has already found that he had neither trade secret nor trademark rights in the term "nextdoor." Dkt. 100 (no trade secret existed in the use of the nextdoor.com name in connection with a neighborhood-based social network.); Dkt. 193 (partial judgment that Nextdoor.com owns the NEXTDOOR trademark for online social networking). Abhyanker does not have any right of publicity or personal naming rights in NEXTDOOR. *See also* Copyright Circular No. 34 (no copyright protection for names, titles or short phrases).

Abhyanker apparently intends to claim he had some rights in the name stemming from the inclusion of the "nextdoor.com" name in patents and patent applications he filed in 2006-2007.[3] Any such claim is unavailing for at least four reasons: *First*, Abhyanker held no ownership interest in those applications between 2008-2014, and hence, could not had any rights stemming from them during the period he used the .cm Domain (2011-2012). *Second*, names are not patentable subject matter; thus, reference to "nextdoor.com" in a patent application could give not give rise to any claim in the name. *Third*, Abhyanker's proclaimed ownership of these patents is a matter of intense dispute (so much so that their prior owner has sued him for malpractice and fraud), calling into serious question his ability to claim *any* rights stemming from them. *Fourth*, Abhyanker never identified these patents as providing any support for his claim of his ownership during discovery in this case, including in his sworn responses to interrogatories asking him to identify "all facts supporting your claim to ownership of the NEXTDOOR mark." *See* Dkt. No. 163 and transcript of 2/20/14 motion hearing during which the Court "forewarn[ed]" Abhyanker that he would be "bound by those responses and [] any attempt to identify further documents, if

---

[3] This issue is briefed more extensively in Nextdoor.com's MIL No. 3 (Dkt. No. 380) and its Objections to Abhyanker's Proposed Witness List at 2-3.

NEXTDOOR.COM, INC.'S TRIAL BRIEF      10      CASE NO. 3:12-cv-05667-EMC-NMC

not done pursuant to the rules, are going to be subject to preclusion orders or anything else.")

Thus, there is no conceivable way Abhyanker could claim any IP rights in the term "nextdoor," much less at the relevant time. *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F. 3d 1235, 1249 (11th Cir. 2009) (noting that this factor under the ACPA tipped in favor of plaintiff because although *at one time* defendant had rights in the disputed mark, its rights in those marks had lapsed). This factor weighs in Nextdoor.com's favor.

**Factor II**: (legal name or a name commonly used to identify that person). Abhyanker was never known as "nextdoor", that is not and was not his legal name, and though he may have used the term internally and hoped to purchase the www.nextdoor.com domain in 2006, he never did. He thus cannot avail himself of this factor; it weighs in Nextdoor.com's favor.

**Factor III**: (prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services). Abhyanker has never offered any goods or services in connection with the NEXTDOOR mark, including on the .cm Site; to the contrary, the evidence shows that he opted to use the Fatdoor mark in connection with his concept for a social networking service. This factor weighs in Nextdoor.com's favor.

**Factor IV**: (bona fide noncommercial or fair use of the mark in a site accessible under the domain name). Abhyanker's use was not noncommercial. He sought to compete with Nextdoor.com, sought to take its name and trademark after its launch, and used the .cm Domain as an imitation site, designed to confuse Nextdoor.com's prospective customers. He admitted to copying the "nextdoor.com" name and content into the site linked from the .cm Domain, effectively pretending to be Nextdoor.com. He further admitted the .site was "barely functional"—thereby tarnishing Nextdoor.com to any visiting consumer. The evidence also indisputably shows that Abhyanker attempted to leverage his use of the .cm Domain to support his false claims of priority in the NEXTDOOR mark before the TTAB. There was nothing non-commercial or "fair" about this. This factor weighs heavily in Nextdoor.com's favor.

**Factor V**: (intent to divert consumers from the mark owner's website). Again, the evidence will show Abhyanker intended to divert traffic from Nextdoor.com's site. He chose the .cm suffix, the registry for Cameroon, for no explicable purpose other than diverting traffic of

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

users who mistyped www.nextdoor.com.  Indeed, he never, even in 2006, registered any domain incorporating the "nextdoor" name other this "unlawful typosquat."  *See Verizon California, Inc. v. Navigation Catalyst Systems, Inc.*, 568 F. Supp. 2d 1088, 1097 (C.D. Cal. 2008) (this factor cut "strongly against" defendants, who registered a domain that was identical to plaintiff's mark, with a typo inserted in the middle (www.ve3irzon.com), since it was "clear that their intent was to profit from the poor typing abilities of consumers trying to reach Plaintiffs' sites").

**Factors XIII and IX**: (whether the party registered a domain name known to be confusingly similar to the mark of another and whether the mark is distinctive).  The Court has already determined the NEXTDOOR mark is distinctive.  And Abhyanker admitted he registered and used the .cm Domain name with knowledge of Nextdoor.com's public launch and use of the NEXTDOOR mark on www.nextdoor.com.  Both factors thus strongly favor Nextdoor.com.

In sum, Nextdoor.com will demonstrate that, after Abhyanker registered the .cm Domain out of anger and in search of retribution, the only use he ever made of it was in connection with his efforts to divert users and gain leverage in his dispute with Nextdoor.com.  This is the essence of bad faith.  Indeed, the Ninth Circuit has concluded that use of domain names for leverage in litigation or a business dispute shows bad faith, even where a party claimed to be doing so in an effort to "protect their trademark rights."  *Rearden*, 683 F.3d at 1220-21 (jury could find that "Rearden Commerce acted in bad faith by seeking to gain leverage in an ongoing trademark dispute"); *see also Flow Control Indus., Inc. v. AMHI, Inc.*, 278 F. Supp. 2d. 1193, 1200-01 (W.D. Wa. 2003) (granting summary judgment on ACPA claim where defendants registered domain name for the purpose of improving their bargaining position in a commercial dispute).  This conclusion is in line with the ACPA's prohibition of any mixed motives in the registration of domain names.  *Lahoti*, 586 F.3d at 1202.  Nextdoor.com will prove at trial that Abhyanker registered the .cm Domain, and operated a sham website there, all as part of a scheme to improve his position in his multi-forum battle with Nextdoor.com.

### 3. The Unique Circumstances Presented, Including Abhyanker's Willfulness, Fabrications, Spoliation And Perjury, Further Confirm He Acted In Bad Faith

To the extent the above-described evidence were not enough, the unique circumstances of

this case make a finding of bad faith inescapable. *See Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2nd Cir. 2000) (in finding defendant had acted in bad faith, "the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute" were the most compelling).

As an initial matter, Abhyanker's cyberpiracy was willful, as evidenced by his continued operation of the .cm Domain for nearly eight months after a demand to cease his cyberpiracy. This supports a finding of bad faith. See *Louis Vuitton,* 211 F. Supp. 2d at 583 (willfulness may be inferred from continuing infringing behavior after being given notice of a claim).

Further, Abhyanker fabricated the only "evidence" of his alleged prior use of the NEXTDOOR mark (on the eDirectree site), and then spoliated the site's source code, which would have proven he never actually used the mark on that site prior to Nextdoor.com's launch. Abhyanker then used this fabricated evidence to gain leverage in multiple proceedings involving Nextdoor.com, including in his oppositions to Nextdoor.com's trademark application, his own competing application for the same mark, and in his pleadings in this case, in all of which he asserted that he had used the NEXTDOOR mark on the eDirectree site "years before" Nextdoor.com's public launch. All such assertions were based on fabricated evidence, as Nextdoor.com will demonstrate through Abhyanker's own admissions and the testimony of Nextdoor.com's forensic expert, David McCain. In fact, to date Nextdoor.com has yet to find a single document created prior to its dispute with Abhyanker that evidence Abhyanker's use, or intent or desire to use, the "nextdoor" name after his October 25, 2006 adoption of the name Fatdoor—with the exception of "evidence" invented *after* the launch of Nextdoor.com.

The evidence manufactured to support his claims include efforts to backfill both his alleged prior use and standing. As to "prior use," this includes documents purportedly created by Fatdoor, and shared with its investors during due diligence in 2007, stating that Fatdoor would "hopefully soon be Nextdoor." The problem for him is that these documents were altered on December 5, 2013, when versions of these materials that never mentioned "Nextdoor" had the word (and purported hope) inserted. Further, as Mr. McCain will attest, on that date edits were made to a hard drive to insert the terms "nextdoor.com bids placed" into a powerpoint Abhyanker

NEXTDOOR.COM, INC.'S TRIAL BRIEF      13      CASE NO. 3:12-cv-05667-EMC-NMC

claimed he gave to potential investor Benchmark. In short, Mr. Abhyanker's purported intent to use the NEXTDOOR name during the 2006-2011 time frame is entirely fabricated.

Moreover, Abhyanker fabricated two assignments he purportedly entered into (in both of which he was both the assignor and assignee) by which he claims to have obtained the right to assert claims based on the NEXTDOOR mark. That includes the 2012 Center'd assignment, which both documentary evidence and witness testimony (Abhyanker, Bill Harris) confirm was unauthorized. The other is the 2007 Legalforce Assignment, which appeared magically in May 2014, but is inconsistent with all other documents in the case. And yet, these fabrications are just the tip of the iceberg; there are many others which can be presented at trial if needed to challenge Abhyanker's claims of priority, as well as his credibility. Such evidence will leave no doubt that the unique circumstances of this case absolutely justify a finding of bad faith under the ACPA.

### D. The Evidence Precludes Any Defense Under The ACPA's Safe Harbor

Finally, the ACPA "safe harbor" is reserved for defendants who can prove they both subjectively *and* reasonably believed they had the right to use the domain. *See* 15 U.S.C §1125(d)(1)(B)(ii); *see also GoPets Ltd.*, 657 F.3d at 1033 (defendants did not qualify for safe harbor where they had no reason to believe they had the right to register identical or confusingly similar domain names). The safe harbor defense applies "very sparingly and only in the most unusual cases." *Lahoti*, 586 F.3d at 1203 *citing Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006).

Critically, a "defendant who acts even partially in bad faith…is not, as a matter of law, entitled to benefit from the ACPA's safe harbor provision." *Lahoti*, 586 F.3d at 1203 ("We agree with the Fourth Circuit, which, in affirming a summary judgment determination of bad faith, has held that **'[a] defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [the ACPA's] safe harbor provision.'"**) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001)); *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1107 (S.D. Cal. 2012) (domain registrant's actions during the course of the litigation contradicted any claim of good faith and precluded protection under the ACPA's safe harbor provision). Further, the defense is unavailable to a defendant who

innocently or mistakenly registers a domain but then continues using it he realized—or should reasonably have realized—it was unlawful.  *See DSPT Int'l, Inc.*, 624 F.3d at 1219-20.  Thus, Abhyanker plainly cannot avail himself of this defense.

Aside from the fact that Abhyanker acted in bad faith (and not just "partially"), his claim that he "honestly" believed he had rights in the mark is as disingenuous as his claim that his use of the NEXTDOOR mark, on the .cm Site, was not likely to confuse.  The truth is, Abhyanker made no use of the mark, at all, from 2006 through 2011.  He knew he had no legitimate claim to senior rights in the mark once Nextdoor.com had launched, so he concocted an elaborate story, manufactured evidence of use that never occurred, and now appears to be relying on a theory that he had some "intent to use" the mark during that period.  But an intention to use a mark, even if Abhyanker actually (and contrary to the evidence) actually held it, would not give rise to trademark rights.  Abhyanker—who runs a trademark prosecution firm—knows that.  That leaves only Abhyanker's claim of rights premised on inclusion of the term www.nextdoor.com in patent applications, which for the reasons stated above and elsewhere (*see* n. 3, supra), could not have conveyed anything to him.  And it would not have been reasonable for Abhyanker, also a self-described patent attorney—to claim he believed otherwise at the time he used the .cm Domain.

Indeed the evidence could never support Abhyanker's claim that he acted in good faith.  Such an assertion is gutted by evidence showing he manufactured document after document to support his claims of priority, and hence, knew those claims to be false.  This includes his fabrication of use on his eDirectree site, his fabrication of content allegedly contained in diligence materials given to potential investors in 2007, and the fabricated assignment agreements.  This evidence will drive a stake in any assertion by Abhyanker that he believed, in good faith, that he had senior rights in the NEXTDOOR mark at the time he was operating his imitation website.

Dated:   November 4, 2014                              FENWICK & WEST LLP


By: */s/ Laurence F. Pulgram*
    Laurence F. Pulgram

Attorneys for Plaintiff
NEXTDOOR.COM, INC.