1  LAURENCE F. PULGRAM (CSB No. 115163)
   lpulgram@fenwick.com
2  JENNIFER L. KELLY (CSB No. 193416)
   jkelly@fenwick.com
3  ILANA S. RUBEL (CSB No. 221517)
   irubel@fenwick.com
4  GUINEVERE L. JOBSON (CSB No. 251907)
   gjobson@fenwick.com
5  FENWICK & WEST LLP
   555 California Street
6  San Francisco, CA  94104
   Telephone: (415) 875-2300
7  Facsimile:  (415) 281-1350

8  ERIC J. BALL (CSB No. 241327)
   eball@fenwick.com
9  MATTHEW B. BECKER (CSB No. 291865)
   mbecker@fenwick.com
10 FENWICK AND WEST LLP
   801 California Street
11 Mountain View, CA 94041
   Telephone: (650) 988-8500
12 Facsimile:  (650) 938-5200

13 Attorneys for Plaintiff
   NEXTDOOR.COM, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>RAJ ABHYANKER, an individual,<br><br>Defendant. | Case No.: 3:12-cv-05667-EMC-NMC<br><br>**NEXTDOOR.COM, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Final Pretrial Conference: November 25, 2014<br>Time:         2:30 p.m.<br>Courtroom: 5, 17th Floor<br>Judge:       Hon. Edward M. Chen<br>Trial Date: December 1, 2014 |

Pursuant to Section 6 of the Court's Civil Pretrial Instructions, Nextdoor.com, Inc. ("Nextdoor.com") submits its Proposed Findings of Fact and Conclusions of law on its claim for cyberpiracy in violation of 15 U.S. C. 1125(D)(1) ("ACPA").

# I. PROPOSED FINDINGS OF FACT

<u>Nextdoor.com Launches its Online Social Network for Neighborhoods</u>

1. On January 14, 2011, Nextdoor.com acquired the domain name www.nextdoor.com.

2. Nextdoor.com applied for registration of the mark NEXTDOOR in February 2011, Application Serial No. 85/236,918 in International Classes 9, 35, 38, 42 and 45.

3. Nextdoor.com publicly launched its website www.nextdoor.com on October 26, 2011.

4. On October 27, 2011, Defendant Abhyanker sent an unsolicited email to Nextdoor.com's CEO, Nirav Tolia, congratulating him on the successful launch of www.nextdoor.com and stating that he had pursued a similar business concept under the name Fatdoor. In that email, Abhyanker made no reference to any claim to rights in, or prior use of, the NEXTDOOR mark or name or the www.nextdoor.com domain. Abhyanker also proposed to be added to the founding team of Nextdoor.com. He received no response to his inquiry.

5. On December 21, 2011, the USPTO published a Notice of Publication to announce that the Plaintiff's NEXTDOOR mark in its trademark application "appeared to be entitled to registration" and would be published in the *Official Gazette* for "opposition by any person who believes he will be damaged by the registration of the mark on January 10, 2012.

6. As this Court has previously found in granting summary judgment on Nextdoor.com's claim of trademark infringement, the NEXTDOOR mark, as used by Nextdoor.com, is distinctive in the field of online social networking.

7. As the Court has previously found in its partial summary judgment, Nextdoor.com has ownership in and has established priority of use in the NEXTDOOR mark.

Abhyanker's State Court Action

8. On November 10, 2011, Abhyanker filed suit in California Superior Court, Case No. 1-11-CV-212924, against Nextdoor.com, its founders and its investors (the "State Court Action"), for misappropriation and related claims based on his theory that his idea for a neighborhood based social networking site using the NEXTDOOR name had been misappropriated.

9. Abhyanker's Complaint and First Amended Complaint in the State Court Action proceeded on a theory that a "Fatdoor/Nextdoor" concept had been pursued by Fatdoor, Inc., with most of Fatdoor, Inc.'s assets ultimately having been sold to Google, Inc. Nextdoor.com and the other defendants demurred to the claims asserted in the State Court Action on the basis that the allegations of Abhyanker's complaint revealed that the claims he asserted for misappropriation were owned, if anyone, by his former employer Fatdoor, Inc.

10. Abhyanker voluntarily dismissed the State Court Action in March 2012.

Abhyanker's Registration and Use of the .cm Domain

11. Abhyanker registered the www.nextdoor.cm domain (the ".cm Domain.") December 28, 2011.

12. Abhyanker owns and controls the .cm Domain.

13. Abhyanker registered the .cm Domain because he was "angry," "upset" and "sad" that he was not a part of Nextdoor.com's successful launch.

14. The ".cm" portion of www.nextdoor.cm refers to the country code top level domain (ccTLD) for the African nation of Cameroon, which does not require registrants to be residents of Cameroon.

15. The www.nextdoor.cm domain name incorporates, in its entirety, the term "NEXTDOOR."

16. Prior to December 28, 2011, Abhyanker had never registered or used the nextdoor.com or nextdoor.cm domains, or other domain name that included "nextdoor" in the URL.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17. On December 28, 2011, Abhyanker filed an Intent to Use Trademark filing for the term NEXTDOOR with the USPTO, serial number 85504896, including, among other fields, online social networking.

18. On February 8, 2012, Abhyanker filed an Amendment to Allege Use with the USPTO.

19. Abhyanker's Amendment cited to the registration and use of the .cm Domain as evidence of his use of the NEXTDOOR Mark.

20. Abhyanker has not dismissed his pending application to register the trademark NEXTDOOR with the USPTO.

21. On January 20, 2012, Abhyanker filed a Notice of Opposition to Nextdoor.com's NEXTDOOR mark (Opposition No. 85236918).

22. As part of that opposition, Abhyanker asserted his use of the .cm Domain and his use of the NEXTDOOR mark on his eDirectree site as bases for opposing Nextdoor.com's registration of the NEXTDOOR mark.

23. Abhyanker's Opposition remains pending before the TTAB.

24. Abhyanker's Opposition has interfered with Nextdoor.com proceeding forward toward registration at the USPTO.

25. On February 9, 2012, Abhyanker filed a second Notice of Opposition to Nextdoor.com's application for registration of the NEXTDOOR mark (Opposition No. 91203762) (together with Opposition No. 85236918, "Opposition Proceedings"). As part of that opposition, Abhyanker asserted his alleged use of the NEXTDOOR mark on his eDirectree site as a basis for opposing Nextdoor.com's registration of the NEXTDOOR mark.

26. While it was in operation, the .cm Domain URL displayed the term "nextdoor" as a descriptor of that site in the tab of a web browser.

27. After registering the .cm Domain, Abhyanker used it to redirect traffic to a shell website on which he used the Nextdoor.com's name, mark, and URL (www.nextdoor.com) (the ".cm Site")

28. Abhyanker referred to "Nextdoor.com" on the .cm Site.

29. The .cm Site was accessible to the public between December 28, 2011 and at least November 1, 2012

30. The .cm Site is what is known as a "typo squatting" site, in that it will receive visits from persons who commit typographical errors when attempting to enter the domain www.nextdoor.com.

31. Abhyanker used the .cm Site to pretend to be www.nextdoor.com, through use of Nextdoor.com's name, mark, and URL on the .cm Site.

32. The .cm Domain also read: "Why don't you give the site a whirl. www.nextdoor.com"; ("Terms of Service" page stated "This terms of Use agreement…sets forth the terms and conditions for the use of online marketplace services available at www. Nextdoor.com…The site is owned and operated by Nextdoor, Inc.….all content included or available on this site, including site design, text, graphics, interfaces, and the selection and arrangements thereof is ©Nextdoor.com…"; and ("If you have questions regarding our Privacy Statement, its implementation, failure to adhere to this Privacy Statement and/or our general practices, please contact us by email support@nextdoor.com or send your comments to: Nextdoor, Inc., c/o law firm of Raj Abhyanker P.C."

33. Abhyanker's uses of the .cm Domain after, and with knowledge of Nextdoor.com's launch, were undertaken in an effort to appropriate Nextdoor.com's NEXTDOOR brand, name and users.

34. On March 22, 2012, Plaintiff's counsel sent a Cease & Desist letter to Raj Abhyanker, asking him to stop using the .cm Domain.

35. On March 29, 2012, Raj Abhyanker P.C. responded to the Cease & Desist letter of March 22.

36. In that response, Abhyanker acknowledged that he was operating the .cm Domain, but refused to comply with Nextdoor.com's demand.

37. On November 5, 2012, Nextdoor.com filed this suit.

<u>Abhyanker's Contemplated Use of "Nextdoor" in 2006</u>

38. In October 2006, Abhyanker conceived of an idea for a neighborhood social network.

39. Abhyanker pursued the use the mark NEXTDOOR to identify a neighborhood social network in 2006.

40. Abhyanker attempted to purchase the domain www.nextdoor.com on October 21, 2006.

41. On October 24, 2006 Abhyanker learned that the domain www.nextdoor.com was not available to purchase.

42. When Abhyanker was unable to acquire the www.nextdoor.com domain, he revised his plan to use the name "nextdoor" in connection with his business concept for a neighborhood-based social network, and opted to instead use the name "Fatdoor" for it.

43. On October 23, 2006, Abhyanker acquired the domain name www.fatdoor.com.

44. Abhyanker started a company named Fatdoor, Inc. (Fatdoor I) on October 25, 2006.

45. After October 2006, there is no contemporaneous written record of Abhyanker ever making any further attempts to acquire the www.nextdoor.com domain, and there is no record of any kind of such attempts prior to the public launch of Plaintiff Nextdoor.com's service.

46. On October 23, 2006, Abhyanker purchased domains "nextlawn.com" and "nextyard.com" in his personal name.

47. Abhyanker transferred the nextlawn.com and nextyard.com domains to Fatdoor I.

48. Those domains lapsed when not renewed in 2010.

49. Thereafter he used www.nextlawn.com and www.nextyard.com domains to redirect traffic to the .cm Domain.

50. Abhyanker has no documents showing use of the NEXTDOOR mark in 2008.

51. Abhyanker has no documents showing use of the NEXTDOOR mark in 2009, other than his claims about the eDirectree website screenshot that was actually created in 2013 as

NEXTDOOR.COM'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS    5    CASE NO. 3:12-cv-05667-EMC-NMC
OF LAW

described below.

52. Abhyanker has no documents showing use of the NEXTDOOR mark in 2010.

53. Abhyanker has no documents showing use of the NEXTDOOR mark in 2011, prior to October 26, 2011.

54. There is no record of Abhyanker using the name "nextdoor" in connection with his business concept for a neighborhood-based social network (or otherwise), after 2006, until after Nextdoor.com publicly launched its service on October 26, 2011.

### Abhyanker Did Not Obtain Any Rights in the "Nextdoor" Mark or Name From his Prior Fatdoor I Venture

55. Abhyanker entered into an Assignment Agreement with Fatdoor I whereby he assigned certain rights to Fatdoor I, including patent applications, on February 1, 2007 in connection with obtaining outside financing for Fatdoor I.

56. While Abhyanker included the URL www.nextdoor.com in a patent application he filed in 2006 (U.S. Pat. App. No. 11/603, 442), he assigned that application and all interests therein to Fatdoor I.[1]

57. The '442 patent application was abandoned on June 24, 2009.

58. Abhyanker also assigned other patent application(s) covering to the project he had pursued under the Nextdoor name in 2006 to Fatdoor I.

59. Abhyanker held no ownership interest in any patent applications including the www.nextdoor.com from 2008 through 2013, including at the time he registered and used the .cm Domain.

60. In the course of seeking VC funding for Fatdoor, Inc. in June, 2007, Abhyanker represented to investors that he had transferred all of his rights related to his "Fatdoor (formerly Nextdoor)" business concept to the company, and had no rights independent of those conveyed.

61. In the course of seeking VC funding, Abhyanker also provided an October 21,

---

[1] Nextdoor.com does not believe that patents can confer trademark or domain name rights, and thus believes that they are irrelevant. It includes suggested findings only if the Court were to conclude that patents could have relevance here.

NEXTDOOR.COM'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS
OF LAW
6
CASE NO. 3:12-cv-05667-EMC-NMC

2006 specification he had written for Nextdoor to his funders as proof of the "Fatdoor (formerly Nextdoor) conception."

62. Abhyanker referred to the "Nextdoor/Fatdoor" concept as a single concept throughout his pleadings in the state court action filed in November 2011.

63. To the extent that there were any rights in the Nextdoor concept or name created by the work in October of 2006, these rights were treated as belonging to Fatdoor, Inc., not Abhyanker individually of LegalForce (described below).

64. Apart from documents created or altered in December, 2013, there are no documents suggesting an intention on the part of Abhyanker after 2006 to use the Nextdoor name prior to the launch of Plaintiff's www.nextdoor.com website.

65. Abhyanker's production of the documents created or altered in December 2013 as if they were authentic documents undermines Abhyanker's credibility in asserting that he always intended to use the nextdoor name or had a good faith belief he owned rights in it.

66. Abhyanker served as CEO of Fatdoor I through at least June 2007 and left the employment of Fatdoor I in the fall of 2007.

67. Fatdoor I later changed direction first changing its name to Center'd, Inc. in 2008, then later to local deal space by the name of DealMap.

68. DealMap assets were acquired by Google in 2011. In that transaction, most of the former Fatdoor I/Center'd intellectual property was acquired by Google. All remaining assets were transferred to a liquidating trust managed by Sherwood Partners.

69. Neither Fatdoor, Inc. nor its successors ever used the NEXTDOOR mark or www.nextdoor.com domain.

### Abhyanker Did Not Acquire Rights from Center'd

70. The week after this lawsuit was filed in November 2012, Abhyanker approached Center'd's former shareholders about obtaining an assignment of intellectual property rights from that entity and requested that he be appointed "interim CEO" of Center'd.

71. On summary judgment, Abhyanker represented to the Court that attorney Dan

Hansen informed him that Jeffrey Drazan, as a former shareholder for Center'd, had the ability to appoint Abhyanker interim CEO of Center'd.

72. Contrary to Abhyanker's previous assertions in opposition to summary judgment, Daniel Hansen did not inform Abhyanker that Jeffrey Drazan had authority to appoint Abhyanker as interim CEO of Center'd.

73. Abhyanker never received authority from Center'd to act as interim CEO to execute the November 12, 2012 assignment agreement.

74. On or about November 12, 2012, Abhyanker created a purported assignment agreement with Center'd by which he assigned to himself, for $1, Center'd's "residual assets."

75. Abhyanker signed the November 12, 2012 document on behalf of both himself and Center'd, purporting to do so in the capacity of its "interim CEO" (the "Center'd Assignment")

76. At the time he executed the Center'd Assignment, Abhyanker knew he did not have the authority to enter into it on behalf of Center'd.

77. Abhyanker presented the Center'd Assignment to the Court in opposition to summary judgment to support his claim that he has standing to assert claims based on the Nextdoor/Fatdoor concept, in which he attested, in his declaration, that the Center'd assignment assigned all Fatdoor's trade secrets to him along with the right to sue for any past trade secret misappropriation.

78. In his opposition to summary judgment, Abhyanker also presented to the Court an email he had edited to make it look as though Jeff Drazan had provided authority without providing the full content of the email.

79. Center'd also did not, as of November 12, 2012, have residual assets available to assign to Abhyanker as it had already assigned its residual assets to the liquidating trust operated by Sherwood Partners.

Abhyanker Did Not Obtain Any Rights in the "Nextdoor" Mark or Name From LegalForce Inc.

80. Abhyanker owned and operated an entity called LegalForce from 2006-2008 ("LegalForce I").

NEXTDOOR.COM'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS
OF LAW

8

CASE NO. 3:12-cv-05667-EMC-NMC

81. Abhyanker asserted at deposition and in a declaration in this action that he obtained his rights in the Nextdoor concept in an assignment from LegalForce I.

82. In 2008, LegalForce I was dissolved and its assets were distributed to Abhyanker and other investors via a December 23, 2008 dissolution agreement.

83. As part of that dissolution, Abhyanker entered into a settlement agreement with LegalForce, signed by a counterparty for LegalForce. Under the settlement, the only assets Abhyanker obtained in that dissolution were any LegalForce pending patent applications and the LegalForce.com domain name. No other assets, including any that Legalforce may have held in the "nextdoor" concept or name, were transferred to Abhyanker via the LegalForce dissolution.

84. On May 21, 2014, Abhyanker sent Nextdoor.com's counsel a document dated June 4, 2007, by which he claimed to have obtained all residual rights from Legalforce I (the "LegalForce Assignment").

85. The Legalforce Assignment purports to assign all of LegalForce's residual rights, including rights in the "nextdoor" concept, to Abhyanker.

86. Abhyanker has relied on the Legalforce Assignment as an alternative basis for his claim that he has standing to assert ownership of the "nextdoor" concept or name.

87. The LegalForce Assignment produced in 2014 contradicts the 2008 dissolution and settlement agreements.

88. The LegalForce Assignment was not produced as part of discovery in October and December 2013.

89. The only version Abhyanker of the Legalforce Assignment Agreement ever provided was a PDF sent by Abhyanker himself, created on May 21, 2014 by electronic scanning of a paper document on May 21, 2014.

90. No digital file of the Legalforce Assignment Agreement from before May 2014, including any stored in email, could be found by either Abhyanker's forensic examiner or Nextdoor.com's forensic examiner.

91. No original paper Legalforce Assignment Agreement could be found.

92. The letterhead depicted on the LegalForce Assignment is unlike any other LegalForce document produced in this case. Each page of the document is numbered "1."

93. There is no evidence in the record corroborating the existence of the LegalForce Assignment in 2007, or its execution at that time.

94. The LegalForce Assignment appears to have been fabricated sometime during the course of this litigation.

95. Abhyanker did not obtain any rights in the "nextdoor" name, mark or business concept via the Legalforce Agreement.

### Abhyanker Manufactured Uses of the NEXTDOOR mark on his eDirectree Site to Attempt to Claim Priority and Ownership of the NEXTDOOR Name

96. After Abhyanker was fired from Fatdoor Inc., he pursued a number of different business ideas, including operating a site at www.eDirectree.com which purported to be an online group management and sharing application.

97. In 2008, Abhyanker created a website eDirectree.com.

98. Abhyanker did not use the NEXTDOOR mark on the edirectree.com site in 2007.

99. Abhyanker did not use the NEXTDOOR mark on the www.edirectree.com website in 2010.

100. Abhyanker did not use the NEXTDOOR mark on the www.edirectree.com website in 2011.

101. The eDirectree website was not publicly accessible in 2010.

102. The eDirectree website was not publicly accessible in 2011 and 2013.

103. As noted above, Abhyanker repurchased the eDirectree.com domain name in February 2012.

104. When the eDirectree website was repurchased by Abhyanker in 2012, it did not function.

105. In connection with his Supplemental Statement of Trademark Use (Dkt. 141), Abhyanker filed a document with the Court that incorporated the phrase "NEXTDOOR ™ Neighbors," alleging that this document represented a page of the eDirectree site as it appeared

"years before" Nextdoor.com's launch in 2011.

106. Additionally, Abhyanker cited this same purported use of the term "nextdoor" on the eDirectree site in support of his opposition in the TTAB as well as in support of own competing application for the NEXTDOOR mark.

107. The screenshot of the eDirectree.com website attached to Abhyanker's pleading as proof in this action of senior rights in the NEXTDOOR mark (Dkt. 141)—which was represented to depict use of NEXTDOOR on that website in 2008—was actually created in 2013 by taking a screenshot, not of a live or functioning website, but of a .jpeg (photo) posted by Abhyanker in 2013 at an IP address.

108. Abhyanker asserts that the original of that .jpeg, although copied during the litigation in 2013, has since been "lost," making it impossible to trace the origin of the screenshot.

109. The screenshot taken in 2013 itself reflects that the .jpeg from which it was made was created after August 13, 2012, as that date appears in the screenshot.

110. The underlying source code for the eDirectree website was destroyed by Abhyanker during the pendency of his dispute with Nextdoor.com in February or March of 2012.

111. This destruction occurred at the same time that Abhyanker was alleging to the TTAB that his use of the eDirectree website was the primary basis for his alleged rights in the NEXTDOOR mark.

112. The destruction of the source code makes it impossible to reconstruct that website to determine what it looked like prior to the launch of Nextdoor.com.

### Abhyanker Manufactured Uses of the NEXTDOOR mark into PowerPoint Presentations to Attempt to Claim Priority and Ownership of the NEXTDOOR Name

113. Abhyanker represented in a sworn declaration before the Court (Dkt.150-1) that he provided a "Diligence CD" to Benchmark Capital on June 22, 2007 while employed by Fatdoor, Inc. and that this Diligence CD references bids placed on the www.nextdoor.com domain.

114. A version of the Diligence CD was produced in discovery as RA369.

115. Analysis of RA 369 and a Toshiba Hard Drive from which it was derived show

1 that the Diligence CD had been edited and resaved throughout the afternoon and evening of
2 December 5, 3013.

3     116. The edits made to the Diligence CD on December 5, 2013 include alterations of a
4 PowerPoint presentation to add, at page 4, reference to "bids placed for Nextdoor.com," where
5 the prior versions never referenced nextdoor.com.

6     117. The edits made to the Diligence CD on December 5, 2013 also include insertions
7 of the word "Nextdoor" instead of or in addition to "Fatdoor," along with notes suggesting intent
8 to change the name of Fatdoor to Nextdoor.

9     118. On December 6, 2013, Abhyanker transmitted to his assistant three different
10 versions of CD covers reflecting that the covers produced as part of RA396 were created in 2013
11 and back dated to June 21 2007, before being produced in this case as if those covers and the
12 Diligence CD were authentic and originally create in 2007.

### Abhyanker's Competing Fatdoor II

14     119. After the public launch of Nextdoor.com, Abhyanker commenced efforts to build a
15 service that would compete with Nextdoor.com, which he planned to call Fatdoor (Fatdoor II).

16     120. On the same December 28, 2011 date that he registered the .cm Domain,
17 Abhyanker contacted potential funders for a project to launch a competing social network.

18     121. Abhyanker is a co-founder and part owner in Fatdoor II.

19     122. Fatdoor II presently operates www.fatdoor.com, which provides neighborhood
20 social networking services and robotics.

21     123. Abhyanker and Fatdoor II intend to compete with Nextdoor.com in the field of
22 online social networking.

23     124. Abhyanker, in 2013 and 2012 respectively, filed applications to register, and now
24 owns the registered trademark for FATDOOR and FATDOOR GET TO KNOW YOUR
25 NEIGHBORS.

26     125. Abhyanker intends to use the .cm Domain to assist his competing
27 www.fatdoor.com business in competition with Nextdoor.com.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### Abhyanker Registered and Used the .cm Domain in Bad Faith

126. Abhyanker registered the .cm Domain with full knowledge of the launch of Nextdoor.com's service.

127. Abhyanker registered the .cm Domain out of anger.

128. "Nextdoor" is not the legal name of Abhyanker.

129. "Nextdoor" is not commonly used to identify Abhyanker.

130. The .cm Domain is identical or confusingly similar to Nextdoor.com's NEXTDOOR mark.

131. Abhyanker used and continues to use the .cm Domain name in as a basis for opposing Nextdoor.com's application for registration of the NEXTDOOR mark at the TTAB.

132. Abhyanker used and continues to use the .cm Domain as a basis for his competing application for the NEXTDOOR mark at the USPTO.

133. Abhyanker registered and used the .cm Domain with the intent to divert traffic away from Nextdoor.com and to gain leverage in his dispute with Nextdoor.com.

### Abhyanker Lacks a Good Faith Belief in Rights in the NEXTDOOR Mark or Name

134. Abhyanker did not register any domain, such as nextdoor.net, nextdoor.biz or nextdoor.us, incorporating "nextdoor" prior to Nextdoor.com's launch.

135. Abhyanker never operated a public website that was called or otherwise known as "nextdoor."

136. Abhyanker did not use the NEXTDOOR mark or name between 2006 and the public launch of Nextdoor.com.

137. Abhyanker has no copyright, trademark, trade secret, or right of publicity rights in NEXTDOOR.

138. Abhyanker has no copyright, trademark, trade secret, or right of publicity rights in the .cm Domain.

139. Abhyanker knew that he had such rights, as evidence by his fabrication of evidence to support his claim of senior rights in the NEXTDOOR mark.

140. Abhyanker is an attorney, a patent lawyer, and a principal in one of the largest registrants of trademarks in the world.

## II. PROPOSED CONCLUSIONS OF LAW

1. The ACPA, which Congress incorporated into the Lanham Act in 1999, sets forth the elements of a cybersquatting claim. To prevail, Nextdoor.com must prove that it holds a distinctive mark, that Abhyanker had a "bad faith intent to profit" from the mark, and that Abhyanker "register[ed], traffic[ked] in, or use[d] a domain name" that is identical to, or confusingly similar to that mark. *See* 15 U.S.C. § 1125(d)(1)(A)(i)-(ii). The ACPA protects both federally-registered marks as well as unregistered marks. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 205 (6th Cir. 2004) (*citing Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)); see also 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:78 ("MCCARTHY").

2. Abhyanker registered in and used the domain name at www.nextdoor.cm.

3. The Court has concluded that Nextdoor.com owns trademark rights and has established priority of use in the NEXTDOOR mark.

4. The Court has already concluded that Nextdoor.com's NEXTDOOR mark is inherently distinctive as it is a suggestive, not descriptive, mark.

5. The Court has already concluded that Abhyanker used an identical mark in a manner which, as a matter of law, is likely to cause confusion.

6. The ACPA lays out nine non-exclusive factors that can be considered in making a determination of bad faith: (I) whether the party has trademark or intellectual property rights in the domain name, (II) whether the domain name consists of the legal name of a person, or a name they commonly use, (III) whether the party has made a prior use of the domain in connection with the bona fide offering of any goods or services, (IV) whether the mark corresponding with the domain is used in a non-commercial or fair use manner on any website accessible under the domain, (V) whether the party intended to divert consumers from the mark owner's website. (VI) whether a party has offered to transfer, sell, or otherwise assign the domain names to the mark

owner or any other person for financial gain without having used the domain names, (VII) whether a party provided false or misleading contact information in registering the domain, (VIII) whether the party registered or acquired multiple domain names known to be confusingly similar to marks of others, and (IX) whether the marks at issue are distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i)(I-IX).

7. In addition to the nine listed factors, a court may rely on other indicia of bad faith intent to profit. It is the "unique circumstances" of each case that are most important for determining bad faith. *Lahoti*, 586 F.3d at 1203. This includes, inferring willfulness "by the fact that a defendant continued infringing behavior after being given notice" of the allegations of infringement. *Louis Vuitton Malletier and Oakley, Inc. v. Veit,* 211 F.Supp.2d 567, 583 (E.D. Pa. 2002). Additionally, the courts consider the egregiousness of the defendant's cybersquatting and other behavior evidencing an attitude of contempt. *Verizon California, Inc. v. Onlinenic, Inc.*, 2009 WL 2706393 *3-6 (N.D. Ca. 2009).

8. Typo-squatting is prohibited under the ACPA. *Verizon California, Inc. v. Navigation Catalyst Systems, Inc.*, 568 F. Supp. 2d 1088, 1094 (C.D. Cal. 2008).

9. The Court has considered the nine statutory factors and the unique circumstances of the case and determines that Abhyanker acted with a bad faith intent to profit when he registered and used the .cm Domain name.

10. Because Abhyanker does not have trademark or other intellectual property rights in NEXTDOOR, Factors I weighs in Nextdoor.com's favor.

11. Abhyanker was never known as "nextdoor", that is not and was not his legal name, and though he may have used the term internally and hoped to purchase the nextdoor.com domain name in the 2006 time period, he never did. Factor II therefore weighs in Nextdoor.com's favor

12. Abhyanker has never offered any goods or services in connection with the NEXTDOOR mark, including on the .cm Domain. Instead, the evidence shows that he chose to use the Fatdoor mark in connection with his concept for a social networking service. Factor II therefore weighs in Nextdoor.com's favor.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13.     Abhyanker's use of the .cm Domain was not *bona fide* non-commercial or fair use because he sought to compete with Nextdxtdoor.com and to use the .cm Domain to confuse Nextdoor.com's prospective customers. Factor VI weighs in Nextdoor.com's favor

14.     Factor V weighs in Nextdoor.com's favor because Abhyanker intended to divert traffic from Nextdoor.com's own site: He chose the .cm domain, the registry for Cameroon, for no explicable purpose other than diverting traffic of users who mistyped www.nextdoor.com

15.     Factors VIII and IX weigh strongly in Nextdoor.com because the Court has already determined that the NEXTDOOR mark is inherently distinctive and Abhyanker has admitted that he registered and used the .cm Domain name with full knowledge of Nextdoor.com's public launch and use of the NEXTDOOR mark on the www.nextdoor.com site.

16.     The ACPA provides a safe harbor for cybersquatting defendants where a court "determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C.A. § 1125(d) (1) (B) (ii).  In the Ninth Circuit, courts should "make use of this 'reasonable belief' defense very sparingly and only in the most unusual cases." *Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190 (9th Cir. 2009) *citing Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir.2006). Additionally, "[a] defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [ACPA's] safe harbor provision."

17.     Abhyanker did not have reasonable grounds to believe that his registration or use of the .cm Domain was fair use or otherwise lawful. A hope to potentially use a name or to acquire rights in patents that mention a name, does not provide a reasonable ground for Abhyanker to believe he can appropriate for himself, on a typo-squatting site, the name of his competitor.

18.     Abhyanker did not have a subjective good faith belief that he had rights in the NEXTDOOR name. This is evidenced by the fact that he had never, since 2006, documented any use or effort to register the name. Further, this is demonstrated by the fact that all of Abhyanker's activities to pursue rights in the name NEXTDOOR, to resurrect eDirectree and Fatdoor II, and

1  even to repurchase nextyard.com and nextlawn.com, commenced only after Nextdoor.com had

2  already launched and established its rights by use of that name.

3      19.    Abhyanker's fabrication of evidence to support his standing and prior intent to use

4  NEXTDOOR further demonstrates that he did not subjectively believe he actually held such a

5  right in the name.

6      20.    Abhyanker is not entitled to the ACPA's safe harbor.

7      21.    The Court grants judgment in favor of Nextdoor.com on its claim for

8  cybersquatting in violation of the ACPA.

9      22.    "Injunctive relief is the remedy of choice for trademark and unfair competition

10 cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing

11 infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988); 15

12 U.S.C.§1116 (injunctive relief for violation of Lanham Act 43(a) or (d)); RCW § 19.86.090

13 (injunctive relief for violation of Washington CPA). Section 43(d) of the Lanham Act

14 specifically authorizes district courts to order transfer of an infringing domain name to the mark

15 owner. "In any civil action involving the registration, trafficking, or use of a domain name under

16 this paragraph, a court may order . . . the transfer of the domain name to the owner of the mark."

17 15 U.S.C. § 1125(d)(1)(C) name.

18     23.    Nextdoor.com is entitled to an injunction prohibiting Abhyanker and each of his

19 agents, servants, assigns and employees, and those persons and entities in active concert or

20 participation with any of them who receive actual notice of this order from using, directing,

21 authorizing, or participating in use of the term "NEXTDOOR" or any colorable imitation thereof

22 or any confusingly similar term, directly or indirectly in connection with, or in any domain names

23 (including, without limitation, nextdoor.cm), offering, operating, selling, promoting, or

24 redirecting to any provider of goods or services in the field of online social networking.

25     24.    Nextdoor.com is entitled to a permanent injunction requiring Abhyanker to

26 transfer the .cm Domain name to Nextdoor.com.

27

28

NEXTDOOR.COM'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS     17     CASE NO. 3:12-cv-05667-EMC-NMC
OF LAW

| | | |
|---|---|---|
| 1 | Dated: November 4, 2014 | FENWICK & WEST LLP |
| 2 | | |
| 3 | | By: */s/ Laurence F. Pulgram* |
| 4 | | Laurence F. Pulgram |
| 5 | | Attorneys for Plaintiff<br>NEXTDOOR.COM, INC. |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO