DAVID S. LAVINE, SBN 166744
dave@legalforcelaw.com
NICHOLAS M. GEROVAC, SBN 289910
nick@legalforcelaw.com
LEGALFORCE RAJ ABHYANKER, P.C.
1580 W. El Camino Real, Suite 13
Mountain View, California 94040
Telephone: 650.965.8731
Facsimile: 650.989.2131

Attorneys for Defendant
Raj Abhyanker

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTDOOR.COM, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>RAJ ABHYANKER, an individual,<br><br>Defendant. | Case No. 3:12-cv-05667-EMC-NMC<br><br>**DEFENDANT RAJ ABHYANKER'S ADDITIONAL TRIAL BRIEF PER DKT. 398** |

  Pursuant to the Court's amended order appearing at Dkt. 398, defendant Raj Abhyanker ("Abhyanker") hereby submits this additional trial within the prescribed seven-page limit. For a fuller presentation, Abhyanker would respectfully direct the Court to his recently-filed trial brief.

**Facts With Supporting Evidence**

Abhyanker's interest in and use of the term "Nextdoor" as a name for an online social networking website dates back nearly ten years, to 2005. It was at that time that Abhyanker began developing technology related to an online network for neighbors who scarcely knew one another. Abhyanker called this concept Nextdoor. Abhyanker's Nextdoor was designed to be a neighborhood-based social network geared toward bringing together neighbors with like interests for mutual benefit.

As his ideas started to coalesce through 2005 and into 2006, Abhyanker created screenshots and wireframes showing the name "Nextdoor." Exs. 1061, 1062. Over the ensuing months, Abhyanker developed software code, product concepts, prototypes and other instrumentalities, many of which included use of the name "nextdoor." In September 2006, Abhyanker hired Sandeep Sood and his firm to provide software and website development services. Exs. 1009, 1011, 1018. He and his firm agreed to conceptualize, design and build components of Abhyanker's social networking website and associated software. Exs. 1009, 1011, 1018. Abhyanker created a cap table and equity distribution spreadsheet for a company to be called NextDoor, Inc. with Sood in 2006. Sood was to be the CEO of this venture, NextDoor, Inc. Ex. 1021. Together with Sood and another engineer, Ankur Verma, Abhyanker created the alpha neighborhood-based social networking site displaying the name Nextdoor. Exs. 1061, 1062.

Despite his repeated efforts between 2006 and 2010, Abhyanker could not use the domain name Nextdoor.com as he could not purchase the domain from its owner at the time, which was not Nextdoor.com. Exs. 1020, 1022, 1032, 1054, 1055. However, Abhyanker remained interested in and used the name Nextdoor. Around September 2007, a U.S. Patent was filed with the United States Patent and Trademark Office, which listed Abhyanker as the sole inventor. Ex. 1133. This application describes Abhyanker's invention and, as part of the claims of the patent, included the term Nextdoor as a domain for a neighborhood social network. In or around September 2007, another patent application also made use of the term Nextdoor as a domain name inside the patent's claims. Ex. 1134. The patent, on which Abyhanker is also the sole inventor, describes his use of the word Nextdoor as a domain for a neighborhood social network. For these efforts, patents utilizing and protecting the name Nextdoor and features central to it

were ultimately issued. Ex. 1095, 1096, 1133, 1134.

Abhyanker's best efforts at the time, unfortunately, did not result in a commercially-successful neighborhood social network. Abhyanker turned his creative spirit and energies towards other projects. However, he did not let the idea of the Nextdoor social network get too far away. In late 2010, Abhyanker met with Silicon Valley investors to reinvigorate Nextdoor, so as to avoid abandonment of the patents on which he was listed as inventor. Exs. 1049, 1050.

It was only in late 2011 when Abhyanker first learned of the existence of a new entrant into the neighborhood social networking field, plaintiff Nextdoor.com. Abhyanker was surprised at how similar the concept and functions of its site were to his earlier efforts. What is more, the site launched under the exact same name as Abhyanker had previously created and used to identify his same online social networking site. Additionally, one of the founders of the Nextdoor.com site, Prakash Janakiraman, was a good friend of Sandeep Sood, who previously had worked with Abhyanker to build out his Nextdoor concept. Abhyanker discovered that Sood had discussed the Nextdoor.com website with Janakiraman, and that the Nextdoor.com site had launched after an initial testing period in the very same neighborhood where Abhyanker had demoed and prepared to launch his own neighborhood social network.

Abhyanker was understandably saddened and upset about these revelations, as he later admitted in deposition. As anyone who had spent years of his life developing and building a unique concept would be, Abhyanker was annoyed to see that his work had been, to all appearances, co-opted. Abhyanker was profoundly disappointed that he was not able to be a part of the execution and idea of a concept and business foundation he had originated. *See* Deposition of Raj Abhyanker, 530:23-531:9.

In response, Abhyanker renewed his focus and reasserted his rights to the Nextdoor concept. On December 28, 2011, Abhyanker reached out to Google Ventures and others for advice on how best to proceed. Ex. 1070. He came to the conclusion that, in order to protect the rights he had obtained in the name through his earlier use and patent rights, he needed to register a similar domain name, Nextdoor.cm, much as he did when he registered nextyard.com and nextlawn.com years before. When he subsequently registered nextdoor.cm, Abhyanker did not conceal his identity or try to be elusive with respect to the information he included as part of the

domain registration. Abhyanker registered this domain name because he believed he had to take such an immediate, affirmative step to assert his rights, and because he believed that he had the right to do so following the appearance of the Nextdoor social networking name within the claims of his patent applications.

After registering the domain name, Abhyanker took further steps in order to reassert his rights, including developing a website on the domain name of nextdoor.cm that featured social networking capabilities. Abhyanker never offered to sell or otherwise transfer the domain name in question, nor did he ever have any desire to do. Abhyanker's motivation behind his registration and use of the nextdoor.cm domain was, at all times, a good-faith attempt at bringing back to life the Nextdoor social networking concept he had created and in which he had provisionally and then finally secured intellectual property rights through his patents.

**Pertinent Law**

When creating the Anti-Cybersquatting Consumer Protection Act (ACPA), Congress was concerned that "cybersquatting"-- registering "well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name" -- threatened "the continued growth and vitality of the Internet." *Interstellar Starship Servs. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002). The "paradigmatic harm that the ACPA was enacted to eradicate" was "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).

To separate those who fit this cybersquatting profile from entrepreneurs and others registering domain names, Congress decided that to violate the ACPA, an individual must have acted with "a bad faith intent to profit" to "register[], traffic[] in, or use[] a domain name" that "is identical or confusingly similar to" a mark that is "distinctive." 15 U.S.C. § 1125(d)(A). Thus, unlike in other trademark enforcement law, liability under the ACPA necessarily requires a finding of a bad-faith intent to profit. 15 U.S.C. § 1125(d)(A)(i); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009). The required bad faith cannot be generalized, but must be of a particular species: a plaintiff must establish that the defendant had a bad-faith *intent to profit*. *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246-48 (6th Cir. 2009) (declining to

find a defendant liable under the ACPA because the plaintiff had not established the defendant acted with an intent to profit from the domain name).

In determining whether this species of bad faith exists, the Ninth Circuit applies a three-step approach. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220 (9th Cir. 2012). First, courts must treat as most important "the unique circumstances of the case. . . ." *Interstellar Starships*, 304 F.3d at 946-47. Second, courts must "survey the nine bad-faith factors. . . ." *Id.* The courts will find a bad-faith intent to profit only when these factors significantly align against the defendant. *See, e.g. Facebook, Inc. v. Banana Ads LLC*, 2013 U.S. Dist. LEXIS 65834 (N.D. Cal. 2013). Third, courts must "consider the availability of [the] statutory safe-harbor defense, which protects any defendant who 'believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.'" *Id.* (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). This statutory safe harbor is to be applied in a caring and thoughtful fashion, and should be used when the factual circumstances indicate that the defendant acted overall with an objectively-reasonable good-faith intent in registering the domain name in question. *Lahoti*, 586 F.3d at 1203; J. Thomas McCarthy, *McCarthy on Trademarks* § 25.78 (4th ed. 2004). In determining whether a defendant acted with a reasonable good-faith belief, courts look to, among other things, whether the defendant sought legal or business advice before registering the domain name. *Mirage Resorts, Inc. v. Stripe*, 152 F. Supp. 2d 1208, 1216 (D. Nev. 2000).

**The Evidence is Clear that Abhyanker Did Not Have a Bad-Faith Intent to Profit**

Abhyanker registered the domain name nextdoor.cm in order to support a cherished social networking concept he conceived of, as well as a large body of connected work in the form of technical build-out he invented and claimed provisionally in some 40 patent applications. That work led to issuance of a series of core patents referring to Nextdoor by name as well as its principal features. From his conception of Nextdoor, through years of his invention of its technical features, through the protection for the Nextdoor name and technical features he garnered from the granting of patent protection, Abhyanker actually and reasonably believed he had legal rights in the Nextdoor name, and that he needed to protect those rights as against newer entrants into the neighborhood social networking such as Nextdoor.com. Abhyanker's conception of Nextdoor, and his substantial and long-running body of work developing Nextdoor

as a neighborhood social network, sets Abhyanker miles apart from the typical cybersquatter and negates any possible bad-faith intent to profit as is required for liability under this statute.

<u>Abhyanker Reasonably Believed That He Had Intellectual Property Rights In The Term Nextdoor At The Time Of Registering and Using The Domain Name</u>

The first factor listed in the ACPA statute looks to whether the defendant holds "trademark or *other intellectual property rights*" in the domain name. 15 U.S.C. §1125(d)(1)(B)(i)(I). The wording of this factor is broad and, on its face, encompasses all intellectual property rights, even those apart from trademark rights, including those stemming from patent law. Abhyanker registered the nextdoor.cm domain precisely because he reasonably believed he had intellectual property rights in the Nextdoor name. Abhyanker based this belief on reasonable grounds: he was the first individual to associate the term "Nextdoor" with an online social network. He had previously built, designed and marketed a social media website under the name a few years earlier. Significantly, he had placed images showing a mock-up of a social media website called Nextdoor in his patent applications. At the time he registered the domain name in question, Abhyanker reasonably believed that he retained intellectual property rights in the Nextdoor name – and thereby distinguished himself from the typical cybersquatter profile. As such, Abhyanker did not act with a bad-faith intent to profit when he registered the domain name in question.

<u>Abhyanker Did Not Use False or Misleading Contact Information</u>

The typical cybersquatter uses false or misleading information when registering the domain name in question, in order to mask his/her identity and to hide from future liability. Thus, using false or misleading information on domain name registration information leads to an inference that the registration was done with a bad-faith intent to profit. *See* 4 *McCarthy on Trademarks and Unfair Competition* § 25:78 ("The provision of false contact information to a registrar is a hallmark of the cybersquatter"). The undisputed facts show that when Abhyanker registered the domain name in question, he placed his full name, and correct email and physical address, in the registration information. There was no intent to conceal identity or purpose.

<u>Abhyanker Did Not Register Multiple, Confusingly Similar, Domain Names</u>

The typical cybersquatter also tends to serially register dozens or even hundreds of

offending domain names at the same time. An individual that registers such a large volume of domain names raises the question of whether the domain names were registered with a bad-faith intent to profit, as it appears that the individual is "warehousing" domain names for future sales. Such warehousing is exactly the type of behavior that Congress was seeking to eliminate through the passage of the ACPA. *See* H.R. Rep. No. 106-412, 13. For his part, Abhyanker registered just one new similar-sounding domain name, nextdoor.cm, after the launch of Nextdoor.com.

<u>Abhyanker Did Not Offer to Transfer, Sell, or Otherwise Assign the Domain Name</u>

The typical cybersquatter offers to sell the domain name in question for an amount that far exceeds the costs paid to register the domain name and subsequently obtained value. *See Lahoti*, 586 F.3d at 1203 (finding a bad-faith intent to profit where the defendant offered to sell the domain name in question for over $72,000, despite having made no efforts to develop recognition of the domain). Such offers to sell the domain name tend to indicate that the owner of the domain has no real interest in keeping or maintaining the domain, and only registered it in the first place to sell it to a well-heeled business in that industry at the highest price it can. Abhyanker has not offered to sell the domain name in question to the plaintiff or any other third party, and has no prior history of registering and selling domain names.

<u>Abhyanker Did Not Profit From Activities Occurring On The Domain Site</u>

Another common characteristic of a cybersquatter is that he/she profits from the activities that occur on the domain name in question in some way. This is most typically achieved through the placement of referral links or advertising content on the webpages that appear on the domain name in question. *See Lahoti*, 586 F.3d at 1202 (finding a bad faith intent to profit where the defendant "earned income when customers clicked on links when visiting the Domain Name website, some of which directed them to [plaintiff's] competitors."). Abhyanker did nothing of the sort with the webpage he placed on the domain name in question – he created no payment links, and no banner adds. Indeed, there is no evidence that Abhyanker received any financial benefit at all from operation of the nextdoor.com website, because he did not.

<u>Abhyanker Did Not Register a Famous Mark as a Domain Name</u>

The final characteristic of a cybersquatter is that he registers a domain name that is in some way similar to a then-famous mark.[1] This is because the typical cybersquatter is seeking to hold hostage a domain that is valuable, and the most valuable domain names relate back to famous marks. In order for this factor to be indicative of a bad-faith intent to profit, the domain name must incorporate a mark that is both distinctive *and* famous. 4 McCarthy § 25:78. Fame, in turn, is defined elsewhere in the text of the statute as requiring wide recognition by the general consuming public of the United States as a designation of source of the goods or services of the marks owner. 15 U.S.C. § 1125(c)(2)(A).[2] At the time that Abhyanker registered the nextdoor.cm domain name on December 28, 2011, Nextdoor.com was in its infancy, and thus its mark was young and formative, and not famous.

From the above, it will be clear at trial that (1) Abhyanker was invested for years in the Nextdoor concepts, and developed them thoughtfully over time, (2) Abhyanker filed for, and later received, patents whose claims gave him rights in the Nextdoor features and name, (3) Abhyanker does not fit the profile of a typical cybersquatter, as is shown by all of the pertinent bad faith factors in the ACPA weighing in his favor. Accordingly, this Court should find that Nextdoor.com is unable to establish Abhyanker's bad-faith intent to profit, and that he therefore did not violate the ACPA when he registered and used the domain name in question.

Dated: November 7, 2014

Respectfully submitted,
LEGALFORCE RAJ ABHYANKER, P.C.

/s/ David Lavine
By:   David Lavine
Attorney for Defendant RAJ ABHYANKER

---

[1] Statutory bad-faith factors II, III and IV do not appear to be applicable to the factual circumstances of this case, and therefore should not be considered as favoring or disfavoring a finding of a bad faith intent to profit. *Southern Grouts & Mortars*, 575 F.3d at 1249.

[2] The statute states that fame is determined by examining "the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties" . . . "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark" . . . "[t]he extent of actual recognition of the mark" . . . and "[w]hether the mark was registered … on the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).