1  LAURENCE F. PULGRAM (CSB No. 115163)
   lpulgram@fenwick.com
2  JENNIFER L. KELLY (CSB No. 193416)
   jkelly@fenwick.com
3  ILANA S. RUBEL (CSB No. 221517)
   irubel@fenwick.com
4  GUINEVERE L. JOBSON (CSB No. 251907)
   gjobson@fenwick.com
5  FENWICK & WEST LLP
   555 California Street, 12th Floor
6  San Francisco, CA  94104
   Telephone: (415) 875-2300
7  Facsimile:  (415) 281-1350

8  ERIC J. BALL (CSB No. 241327)
   eball@fenwick.com
9  MATTHEW B. BECKER (CSB No. 291865)
   mbecker@fenwick.com
10 FENWICK AND WEST LLP
   801 California Street
11 Mountain View, CA 94041
   Telephone: (650) 988-8500
12 Facsimile:  (650) 938-5200

13 Attorneys for Plaintiff
   NEXTDOOR.COM, INC.

14

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18 NEXTDOOR.COM, INC., a Delaware        Case No.: 3:12-cv-05667-EMC-NMC
   corporation,
19                                       **NEXTDOOR.COM, INC.'S
                                         TRIAL STATEMENT**
20             Plaintiff,
                                         **[PER DOCKET 398]**
21      v.
                                         Final Pretrial
22 RAJ ABHYANKER, an individual,         Conference: November 25, 2014
                                         Time:       2:30 p.m.
23             Defendant.                Courtroom: 5, 17th Floor
                                         Judge:      Hon. Edward M. Chen
24                                       Trial Date:  December 1, 2014

25

26

27

28

NEXTDOOR.COM, INC.'S                               CASE NO. 3:12-cv-05667-EMC-NMC
TRIAL STATEMENT

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## I.     NEXTDOOR.COM'S THEORY OF THE CASE

There is no dispute that Defendant Raj Abhyanker set up and began operating a site using the NEXTDOOR mark at www.nextdoor.cm (the ".cm Domain") shortly after Nextdoor.com's public launch.  *See, e.g.*, Dkt. 332-9, Ex. H.  This Court has also already found that (i) the NEXTDOOR mark is distinctive, and (ii) Abhyanker's use of the NEXTDOOR mark on that site was likely to confuse.  The only element at issue is whether Abhyanker had a "bad faith intent to profit" in connection with his registration and use of the .cm Domain.

The evidence will overwhelmingly show he did.  Abhyanker used the .cm Domain not only to divert traffic to a "typo-squatting" site that mimicked Nextdoor.com's site, but also to support his knowingly false assertion that he had priority of use in the NEXTDOOR mark.  Abhyanker's motive was clear:  to gain leverage in his dispute with Nextdoor.com, to his financial advantage.  Indeed, any doubt that Abhyanker had no legitimate reason to operate the .cm Domain vanished when he admitted, at deposition, that he did so because he was "upset" about Nextdoor.com's successful launch in a field where he intended to compete.

## II.     PERTINENT FACTUAL HISTORY

In October 2006, Abhyanker had an idea to create a social network.  But after he failed in his effort to acquire the domain name www.nextdoor.com on October 24, 2006, he opted for the name "Fatdoor," incorporating Fatdoor, Inc. the next day.  Undisputed Fact No. 21.  A few months later, he assigned all his rights, including any in his Nextdoor/Fatdoor concept and related patents and intellectual property, to Fatdoor, Inc.  Ex. 180.  Abhyanker represented to investors in Fatdoor that he had conveyed all his related IP rights, and described the Fatdoor concept as "formerly Nextdoor."  Ex. 225.  But other than that, he never used the Nextdoor name again—that is, until Nextdoor.com launched.

Fatdoor was not successful.  In mid-2007, Fatdoor's Board fired Abhyanker.  In April 2008, Fatdoor changed its name to Center'd and changed business plans.  Eventually, in 2011, Google acquired most of Center'd's assets.  The residue went into a liquidating trust managed by Sherwood Partners.  None of those entities ever used, or gave Abhyanker, the name Nextdoor.

After his stint at Fatdoor, Abhyanker pursued a number of different ideas, including

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

dabbling in other unsuccessful social networks, such as eDirectree.com.  Other than documents *created after the launch of Nextdoor.com* there is no evidence of any of Abhyanker's businesses, including eDirectree, eatbid, Trademarkia, or Legalforce, using the term "nextdoor."

Nextdoor.com launched its social networking site on October 26, 2011.  Undisputed Fact No. 4.  The next day, Abhyanker sent an unsolicited email to its CEO congratulating him and stating he had pursued a similar concept under the name Fatdoor.  Ex. 11.  He said nothing about owning the "nextdoor" name.  *Id*.  The CEO, not knowing Abhyanker, did not respond.

Two weeks later, Abhyanker sued Nextdoor.com for misappropriation in state court.  *See* Undisputed Fact No. 40.  Then, on December 28, 2011, Abhyanker registered the .cm Domain.  *See* Undisputed Fact Nos. 10-12.  That same day, he also applied for registration of the NEXTDOOR mark in his own name.  In February 2012, as an amendment to allege his use and priority, he cited to the USPTO his use on the .cm Domain and submitted an exemplar of that use, which included the NEXTDOOR mark.  *See* Undisputed Fact Nos. 7-9, 14-15.

Nextdoor.com and the other defendants demurred in the State Court Action, all challenging Abhyanker's standing to assert claims that his pleadings showed were owned, if by anyone, by Fatdoor, Inc.  Abhyanker voluntarily dismissed that case in March 2012.

Meanwhile, in January 2012, he commenced opposition proceedings in the TTAB blocking issuance of Nextdoor.com's pending trademark registration, asserting his use of the .cm Domain as a basis for his alleged priority in the NEXTDOOR mark.  *See* Undisputed Fact Nos. 7-9, 14-15.  On February 9, 2012, he repurchased the eDirectree.com domain (which had been offline since at least February 2009) and sometime thereafter added the term "Nextdoor™ Neighbors" to the website.  Ex. 101.  He then manufactured a screenshot to support his claim that he had been using the NEXTDOOR mark on eDirectree.com since before Nextdoor.com's launch, and cited it to the TTAB (as well as later in this case).  *Id*.

On March 22, 2012, Nextdoor.com sent Abhyanker a letter regarding his infringement, demanding that he cease all use of the NEXTDOOR mark, including the .cm Domain.  *See* Undisputed Fact No. 47.  He refused.  *See* Undisputed Fact No. 48.  On November 5, 2012, Nextdoor.com filed this suit, seeking to put an end to Abhyanker's harassment and clear its title

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to the NEXTDOOR mark.  *See* Undisputed Fact No. 49.  Within days, Abhyanker removed all content on the .cm Domain.

Then, to manufacture standing, purportedly acting on behalf of Center'd, he executed a fake assignment of its purported residual assets (there were none) to himself for $1.  Ex. 186. Although he tendered that assignment to the Court as genuine, in fact he knew perfectly well that he had no such authority, as reflected in contemporaneous emails.  Exs. 188, Ex. G; 189; 190.

Abhyanker then proceeded to defend this case aggressively and to assert numerous counterclaims premised, *inter alia*, on his purported senior use of the NEXTDOOR mark.  *See, e.g.*, Dkt. 132, Ex. A.  Required by the Court to provide documentary proof of prior use, he told the Court he had only the eDirectree screenshot.  Ex. 101.  But after his fabrication of the eDirectree screenshot came to light, Abhyanker dismissed with prejudice his claim for priority, and stipulated to an injunction against any further use of the NEXTDOOR mark.  Dkts. 192, 193. During his deposition (by which point many other fabrications had been uncovered), Abhyanker admitted he had registered the .cm Domain because he was "upset" and "saddened" that he was not a part of Nextdoor.com's success.  June 11, 2014 Depo. Tx. 530:3 - 531:4; 532:15-20.  He also testified that at the time he operated the .cm Domain, he intended to compete with Nextdoor.com.  August 4, 2014 Depo. Tx. 773:12-776:05.

## III.   NEXTDOOR.COM WILL EASILY PREVAIL ON ITS CYBERPIRACY CLAIM

As this Court noted [Dkt. 397], the only element of Nextdoor.com's ACPA claim that remains at issue is whether Abhyanker acted in bad faith.  The evidence easily supports the conclusion he did.  The bad faith element of the ACPA reaches a wide variety of activities, including use of a domain to obtain leverage in a business dispute, to divert traffic by confusing potential customers, or otherwise to gain some competitive advantage over a mark holder—all of which Abhyanker engaged in here.[1]  Further, the inquiry does not simply focus on a defendant's

---

[1] *See, e.g., GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011) (bad faith found where defendant intended to divert traffic by confusing consumers); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1033 (C.D. Cal. 2010) (use of a "confusingly similar" domain to route potential customers to defendant's website supported a bad faith claim); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220-21 (9th Cir. 2012) ("Rearden Commerce acted in bad faith by seeking to gain leverage in an ongoing trademark dispute.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

state of mind when he registered the domain, rather "evidence of bad faith may arise well after

registration…." *See, e.g., Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009).

The ACPA lays out nine non-exclusive factors that may be considered in making a

determination of bad faith, but it is the "unique circumstances" of each case that are most

important.[2]  This includes inferring bad faith from continued use of an offending domain after

notice of the infringement.  Courts also consider the egregiousness of the defendant's

cybersquatting and his behavior evidencing an attitude of contempt for the judicial process.

*Verizon California, Inc. v. Onlinenic, Inc.*, No. C 08–2832, 2009 WL 2706393, at *3-6 (N.D. Cal.

2009).  Under this analysis, the conclusion that Abhyanker acted in bad faith is inescapable.

**A.      Seven of the Nine Statutory Factors Favor a Finding of Bad Faith**

**Factor I**:  (trademark or other intellectual property rights of the person, if any, *in the*

*domain name*).  Abhyanker had no rights in the NEXTDOOR mark or .cm Domain.  The Court

has already found that he had neither trade secret nor trademark rights in the term "nextdoor."

Dkt. 100, 193.  Abhyanker intends to claim he had some rights in the name stemming from the

inclusion of the "nextdoor.com" name in patent applications he filed in 2006-2007.  But his patent

assertions were never disclosed in initial disclosures, were therefore not subject to discovery, and

cannot fairly be added to trial now.  Nor did he ever identify his bizarre theory of patents being a

source of trademark rights during fact discovery.  *See* Response to Interrogatory Nos. 1, 5 (not

mentioning patents in response to requests to describe public uses of "nextdoor" and to "state all

facts supporting your claim to ownership of the Nextdoor mark").  In all events, any such claims

are unavailing for multiple reasons.  Most obviously, names are not patentable subject matter.

And even his own expert acknowledged that Abhyanker held no ownership interest in the asserted

patent rights during his period of use of the .cm Domain.  Deposition of Sheldon p. 62:20 – 66:14.

[2] The ACPA does not require that all the factors be analyzed.  For example, there is no
requirement that a defendant attempt to sell the domain name to find the registrant acted in bad
faith.  *See DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1218-19 (9th Cir. 2010).  Similarly, an
infringer does not need to register multiple similar domains to commit cyberpiracy – just one
infringing domain name can be enough.  *See e.g., id.* (affirming finding of cyberpiracy for a
single domain); *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985
(9th Cir. 2009) (same).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Further, even the  rights that Abhyanker claims now are hotly disputed, as they are based on a 2014 assignment he executed to himself on behalf of GeoTag (an assignee of Fatdoor), without GeoTag's permission. Ex. 239.  These patent issues are briefed more extensively in Nextdoor.com's MIL No. 3 (Dkt. No. 380) and its Objections to Abhyanker's Proposed Witness List at 2-3.  Dkt. No. 395-1.  There is no conceivable way Abhyanker could claim any IP rights in the term "nextdoor," much less at the relevant time.

**Factor II**:  (legal or other name commonly used to identify that person).  Abhyanker was never known as "nextdoor"; that is not and was not his legal name; and though he may have used the term internally and hoped to purchase the www.nextdoor.com domain in 2006, he never did.

**Factor III**:  (prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services).  Abhyanker has never offered any goods or services in connection with the NEXTDOOR mark; to the contrary, he opted to use FATDOOR.

**Factor IV**: (bona fide noncommercial or fair use of the mark under the domain name). Abhyanker sought to compete with Nextdoor.com, usurp its trademark, and confuse prospective customers.  He copied the "nextdoor.com" name and content into the site using the .cm Domain, pretending to be Nextdoor.com.  *See, e.g.*, Dkt. 332-9, Ex. H; Undisputed Fact No. 45.  And he attempted to leverage the .cm Domain to support his false claims of priority before the TTAB. *See* Undisputed Fact Nos. 7-9, 14-15.  There was nothing non-commercial or "fair" about this.

**Factor V**: (intent to divert consumers from Plaintiff's website). Abhyanker chose the .cm suffix, the registry for Cameroon, to divert traffic of users who mistyped www.nextdoor.com. *See* Undisputed Fact Nos. 11-12.  He never registered any domain incorporating the "nextdoor" name other than this "unlawful typosquat."  *See Verizon California, Inc. v. Navigation Catalyst Sys., Inc*., 568 F. Supp. 2d 1088, 1097 (C.D. Cal. 2008) (this factor cut "strongly against" defendants who typosquat).

**Factors XIII and IX**: (whether the party registered a domain name known to be confusingly similar to the mark of another and whether the mark is distinctive).  The Court has already determined the NEXTDOOR mark is distinctive, and that Abhyanker used the identical mark. Dkt. 361.  Even more, Abhyanker admitted he registered and used the .cm Domain name

1   with knowledge of Nextdoor.com's NEXTDOOR mark.  August 4, 2014 Depo. Tx. 775:19-25.

2   Both factors strongly favor Nextdoor.com.

3       **B.    The Unique Circumstances Here, Including Abhyanker's Intent, Willfulness and Fabrications, Confirm He Acted In Bad Faith**

4

5       Finally, the unique circumstances of this case also strongly support a finding of bad faith.

6   Abhyanker *admitted* he registered and operated the .cm Domain out of anger.  He defiantly

7   continued operating it after Nextdoor.com's warning that his conduct was unlawful.  *See Louis*

8   *Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) (willfulness

9   inferred from continuing infringing behavior after notice of claim).  He did not offer any goods or

10  services in connection with his site; he merely pretended to be Nextdoor.com.  Further, he

11  fabricated the only "evidence" of his alleged prior use of the NEXTDOOR mark (on the

12  eDirectree site), and spoliated the site's source code, which could have definitively proven he

13  never actually used the mark on that site prior to Nextdoor.com's launch.  Abhyanker used this

14  fabricated evidence to gain leverage in multiple proceedings involving Nextdoor.com.  And, as

15  will be substantiated by forensic expert David McCain, he fabricated additional evidence to

16  simulate his supposed desire and intent to use the mark between 2006 and 2011, and his standing

17  to do so, negating any claim of a reasonable "good faith belief" that he had rights to a mark he

18  had never, prior to Nextdoor.com's launch, publicly used.

19      **C.    The Evidence Precludes Any Defense Under The ACPA's Safe Harbor**

20      The ACPA "safe harbor" defense is reserved for defendants who can prove they both

21  subjectively *and* reasonably believed they had the right to use the domain.  15 U.S.C

22  §1125(d)(1)(B)(ii); *see also GoPets Ltd.*, 657 F.3d at 1033 (safe harbor inapplicable where

23  defendants had no reason to believe they had the right to register identical or confusingly similar

24  domain names).  The safe harbor defense applies "very sparingly and only in the most unusual

25  cases." *Lahoti*, 586 F.3d at 1203 *citing Audi AG  v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006).

26      Critically, a "defendant who acts even partially in bad faith…is not, as a matter of law,

27  entitled to benefit from the ACPA's safe harbor provision."  *Lahoti*, 586 F.3d at 1203 ("We agree

28  with the Fourth Circuit, which, in affirming a summary judgment determination of bad faith, has

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

held that '[a] defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [the ACPA's] safe harbor provision.'") (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001)); *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1107 (S.D. Cal. 2012) (domain registrant's actions during the course of the litigation contradicted any claim of good faith and precluded protection under the ACPA's safe harbor provision).  Thus, Abhyanker cannot avail himself of this defense.

Aside from the fact that Abhyanker acted in bad faith (and not just "partially"), his claim that he "honestly" believed he had rights in the mark is as disingenuous as his claim that his use of the NEXTDOOR mark, on the .cm Domain, was not likely to confuse.  The truth is, Abhyanker made no use of "nextdoor" at all, from 2006 through 2011.  He knew he had no legitimate claim to senior rights in the mark once Nextdoor.com had launched, so he concocted an elaborate story, manufactured evidence of use that never occurred, and now appears to be relying on a theory that he had some "intent to use" the mark during that period.  But a mere intention to use a mark, even if Abhyanker actually (and contrary to the evidence) actually held it, would not give rise to trademark rights.  Abhyanker—who runs a trademark prosecution firm—knows that.

Indeed the evidence could never support Abhyanker's claim that he acted in good faith. Such an assertion is gutted by evidence showing he manufactured documents to support his claims of priority, and hence, knew those claims to be false.  This includes his fabrication of use on his eDirectree site, his fabrication of content allegedly contained in diligence materials given to potential investors in 2007, and three fabricated assignment agreements to support his claim of standing.  *See, e.g.*, Exs. 101; 183; 186; 188, Ex. G; 196; 239; 251; and 456.  This renders incredible any assertion by Abhyanker that he believed, in good faith, that he had senior rights in the NEXTDOOR mark at the time he was operating his imitation website.

Dated:   November 10, 2014        FENWICK & WEST LLP

By: */s/ Laurence F. Pulgram*
    Laurence F. Pulgram

Attorneys for Plaintiff
NEXTDOOR.COM, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO